# IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF MICHIGAN

**1:20-cv-731**
Janet T. Neff - U.S. District Judge
Sally J. Berens - U.S. Magistrate Judge

H. H.,          )

J. H.;          )

v.              )

FILED - KZ
August 5, 2020 11:56 AM
U.S. DISTRICT COURT
Case !   WESTERN DISTRICT OF MICHIGAN
___mg_   Scanned by Ens/8/5

THOMACA BUSH,        )

 STACEY STROUSE,   )

SIDRA ALVI-WALLER,)

PETER BROWN,        )

MARISA ANDERSON, )

 RICHARD GARCIA,   )

JANE DOE DEFENDANT No. ONE (1), )

RITA ERMATINGER,  )

JANE DOE DEFENDANT No.  TWO (2), )

JANE DOE DEFENDANT No. THREE (3), )

TONYA MARTINEZ,    )

ELIZABETH MONTEMAYOR, )

HERMAN MCCALL;   )

## PRELIMINARY STATEMENT

1. This complaint contains federal and state claims against the Defendants for conduct depriving the plaintiffs of rights, privileges, or immunities guaranteed under federal law and the U.S. Constitution under the color of the law during a child protective investigation and removal of the H. Family children.

2. The defendants actions were unconstitutional, failing strict scrutiny and lacking a rational basis.

3. The remedies sought include costs, damages including punitive damages, injunctive relief and declaratory judgement against the Defendants.

4. The plaintiffs have filed this complaint with a motion for a protective order and here in refer to themselves as H. H., J. H. and the H. family collectively.

5. MDHHS herein refers to Michigan Department of Health and Human Services, CPS refers to the MDHHS division of Child Protective Services and DCFS refers to the Illinois Department of Children and Family Services.

6. Thomaca Bush is an Ingham County MDHHS CPS Investigator, and is being sued in her individual and official capacities.

7. Stacey Strouse was the acting Ingham County Deputy Juvenile Register, and is being sued in her individual and official capacities.

8. Sidra Alvi-waller was an Ingham County Deputy Juvenile Register, and is being sued in her individual and official capacities.

9. Peter Brown is the Ingham County Court Attorney Referee, in his individual and official capacities for administrative duties and judicial acts taken in "complete absence of all jurisdiction".

10. Marisa Anderson is an Ingham County MDHHS employee, and is being sued in her individual and official capacities.

11. Richard Garcia is the Ingham County Court Chief Probate Judge, in his official capacity as the head of the Ingham County Court.

12. Jane Doe Defendant No. One (1) is a Champaign County Illinois DCFS worker, and is being sued in her individual and official capacities.

13. Rita Ermatinger is an Ingham County MDHHS CPS Employee, and is being sued in her individual and official capacities.

14. Jane Doe Defendant No. Two (2) is a MDHHS CPS Employee, identity uncertain and maybe Thomaca Bush and is being sued in her individual and official capacities.

15. Jane Doe Defendant No. Three (3) is a MDHHS CPS Employee, identity uncertain and maybe Rita Ermatinger and is being sued in her individual and official capacities.

16. Tonya Martinez was an Ingham County MDHHS CPS Supervisor, and is being sued in her individual and official capacities.

17. Elizabeth Montemayor is the Ingham County MDHHS CPS Division Manager, and is being sued in her individual and official capacities as the head of Ingham County CPS.

18. Herman Mccall is the MDHHS Executive Director of Children's Services Agency, and is being sued in his official capacity as the head of MDHHS.

19. The H. Family brings this complaint after on September 29th 2018, in Champaign County Illinois, when they were Illinois residents returning from a camping trip to Michigan, the H. Family's minor children were unlawfully removed from their care, in violation of state and federal law, with multiple substantive and procedural due process violations and kidnapped across state lines, to Michigan by the defendants as enumerated in the Statement of facts.

20. The government action in this case, removing the H. Family's children, encroached upon the H. Family's substantive due process right to familial integrity.

21. Defendants engaged in a conspiracy to deprive the H. Family of their constitutional rights and circumvent due process as set forth by clearly valid statutes.

22. The Defendants' conduct in depriving the H. Family of their protected liberty interests goes beyond mere negligence and instead are grossly negligent, deliberately indifferent, intentional and/or based on malicious intent as to each Defendant in their respective actions as described in the statement of facts.

23. Defendants employed by MDHHS were or should have been aware of the clearly established rights of the H. Family because MCL 722.628 (17) states; "All department employees involved in investigating child abuse or child neglect cases shall be trained in the legal duties to protect the state and federal constitutional and statutory rights of children and families from the initial contact of an investigation through the time services are provided."

24. Defendants employed by MDHHS were or should have been aware of the clearly established rights of the H. Family, when MDHHS maintains a Michigan Child Welfare Law manual (MCWL) and CPS employees are trained on this manual.

25. Defendants were or should have been aware of the clearly established rights of the H. Family, when Ingham County CPS workers had been defendants of a prior Section 1983 lawsuit in O'Donnell v. Brown, 335 F. Supp. 2d 787 (WD Mich 2004) and this case is taught to CPS workers in the "MCWL".

26. No reasonable official in MDHHS employees shoes would have believed that his or her conduct was authorized by state or constitutional law because there were clear laws to the contrary; furthermore they received direct training on these laws and court holdings

demonstrating previously held jurisprudence.

27. The Ingham County Court, Ingham County CPS and MDHHS failed to train their employees in their legal duties to protect the state and federal constitutional and statutory rights of children and families.

28. The Ingham County Court, Ingham County CPS and MDHHS failed to supervise their employees, who failed in their legal duties to protect the state and federal constitutional and statutory rights of children and families.

29. The petition and the direct testimony of Thomaca Bush clearly state constitutional rights were asserted and she was on heightened notice of her violations when H. H. was directly quoting statutes to her.

30. The 4th Amendment of the United States Constitution required no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

31. The Sixth Circuit has established courts have recognized in various situations a fundamental liberty interest in familial integrity. O'Donnell v. Brown, 335 F. Supp. 2d 787, 813 (W.D. Mich. 2004)

32. The Sixth Circuit has established this interest includes parents' rights to make decisions about the care, custody, and management of their children. O'Donnell v. Brown, 335 F. Supp. 2d 787, 813 (W.D. Mich. 2004)

33. The Sixth Circuit has established there is "a fundamental liberty interest of natural parents in the care, custody, and management of their children. O'Donnell v. Brown, 335 F. Supp. 2d 787, 813 (W.D. Mich. 2004)

34. The Sixth Circuit has established parents and children have a well-elaborated constitutional right to live together without governmental interference. O'Donnell v.

Brown, 335 F. Supp. 2d 787, 813 (W.D. Mich. 2004)

35. The Sixth Circuit has established that a parent has a liberty interest in familial association and privacy that, absent extraordinary circumstances, cannot be violated without adequate pre-deprivation procedures. O'Donnell v. Brown, 335 F. Supp. 2d 787, 813 (W.D. Mich. 2004)

36. The Sixth Circuit has established the substantive component of the Due Process Clause provides "heightened protection against government interference with certain fundamental rights and liberty interests." O'Donnell v. Brown, 335 F. Supp. 2d 787, 813 (W.D. Mich. 2004)

37. The Sixth Circuit has established that in the absence of exigent circumstances or a court order authorizing the children to be seized and placed in protective custody, children can not be removed without notice to the parents. O'Donnell v. Brown, 335 F. Supp. 2d 787, 813 (W.D. Mich. 2004)

38. The Sixth Circuit has established due process also means that governmental officials will not remove a child from his home without an investigation and pre-deprivation hearing resulting in a court order of removal, absent exigent circumstances. O'Donnell v. Brown, 335 F. Supp. 2d 787, 813 (W.D. Mich. 2004)

39. The Sixth Circuit has established removal of children from the custody of their parents requires pre deprivation notice and a hearing except for extraordinary situations where some valid governmental interest is at stake that justified postponing the hearing until after the event. O'Donnell v. Brown, 335 F. Supp. 2d 787, 813 (W.D. Mich. 2004)

40. The Sixth Circuit has established only where a child's life is in imminent danger or where there is immediate danger of severe or irremediable injury to the child's health (and prior judicial authorization is not immediately obtainable) may an official summarily assume

custody of a child from his parents. O'Donnell v. Brown, 335 F. Supp. 2d 787, 813 (W.D. Mich. 2004)

41. The Sixth Circuit has established post-deprivation remedies will be adequate only when pre-deprivation remedies were "impossible." O'Donnell v. Brown, 335 F. Supp. 2d 787, 813 (W.D. Mich. 2004)

42. The Sixth Circuit has established courts permit post-deprivation process to make up for lack of pre-deprivation process when government officials commit "random or unauthorized" acts, but when government officials act according to an "established state procedure that itself violates due process rights," post-deprivation remedies are inadequate. O'Donnell v. Brown, 335 F. Supp. 2d 787, 813 (W.D. Mich. 2004)

43. The Sixth Circuit has established due process requires a valid, written court order for the removal of the children before children can be seized absent exigent circumstances or probable cause. O'Donnell v. Brown, 335 F. Supp. 2d 787, 813 (W.D. Mich. 2004)

44. The Sixth Circuit has established an ex parte hearing based on misrepresentation and omission does not constitute notice and an opportunity to be heard. O'Donnell v. Brown, 335 F. Supp. 2d 787, 813 (W.D. Mich. 2004)

45. The Sixth Circuit has established the Fourth Amendment applies to CPS workers, as it does to all other officers and agents of the state whose requests to enter, however benign or well-intentioned, are met by a closed door. There is ... no social worker exception to the strictures of the Fourth Amendment. Walsh v. Erie County Dept. of Job and Family Serv., 240 F. Supp. 2d 731 - Dist. Court, ND Ohio 2003 and O'Donnell v. Brown, 335 F. Supp. 2d 787, 813 (W.D. Mich. 2004)

46. The Sixth Circuit has established there can be no doubt that the state can and should protect the welfare of children who are at risk from acts of abuse and neglect. There

likewise can be no doubt that occasions arise calling for immediate response, even without prior judicial approval. But those instances are the exception. Otherwise child welfare workers would have a free pass into any home in which they have an anonymous report of poor housekeeping, overcrowding, and insufficient medical care and, thus, a perception that children may be at some risk. Walsh v. Erie County Dept. of Job and Family Serv., 240 F. Supp. 2d 731 - Dist. Court, ND Ohio 2003

47. The Sixth Circuit has established this is not to say that CPS workers could have done nothing in response to reports of abuse or neglect but once the plaintiffs declined to be responsive, CPS workers are obligated by the Constitution to depart, and to leave the family alone and in peace until such time as more information was learned from other, and more trustworthy sources. If, at that point, the family refuse to cooperate, CPS workers have several options, including filing of an abuse or neglect complaint and seeking an emergency removal order pursuant to state laws, CPS workers electing to forego those options, then a reasonable jury could find, violates the Fourth Amendment. Walsh v. Erie County Dept. of Job and Family Serv., 240 F. Supp. 2d 731 - Dist. Court, ND Ohio 2003

48. The Sixth Circuit has established an investigation must occur before filing of an abuse or neglect complaint and seeking an emergency removal order, based on probable cause, pursuant to state laws and that anonymous reports of poor housekeeping, overcrowding, and insufficient medical care and, thus, a perception that children may be a some risk is not probable cause. Walsh v. Erie County Dept. of Job and Family Serv., 240 F. Supp. 2d 731 - Dist. Court, ND Ohio 2003

49. The Sixth Circuit has clearly established prosecutorial immunity is not a defense for the execution of a removal order that would not have been issued but for known falsities that

the social worker provided to the court to secure the order. Brent v. Wayne Co. Dept. of Human Services, 901 F.3d 656, 685 (6th Cir. 2018)

50. The Sixth Circuit has directly held that a social worker, like a police officer, cannot execute a removal order that would not have been issued but for known falsities that the social worker provided to the court to secure the order. Brent v. Wayne Co. Dept. of Human Services, 901 F.3d 656, 685 (6th Cir. 2018)

51. The Sixth Circuit has clearly established Ex Parte Young doctrine provides a limited exception to the sovereign immunity bar, in that litigants may seek certain forms of relief by naming the relevant state officer, in his official capacity, as a defendant and does not preclude actions against state officials sued in their official capacity for prospective injunctive or declaratory relief. Brent v. Wayne Co. Dept. of Human Services, 901 F.3d 656, 685 (6th Cir. 2018)

52. MDHHS continued inclusion of the H. Family on the central registry, practices to use historical records as evidence, practices and written policies surrounding "orders to cooperate", a failure to supervise and a failure to train creates a certainly imminent threat that finding the H. Family Children in the same circumstance would be presumed to be ongoing neglect and the findings would be used as evidence of failure of prior reasonable efforts triggering another petition and likelihood of repeat violations.

53. MDHHS did and continues to use historical child protective services records as evidence without regards to the court disposition, even after those records were amended and expunged for lack of allegations meeting statutory authority pursuant to Julie Q. V. Illinois Department of Children and Family Services (March 21, 2013).

54. The H. Family faces a substantial risk' that the harm will occur from the challenged practices and policies greater than any other parent in Michigan because they travel while

asserting residency rights in Illinois and; and live a lifestyle viewed as "homeless"; MDHHS encourages over reporting of "concerns", educating the public on potential indicator of neglect or abuse which lead the reporting of children playing on the barenaked earth and 5 years potty accident playing as " poor hygiene" and failing to educate MDHHS employees Michigan statutes only has jurisdiction if there is no habitable shelter provided or when homelessness is accompanied by dependency and danger of substantial physical or psychological harm and MDHHS instead maintains written policies such as "The family is homeless or about to be evicted (current eviction notice)" as a criteria; Michigan juvenile statutes do not direct any inquiry into out of state court orders only in state orders, and; MDHHS policies fail to train on transferring a case to the proper state during an investigation, only addressing interstate compacts after formal jurisdiction has been acquired.

55. The Ingham County Court had a complete absence of judicial authority to initiate proceedings in the Ingham County case four (4) days before a verified petition was filed with the court and no exigent circumstances existed.

56. The Ingham County Court had a clear absence of judicial authority to hold hearings four (4) days before a verified petition was filed and no exigent circumstances existed.

57. The Ingham County Court were deprived of a complete absence of judicial authority to assume jurisdiction in the Ingham County case under the UCCJEA and relevant state statutes when the petition notifies the court the children have not been residents of the state for six (6) months providing less than 60 days of in state presence only, clearly indicating no residence had been established and; that a child subject to the proceedings were subject to prior court orders out of state and; the court does not make any finding of an emergency under 204 of the UCCJEA, fails to make any findings "the child's

immediate removal from those surroundings is necessary to protect the child's health and safety", fails to afford the parent notice and opportunity to be heard and never consults with the other court having continuing jurisdiction.

58. Thomaca Bush was told mere minutes before the electronic filing of a non verified petition that the H. Family would need to be served at the Illinois address via mail and state statute clearly mandated such service if personal service could not be achieved in Michigan.

59. The H. Family does not meet any legal definition of homeless as defined by any statute when they do have a home to go to if they weary of their travels, can afford a home but travel by choice and were unable to receive mail at an non residential government location they had departed from prior to the initiation of the Ingham County case.

60. The Ingham County Court maintains policy and practices that are with clear absence of judicial authority when they violate clearly established statutes in a manner that affects all juvenile cases filed in this manner.

61. When a judicial officer knows that he lacks jurisdiction, or acts in the face of clearly valid statutes or case law expressly depriving him of jurisdiction, judicial immunity is lost.

62. The Ingham County defendants do not enjoy quasi-judicial immunity or judicial immunity for acts in the face of clearly valid statutes.

63. The Sixth Circuit has held that "a judicial officer acts in the clear absence of jurisdiction only if he knows that he lacks jurisdiction, or acts despite a clearly valid statute or case law expressly depriving him of jurisdiction." Mills v. Killebrew, 765 F.2d 69, 71 (6th Cir.1985)

64. The H. Family was investigated in Ingham County Michigan, for "concerns" that did not meet statutory definitions of abuse or neglect under Michigan Child Welfare law and

MDHHS was without statutory authority to investigate.

65. Thomaca Bush/MDHHS investigated the H. Family for "concerns" of "potential neglect indicators", traveling and homeschooling their children eventually placing the children in public school against the H. Family's wishes despite the foster parent being willing to provide home education, with no proffer of evidence to support educational neglect.

66. Thomaca Bush fabricated evidence of suspected untreated mental illness, misrepresented the level of H. H. cooperation and falsely claimed that the H. Family had absconded; making false statements as a complaining witness.

67. Thomaca Bush withheld exonerating evidence of out of state residency, personal knowledge of evidence of mental health treatment, that the prior drug use was as the result of medical treatment, not substance abuse with H. H. passing a drug and alcohol assessment at the time, the H. Family had asserted an affirmative defense to marijauna use as a valid card holding medical marijauna patients, providing such proofs and that the H. Family was cooperating in providing exonerating evidence.

68. The H. Family's minor children were unlawfully removed from their care, without statutory authority, with no probable cause basis, based on fabricated claims and third party gossip with no identified original witness or colleraberating evidence.

69. The H. Family Children were seized across state lines in excess of a now missing from the court file and unfiled ex parte order, with no judges signature, this order had state line limits directly marked on it, without the jurisdictional procedures under the UCCJEA and the corresponding state statues being followed, with neither court being notified of the jurisdictional issue and this order was based on affidavit that did not contain probable cause instead contained false statements from the complaining witness and was the result of fraud upon the court.

70. The Plaintiffs make a collateral attack on the ex parte protective custody order as void in ab initio.

71. Defendants initiated the Ingham County proceeding in a manner that violated state laws, court rules and created constitutional rights violations when it was initiated with a phone call requesting the scheduling of a same day preliminary hearing, on a petition for in home jurisdiction, before the submission of a written petition or written request for action, without exigent circumstances and children were not in custody.

72. The original petition electronically emailed to the Referee Peter Brown was for in home jurisdiction of the children only, not removal and is not verified by affidavit or signature of the complainant.

73. Defendants used same day preliminary hearings without statutory authority and in violation of statutes directing a 72 hour to 14 day notice, denying the H. Family their right to adequate notice and an opportunity to be heard.

74. Defendants propagated their own policies surrounding notice and opportunity to be heard that violated state statutes, court rules and the constitutional rights of the H. Family.

75. The Defendants enforced "unfiled" "recommended orders after preliminary hearing" prior to judicial review and the issuance of a written court order, in "clear absence of all jurisdiction" and this order was enforced before it was due, in excess of its limits.

76. On or about September 28th 2018, between the hours of 2:10 pm and 8:30 pm Defendants falsely purported that a court had issued a valid written court order with the "Unfiled" "Recommended" "Order after Preliminary Hearing" signed by Referee Peter Brown in the recommendation section only; to take the H. Family's children into state custody, extradite them to Michigan, placing them in foster care and that failure to turn over children was in violation of a valid court order.

77. On or about September 28th 2018, between the hours of 2:10 pm and 8:30 pm there was no written court order in existence, only a recommendation for an order and nothing filed in the case had been formally file stamped with the court.

78. On or about September 28th 2018, before 8:30 pm, there was no written court order for protective custody nor was there a recommended court order for protective custody.

79. On or before September 28th 2018, at 8:30 pm, there was a recommended court order for constructive removal, where children were recommended to be placed in "care and supervision" of MDHHS but maintain the children in their home and not protective custody subject to MDHHS's discretion on parenting time parameters.

80. This recommendation did not become a written court order until it was signed by a judge and filed 3 days later on October 1st 2018.

81. Defendants appear to have operated under the presumption a phone call to H. H. notifying her of the intention to file a petition "for cooperation", was in effect a "constructive removal" under the Ingham County practices.

82. No actual removal had occurred yet, when Ingham County Referee Peter Brown found the children removed on September 28th 2018, instead the children were actually physically removed the following day.

83. Constructive removals are not authorized under Michigan law, as in home jurisdiction cases, the court retains jurisdiction and custody is not placed with MDHHS.

84. Michigan State laws require placement orders that consist of "in-home placement" orders and/or "protective custody orders" not open ended discretion of MDHHS.

85. Protective custody orders with statutory findings are required for MDHHS to physically seize children in Michigan.

86. Thomaca Bush lacked probable cause and failed to make an oath or affirmation to support her fraudulent claims.

87. Thomaca Bush did not describe the place to be searched or entered because it would reveal out of state residency.

88. Michigan had no jurisdiction over the H. Family, was required to let them go on their planned travel, was required to by statute attempt to achieve service by mail when the H. Family was not present in Michigan for personal service and could not deem their return to their home state prior to a decision to file a petition absconding after law enforcement cleared the H. Family of any crime.

89. Michigan had no authority to require the H. Family to forego jurisdictional challenges and surrender to unconstitutional local practices.

90. Thomaca Bush made intentional or reckless false statements in the affidavit in support of the apprehension orders.

91. Thomaca Bush lacked a good-faith exception for bypassing the ex parte protective custody order process and instead tried to enforce non existent court orders when she was seeking further court orders to effectuate a seizure without the court having made findings placing the children in protective custody.

92. The resulting Ex Parte Protective Order clearly indicated further post deprivation hearings were required the next business day and Thomaca Bush did not return this "warrant" as "executed" as required by law.

93. Parents must be afforded due process protections including notice and opportunity to be heard, for MDHHS to change a placement of children subject to "in home jurisdiction", from in home placement to "protective custody".

94. Thomaca Bush sought apprehension orders to enforce prior court orders that did not exist

and made prejurious claims in an affidavit for apprehension orders; leading to erroneous findings including that the children had been placed into protective custody via a prior court order.

95. Seeking apprehension orders without further hearings violated the H. Family's right to notice and opportunity to be heard at both pre-deprivation and post-deprivation stages.

96. On October 1st 2018 the Defendants failed to hold a post deprivation hearing as required by law, did not release the children, instead of taking the children to court the next business day, Thomaca Bush was personally in physical control of the children, sought and authorized forensic medical exams on the children, without parental consent and before a court order was signed by a judge and then placed the children in a second foster home.

97. Defendants feloniously took away and avoided an original petition electronically filed September 28th 2018, to keep the children in the home and filed an altered petition rather than amended petition for removal on October 2nd 2018, without due process notice of the material change in relief requested, for the purpose of avoiding a judgement on the original petition leaving children in the home.

98. MDHHS Defendants were trained by the MCWL that is clearly established in "In re AMB, 248 Mich.App. 144 (2001)" that parents must be given due process notice and opportunity to be heard when there is an amended petition filed.

99. Defendants seized and held the plaintiffs children without a required post deprivation hearing within 24 hours or the next business day and/or did not release the children as required, instead holding them for 61 days until dismissal of the state case on November 29th 2018.

100.      The resulting "Ex Parte Protective Custody Order" used to seize the children was

never filed with the court, failed to make the required finding to initially place children into protective custody and had state line limits to its enforceability.

101.    The Defendants feloniously took away and/or avoided filing the affidavit for apprehension orders and resulting "ex parte protective custody order(s)", to avoid a post deprivation hearing and the H. Family having an opportunity to be heard and present a meritorious defense.

102.    This "Ex Parte Protective Custody Order" was executed across state lines in excess of its limits.

103.    The only court order in the court file is for "care and supervision" and does not authorize seizure of the children.

104.    The only court order surrounding removal hearings in the Ingham County court file was not signed by a judge, issued and filed with the court until October 1st 2018 after the children were seized, illegally taken from Illinois and subjected to forensic medical exams without consent.

105.    The decision to seize and place the H. Family children into protective custody, was made by Thomaca Bush/MDHHS and not as a result of a judicial finding by the court.

106.    The Defendants failed to give the H. Family notice of their inclusion on the child abuse registry, failed to give them notice of their rights to contest this inclusion, notice of their rights to amendment and or expudgment of their CPS records and failed to remove the H. Family from the registry as required by statute when the court dismissed the petition on its merits, violating the 14th Amendment Equal Protection and Due Process clauses.

107.    The Ingham County Court and MDHHS has an appointment and funding scheme

for court appointed attorneys that violates statute(s), compromises the independence of these attorneys, deprives parents of the opportunity to be heard and denies parents effective counsel thus 6th amendment rights are implicated by these policies when the County has a stated goal of "early permanency".

108.    Because the Ingham County legal proceedings were tainted by no due process notice, fabricated evidence, withholding exonerating evidence, judicial overreach of a court referee in "clear absence of all jurisdiction", lack of valid court order for "placement" or "protective custody", and no post deprivation hearing the next business day yet the children were not released; the H. Family's children were illegally detained in protective custody for 61 days .

109.    The prosecution was in bad faith; and was part of a pattern of harassment against H. H. and J. H..

110.    Defendant Thomaca Bush was acting in retaliation of 1st amendment objections to constitutional rights violations.

111.    The petition(s) clearly indicate H. H. asserted constitutional rights and put Thomaca Bush on notice she was violating those rights.

112.    The petition(s) and court records indicate the state case was entirely about gaining cooperation during an investigation, to get past clearly raised constitutional right objections during an investigation and not because of some significant risk harm had been found.

113.    Thomaca Bush was acting in discrimination of a protected class (disability discrimination) after a reasonable accomodation was requested in violation of Illinois, Michigan and federal law.

114.    The Defendant, Thomaca Bush, denied the H. Family their 14th amendment rights

to equal protections of the state laws of both Illinois and Michigan for medical marijauna

patients despite H. H. directly quoting the law granting protections .

115.　　　Defendant, Thomaca Bush, knew or should have known that MDHHS and

Ingham County lacked "subject matter and personal jurisdiction" over the H. Family

pursuant to UCCJEA and Michigan Statutes, and that the Ingham County MDHHS could

not substantiate any allegations of abuse or neglect as defined by Michigan Child Welfare

Law.

116.　　　Defendant Thomaca Bush is not being sued for the filing of a petition itself but

the issues surrounding her investigative and administrative actions: calling in and

investigating her own hotline report with no reasonable cause to suspect abuse or neglect

as defined by Michigan Statutes, without a good faith basis for a reasonable suspicion of

child abuse or neglect, based on 3rd party gossip from a call directly to the local office,

not central intake, 48 hours after the incompleted hotline report of Dennis Baker;

initiating the proceedings without a verified petition; filing a petition for in home

juridiction or an "order to cooperate with an investigation" before offering services or

completing a field investigation; fabricated evidence; perjury; it was her decision to

remove the children and not the result of a judicial decision when she used the

apprehension order process before a dispositional hearing and no prior protective custody

order existed; enforcing orders after a preliminary hearing as "orders to cooperate with

the investigation" that have not been signed by a judge and did not place the children into

protective custody or release children from protective custody; seizing the children from

out of state without notifying either court of the clear jurisdictional issues; failing to

schedule a preliminary hearing after the children were in protective custody, instead of

promptly taking the children to court as required on the next business day she personally

authorized/sought forensic medical exams on the children (including sex abuse exam with no allegations) with no parental consent and no court order; committed felonious acts surrounding the taking away the original petition to leave children in the home; placing the H. Family on the child abuse registry without notice or completing an investigation; 1st amendment retaliation; disability discrimination; failure to accomidate and the due process issues she personally caused by her actions and inactions.

117.     The Defendants Stacey Strouse, and Sidra Alvi-waller were on notice that they had a legal duty to prepare all petitions for investigation, summons, writs and other necessary papers under MCL 712a.7 and wilfully neglected those duties.

118.     No reasonable official in Ingham County Juvenile Court Register employees shoes would have believed that his or her conduct was authorized by state or constitutional law because there were clear laws and court rules to the contrary; furthermore these laws and court rules directly instructed their duties by named job title and Ingham County has maintained written policy instructing on these duties.

119.     The Defendant Peter Brown was on notice that he had a legal duty to make a written signed report to the judge containing a summary of the testimony taken and a recommendation for the court's findings and disposition under MCL 712a.10 and wilfully neglected that duty.

120.     No reasonable official in an Attorney Referee shoes would have believed that his or her conduct was authorized by state or constitutional law because there were clear laws and court rules to the contrary; furthermore Defendant Peter Brown is a practicing Attorney in the Juvenile court system for years on contract with Ingham County and other attorney referees with such experience would be expected to know Child Protection Law, court rules and prior holdings in his circuit.

121.   Defendant Richard Garcia swore an oath to support the Constitution(s) of the United States and Michigan, as well as for faithful discharge of the duties of his office and willfully neglected those duties.

122.   No reasonable official in a Chief Probate Judges shoes would have believed that his or her conduct was authorized by state or constitutional law because there were clear laws and court rules to the contrary; furthermore Defendant Richard Garcia is a sitting Chief Probate Judge in the Juvenile court system with years of experience and other Judges in his position would be expected to know Child Protection Law, court rules and prior holdings in his circuit.

123.   The Defendants propagated policies and practices for "orders to cooperate with the investigation in the Child Protectives Services Manual "PSM" without statutory authority.

124.   The Defendants propagate their own policies and practices in the seeking of implementations of and execution of "orders after preliminary hearing" as "orders to cooperate" and there is not established policy describing such procedure in the "PSM" before the dispositional stage as services are voluntary till this stage per policy.

125.   The Defendants propagated their own policies and practices in the avoiding and taking away the original petition for in home jurisdiction; which was a felonious obstruction of public justice that violated the H. Family's equal protection and due process rights.

126.   The Defendants propagated their own policies and practices initiating proceedings based on a phone call and not a written petition.

127.   The Defendants propagated their own policies and practices surrounding scheduling same day hearings without statutory notice requirements being adhered to,

that resulted in removal of the H. Family children without notice and opportunity to be heard, when no exigent circumstances existed nor was there valid court order to seize the children already removed from Michigan.

128.    The Plaintiffs were deprived of their rights, privileges, or immunities guaranteed under federal law and the U.S. Constitution by the Defendant's conduct while the Defendants were acting under the color of law.

129.    The Defendants collective actions were not in good faith, there is proof of gross negligence and or deliberate indifference to a known risk, there were numerous violations of clear standards of law and some actions of the Defendants; were taken with malicious intent.

130.    To the point the Federal Court must review the state court rulings, the Plaintiffs attempt to "clear away" unconstitutional state-law policies going forward, and do not seek relief against any judgement issued in state court, as the H. Family were state court winners when their children were returned in the state court proceedings on November 29th 2018 pursuant to the Plaintiffs Motion(s) To Dismiss.

131.    The Plaintiffs only seek declaratory and injunctive relief for acts taken in an official capacity and limit their claims to monetary damages for acts in individual capacities not covered under established privileges of immunity.

## JURISDICTION AND VENUE

1.  This action is brought pursuant to 42 U.S.C. §§ 1920, 42 U.S.C. § 1983, 42 U.S.C. §

    1985, 42 U.S.C. §1986 and 42 U.S.C. §1988 to redress the deprivation by Defendants, at

    all times herein acting under color of state law, of rights secured to the H. Family under

    the United States Constitution, including the First, Fourth, Fifth, Ninth and Fourteenth

    Amendments, and under federal and state law where applicable.

2.  This Court has supplemental jurisdiction over Plaintiffs' H Family state law This court

    has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). Venue is proper here

    pursuant to 28 U.S.C. § 1391(b), 28 U.S.C. § 1367(a) because they are part of the same

    case and controversy described by Plaintiffs' federal claims, and independent original

    jurisdiction over H Family's state law claims pursuant to 28 U.S.C. § 1332 because this

    action is between citizens of different states and the matter in controversy exceeds the

    sum of $75,000, exclusive of interest and costs.

3.  Venue is proper in the Western District of Michigan pursuant to 28 U.S.C. § 1391(b)(1),

    (2), and (3), because most or all of the Defendants reside and may be found in the

    Michigan and a substantial part of the events giving rise to these claims occurred in

    Ingham County, Michigan .

## PARTIES

### Named Plaintiffs

1. Jane Doe Plaintiff, herein referred to as H. H. and John Doe Plaintiff, herein referred to as J.H., identities established in the Plaintiffs REFERENCE LIST pursuant to Rule 6 of the Federal Rules Of Civil Procedure, both residents of Tazewell County Illinois.

### Named Defendants

2. Thomaca Bush, Ingham County MDHHS Investigator; Stacey Strouse, Ingham County Court Deputy Juvenile Register; Peter Brown, Ingham County Court Referee; Jane Doe Defendant No. One, a Jane Doe defendant identity to be discovered through discovery, Champaign County Illinois DCFS; Sidra Alvi-waller, Ingham County Deputy Juvenile Register; Marisa Anderson, Ingham County MDHHS Supervisor; Richard Garcia, Ingham County Court Chief Probate Judge; Rita Ermatinger, Ingham County MDHHS Supervisor; Jane Doe Defendant No. Two (2), a Jane Doe defendant identity to be discovered through discovery, MDHHS Employee; Jane Doe Defendant No. Three (3), a Jane Doe defendant identity to be discovered through discovery, MDHHS Employee; Tonya Martinez, a Ingham County MDHHS Supervisor; Elizabeh Montemayor, Ingham County MDHHS CPS Program Manager; Herman Mccall, MDHHS Executive Director of Children's Services Agency.

## STATEMENT OF FACTS

For their Complaint, Plaintiffs H. H. and J. H. allege and state as follows.

1. H. H. is the product of the Illinois foster care system, going into care at 6 months old and being adopted at age 8.

2. The H. Family Children are the 4th generation of H. H. Family to be subject to removal by child protective services.

3. H. H. is permanently disabled as a result of medical conditions and co-existing mental health diagnosis related to her CPS related trauma beginning in her own childhood within the Child Protective Services system, however these conditions do not prevent her from parenting as evidenced by multiple psychological evaluations and integrated parenting assessments.

4. H. H. has had numerous run-ins with Child Protective Services because her history, mental health disability and socio-economic status increases "risk factors" on industry standard structured risk assessment tools and checklists.

5. The H. Family will always meet the risk criteria currently in use in the child protective services policies nationwide and have a greater likelihood of future CPS involvement then the average family due to the encouragement of CPS for the reporting mere "suspicions of abuse or neglect" without alleging probable cause and the government educates the public and mandated reporters on risk factors and potential indicators of child abuse and/or neglect but not the legal definitions of abuse or neglect when encouraging reporting of families to child protective services.

6. These run ins with CPS has resulted in 4 removals between 2005 and 2018 with only one adjudicated case from 2005.

7. The adjudication in the 2005 case did not find H. H. unfit and instead found her

"unable".

8. These 4 removals have led to the ultimate finding H. H. is a fit parent in each case and H. H. has not engaged in aggravating circumstances warranting deprivation of parental rights based on prior circumstances.

9. On or about December 13th 2005 in Tazewell County Illinois, H. H.'s eldest son, E. H. was the victim of severe child abuse, sustaining life threatening injuries at the hands of H. H.'s paramour at the time.

10. On or about December 13th 2005 H. H. was a single mother with no support system, who tragically chose a paramour to babysit while at work because she had no alternative care and had no prior knowledge of risk of harm or prior abusive behaviour.

11. On or about December 13th 2005 when H. H. discovered E. H. had been abused; she reacted appropriately seeking immediate medical care even when threatened with death when seeking to call 911 and cooperated fully with law enforcement and DCFS investigators.

12. H. H. did not seek to shield herself and acted in the child's best interest after the abuse and took immediate actions to protect the child from further abuse.

13. On or about December 13th 2005 the perpetrator admitted his guilt and lack of H. H. involvement, largely admitting to the threats against H. H. denying it was a death threat yet acknowledged a threat had been made, eventually pleading guilty to a class X felony of aggravated child abuse and was still incarcerated on September 28th 2018.

14. During the 2005 investigation H. H. home failed a safety inspection several days into the child's hospitalization, after not cleaning up the home including the child's last meal as to not tamper with a crime scene, improper storage of chemicals and other items but this was not the cause of any harm, nor did the conditions render the premises uninhabitable

and the conditions were rectified before the child was released into DCFS custody.

15. The child was removed because of the child abuse in which H. H. was not found to be the perpetrator. H. H. was not found to be unfit and was instead found "unable" after full litigation by the State in the Illinois 2005 case.

16. H. H. admits to E. H.'s being an abused child but at no fault of her own in the 2005 case, denies she had opportunity to prevent the injuries or that her children would be at risk in future as she addressed her "risk factors" had led to her child being at risk and she took immediate protective measures to mitigate such risks going forward.

17. In the 2005 case H. H. engaged in and demonstrated benefit from her services, these services where mostly set up by H. H., before a referral could be made, while the child was hospitalized, and before the child was placed in care; initial services were finished within 6 weeks of dispositional order and no court involvement was necessary to gain compliance with services.

18. Michigan Child protective statutes give full weight and credit to the final findings of other States in determining if aggravated circumstances exist.

19. Michigan Child protective statutes give full weight and credit to the court orders of other states that terminated parental rights in prior child protective proceedings if their laws are similar to Michigan Statutes.

20. The UCCJEA codified at 28 U.S. Code § 1738A, the long title is "Full faith and credit given to child custody determinations" and governs that Michigan was required to give full faith and credit to Illinois prior judicial findings.

21. A finding of "unable" in the Illinois 2005 case, is a no fault judicial finding and precludes Michigan from later finding H. H. "unfit" for the same circumstances without gathering more or better evidence about the 2005 case.

22. No new allegations have surfaced that MDHHS or DCFS gathered more or better evidence about the 2005 case leading to any evidence the "unable" finding was erroneous.

23. MCL 712A.2 (b) (1) requires a parent be "able to do so" and then neglect the child.

24. MCL 712A.2 (b) (1) states "Jurisdiction in proceedings concerning a juvenile under 18 years of age found within the county: (1) Whose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship. As used in this sub-subdivision: (A) "Education" means learning based on an organized educational program that is appropriate, given the age, intelligence, ability, and psychological limitations of a juvenile, in the subject areas of reading, spelling, mathematics, science, history, civics, writing, and English grammar. (B) "Neglect" means that term as defined in section 2 of the child abuse and neglect prevention act, 1982 PA 250, MCL 722.602. (C) "Without proper custody or guardianship" does not mean a parent has placed the juvenile with another person who is legally responsible for the care and maintenance of the juvenile and who is able to and does provide the juvenile with proper care and maintenance."

25. MCL 712A.2 (b) (2) states: "Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in. As used in this sub-subdivision, "neglect" means that term as defined in section 2 of the child abuse and neglect prevention act, 1982 PA 250, MCL 722.602."

26. Michican's statutory definitions are found in MCL 722.622 which states: " As used in this act: "(a) "Adult foster care location authorized to care for a child" means an adult foster care family home or adult foster care small group home as defined in section 3 of the adult foster care facility licensing act, 1979 PA 218, MCL 400.703, in which a child is placed in accordance with section 5 of 1973 PA 116, MCL 722.115. (b) "Attorney" means, if appointed to represent a child under the provisions referenced in section 10, an attorney serving as the child's legal advocate in the manner defined and described in section 13a of chapter XIIA of the probate code of 1939, 1939 PA 288, MCL 712A.13a. (c) "Central registry" means the system maintained at the department that is used to keep a record of all reports filed with the department under this act in which relevant and accurate evidence of child abuse or child neglect is found to exist. (d) "Central registry case" means a child protective services case that the department classifies under sections 8 and 8d as category I or category II. For a child protective services case that was investigated before July 1, 1999, central registry case means an allegation of child abuse or child neglect that the department substantiated. (e) "Centralized intake" means the department's statewide centralized processing center for reports of suspected child abuse and child neglect. (f) "Child" means a person under 18 years of age. (g) "Child abuse" means harm or threatened harm to a child's health or welfare that occurs through nonaccidental physical or mental injury, sexual abuse, sexual exploitation, or maltreatment, by a parent, a legal guardian, or any other person responsible for the child's health or welfare or by a teacher, a teacher's aide, or a member of the clergy. (h) "Child care organization" means that term as defined in section 1 of 1973 PA 116, MCL 722.111. (i) "Child care provider" means an owner, operator, employee, or volunteer of a child care organization or of an adult foster care location authorized to care for a child. (j) "Child

care regulatory agency" means the department of licensing and regulatory affairs or a successor state department that is responsible for the licensing or registration of child care organizations or the licensing of adult foster care locations authorized to care for a child. (k) "Child neglect" means harm or threatened harm to a child's health or welfare by a parent, legal guardian, or any other person responsible for the child's health or welfare that occurs through either of the following: (i) Negligent treatment, including the failure to provide adequate food, clothing, shelter, or medical care, though financially able to do so, or by the failure to seek financial or other reasonable means to provide adequate food, clothing, shelter, or medical care. (ii) Placing a child at an unreasonable risk to the child's health or welfare by failure of the parent, legal guardian, or other person responsible for the child's health or welfare to intervene to eliminate that risk when that person is able to do so and has, or should have, knowledge of the risk. (l) "Children's advocacy center" means an entity accredited as a child advocacy center by the National Children's Alliance or its successor agency or an entity granted associate or developing membership status by the National Children's Alliance or its successor agency. (m) "Citizen review panel" means a panel established as required by section 5106a of the child abuse prevention and treatment act, 42 USC 5106a. (n) "Member of the clergy" means a priest, minister, rabbi, Christian science practitioner, or other religious practitioner, or similar functionary of a church, temple, or recognized religious body, denomination, or organization. (o) "Controlled substance" means that term as defined in section 7104 of the public health code, 1978 PA 368, MCL 333.7104. (p) "CPSI system" means the child protective service information system, which is an internal data system maintained within and by the department, and which is separate from the central registry and not subject to section 7. (q) "Department" means the department of health and human services.(r) "Director"

means the director of the department. (s) "Expunge" means to physically remove or eliminate and destroy a record or report. (t) "Lawyer-guardian ad litem" means an attorney appointed under section 10 who has the powers and duties referenced by section 10. (u) "Local office file" means the system used to keep a record of a written report, document, or photograph filed with and maintained by a county or a regionally based office of the department. (v) "Nonparent adult" means a person who is 18 years of age or older and who, regardless of the person's domicile, meets all of the following criteria in relation to a child: (i) Has substantial and regular contact with the child. (ii) Has a close personal relationship with the child's parent or with a person responsible for the child's health or welfare. (iii) Is not the child's parent or a person otherwise related to the child by blood or affinity to the third degree. (w) "Online reporting system" means the electronic system established by the department for individuals identified in section 3(1) to report suspected child abuse or child neglect. (x) "Person responsible for the child's health or welfare" means a parent, legal guardian, person 18 years of age or older who resides for any length of time in the same home in which the child resides, or, except when used in section 7(2)(e) or 8(8), nonparent adult; or an owner, operator, volunteer, or employee of 1 or more of the following: (i) A licensed or registered child care organization. (ii) A licensed or unlicensed adult foster care family home or adult foster care small group home as defined in section 3 of the adult foster care facility licensing act, 1979 PA 218, MCL 400.703. (iii) A court-operated facility as approved under section 14 of the social welfare act, 1939 PA 280, MCL 400.14. (y) "Relevant evidence" means evidence having a tendency to make the existence of a fact that is at issue more probable than it would be without the evidence. (z) "Sexual abuse" means engaging in sexual contact or sexual penetration as those terms are defined in section 520a of the Michigan

penal code, 1931 PA 328, MCL 750.520a, with a child. (aa) "Sexual exploitation"
includes allowing, permitting, or encouraging a child to engage in prostitution, or
allowing, permitting, encouraging, or engaging in the photographing, filming, or
depicting of a child engaged in a listed sexual act as defined in section 145c of the
Michigan penal code, 1931 PA 328, MCL 750.145c. (bb) "Specified information" means
information in a children's protective services case record related specifically to the
department's actions in responding to a complaint of child abuse or child neglect.
Specified information does not include any of the following: (i) Except as provided in
this subparagraph regarding a perpetrator of child abuse or child neglect, personal
identification information for any individual identified in a child protective services
record. The exclusion of personal identification information as specified information
prescribed by this subparagraph does not include personal identification information
identifying an individual alleged to have perpetrated child abuse or child neglect, which
allegation has been classified as a central registry case. (ii) Information in a police agency
report or other law enforcement agency report as provided in section 7(8). (iii) Any other
information that is specifically designated as confidential under other law. (iv) Any
information not related to the department's actions in responding to a report of child
abuse or child neglect. (cc) "Structured decision-making tool" means the department
document labeled "DSS-4752 (P3) (3-95)" or a revision of that document that better
measures the risk of future harm to a child. (dd) "Substantiated" means a child protective
services case classified as a central registry case. (ee) "Unsubstantiated" means a child
protective services case the department classifies under sections 8 and 8d as category III,
category IV, or category V."

27. The statute, MCL 712A.19b (b) (ii) allowing termination of parental rights also requires

culpability on the part of the parent.

28. MCL 712A.19b (b) (ii) states: "The parent who had the opportunity to prevent the physical injury or physical or sexual abuse failed to do so and the court finds that there is a reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home."

29. MDHHS defines "Failure to Protect" as; "Knowingly allowing another person to abuse and/or neglect the child without taking appropriate measures to stop the abuse and/or neglect or to prevent it from recurring when the person is able to do so and has, or should have had, knowledge of the abuse and/or neglect", in written policy PSM 711-5.

30. Article IV of the United States Constitution requires Michigan to give "Full Faith and Credit" to the judicial proceedings of every other State including Illinois.

31. It is clearly established constitutional right as In Mills v. Duryee, 1t1 U.S. (7 Cranch) 481 (1813), when the United States Supreme Court ruled that the merits of a case, as settled by courts of one state, must be recognized by the courts of other states; state courts may not reopen cases which have been conclusively decided by the courts of another state.

32. The "Unable" finding prohibits Michigan courts from finding H. H. unfit for the 2005 circumstances as Michigan law requires a finding the parent was "able" to protect and failed to do so before a Michigan court can take jurisdiction under MCL 712a.2 (b) (1) .

33. Defendants unable to conclude that sufficient facts were established to support a conclusion that H. H. eldest son came within the provisions of MCL 712A.2(b)(1); MSA 27.3178(598.2)(b)(1) because of neglect or a refusal to provide proper or necessary care. The mere fact that an injury resulted does not necessarily establish that the injury was attributable to a failure to provide proper care. The facts in this case merely showed that H. H. entrusted the temporary care of her son to a friend who she thought could take

proper care of her child... The petition did not indicate that, at the time H. H. entrusted her son to her friend's temporary care, she had any basis to believe that her friend either would not or could not provide proper care. In re Waite, 468 NW 2d 912 (1991).

34. In the 2005 case only H. H. was offered services, J. H. was not a party to the case nor were the minor children J. H. Jr. or M. H., offered any services.

35. Services for H. H. in the 2005 case included individual counseling, DBT therapy, psychiatric medication, parenting classes, domestic violence victim classes, substance abuse evaluation, substance abuse education (no treatment), random drug testing and case management.

36. Services did not include homemaking services, H. H. was merely educated on the Illinois DCFS safety checklist to maintain compliance and those conditions were not found to exist in the Ingham County investigation.

37. Services for H. H. in the 2005 case was initiated by H. H. prior to court involvement and H. H. was extremely proactive in her services, having set up Domestic Violence classes, starting parenting classes and passing a drug and alcohol assessment while the child was hospitalized before protective custody was actually taken, voluntarily seeking paternal family placement.

38. H. H. was restored to fitness in the 2005 case and currently has joint custody of E. H. with no restrictions or supervision requirements.

39. There is no evidence to support a finding the 2005 case rendered the home unfit on September 28th 2018 as no evidence existed H. H. had the opportunity to prevent the abuse in 2005 and failed to take action, H. H. was never charged with, let alone convicted of a criminal offense in relation to the 2005 case, no further abuse has occurred, the perpetrator was still incarcerated and all conditions were mitigated by prior services.

40.  On or about February 2009 H. H. and the father of E. H. had a disagreement over homeschooling E. H. and the father sought an emergency order of protection in Tazewell County Illinois without allegations that arose to personal or subject matter jurisdiction.

41. In a clear absence of juridical authority, the same judge in the 2005 case without subject matter jurisdiction, granted relief beyond what was requested and ordered DCFS to investigate H. H. for her mental health issues.

42. As a result H. H. and J. H. voluntarily signed temporary guardianship of J. H. Jr. to the paternal grandmother, A. W. because J. H. was scheduled to fly back to Iraq to rejoin his United States Army Unit, the next morning and H. H. was under an active order of protection in Tazewell County with Peoria County DCFS claimed to the H. Family erroneously the allegations in the new order of protection were related to the prior injuries in 2005.

43.  No such allegations existed and the allegations were home education and H. H. was receiving mental health treatment.

44. Peoria County DCFS claimed having an active order of protection created "an environment-injurious to child" and called in a false report on H. H. which was assigned to Knox County DCFS for investigation.

45. H. H. and J. H. signed temporary guardianship to protect J. H. Jr. from judicial removal during the Knox County investigation.

46. After providing exonerating evidence H. H. sought to clarify the legal status of a voluntary safety plan with a call to Knox County Sheriff's Dept. and in response Peoria County sought emergency removal with no personal or subject matter jurisdiction as the child did not live in Peoria County and was not found in Peoria County.

47. Knox County Illinois DCFS violated H. H. constitutional rights in investigating H. H. in

the 2009 Illinois case with no allegation of abuse or neglect as defined under Illinois law.

48. Peoria County Illinois DCFS violated H. H. constitutional rights in requiring H. H. adhere to a safety plan after she sought legal clarification by Knox County Sheriff's Dept. if the safety plan was truly voluntary with no allegation of abuse or neglect as defined under Illinois law.

49. Peoria County Illinois DCFS violated H. H. constitutional rights in filing a petition with no allegation of abuse or neglect as defined under Illinois law for questioning the continued use of a safety plan.

50. The Peoria County petition was transferred to Knox County after a jurisdictional challenge.

51. To avoid a prolonged delay in the Knox County proceeding preventing adjudication because of J. H. Attorney asserting rights on J. H. under pursuant to "the Soldiers and Sailors Relief Act of 1940", H. H. consented to informal supervision in exchange for the immediate return of J. H. Jr. to the physical custody of H. H.

52. The purpose of this informal supervision was so J. H. could return from Iraq and dispose of the matter pursuant to "the Soldiers and Sailors Relief Act of 1940", as he retained his legal rights and got J. H. Jr. out of foster care placement in the interim.

53. H. H. was under duress and was offered in exchange for agreeing to court supervision, the immediate return of the child.

54. The 2009 Illinois case was dismissed the day after J. H. returned to Illinois from military service, without adjudication upon the State's emergency motion because no abuse or neglect could be substantiated and no services were needed.

55. The entire 2009 proceedings was the result of Illinois DCFS exceeding its statutory authority to even investigate H. H. pursuant to a class action settlement in Julie Q. V.

Illinois Department of Children and Family Services (March 21, 2013) the Illinois Supreme Court has held DCFS had no authority to investigate or indicate parents like H. H. for the DCFS allegation #60 because the legislature had expressly removed the "environment-injurious" phrase from Illinois law.

56. H. H. has an official letter from Illinois DCFS in reference to the 2009 case stating she had been removed from Illinois Child Abuse registry pursuant to a class action settlement in Julie Q. V. Illinois Department of Children and Family Services (March 21, 2013)

57. Michigan can not relitigate the 2009 case after the Illinois Supreme Court ruled Illinois had no authority to investigate or act upon allegation 60 and ordered the removal of 19,000 people from the Illinois registry including H. H..

58. Michigan must give full weight and credit to Julie Q. V. Illinois Department of Children and Family Services ruling under Article IV of the United States Constitution.

59. During the 2009 case only service offered to H. H. was a substance abuse evaluation which recommended no treatment.

60. J. H. was never engaged in any services by Illinois DCFS as he was not alleged to have committed any wrongdoing and was not present during pendency of the 2009 action as he was on active duty deployment to Iraq with the United States Army.

61. On or about March 14th 2011, H. H. sought treatment for J. H. medical conditions from the US Army related to his traumatic brain injury substantiated in Iraq in 2009 and was retaliated against with yet another call against the H. Family to CPS in Tennessee.

62. Tennessee CPS sent H. H. a letter indicating an open investigation.

63. H. H. consulted with an attorney who stated Tennessee CPS had a practice to take service member children faster because they use a loophole they fear the parents will take the child out of state.

64. This attorney incorrectly advised H. H. under UCCJEA Kentucky still had primary jurisdiction for 5 more months and since Kentucky had prior unfounded cases from the same reporters the case would be best handled in Kentucky.

65. However, Illinois still had primary jurisdiction under UCCJEA and the courts in Illinois were not consulted at any time during the pendency of the TN case.

66. This attorney advised H. H. to have law enforcement on Fort Campbell Army base verify with Tennessee CPS the child was fine and not met with Tennessee CPS only to deal with Kentucky.

67. Fort Campbell Military Police declined to get involved so it was decided H. H. would take the child to Kentucky CPS to verify the child's safety.

68. Tennessee CPS directed Kentucky to detain H. H., drug test H. H. and remove the child without a court order and Kentucky CPS informed them they would not do so and it was against their policy and practices.

69. Tennessee CPS then directed Todd County Sheriff to detain H. H. and the child and then Tennessee removed the child across state lines without a court order or consulting the courts in either Tennessee or Kentucky in violation of the UCCJEA.

70. Approximately two months later Tennessee CPS filed a motion to dismiss because they could not substantiate allegations, any misunderstanding was the result of H. H. having a history of trauma leaving her overprotective and the Department only took the child because H. H. removed the child from the jurisdiction.

71. Tennessee did not place the H. Family on the Tennessee Abuse Registry which is available for public access online.

72. Tennessee has a law that is used to seize children before probable cause has been developed based on a fear the parents may" remove the child from the jurisdiction.

73. Tennessee Code Title 37. Juveniles § 37-1-114 (a) (2) states: "or the child may abscond or be removed from the jurisdiction of the court, and in either case, there is no less drastic alternative to removal of the child from the custody of the child's parent, guardian, legal custodian or the person who physically possesses or controls the child available that would reasonably and adequately protect the child's health or safety or prevent the child's removal from the jurisdiction of the court pending a hearing."

74. Tennessee law and the UCCJEA did not allow Tennessee CPS to take custody across state lines without a court order, no probable cause, no due process and thus the removal was unlawful.

75. H. H. had not absconded with the child to avoid authorities and instead took the child to the authorities she believed had proper jurisdiction, who declined to get involved or take protective custody.

76. On or about June 2013 H. H. received a letter from Illinois DCFS State Central Register pursuant to the Julie Q class action settlement which she retained in her records and presented to Mellisa Wright, Ingham County foster care caseworker, was then provided to the Prosecuting Attorney.

77. This letter stated : "Dear Mrs H. H. You are receiving this notice because, according to our records, you had previously been investigated by the Department of Children and Family Services (DCFS) after a Hotline call was made to DCFS prior to July 13, 2012. DCFS previously made a decision that you had neglected a child and it put your name into the State Central Register (or "indicated" you) as a person who was considered responsible for child neglect. According to our records, you were indicated for DCFS Allegation #60: Environment Injurious to Health and Welfare." You should have received notice of this indicated finding for this allegation at the time which included an

explanation that your name would be placed on the State Central Register. At this time,
due to a recent court decision by the Illinois Supreme Court (Julie Q. v. IL DCFS), your
name has been removed from the State Central Register. You are no longer listed as
having been indicated for this specific allegation. However, if you have previously been
indicated on other allegation numbers this decision does not affect those indicated
findings. This letter, and the court case Julie Q. v. IL. Department of Children and Family
Services, also do not directly affect juvenile court or foster care cases. If you believe that
you are receiving this notice in error, or have any additional questions or concerns
regarding this notice, please contact the DCFS Advocacy Office at 800-232-3798 or 217-
524-2029 and have the SCR number listed above ready to provide. You may also find
more information on our website at:

It is important that you retain a copy of this important legal notice for your own records."

78. MCL 712A.2 (b) (6) (i) sunset on May 1st, 2018 limiting the court's authority to issue
orders affecting a party as necessary.

79. MCL 712A.2 (b) (6) (i) states: "In a proceeding under this chapter concerning a juvenile's
care and supervision, the court may issue orders affecting a party as necessary. This
subdivision does not apply after May 1, 2018. As used in this subdivision, "party" means
1 of the following: (i) In a delinquency proceeding, the petitioner and juvenile. (ii) In a
child protective proceeding, the petitioner, department, child, respondent, parent,
guardian, or legal custodian, and any licensed child caring institution or child placing
agency under contract with the department to provide for a juvenile's care and
supervision."

80. The family are Illinois residents, maintaining legal residency in Tazewell County Illinois
since July 2017, and since September 2017 traveling to membership resorts including 11

in Michigan of which 1 is in Ingham County.

81. The H. Family owns in a 2008 travel trailer, licensed and registered to their legal address in Illinois, which has 4 beds, (2 queens and 2 twins), 30 amp power, ducted propane heating, air conditioning, fresh water, kitchen, a full bath, self contained sewage system and found so suitable at all times by authorities.

82. The H. Family trailer is owned outright without a lien holder and is insured with a full time RVers policy that covers emergency housing cost in event damage occurred rendering travel trailer uninhabitable or in substandard conditions.

83. The H. Family bought into timeshare membership resorts for approximately $6500.00 providing the H. Family unlimited nights at full amenity resorts at no additional cost and were never at risk of not finding a parking site that was equipped with adequate safety and sanitary facilities.

84. The H. Family has a second RV membership providing the H. Family access to full amenity resorts from other chain timeshare resorts from $10 a night and were never at risk of not finding a parking site that is equipped with adequate safety and sanitary facilities.

85. No law or policy allows MDHHS employees to treat transient housing as "inadequate shelter".

86. No law or policy allows MDHHS employees to deem housing "unstable" simply because it is mobile when such housing is not in jeopardy.

87. According to a FEMA press release Release date: October 30, 2017 Release Number: DR-4337-FL FS 020 "FEMA, in partnership with state and local governments, may provide Direct Temporary Housing Assistance in the form of travel trailers to eligible applicants. Travel trailers are temporary living quarters that can be towed by a light duty

truck. They are fully licensed, on wheels or a jacking system, attached to the site only by quick disconnect-type utilities and secured."

88. MCL 125.402 Housing law of Michigan defines (1) Dwelling. A "dwelling" is any house, building, structure, tent, shelter, trailer or vehicle, or portion thereof, (except railroad cars, on tracks or rights-of-way) which is occupied in whole or in part as the home, residence, living or sleeping place of 1 or more human beings, either permanently or transiently.

89. MCL 125.402 further states: "A house trailer or other vehicle, when occupied or used as a dwelling, shall be subject to all the provisions of this act, except that house trailers or other vehicles, duly licensed as vehicles, may be occupied or used as a dwelling for reasonable periods or lengths of time, without being otherwise subject to the provisions of this act for dwellings, when located in a park or place designated or licensed for the purpose by the corporate community within which they are located: Provided, That such parking sites are equipped with adequate safety and sanitary facilities. (1a). "

90. MCL 125.402 also defines: "Sub-standard dwelling" is a dwelling of any class which is not so equipped as to have each of the following items: running water, inside toilets; or a dwelling which has either inadequate cellar drainage, defective plumbing, and inside room having no windows therein, improper exits or defective stairways so as to make such dwelling a fire hazard.".

91. No sub-standard conditions were alleged in the Ingham County petition.

92. City of Lansing's official website links a PDF to locate Sewage Waste Disposal Stations for Recreational Vehicles Disposal in the tri-county area which lists resort 3, the Ingham County campground and the Ingham County Fairgrounds as equipped with adequate safety and sanitary facilities.

93. The H. Family travels with intent to return to the Illinois address, they have personal effects in the home at the Illinois address, their mail is received at the Illinois address, DMV records have the H. Family at Illinois address, H. H. eldest son is in high school in their hometown and the H. Family was only temporarily in Michigan and does have a regular fixed address they return to with significant connection to their town and state, with substantial evidence available in the State of Illinois concerning the children's care, protection, training, and personal relationships and there is a court which has made a child-custody determination consistent with UCCJEA in respect to J. H. Jr. as referenced in the Ingham County petition.

94. No other state besides Illinois had jurisdiction as Illinois was the children's State of Residence for more than the prior six months preceding the Michigan case and the H. Family had only been temporarily absent with the intent to return.

95. 28 U.S. Code § 1738A (a) states: "The appropriate authorities of every State shall enforce according to its terms, and shall not modify except as provided in subsections (f), (g), and (h) of this section, any custody determination or visitation determination made consistently with the provisions of this section by a court of another State. (b) As used in this section, the term - (1) "child" means a person under the age of eighteen; (2) "contestant" means a person, including a parent or grandparent, who claims a right to custody or visitation of a child; (3) "custody determination" means a judgment, decree, or other order of a court providing for the custody of a child, and includes permanent and temporary orders, and initial orders and modifications; (4) "home State" means the State in which, immediately preceding the time involved, the child lived with his parents, a parent, or a person acting as parent, for at least six consecutive months, and in the case of a child less than six months old, the State in which the child lived from birth with any of

such persons. Periods of temporary absence of any of such persons are counted as part of the six-month or other period; (5) "modification" and "modify" refer to a custody or visitation determination which modifies, replaces, supersedes, or otherwise is made subsequent to, a prior custody or visitation determination concerning the same child, whether made by the same court or not; (6) "person acting as a parent" means a person, other than a parent, who has physical custody of a child and who has either been awarded custody by a court or claims a right to custody; (7) "physical custody" means actual possession and control of a child; (8) "State" means a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or a territory or possession of the United States; and (9) "visitation determination" means a judgment, decree, or other order of a court providing for the visitation of a child and includes permanent and temporary orders and initial orders and modifications. (c)A child custody or visitation determination made by a court of a State is consistent with the provisions of this section only if - (1)such court has jurisdiction under the law of such State; and (2) one of the following conditions is met: (A) such State (i) is the home State of the child on the date of the commencement of the proceeding, or (ii) had been the child's home State within six months before the date of the commencement of the proceeding and the child is absent from such State because of his removal or retention by a contestant or for other reasons, and a contestant continues to live in such State; (B) (i) it appears that no other State would have jurisdiction under subparagraph (A), and (ii) it is in the best interest of the child that a court of such State assume jurisdiction because (I) the child and his parents, or the child and at least one contestant, have a significant connection with such State other than mere physical presence in such State, and (II) there is available in such State substantial evidence concerning the child's present or future care, protection,

training, and personal relationships; (C) the child is physically present in such State and (i) the child has been abandoned, or (ii) it is necessary in an emergency to protect the child because the child, a sibling, or parent of the child has been subjected to or threatened with mistreatment or abuse; (D) (i) it appears that no other State would have jurisdiction under subparagraph (A), (B), (C), or (E), or another State has declined to exercise jurisdiction on the ground that the State whose jurisdiction is in issue is the more appropriate forum to determine the custody or visitation of the child, and (ii) it is in the best interest of the child that such court assume jurisdiction; or (E) the court has continuing jurisdiction pursuant to subsection (d) of this section. (d) The jurisdiction of a court of a State which has made a child custody or visitation determination consistently with the provisions of this section continues as long as the requirement of subsection (c)(1) of this section continues to be met and such State remains the residence of the child or of any contestant. (e) Before a child custody or visitation determination is made, reasonable notice and opportunity to be heard shall be given to the contestants, any parent whose parental rights have not been previously terminated and any person who has physical custody of a child. (f) A court of a State may modify a determination of the custody of the same child made by a court of another State, if - (1)it has jurisdiction to make such a child custody determination; and (2) the court of the other State no longer has jurisdiction, or it has declined to exercise such jurisdiction to modify such determination. (g) A court of a State shall not exercise jurisdiction in any proceeding for a custody or visitation determination commenced during the pendency of a proceeding in a court of another State where such court of that other State is exercising jurisdiction consistently with the provisions of this section to make a custody or visitation determination. (h) A court of a State may not modify a visitation determination made by a

court of another State unless the court of the other State no longer has jurisdiction to modify such determination or has declined to exercise jurisdiction to modify such determination."

96. 750 ILCS 36/102 states: "(1) "Abandoned" means left without provision for reasonable and necessary care or supervision. (2) "Child" means an individual who has not attained 18 years of age. (3) "Child-custody determination" means a judgment, decree, or other order of a court providing for the legal custody, physical custody, or visitation with respect to a child. The term includes a permanent, temporary, initial, and modification order. The term does not include an order relating to child support or other monetary obligation of an individual. (4) "Child-custody proceeding" means a proceeding in which legal custody, physical custody, or visitation with respect to a child is an issue. The term includes a proceeding for divorce, separation, neglect, abuse, dependency, guardianship, paternity, termination of parental rights, and protection from domestic violence, in which the issue may appear. The term does not include a proceeding involving juvenile delinquency, contractual emancipation, or enforcement under Article 3. (5) "Commencement" means the filing of the first pleading in a proceeding. (6) "Court" means an entity authorized under the law of a state to establish, enforce, or modify a child-custody determination. (7) "Home state" means the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding. In the case of a child less than six months of age, the term means the state in which the child lived from birth with any of the persons mentioned. A period of temporary absence of any of the mentioned persons is part of the period. (8) "Initial determination" means the first child-custody determination concerning a particular child. (9) "Issuing court" means the court that

makes a child-custody determination for which enforcement is sought under this Act. (10) "Issuing state" means the state in which a child-custody determination is made. (11) "Modification" means a child-custody determination that changes, replaces, supersedes, or is otherwise made after a previous determination concerning the same child, whether or not it is made by the court that made the previous determination. (12) "Person" means an individual, corporation, business trust, estate, trust, partnership, limited liability company, association, joint venture, government; governmental subdivision, agency, or instrumentality; public corporation; or any other legal or commercial entity. (13) "Person acting as a parent" means a person, other than a parent, who: (A) has physical custody of the child or has had physical custody for a period of six consecutive months, including any temporary absence, within one year immediately before the commencement of a child-custody proceeding; and (B) has been awarded legal custody by a court or claims a right to legal custody under the law of this State. (14) "Physical custody" means the physical care and supervision of a child. (15) "State" means a state of the United States, the District of Columbia, Puerto Rico, the United States Virgin Islands, or any territory or insular possession subject to the jurisdiction of the United States. (16) "Tribe" means an Indian tribe or band, or Alaskan Native village, which is recognized by federal law or formally acknowledged by a state. (17) "Warrant" means an order issued by a court authorizing law enforcement officers to take physical custody of a child."

97. 750 ILCS 36/107 states; "If a question of existence or exercise of jurisdiction under this Act is raised in a child-custody proceeding, the question, upon request of a party, must be given priority on the calendar and handled expeditiously."

98. 750 ILCS 36/110 states: "Communication Between Courts. (a) A court of this State may communicate with a court in another state concerning a proceeding arising under this Act.

(b) The court may allow the parties to participate in the communication. If the parties are not able to participate in the communication, they must be given the opportunity to present facts and legal arguments before a decision on jurisdiction is made. (c) Communication between courts on schedules, calendars, court records, and similar matters may occur without informing the parties. A record need not be made of the communication. (d) Except as otherwise provided in subsection (c), a record must be made of a communication under this Section. The parties must be informed promptly of the communication and granted access to the record. (e) For the purposes of this Section, "record" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form."

99. 750 ILCS 36/201 states: "Initial Child-Custody Jurisdiction. (a) Except as otherwise provided in Section 204, a court of this State has jurisdiction to make an initial child-custody determination only if: (1) this State is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this State but a parent or person acting as a parent continues to live in this State; (2) a court of another state does not have jurisdiction under paragraph (1), or a court of the home state of the child has declined to exercise jurisdiction on the ground that this State is the more appropriate forum under Section 207 or 208, and: (A) the child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this State other than mere physical presence; and (B) substantial evidence is available in this State concerning the child's care, protection, training, and personal relationships; (3) all courts having jurisdiction under paragraph (1) or (2) have declined to exercise jurisdiction on the ground that a court of this State is the more

appropriate forum to determine the custody of the child under Section 207 or 208; or (4) no court of any other state would have jurisdiction under the criteria specified in paragraph (1), (2), or (3). (b) Subsection (a) is the exclusive jurisdictional basis for making a child-custody determination by a court of this State. (c) Physical presence of, or personal jurisdiction over, a party or a child is not necessary or sufficient to make a child-custody determination."

100.     750 ILCS 36/202 states: "Exclusive, Continuing Jurisdiction. (a) Except as otherwise provided in Section 204, a court of this State which has made a child-custody determination consistent with Section 201 or 203 has exclusive, continuing jurisdiction over the determination until: (1) a court of this State determines that neither the child, the child's parents, and any person acting as a parent do not have a significant connection with this State and that substantial evidence is no longer available in this State concerning the child's care, protection, training, and personal relationships; or (2) a court of this State or a court of another state determines that the child, the child's parents, and any person acting as a parent do not presently reside in this State. (b) A court of this State which has made a child-custody determination and does not have exclusive, continuing jurisdiction under this Section may modify that determination only if it has jurisdiction to make an initial determination under Section 201."

101.     750 ILCS 36/204 states: " Temporary Emergency Jurisdiction. (a) A court of this State has temporary emergency jurisdiction if the child is present in this State and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse. (b) If there is no previous child-custody determination that is entitled to be enforced under this Act and a child-custody proceeding has not been

commenced in a court of a state having jurisdiction under Sections 201 through 203, a child-custody determination made under this Section remains in effect until an order is obtained from a court of a state having jurisdiction under Sections 201 through 203. If a child-custody proceeding has not been or is not commenced in a court of a state having jurisdiction under Sections 201 through 203, a child-custody determination made under this Section becomes a final determination, if it so provides and this State becomes the home state of the child. (c) If there is a previous child-custody determination that is entitled to be enforced under this Act, or a child-custody proceeding has been commenced in a court of a state having jurisdiction under Sections 201 through 203, any order issued by a court of this State under this Section must specify in the order a period that the court considers adequate to allow the person seeking an order to obtain an order from the state having jurisdiction under Sections 201 through 203. The order issued in this State remains in effect until an order is obtained from the other state within the period specified or the period expires. (d) A court of this State which has been asked to make a child-custody determination under this Section, upon being informed that a child-custody proceeding has been commenced in, or a child-custody determination has been made by, a court of a state having jurisdiction under Sections 201 through 203, shall immediately communicate with the other court. A court of this State which is exercising jurisdiction pursuant to Sections 201 through 203, upon being informed that a child-custody proceeding has been commenced in, or a child-custody determination has been made by, a court of another state under a statute similar to this Section shall immediately communicate with the court of that state to resolve the emergency, protect the safety of the parties and the child, and determine a period for the duration of the temporary order."

102.     750 ILCS 36/205. States: "Notice; Opportunity To Be Heard; Joinder. (a) Before a

child-custody determination is made under this Act, notice and an opportunity to be heard

in accordance with the standards of Section 108 must be given to all persons entitled to

notice under the law of this State as in child-custody proceedings between residents of

this State, any parent whose parental rights have not been previously terminated, and any

person having physical custody of the child. (b) This Act does not govern the

enforceability of a child-custody determination made without notice or an opportunity to

be heard. (c) The obligation to join a party and the right to intervene as a party in a child-

custody proceeding under this Act are governed by the law of this State as in child-

custody proceedings between residents of this State."

103.     750 ILCS 36/201 states: "(a) Except as otherwise provided in Section 204, a court

of this State has jurisdiction to make an initial child-custody determination only if: (1)

this State is the home state of the child on the (2) a court of another state does not have

jurisdiction under paragraph (1), or a court of the home state of the child has declined to

exercise jurisdiction on the ground that this State is the more appropriate forum under

Section 207 or 208, and: (A) the child and the child's parents, or the child and at least one

parent or a person acting as a parent, have a significant connection with this State other

than mere physical presence; and (B) substantial evidence is available in this State

concerning the child's care, protection, training, and personal relationships; (3) all courts

having jurisdiction under paragraph (1) or (2) have declined to exercise jurisdiction on

the ground that a court of this State is the more appropriate forum to determine the

custody of the child under Section 207 or 208; or (4) no court of any other state would

have jurisdiction under the criteria specified in paragraph (1), (2), or (3). (b) Subsection

(a) is the exclusive jurisdictional basis for making a child-custody determination by a

court of this State. (c) Physical presence of, or personal jurisdiction over, a party or a child is not necessary or sufficient to make a child-custody determination."

104.    750 ILCS 36/202 states: "(a) Except as otherwise provided in Section 204, a court of this State which has made a child-custody determination consistent with Section 201 or 203 has exclusive, continuing jurisdiction over the determination until: (1) a court of this State determines that neither the child, the child's parents, and any person acting as a parent do not have a significant connection with this State and that substantial evidence is no longer available in this State concerning the child's care, protection, training, and personal relationships; or (2) a court of this State or a court of another state determines that the child, the child's parents, and any person acting as a parent do not presently reside in this State. (b) A court of this State which has made a child-custody determination and does not have exclusive, continuing jurisdiction under this Section may modify that determination only if it has jurisdiction to make an initial determination under Section 201. (c) A court of this State shall continue to exercise exclusive jurisdiction and be considered the home state of a child if a parent moves with a child under subsection (h) of Section 609.2 of the Illinois Marriage and Dissolution of Marriage Act."

105.    MCL 722.1107 states: "If a question of existence or exercise of jurisdiction under this act is raised in a child-custody proceeding, upon request of a party, the question must be given priority on the court calendar and handled expeditiously."

106.    MCL 722.1110 states: "(1) A court of this state may communicate with a court in another state concerning a proceeding arising under this act. (2) The court may allow the parties to participate in the communication. If the parties are not able to participate in the communication, the parties shall be given the opportunity to present facts and legal arguments before a decision on jurisdiction is made. (3) A communication between courts

on schedules, calendars, court records, and similar matters may occur without informing

the parties. A record need not be made of that communication. (4) Except as provided in

subsection (3), a record must be made of a communication under this section. The parties

must be informed promptly of the communication and granted access to the record. (5)

For the purposes of this section, "record" means information that is inscribed on a

tangible medium or that is stored in an electronic or other medium and is retrievable in

perceivable form. Record includes each of the following: (a) Notes or transcripts of a

court reporter who listened to a conference call between the courts. (b) An electronic

recording of a telephone call. (c) A memorandum or electronic record of a

communication between the courts. (d) A memorandum or electronic record of a

communication between the courts that a court makes after the communication."

107.     MCL 722.1201 states: "(1) Except as otherwise provided in section 204, a court of

this state has jurisdiction to make an initial child-custody determination only in the

following situations: (a) This state is the home state of the child on the date of the

commencement of the proceeding, or was the home state of the child within 6 months

before the commencement of the proceeding and the child is absent from this state but a

parent or person acting as a parent continues to live in this state.(b) A court of another

state does not have jurisdiction under subdivision (a), or a court of the home state of the

child has declined to exercise jurisdiction on the ground that this state is the more

appropriate forum under section 207 or 208, and the court finds both of the following: (i)

The child and the child's parents, or the child and at least 1 parent or a person acting as a

parent, have a significant connection with this state other than mere physical presence.

(ii) Substantial evidence is available in this state concerning the child's care, protection,

training, and personal relationships. (c) All courts having jurisdiction under subdivision (a) or (b) have declined to exercise jurisdiction on the grounds that a court of this state is the more appropriate forum to determine the custody of the child under section 207 or 208. (d) No court of another state would have jurisdiction under subdivision (a), (b), or (c). (2) Subsection (1) is the exclusive jurisdictional basis for making a child-custody determination by a court of this state. (3) Physical presence of, or personal jurisdiction over, a party or a child is neither necessary nor sufficient to make a child-custody determination.

108.     MCL 722.1204 states "(1) A court of this state has temporary emergency jurisdiction if the child is present in this state and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse. (2) If there is no previous child-custody determination that is entitled to be enforced under this act and if a child-custody proceeding has not been commenced in a court of a state having jurisdiction under sections 201 to 203, a child-custody determination made under this section remains in effect until an order is obtained from a court of a state having jurisdiction under sections 201 to 203. If a child-custody proceeding has not been or is not commenced in a court of a state having jurisdiction under sections 201 to 203, a child-custody determination made under this section becomes a final child-custody determination, if that is what the determination provides and this state becomes the home state of the child. (3) If there is a previous child-custody determination that is entitled to be enforced under this act or if a child-custody proceeding has been commenced in a court of a state having jurisdiction under sections 201 to 203, an order issued by a court

of this state under this section must specify in the order a period of time that the court considers adequate to allow the person seeking an order to obtain an order from the state having jurisdiction under sections 201 to 203. The order issued in this state remains in effect until an order is obtained from the other state within the period specified or the period expires. (4) If a court of this state that has been asked to make a child-custody determination under this section is informed that a child-custody proceeding has been commenced in, or that a child-custody determination has been made by, a court of a state having jurisdiction under sections 201 to 203, the court of this state shall immediately communicate with the other court. If a court of this state that is exercising jurisdiction under sections 201 to 203 is informed that a child-custody proceeding has been commenced in, or a child-custody determination has been made by, a court of another state under a statute similar to this section, the court of this state shall immediately communicate with the court of the other state. The purpose of a communication under this subsection is to resolve the emergency, protect the safety of the parties and the child, and determine a period for the duration of the temporary order."

109.     MCL 722.1205 states "(1) Before a child-custody determination is made under this act, notice and an opportunity to be heard in accordance with the standards of section 108 must be given to each person entitled to notice under the law of this state as in child-custody proceedings between residents of this state, a parent whose parental rights have not been previously terminated, and a person having physical custody of the child. (2) This act does not govern the enforceability of a child-custody determination made without notice and an opportunity to be heard. (3) The obligation to join a party and the right to intervene as a party in a child-custody proceeding under this act are governed by the law of this state as in child-custody proceedings between residents of this state."

110.     MCL 722.1206 states "(1) Except as otherwise provided in section 204, a court of this state may not exercise its jurisdiction under this article if, at the time of the commencement of the proceeding, a child-custody proceeding has been commenced in a court of another state having jurisdiction substantially in conformity with this act, unless the proceeding has been terminated or is stayed by the court of the other state because a court of this state is a more convenient forum under section 207. (2) Except as otherwise provided in section 204, before hearing a child-custody proceeding, a court of this state shall examine the court documents and other information supplied by the parties as required by section 209. If the court determines that, at the time of the commencement of the proceeding, a child-custody proceeding has been commenced in a court in another state having jurisdiction substantially in accordance with this act, the court of this state shall stay its proceeding and communicate with the court of the other state. If the court of the state having jurisdiction substantially in accordance with this act does not determine that the court of this state is a more appropriate forum, the court of this state shall dismiss the child-custody proceeding. (3) In a proceeding to modify a child-custody determination, a court of this state shall determine whether a proceeding to enforce the child-custody determination has been commenced in another state. If a proceeding to enforce a child-custody determination has been commenced in another state, the court may do any of the following: (a) Stay the proceeding for modification pending the entry of an order of a court of the other state enforcing, staying, denying, or dismissing the proceeding for enforcement. (b) Enjoin the parties from continuing with the proceeding for enforcement. (c) Proceed with the modification under conditions it considers appropriate."

111.     MCL 722.1207 states "(1) A court of this state that has jurisdiction under this act

to make a child-custody determination may decline to exercise its jurisdiction at any time if it determines that it is an inconvenient forum under the circumstances and that a court of another state is a more appropriate forum. The issue of inconvenient forum may be raised upon the motion of a party, the court's own motion, or the request of another court. (2) Before determining whether it is an inconvenient forum, a court of this state shall consider whether it is appropriate for a court of another state to exercise jurisdiction. For this purpose, the court shall allow the parties to submit information and shall consider all relevant factors, including all of the following: (a) Whether domestic violence has occurred and is likely to continue in the future and which state could best protect the parties and the child. (b) The length of time the child has resided outside this state. (c) The distance between the court in this state and the court in the state that would assume jurisdiction. (d) The parties' relative financial circumstances. (e) An agreement by the parties as to which state should assume jurisdiction. (f) The nature and location of the evidence required to resolve the pending litigation, including the child's testimony. (g) The ability of the court of each state to decide the issue expeditiously and the procedures necessary to present the evidence. (h) The familiarity of the court of each state with the facts and issues of the pending litigation. (3) If a court of this state determines that it is an inconvenient forum and that a court of another state is a more appropriate forum, it shall stay the proceedings upon condition that a child-custody proceeding be promptly commenced in another designated state and may impose any other condition the court considers just and proper. (4) A court of this state may decline to exercise jurisdiction under this act if a child-custody determination is incidental to an action for divorce or another proceeding while still retaining jurisdiction over the divorce or other proceeding."

112.     MCL 722.1208 states "(1) Except as otherwise provided in section 204 or by other

law of this state, if a court of this state has jurisdiction under this act because a person

invoking the court's jurisdiction has engaged in unjustifiable conduct, the court shall

decline to exercise its jurisdiction unless the court finds 1 or more of the following: (a)

The parents and all persons acting as parents have acquiesced in the exercise of

jurisdiction.(b) A court of the state otherwise having jurisdiction under sections 201 to

203 determines that this state is a more appropriate forum under section 207. (c) No court

of another state would have jurisdiction under sections 201 to 203.(2) If a court of this

state declines to exercise its jurisdiction under subsection (1), the court may fashion an

appropriate remedy to ensure the safety of the child and prevent a repetition of the

unjustifiable conduct, including staying the proceeding until a child-custody proceeding

is commenced in a court having jurisdiction under sections 201 to 203 (3) If a court

dismisses a petition or stays a proceeding because it declines to exercise jurisdiction

under subsection (1), it shall charge the party invoking the jurisdiction of the court with

necessary and reasonable expenses including costs, communication expenses, attorney

fees, investigative fees, witness expenses, travel expenses, and child care expenses during

the course of the proceedings, unless the party from whom expenses and fees are sought

establishes that the award would be clearly inappropriate. The court may not assess fees,

costs, or expenses against this state unless authorized by law other than this act."

113.     MCL 722.1209 states "(1) Subject to the law of this state providing for

confidentiality of procedures, addresses, and other identifying information, in a child-

custody proceeding, each party, in its first pleading or in an attached sworn statement,

shall give information, if reasonably ascertainable, under oath as to the child's present

address, the places where the child has lived during the last 5 years, and the names and

present addresses of the persons with whom the child has lived during that period. The pleading or sworn statement must state all of the following: (a) Whether the party has participated, as a party or witness or in another capacity, in another child-custody proceeding with the child and, if so, identify the court, the case number of the child-custody proceeding, and the date of the child-custody determination, if any. (b) Whether the party knows of a proceeding that could affect the current child-custody proceeding, including a proceeding for enforcement or a proceeding relating to domestic violence, a protective order, termination of parental rights, or adoption, and, if so, identify the court, the case number, and the nature of the proceeding. (c) The name and address of each person that the party knows who is not a party to the child-custody proceeding and who has physical custody of the child or claims rights of legal custody or physical custody of, or parenting time with, the child. (2) If the information required by subsection (1) is not furnished, upon motion of a party or its own motion, the court may stay the proceeding until the information is furnished. (3) If the declaration as to an item described in subsection (1) is in the affirmative, the declarant shall give additional information under oath as required by the court. The court may examine the parties under oath as to details of the information furnished and other matters pertinent to the court's jurisdiction and the disposition of the case. (4) Each party has a continuing duty to inform the court of a proceeding in this or another state that could affect the current child-custody proceeding. (5) If a party alleges in a sworn statement or a pleading under oath that a party's or child's health, safety, or liberty would be put at risk by the disclosure of identifying information, the court shall seal and not disclose that information to the other party or the public unless the court orders the disclosure after a hearing in which the court considers the

party's or child's health, safety, and liberty and determines that the disclosure is in the interest of justice."

114.　　MCL 206.18 states "Resident" means: (1) (a) An individual domiciled in the state. "Domicile" means a place where a person has his true, fixed and permanent home and principal establishment to which, whenever absent therefrom he intends to return, and domicile continues until another permanent establishment is established. If an individual during the taxable year being a resident becomes a nonresident or vice versa, taxable income shall be determined separately for income in each status. If an individual lives in this state at least 183 days during the tax year or more than 1/2 the days during a taxable year of less than 12 months he shall be deemed a resident individual domiciled in this state. (b) The estate of a decedent who at his death was domiciled in this state. (c) Any trust created by will of a decedent who at his death was domiciled in this state and any trust created by, or consisting of property of, a person domiciled in this state, at the time the trust becomes irrevocable. (2) For the purpose of the definition of "resident", a taxable year shall be deemed to be terminated at the date of death. (3) The term "resident" when referring to a corporation means a corporation organized under the laws of this state.

115.　　In August 2018 the H. Family were temporarily camping at "Resort 1" in rural St Clair County, when a central hotline call was made and an investigation ensued into claims children were starved, unbathed, M. H. may have had lice, children not enrolled in school (despite county schools still on summer break) and family was believed to be homeless because they had been at campground for 25 days with unfounded speculation to family home being foreclosed on.

116.　　On or about August 27th 2018, children were located and found to be healthy

without any signs of malnutrition, only presenting with messy but clean hair, no lice and

dirt level indicative children were in a campground and playing outside, not chronic

neglect. The primary concern of starvation immediately ruled out.

117.     On or about August 27th 2018, H. H. had told the St. Clair worker that CPS

involvement traumatized the family.

118.     On or about August 27th 2018, H. H. stated the government had no right to

intrude based on anonymous claims absent probable cause.

119.     On or about August 27th 2018, H. H. stated the government had no right to

intrude absent probable cause and that anonymous tips were not a good faith basis for

probable cause without further evidence.

120.     On or about August 27th 2018, H. H. stated the government had no right to

intrude absent allegations that meet criteria.

121.     The majority of the "concerns" lacked statutory authority for MDHHS to

investigate.

122.     On or about August 27th 2018, H. H. established with the St Clair Worker that the

only allegation the department had jurisdiction over was the starvation claim and it was

based on anonymous claims.

123.     On or about August 27th 2018, H. H. further established with the St Clair Worker,

the anonymous starvation claim was readily apparent to be unsubstantiated.

124.     On or about August 27th 2018, The St. Clair MDHHS interview with J. H. Jr. was

traumatic to him and he began displaying anxiety symptoms ie. tearing up, agitated

affect, pacing and chewing his shirt.

125.     On or about August 27th 2018, H. H. appropriately consoled J. H. Jr., calmed him

down within a minute or so in front of the St. Clair County MDHHS worker and his

interview was then terminated because of the obvious harm to the child.

126.     This child had prior unsubstantiated removals due to CPS overstepping and violating policy.

127.     The H. Family's unique history shows a pattern of CPS involvement that has been contrary to the best interest of the H. Family's Children including the Ingham County case.

128.     On or about August 27th 2018, H. H. informed the St Clair County worker of this history and resulting trauma.

129.     On or about August 27th 2018, H. H. informed the St Clair County worker the family was leaving in a couple days and would be located in Arenac County at "Resort 2", exchanging contact information.

130.     On or about August 27th 2018, the on call St. Clair County MDHHS worker interviewed the H. Family with full cooperation and never attempted to ask for a warrantless search after it was established no probable cause had been discovered and H. H. was affirmatively asserting constitutional rights.

131.     The RV door was wide open for portions of the interview and no complaints were made about the RV conditions to the H, Family by the St Clair worker.

132.     Had the St Clair on call worker found any evidence of abuse or neglect she was required to seek safety planning within 24 hours and no action was taken in the required timeframe.

133.     Jason Salamango, St Clair County MDHHS CPS Investigator was assigned to the case and did not make first contact for about two (2) weeks.

134.     On or about September 11th 2018 and spoke with H. H. to conduct his investigation then arranged with H. H. to do a follow up visit at Resort 1 when H. Family

returned to Resort 1 as planned September 13th so he could close the case.

135. The H. Family was at "Resort 2" in Arenac County as planned when Jason Salamango contacted H. H. However, overnight the H. Family discussed their plans to return to "Resort 1" and changed it last minute to travel to a campground in Bay County next.

136. On or about September 12th 2018, H. H. contacted Jason Salamango to update the upcoming travel itinerary and agreed to a courtesy check that would entail: a look inside the trailer door, a second interview with H. H. and J. H. only, children would not be interviewed and Bay County was only to observe children were still in good health.

137. On or about September 12th 2018, H. H. discussed with Jason Salamango, the harmful effect unwarranted CPS involvement on the H. Family had; including the evidence of trauma J. H. Jr. had displayed to the St Clair County worker, asking for reasonable accommodations to lessen the trauma.

138. On or about September 12th 2018, As a reasonable accommodation request H. H. while acknowledging CPS history, giving a brief overview of the case and circumstances, asked she not be forced to retell every detail of her extensive CPS trauma and that historical records be reviewed instead as policy requires this review anyway.

139. St Clair County investigation revealed evidence that MDHHS supervision and/or foster care would be harmful to the children and was not " adequate to safeguard the child's health and welfare."

140. The H. Family frequently changed travel itinerary on whims and had evidence of numerous changed reservations.

141. The H. Family had plans to go to "Resort 3" on September 13th 2018, like they ended up going, but they changed plans September 10th 2018 before ever hearing from

Jason Salamango and knowing the case was still open and had been assigned to him.

142.     On or about September 10th 2018 the reason the H. Family chose Bay County Park district's Pinconning Campground so they could return to "Resort 2" on September 20th 2018 as they fell in love with the resort but their membership required 7 days out of that particular resorts system and Bay County was close and affordable for the interim week.

143.     On or about September 12th 2018, the Bay County MDHHS worker then the before the H. Family arrived in their county, in an "egregious abuse of governmental power"improperly demanded and threatened to seek an unauthorized " order to cooperate with the investigation" to gain compliance with a second interview with the children and unwarranted search of the H. Family RV with specific request to view inside cabinets and refrigerator.

144.     On or about September 12th 2018, H. H. called and confronted Jason Salamango with the material facts CPS did not have lawful authority to conduct warrantless searches over heresy from anonymous sources when initial investigation had discounted allegations and no attempt to follow up had been made for 2 weeks indicating zero exigency in the case and since probable cause could not be established the courts could not issue a search warrant.

145.     On or about September 12th 2018, Jason Salamango proffered it was not a search being requested under the 4th amendment and H. H. countered back a request to see inside cabinets and refrigerator was most certainly a search request.

146.     On or about September 13th 2018 H. H. did an internet search for Michigan statutes and Michigan CPS policies and downloaded a digital copy of the "PSM MOBILE" from the Michigan MDHHS website and began studying local policies after

being confronted with the threat for "order to cooperate with the investigation" and found no laws or policy to guide her how that "practice" or "custom" works beyond seeking court order to access children or access for an interview with the perpetrator in serious cases as defined by statute.

147.    Believing such practices to be unconstitutional and without statutory authority, H. H. contacted a Bay County MDHHS supervisor about the illegal threats and requested reasonable accommodations.

148.    On or about September 13th 2018,H. H. contacted Jason Salamango's supervisor about the illegal threats and requested reasonable accommodations.

149.    On or about September 13th 2018, The H. Family decided not to go to Bay County as the illegal threats for unauthorized "orders to cooperate with the investigation" occurred before they had even arrived in Bay County but maintained phone contact with Jason Salamango.

150.    At no point did J. H. ever speak with Bay County workers or Jason Salamango St Clair County.

151.    At no point did J. H. ever curse at anyone from MDHHS.

152.    On or about September 13th 2018, in exercising free speech H. H. may have used a few curse words as part of her everyday vocabulary and fiery speech protesting civil rights violations but does not recall being deliberately profane with Bay County or St Clair County MDHHS employees.

153.    On or about September 15th 2018 the H. Family truck blew the head gasket in the engine on their truck used to tow the H. Family trailer and estimates for repairs exceeded the H. Family's savings.

154.    On or about September 17th 2018, H. H. then engaged with Jason Salamango for

alternatives to warrantless search based on what he knew to be false anonymous claims, since the starvation claim had already been immediately discounted as false, instead offering banking statements and receipts to show food purchases.

155.    On or about September 17th 2018, H. H. requested Jason Salamango make several reasonable accommodation requests that were granted.

156.    The H. Family did not flee in response to an investigation and instead changed their plans to avoid unconstitutional practices and went to "Resort 3" in Ingham County Michigan, when they had the ability to leave Michigan completely and cease contact with Jason Salamango.

157.    The H. Family believes illegal threats for "order to cooperate with the investigation" and known intent to violate parents constitutional rights would chill a person of ordinary firmness from continuing travel plans to such jurisdiction as effort to avoid unconstitutional practices and/or customs.

158.    On or about September 17th 2018, Jason Salamango had no valid reason to continue to seek a warrantless search of the H. Family travel trailer after it was established" no probable cause" or "reasonable suspicion" supported by articulable facts" had been discovered in St. Clair County.

159.    On or about September 17th 2018, Jason Salamango did not immediately depart and instead continued to seek consent for a warrantless search after the H. Family declined to be responsive and failed to establish cause through more reliable sources.

160.    On or about September 17th 2018, Jason Salamango continued investigation into the H. Family after he knew the allegations were unsubstantiated.

161.    Jason Salamango failed to close the investigation in the statorially required 30 days without valid cause for an extension.

162.     Prompt closure would have resulted in a closed case by September 27th 2018 when Jason Salamango spoke with Thomaca Bush.

163.     On September 17th 2018 H. H. continued to give answers to Jason Salamango, for the "safety" and/ or "risk" assessment such as acknowledging mental health diagnosis and that H. H. engaged in current treatment for those concerns.

164.     On or about September 17th 2018, at 8:15 pm, H. H. made reservations for a "Budget" Moving Truck to be picked up at 9 am Friday September 28th 2018 as a backup transportation option back to Illinois.

165.     On or about September 17th 2018, at 8:16 pm, H. H. received the assigned confirmation #1808330425395 for the reservations of a "Budget" Moving Truck via an email.

166.     On or about September 17th 2018, H. H. began alternative plans for towing the trailer as they were required by membership rules to limit their stay at Resort 3 to a period not to exceed 14 nights and the truck would not be repaired or replaced in time.

167.     On or about September 17th 2018, H. H. made a reservation at an Ingham County campground for next month in the event the H. Family needed to wait a month to save money for their truck engine repair and H. Family couldn't properly utilize the Budget truck's hitch to haul the H. Family travel trailer as hoped.

168.     On or about September 17th 2018, H. H. made arrangements with Progressive Insurance to have the Travel trailer towed to the next campground ahead of their maxing out allowed stay at resort 3 which was also preparing to close for the season and to a campground open year around allowing the H. Family time to deal with the engine failure without being in violation of membership rules.

169.     On or about September 24th 2018, while the H. Family where temporarily

camping at "Resort 3" in rural Ingham County Michigan, Dennis Baker, during a sewer

pump out session, while engaging in prohibited housing discrimination, confronted the H.

Family over the resort being a "family friendly" place, demand to speak with J. H. when

H. H. answered the door claiming other guests had complained about the H. Family but

described the unnamed person as "watching form his deck" and no one in resort with a

deck had a view as described, however he did moments before see and complain about

hosed down vomit remnants from a single family member as M. H. was playing on the

playground, in full view of the bedroom slide window, in a dress and doing the potty

dance because she didn't want to stop playing.

170.    On or about September 24th 2018, Dennis Baker did not have "reasonable cause

to suspect" child abuse or neglect of the H. Family Children.

171.    On or about September 24th 2018, while the H. Family where temporarily

camping at "Resort 3" in rural Ingham County Michigan, Dennis Baker, while engaging

in prohibited housing discrimination attempted to report the H. Family to Child

Protective Services in Ingham County and was routed to the state child abuse hotline

where he was placed on hold.

172.    On or about September 24th 2018, Dennis Baker, when placed on hold, grew

frustrated with the wait and then ultimately abandoned his call to CPS and called Law

Enforcement instead.

173.    According to the petition on or about September 24th 2018, "Children's Protective

Services received a complaint alleging "concerns regarding the family's living

conditions" listing a full report from the caller on that date.

174.    MDHHS has no statutory authority to investigate "concerns" when the reporter

does not meet statutory criteria such as reasonable suspicion of abuse or neglect as

defined by statute.

175.     MDHHS has no statutory authority to investigate "concerns" of neglect absent

allegations of reasonably suspected harm or reasonably suspected threatened harm to a

child's health or welfare by a parent, legal guardian, or any other person responsible for

the child's health or welfare.

176.     MDHHS initiated 2 investigations into the H. Family for reports about

perceptions H. Family was experiencing financial difficulties resulting in homelessness

and were providing alternative shelter in an RV.

177.     MDHHS lacks statutory authority to investigate the H. Family for neglect by

failure to provide shelter unless there are allegations the failure was a result of neglect

and the H. Family financially able to do so, or failed to seek financial or other reasonable

means to provide.

178.     MCL 712a.2 MCL 722.602 and MCL 722.622 was amended effective June 2018

to include language addressing a parents financial ability and creating a defense to

neglect allegations.

179.     MCL 722.622 (i) states "Negligent treatment, including the failure to provide

adequate food, clothing, shelter, or medical care, though financially able to do so, or by

the failure to seek financial or other reasonable means to provide adequate food, clothing,

shelter, or medical care."

180.     MDHHS has not updated their PSM or MCWL to reflect the changes in state law

and fail to educate their employees on current child protection laws.

181.     MDHHS lacks statutory authority to investigate the H. Family for neglect, over

concerns of a "dirty home" and "dirty underwear", absent allegations that the home is

uninhabitable.

182.    "We do not believe that dirty homes and diaper rash are the type of "neglect"
contemplated by the statute as authorizing the termination of parental rights. Petitioner
does not allege that the home is uninhabitable." In re Youmans, 156 Mich App 679
(1986).

183.    In re Youmans, 156 Mich App 679 (1986) found this type of neglect was
jurisdictional at time of case initiation not just in respect to termination proceedings and
rendered all proceeding with respect to the children were void ab initio.

184.    Thomaca Bush did receive training on the standards clearly established in "In re
Youmans, 156 Mich App 679 (1986)" as it is referenced in the MCWL taught to all CPS
workers in Michigan.

185.    "There can be no doubt that the state can and should protect the welfare of
children who are at risk from acts of abuse and neglect. There likewise can be no doubt
that occasions arise calling for immediate response, even without prior judicial approval.
But those instances are the exception. Otherwise child welfare workers would have a free
pass into any home in which they have an anonymous report of poor housekeeping,
overcrowding, and insufficient medical care and, thus, a perception that children may be
at some risk." WALSH v. ERIE COUNTY DEPARTMENT OF JOB AND FAMILY
SERVICES 240 F.Supp.2d 731 (2003)

186.    Begrimed children playing on naked mother earth, tight quarters and children not
being enrolled in public school are not justification for the Defendants actions.

187.    "The home and the family, held together by the ties of natural, rather than
adoptive, affection, is the last bulwark of American institutions. Poverty, lack of
education, or of culture alone are never sufficient justification for severing the ties that
bind families together. In this western country, on these western plains, many a home

might have been broken where large families were raised by the pioneers in one room cabins of logs, or sod, had poverty, lack of education, or begrimed faces of children, playing on naked mother earth, being the only showing required." Re Kelber, 200 N.W. 786 (N.D. 1924) North Dakota Supreme Court.

188.     MDHHS has no statutory authority to investigate families unless Central Intake receives a complaint from a person authorized to make a report, accepts the complaint and assigns it for field investigation.

189.     MDHHS has no statutory authority to investigate families based on telephone complaints from the public, to the local office when the legislature removed that responsibility from the local office and created the Central Intake Hotline in March 2016 with the amendment of MCL 722.622, MCL 722.623, and MCL 722.62

190.     MDHHS does not educate the public on the criteria for abuse or neglect as defined by statute or policy.

191.     MDHHS does not educate the public on the requirement they have reasonable suspicion of child abuse or neglect to initiate a report and instead advises the public to call the local office.

192.     MDHHS does educate the public on risk factors and "Potential Indicators of Child Abuse and/or Neglect".

193.     MDHHS maintains a website page found at https://www.michigan.gov/mdhhs/0,5885,7-339-73971_7119_50648_7193-15254--,00.html

194.     MDHHS website states: "Potential Indicators of Child Abuse and/or Neglect Determining when to report suspected child abuse or neglect can be difficult. A bruise on a toddler's forehead may be the result of learning to walk or the result of abuse. When in

doubt, contact the local MDHHS office for consultation. Below are some of the commonly accepted physical and behavioral indicators of abuse and/or neglect. Please note that the physical and behavioral indicators listed are not the only indicators of child abuse and neglect and if present, do not always mean a child is being abused or neglected. Physical Neglect - Physical Indicators Unattended medical needs. Lack of supervision. Regular signs of hunger, inappropriate dress, poor hygiene. Distended stomach, emaciated. Significant weight change. Physical Neglect - Behavioral Indicators Regularly displays fatigue or listlessness, falls asleep in class. Steals/hoards food, begs from classmates. Reports that no caretaker is at home. Physical Abuse - Physical Indicators. Unexplained bruises (in various stages of healing), welts, loop marks. Adult/human bite marks. Bald spots or missing clumps of hair. Unexplained burns/scalds. Unexplained fractures, skin lacerations/punctures or abrasions. Swollen lips/chipped teeth. Linear/parallel marks on cheeks and temple area. Crescent-shaped bruising. Puncture wounds. Bruising behind the ears. Physical Abuse - Behavioral Indicators Self-destructive/self-mutilation. Withdrawn and/or aggressive-behavior extremes. Uncomfortable/skittish with physical contact. Arrives at school late or stays late as if afraid to be at home. Chronic runaway (adolescents). Complains of soreness or moves uncomfortably. Wears clothing inappropriate to weather, tocover body. Lack of impulse control (e.g. inappropriate outbursts). Sexual Abuse - Physical indicators Pain or itching in genital area. Bruises or bleeding in genital area. Sexually transmitted disease. Frequent urinary or yeast infections. Extreme or sudden weight change. Pregnancy under 12 years of age. Sexual Abuse - Behavioral Indicators Withdrawal, chronic depression. Sexual behaviors or references that are unusual for the child's age. Seductive or promiscuous behavior. Poor self-esteem, self-devaluation, lack of confidence. Suicide attempts

(especially adolescents). Hysteria, lack of emotional control."

195.      Based on information and belief, Dennis Baker was told by Central Intake his concerns did not meet criteria for a report under MCL 722.624 and the Departement would be rejecting the complaint and Dennis Baker was placed on hold to escalate his call to a supervisor per his demand and then he abandoned the call to MDHHS.

196.      MCL 722.624 lists "persons permitted to report child abuse or neglect" .

197.      MCL 722.624 states: "In addition to those persons required to report child abuse or neglect under section 3, any person, including a child, who has reasonable cause to suspect child abuse or neglect may report the matter to the department or a law enforcement agency."

198.      On or about September 24th 2018, Dennis Baker did not have "reasonable cause to suspect child abuse or neglect" and was relying on 3rd party heresay and prejudices.

199.      On or about September 24th 2018, MDHHS was not permitted to take a report from Dennis Baker, because he did not have "reasonable cause to suspect child abuse or neglect" and was relying on 3rd party heresay and prejudices.

200.      Based on information and belief Central Intake rejected the complaint because their policy and procedures would have required such outcome under the known circumstances.

201.      On or about September 24th 2018, Dennis Baker then requested a law enforcement welfare check from Ingham County Sheriff Department for "suspicious circumstances" and not to make a report of "reasonable suspicion of child abuse or neglect".

202.      The police report reveals the caller attempted to report the H. Family to the MDHHS child abuse hotline but was put on hold, so he called law enforcement instead.

203.     Later Mr Baker acknowledged to Thomaca Bush, law enforcement did not find reported conditions mere minutes after the report was made per the "concerns" listed in the petition.

204.     On or about September 24th 2018, Ingham County Sheriff Dept responded to "Resort 3" and conducted a welfare check, concluding no further action needed per the police report.

205.     On or about September 24th 2018, The H. Family was cooperative with Ingham County Sheriff consenting to a warrantless search of the RVs cabinets and fridge, providing online banking access showing over $1800.00 and showed the responding officers evidence of active homeschooling per the police report.

206.     On or about September 24th 2018 Lt. Hull advised the H. Family, their RV was by no means dirtiest home he had seen and while it was not a concern to him under the laws he had to follow, the caller had or was calling CPS and they might have different standards, advising H. Family to "pick up more than once a day" noting the small quarters collect clutter faster than a house.

207.     On or about September 24th 2018, H. H. spoke with Jason Salamango, St Clair County MDHHS Investigator and informed him of the Ingham County welfare check.

208.     On or about September 26th 2018, H. H. spoke with Jason Salamango, St Clair County MDHHS Investigator and was assured he had spoken with Ingham County Sheriff verifying children were still fine, had an appropriate amount of food in the H. Family RV, and that St Clair County MDHHS investigation was being closed unfounded.

209.     On or about September 26th 2018, H. H. spoke with Jason Salamango, St Clair County MDHHS Investigator, who stated he could not locate a hotline report to MDHHS or Ingham County in reference to the H. Family from September 24th 2018 and that the

reporter apparently had not filed a CPS hotline report on September 24th 2018.

210. On or about September 26th 2018, H. H. spoke with Jason Salamango, St Clair County MDHHS Investigator, who stated he did not believe the hotline report alleged to occurred on September 24th 2018 was accepted by the hotline for investigation.

211. Ingham County MDHHS took no required steps to begin an investigation until September 26th 2018, missing the mandated 24 hour response had a report been filed on September 24th 2018.

212. Based on information and belief, the Initial hotline call was not screened in at intake of the September 24th 2018 report because Dennis Baker was disconnected when he chose to call law enforcement after being placed on hold.

213. Based on information and belief, another call was made on September 26th 2018; from Dennis Baker to the local Ingham County office advising them, the H. Family was in the midst of leaving "Resort 3", believing the family to be fleeing..

214. On September 26th 2018 Dennis Baker was aware his allegations could not be substantiated by law enforcement and he had no reasonable cause to suspect abuse or neglect as defined by Michigan statute per the listed "concerns" on the petition.

215. On September 26th 2018 Dennis Baker offered third party gossip and hearsay that does not contain an adequate degree of reliability, from unidentified sources as the chief basis in fact for his "concerns" per the petition.

216. On September 26th 2018 Dennis Baker had not proffered any probable cause to suspect abuse or neglect as defined by Michigan statute per the listed "concerns" on the petition.

217. Based on information and belief, this September 26th 2018 call prompted Thomaca Bush to respond with a "show of force" and an "egregious abuse of

governmental power" with 3 other MDHHS employees.

218.     On or about September 26th 2018 at "Resort 3" Thomaca Bush, an Investigator for Ingham County MDHHS, CPS division, accompanied by 3 fellow "Jane Doe" MDHHS employees and/or interns, initiated an investigation into H. Family for "traveling", "unstable housing", "dirty home", "concerns regarding the family's living conditions" and "home schooling" in an "egregious abuse of governmental power".

219.     Thomaca Bush was aware or should have known it was clearly established MDHHS and the Juvenile Court have no authority or "jurisdiction" over "dirty homes" that are not alleged "uninhabitable", as she received training in the "Michigan Child Welfare Law Manuel" (MCWL) Chapter Three (5) titled "Jurisdiction" subsection "3.4.3.".

220.     Plaintiff J.H consented to an interview, asserted protections as a licenced out of state medical marijuana patient and requested a forensic drug test to exonerate himself.

221.     J. H. denied that anyone had complained to Dennis Baker, proffered no occupied campsite with a deck as described by Dennis Baker had a view to see the playground as Dennis Baker claimed to the H. Family so he thought Dennis Baker was lying and that the circumstances were not as described, only admitting Dennis Baker had confronted him about such shortly before police arrived because Dennis was angry he saw remnants of J. H. mostly hosed down/washed away vomited spaghetti a short distance behind the trailer/truck and made assumptions of drug use.

222.     J. H. provided Thomaca Bush with credible evidence the H. Family were not Michigan residents and were in fact Illinois residents.

223.     J. H. provided Thomaca Bush with his name, date of birth, the H. Family's address in Illinois, phone number, his DoD Armed Forces Retiree Identification Card, his

drivers license, and his Illinois Medical Marjuana card.

224.    On or about September 26th 2018 Thomaca Bush was aware that the H. Family had a legal defense MDHHS had to take into account that the H. Family had not established Michigan residency and were in fact Illinois residents.

225.    On or about September 26th 2018 the H. Family was to move to a campground in Ingham County via a tow truck since their truck broke down.

226.    On or about September 26th 2018 when H. H. arrived to check in the manager informed H. H. that she had been contacted about the H. Family and they didn't accept "their kind" refusing to give any further information and refusing service.

227.    On or about September 26th 2018 the H. Family went to the Ingham County Fairgrounds until they could sort out things.

228.    On or about September 27th 2018 Thomaca Bush and her MDHHS intern "Jennifer" met with the H. Family at the Ingham County Fairgrounds in Mason MI.

229.    On or about September 27th 2018 the H. Family under duress of practices for orders to cooperate, consented to a search and interviews within standard investigation per MDHHS policy to avoid an unlawful "order to cooperate with investigation" as threatened.

230.    On or about September 27th 2018 MDHHS policy established in the PSM suggested the availability to seek "order to cooperate with investigation" if parents did not cooperate and voluntarily submit to an interview.

231.    MDHHS employees propagate their own policies and practices in seeking "orders after a preliminary hearing" as "orders to cooperate" during the investigative stage and there is no established policy describing such procedure in the "PSM".

232.    On or about September 27th 2018 H. H. provided Thomaca Bush with her name,

date of birth, the H. Family's address in Illinois, her phone number and her old State Identification Card.

233.     On or about September 27th 2018 H. H. provided Thomaca Bush exonerating evidence of being a lawful out of state medical marijauna patient.

234.     On or about September 27th 2018 H. H. provided Thomaca Bush exonerating evidence of being treated by a psychiatrist with medical marijauna.

235.      On or about September 27th 2018 H. H. provided Thomaca Bush exonerating evidence of medication being dispensed to H. H. for her mental health concerns and included the dosage amounts authorized by a licensed psychiatrist.

236.     On or about September 27th 2018 H. H. asserted ADA accommodations requests to receive services to prevent removal despite her objections to certain questions posed during the interview stage, and to skip such questions finishing the investigation based on historical record review and reliable independent sources.

237.     On or about September 27th 2018 H. H. alleged constitutional rights violations for the involuntary nature of her aquesting to the demands of Thomaca Bush and the involuntary interview and search.

238.     On or about September 27th 2018 H. H. alleged constitutional rights violations specifically referencing lack of probable cause.

239.     On or about September 27th 2018 Thomaca Bush verbally insisted to H. H. she did have probable cause in response to H. H. complaints of no probable cause.

240.     Based on information and belief on or about September 26th 2018 Thomaca Bush had already determined she could substantiate J. H. for substance abuse, being an out of state medical marijuana patient without a "MICHIGAN" Medical marijuana card, and her belief his drug screen would show marijuana and Thomaca Bush had called in the actual

official central hotline report with accusations against both parents for substance abuse listing H. H. as a known perpetrator with out of state removals because J. H. admitted the H. Family had prior CPS removals.

241.    Thiomaca Bush's refusal to afford out of state patients protections under state law violated state statutes, policy and the 14th amendment of the constitution.

242.    On or about September 27th 2018, H. H. provided documentation of her valid status in an out of state medical marijuana patient.

243.    On or about September 27th 2018, H. H. asserted 14th Amendment equal protections as out of state residents, telling Thomaca Bush the Pekin Illinois address, stating only H. H. had established temporary /"snowbird" residency in Florida for the sole purpose of legally accessing the medical marijauna program pursuant to Florida law, giving statements that the H. Family had not established residency in Michigan at any point, were only visiting temporarily less than 2 months, never at one location more than 28 days in which the H. Family had still briefly returned to Illinois to pick up the eldest child, E. H. and get their mail from their legal residence.

244.    On or about September 27th 2018 the H. Family address was the Illinois address and were merely present at the Ingham County Fairgrounds less than 18 hours, were on government owned property with no ability to receive summons via mail and as such not a legal address for establishing residency under state and federal laws.

245.    On or about September 27th 2018, H. H. asserted 14th Amendment equal protections under Michigan State law as an out of state medical marijauna patient.

246.    MCL 333.26423 (p) states "Visiting qualifying patient" means a patient who is not a resident of this state or who has been a resident of this state for less than 30 days."

247.    On or about September 27th 2018 H. H. asserted the H. Family was not Michigan

residents, referenced MCL 333.26423 (p) and quoted statute MCL 333.26424 (D) verbatim to Thomaca Bush.

248.     MCL 333.26424 (d) A person shall not be denied custody or visitation of a minor for acting in accordance with this act, unless the person's behavior is such that it creates an unreasonable danger to the minor that can be clearly articulated and substantiated.

249.     On or about September 27th 2018, Thomaca Bush responded to the defense by stating well you can't buy it legally in "Michigan".

250.     On or about September 27th 2018, H. H. stated yes the H. Family had been able to purchase from legal dispensaries in Michigan as state law allows it.

251.     On or about September 27th 2018, Thomaca Bush interrupted H. H. providing documentation of exonerating evidence, then moved the interview outside, claiming it was too "hot", as she stood with her coat on directly in front of the heater and moved the interview outside the trailer.

252.     On or about September 27th 2018, Thomaca Bush had not raised any concerns with the odor, the food prep dishes in the sink from the lunch being cooked or the tight quarters.

253.     On or about September 27th 2018, after moving interview outside, On or about September 27th 2018, Thomaca Bush denied ever contacting the Ingham County Campground that denied services to the H. Family on September 26th 2018 and stated she would not sabotage families housing stability even though she had not been accused of such and her denials appeared to indicate guilt.

254.     On or about September 27th 2018, "Jennifer the intern", looked visibly shocked at Thomaca Bush's denial and her body language suggested she was uncomfortable with the discussion and raised H. H. suspicions Thomaca Bush was lying.

255.      Thomaca Bush then began asking questions of H. H. whereas H. H. had been leading the interview and providing exonerating evidence before prompted, she asked H. H. what states the family lived in with the children.

256.      On or about September 27th 2018, H. H. began listing states the family had lived in and Thomaca Bush interpreted H. H. to confront her with information J. H. had given a different answer and the interview became confrontational by Thomaca Bush's change in tone, posture, statements made and the questions started deviating from standard protocols.

257.      This confrontation changed the tone and tenure of the interview and alarmed H. H. and she made an objection to lack of probable cause.

258.      On or about September 27th 2018, H. H. began listing States the H. Family had visited as J. H. list had included States the H. Family visited during their travels but had not established any sort of legal residency when asked what States the H. Family previously lived in, as H. H. was attempting to distinguish legal residency and merely visiting.

259.      J. H. lacked knowledge of the jurisdictional issues and the legal differences between residency and merely temporary presence in a state, however H. H. was acutely aware of such issues and the importance of asserting proper residency status.

260.      On or about September 27th 2018, H. H. stopped her recantation to clarify Illinois was the H. Family State of Residence and H. H. only had also established snow bird temporary residency in Florida to utilize Florida's Medical Marijauan program as well as the family followed both Illinois and Florida homeschooling laws starting her spiel the H. Family had given law enforcement, about wanting to be protected while snowbirding as Florida had more regulation and they wanted no question of compliance with truancy

laws that do not have UCCJEA limitations, so they follow in all states they visit during the school year noting Michigan has similar requirements for them to follow and the H. Family was in compliance with truancy laws.

261. On or about September 27th 2018, Thomaca Bush then interrupted H. H. to ask what states the family had ever traveled through with the children and this is not a standard question asked of parents during other investigations.

262. On or about September 27th 2018, because the confrontation turn of the interview, H. H. felt her heart racing, breathing became difficult, lips began to go numb, H. H. started perspiring, having difficulty communicating, memory recall was greatly diminished and H. H. started feeling "paranoid" Thomaca Bush was "out to get her" and would take H. H. children illegally.

263. H. H. has extensive mental health treatment that has taught her these are signs her PTSD is being "triggered", how to properly assert her various rights and to seek reasonable accomodations in highly stressful situations to reduce symptoms and lessen the negative impact of her disability.

264. On or about September 27th 2018, Thomaca Bush had not stated was "out to get H. H." and would take H. H. children illegally thus H. H. felt if she could move on from the questions that were not standard or necessary for the assessments, she could prevent the investigation from going rogue, lessen the PTSD symptoms and still engage in services.

265. On or about September 27th 2018, H. H. asserted 4th and 5th amendment protections declining to discuss the H. family's travel path in the manner Thomaca Bush was demanding.

266. On or about September 27th 2018, Thomaca Bush, in an "egregious abuse of

governmental power" asserted H. H. had no such protections.

267.     On or about September 27th 2018, H. H. responded with a reasonable accommodation request to decline to answer specific questions and still engage in services to prevent removal, giving a credible statement of a qualifying disability and providing a nexus for the need for the specific accommodation request.

268.     On or about September 27th 2018, Thomaca Bush's refusal to accept the Plaintiffs had constitutional rights was causing H. H. to feel threatened with possibility her children would be unlawful removed, which is a "trigger" for H. H. 's PTSD and H. H began to become upset so she sent M. H. inside to protect her from witnessing H. H. agitation.

269.     On or about September 27th 2018, J. H. also attempted to explain the need for accommodation and associated rights giving credible statements of H. H. disability.

270.     On or about September 27th 2018, the reasonable accommodation was denied and Thomaca Bush with unclean hands became openly hostile: escalating H. H. disability symptoms, despite the warnings of the harm of her actions.

271.     On or about September 27th 2018, outside the trailer Thomaca Bush while remaining confrontational, maintaining her erroneous beliefs the H. Family could not have legally accessed medical marijuana in Michigan and continued to ask about travel.

272.     Answering the question would have revealed travel in states Medical Marijauna is not legal like Indiana and H. H. presumed Thomaca Bush was trying to elicit information to suggest erroneously the H. Family admitted to illegally transported marjuana with the children present.

273.     On or about September 27th 2018, Thomaca Bush also attempted to ask H. H. about her marital status and H. H. responded by asking what Thomaca Bush already knew and relevance under Michigan CPS policy.

274.     Michigan's MiSACWIS does not factor marital status and marital status is not required qualitative information under Michigan child protective services policies and H. H. referred to J. H. as her husband and he likewise H.H was his wife, H. H. had already disclosed her maiden name, identifying information and identification card.

275.     On or about September 27th 2018, H. H. was aware of Michigan's CPS policies readily available online and that the constitution protects disclosure of private facts involving the H. Family's marriage and was raising another constitutional right objection.

276.     The H. Family marital status was irrelevant to question(s) if children were being abused or neglected or at risk of maltreatment and the H. Family had a right to resist invasion of privacy in their marriage.

277.     On or about September 27th 2018, H. H. was hinting around this question also implicating constitutional rights as a way to continue to resist the invasion of her privacy and the sanctity of her home life.

278.     On or about September 27th 2018, Thomaca Bush did not attempt to answer relevance or what she already knew, and instead concluded the interview with a threat to "staff" with her supervisor and only "J. H." would be notified of what happens next with the H. Family's children.

279.     On or about September 27th 2018, this threat elicited H. H. to utter profanity directed at Thomaca Bush.

280.     On or about September 27th 2018, This interview was concluded without offering safety planning or services and without obtaining accurate information for investigative purposes despite multiple pleadings from the H. Family to move on to the next question.

281.     No attempt was made at any time to see if H. Family was properly storing chemicals or to determine if any of the other conditions reported in the 2005 case existed

in September 2018.

282.      No attempt was made at any time to identify or address any condition that would render the RV uninhabitable and thus an unfit home.

283.      On or about September 27th 2018, H. H. had provided qualitative information concerning the following areas: Previous names or aliases, Native American heritage for self and child(ren) (which was not disclosed in court petition), Names and dates of birth of his or her children, Friend of the Court involvement, Historical and/or current substance use concerns, Historical and/or current mental health concerns.

284.      On or about September 27th 2018, H. H. had attempted to correctly identify former residences, attempting to make legal clarifications as to "residence", was willing to include the 13 states the family had stayed in the travel trailer and it's only upon expansion to states traveled through without regards to stopping for any reason that raised objections.

285.      The pass through states in between were readily discoverable by drawing a line on the map without requiring any disclosure from H. H..

286.      On or about September 27th 2018, Thomaca Bush did not attempt to ask qualitative information concerning why H. H. advered her prior CPS involvement could not be used against her and mistates H. H. response in the petition(s).

287.      On or about September 27th 2018, the Questions about the prior CPS occurred after Thomaca Bush stated the case was being staffed and J. H. would be notified of the outcome and after H. H. was fully upset as a result of Thomaca Bush's unclean hands.

288.      The falsely portrayed statements by Thomaca Bush in the petition that H. H. "reported the worker did not need to know about her previous CPS history and that she had CPS history out the "wazoo" are contradictory."

289.     On or about September 27th 2018 H. H. acknowledgement of multiple prior cases would indicate H. H. wasn't anticipating Thomaca Bush would not "know about them".

290.     H. H. was aware Thomaca Bush was required by statute and policy to submit records request to Illinois which would disclose prior removals.

291.     The Plaintiffs concede most parents would not know such information but proffer H. H. had repeatedly demonstrated throughout the interview, exceptional knowledge of statutes and policies and a reasonable person would not have inferred evasiveness to avoid detection of past cps history.

292.     On or about September 27th 2018 Thomaca Bush did not ask either H. H. or J. H. for any qualitative information concerning prior cps involvement to evaluate the H. Family's response to the previous cases, if the H. Family had engaged and/or benefited from prior services, if the H. Family had been adjudicated unfit or if rights were terminated.

293.     On or about September 27th 2018, H. H. did not fail to provide less information then J. H., nor did J. H. interview illicit any more information than H. H. acknowledgement of prior cases.

294.     Thomaca Bush did not attempt to ask H. H. questions about any qualitative information concerning if H. H. was a licensed foster care or daycare provider.

295.     On or about September 27th 2018, Thomaca Bush did not attempt to ask H. H. questions about any qualitative information concerning historical and/or current domestic violence.

296.     On or about September 27th 2018, Thomaca Bush did not attempt to ask H. H. questions about any qualitative information concerning history of abuse/neglect, violence, or trauma as a child.

297.     On or about September 27th 2018, Thomaca Bush did not attempt to ask H. H. questions about any qualitative information concerning physical health concerns.

298.     On or about September 27th 2018, Thomaca Bush did not attempt to ask H. H. questions about any qualitative information concerning presence and adequacy of support persons.

299.     On or about September 27th 2018, Thomaca Bush did not attempt to ask H. H. questions about any qualitative information concerning any identified disabilities, delinquency, behavioral concerns, or mental health concerns for his or her child(ren).

300.     On or about September 27th 2018, Thomaca Bush did not attempt to ask H. H. questions about any qualitative information concerning current or prior criminal history.

301.     On or about September 27th 2018, Thomaca Bush did not attempt to ask H. H. questions about any qualitative information concerning methods of discipline used in the home.

302.     On or about September 27th 2018, H. H. spoke with Jason Salamango, St Clair County MDHHS Investigator and informed him of the confrontation with Thomaca Bush and gave him Thomaca Bush's phone number so he could intercede.

303.     On or about September 27th 2018, Jason Salamango, St Clair County MDHHS Investigator on behalf of H. H. contacted Thomaca Bush at the phone number provided by H. H..

304.     On or about September 28th 2018, at approximately 9 am the H. Family picked up a rental truck that had been scheduled since September 17th 2018 to return to Illinois with confirmed reservations for another campground made prior to arriving in Michigan on vacation.

305.     On or about September 28th 2018, at approximately 10:00 am, H. H. made a

detailed reasonable accommodation request to the on call supervisor who is referred to as "Supervisor 1" in this complaint and she stated per MDHHS policy they did not have to grant reasonable accommodations for disability, per MDHHS policy only accommodations for hearing impaired and interpreters are required.

306.     This supervisor stated Thomaca Bush would need to conduct a 2nd interview with H. H. and H. H. stated the H. Family would be retaining counsel to be present during future interviews.

307.     CPS has been given documentation of a qualifying disabling condition that they themselves acknowledge as readily apparent in their filing, the request was reasonable and did not pose an undue hardship to CPS as every state the children have ever travelled through is not standard information gathered.

308.     H. H. was struggling under the stress, moving on could have easily been accommodated under ADA.

309.     H. H. clearly stated her accommodation request, it was reasonable, indicating the qualifying disability and nexus for the accommodation.

310.     H. H. clearly stated her accommodation request was seeking to be unresponsive during the investigative stage and still be engaged in services.

311.     Most of the critical information sought for investigative purposes could be exchanged in the documentation H. H. had to prove her fitness as a parent without subjecting her to reliving trauma repeatedly in verbally answering questions.

312.     The H. Family proffer H. H. had provided adequate information to correctly assess her mental health treatment status and exonerate her of substance abuse claims.

313.     Thomaca Bush had other avenues under state law besides interviewing with H. H. to obtain H. H. mental health records.

314.    The H. Family proffer they had provided enough information to correctly assess the children's safety if historical record review had occurred.

315.    On September 28th 2018, in violation of state statutes and in contradiction to instructions in the MCWL, Thomaca Bush sought a same day preliminary hearing for children not in custody via a phone call and without a verified petition by calling Stacey Strouse at the Ingham County Juvenile Court.

316.    No policy or official practice tells CPS workers they can request the first hearing to be held sooner than statutes require via phone call absent exigent circumstances.

317.    Thomaca Bush was propagating her own policies and practices.

318.    Court records show on September 28th 2018, an "operator" identified on the "Register Of Actions" as "SSTROUSE" initiated proceedings in case # 76509-1/2-NA.

319.    There are no pleadings in the official court file with a file stamp date of September 28th 2018 and the altered petition has a file date of October 2nd 2018.

320.    The Ingham County Court File contains a document labeled "Preliminary Hearing Information Sheet Protective Services Referral" that contains the question "Do you want foster care? The answer is No, remain in home with cooperation" (EXHIBIT TWO (2))

321.    The Ingham County Court File contains a document labeled "Preliminary Hearing Information Sheet Protective Services Referral" that contains the following address for both H. H. and J. H., 700 E. Ash Street, Mason, MI, 48854 Ingham Co. Fairgrounds.

322.    At no time was 700 E. Ash Street, Mason, MI, 48854 Ingham Co. Fairgrounds a correct or true address and is not as residential address as clearly noted in the court file..

323.    Thomaca Bush had been given the true and correct address in Illinois and she withheld this information as it would have notified the court of jurisdictional issues.

324.    Court rules and statutes clearly allow for the H. Family to be served via mail at

their Illinois residence.

325.    Court rules and statutes clearly required for the H. Family to be served via mail at their Illinois residence since they were not present in Michigan to be served in person.

326.    Statutes require the petition be verified and a summons served upon the respondents a minimum of at least 72 hours before a hearing unless a verified petition is accompanied by a placement request for an ex parte protective custody order.

327.    MCL 712A.13 states: "Service of summons may be made anywhere in the state personally by the delivery of true copies thereof to the persons summoned: Provided, That if the judge is satisfied that it is impracticable to serve personally such summons or the notice provided for in the preceding section, he may order service by registered mail addressed to their last known addresses, or by publication thereof, or both, as he may direct. It shall be sufficient to confer jurisdiction if (1) personal service is effected at least 72 hours before the date of hearing; (2) registered mail is mailed at least 5 days before the date of hearing if within the state or 14 days if outside of the state; (3) publication is made once in some newspaper printed and circulated in the county in which said court is located at least 1 week before the time fixed in the summons or notice for the hearing. Service of summons, notices or orders required by this chapter may be made by any peace officer or by any other suitable person designated by the judge. The judge may, in his discretion, authorize the payment of necessary traveling expenses incurred by any person summoned or otherwise required to appear at the time of hearing of any case coming within the provisions of this chapter, and such expenses and the expenses of making service as above provided, when approved by the judge, shall be paid by the county treasurer from the general fund of the county. If any person so summoned, as herein provided, shall fail without reasonable cause to appear before said court, he may

be proceeded against for contempt of court and punished accordingly."

328.     Thomaca Bush was prohibited from completing service of a notice of a hearing

because she was a party to the case and she had not yet seized the children for the

exceptions allowing for such of the preliminary after a child has been removed pursuant

to an ex parte order.

329.     MCR 2.103 (A) states: "Service Generally. Process in civil actions may be served

by any legally competent adult who is not a party or an officer of a corporate party."

330.     Under MCR 3.961 proceedings could only be initiated by a verified petition. (A)

Form. Absent exigent circumstances, a request for court action to protect a child must be

in the form of a petition. The form, captioning, signing, and verifying of documents are

prescribed in MCR 1.109(D)

331.     MCR 1.109(D) states: "Signatures. (1) A signature, as required by these court

rules and law, means a written signature as defined by MCL 8.3q or an electronic

signature as defined by this subrule. (2) An electronic signature means an electronic

sound, symbol, or process, attached to or logically associated with a record and executed

or adopted by a person with the intent to sign the record. (3) If a law or court rule requires

a signature to be notarized or made under oath, the requirement is satisfied if the

electronic signature of the person authorized to perform those acts, together with all other

information required to be included by other applicable law or court rule, is attached to or

logically associated with the signature. (4) Retention of a signature electronically affixed

to a document that will be retained by the court in electronic format must not be

dependent upon the mechanism that was used to affix that signature."

332.     MCL 8.3q states: "The words "written" and "in writing" shall be construed to

include printing, engraving, and lithographing; except that if the written signature of a

person is required by law, the signature shall be the proper handwriting of the person or, if the person is unable to write, the person's proper mark, which may be, unless otherwise expressly prohibited by law, a clear and classifiable fingerprint of the person made with ink or another substance."

333.    The Information Sheet has handwritten notations of a "P" for present next to the names of counsel assigned H. Family at the preliminary hearing and the PS Worker listed as Thomaca Bush. It also has an ink mark striking the name of the Guardian Ad Litem "Michael Van Huysse".

334.    Based on information and belief Referee Peter Brown is the author of the"P"'s on the Information Sheet and the notations were made during the September 28th 2018 preliminary hearing.

335.    Based on information and belief the Ingham County proceedings were initiated prior to the submission of a petition as required by statute and court rules.

336.    The H. Family's presence at a hearing held for purposes of preliminary inquiry was not "needed" and certainly not required under court rules.

337.    The original petition did not include an application for an ex parte order for protective custody or placement pursuant to MCL 712A.14b or MCR 3.963 nor does it make a request for a removal or recommend any physical placement type.

338.    MCR 3.963 (A) states: "Taking Custody Without Court Order. (1) An officer may without court order remove a child from the child's surroundings and take the child into protective custody if, after investigation, the officer has reasonable grounds to believe that a child is at substantial risk of harm or is in surroundings that present an imminent risk of harm and the child's immediate removal from those surroundings is necessary to protect the child's health and safety. If the child is an Indian child who resides or is

domiciled on a reservation, but is temporarily located off the reservation, the officer may

take the child into protective custody only when necessary to prevent imminent physical

damage or harm to the child.(2) An officer who takes a child into protective custody

under this rule shall immediately notify the Department of Human Services. While

awaiting the arrival of the Department of Human Services, the child shall not be held in a

detention facility. (3) If a child taken into protective custody under this subrule is not

released, the Department of Human Services shall immediately contact the designated

judge or referee as provided in subrule (D) to seek an ex parte court order for placement

of the child pursuant to subrule (B)(4)."

339.      MCR 3.963 (B) states: "Court-Ordered Custody. (1) Order to Take Child into

Protective Custody. The court may issue a written order, electronically or otherwise,

authorizing a child protective services worker, an officer, or other person deemed suitable

by the court to immediately take a child into protective custody when, after presentment

of a petition or affidavit of facts to the court, the court has reasonable cause to believe

that all the following conditions exist, together with specific findings of fact: (a) The

child is at substantial risk of harm or is in surroundings that present an imminent risk of

harm and the child's immediate removal from those surroundings is necessary to protect

the child's health and safety. If the child is an Indian child who resides or is domiciled on

a reservation, but is temporarily located off the reservation, the child is subject to the

exclusive jurisdiction of the tribal court. However, the state court may enter an order for

protective custody of that child when it is necessary to prevent imminent physical

damage or harm to the child. (b) The circumstances warrant issuing an order pending a

hearing in accordance with: (i) MCR 3.965 for a child who is not yet under the

jurisdiction of the court, or (ii) MCR 3.974(C) for a child who is already under the

jurisdiction of the court under MCR 3.971 or 3.972. (c) Consistent with the

circumstances, reasonable efforts were made to prevent or eliminate the need for removal

of the child. (d) No remedy other than protective custody is reasonably available to

protect the child. (e) Continuing to reside in the home is contrary to the child's welfare.

(2) The court may include in such an order authorization to enter specified premises to

remove the child. (3) The court shall inquire whether a member of the child's immediate

or extended family is available to take custody of the child pending preliminary hearing,

or an emergency removal hearing if the court already has jurisdiction over the child under

MCR 3.971 or MCR 3.972, whether there has been a central registry clearance, and

whether a criminal history check has been initiated. (4) Ex parte Placement Order. If an

officer has taken a child into protective custody without court order under subsection (A),

or if the Department of Human Services is requesting the court grant it protective custody

and placement authority, the Department of Human Services shall present to the court a

petition or affidavit of facts and request a written ex parte placement order. If a judge

finds all the factors in subrule (B)(1)(a)-(e) are present, the judge may issue a placement

order; if a referee finds all the factors in subrule (B)(1)(a)-(e) are present, the referee may

issue an interim placement order pending a preliminary hearing. The written order shall

contain specific findings of fact. It shall be communicated, electronically or otherwise, to

the Department of Human Services."

340.    MCR 3.963 (C) states: "Arranging for Court Appearance. An officer or other

person who takes a child into protective custody must:(1) immediately attempt to notify

the child's parent, guardian, or legal custodian of the protective custody; (2) inform the

parent, guardian, or legal custodian of the date, time, and place of the preliminary or

emergency removal hearing scheduled by the court; (3) immediately bring the child to the

court for preliminary hearing, or immediately contact the court for instructions regarding placement pending preliminary hearing; (4) if the court is not open, DHS must contact the person designated under subrule (D) for permission to place the child pending the hearing; (5) ensure that the petition is prepared and submitted to the court; (6) file a custody statement with the court that includes: (a) a specific and detailed account of the circumstances that led to the emergency removal, and (b) the names of persons notified and the times of notification or the reason for failure to notify."

341.     MCR 3.963 (D) states: "Designated Court Contact (1) When the Department of Human Services seeks a placement order for a child in protective custody under subrule (A) or (B), DHS shall contact a judge or referee designated by the court for that purpose. (2) If the court is closed, the designated judge or referee may issue an ex parte order for placement upon receipt, electronically or otherwise, of a petition or affidavit of facts. The order must be communicated in writing, electronically or otherwise, to the appropriate county DHS office and filed with the court the next business day."

342.     MCR 3.965 (A) states: " Time for Preliminary Hearing. (1) Child in Protective Custody. The preliminary hearing must commence no later than 24 hours after the child has been taken into protective custody, excluding Sundays and holidays, as defined by MCR 8.110(D)(2), unless adjourned for good cause shown, or the child must be released.

343.     MCR 3.965 (B) states: "Procedure. (1) The court must determine if the parent, guardian, or legal custodian has been notified, and if the lawyer-guardian ad litem for the child is present. The preliminary hearing may be adjourned for the purpose of securing the appearance of an attorney, parent, guardian, or legal custodian or may be conducted in the absence of the parent, guardian, or legal custodian if notice has been given or if the court finds that a reasonable attempt to give notice was made" ... "(5) The court shall

determine if the petition should be dismissed or the matter referred to alternate services. If the court so determines the court must release the child. Otherwise, the court must continue the hearing. (6) The court must advise the respondent of the right to the assistance of an attorney at the preliminary hearing and any subsequent hearing pursuant to MCR 3.915(B)(1)(a). (7) The court must advise the respondent of the right to trial on the allegations in the petition and that the trial may be before a referee unless a demand for a jury or judge is filed pursuant to MCR 3.911 or 3.912. (8) The court must advise a nonrespondent parent of his or her right to seek placement of his or her children in his or her home. (9) The court shall allow the respondent an opportunity to deny or admit the allegations and make a statement of explanation. (10) The court must inquire whether the child is subject to the continuing jurisdiction of another court and, if so, which court."

344.    The original petition contains the verbiage "remain in the home with their parents, H. H.. and J.H without conditions set by the court".

345.    The intent of MDHHS and Thomaca Bush at the initiation of proceedings was not to remove the children from the home but to remain in home with cooperation.

346.    MDHHS CPS Investigator Thomaca Bush did not include a request for an ex parte protective custody for "placement" in foster care at any time and therefore the second altered petition still falls under the provisions of MCR 3.962 and a informal preliminary inquiry under MCL 712a.11, was the correct avenue.

347.    On or about September 28th 2018, at 12:51 pm MDHHS CPS Investigator Thomaca Bush did not include a request for an ex parte protective custody for "placement" in foster care and the original petition falls under the provisions of MCR 3.962 and a informal preliminary inquiry under MCL 712a.11, was the correct avenue.

348.    On or about September 28th 2018, at 12:51 pm MDHHS CPS Investigator

Thomaca Bush did not include a request for an ex parte protective custody for "placement" in foster care and therefore a formal preliminary hearing was not authorized by statute or court rules.

349.     MCL 712A.11 (1) states "Except as provided in subsection (2), if a person gives information to the court that a juvenile is within section 2(a)(2) to (4), (b), (c), or (d) of this chapter, a preliminary inquiry may be made to determine whether the interests of the public or the juvenile require that further action be taken. If the court determines that formal jurisdiction should be acquired, the court shall authorize a petition to be filed. However, the court may proceed on the consent calendar under section 2f of this chapter if at any time before disposition the court determines that a case should not proceed on the formal calendar but that the protective and supportive action by the court will serve the best interests of the juvenile and the public."

350.     MCL 712A.11 (2) addresses juvenile delinquency matters only.

351.     MCL 712A.11 (3) states, "The petition described in subsections (1) and (2) shall be verified and may be upon information and belief. The petition shall set forth plainly the facts that bring the juvenile within this chapter and shall contain all of the following information:

(a) The juvenile's name, birth date, and address.

(b) The name and address of the juvenile's parents.

(c) The name and address of the juvenile's legal guardian, if there is one.

(d) The name and address of each person having custody or control of the juvenile.

(e) The name and address of the juvenile's nearest known relative, if no parent or guardian can be found.

352.     MCL 712A.11 (4) states, "If any of the facts required under subsection (3) are not

known to the petitioner, the petition shall state that the facts are not known. If the juvenile attains his or her seventeenth birthday after the filing of the petition, the court's jurisdiction shall continue beyond the juvenile's seventeenth birthday and the court may hear and dispose of the petition under this chapter."

353.    MCL 712A.11 (5) states, "When a petition is authorized, the court shall examine the court file to determine if a juvenile has had fingerprints taken as required under section 3 of 1925 PA 289, MCL 28.243. If a juvenile has not had his or her fingerprints taken, the court shall do either of the following: (a) Order the juvenile to submit himself or herself to the police agency that arrested or obtained the warrant for the arrest of the juvenile so the juvenile's fingerprints can be taken. (b) Order the juvenile committed to the custody of the sheriff for the taking of the juvenile's fingerprints".

354.    MCL 712A.11 (6) states, "A petition or other court record may be amended at any stage of the proceedings as the ends of justice require.MCL 712A.11 (7) states, "If the juvenile diversion act, 1988 PA 13, MCL 722.821 to 722.831, is complied with and the court determines that court services can be used in the prevention of delinquency without formal jurisdiction, the court may offer court services to a juvenile without a petition being authorized as provided in section 2(e) of this chapter".

355.    MCL 712A.11 does not authorize the court to issue an order to cooperate with an investigation.

356.    MCL 712A.11 does not authorize the court to issue an order to engage in services.

357.    MCL 712A.11 does not authorize the court to issue an order affecting custody, care or supervision of children.

358.    MCL 712A.11 does not authorize the court to issue any order beyond ordering a child to submit to fingerprinting.

359.     Thomaca Bush was seeking an unauthorized "order to cooperate" during the investigation and not emergency removal.

360.     Any practice using an "order to cooperate" or forcing cooperation of parents during the investigation stages is not authorized under any statute and would exceed the authority granted under MCL 722.628 (12) and MCL 722.628d and violates the established Plaintiffs Constitutional rights.

361.     MCL 722.628 states: "(1) Within 24 hours after receiving a report made under this act, the department shall refer the report to the prosecuting attorney and the local law enforcement agency if the report meets the requirements of subsection (3)(a), (b), or (c) or section 3(6) or (9) or shall commence an investigation of the child suspected of being abused or neglected. Within 24 hours after receiving a report whether from the reporting person or from the department under subsection (3)(a), (b), or (c) or section 3(6) or (9), the local law enforcement agency shall refer the report to the department if the report meets the requirements of section 3(7) or shall commence an investigation of the child suspected of being abused or neglected or exposed to or who has had contact with methamphetamine production. If the child suspected of being abused or exposed to or who has had contact with methamphetamine production is not in the physical custody of the parent or legal guardian and informing the parent or legal guardian would not endanger the child's health or welfare, the local law enforcement agency or the department shall inform the child's parent or legal guardian of the investigation as soon as the local law enforcement agency or the department discovers the identity of the child's parent or legal guardian. (2) In the course of its investigation, the department shall determine if the child is abused or neglected. The department shall cooperate with law enforcement officials, courts of competent jurisdiction, and appropriate state agencies

providing human services in relation to preventing, identifying, and treating child abuse and child neglect; shall provide, enlist, and coordinate the necessary services, directly or through the purchase of services from other agencies and professions; and shall take necessary action to prevent further abuses, to safeguard and enhance the child's welfare, and to preserve family life where possible. In the course of an investigation, at the time that a department investigator contacts an individual about whom a report has been made under this act or contacts an individual responsible for the health or welfare of a child about whom a report has been made under this act, the department investigator shall advise that individual of the department investigator's name, whom the department investigator represents, and the specific complaints or allegations made against the individual. The department shall ensure that its policies, procedures, and administrative rules ensure compliance with the provisions of this act. (3) In conducting its investigation, the department shall seek the assistance of and cooperate with law enforcement officials within 24 hours after becoming aware that 1 or more of the following conditions exist: (a) Child abuse or child neglect is the suspected cause of a child's death. (b) The child is the victim of suspected sexual abuse or sexual exploitation. (c) Child abuse or child neglect resulting in severe physical injury to the child. For purposes of this subdivision and section 17, "severe physical injury" means an injury to the child that requires medical treatment or hospitalization and that seriously impairs the child's health or physical well-being. (d) Law enforcement intervention is necessary for the protection of the child, a department employee, or another person involved in the investigation. (e) The alleged perpetrator of the child's injury is not a person responsible for the child's health or welfare.(f) The child has been exposed to or had contact with methamphetamine production. (4) Law enforcement officials shall cooperate with the

department in conducting investigations under subsections (1) and (3) and shall comply with sections 5 and 7. The department and law enforcement officials shall conduct investigations in compliance with the protocols adopted and implemented as required by subsection (6). (5) Involvement of law enforcement officials under this section does not relieve or prevent the department from proceeding with its investigation or treatment if there is reasonable cause to suspect that the child abuse or child neglect was committed by a person responsible for the child's health or welfare. (6) In each county, the prosecuting attorney and the department shall develop and establish procedures for involving law enforcement officials and children's advocacy centers, as appropriate, as provided in this section. In each county, the prosecuting attorney and the department shall adopt and implement standard child abuse and child neglect investigation and interview protocols using as a model the protocols developed by the governor's task force on children's justice as published in FIA Publication 794 (revised 8-98) and FIA Publication 779 (8-98), or an updated version of those publications. (7) If there is reasonable cause to suspect that a child in the care of or under the control of a public or private agency, institution, or facility is an abused or neglected child, the agency, institution, or facility shall be investigated by an agency administratively independent of the agency, institution, or facility being investigated. If the investigation produces evidence of a violation of section 145c or sections 520b to 520g of the Michigan penal code, 1931 PA 328, MCL 750.145c and 750.520b to 750.520g, the investigating agency shall transmit a copy of the results of the investigation to the prosecuting attorney of the county in which the agency, institution, or facility is located. (8) A school or other institution shall cooperate with the department during an investigation of a report of child abuse or child neglect. Cooperation includes allowing access to the child without parental consent if access is

determined by the department to be necessary to complete the investigation or to prevent child abuse or child neglect of the child. The department shall notify the person responsible for the child's health or welfare about the department's contact with the child at the time or as soon afterward as the person can be reached. The department may delay the notice if the notice would compromise the safety of the child or child's siblings or the integrity of the investigation, but only for the time 1 of those conditions exists. (9) If the department has contact with a child in a school, all of the following apply: (a) Before contact with the child, the department investigator shall review with the designated school staff person the department's responsibilities under this act and the investigation procedure. (b) After contact with the child, the department investigator shall meet with the designated school staff person and the child about the response the department will take as a result of contact with the child. The department may also meet with the designated school staff person without the child present and share additional information the investigator determines may be shared subject to the confidentiality provisions of this act. (c) Lack of cooperation by the school does not relieve or prevent the department from proceeding with its responsibilities under this act. (10) A child shall not be subjected to a search at a school that requires the child to remove his or her clothing to expose his buttocks or genitalia or her breasts, buttocks, or genitalia unless the department has obtained an order from a court of competent jurisdiction permitting such a search. If the access occurs within a hospital, the investigation shall be conducted so as not to interfere with the medical treatment of the child or other patients. (11) The department shall enter each report made under this act that is the subject of a field investigation into the CPSI system. The department shall maintain a report entered on the CPSI system as required by this subsection until the child about whom the investigation is made is 18 years old or

until 10 years after the investigation is commenced, whichever is later, or, if the case is classified as a central registry case, until the department receives reliable information that the perpetrator of the child abuse or child neglect is dead. Unless made public as specified information released under section 7d, a report that is maintained on the CPSI system is confidential and is not subject to the disclosure requirements of the freedom of information act, 1976 PA 442, MCL 15.231 to 15.246. (12) After completing a field investigation and based on its results, the department shall determine in which single category, prescribed by section 8d, to classify the allegation of child abuse or child neglect. (13) Except as provided in subsection (14), upon completion of the investigation by the local law enforcement agency or the department, the law enforcement agency or department may inform the person who made the report as to the disposition of the report. (14) If the person who made the report is mandated to report under section 3, upon completion of the investigation by the department, the department shall inform the person in writing as to the disposition of the case and shall include in the information at least all of the following: (a) What determination the department made under subsection (12) and the rationale for that decision. (b) Whether legal action was commenced and, if so, the nature of that action. (c) Notification that the information being conveyed is confidential. (15) Information sent under subsection (14) shall not include personally identifying information for a person named in a report or record made under this act. (16) Unless section 5 of chapter XII of the probate code of 1939, 1939 PA 288, MCL 712.5, requires a physician to report to the department, the surrender of a newborn in compliance with chapter XII of the probate code of 1939, 1939 PA 288, MCL 712.1 to 712.20, is not reasonable cause to suspect child abuse or child neglect and is not subject to the section 3 reporting requirement. This subsection does not apply to circumstances that arise on or

after the date that chapter XII of the probate code of 1939, 1939 PA 288, MCL 712.1 to 712.20, is repealed. This subsection applies to a newborn whose birth is described in the born alive infant protection act, 2002 PA 687, MCL 333.1071 to 333.1073, and who is considered to be a newborn surrendered under the safe delivery of newborns law as provided in section 3 of chapter XII of the probate code of 1939, 1939 PA 288, MCL 712.3. (17) All department employees involved in investigating child abuse or child neglect cases shall be trained in the legal duties to protect the state and federal constitutional and statutory rights of children and families from the initial contact of an investigation through the time services are provided. (18) The department shall determine whether there is an open friend of the court case regarding a child who is suspected of being abused or neglected if a child protective services investigation of child abuse and child neglect allegations result in any of the following dispositions: (a) A finding that a preponderance of evidence indicates that there has been child abuse or child neglect. (b) Emergency removal of the child for child abuse or child neglect before the investigation is completed. (c) The family court takes jurisdiction on a petition and a child is maintained in his or her own home under the supervision of the department. (d) If 1 or more children residing in the home are removed and 1 or more children remain in the home. (e) Any other circumstances that the department determines are applicable and related to child safety. (19) If the department determines that there is an open friend of the court case and the provisions of subsection (18) apply, the department shall notify the office of the friend of the court in the county in which the friend of the court case is open that there is an investigation being conducted under this act regarding that child and shall also report to the local friend of the court office when there is a change in that child's placement. (20) Child protective services may report to the local friend of the court office

any situation in which a parent, more than 3 times within 1 year or on 5 cumulative reports over several years, made unfounded reports to child protective services regarding alleged child abuse or child neglect of his or her child. (21) If the department determines that there is an open friend of the court case, the department shall provide noncustodial parents of a child who is suspected of being abused or neglected with the form developed by the department that has information on how to change a custody or parenting time court order."

362.     MCL 722.628d states: "(1) For the department's determination required by section 8, the categories, and the departmental response required for each category, are the following: (a) Category V - services not needed. Following a field investigation, the department determines that there is no evidence of child abuse or child neglect. (b) Category IV - community services recommended. Following a field investigation, the department determines that there is not a preponderance of evidence of child abuse or child neglect, but the structured decision-making tool indicates that there is future risk of harm to the child. The department shall assist the child's family in voluntarily participating in community-based services commensurate with the risk to the child. (c) Category III - community services needed. The department determines that there is a preponderance of evidence of child abuse or child neglect, and the structured decision-making tool indicates a low or moderate risk of future harm to the child. The department shall assist the child's family in receiving community-based services commensurate with the risk to the child. If the family does not voluntarily participate in services, or the family voluntarily participates in services, but does not progress toward alleviating the child's risk level, the department shall consider reclassifying the case as category II. (d) Category II - child protective services required. The department determines that there is

evidence of child abuse or child neglect, and the structured decision-making tool

indicates a high or intensive risk of future harm to the child. The department shall open a

protective services case and provide the services necessary under this act. The department

shall also list the perpetrator of the child abuse or child neglect, based on the report that

was the subject of the field investigation, on the central registry as provided in section

7(7), either by name or as "unknown" if the perpetrator has not been identified. (e)

Category I - court petition required. The department determines that there is evidence of

child abuse or child neglect and 1 or more of the following are true: (i) A court petition is

required under another provision of this act. (ii) The child is not safe and a petition for

removal is needed.(iii) The department previously classified the case as category II and

the child's family does not voluntarily participate in services. (iv) There is a violation,

involving the child, of a crime listed or described in section 8a(1)(b), (c), (d), or (f) or of

child abuse in the first or second degree as prescribed by section 136b of the Michigan

penal code, 1931 PA 328, MCL 750.136b. (2) In response to a category I classification,

the department shall do all of the following: (a) If a court petition is not required under

another provision of this act, submit a petition for authorization by the court under

section 2(b) of chapter XIIA of the probate code of 1939, 1939 PA 288, MCL 712A.2. (b)

Open a protective services case and provide the services necessary under this act. (c) List

the perpetrator of the child abuse or child neglect, based on the report that was the subject

of the field investigation, on the central registry as provided in section 7(7), either by

name or as "unknown" if the perpetrator has not been identified. (3) The department is

not required to use the structured decision-making tool for a nonparent adult who resides

outside the child's home who is the victim or alleged victim of child abuse or child

neglect or for an owner, operator, volunteer, or employee of a licensed or registered child

care organization or a licensed or unlicensed adult foster care family home or adult foster care small group home as those terms are defined in section 3 of the adult foster care facility licensing act, 1979 PA 218, MCL 400.703. (4) If following a field investigation the department determines that there is a preponderance of evidence that an individual listed in subsection (3) was the perpetrator of child abuse or child neglect, the department shall list the perpetrator of the child abuse or child neglect on the central registry as provided in section 7(7).

363. "Children's Protective Services Policy Manuals (PSM) refers to "order to cooperate" and/ or "orders for cooperation" multiple times in their policies found in sections: PSM 711-1, PSM 711-4, PSM 713-01, PSM 713-08 PSM 713-09, PSM 713-11 and PSM 714-1.

364. There is formal written policy implementing such a process in PSM 713-08; when an investigator seeks to gain access to a child, and to interview the perpetrator.

365. The H. Family legal action for "order to cooperate" was threatened against the Plaintiff in two separate investigations, in multiple counties by two separate investigators exposing an unlawful and unconstitutional practice or custom.

366. H. H. has found the same issues in multiple counties reviewing public court records in Grand Traverse, Ingham, St Clair and Bay Counties

367. The petition(s) fails to allege factual evidence that "the child's immediate removal from those surroundings is necessary to protect the child's health and safety".

368. The petition(s) fails to allege factual evidence that the children were unsafe in the H. Family's home.

369. The petition(s) allegation the H. Family failed to ensure the children's safety was not based on evidence developed by law enforcement of safety concerns.

370.     The petition(s) allegation the H. Family failed to ensure the children's safety was not based on evidence developed by MDHHS of safety concerns.

371.     The petition(s) allegation the H. Family failed to ensure the children safety was based on H. H. assertion of constitutional rights to MDHHS investigators.

372.     The petition(s) allegation the H. Family failed to ensure the children safety was based on H. H. refusal to surrender constitutional rights to MDHHS investigators.

373.     The original petitions only contain assertions of "contrary to the welfare of the children".

374.     This phone call did not include a request for a placement order for the children instead requested that the children remain in our home with cooperation as evidenced by the Preliminary hearing information sheet and original petition.

375.     Stacey Strouse did not set the hearing for the least 72 hours out, and instead set it for hearing less than half an hour later.

376.      Stacey Strouse did not do any of the required investigation into the petition that she is required to under statute.

377.     Stacey Strouse instead instructed Thomaca Bush to send the petition via email to Referee Peter Brown.

378.     Judge Richard Garcia has in his administrative duties, delegated his duties for receiving electronic filings to Referee Peter Brown.

379.     MCR 8.110 (6) states: "A chief judge may delegate administrative duties to a trial court administrator or others."

380.     Per a recorded phone call about another case in Ingham County with similar due process issues,, it is Stacey Strouses position that she did not have to do any further investigation or follow any statutory requirements and instead follows an Ingham County

practice.

381.    MCL 712A.7 provides "The judge of probate may appoint the register of probate, a deputy probate register, or clerk of his court as register of the juvenile division of the probate court. Such register of the juvenile division shall prepare all petitions for investigation, summons, writs and other necessary papers, and shall perform such duties as required by the judge of probate, and he shall exercise and be competent to do all acts required of the judge of probate, except judicial acts. Such register so appointed shall receive for his services under this chapter, in addition to his regular salary, such sum as the board of supervisors shall fix: Provided, however, That in counties having a population of 100,000, and not more than 350,000 inhabitants, according to the last federal census, the compensation shall be not less than $500.00 annually."

382.    Defendant Stacey Strouse, Ingham County Court Deputy Juvenile Register " serves as a team leader of staff engaged in processing and maintaining the records of the Juvenile Division of the Probate Court. Regularly performs the functions of a Deputy Juvenile Register II which includes responsibility for setting up and processing new court files, reviewing and filing petitions and other documents, entry of case information to the computer, reviewing case files for court action, interpreting and processing court orders and other documents, noticing of juvenile division matters for hearing, and performing other tasks related to maintaining and processing juvenile division records.

383.    On or about September 28th 2018, Stacey Strouse was employed by the State Court and Ingham County.

384.    On or about September 28th 2018, Stacey Strouse was acting outside her position and was performing the Duties of the Juvenile Court Register.

385.    Ingham County Court Employees collective bargaining agreement indicates Judge

Richard Garcia has authorized the splitting of the Juvenile Court Registers Duties and has hired multiple court employees to fulfill this statutory position.

386.	MCR 8.110 (C) states: "Duties and Powers of Chief Judge. (1) A chief judge shall act in conformity with the Michigan Court Rules, administrative orders of the Supreme Court, and local court rules, and should freely solicit the advice and suggestions of the other judges of his or her bench and geographic jurisdiction. If a local court management council has adopted the by-laws described in AO 1997-6 the chief judge shall exercise the authority and responsibilities under this rule in conformity with the provisions of AO 1997-6. (2) As the presiding officer of the court, a chief judge shall: (a) call and preside over meetings of the court; (b) appoint committees of the court; (c) initiate policies concerning the court's internal operations and its position on external matters affecting the court; (d) meet regularly with all chief judges whose courts are wholly or partially within the same county; (e) represent the court in its relations with the Supreme Court, other courts, other agencies of government, the bar, the general public, and the news media, and in ceremonial functions; and (f) counsel and assist other judges in the performance of their responsibilities."

387.	A LinkedIn profile listed as "stacey-strouse-9215abaa" identifies Stacey Strouse's job title as Deputy Juvenile Register III - Ingham County.

388.	The plaintiff discovered the job description for the Ingham County Court Deputy Juvenile Register III as set for by the Ingham County human resource department, listed online.

389.	The Ingham County Court Deputy Juvenile Register's official duties were to perform the following "Essential Functions:" "1. As team leader, tracks the number of delinquent and neglect cases assigned to each staff member and the number of dismissals,

and makes work assignments accordingly. Distributes and signs-out incoming work, maintains log of cases and staff they are assigned to, and attempts to ensure the even flow of work. 2. In the absence of the Juvenile Register, or as needed in periods of high workload, reviews files prior to Court proceedings to ensure proper noticing, documents are in proper chronological order, all orders and forms are properly completed, trial and hearing dates are properly set, and the file is prepared for court action. Performs other assignments of the Register as needed. 3. Sets up and processes new files for delinquent, neglect/abuse and other Juvenile Division cases. Sets up personal files for caseworkers, including police report, petition, court orders, and other legal forms. 4. Interprets and processes the preliminary court order. Ensures that all required legal documents are prepared and noticed as required by the Juvenile Code, attorneys are appointed, and other procedural requirements are met. Prepares notices, summons subpoenas, publications, warrants, and other documents and ensures time limits are met. 5. Creates the documents required by each court hearing, requires preparation of orders of disposition, commitment order, and various other orders and documents from the notes of the Judge. Confers with the Judge as necessary to ensure the accuracy of the orders. Ensures placements outside the home are made in light of information on eligibility for State funding. 6. Maintains records and files of all assigned cases, including court legal files, social files in coordination with caseworker, computer case management system, placement records, and information for State reports. 7. Assists attorneys, prosecutors, schools, police and the public with inquiries regarding court specific cases and other information related to court records. Extracts information from computer system as necessary. 8. Enters case information to the computer system including court orders and other case event information, notice of hearing, and other documentation generated for the case. 9.

Prioritizes and prepares files according to hearing dates. 10. Performs record checks requiring use of computer system to obtain information and locate legal files. Ensures information is released only as provided by court rules. Completes record check forms and receipts fees for copies. 11. Makes copies of files or orders of files for clients, attorneys, other courts and other agencies. Makes copies of petitions, orders and other documents as requested. 12. Backs up the switchboard operator, Deputy Juvenile Register III, and other court support staff. 13. Performs a variety of general support tasks such as locating files, processing mail, general word processing, data entry, and related tasks."

390.     Defendant Stacey Strouse, acting as Ingham County Court Deputy Juvenile Register wilfully failed to perform her public duty as required by statute and the constitution.

391.     Stacey Strouse's dereliction of duty aided in the common law felony of obstruction of public justice in her avoiding the filing of the original petition when she did not ensure this original petition was filed with the court or had any notation on it as to when it was originally electronically filed. These are statutory duties that she willfully neglected. The original petition should have been rejected on investigation because it was unsigned. Had the original petition been properly filed and heard there would be no judgement for removal. The taking away and avoiding the filing of the original petition had the effect of the judgement on the original petition did not take effect.

392.     Stacey Strouse assigned court appointed attorney for J. H. and H. H. when she initiated the proceedings prior to submission of a petition or any paperwork

393.     Stacey Strouse assessed the H. Family's ability to pay for a court appointed attorney before receiving a petition or any paperwork at all because of a screening method to target parents that refuse to cooperate during an investigation and assert legal

rights.

394.     Ingham County has no authority to appoint court appointed attorneys for a
preliminary inquiry.

395.     It has been clearly established in Michigan the H. Family had no right to court
appointed counsel at a preliminary inquiry, "In this case, given that respondent was not
entitled to be present at the January 10, 2014 preliminary inquiry, he was not entitled to
the assistance of counsel at that proceeding" In re England, 887 NW 2d 10 (2016) 314
Mich. App. 245

396.     Stacey Strouse informed Thomaca Bush the time of hearing was at 1:15 pm on
September 28th 2018 and instructed her to give verbal notice to the parties and email the
petition to Referee Peter Brown.

397.     The court rules lay out requirements of the petition, MCR 3.961 (B) "Content of
Petition. A petition must contain the following information, if known: (1) The child's
name, address, and date of birth. (2) The names and addresses of: (a) the child's mother
and father, (b) the parent, guardian, legal custodian, or person who has custody of the
child, if other than a mother or father, and (c) the nearest known relative of the child, if
no parent, guardian, or legal custodian can be found. (3) The essential facts that constitute
an offense against the child under the Juvenile Code. (4) A citation to the section of the
Juvenile Code relied on for jurisdiction. (5) The child's membership or eligibility for
membership in an Indian tribe, if any, and the identity of the tribe. (6) The type of relief
requested. A request for removal of the child or a parent or for termination of parental
rights at the initial disposition must be specifically stated "

398.     The petition(s) failed to contain "essential facts that constitute an offense against
the child under the Juvenile Code."

399.    Court rule MCR 3.962 required the court conduct a "Preliminary Inquiry" since petition was accompanied by a request for children to remain in the home at time in the preliminary hearing information sheet.

400.    MCR 3.962 (A) states: "When a petition is not accompanied by a request for placement of the child and the child is not in temporary custody, the court may conduct a preliminary inquiry to determine the appropriate action to be taken on a petition.

401.    MCR 3.962 lays forth what the court can do. "Action by Court. A preliminary inquiry need not be conducted on the record or in the presence of the parties. At the preliminary inquiry, the court may: (1) Deny authorization of the petition. (2) Refer the matter to alternative services. (3) Authorize the filing of the petition if it contains the information required by MCR 3.961(B), and there is probable cause to believe that one or more of the allegations is true. For the purpose of this subrule, probable cause may be established with such information and in such a manner as the court deems sufficient."

402.    Ingham County had no authority to hold a mandatory appearance preliminary hearing on September 28th 2018 when the original petition was accompanied by a request to leave children in the home.

403.    It has been clearly established in Michigan "A preliminary inquiry is, by definition, an "informal review" proceeding to determine proper action on a petition. MCR 3.903(A)(23). It is distinguished from a preliminary hearing in that the child is not in the temporary custody of DHHS and there is no request for the child's removal contained in the petition. MCR 3.962(A); MCR 3.965(A)(1); In re Hatcher, 443 Mich. 426, 434, 505 N.W.2d 834 (1993). "The permissible actions following a preliminary inquiry are limited to granting or denying authorization to file the petition, or referring the matter to `alternative services.'" In re Kyle, 480 Mich. 1151, 1151, 746 N.W.2d 302

(2008), citing MCR 3.962(B)(1) through (3). Because of its "informal" nature, MCR

3.903(A)(23), and the narrowly tailored purpose it serves, MCR 3.962(B), the court rules

provide that "[a] preliminary inquiry need not be conducted on the record or in the

presence of the parties." MCR 3.962(B). In re England, 887 NW 2d 10 (2016) 314 Mich.

App. 245

404.     MCR 3.903(a)(23) states: "Preliminary inquiry" means informal review by the

court to determine appropriate action on a petition."

405.     On or about September 28th 2018, Thomaca Bush sought to hold an emergency

hearing without exigent circumstances and without due process notice and opportunity to

be heard.

406.     On or about September 28th 2018, at approximately 12:40 pm, Thomaca Bush in

an "egregious abuse of governmental power" contacted H. H., informing her of intent to

file the petition for "in home jurisdiction" and an "order to cooperate with the

investigation" only; never mentioning removal of children.

407.     On or about September 28th 2018, at approximately 12:40 pm, H. H. interrupted,

interjecting an objection to telephone service not proper summons and adequate notice,

advised Thomaca Bush to serve her in Illinois at the Pekin address via mail as the family

would not be in Michigan for personal service, thus the court could not have a hearing

sooner than 14 days, that she was getting a lawyer and then hung up without waiting for

further reply.

408.     Thomaca Bush was aware or should have know Michigan had no jurisdiction over

the H. Family Children as they were "Children From Another State", the children were no

longer present in Michigan, the children were not alleged to be abandoned and there were

no allegations an "emergency existed", as she received training in the "Michigan Child

Welfare Law Manuel" (MCWL) Chapter Three (3) titled "Jurisdiction" subsection "3.5.6.".

409.     Thomaca Bush was aware or should have know the H. Family were entitled to the 14 day via mail notice as out of state residents as she received training in the "Michigan Child Welfare Law Manuel" (MCWL) Chapter Seven (7) titled "Pretrial" subsection "7.1.3.".

410.     At 12:51 pm September 28th 2018 no witness had been identified to proffer evidence of abuse or neglect as defined by Michigan statute per the listed "concerns" on the petition.

411.     At 12:51 pm September 28th 2018 Thomaca Bush was aware the anonymous call in St Clair County Mi, was never collaborated and no witnesses identified or interviewed.

412.     At 12:51 pm September 28th 2018 Thomaca Bush was aware by Dennis Baker's statements, the anonymous call in Ingham County was almost entirely based on alleged neighborhood rumors and gossip, that he knew the contents of the report to law enforcement, he acknowledged law enforcement could not collaborate his accusations minutes later and the H. Family had asserted the Dennis had personal animosity rooted in disabilty discrimination and that no other witnesses had complained.

413.     At 12:51 pm September 28th 2018 Thomaca Bush had not attempted to identify or interview any third party witness that had allegedly complained when she knew such accusations were disputed and she lacked probable cause based on neighborhood rumor, malicious gossip and personal animosity.

414.     At 12:51 pm September 28th 2018 Thomaca Bush had not completed the risk assessment in the structured decision making tool as required by MCL 722.628d.

415.     At 12:51 pm September 28th 2018 Thomaca Bush had not completed an accurate

risk assessment in the structured decision making tool as required by MCL 722.628d.

416.     At 12:51 pm September 28th 2018 Thomaca Bush had not developed

preponderance of the evidence of child abuse and/or neglect as defined by MCL 722.622.

417.     At 12:51 pm September 28th 2018 Thomaca Bush did not have a current

complaint that included allegations of neglect, abuse and neglect as defined by MCL

722.622, nor was preponderance of evidence of neglect as defined by MCL 722.622

found to exist, even if not alleged in the complaint.

418.     At 12:51 pm September 28th 2018 Thomaca Bush had not assessed if the H.

Family's relatives, friends, or neighbors were able to help when a caretaker(s) or other

adult is not functioning well and/or is in need of assistance to provide for the child's

safety and well-being.

419.     Relatives, friends, or neighbors have come forward to help when the H. Family

and children needed support and/or the child needed placement.

420.     Relatives, friends, or neighbors have followed through on commitments in the

past and provide ongoing support and assistance to the H Family.

421.     At 12:51 pm September 28th 2018 Thomaca Bush had not developed evidence H.

Family was unable/unwilling to control impulses.

422.     At 12:51 pm September 28th 2018 Thomaca Bush had not developed evidence the

H. Family provided inadequate physical care and/or inadequate supervision of children.

423.     At 12:51 pm September 28th 2018 Thomaca Bush had not developed evidence

within the past year, the H. Family had a problem with alcohol and/or other drugs that

interfered, or interfered, with the caretaker's or the household's functioning.

424.     At 12:51 pm September 28th 2018 Thomaca Bush had not developed evidence H.

Family was homeless or children are unsafe due to housing conditions merely because

they normally travel in a RV.

425.     At 12:51 pm September 28th 2018 Thomaca Bush had not developed evidence ,

the H. Family made choices or behaved out of self-interest rather than the best interest of

the child and this has a negative effect on children's safety and well-being.

426.     At 12:51 pm September 28th 2018 Thomaca Bush had not developed evidence of

mental injury or a preponderance of evidence of mental injury was found to exist, even if

not alleged in the current complaint.

427.     At 12:51 pm September 28th 2018 Thomaca Bush had not developed evidence the

H. Family was domineering and/or employed excessive and/or inappropriate discipline.

428.     At 12:51 pm September 28th 2018 Thomaca Bush had not developed evidence the

H. Family needed to improve parenting skills but either: refused services, or agreed to

participate but indicate that parenting style will not change, or agreed to participate but

history shows a pattern of uncompleted services when working with CPS or foster care.

429.     At 12:51 pm September 28th 2018, Thomaca Bush had not developed evidence H.

Family viewed any incident less seriously than the department, when department policy

was correctly applied. Thomaca Bush viewed the complaint more seriously than the

Department as evidenced in the Initial case plan and St Clair County's disposition of their

investigation.

430.     At 12:51 pm September 28th 2018, Thomaca Bush had not completed a structured

decision making tool assessment, opened a case and offered any services, nor were any

services declined and reassessment completed which are required steps of an

investigation as described in Michigan's Protective Services Manuel (PSM). "The

structured decision making (SDM) approach is an example of an effort to integrate

predictive and contextual assessment strategies into child welfare practice. Clinical

decision makers complete both an actuarial risk assessment and an objective assessment

of family strengths and needs. Both assessments incorporate clinical input in their design

and completion." Citing "Assessing parenting capacity in a child welfare context" by

Karen S.Budd, Department of Psychology, DePaul University, 2219 N. Kenmore Ave.

Chicago, IL 60614, United States

431.     At 12:51 pm September 28th 2018, Thomaca Bush had not completed the

statutory required steps of an investigation as described in Michigan's Protective Services

Manuel (PSM) before filing a petition in retaliation for H. H. verbally asserting

constitutional rights and for a profane insult.

432.     At 12:51 pm September 28th 2018, Thomaca Bush had not completed the

statutory required steps of an investigation as described in Michigan's Protective Services

Manuel (PSM), before filing a petition because H. H. had requested an ADA reasonable

accommodation Thomaca Bush was personally denying.

433.     At 12:51 pm September 28th 2018, Thomaca Bush had not completed an accurate

investigation or the required steps of an investigation checklist as described in Michigan's

Protective Services Manuel (PSM) and MCL 722.628e.

434.     MCL 722.628e states: "(1) The department shall implement an investigation

checklist to be used in each investigation of suspected abuse and neglect handled by the

department. (2) Subject to subsections (3) and (4), an investigation shall not be closed

until the checklist described in subsection (1) is completed. (3) A supervisor must review

the completed checklist. If the supervisor determines that the investigation complies with

the investigation checklist and with the following state laws and department policy, the

investigation may be closed: (a) Face-to-face contact was made with all alleged child

victims. (b) A petition was filed as required by sections 8d(1)(e), 17, and 18. (c) A

petition was filed when court intervention was needed to ensure child safety. (d) Any other items that impact child safety and well-being that are specifically outlined in department policy to require the approvals outlined in subsection (4). (4) If the supervisor determines that the investigation does not comply with the investigation checklist and the state laws and department policy outlined in subsection (3), the supervisor shall determine the reason the investigation checklist and state law or department policy outlined in subsection (3) were not followed. An investigation that falls under this subsection shall not be closed until after the local office director has reviewed the investigation."

435.    At 12:51 pm September 28th 2018 Thomaca Bush had not personally reviewed the H. Family's case history, had not received any files of historical records, had not requested or reviewed any records from service providers and had not evaluated benefit from prior services.

436.    At 12:51 pm September 28th 2018 Thomaca Bush had not completed the statutory required steps as described in Michigan's Protective Services Manuel (PSM) before filing a petition because MDHHS has written policies to seek an order to cooperate with an investigation that exceeds statutory authority and is unconstitutional on their face.

437.    MDHHS has no statutory authority to deviate from the statutory requirements of MCL 722.628d and institute written policies and statewide practices to seek orders to cooperate with their investigations against parents..

438.    MDHHS has no statutory authority to deviate from the statutory requirements of MCL 722.628d and institute written policies and statewide practices to seek in home jurisdiction beyond statutory limits when parents have not refused services and merely declined to be responsive during investigative stages of a CPS case .

439.     It is clearly established since 2003 in the 6th Circuit in "WALSH v. ERIE
COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES 240 F.Supp.2d 731
(2003)" that the 4th amendment applies to social workers.

440.     Ingham County CPS and MDHHS/FIA (as their predecessor) have been aware
since July 30th 2004, that the holdings in "WALSH v. ERIE COUNTY DEPARTMENT
OF JOB AND FAMILY SERVICES 240 F.Supp.2d 731 (2003)", applies to CPS workers
in Michigan when it was upheld against FIA and Ingham County CPS Investigators in
O'Donnell v. Brown, 335 F. Supp. 2d 787 (WD Mich 2004).

441.     MDHHS has no statutory authority to deviate from the statutory requirements of
MCL 722.628d and institute written policies and statewide practices to override a
decision made by the structured decision-making tool.

442.     At 12:51 pm September 28th 2018 Thomaca Bush emailed an unverified petition
to email address PBrown@ingham.org herein referred to as the original petition.

443.     At 12:51 pm September 28th 2018 Thomaca Bush emailed an unverified petition
lacking her signature to Referee Peter Brown.

444.     At 12:51 pm September 28th 2018 Thomaca Bush emailed an unverified petition
that was lacking probable cause to Referee Peter Brown.

445.     This petition fails to identify the children's present address, the places where the
child has lived during the last 5 years, and the names and present addresses of the persons
with whom the child has lived during that period.

446.     However this petition met the duty to inform the court of a proceeding in this or
another state that could affect the current child-custody proceeding when it acknowledges
prior out of state foster care orders.

447.     Section five of the original petition states: It is contrary to the welfare of the

children, J. H. Jr. and M. H. to remain in the home with their parents, H. H. and J. H. Sr. without conditions set by the court due to physical neglect and lack of cooperation by the parents regarding ensuring the children's safety and wellbeing. The parents have previous CPS history in Illinois regarding physical neglect. The mother, H. H., has reported mental health issues.

448.     Section six of the original petition states: CPS investigations, drugs screens, law enforcement intervention, previous CPS services in IL.

449.     Section seven of the petition states: "the specific allegations are: Please see attached.

450.     This petition did not contain allegations of factual evidence but instead lists "concerns" on an unsigned document attached in a separate document that reads as follows: Family Composition

1) H. H. (DOB: **/**/****) is the biological mother of J. H. Jr. (DOB: **/**/****) and M. H. (DOB: **/**/****).

2) J. H. Sr (DOB: **/**/****) is the legal father of J. H. Jr. (DOB: **/**/****) and M. H. (DOB: **/**/****).

Previous Concerns

3) While in Peoria County, IL in 2006, H. H. had her son, E. H. removed from her care due to severe physical abuse and physical neglect. E. H. was beaten by H. H. 's then boyfriend. There were also reported concerns regarding the family's housing conditions as it was observed to have old food on the floor, filthy countertops, unidentified insects throughout the home, dirty laundry piled up, a toilet brush laying within the children's toys, bug spray with eating utensils, and lighters on the floor. H. H. 's son was also taken to the hospital due to injuries he sustained from being beaten including a skull fracture,

extensive bruising, broken leg, and liver contusion.

4) While in Peoria County, IL in 2009, H. H. and J. H.'s son, J. H. Jr., was removed from their care. At the time H. H.was admitted to a

psychiatric hospital due to her mental health, tested positive for marijuana and opiates, and had very aggressive behavior.

Current Concerns

5) On 09/24/2018, Children's Protective Services received a complaint alleging for the last week the family has been staying at "Resort 3" in a 25 foot trailer. The family is believed to be just traveling due to not having stable housing. There are concerns regarding the family's living conditions as there is garbage all over outside and inside the trailer. Since arriving at the campground the family has been vomiting all over the place. The children are not enrolled in school. The daughter has been wearing dirty underwear and observed holding her private area. The children smell like urine. The children's bodies and clothes are dirty.

6) On 09/26/2018, Children's Protective Services Worker, Thomaca Bush, met with J. H. at "Resort 3".

a. J. H. reported he, his wife (H. H.) and their children (J. H. Jr. and M. H.) have been living in their camper for over a year as a lifestyle choice.

b. J. H. reported no one has complained about the conditions around their trailer, but then stated the neighbors complained about the conditions

and maintenance told him they had to clean up the outside of the camper.

c. J. H. reported there was no trash around the trailer and only the

children's toys were outside.

d. J. H. reported he is a disabled veteran and has a brain injury. He

stated he is currently prescribed Depakote, an antidepressant, and
Tizanidine (muscle relaxer).

e. J. H. denied substance use and reported having the stomach flu
causing him to vomit around the camper.

f. J. H. reported the worker would not be able to see the inside of the trailer as they
packed all of their belongings to move from the campsite.

g. J. H. voluntarily participated in a Forensic Fluids drug screen
which is currently pending.

h. J. H. reported he and his wife, H. H., currently had a CPS
investigation in St. Claire, MI and CPS history in Illinois where their
children were removed.

i. J. H. reported he and his family have resided in several different
states including Colorado, Arkansas, Florida, and Texas.

j. J. H. reported the children are being home schooled as he and H. H.
have school workbooks for them.

7) On 09/26/2018 Contact was made with Dennis, park maintenance at "Resort 3".

a. Dennis reported vomit, noodles, and various trash was observed around
the family's camper.

b. Dennis stated he addressed this with the family and it was cleaned before
the police came out to the camp site.

c. Dennis reported there have been several complaints of the conditions of
the camper and reports of the family's daughter being outside unsupervised playing and
having dirty clothes on by the other family's at
the campsite. Dennis reported one neighbor reported the child's underwear

was so dirty it appeared to be black.

d. Dennis reported the parents appear to be on some kind of substance as

they vomit often outside the camper. He stated the father appears very jittery when

spoken to.

e. Dennis reported the children are reportedly home schooled

8) 09/27/2018 Children's Protective Services Worker, Thomaca Bush, met with H. H. at

Ingham County Fair Grounds.

a. The camper was observed to have a very foul odor, some dirty dishes, and

very tight living area. The worker asked to speak with H. H.outside of the camper.

b. CPS worker, Thomaca Bush, attempted to ask H. H.questions regarding the

investigation. H. H.became very irate and confrontational, stating the

information was irrelevant, calling the worker a "bitch", and getting into

the worker's face.

c. H. H. reported the worker was infringing on her constitutional rights,

the worker needed to move on from the questions, and she would only answer what she

needed or wanted to.

d. H. H. reported the worker was "flaring up" her PTSD and paranoia.

e. At one point, H. H. told her daughter, M. H. , to go inside so she can continue to be

"pissed off" at the worker.

f. H. H. reported she and her family have resided in thirteen different states, the worker

needed to get a map and draw lines to all of them as the

federal investigation was being made.

g. H. H. reported the worker did not need to know about her previous CPS history and

that she had CPS history out the "wazoo."

9) On 09/27/2018 CPS worker, Thomaca Bush, spoke with CPS worker, Jason Salamango, in St. Claire County, MI.

a. Jason Salamango reported he does currently have an CPS investigation with H. H. and J. H. regarding physical neglect of their children as it was reported the family was staying in a camper and teepee shaped tent, the children had not bathed over twenty five days, M. H. had lice in her hair, the family's home was foreclosed on, and the children were not enrolled in school.

b. Jason Salamango reported the on-call worker in St. Clair, MI met with H. H.and J. H.and reported the camper to have a very strong smell coming from it that was so strong the worker was only able to peak inside the camper. Mr. Salamango reported the children's clothing was observed to be dirty and their hair was messy, but they did not have lice.

c. Jason Salamango reported during his investigation the H. family left the area and he requested a courtesy worker go out to verify the wellbeing of the children and observe the family's camper at their new location. Mr. Salamango reported once the courtesy worker made contact with H. H. and J. H. began cursing and yelling at the worker and refused to cooperate with the investigation.

d. Jason Salamango reported when he spoke with H. H.she was confrontational and would not answer questions he asked regarding the investigation and would not tell him where she and her family were going after they left. Mr. Salamango reported most of the information he found out about the family came from CPS history he received from Illinois.

10) On 09/27/2018, contact was made with Lt. Dennis Hull with Ingham County Sheriff's Office.

a. Lt. Hull reported he and Deputy Kindervater were dispatched to the family camper for a wellbeing check.

b. Lt. Hull reported the family camper was observed to be very tight and very dirty with dirty laundry all over the place and dirty dishes on the countertops. He reported the camper also had a strong smell of dog.

c. Lt. Hull reported the family had food in the home and the children appeared to be fed, but he believed the home needed a thorough cleaning.


Recommendations

It is respectfully requested the court authorize the petition, take jurisdiction of J. H. Jr. and M. H. and place the children in the care and custody of the Department of Health and Human Services. It is further requested parenting time for J. H. Sr. and H. H. be supervised and/or unsupervised at the discretion of the department."

451.     The Ingham County Petitions list the H. Family Address as Ingham County Fairgrounds 700 Ash, Mason, MI.

452.     Section eight of this original petition contains only one checkmarked box.

453.     Section eight of this original petition has a checkmark for box stating "authorize this petition and take jurisdiction of the children.

454.     Section eight of this original petition is not checkmarked on the box to "issue an order removing".

455.     Section eight of this original petition is not checkmarked on the box "the children"

456.     Section eight of this original petition is not checkmarked on the box "the abuser"

457.     This petition does not contain allegations of evidence of abuse or neglect as

defined by Michigan statute but merely lists "concerns".

458.      This petition contains misrepresentation of the truth and fabricated evidence.

459.      H. Family was cooperative in ensuring the children were safe.

460.      H. H. did not become very irate and confrontational when asked questions regarding the investigation; but rather H. H. became upset over clear violations of her rights and Thomaca Bush had unclean hands.

461.      H. H. never reported she and her family have resided in thirteen different states.

462.      H. H. never stated "draw lines to all of them as the federal investigation was being made."; this is a misrepresentation of a question asking why Thomaca Bush was turning it into a federal investigation after a threat to seek information from all 50 states.

463.      H. H. never reported the worker did not need to know about her previous CPS history and that she had CPS history out the "wazoo."

464.      Multiple assertions about the cooperation and objections of the H. Family are inaccurate portrayals of legitimate assertions of constitutional protections.

465.      This petition omits exonerating evidence Thomaca Bush had direct knowledge of.

466.      Omitted is the evidence of Thomaca Bush's unclean hands in escalating the interview into a confrontational interview.

467.      Omitted is the evidence of mental health treatment Thomaca Bush was shown before the interview became confrontational.

468.      Omitted is the evidence of the H. Family's medical marijauna patient status and assertions of legal protections.

469.      Omitted is the evidence H. H. was cooperative in providing exonerating evidence.

470.      Omitted is the evidence H. H. and J. H. asked for reasonable accommodations during the interview.

471.    Omitted is the evidence of H. H. begging for services and moving on to the next question, in spite of her objections to invasion of her privacy.

472.    Omitted is the evidence Thomaca Bush never offered any safety planning, had not found the children unsafe and nor did the H. Family then refuse services.

473.    Omitted is the H. Family's residence out of state and claims to the legal protections for out of state residents despite a requirement under MCL 722.1209 to include the known address for the previous 5 years.

474.    Michigan courts lacked jurisdiction over the H. Family as out of state residents.

475.    Thomaca Bush was aware of the material facts the H. Family had been in Michigan less than 6 months, intended to return to Illinois, H. H. was specifically quoting laws, specifically denying the H. Family had achieved residency in Michigan at any point and asserting rights as an out of state residence and there was prior court orders affecting custody in Illinois.

476.    At 1:15 pm on September 28th 2018 Referee Peter Brown presided over the same day preliminary hearing.

477.    At 1:15 pm on September 28th 2018 no summons had been issued or served on any party.

478.    The H. Family were informed by appointed counsel Ronald Berry and Scott Nichol, that Thomaca Bush testified at the September 28th 2018 preliminary hearing, to no attempt to notify J. H. of court at all.

479.    Instead Thomaca Bush merely may have heard him in the background and testified of H. H. assertions of improper service when she notified H. H. via telephone only and indicated no summons had been served as required by law.

480.    Ingham County has no authority to hold a mandatory appearance preliminary

hearing on September 28th 2018 when the original petition was accompanied by a request to leave children in the home.

481.      It has been clearly established in Michigan, "Because of its "informal" nature, MCR 3.903(A)(23), and the narrowly tailored purpose it serves, MCR 3.962(B), the court rules provide that "[a] preliminary inquiry need not be conducted on the record or in the presence of the parties." MCR 3.962(B). In re England, 887 NW 2d 10 (2016) 314 Mich. App. 245

482.      Ingham County had no authority to hold a preliminary inquiry on September 28th 2018 when the original petition was not verified by Thomaca Bush's signature.

483.      Ingham County has authority to hold an informal preliminary inquiry only when a verified petition has been filed that is accompanied by a request to leave children in the home.

484.      It has been clearly established in Michigan, "A preliminary inquiry is, by definition, an "informal review" proceeding to determine proper action on a petition. MCR 3.903(A)(23). It is distinguished from a preliminary hearing in that the child is not in the temporary custody of DHHS and there is no request for the child's removal contained in the petition. MCR 3.962(A); MCR 3.965(A)(1); In re Hatcher, 443 Mich. 426, 434, 505 N.W.2d 834 (1993)". In re England, 887 NW 2d 10 (2016) 314 Mich. App. 245

485.      MDHHS's systematic use of the preliminary hearing process instead of an informal preliminary inquiry, to bypass due process and receive an enforceable same day order to cooperate with an investigation if the petition is accompanied by a request to leave children in the home violates parents rights to due process.

486.      It has been clearly established in Michigan "The permissible actions following a

preliminary inquiry are limited to granting or denying authorization to file the petition, or referring the matter to `alternative services.'" In re Kyle, 480 Mich. 1151, 1151, 746 N.W.2d 302 (2008), citing MCR 3.962(B)(1) through (3)". In re England, 887 NW 2d 10 (2016) 314 Mich. App. 245

487.     MCL 712A.13a (1) (c) states: "Attorney" means, if appointed to represent a child in a proceeding under section 2(b) or (c) of this chapter, an attorney serving as the child's legal advocate in a traditional attorney-client relationship with the child, as governed by the Michigan rules of professional conduct. An attorney defined under this subdivision owes the same duties of undivided loyalty, confidentiality, and zealous representation of the child's expressed wishes as the attorney would to an adult client. For the purpose of a notice required under these sections, attorney includes a child's lawyer-guardian ad litem."

488.     MCL 712A.13a (1) (d) states: "Case service plan" means the plan developed by an agency and prepared under section 18f of this chapter that includes services to be provided by and responsibilities and obligations of the agency and activities, responsibilities, and obligations of the parent. The case service plan may be referred to using different names than case service plan including, but not limited to, a parent/agency agreement or a parent/agency treatment plan and service agreement."

489.     MCL 712A.13a (1) (e) states: "Foster care" means care provided to a juvenile in a foster family home, foster family group home, or child caring institution licensed or approved under 1973 PA 116, MCL 722.111 to 722.128, or care provided to a juvenile in a relative's home under a court order."

490.     MCL 712a.13a (2) states: "If a juvenile is alleged to be within the provisions of section 2(b) of this chapter, the court may authorize a petition to be filed at the conclusion

of the preliminary hearing or inquiry. The court may authorize the petition upon a showing of probable cause that 1 or more of the allegations in the petition are true and fall within the provisions of section 2(b) of this chapter. If a petition is before the court because the department is required to submit the petition under section 17 of the child protection law, 1975 PA 238, MCL 722.637, the court shall hold a hearing on the petition within 24 hours or on the next business day after the petition is submitted, at which hearing the court shall consider at least the matters governed by subsections (4) and (5)."

491.     MCL 722.637 states: "(1) Except as provided in subsection (2), within 24 hours after the department determines that a child was severely physically injured as defined in section 8, sexually abused, or allowed to be exposed to or have contact with methamphetamine production, the department shall submit a petition for authorization by the court under section 2(b) of chapter XIIA of 1939 PA 288, MCL 712A.2. (2) The department is not required to file a petition for authorization by the court as described in subsection (1) if the department determines that the parent or legal guardian is not a suspected perpetrator of the abuse and the department determines that all of the following apply: (a) The parent or legal guardian did not neglect or fail to protect the child. (b) The parent or legal guardian does not have a historical record that shows a documented pattern of neglect or failing to protect the child. (c) The child is safe in the parent's or legal guardian's care."

492.     MCL 712A.13a (3) states. "(3) Except as provided in subsections (5) and (6), if a petition under subsection (2) is authorized, the court may release the juvenile in the custody of either of the juvenile's parents or the juvenile's guardian or custodian under reasonable terms and conditions necessary for either the juvenile's physical health or mental well-being."

493.   MCL 712A.13a (3) does not apply to children not in custody, because children not in custody do not need a court order to be released.

494.   The children were not in custody to be released and therefore MCL 712A.13a (3) does not apply.

495.   The Court "order after a preliminary hearing" did not directly release the children to their parents and therefore MCL 712A.13a (3) does not apply.

496.   In light of "In Re Sanders", "orders to cooperate with an investigation" would not be reasonable terms and conditions because it violates parents constitutional rights prior to adjudication and before MDHHS has statutory authority to file a petition.

497.   MDHHS lacks authority to use MCL 712a.13a (3) provisions in cases the children have not been previously removed, when they only seek in home jurisdiction and do not avail themselves of the ex parte protective custody order process.

498.   MCL 712A.13a: Sections 4, 5, 7 and 8 relate only to court powers when there is a petition alleging abuse of the child by the parent, guardian, custodian, nonparent adult, or other person and does not apply to the H. Family's case as no abuse was alleged.

499.   MCL 712A.13a (4) states: "The court may order a parent, guardian, custodian, nonparent adult, or other person residing in a child's home to leave the home and, except as the court orders, not to subsequently return to the home if all of the following take place: (a) A petition alleging abuse of the child by the parent, guardian, custodian, nonparent adult, or other person is authorized under subsection (2). (b) The court after a hearing finds probable cause to believe the parent, guardian, custodian, nonparent adult, or other person committed the abuse. (c) The court finds on the record that the presence in the home of the person alleged to have committed the abuse presents a substantial risk of harm to the child's life, physical health, or mental well-being.

500.    MCL 712A.13a (5) states: "If a petition alleges abuse by a person described in subsection (4), regardless of whether the court orders the alleged abuser to leave the child's home under subsection (4), the court shall not leave the child in or return the child to the child's home or place the child with a person not licensed under 1973 PA 116, MCL 722.111 to 722.128, unless the court finds that the conditions of custody at the placement and with the individual with whom the child is placed are adequate to safeguard the child from the risk of harm to the child's life, physical health, or mental well-being."

501.    MCL 712A.13a (6) states: " (6) If a court finds a parent is required by court order to register under the sex offenders registration act, the department may, but is not required to, make reasonable efforts to reunify the child with the parent. The court may order reasonable efforts to be made by the department."

502.    MCL 712A.13a (8) states: "An order entered under subsection (4) may also contain 1 or more of the following terms or conditions: (a) The court may require the alleged abusive parent to pay appropriate support to maintain a suitable home environment for the juvenile during the duration of the order. (b) The court may order the alleged abusive person, according to terms the court may set, to surrender to a local law enforcement agency any firearms or other potentially dangerous weapons the alleged abusive person owns, possesses, or uses. (c) The court may include any reasonable term or condition necessary for the juvenile's physical or mental well-being or necessary to protect the juvenile."

503.    MCL 712A.13a (9) states: "The court may order placement of the child in foster care if the court finds all of the following conditions: (a) Custody of the child with the parent presents a substantial risk of harm to the child's life, physical health, or mental well-being. (b) No provision of service or other arrangement except removal of the child

is reasonably available to adequately safeguard the child from risk as described in

subdivision (a).(c) Continuing the child's residence in the home is contrary to the child's

welfare. (d) Consistent with the circumstances, reasonable efforts were made to prevent

or eliminate the need for removal of the child. (e) Conditions of child custody away from

the parent are adequate to safeguard the child's health and welfare."

504.      MCL 712A.13a (10) states: " If the court orders placement of the juvenile outside

the juvenile's home, the court shall inform the parties of the following: (a) That the

agency has the responsibility to prepare an initial services plan within 30 days of the

juvenile's placement. (b) The general elements of an initial services plan as required by

the rules promulgated under 1973 PA 116, MCL 722.111 to 722.128. (c) That

participation in the initial services plan is voluntary without a court order."

505.      MCL 712A.13a (20) states: "As used in this section, "abuse" means 1 or more of

the following: (a) Harm or threatened harm by a person to a juvenile's health or welfare

that occurs through nonaccidental physical or mental injury. (b) Engaging in sexual

contact or sexual penetration as defined in section 520a of the Michigan penal code, 1931

PA 328, MCL 750.520a, with a juvenile.

506.      ``MCL 712A.10 (1) states: "Except as otherwise provided in subsection (2) and

sections 14, 14a, and 14b of this chapter, the judge may designate a probation officer or

county agent to act as referee in taking the testimony of witnesses and hearing the

statements of parties upon the hearing of petitions alleging that a child is within the

provisions of this chapter, if there is no objection by parties in interest. The probation

officer or county agent designated to act as referee shall do all of the following: (a) Take

and subscribe to the oath of office provided by the constitution. (b) Administer oaths and

examine witnesses. (c) If a case requires a hearing and the taking of testimony, make a

written signed report to the judge containing a summary of the testimony taken and a recommendation for the court's findings and disposition."

507.    MCL 712A.15 (1) states: "In the case of a child concerning whom a complaint has been made or a petition has been filed pursuant to this chapter, the court may order the child, pending the hearing, detained in a facility as the court shall designate. The court may release the child, pending the hearing, in the custody of a parent, guardian, or custodian, to be brought before the court at the time designated. As used in this subsection, "petition" includes all of the following: (a) Petition. (b) Supplemental petition. (c) Petition for revocation of probation. (d) Supplemental petition alleging a violation of a personal protection order."

508.    MCL 712A.15 (2) states: "Custody, pending hearing, is limited to the following children: (a) Those whose home conditions make immediate removal necessary. (b) Those who have a record of unexcused failures to appear at juvenile court proceedings.(c) Those who have run away from home. (d) Those who have failed to remain in a detention or nonsecure facility or placement in violation of a court order. (e) Those whose offenses are so serious that release would endanger public safety. (f) Those who have allegedly violated a personal protection order and for whom it appears there is a substantial likelihood of retaliation or continued violation."

509.    MCL 712A.15 (3) states: "A child taken into custody pursuant to section 2(a)(2) to (4) of this chapter or subsection (2)(c) shall not be detained in any secure facility designed to physically restrict the movements and activities of alleged or adjudicated juvenile offenders unless the court finds that the child willfully violated a court order and the court finds, after a hearing and on the record, that there is not a less restrictive alternative more appropriate to the needs of the child. This subsection does not apply to a

child who is under the jurisdiction of the court pursuant to section 2(a)(1) of this chapter or a child who is not less than 17 years of age and who is under the jurisdiction of the court pursuant to a supplemental petition under section 2(h) of this chapter."

510.    MCL 712A.15 (4) states: "A child taken into custody pursuant to section 2(b) of this chapter or subsection (2)(a) shall not be detained in any secure facility designed to physically restrict the movements and activities of alleged or adjudicated juvenile offenders or in a cell or other secure area of any secure facility designed to incarcerate adults."

511.    A written signed report to the judge was required under MCL 712A.10 (1) c "If a case requires a hearing and the taking of testimony, make a written signed report to the judge containing a summary of the testimony taken and a recommendation for the court's findings and disposition."

512.    Ingham County Court referee Brown heard testimony on lack of service attempt to J. H. and an attempt to H. H. that Thomaca Bush testified was met with an objection to improper service yet made determination service was properly made with no notice to reviewing judge of material facts at issue with service.

513.    There is no written report to the contents of Thomaca Bush's testimony authored by Referee Peter Brown in the case file.

514.    H. H. has repeatedly requested access to the court recording and has been denied each time and told to seek and pay for a transcript instead.

515.    MCL 712A.28 (2) states "Beginning June 1, 1988, the court shall maintain records of all cases brought before it and as provided in the juvenile diversion act. Except as otherwise provided in this subsection, records of a case brought before the court shall be open to the general public. Diversion records shall be open only as provided in the

juvenile diversion act. Except as otherwise provided in section 49 of the crime victim's rights act, 1985 PA 87, MCL 780.799, if the hearing of a case brought before the court is closed under section 17 of this chapter, the records of that hearing shall be open only by court order to persons having a legitimate interest."

516.    Ingham County Court Referee Peter Brown after finding the children were subject to prior foster care proceedings in another state, failed under MCL 722.1206 to stay the proceedings and communicate with the court of the other state.

517.    The court of the state having jurisdiction did not determine that the court of this state is a more appropriate forum because they were never contacted and thus the court was required to dismiss the proceedings under MCL 722.1206.

518.    Ingham County Court Referee Peter Brown failed in his administrative duties as no report of testimony was made to a judge and the judge merely signed off on the court order completed by Referee Peter Brown.

519.    On September 28th 2018 at 2:10 pm Referee Peter Brown in an "egregious abuse of governmental power" acted in clear absence of judicial authority, issued an order after preliminary hearing that had no judicial review and served it to Thomaca Bush for execution.

520.    This order after preliminary hearing is not an ex parte protective custody order.

521.    This order after preliminary hearing is not an interim order pending preliminary hearing.

522.    The Court record contains notice of service of the order after preliminary hearing by Referee Peter Brown at 2:20pm September 28th 2018 to Thomaca Bush, court appointed counsel in open court and MDHHS via electronic service.

523.    The Court record contains notice of service of the order after preliminary hearing

by Referee Peter Brown September 28th 2018 no time specified to H. H. and J. H. in open court, despite their absence and no such service and a notation of "FTA" next to the H. Family's names.

524.     Referee Peter Brown violated his duties under MCL 712A.10 and acted in "clear absence of judicial authority" in issuing orders and serving them on parties without judicial review after such practice was clearly established as invalid.

"Neither the court rules nor any statute permits a hearing referee to enter an order for any purpose. In fact, that a hearing referee must make and sign a report summarizing testimony and recommending action for a judge reveals that the Legislature specifically denied referees the authority to enter orders, no matter their substance." IN RE AMB

"It is important to bear in mind, however, that the friend of the court is not the judge (which we suspect he would be the first to concede), and that his recommendations are never to be followed blindly. They are a helpful time-saving crutch and no more. The responsibility for the ultimate decision and the exercise of judicial discretion in reaching it still rests squarely upon the trial judge. These grave prerogatives he may never delegate to others." Campbell v. Evans, 99 NW 2d 341 (1959) .

525.     Ingham County Court referee Peter Brown acted with clear absence of all jurisdiction and in a judicial capacity when he authored the court order and made substantive legal findings following preliminary hearing.

526.     Referee Peter Brown does not have judicial immunity for acts "in clear access of all jurisdiction", "A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the "clear absence of all jurisdiction." Stump v. Sparkman, 435 US 349 - Supreme Court 1978

527.	Ingham County Court referee Brown acted with clear absence of all jurisdiction and in a judicial capacity; when he completed service of the proposed "court order following preliminary hearing" and issued court ordered summons in lieu of a "written report with a summary of testimony"; to some of the parties prior to a judge's review and petition being authorized by court as evidenced by proof of service in page 6 of order after preliminary hearing.

528.	Court referees are not authorized to author or issue orders of any kind at a hearing under MCL 712A.10 (1) and are limited in their power to issue orders to ex parte placement orders only under MCR 3.963(B) pursuant to MCR 3.913 and Ingham County Court is allowing Referees to author court orders and issue court ordered summons that includes an order after preliminary hearing and referees are not preparing a written report with summary of testimony prior to court order being authorized by a judge .

529.	MCR 3.913 (A) states: "Assignment of Matters to Referees. (1) General. Subject to the limitations in subrule (A)(2), the court may assign a referee to conduct a preliminary inquiry or to preside at a hearing other than those specified in MCR 3.912(A) and to make recommended findings and conclusions.

530.	MCR 3.913(2) (b) states "Child Protective Proceedings. Only a person licensed to practice law in Michigan may serve as a referee at a child protective proceeding other than a preliminary inquiry, preliminary hearing, a progress review under MCR 3.974(A) or (B), or an emergency removal hearing under MCR 3.974(C). In addition, either an attorney or a non attorney referee may issue an ex parte placement order under MCR 3.963(B)".

531.	In not filing a written recommendation Ingham County Court Referee Brown denied the H. Family rights to seek review of the recommendations for plain legal error.

MCR 3.991 (B)

532.     Ingham County Court Referee Brown failed to make required advisement to parties pursuant to MCR 3.913 (C)

533.     MCR 3.913(C) states: "Advice of Right to Review of Referee's Recommendations. During a hearing held by a referee, the referee must inform the parties of the right to file a request for review of the referee's recommended findings and conclusions as provided in MCR 3.991(B)."

534.     MCR 3.991 (A) states: " General. (1) Before signing an order based on a referee's recommended findings and conclusions, a judge of the court shall review the recommendations if requested by a party in the manner provided by subrule (B)."

535.     The H. Family had meritorious claims of plain legal error of lack of subject matter and personal jurisdiction that had been raised would have likely resulted in a different judicial decision under MCR 3.991 (E) (2)

536.     MCR 3.991 (E) states: "Review Standard. The judge must enter an order adopting the referee's recommendation unless: (1) the judge would have reached a different result had he or she heard the case; or (2) the referee committed a clear error of law, which (a) likely would have affected the outcome, or (b) cannot otherwise be considered harmless."

537.     The H. Family had a constitutional right to resist the invasion of their privacy under the 4th Amendment. WALSH v. ERIE COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES 240 F.Supp.2d 731 (2003)

538.     Ingham County Court Referee Brown made plain legal errors in determining; the children were removed September 28th 2018 , that court had subject matter jurisdiction, that notice of hearing had been given as required by statute, making specific findings of probable cause for allegations with no proffer of evidence or identified 1st hand witness

and that reasonable efforts had been made.

539.    Ingham County Court Referee Brown failed to make required imminent risk finding by making no finding on line 13 of order after preliminary hearing, placing children in protective custody to have issued a removal order under MCR 3.963 (a) .

540.    MCL 712A.3a fails to direct the court to any inquiry to in state jurisdiction and only requires notice be given to in state courts in violation of the UCCJEA"

541.    MCL 712A.3a states: "When any order affecting the welfare of a child is entered under this chapter by the judge of probate in any case where the child is subject to the prior or continuing order of any other court of this state, a notice thereof shall be filed in such other court and a copy of such notice shall be served personally or by registered mail upon the parents, guardian, or persons in loco parentis and upon the prosecuting attorney of the county wherein such other court is located. Such notices shall not disclose any allegations or findings of facts set forth in such petitions or orders, nor the actual person or institution to whom custody is changed. Such facts may be disclosed directly to such prosecuting attorney and shall be disclosed on request of the prosecuting attorney or by order of such other court, but shall be considered as confidential information, the disclosure of which will be subject to the same care as in all juvenile matters."

542.    Ingham County Court unlawfully failed to follow the UCCJEA when facts are known that would trigger UCCJEA and only disclose or make findings in state court jurisdiction.

543.    Ingham County Court unlawfully failed to enforce reasonable efforts requirements to prevent removal from the H. family as punitive action for offering passive resistance to investigation via constitutional objections and for having prior CPS history, making no inquiry into the court adjudication of prior cases, nature of prior services or a

determination prior efforts failed; despite notice of policies, state and federal laws requiring such efforts.

544.     Removal of children without reasonable efforts and no due process as punitive action for asserting constitutional rights is cruel and unusual punishment prohibited by the 8th amendment of the United State Constitution.

545.     The litany of services available in the H. Family but not considered or offered include: 24 hour emergency caretaker homemaker services; daycare; crisis counseling, individual and family counseling; emergency shelters; arrangements for the provision of temporary child care to provide respite to the family for a brief period, as part of a plan for preventing the children's removal from the home; home-based family services, self-help groups, provisions, or arrangements for mental health, drug and alcohol abuse counseling, Drug treatment, housing assistance, parenting education, anger management classes, mental health care referrals, child-development classes, home visits by nurses, referrals to medical care, financial management services, stress management services, wrap-around services, and facilitate meetings with family/support persons.

546.     Ingham County Court Referee Brown used discriminatory factors in authorizing the petition based on evidence of a reasonable accommodation for disability in violation of the United States Civil Rights Act of 1968, Michigan's PERSONS WITH DISABILITIES CIVIL RIGHTS ACT of 1976 and established case law.

547.     MCL 37.1302 Prohibited conduct. Except where permitted by law, a person shall not: (a) Deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation or public service because of a disability that is unrelated to the individual's ability to utilize and benefit from the goods, services, facilities, privileges, advantages, or

accommodations or because of the use by an individual of adaptive devices or aids

548.     On September 28th 2018 H. H. and J. H. were never at the Ingham County Courthouse and did not appear in court.

549.     The Court record contains a court report for the September 28th 2018 hearing, that has a signature dated September 28th 2018 and file stamp date of October 2nd 2018.

550.     This court report has various checked marked boxes of admonishments alleged to be given to the H. Family despite notation the H. Family failed to appear.

551.     Michigan State Court Administrative Office produces approved court forms with various checkmark boxes for statutorily required findings.

552.     This court report states the children were placed in foster care.

553.     There were no findings in the order after preliminary hearing as required to place the H. Family's children into protective custody.

554.     The only findings made were the findings required under federal law to receive federal funding.

555.     The findings made were not based on probable cause and used language such as "may have had".

556.     The findings were made based on uncolberated anonymous claims that were not able to be substantiated and unidentified third party gossip ie. hearsay that did not contain an adequate degree of reliability.

557.     While Walsh V Erie County speaks to the sufficiency of an anonymous call, it clearly indicates a need to make a determination on the veracity of the call, needing more trustworthy sources and a need to determine if the information was based on personal observations or neighborhood rumors, malicious gossip and personal animosity.

558.     The circumstances Defendants relied on, however, do not provide a showing of imminent or likely harm sufficient to justify their actions

559.     Dennis Baker's reliance on third party gossip and made an acknowledgment that law enforcement found no evidence to support the allegations or a reason to believe that the children were at such risk of harm or injury that immediate action was necessary.

560.     The petition does give indication of the caller's basis for the allegation was neighborhood rumors, malicious gossip. and personal animosity.

561.     It had been clearly established prior to September 26th 2018, in the 6th circuit in Walsh V Erie, CPS workers do not have probable cause based on an anonymous phone call.

562.     It had been clearly established prior to September 26th 2018, in the 6th circuit in Walsh V Erie, CPS workers must depart and get their information from more reliable sources before seeking a court order if a family declines to be cooperative.

563.     The findings were not supported by the evidence developed by law enforcement.

564.     The findings were not supported by the evidence developed by MDHHS.

565.     The findings were not supported by the evidence gleaned from a historical record review.

566.     The findings were contradicted by evidence known to the complaining witness Thomaca Bush.

567.     On September 28th 2018, after the court hearing Thomaca Bush sought to enforce the order after preliminary hearing before it was a court order.

568.     Michigan State statutes require a judge to sign the orders after a preliminary hearing and such signature was not affixed until October 1st 2018.

569.     The practices to seek orders to cooperate have created systematic due process

violations across the state of Michigan in multiple counties.

570.      Ingham County is not the only Michigan County with systemic due process issues as a result of MDHHS seeking unauthorized and unconstitutional orders to cooperate with investigation.

571.      The H. Family was subject to such proceedings in Ingham county and a review of Ingham County and Ingham County and Grand Traverse County Court Records and local practices found similar systemic issues as found in Ingham County.

572.      H. H. has personally reviewed court files and video recordings of cps workers from other parents who have publicly posted information and facts concerning the patterns of MDHHS to seek unauthorized orders to cooperate and unauthorized same day preliminary hearings.

573.      Ingham County has initiated other cases in the same manner the H. Family proceedings with unauthorized same day preliminary hearings and the parents posted to social media.

574.      One such case H. H. spoke to Stacey Strouse concerning another mothers case involving similar allegations and same day preliminary hearing after discovering the mothers situation via postings in a Facebook group.

575.      In this recorded call, Stacey Strouse indicated all cases in Ingham County are initiated the same way and used language nearly identical to the wording of MDHHS written policy.

576.      H. H. also spoke with a Grand Traverse County Juvenile Register, during a recorded call, in regards to another parents complaints of same day preliminary hearings, orders to cooperate and "early permanency" sought without statutory authority.

577.      Ingham County and Grand Traverse County MDHHS is illegally filing unverified

petitions without a signature from the complaining witness and instead only initials appear on some of the petitions with the Ingham County petition having no signature or initials on the original petition.

578.   Ingham County and Grand Traverse County are initiating proceedings with same day preliminary hearings instead of preliminary inquiry without statutory authority.

579.   Ingham County is initiating cases before a petition has been submitted or authorized and failing to file the original petitions.

580.   Grand Traverse County Juvenile Register is illegally filing petitions before such petition has been authorized.

581.   Ingham County and Grand Traverse County MDHHS are illegally filing petitions for orders to cooperate during an investigation.

582.   Ingham County and Grand Traverse County MDHHS is illegally filing petitions with no probable cause and no identified witnesses based on "concerns".

583.   Ingham County and Grand Traverse County MDHHS is illegally filing petitions for orders to cooperate with the investigation before the department has listed the parent as a category 2 or 3 case and without offering services during the current case.

584.   Ingham County and Grand Traverse County MDHHS is illegally filing petitions without statutory requirement; the department has used a structured tool to make a determination anyof the following are true: (i) A court petition is required under another provision of this act. (ii) The child is not safe and a petition for removal is needed. (iii) The department previously classified the case as category II and the child's family does not voluntarily participate in services.

585.   Ingham County and Grand Traverse County MDHHS is illegally filing petitions without statutory requirement; the department has used a structured tool to make a

determination that the structured decision-making tool indicates a high or intensive risk of future harm to the child.

586.     Ingham County and Grand Traverse County MDHHS are illegally filing petitions for removal without statutory requirement of: "(a) Custody of the child with the parent presents a substantial risk of harm to the child's life, physical health, or mental well-being, (b) No provision of service or other arrangement except removal of the child is reasonably available to adequately safeguard the child from risk as described in subdivision (a)."

587.     Ingham County and Grand Traverse County MDHHS is illegally filing petitions for removal without statutory standard of substantial risk of harm to the child's life, physical health, or mental well-being and is instead using contrary to welfare standards.

588.     Ingham County and Grand Traverse County Courts are illegally holding same day preliminary hearings without statutory due process.

589.     Grand Traverse County MDHHS illegally used orders after preliminary hearings that directly denied authorization of the petition, as a valid enforceable court order for cooperation during investigation.

590.     Review of recordings between Sarah Culbertson, an MDHHS supervisor and a biological parent in Grand Traverse County proves MDHHS uses orders after a preliminary hearing as orders to cooperate with the investigation even when the petition was not authorized.

591.     On September 28th 2018 at about 5:30 pm CST, Marisa Anderson, a supervisor from MDHHS, contacted the H. Family, who were back in Illinois and falsely stated the department was granted a court order for custody never notifying the H. Family the recommended order was not an enforceable order.

592.     During the September 28th 2018 phone calls with Marisa Anderson H. H. was asked the H. Family location and was told she had to disclose because the children were AWOL and because MDHHS had legal custody they had to know where the children were.

593.     During the September 28th 2018 phone calls at approximately 5:30 pm with Marisa Anderson H. H. told Marisa Anderson the H. Family's current location at a K.O.A campground in Illinois on the route to their destination.

594.     The H. Family and plaintiff J. H.'s Mother A. W. all exchanged multiple phone calls with Marisa Anderson on or about the evening of September 28th 2018 between 5:30 pm and 7:00 pm, prior to apprehension order being sought, indicating family was not in Michigan jurisdiction, seeking UCCJEA protections and that the H. Family and A.W. wished to enter into another "APPOINTMENT OF SHORT-TERM GUARDIAN" under 755 ILCS 5/11-5.4 ; as in 2009 case in Illinois until legal matter could be resolved.

595.     Marisa Anderson declared A. W.the children were considered AWOL from a Court Ordered placement and attempted to verify if the children were at a KOA campground in Illinois.

596.     On September 28th 2018 at about 5:30 pm to 7:00 pm CST, the H. Family children had not been placed in protective custody per order of a court.

597.     On or about September 28th 2018, the H. Family children were placed in protective custody status per decision of Thomaca Bush and not order of a court.

598.     On or about September 28th 2018, the H. Family children the decision to place the children in protective custody was made by Thomaca Bush and/or Marisa Anderson prior to a court order being issued.

599.     Marisa Anderson advised the H. Family and A. W. that MDHHS was unwilling to

allow A.W. to take the children without first returning children to Michigan and then there could be a possibility months later under interstate compact the children could be placed in A.W. care that could be addressed later and at no time sought to notify the court in either state of the need to address the UCCJEA.

600.     28 U.S. Code § 1738A (e), 750 ILCS 36/110, MCL 722.1201, MCL 722.1110 (2) required a court determination on jurisdiction and the Plaintiffs have "reasonable notice and opportunity to be heard." on matter of jurisdiction.

601.     On or about September 28th 2018, at 5:30 pm CST, Marisa Anderson was to have forwarded the "order after preliminary hearing" to J. H. email 2 hours prior to Thomaca Bush having submitted a request for "apprehension order".

602.     On or about September 28th 2018, Marisa Anderson in an "egregious abuse of governmental power" and in violation of written policy PSM 713-11, sought multiple placements for the plaintiffs children without having established legal authority for placement, leaving blank the legal status box on form Child Welfare Licensing Placement Assistance Request", with stated reason for foster care placement was refusal to cooperate by H. H. and "no reported concerns" listed for J. H. (EXHIBIT FIVE (5))

603.     On September 28th 2018 there was no court order for H. H., to have refused to cooperate with the order entered October 2nd 2018, gave H. Family 7 days to comply with turn over information and sign medical releases and H. Family had not refused to comply.

604.     After the preliminary inquiry MDHHS operated on the presumption they had a valid enforceable court order for "constructive removal" and/or "preliminary jurisdiction" .

605.     Based on information and belief developed from conversation with Mellisa

Wright, MDHHS records show the decision for a "physical removal" came after Thomaca

Bush could not serve the recommended "Order After Preliminary Hearing" on the H.

Family at the Ingham County Fairgrounds.

606.     Based on information and belief developed from conversation with Mellisa

Wright, MDHHS records show the decision to remove came after it was discovered

through conversations with Marisa Anderson that the H. Family had returned to Illinois

which was viewed as absconding from a valid court order for ""constructive removal"

and/or "preliminary jurisdiction" "

607.     Marisa Anderson, as Thomaca Bush's acting supervisor, participated and or

encouraged and implicitly authorized, approved, or knowingly acquiesced in the

unconstitutional conduct of Thomaca Bush.

608.     Michigan statutes have two procedures for seeking court orders to enter into a

premises and to seize children under the probate code.

609.     For children not under a current court order placing children in out of home care,

the correct procedures for CPS to seize children is to seek ex parte protective custody

orders under MCL 712A.14b.

610.     MCL 712A.14b (1) states: "Upon receipt electronically or otherwise of a petition

or affidavit of facts, a judge or referee may issue a written ex parte order, electronically or

otherwise, authorizing the department of human services to immediately take a child into

protective custody and place the child pending the preliminary hearing if the court finds

all of the following: (a) There is reasonable cause to believe that the child is at substantial

risk of harm or is in surroundings that present an imminent risk of harm and the child's

immediate removal from those surroundings is necessary to protect the child's health and

safety. (b) The circumstances warrant issuing an ex parte order pending the preliminary

hearing. (c) Consistent with the circumstances, reasonable efforts were made to prevent or eliminate the need for removal of the child. (d) No remedy other than protective custody is reasonably available to protect the child. e) Continuing to reside in the home is contrary to the child's welfare.MCL 712A.14b (2) states: "The ex parte order shall be supported by written findings of fact."

611.    For children under the court's jurisdiction after a dispositional hearing and absent from a court ordered placement, the correct procedures for CPS to seize children is to seek apprehension orders under MCL 712A.2c.

612.    MCL 712A.2c states: "The court may issue an order authorizing a peace officer or other person designated by the court to apprehend a juvenile who is absent without leave from an institution or facility to which he or she was committed under section 18 of this chapter, has violated probation, has failed to appear for a hearing on a petition charging a violation of section 2 of this chapter, is alleged to have violated a personal protection order issued under section 2(h) of this chapter, or is alleged to have violated a valid foreign protection order. The order shall set forth specifically the identity of the juvenile sought and the house, building, or other location or place where there is probable cause to believe the juvenile is to be found. A person who interferes with the lawful attempt to execute an order issued under this section is guilty of a misdemeanor punishable by imprisonment for not more than 90 days or a fine of not more than $100.00, or both."

613.    MCL 712A.2c's requirement for "committed under section 18 of this chapter", means a pursuant to a dispositional order after adjudication.

614.    On or before 8:30 pm on September 28th 2018 no court order existed at all, as the recommended court order after preliminary hearing was not adopted by the court until October 1st 2018.

615.     On or before 8:30 pm on September 28th 2018 the recommended court order was not an ex parte protective order.

616.     On or before 8:30 pm on September 28th 2018 the recommended court order did not address placement of children as required under sections 4 and 5

617.     At no time was an ex parte protective custody order sought by MDHHS.

618.     Thomaca Bush exceeded her authority in seeking an apprehension order under MCL 712A.2c, on children not yet committed to the court jurisdiction under a court order after disposition under MCL 712A.18.

619.     MDHHS employees propagate their own policies and practices in the implementations and execution of "orders after preliminary hearing" as "orders to cooperate" and there is not established policy describing such procedure in the "PSM" before the dispositional stage as services are voluntary till this stage per policy.

620.     MDHHS has an unwritten policy and practice to enforce orders after preliminary hearings, that issued during the informal preliminary inquiry process as described by MCL 712a.11, without any legal authority and in contradiction to state law, resulting in out right violations of substantive and procedural due process.

621.     MCR 3.974 directs the proper due process requirements when a placement change is sought for children whom the court has authorized a petition and remains at home the court may not order a change in the placement of a child without a hearing.

622.     MCR 3.974 (A) (3) states "Except as provided in subrule (C), the court may not order a change in the placement of a child without a hearing. If the child for whom the court has authorized a petition remains at home or has otherwise returned home from foster care, and it comes to the court's attention at a review hearing held pursuant to subrule (A)(2), or as otherwise provided in this rule, that the child should be removed

from the home, the court may order the placement of the child. If the court orders the child to be placed out of the home following a review hearing held pursuant to subrule (A)(2), the parent must be present and the court shall comply with the placement provisions in MCR 3.965(C). If the parent is not present, the court shall proceed under subrule (C) before it may order removal. If the child is an Indian child, in addition to a hearing held in accordance with this rule, the court must also conduct a removal hearing in accordance with MCR 3.967 before it may order the placement of the Indian child.

623.     MCR 3.974 (C) (1) states "If a child, for whom the court has authorized and original petition remains at home or is returned home following a hearing pursuant to the rules in this subchapter, the court may order the child to be taken into protective custody pending an emergency removal hearing pursuant to the conditions listed in MCR 3.963(B)(1) and upon receipt, electronically or otherwise, of a petition or affidavit of fact. If the child is an Indian child and the child resides or is domiciled within a reservation, but is temporarily located off the reservation, the court may order the child to be taken into protective custody only when necessary to prevent imminent physical damage or harm to the child."

624.     On or about September 28th 2018, at 830 pm Thomaca Bush in an "egregious abuse of governmental power" emailed an affidavit for an apprehension order that was not based on probable cause or authorized by statute.

625.     This affidavit and request for apprehension orders stated: "Attachment A- Email Affidavit- NA-CPS-

Dear Judge Garcia

I am seeking apprehension orders for two minor children. Their names are J. H.

( \*\*/\*\*/\*\*\*\* DOB) and M. H. ( \*\*/\*\*/\*\*\*\* DOB) Continuing to reside in the home is contrary to the child(ren)'s welfare because:

On 09/28/2018, a petition was authorized in the 30th Circuit Court by Referee Peter Brown to remove J. H. and M. H. from the care and custody of their mother, H. H., and father, J. H.. This was due to neglect, lack of cooperation, previous CPS removals in other states, and concerns regarding untreated mental health and substance use. The parents have absconded with the children. Consistent with the circumstances, reasonable efforts were made to prevent or eliminate the need for removal of the child(ren) as follows: Past and current CPS involvement, Law Enforcement involvement, out of state foster care. Reasonable efforts to preserve and reunify the family to make it possible for the child(ren) to safely return home are recommended because there is not a request to terminate parental rights at this time. I declare that the statements above are true to the best of my information, knowledge and belief.

Thomaca Bush, CPS Worker".

626.    The H. Family was not fleeing CPS, instead merely were exercising constitutionally protected rights to travel, having gone about their scheduled travel and to have legal protections in the various states.

627.    The state can only interfere with a constitutionally protected right to travel if the state uses due process of the law as established by statute or if there is probable cause that exigent circumstances exist.

628.    Thomaca Bush did not have a reasonable basis for concluding that the children were in any imminent danger as to act as if there were exigent circumstances waiving due process requirements.

629.    The Ingham County pleadings do not contain any proffer of evidence to support

probable cause.

630.     The Ingham County pleadings do not contain any allegations the children were found unsafe but rather the H. Family had not ensured Thomaca Bush the children were safe, to her satisfaction.

631.     The Ingham County pleadings do not contain any allegations "there is reasonable cause to believe that the child is at substantial risk of harm or is in surroundings that present an imminent risk of harm and the child's immediate removal from those surroundings is necessary to protect the child's health and safety."

632.     The Ingham County pleadings do not contain facts that the circumstances warranted issuing an ex parte order pending the preliminary hearing.

633.     The Ingham County pleadings do not contain facts that MDHHS complied with statutory requirements to provide reasonable efforts to prevent removal and under the circumstances, reasonable efforts were not made to prevent or eliminate the need for removal of the child.

634.     The Ingham County pleadings do not contain facts that MDHHS offered any direct services to the H. Family.

635.     The Ingham County pleadings do not contain facts that the H. Family had refused services from MDHHS.

636.     The Ingham County pleadings contain facts that MDHHS was seeking in home jurisdiction before offering services.

637.     The Ingham County pleadings do not contain facts to support a finding, no remedy other than protective custody is reasonably available to protect the child.

638.     The Ingham County pleadings do not contain facts to support a finding, continuing to reside in the home was contrary to the child's welfare.

639. The Ingham County pleadings do not allege any imminent danger.

640. The Ingham County pleadings do not allege exigent circumstances existed.

641. It had been clearly established prior to September 28th 2018, Article IV section One (1) of the United States Constitution states: "Full faith and credit shall be given in each state to the public acts, records, and judicial proceedings of every other state. And the Congress may by general laws prescribe the manner in which such acts, records, and proceedings shall be proved, and the effect thereof."

642. It had been clearly established prior to September 28th 2018, Article IV section Two (2) of the United States Constitution states: "The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states.

643. It had been clearly established prior to September 28th 2018, the 4th Amendment of the United States Constitution states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

644. It had been clearly established prior to September 28th 2018, the 5th Amendment of the United States Constitution states: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

645.    It had been clearly established prior to September 28th 2018, The 9th Amendment of the United States Constitution states: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people".

646.    It had been clearly established prior to September 28th 2018: The 14th Amendment of the United States Constitution section One (1) states: "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

647.    It had been clearly established prior to September 28th 2018, since O'DONNELL v. Brown, 335 F. Supp. 2d 787 (W.D. Mich. 2004), Defendants were required to provide the H. Family constitutionally adequate process before depriving them of their right to familial integrity.

648.    It had been clearly established prior to September 28th 2018, "The constitutional guarantee of procedural due process requires that the government provide "due process" before making a decision to "infringe upon a person's life, liberty, or property interest." O'DONNELL v. Brown, 335 F. Supp. 2d 787 (W.D. Mich. 2004),

649.    Ingham County CPS and MDHHS/FIA (as their predecessor) have been aware since July 30th 2004, that parents have the right to procedural due process when it was upheld against FIA and Ingham County CPS Investigators in O'Donnell v. Brown, 335 F. Supp. 2d 787 (WD Mich 2004).

650.    It had been clearly established prior to September 28th 2018, freedom of movement has been judicially recognized as a fundamental Constitutional right Corfield

v. Coryell, 6 Fed. Cas. 546 (1823), Shapiro v. Thompson, 394 US 618 (1969) Vinson v.
Campbell County Fiscal Court, 820 F. 2d 194 (1987) and WALSH v. ERIE COUNTY
DEPARTMENT OF JOB AND FAMILY SERVICES 240 F.Supp.2d 731 (2003).

651.     Thomaca Bush could not restrict the H. Family freedom of travel based on largely
anonymous third party gossip and hearsay that did not contain an adequate degree of
reliability; about children being raised in an RV, perception of poverty, homeschooling,
and the begrimed faces of children, playing on naked mother earth, with no collaborating
evidence of neglect as defined by statute and her own observation could not find reported
conditions, determining the children were safe, had their basic needs met and no further
action was needed to address safety issues as evidenced by no safety planning offered.

652.     The H. Family had a constitutionally protected right to continue their travels.

653.     It had been clearly established prior to September 26th 2018, in the 6th circuit in
Walsh V Erie, CPS workers can't prevent parents from leaving during an investigation
absent a warrant based on probable cause.

654.     Pursuant to state and federal law MDHHS maintains a written policy titled PSM
715-3 governing when a court order has been issued ordering removal of a child not
physically present in Michigan, and these procedures were not followed.

655.     On or before 8:30 pm on September 28th 2018, Thomaca Bush did not have a
valid enforceable court order, ordering removal.

656.     On or before 8:30 pm on September 28th 2018, Thomaca Bush had not contacted
the other state's CPS equivalent.

657.     On or before 8:30 pm on September 28th 2018, Thomaca Bush had not
communicated with any court in Illinois in accordance to the UCCJEA

658.     On or before 8:30 pm on September 28th 2018, Thomaca Bush had not

communicated with any court in Michigan that the children were located in Illinois and were Illinois residents in accordance with the UCCJEA.

659.　　On or before 8:30 pm on September 28th 2018, Thomaca Bush had not communicated with the LGAL and never received written permission to extradite the H. Family children.

660.　　The H. Family was forwarded an email that contained header information to suggest the court from an email assigned to Judge Richard Garcia emails back an apprehension order with state line limits and incorrectly finds the children were already in "protective custody" via prior court order and absent from court ordered placement.

661.　　Protective Custody was not granted by prior order of the court, as claimed at approximately 8:30 pm September 28th 2018.

662.　　The H. Family didn't abscond, there was no court order to abscond from, they had prior intentions of leaving Michigan on September 28th 2018 at 9 am, hours before the petition was filed.

663.　　The decision to place the children in protective custody was not made by the court but Thomaca Bush in seeking apprehension orders reserved for children after adjudication and disposition and not an ex parte protective custody order.

664.　　Thomaca Bush maliciously and without probable cause, procured a search warrant to be issued and executed in retaliation for thwarting the efforts to enforce non-existent orders to cooperate with her investigation.

665.　　MCL 780.658 states: "Any person who maliciously and without probable cause procures a search warrant to be issued and executed shall be fined not more than $1,000.00 or imprisoned not more than 1 year."

666.　　On or about 8:30 pm on September 28th 2018, the Court purportedly sent emails

back from Rgarcica@ingham.org, two (2) ex parte protective custody orders.

667.     The resulting ex parte protective custody orders is check marked in box 3. a. and

verbiage of line 3. a. states: "The child(ren) has/have already been removed from the

parent(s), guardian or legal custodian and is/are absent without leave from court-ordered

placement".

668.     The resulting ex parte protective custody orders does not have a check mark in

box 3. b.

669.     The resulting ex parte protective custody orders while not checkmarked contains

verbiage on line 3. b. (3) which states: "Continuing to reside in the home is contrary to

the child(ren)'s welfare because: (specify) "Parents have absconded with the child"."

670.     The resulting ex parte protective custody orders verbiage on line 3. b. (5) states:

671.     "Consistent with the circumstances, reasonable efforts were made to prevent or

eliminate the need for removal of the child(ren) as follows: (specify) CPS Investigation".

672.     The resulting ex parte protective custody orders does not have a check mark in

box 4. a or 4 b.

673.     The resulting ex parte protective custody orders has a Pickup radius of Statewide

listed on page 4.

674.     The resulting ex parte protective custody orders have a section titled "OFFICER'S

CUSTODY STATEMENT AND RECORD OF NOTIFICATION"

675.     The "OFFICER'S CUSTODY STATEMENT AND RECORD OF

NOTIFICATION" states:

1. I certify and return that I have taken Child(ren)'s name(s) into custody on at

and have delivered the child(ren) to Place of temporary placement

2. I notified attempted to notify the parent(s), guardian(s), or legal custodian(s) listed

below that the child(ren) has/have been taken into custody and that a preliminary or an emergency removal hearing will be held on Date at at Time Location NAME METHODS USED (reasons for failure to notify must be noted).

676.     These ex parte protective custody orders are not filed with the court and are missing from the court record.

677.     The now missing ex parte protective custody orders had no signature and instead has the initials R. G. in designated signature area, in the line above a line that says Judge/Referees Signature and below that is the typed name Richard Garcia.

678.     It was clearly established in "O'Donnell", "Michigan law is M.C.L. § 780.651, which authorizes the issuance of search warrants by "electronic or electromagnetic communication." The statute at the time of this incident stated: "A judge may issue a written search warrant in person or by an electronic or electromagnetic means of communication." M.C.L. § 780.651(3) (emphasis added). "The peace officer or department receiving an electronically or electromagnetically issued search warrant shall receive proof that the issuing judge or district court magistrate has signed the warrant before the warrant is executed. Proof that the issuing judge or district court magistrate has signed the warrant may consist of an electronically or electromagnetically transmitted facsimile of the signed warrant." O'DONNELL v. Brown, 335 F. Supp. 2d 787 (W.D. Mich. 2004),

679.     Current text of MCL 780.651 (3) was moved to section 5 but has not changed in a material way affecting the requirement of a signed warrant only adding the addition of "or an electronic signature on a warrant transmitted over a computer network."

680.     MCL 780.651 (5) states "The peace officer or department receiving an electronically or electromagnetically issued search warrant shall receive proof that the

issuing judge or district court magistrate has signed the warrant before the warrant is executed. Proof that the issuing judge or district court magistrate has signed the warrant may consist of an electronically or electromagnetically transmitted facsimile of the signed warrant or an electronic signature on a warrant transmitted over a computer network."

681.    On or about September 28th 2018, H. H. began experiencing great emotional distress at the thought of having to surrender her children to authorities or go to jail and still lose her children, resulting in the family continuing on to Urbana Illinois so H. H. could seek inpatient hospitalization and the H. Family checked into a hotel..

682.    At approximately midnight, out of fear of a warrant being issued and to avoid criminal charges J. H. notified MDHHS of the change in plans and gave the children's location in the H. Family motel room in Urbana Illinois.

683.    On or About September 29th 2018 at approximately 6 am, A Sheriff Deputy from Champaign County Illinois entered the H. Family's motel room without a warrant enforceable in Illinois and seized the children in Urbana, Illinois.

684.    The now missing ex parte protective custody order was executed without a signature, in excess of its limits and thus the officer, IL DCFS and the MDHHS employees wilfully exceeded their authority.

685.    MCL 780.651 (5) states "The peace officer or department receiving an electronically or electromagnetically issued search warrant shall receive proof that the issuing judge or district court magistrate has signed the warrant before the warrant is executed. Proof that the issuing judge or district court magistrate has signed the warrant may consist of an electronically or electromagnetically transmitted facsimile of the

signed warrant or an electronic signature on a warrant transmitted over a computer network.

686.     MCL 780.657 states: "Any person who in executing a search warrant, wilfully exceeds his authority or exercises it with unnecessary severity, shall be fined not more than $1,000.00 or imprisoned not more than 1 year."

687.     MCL 780.658 states: "Any person who maliciously and without probable cause procures a search warrant to be issued and executed shall be fined not more than $1,000.00 or imprisoned not more than 1 year."

688.     On or About September 29th 2018, A Sheriff Deputy from Champaign County Illinois transported J. H. and H. Family's children to Champaign County Illinois Sheriff's office to meet Illinois DCFS to determine what would occur with children after J. H. attempted to prove the children were not absconded with.

689.     The Champaign County Illinois Sheriff office maintains they did not place children in protective custody and were relying on information and belief the H. Family was wanted by Michigan authorities.

690.     It was the Plaintiffs belief an attempt to leave the Sheriff office with the children would result in criminal charges in both states and any constitutional rights violations would have to be sorted out later, that legally they had to surrender children to authorities first and not physically resist.

691.     On or About September 29th 2018, a female caseworker from Champaign County DCFS, herein referred to as Jane Doe Defendant number one (1), identity to be found through discovery, in an "egregious abuse of governmental power" illegally kidnapped H. Family minor children M. H., age 5 and J. H. Jr, age 10, from Champaign County Sheriff Dept. and transported them across 2 state lines to Michigan without a court order or

parental consent at the behest of Thomaca Bush and/or other MDHHS employees.

692.     On or about September 29th 2018, MDHHS did not have a valid enforceable court order, ordering removal.

693.     On or about September 29th 2018, MDHHS had a void court order, ordering pick up of children erroneously claimed to be in protective custody per non-existent prior court order.

694.     On or about September 29th 2018, MDHHS had a void court order, ordering pick up of children that restricted enforcement across state lines.

695.     On or before September 29th 2018, MDHHS had not first contacted the other state's CPS equivalent before sending law enforcement in Illinois to seize the children.

696.     On or before September 29th 2018, MDHHS had not communicated with any court in Illinois in accordance with the UCCJEA.

697.     On or before September 29th 2018, MDHHS had not communicated with any court in Michigan, the children were located in Illinois and were Illinois residents in accordance with the UCCJEA.

698.     On or before September 29th 2018, MDHHS had not communicated with the LGAL and never received written permission to extradite the H. Family children.

699.     On or about September 29th 2018 approximately 2 hours after children were unlawfully removed Ingham County CPS supervisor Rita Ermatinger sent the original petition and apprehension order to plaintiff J. H. via email.

700.     Rita Ermatinger failed to properly supervise Thomaca Bush, assisted Thomaca Bush in executing the never filed ex parte order across the state in excess of the limits of the order and failed her duties to protect the constitutional rights of the Plaintiffs.

701.     This application for apprehension order and ensuing "ex parte protective custody

order" is never returned executed nor is entered into court records on the next business day or any day thereafter.

702.     Rita Ermatinger, as Thomaca Bush's acting supervisor, participated and or encouraged and implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of Thomaca Bush.

703.     On or About September 29th 2018, A Sheriff Deputy from Champaign County Illinois seized the H. Family's motel room without a valid court order and Michigan statutes required MDHHS shall immediately contact the designated judge or referee, as provided in subsection (3), to seek a valid court order for placement of the child pending a preliminary hearing before taking physical custody of the children.

704.     MCL 712A.14a (2) states "If a child taken into protective custody under this section is not released, the officer or the department of human services shall immediately contact the designated judge or referee, as provided in subsection (3), to seek a court order for placement of the child pending a preliminary hearing."

705.     MCL 712A.14a (3) states: "A judge or referee shall be designated as the contact when a placement order is sought for a child in protective custody under this section. In accordance with the provisions of section 14b of this chapter, if the court is closed, the designated judge or referee may, upon receipt electronically or otherwise of a petition or affidavit of facts, order placement if the placement order is communicated in writing, electronically or otherwise, to the appropriate county department office and filed with the court the next business day. When a placement order is issued by a designated referee, the order shall take effect as an interim order".

706.     On or About September 29th 2018, two unidentified MDHHS employee(s) took the H. Family Children into the protective custody of MDHHS from Illinois DCFS,

without a valid court order, at the first exit in Michigan these two employees are identified in this suit as Jane Doe Defendants No. two (2) and three (3).

707.     On or After September 29th 2018, Thomaca Bush, Marisa Anderson, Rita Ermatinger, Jane Doe Defendants No. One, Two and Three and three (3), failed to notify the H. Family of a preliminary hearing the next business day.

708.     MDHHS was required to release the H. Family children the next business day if the electronic order was not properly filed with the court.

709.     MDHHS failed to release the H. Family children by October 1st 2018, which was the next business day, as required under MCR 3.965 (A), when a preliminary hearing on the ex parte protective custody order did not commence.

710.     The H. Family was unlawfully denied a right to a hearing for 61 days as a result of multiple due process violations that should have included a hearing in Illinois courts within hours after children were taken into emergency protective custody MDHHS. failed to follow MCR 3.963 (C) Arranging for Court Appearance.

711.     The H. Family was denied an adequate pre-deprivation process when the court heard in a home jurisdiction petition without statutory 72 notice and an opportunity to be heard.

712.     The State and its agents deprived the H. Family of their liberties without due process of law.

713.     The State and its agents denied the H. Family equal protection of the laws.

714.     At no time during the Ingham County case was probable cause developed to believe the children were in need of medical attention.

715.     At no time during the Ingham County case were there allegations the H. Family children were neglected to the point their mental health was impaired.

716.    At no time during the Ingham County case were there allegations the H. Family children were neglected to the point their emotional health was impaired.

717.    At no time during the Ingham County case were there allegations the H. Family children were neglected to the point their physical health was impaired.

718.    At no time during the Ingham County case were there allegations the H. Family children were neglected to the point they suffered an injury.

719.    At no time during the Ingham County case were there allegations of a specified threat of harm.

720.    At no time during the Ingham County case were there allegations the H. Family children were drug exposed.

721.    At no time during the Ingham County case were there allegations of physical abuse.

722.    At no time during the Ingham County case were there allegations of sexual abuse.

723.    The H. Family was denied an adequate post-deprivation process when the court failed to file the ex parte protective custody order the next business day, which was October 1st 2018, as required by court rules and statute.

724.    The H. Family was denied an adequate post-deprivation process when MDHHS and Thomaca Bush failed to take the children promptly to the court the next business day, which was October 1st 2018, as required by court rules and statute.

725.    The H. Family was denied an adequate post-deprivation process when Thomaca Bush, failed to file the ex parte protective custody order the next business day, which was October 1st 2018, as required by court rules and statute.

726.    The H. Family was denied an adequate post-deprivation process when Thomaca Bush failed to seek a preliminary hearing the next business day, which was October 1st

2018, as required by court rules and statute.

727.     The H. Family was denied an adequate post-deprivation process when Thomaca

Bush failed to notify the H. Family of the statutory required preliminary hearing the next

business day, which was October 1st 2018.

728.     On or After September 29th 2018, Thomaca Bush and or unidentified MDHHS

employee(s) failed to schedule a preliminary hearing the next business day with Ingham

County Court.

729.     On or about October 1st 2018, Thomaca Bush had the H. Family's children drug

tested at Sparrow Medical Center without a court order or parental consent in violation of

the H. Family's constitutional rights.

730.     On or about October 1st 2018, Thomaca Bush had the H. Family's children

subjected to a forensic medical exam including full body x-rays at Sparrow Medical

Center without a court order or parental consent in violation of the H. Family's

constitutional rights.

731.     On or about October 1st 2018, Thomaca Bush had the H. Family's daughter M. H.

subjected to a forensic sex abuse exam at Sparrow Medical Center without a court order

or parental consent in violation of the H. Family's constituinal rights.

732.     Thomaca Bush failed to seek a court order for a medical exam under MCL

722.626 (3).

733.      MCL 722.626 (3) states "If a report is made by a person other than a physician,

or if the physician's report is not complete, the department may request a court order for a

medical evaluation of the child. The department shall have a medical evaluation made

without a court order if either of the following occurs: (a) The child's health is seriously

endangered and a court order cannot be obtained. (b) The child is displaying symptoms

suspected to be the result of exposure to or contact with methamphetamine production."

734.    Forensic exams are not routine medical care and Thomaca Bush was aware her actions violated the law, policy and the H. Family's constitutional rights.

735.    Thomaca Bush was aware or should have know she lacked authority to seek a medical exam when there was no formal jurisdiction or exigent circumstances, as she received training in the "Michigan Child Welfare Law Manuel" (MCWL) Chapter Three (3) titled "Jurisdiction" subsection "3.4.8.".

736.    On or about October 1st 2018, 2 days after children are removed Ingham County Judge Janelle Lawless issued an "Order After Preliminary Hearing" without review of a written report with summary of testimony or making substantive legal findings of her own, merely signing Referee Brown's recommended order and making no findings on protective custody or placement of children under MCR 3.965(C)(2) or MCL 712A.13a (9) on lines 25 (a) (ii) or 25 (b), yet continuing placement on line 28."

737.    On or about October 1st 2018, Thomaca Bush, personally physically moved the H. Family children from their emergency placement and placed the children in a second foster home instead of scheduling a hearing and promptly bringing the children to court.

738.    On or about October 2nd 2018, 3 days after children were removed without a court order, Ingham County Court clerk "SALVI", whom has been identified as Sidra Alvi-waller, updated the "registry of action" and entered a Record of Preliminary Hearing to reflect an order for the "care and custody" and/or removal of the H. Family children, children placed in foster care , despite the inability of referees to grant such an order, the order entered October 1st 2018 stated "care and supervision" online 25 and no protective custody order is issued.

739.    On or about October 2nd 2018, a second Summons was authorized by Sidra Alvi-

waller with a rubber stamped signature from Judge Richard Garcia.

740.    The official Ingham County Court file does not contain the original petition, affidavit and request for apprehension orders, or the resulting ex parte protective custody orders.e official Ingham County Court file does contain an altered petition file stamped October 2nd 2018.

741.    The Ingham County Court file reveals numerous violations of MCR 8.119 as it relates to the filing and retention of court records.

742.    MCR 8.119 (A), states: "Applicability. This rule applies to all records in every trial court. For purposes of this rule, records are as defined in MCR 1.109, MCR 3.218, MCR 3.903, and MCR 8.119(D)-(G)."

743.    MCR 8.119 (B), states: "Trial courts shall comply with the records standards in this rule, MCR 1.109, and as prescribed by the Michigan Supreme Court."

744.    MCR 8.119 (C), states: "Filing of Documents and Other Materials. The clerk of the court shall process and maintain documents filed with the court as prescribed by Michigan Court Rules and the Michigan Trial Court Records Management Standards and all filed documents must be file stamped in accordance with these standards. The clerk of the court may only reject documents that do not comply with MCR 1.109(D)(1) and (2), are not signed in accordance with MCR 1.109(E), or are not accompanied by a required filing fee or a request for fee waiver, unless already waived or suspended by court order."

745.    MCR 8.119 (D), states: "Records Kept by the Clerk of the Court. The clerk of the court shall maintain the following case records in accordance with the Michigan Trial Court Records Management Standards. Documents and other materials made nonpublic or confidential by court rule, statute, or order of the court pursuant to subrule (I) must be designated accordingly and maintained to allow only authorized access. In the event of

transfer or appeal of a case, every rule, statute, or order of the court under subrule (I) that makes a document or other materials in that case nonpublic or confidential applies uniformly to every court in Michigan, irrespective of the court in which the document or other materials were originally filed. (1) Case History and Case Files. The clerk shall maintain records of each case consisting of case history (known as a register of actions) and, except for civil infractions, a case file in such form and style as may be prescribed by the State Court Administrative Office. Each case shall be assigned a case number on receipt of a case initiating document. The case number shall comply with MCR 1.109(D)(1)(b)(iii). In addition to the case number, a separate petition number shall be assigned to each petition filed under the juvenile code, MCL 712A.1 ., as required under MCR 1.109(D)(1)(d). The case number (and petition number if applicable) shall be recorded in the court's automated case management system and on the case file. The records shall include the following characteristics: (a) Case History. The clerk shall create and maintain a case history of each case, known as a register of actions, in the court's automated case management system. The automated case management system shall be capable of chronologically displaying the case history for each case and shall also be capable of searching a case by number or party name (previously known as numerical and alphabetical indices) and displaying the case number, date of filing, names of parties, and names of any attorneys of record. The case history shall contain both pre- and post-judgment information and shall, at a minimum, consist of the data elements prescribed in the Michigan Trial Court Records Management Standards. Each entry shall be brief, but shall show the nature of each item filed, each order or judgment of the court, and the returns showing execution. Each entry shall be dated with not only the date of filing, but with the date of entry and shall indicate the person recording the action. (b) Case File.

The clerk of the court shall maintain a file of each action, bearing the case number assigned to it, for all pleadings, process, written opinions and findings, orders, and judgments filed in the action, and any other materials prescribed by court rule, statute, or court order to be filed with the clerk of the court. If case file records are maintained separately from the case files, the clerk shall maintain them as prescribed by the Michigan Trial Court Records Management Standards. (2) Calendars. The clerk may maintain calendars of actions. A calendar is a schedule of cases ready for court action that identifies times and places of activity. (3) Abolished Records.(a) Journals. Except for recording marriages, journals shall not be maintained. (b) Dockets. Case history replaces a docket. Wherever these rules or applicable statutes require entries on a docket, those entries shall be entered in the court's automated case management system. (4) Official Court Record. There is only one official court record, regardless whether original or suitable-duplicate and regardless of the medium. Suitable-duplicate is defined in the Michigan Trial Court Records Management Standards. Documents electronically filed with the court or generated electronically by the court are original records and are the official court record. A paper printout of any electronically filed or generated document is a copy and is a nonrecord for purposes of records retention and disposal."

746.     MCR 8.119 (E) states: "The clerk or other persons designated by the chief judge of the court shall maintain in the manner prescribed by these rules, other materials filed with or handled by the court for purposes of case processing, including but not limited to wills filed for safekeeping, case evaluations, exhibit logs, presentence reports, probation files, problem-solving court treatment files, financial statements for collections, and friend of the court records."

747.     MCR 8.119 (F), states: "Court Recordings, Log Notes, Jury Seating Charts, and

Media. Court recordings, log notes, jury seating charts, and all other records such as tapes, backup tapes, discs, and any other medium used or created in the making of a record of proceedings and kept pursuant to MCR 8.108 are court records and are subject to access in accordance with subrule (H)(2)(b).

748.    MCR 8.119 (G), states: "Other Court Records. All court records not included in subrules (D), (E), and (F) are considered administrative and fiscal records or nonrecord materials and are not subject to public access under subrule (H). These records are defined in the approved records retention and disposal schedule for trial courts.

749.    MCR 8.119 (K), states: "For purposes of retention, the records of the trial courts include: (1) administrative and fiscal records, (2) case file and other case records, (3) court recordings, log notes, jury seating charts, and recording media, and (4) nonrecord material. The records of the trial courts shall be retained in the medium prescribed by MCR 1.109. The records of a trial court may not be disposed of except as authorized by the records retention and disposal schedule and upon order by the chief judge of that court. Before disposing of records subject to the order, the court shall first transfer to the Archives of Michigan any records specified as such in the Michigan trial courts approved records retention and disposal schedule. An order disposing of court records shall comply with the retention periods established by the State Court Administrative Office and approved by the state court administrator, Attorney General, State Administrative Board, Archives of Michigan, and Records Management Services of the Department of Management and Budget, in accordance with MCL 399.811."

750.    MCR 8.119 (L) states: "Reporting Duties. (1) The clerk of every court shall submit reports and records as required by statute and court rule. (2) The clerk of every court shall submit reports or provide records as required by the State Court

Administrative Office, without costs."

751. On or about October 2nd 2018, a second and altered petition was filed as the original petition and the original petition was feloniously taken away by Sidra Alvi-waller.

752. MCR 8.119 (D) (1) (a) required Each entry shall be dated with not only the date of filing, but with the date of entry and shall indicate the person recording the action.

753. There is only one date for filing and entry of this altered petition and that date is October 2nd 2018, which is the day after the order on the original petition was signed by Judge Lawless and filed.

754. Section five of the altered petition states: It is contrary to the welfare of the children, J. H. Jr. and M. H. to remain in the home with their parents, H. H. and J. H. Sr. without conditions set by the court due to physical neglect and lack of cooperation by the parents regarding ensuring the children's safety and wellbeing. The parents have previous CPS history in Illinois regarding physical neglect. The mother, H. H., has reported mental health issues.

755. Section six of the altered petition states: CPS investigations, drugs screens, law enforcement intervention, previous CPS services in IL.

756. The verbiage "without conditions set by the court" was removed from section 5 in the original petition and an altered petition was filed with the Ingham County Circuit Court instead of the original.

757. This altered petition contained an attached list of "concerns" for section 7 with . the same verbiage verbatim as the original petition.

758. This altered petitions attached list of "concerns" contains the same verbiage verbatim as the original petition.

759.     Neither petition contains factual allegations of abuse or neglect as defined by Michigan Statutes.

760.     Section eight of this altered petition contains three checkmarked boxes.

761.     Section eight of this altered petition has a checkmark for box stating "authorize this petition and take jurisdiction of the children.

762.     Section eight of this altered petition is checkmarked on the box to "issue an order removing".

763.     Section eight of this original petition is checkmarked on the box "the children"

764.     Section eight of this original petition is not checkmarked on the box "the abuser"

765.     The court record does not contain a motion to amend, nor does it contain an order from the court allowing the first petition for jurisdiction only to be taken away and replaced with an altered petition for removal.

766.     Amendments can be made only by motion to the court. MCL 600.2325 provides that no process, pleading, or record will be amended by the clerk or other officer of the court or any other person without the order of the court.

767.     MCL 600.2325 "Amendment only on order of court. No process, pleading or record, shall be amended or impaired by the clerk or other officer of any court, or by any other person, without the order of such court, or of some other court of competent jurisdiction."

768.     Referee Peter Brown had no authority to authorize amendment as an officer of the court and was not permitted by statute or court rule to issue judicial orders.

769.     Ingham County Court attempted service first 6 days later on October 4th 2018, at an address that was known to not be their home and is directly identified on the Ingham County petition as the Ingham County Fairground and not a residence.

770.    The court was never notified by Thomaca Bush or MDHHS of the Plaintiffs true address as they were concealing out of state residency and lack of jurisdiction.

771.    The invalid and unfiled ex parte order from Judge Garcia lists the home address as homeless.

772.    After the St Clair County case was closed unfounded on Oct. 4th 2018 Thomaca Bush failed to notify court allegations stated as probable cause could not be sustained as previously proffered to court.

773.    Thomaca Bush failed to follow MHHS policy PSM 715-3 and did not immediately notify the court when new facts or evidence became known which contradict the alleged abuse/neglect contained within a previously filed petition already authorized by the court.

774.    Thomaca Bush was required under PSM 713-11 and PSM 713-01, to complete investigation within 30 days and refused to continue and on October 5th 2018, she made a statement the reason was H. H. disability must be symptom free to continue and never offering any follow up.

775.    Thomaca Bush failed to complete an and/or Falsely elevated "safety" and/ or "risk" assessment after being aware evidence showed the H. Family were innocent.

776.    After J. H. passed his toxicology screen, Thomaca Bush "egregious abuse of governmental power" failed to follow provisions of PSM 715-3, when facts were known which contradict the petition caseworker must notify court.

777.    On or about October 7th 2018, MDHHS held a FTM (Family Team Meeting) with only J. H. and made no attempt to notify H. H. of such a meeting or include her in the meeting.

778.    Thomaca Bush had on or about September 27th 2018, threatened only J. H. would

be notified of what was going to happen with the children and followed through with this threat, excluding H. H. in all activities going forth.

779.     On or about October 7th 2018, MDHHS held a FTM (Family Team Meeting) and determined the H. Family housing would remain as before with no actions.

780.     On or about October 7th 2018, MDHHS held a FTM (Family Team Meeting) and J. H. reiterated the H. Family were Illinois residents and once again provided the Illinois address.

781.     On or about October 7th 2018, MDHHS held a FTM (Family Team Meeting) and produced a document that is in the case file and this document indicates no changes were required of the H. Family RV or living conditions.

782.     On or about October 7th 2018, MDHHS held a FTM (Family Team Meeting) and produced a document that is in the case file and this document requires the H. Family to stop traveling and remain "stationary".

783.     On or about October 7th 2018, MDHHS held a FTM (Family Team Meeting) and produced a document that is in the case file and this document indicates a promise to not leave the area and to cooperate with MDHHS was elicited in writing.

784.     On or about October 7th 2018, J. H. towed the H. Family travel trailer to a campground in Eaton County for the H. Family to stay while in exile.

785.     On or about October 7th 2018, the H. Family began incurring additional housing costs of $350 a month because they were required to go "stationary" for CPS and their membership resorts were closed for the winter season.

786.     On or about October 10th 2018, a document titled "FOSTER CARE/JUVENILE JUSTICE ACTION SUMMARY" was filed with the Caseworker/Agency change that listed the foster parents address as the new address for H. H. and did not correctly notify

the court of the H. Family true and correct address in Illinois.

787.    On or about October 13th 2018, H. H. spoke with her court appointed counsel
Ronald Berry via telephone.

788.    On or about October 13th 2018, H. H. instructed her court appointed counsel
Ronald Berry to file motions on her behalf including a jury demand.

789.    On or about October 13th 2018, H. H. instructed her court appointed counsel
Ronald Berry to file motions on her behalf including an objection to the preliminary
hearing and procedural due process issues.

790.    On or about October 13th 2018, H. H. instructed her court appointed counsel
Ronald Berry to file motions on her behalf including a challenge to lack of valid
protective custody order.

791.    On or about October 13th 2018, H. H. instructed her court appointed counsel
Ronald Berry to file motions on her behalf including a challenge to subject matter
jurisdiction and cited case law she wanted used listing both In Re AMB and In Re
Youmans..

792.    On or about October 13th 2018, H. H. instructed her court appointed counsel
Ronald Berry to file motions on her behalf including a challenge to subject matter
jurisdiction and cited she wanted to use the UCCJEA as a defense with the goal of
dismissal not transfer.

793.    On or about October 13th 2018, H. H. instructed her court appointed counsel
Ronald Berry that only using the UCCJEA had weaknesses in failure to challenge subject
matter jurisdiction as well, could potentially result in an emergency order and transfer to
Illinois courts with a lower standard for jurisdiction.

794.    H. H. was familiar with the standards being different for Illinois DCFS to have no

statutory authority to investigate environment injurious without blatant disregard for the child's welfare yet the Illinois court could potentially acquire jurisdiction on the lesser standards pursuant to the Julie Q. case, that had personally been applied H. H. before.

795.    H. H. had a concern the industry standard risk assessments based on historical records alone and no new proofs of neglect or abuse, could be used to allege "environment injurious" in the manner IL DCFS had historically used such concerns for anticipatory neglect as grounds for jurisdiction.

796.    On or about October 13th 2018, H. H. instructed her court appointed counsel Ronald Berry to file motions on her behalf including a challenge to lack of consulting with Illinois courts prior to the children's extradition to Illinois.

797.    On or about October 18th 2018 the Ingham County Court held a pretrial hearing.

798.    On or about October 18th 2018 immediately prior to the pretrial hearing the Ingham County prosecutor, court appointed counsel for both H. H. and J. H., the G.A.L., Mellisa Wright and a representative held a pretrial conference excluding the H. Family.

799.    On or about October 18th 2018 during this pretrial conference, it was determined MDHHS was aware they could not substantiate allegations and indicated they would be filing yet another petition with allegations from out of state historical CPS records.

800.    Based on information and belief this 3rd petition was anticipated to contain allegations from unsubstantiated investigations from unreliable sources.

801.    Based on information and belief this 3rd petition was anticipated to contain allegations H. H. mental health conditions would last beyond 2 years.

802.    Based on information and belief allegations H. H. mental health conditions would last beyond 2 year years would have been erroneously viewed as statutory grounds for Termination of parental rights.

803.    Submission of petition for authorization of request for termination of parental

rights; under MCL 712A.2 is limited by MCL722.638 which states: "(1) The department

shall submit a petition for authorization by the court under section 2(b) of chapter XIIA

of 1939 PA 288, MCL 712A.2, if 1 or more of the following apply: (a) The department

determines that a parent, guardian, or custodian, or a person who is 18 years of age or

older and who resides for any length of time in the child's home, has abused the child or a

sibling of the child and the abuse included 1 or more of the following: (i) Abandonment

of a young child. (ii) Criminal sexual conduct involving penetration, attempted

penetration, or assault with intent to penetrate. (iii) Battering, torture, or other severe

physical abuse. (iv) Loss or serious impairment of an organ or limb. (v) Life threatening

injury. (vi) Murder or attempted murder. (b) The department determines that there is risk

of harm, child abuse, or child neglect to the child and either of the following is true: (i)

The parent's rights to another child were terminated as a result of proceedings under

section 2(b) of chapter XIIA of 1939 PA 288, MCL 712A.2, or a similar law of another

state and the parent has failed to rectify the conditions that led to the prior termination of

parental rights. (ii) The parent's rights to another child were voluntarily terminated

following the initiation of proceedings under section 2(b) of chapter XIIA of 1939 PA

288, MCL 712A.2, or a similar law of another state, the parent has failed to rectify the

conditions that led to the prior termination of parental rights, and the proceeding involved

abuse that included 1 or more of the following: (A) Abandonment of a young child. (B)

Criminal sexual conduct involving penetration, attempted penetration, or assault with

intent to penetrate. (C) Battering, torture, or other severe physical abuse. (D) Loss or

serious impairment of an organ or limb. (E) Life-threatening injury. (F) Murder or

attempted murder. (G) Voluntary manslaughter.(H) Aiding and abetting, attempting to

commit, conspiring to commit, or soliciting murder or voluntary manslaughter. (2) In a petition submitted as required by subsection (1), if a parent is a suspected perpetrator or is suspected of placing the child at an unreasonable risk of harm due to the parent's failure to take reasonable steps to intervene to eliminate that risk, the department shall include a request for termination of parental rights at the initial dispositional hearing as authorized under section 19b of chapter XIIA of 1939 PA 288, MCL 712A.19b. (3) If the department is considering petitioning for termination of parental rights at the initial dispositional hearing as authorized under section 19b of chapter XIIA of 1939 PA 288, MCL 712A.19b, even though the facts of the child's case do not require departmental action under subsection (1), the department shall hold a conference among the appropriate agency personnel to agree upon the course of action. The department shall notify the attorney representing the child of the time and place of the conference, and the attorney may attend. If an agreement is not reached at this conference, the department director or the director's designee shall resolve the disagreement after consulting the attorneys representing both the department and the child."

804.     During this pretrial conference MDHHS was informed of their duty to accommodate H. H. mental health conditions under the ADA and H. H. was affirmatively asserting such rights as evidenced by the petition.

805.     During this pretrial conference MDHHS held out they did not have to accommodate H. H. mental health conditions under the ADA.

806.     Based on information and belief this 3rd petition was anticipated to lead to permanent termination of parental rights.

807.     On or about October 18th 2018 during this pretrial conference after it was determined MDHHS could not substantiate allegations, the Ingham County Prosecutor

offered a deal to speed up proceedings by the H. Family stipulating to allegations in petition.

808.     On or about October 18th 2018, stipulating to factual allegations in the petition would not have been stipulating abuse or neglect and would have hastened a hearing on subject matter jurisdiction.

809.     Parties stipulating to factual allegations does not grant the Court subject matter jurisdiction unless allegations stipulated meet statutory requirements for subject matter jurisdiction.

810.     On or after October 18th 2018 neither court appointed attorneys for H. H. or J. H. informed of the proffer from the county attorney to hasten proceedings with stipulations.

811.     On or about October 18th 2018 during this pretrial conference the counsel for H. H. caused the jury trial to be scheduled on the last day allowed under state law.

812.     On or about October 18th 2018 during the pretrial hearing, counsel for H. H. sought an oral motion for a jury demand and no written motion was filed despite court rules requiring such demand be made in writing.

813.     On or about October 18th 2018 during the pretrial hearing, counsel for H. H. sought an oral motion to for a jury demand and proffered he had already scheduled the trial before the pretrial hearing and it would be December 3rd 2018.

814.     On or about October 18th 2018 during the pretrial hearing, the G.A.L. raised concerns about the scheduled delay and advised the court the jury trial was being pushed back and raised objections mentioning the 63 day rule.

815.     Michigan State court rules require a trial occur within 63 days of a child being removed unless the trial is postponed (1) on stipulation of the parties for good cause; (2) because process cannot be completed; or (3) because the court finds that the testimony of

a presently unavailable witness is needed.

816.     MCR 3.972 (A) states: "If the child is not in placement, the trial must be held

within 6 months after the filing of the petition unless adjourned for good cause under

MCR 3.923(G). If the child is in placement, the trial must commence as soon as possible,

but not later than 63 days after the child is removed from the home unless the trial is

postponed"

817.     Jury trial was set for Dec 3rd 2018 66 days after the case was initiated with the

original petition.

818.     Jury trial was set for Dec 3rd 2018 65 days after the children were taken into

custody.

819.     Jury trial was set for Dec 3rd 2018 63 days after the case was file stamped with

the altered petition.

820.     On or about October 18th 2018 during the pretrial hearing, the G.A.L. asked for

an explanation for the delay.

821.     On or about October 18th 2018 during the pretrial hearing, counsel for H. H.,

Ronald Berry, refused to give a justification saying the reason was irrelevant.

822.     The trial was not postponed on stipulation of the parties for good cause.

823.     On or after October 18th 2018 after the pretrial hearing, counsel for H. H., Ronald

Berry, refused to give a justification and denied the G.A.L. had objected to a delay but

tried to adver the objection was to a jury trial over bench trial and H. H. has no

explanation for the purposely sought delay.

824.     On or about October 18th 2018 during the pretrial hearing, counsel for H. H.

attempted to seek an oral motion to dismiss and was not prepared for such motion despite

explicit instructions from his client to prepare a motion to dismiss based on subject matter

jurisdiction and personal jurisdiction.

825.	On or about October 18th 2018 during the pretrial hearing, H. H. was prepared to argue a motion to dismiss and demand a rehearing on the courts prior order(s) and had hard copies of the opinions for the case law she had directed her court appointed counsel to cite, In Re A.M.B. and In Re Youhams.

826.	On or about October 18th 2018 during the pretrial hearing, the Court appointed counsel for H. H. refused to effectively represent H. H. and offer any objects his client had to the preliminary hearings due process issues and defects in court orders.

827.	On or about October 23rd 2018 at 3:16 pm H. H. sent Ronald Berry her court appointed attorney an email with a google drive link with a "Motion For Writ Of Habeas Corpus, declare Proceedings Void Ab Initio And Dismiss Case". This email stated "link to motion".

828.	On or about October 23rd 2018 at 4:44 pm, Ronald Berry emailed back. This email stated "Received. Thank You. Sincerely. Ron.

829.	On or before October 29th 2018 H. H. had several phone conversations with her court appointed attorney Ronald Berry regarding her wishes to proceed on the issues she wanted raised and Ronald Berry refused to consider H. H. wishes and refused to submit her demands on the record.

830.	H. H. 's court appointed public defender Ronald Berry refused to raise the issue of not being notified of the nature of the proceedings stating H. H. would never prove she wasn't told the petition was for "removal" and she was instead told Thomaca Bush was seeking "in-home jurisdiction" only.

831.	H. H. 's court appointed public defender Ronald Berry refused to object to inadequate notice for the preliminary hearing, stating "that's not how we do things here

[Ingham County], when H. H. was referencing Michigan state statutes and Michigan court rules involving due process notice, implying the chief judge was free to set local rules and therefore he would not present H. H. defense to failing to appear 24 minutes after a petition was filed electronically for in home jurisdiction.

832.     On or about October 29th 2018 at 11:32 am H. H. sent her court appointed attorney Ronald Berry the following email. "My kids have been in care for 30 days with no case plan in place as required by law. My first investigation was closed out at a 4, no preponderance of the evidence, risk assessment completed with no services needed. How can one investigator find no preponderance of evidence and no services needed yet the court use those allegations as probable cause of...? How could services been reasonable efforts if none were offered? How is the same info resulting in such opposite conclusions? We did not abscond with children they removed without judicial authority from another state and cps knew it prior to ex parte emergency removal order. CPS had even spoken to family in Illinois regarding prior temporary guardianship as allowed under Illinois law and desire to safety place if need had arisen. Thomaca Bush knew prior to any petition, I identified my disability, showed her proof I was being treated for mental illness, she had seen proof of medication dispensed to me, and we asserted defense that she could not use medical marijuana or prior opiate use against either parent because we asserted a legal defense of accepted medical use and then she never informed the court of it. Thomaca Bush listed J. H. medication list omitting the medical marijauna or that she had been shown J. H. Medical marijauna card. Yet it is listed as untreated mental illness and substance abuse as reasons for removal order. That is perjury and discrimination. False allegations of substance use is discrimination under the ADA. Court orders based on discriminatory intent are void. My Foster care caseworker is building a case to send to

the state attorney laying out evidence does not support the petition, that's her case plan. It amounts to her taking evidence of perjury to state attorney. You are doing me a huge disservice by refusing to move forward with my wishes. Yes a case of perjury can be made. You are my lawyer and it's my caseworker fighting for me not you this is unreal. Using the ADA is in my best interest. The case law in my favor. Thomaca Bush refused to grant reasonable accommodation so I could participate in services and petition was retallatory for having asserted rights under ADA. I had asserted those rights in St Clair county to which she said was uncooperation and I asserted them with one of her supervisors just hours prior to petition. The petition itself describes a reasonable accommodation request. My frustration with her is a symptom of my mental health disability with no evidence it prevents me from parenting. Yes this is disability discrimination and refusal to provide services in refusing to continue with investigation. I had my first appt. With the psychologist up here. He has a PhD, believes in medical marijuana for ptsd patients, used to work for CPS and is tailoring my treatment plan to use the ADA against CPS as his idea not my suggestion. He knows how to handle the concerns cps is feeding the state. I have never heard of a situation were so many providers are willing to go against CPS so strongly. I have a team to back me up. Please please file the dismissal motion on the grounds of: 1.) lack of personal jurisdiction(weakest point imo) 2.) lack of subject matter jurisdiction (No neglect under statute., 3.) lack of reasonable effort, 4.) harm to children in care, and 5.) discriminatory intent violations of ADA. 6.) No notice of preliminary hearing 7.) Perjury There is ample case law to cite for each grounds. Failing to present this to the court will result in the record being void of my objections. I can articulate a case for each grounds, jurisdiction is always subject to attack, statute allows a party to petition for a hearing prior to trial

when it is in the child's best interest. I am not persuaded these matters are for jury but rather are matters for pretrial motions. Please proceed as I instructed or I will on my own and ask that the court still require you to assist me. You may never had that happen before but obviously this case is full of firsts."

833.　　On or after October 29th 2018 H. H. had several phone conversations with her court appointed attorney Ronald Berry regarding her wishes to proceed on the issues she wanted raised and forbade him from submitting a motion without her prior review.

834.　　On or about November 14th 2018 at 4:06pm, J. H.'s court appointed attorney emailed J. H. a copy of a motion to dismiss that was to be filed the next day.

835.　　This Motion to Dismiss raised jurisdictional issues with the H. Family residency and asserted UCCJEA protectections.

836.　　This Motion to Dismiss raised jurisdictional issues with the sufficiency of the petitions allegations and raised "In re Youmans, 156 Mich App 679 (1986)" as part of J. H. defense.

837.　　This Motion to Dismiss had the wrong case number and the wrong judges name.

838.　　This Motion to Dismiss is missing from the court file.

839.　　This Motion to Dismiss was verbally presented by J. H. 's court appointed attorney at the Motion hearing on or about November 29th 2018.

840.　　The H. Family's constitutional rights to the care, custody and companionship of their children was further deprived for another 6 weeks by lack of timely and effective defense due to the refusal of court appointed counsel to object to the systemic due process issues in Ingham County.

841.　　The H. Family had a 14th amendment right to notice that was never objected to by court appointed counsel on the record.

842.     The H. Family had a 14th amendment right to an opportunity to be heard that never objected to by court appointed counsel on the record.

843.     The H. Family had a 14th amendment right to an opportunity to be heard that was denied by refusal by court appointed counsel to get the information on the record and file appropriate pleadings.

844.     The H. Family had a 14th amendment right to an opportunity to be heard that was denied by refusal of court personnel to allow H. H. to file a writ of habeas corpus because of this appointment of counsel scheme.

845.     The H. Family had a 14th amendment equal protection right to effective counsel as it was a state 6th amendment right the H. Family had a right to equally benefit from.

846.     Ingham County is funding their court appointed attorneys in a manner inconsistent with state statute.

847.     There is no court order in file directing the source of payment for the Court appointed counsel.

848.     The Court order titled "Order After Preliminary Hearing" entered October 1st 2018 by Judge Janelle Lawless and recommended by Referee Peter Brown on September 28th 2018, relieved the H. Family of the costs for their court appointed counsel.

849.     MCL 712A.17c (4) states: "In a proceeding under section 2(b) or (c) of this chapter, the court shall advise the respondent at the respondent's first court appearance of all of the following: (a) The right to an attorney at each stage of the proceeding.(b) The right to a court-appointed attorney if the respondent is financially unable to employ an attorney. (c) If the respondent is not represented by an attorney, the right to request and receive a court-appointed attorney at a later proceeding."

850.     MCL 712A.17c (5) states: "If it appears to the court in a proceeding under section

2(b) or (c) of this chapter that the respondent wants an attorney and is financially unable to retain an attorney, the court shall appoint an attorney to represent the respondent."

851.      MCL 712A.17c (6) states: "Except as otherwise provided in this subsection, in a proceeding under section 2(b) or (c) of this chapter, the respondent may waive his or her right to an attorney. A respondent who is a minor may not waive his or her right to an attorney if the respondent's parent or guardian ad litem objects."

852.      MCL 712A.17c (8) states: "If an attorney or lawyer-guardian ad litem is appointed for a party under this act, after a determination of ability to pay the court may enter an order assessing attorney costs against the party or the person responsible for that party's support, or against the money allocated from marriage license fees for family counseling services under section 3 of 1887 PA 128, MCL 551.103. An order assessing attorney costs may be enforced through contempt proceedings."

853.      MCL 712A.17c (9) states: "An attorney or lawyer-guardian ad litem appointed by the court under this section shall serve until discharged by the court. If the child's case was petitioned under section 2(b) of this chapter, the court shall not discharge the lawyer-guardian ad litem for the child as long as the child is subject to the jurisdiction, control, or supervision of the court, or of the Michigan children's institute or other agency, unless the court discharges the lawyer-guardian ad litem for good cause shown on the record. If the child remains subject to the jurisdiction, control, or supervision of the court, or the Michigan children's institute or other agency, the court shall immediately appoint another lawyer-guardian ad litem to represent the child."

854.      The Court made no inquiry into the H. Families finances and the Ingham Court Sheriff Dept. Report indicates the H. Family was not indigent and had anticipated access to $5000.00 on the date of filing, earmarked for truck repairs, that was available for

retainer fees for independent counsel of the H. Family's choice.

855.　　　Ingham County's funding scheme for court appointed attorneys creates a payscale that is a tiny fraction of the prevailing market rate.

856.　　　The State Bar of Michigan published a study titled: "ECONOMICS OF LAW PRACTICE", this study Table 9 – 2017 Attorney Hourly Billing Rates by Circuit indicates 30th Circuit/ Ingham has a median attorney hourly billing rate of $235.

857.　　　Ingham County has posted its funding rates on its county website in a document titled "NA Voucher".

858.　　　Ingham County funding scheme for court appointed attorneys would have only paid $60.00 to H. H. Court appointed attorney Ronald Berry, if he had properly objected to procedural due process at the preliminary hearing and cause dismissed.

859.　　　Ingham County funding scheme for court appointed attorneys would have only paid $210.00 to H. H. Court appointed attorney Ronald Berry, if he had properly filed the written motion to dismiss at or before the pretrial hearing and cause dismissed.

860.　　　Ingham County funding scheme for court appointed attorneys would have only paid $210.00 to H. H. Court appointed attorney Ronald Berry, if at pretrial the H. Family stipulated to petition avoiding trial and successfully challenged either subject matter jurisdiction or personal jurisdiction causing cause to be dismissed at the pretrial.

861.　　　Ingham County funding scheme for court appointed attorneys would have only paid extraordinary expenses for the motion to dismiss to H. H. Court appointed attorney Ronald Berry, if he did not file the written motion to dismiss at or before the pretrial hearing and cause was not dismissed at the pretrial hearing.

862.　　　Ingham County funding scheme would pay extraordinary expenses of services at $50.00 per hour in-court and $35.00 per hour out-of-court only if Ronald Berry caused

the motion to dismiss be held at extra hearing at not at the pretrial.

863.     Ingham County funding scheme would not pay extraordinary expenses of services at $35.00 per hour out-of-court for research of the Child Protection Law.

864.     The H. Family's defense required extensive review of child protection law and such review was never made by Ronald Berry even after such laws were asserted as proper procedural due process and H. H. wished to assert a defense that such laws were not being followed.

865.     The Ingham County Court appointed attorney voucher sheet lists the qualifications for extraordinary expenses stating: "**Extraordinary expenses must be submitted to the Judge/Referee who heard the matter for approval. **Extraordinary expenses does not mean the following: review of the Updated Service Plan, Court Report, Permanent Ward Report, psychological report, therapy report, drug or alcohol test results, and attachments; routine calls to/from clients, attorneys, prosecutor and court staff; preparation for trial such as witness lists and subpoena requests, review of reports, witness questions, opening/closing argument; or, research of the Child Protection Law, which you are presumed to know. **May go to an FTM. Payment will not exceed 1 ½ hour at out-of-court rate of $35.00. **May visit a prisoner only with prior approval. You will be expected to attempt to set up a phone conference with the prisoner through the prison, if possible. If a sufficient amount of time is available, conduct consultation via mail, which means that when you are made aware of the next court date, write to your client at that time."

866.     Ingham County funding scheme for court appointed attorneys would have only paid $420.00 to H. H. Court appointed attorney Ronald Berry, if he caused the hearing to dismiss to occur after pretrial hearing and after the trial was scheduled.

867.     All delays in presenting the H. Family's defense financially benefited the court appointed attorneys and denied the H. Family. effective counsel.

868.     The roster of court-appointed attorneys in Ingham County Juvenile Court years was selected by the Chief Probate Judge Richard Garcia.

869.     A March 7, 2019 article in the Lansing City Pulse made this statement about Ingham County Court appointed counsel; "They're notoriously underpaid and arguably lack the financial incentive to vigorously defend their impoverished clients."

870.     A March 7, 2019 article in the Lansing City Pulse noted; "Judicial hiring discretion creates obvious conflicts of interest. Any particular court-appointed attorney who happened to irritate a judge or fundamentally disagree on the outcome of any given case could theoretically be removed from the county's roster in retribution."

871.     On December 10, 2019 Ingham County Commissioners passed RESOLUTION # 19 – 564 which states: "WHEREAS, on December 2, 2019, the Michigan Department of Health and Human Services informed the 30th Judicial Circuit Court Juvenile Division that they were awarded an allocation of $214,808.00 through the Child and Parent Legal Representation Grant for Fiscal Year 2020; and

WHEREAS, the allocation is based on anticipated Fiscal Year 2020 Appropriations for Michigan Department of Health and Human Services (MDHHS) and is subject to the availability of funds, MDHHS's anticipated Appropriation Act for FY 2020, MDHHS approval, and State Administrative Board approval; and

WHEREAS, funds from the grant must be used to improve the legal representation of children and adults who have had neglect and abuse actions filed with the Court; and

WHEREAS, funds from the grant will be used to reimburse attorneys and Lawyers Guardian Ad Litem for specific trainings; and

WHEREAS, funds from the grant will be used to pay annually for the Lawyers Guardian Ad Litem to have access to web based legal research and court rules; and

WHEREAS, funds from the grant will be used to compensate court appointed attorneys to represent parents and children in vertical and collateral cases to create early permanency for the child; and

WHEREAS, funds from the grant will be used to recruitment of new attorneys through a Mentorship Program; and

WHEREAS, funds from the grant will be used to increase the reimbursement rate for Family Team Meetings and encourage participation in Foster Care Review Board proceedings by providing financial compensation.

THEREFORE BE IT RESOLVED, that the Ingham County Board of Commissioners hereby authorizes accepting a grant award from the Michigan Department of Health and Human Services for the sum of $214,808.00

BE IT FURTHER RESOLVED, that the Controller/Administrator is directed to make the necessary adjustments to the 2020 Circuit Court Juvenile Division budget.

BE IT FURTHER RESOLVED, that the Chairperson of the Board of Commissioners is hereby authorized to sign any necessary documents on behalf of the County after approval as to form by the County Attorney.

LAW & COURTS: The Law & Courts Committee will meet on 12/05/2019

FINANCE: Yeas: Grebner, Tennis, Crenshaw, Polsdofer, Schafer, Maiville Nays: None Absent: Morgan Approved 12/04/2019"

872. This December 2019 grant was applied for by Judge Richard Garcia and/or Ingham County Court for the purpose of the local practice funding outside the statutory funding source.

873.     Ingham County court appointed attorneys scheme is fundamentally unfair and serves court's interests, clearly diverging from the parent's interests insofar as the court wishes to hasten without procedural due process; the deprivation of parental rights and stated goal is to achieve "early permanency" or fast tracked deprivation of parental rights and thus wants to avoid both the expense of effective appointed counsel and the cost of the lengthened proceedings his or her presence may cause.

874.     In seeking to understand a scheme involving "early permanency" H. H. Family reviewed an article titled "Privatization of Case Management, Adoption, Family Foster Care and Family Preservation in West Virginia January 2007"

875.     This article titled "Privatization of Case Management, Adoption, Family Foster Care and Family Preservation in West Virginia January 2007" promoted using Michigan's privatization of adoption as a model and creating such a program in West Virginia.

876.     This article titled "Privatization of Case Management, Adoption, Family Foster Care and Family Preservation in West Virginia January 2007" states: "Since adoption privatization has been the most successful and the least controversial component of child-welfare privatization, states should begin their child-welfare reform by privatizing the adoption process."

877.     This article titled "Privatization of Case Management, Adoption, Family Foster Care and Family Preservation in West Virginia January 2007" states: "Adoption component of child welfare services is the most fertile and successful one for privatization. Kansas and Michigan have the longest-running adoption privatization program."

878.     This article titled "Privatization of Case Management, Adoption, Family Foster Care and Family Preservation in West Virginia January 2007" states: "Since 1992

Michigan has contracted with approximately 55 different providers for adoption services. Providers are not paid based on the difficulty of finding a child a home. The harder a child is to place, the higher the payment. All foster care providers under contract, licensed to provide adoption services and all nonprofit licensed adoption agencies without a foster-care program are offered adoption contracts. Payment for adoption is based on an outcome-based reimbursement system. Agencies are rewarded for achieving outcomes related to the timeliness of placement.

879.    "This article titled "Privatization of Case Management, Adoption, Family Foster Care and Family Preservation in West Virginia January 2007" states: "Previously, many states including West Virginia, were hesitant to terminate parental rights. Children languished in the foster care system for their entire childhood, often being moved from foster home to foster home, while our child welfare agencies worked on efforts to reunify the child with their biological family. The Adoption and Safe Families Act clearly identifies that foster care should be considered temporary and that permanency planning needs to begin as soon as a child enters foster care."

880.    This article titled "Privatization of Case Management, Adoption, Family Foster Care and Family Preservation in West Virginia January 2007" states: "The primary goal of concurrent planning is early permanence for the child."

881.    H. H. believing the issues she uncovered are systematic statewide and began posting the issues she found in social media seeking other parents with similar circumstances.

882.    Multiple parents across the whole State of Michigan, have reached out with stories of similar practices for orders to cooperate with the investigation, children taken for reasons that do not meet statutory requirements for subject matter jurisdiction, due

process violations and lack of proper timely notice of hearings, same day preliminary

hearings on petitions to remain in home, incorrect initiation proceedings by the juvenile

court registers and early permanency sought without statutory authority

883.    MDHHS may seek termination of parental rights for the temporary custody of the

court following a review hearing under MCL 712A.19(3).

884.    MCL 712A.19 (3) requires the review hearing be held within statutory time

frames stating, " (2) Except as provided in subsections (3) and (4), if a child subject to the

court's jurisdiction remains in his or her home, a review hearing must be held not more

than 182 days from the date a petition is filed to give the court jurisdiction over the child

and no later than every 91 days after that for the first year that the child is subject to the

court's jurisdiction. After the first year that the child is subject to the court's jurisdiction, a

review hearing shall be held no later than 182 days from the immediately preceding

review hearing before the end of that first year and no later than every 182 days from

each preceding review hearing after that until the case is dismissed. A review hearing

under this subsection must not be canceled or delayed beyond the number of days

required in this subsection, regardless of whether a petition to terminate parental rights or

another matter is pending. Upon motion by any party or in the court's discretion, a review

hearing may be accelerated to review any element of the case service plan prepared

according to section 18f of this chapter.; (3) Except as otherwise provided in subsection

(4), if, in a proceeding under section 2(b) of this chapter, a child is subject to the court's

jurisdiction and removed from his or her home, a review hearing must be held not more

than 182 days after the child's removal from his or her home and no later than every 91

days after that for the first year that the child is subject to the court's jurisdiction. After

the first year that the child has been removed from his or her home and is subject to the

court's jurisdiction, a review hearing must be held not more than 182 days from the immediately preceding review hearing before the end of that first year and no later than every 182 days from each preceding review hearing after that until the case is dismissed. A review hearing under this subsection must not be canceled or delayed beyond the number of days required in this subsection, regardless of whether a petition to terminate parental rights or another matter is pending. Upon motion by any party or in the court's discretion, a review hearing may be accelerated to review any element of the case service plan prepared according to section 18f of this chapter.

885.    However, MDHHS is seeking termination of parental rights at the initial disposition stage without alleging facts that bring a parent under the jurisdiction of the court and without alleging aggravating circumstances.

886.    MDHHS is seeking termination of parental rights using MCL 712A.19b while the children "protective custody" of the court before the court has assumed jurisdiction at an adjudication hearing and before a review hearing.

887.    H. H. has personally reviewed multiple petitions filed in Ingham County and Ingham County and Grand Traverse County with grounds for Termination of parental rights under MCL 712A.19b was sought at the initial disposition hearing.

888.    MCL 712A.19b states: "(1) Except as provided in subsection (4), if a child remains in foster care in the temporary custody of the court following a review hearing under section 19(3) of this chapter or a permanency planning hearing under section 19a of this chapter or if a child remains in the custody of a guardian or limited guardian, upon petition of the prosecuting attorney, whether or not the prosecuting attorney is representing or acting as legal consultant to the agency or any other party, or petition of the child, guardian, custodian, concerned person, agency, or children's ombudsman as

authorized in section 7 of the children's ombudsman act, 1994 PA 204, MCL 722.927, the
court shall hold a hearing to determine if the parental rights to a child should be
terminated and, if all parental rights to the child are terminated, the child placed in
permanent custody of the court. The court shall state on the record or in writing its
findings of fact and conclusions of law with respect to whether or not parental rights
should be terminated. The court shall issue an opinion or order regarding a petition for
termination of parental rights within 70 days after the commencement of the initial
hearing on the petition. The court's failure to issue an opinion within 70 days does not
dismiss the petition."

889.     MDHHS is seeking termination of parental rights at the initial disposition stage
without alleging facts that bring a parent under the jurisdiction of the court and without
alleging aggravating circumstances.

890.     A review of Ingham County and Ingham County and Grand Traverse County
Court Records and local practices found similar systemic issues as found in Ingham
County.

891.     Court records show Ingham County and Ingham County and Grand Traverse
County MDHHS filed multiple petitions to terminate rights using an outdated version of
MCL 712A.19b (g)

892.     MCL 712A.19b (g) was amended effective June 12th 2018

893.     MCL 712A.19b (g) states: "The parent, although, in the court's discretion,
financially able to do so, fails to provide proper care or custody for the child and there is
no reasonable expectation that the parent will be able to provide proper care and custody
within a reasonable time considering the child's age."

894.     Old law before June 12th 2018 said: (g) The parent, without regard to intent, fails

to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

895.     The Ingham County and Ingham County and Grand Traverse County petitions in question contained information that stated the mother's inability to regularly visit the children, to MDHHS satisfaction, was financial in nature and was not of a duration of the statutory 2 years in which MDHHS could seek termination of parental rights at initial deposition.

896.     Review of recordings between Sarah Culbertson and a parent in Grand Traverse County, herein referred to as T. D., shows MDHHS uses orders after a preliminary hearing even when the order denies authorization for filing of the petition.

897.     A parent in Grand Traverse County, herein referred to as T. D., requested their own CPS records twice in six months and received two versions which he has proffered contains credible evidence of multiple references to, "order to cooperate with an investigation".

898.     A parent in Grand Traverse County, herein referred to as T. D., requested their own CPS records twice in six months and received two versions which he has proffered contains credible evidence of a practice for local offices to open cases without a central hotline call or after the call had been rejected as failing to meet criteria for investigation.

899.     A parent in Grand Traverse County, herein referred to as T. D., requested their own CPS records twice in six months and received two versions which he has proffered contains credible evidence no services had been offered beyond investigative tools.

900.     A parent in Grand Traverse County, herein referred to as T. D., requested their own CPS records twice in six months and received two versions which he has proffered

contains credible evidence no risk assessment or reassessments were completed prior to seeking in home jurisdiction.

901. Grand Traverse County MDHHS sought two (2) "rule to show cause" motions seeking sanctions for failure to cooperate during the pendency of the proceedings on an "in-home jurisdiction" petition prior to adjudication.

902. Because Ingham County court appointed attorneys scheme is so fundamentally unfair and serves court's interests, clearly diverging from the parent's interests insofar as the court wishes to hasten without procedural due process; the deprivation of parental rights and stated goal is to achieve "early permanency" or fast tracked deprivation of parental rights it involves the H. Family's 14th amendment rights to fundamental fairness in judicial proceedings.

903. Ingham County Court has a financial incentive to fast track the deprivation of parental rights and adjudicate cases.

904. Ingham County receives a 25% kickback on monies collected on court ordered services only after adjudication.

905. Ingham County loses a 25% kickback on monies collected on court ordered services if a family is offered, accepts and receives voluntary services prior to submission of petition and adjudication.

906. MCL 712A.18 (2) states: "An order of disposition placing a juvenile in or committing a juvenile to care outside of the juvenile's own home and under state, county juvenile agency, or court supervision shall contain a provision for reimbursement by the juvenile, parent, guardian, or custodian to the court for the cost of care or service. The order shall be reasonable, taking into account both the income and resources of the juvenile, parent, guardian, or custodian. The amount may be based upon the guidelines

and model schedule created under subsection (6). If the juvenile is receiving adoption
assistance under sections 115f to 115m or 115t of the social welfare act, 1939 PA 280,
MCL 400.115f to 400.115m and 400.115t, the amount shall not exceed the amount of the
support subsidy. The reimbursement provision applies during the entire period the
juvenile remains in care outside of the juvenile's own home and under state, county
juvenile agency, or court supervision, unless the juvenile is in the permanent custody of
the court. The court shall provide for the collection of all amounts ordered to be
reimbursed and the money collected shall be accounted for and reported to the county
board of commissioners. Collections to cover delinquent accounts or to pay the balance
due on reimbursement orders may be made after a juvenile is released or discharged from
care outside the juvenile's own home and under state, county juvenile agency, or court
supervision. Twenty-five percent of all amounts collected under an order entered under
this subsection shall be credited to the appropriate fund of the county to offset the
administrative cost of collections. The balance of all amounts collected under an order
entered under this subsection shall be divided in the same ratio in which the county, state,
and federal government participate in the cost of care outside the juvenile's own home
and under state, county juvenile agency, or court supervision. The court may also collect
from the government of the United States benefits paid for the cost of care of a court
ward. Money collected for juveniles placed by the court with or committed to the
department or a county juvenile agency shall be accounted for and reported on an
individual juvenile basis. In cases of delinquent accounts, the court may also enter an
order to intercept state or federal tax refunds of a juvenile, parent, guardian, or custodian
and initiate the necessary offset proceedings in order to recover the cost of care or
service. The court shall send to the person who is the subject of the intercept order

advance written notice of the proposed offset. The notice shall include notice of the opportunity to contest the offset on the grounds that the intercept is not proper because of a mistake of fact concerning the amount of the delinquency or the identity of the person subject to the order. The court shall provide for the prompt reimbursement of an amount withheld in error or an amount found to exceed the delinquent amount."

907.    MCL 712A.18 (2) creates a conflict of interest for the Court when it provides: "Twenty-five percent of all amounts collected under an order entered under this subsection shall be credited to the appropriate fund of the county to offset the administrative cost of collections."

908.    Using Michigan Supreme Court guidelines J. H. would have been anticipated to pay upwards of $930 a month in costs of services if properly assessed an amount based on income.

909.    Using Michigan Supreme Court guidelines the Court would have generated upwards of $240 a month in collection kickbacks if J. H. were properly assessed an amount based on income.

910.    MDHHS also profited from the removal of the H. Family children with federal funding from Title IV funding which now includes funds for court appointed attorneys.

911.    MDHHS was not entitled to federal funding because the H. Family income exceeded pre 1996 AFDC income limits for Illinois and Michigan.

912.    Pre 1996 AFDC income limits for Illinois is $1058.00 a month and Michigan is $696.00 a month.

913.    Ingham County court appointed attorney scheme deprived the H. Family of their 14th amendment right to "fundamental fairness" in judicial proceedings to which the Ingham County Court would have financially benefited had the H. Family not so

vigorously defended themselves out of court and demonstrated superior knowledge of the law and policy.

914.     The H. Family did not have to suffer termination of parental rights to be subject to an illegal scheme to fast track the deprivation of parental rights and "early permanency".

915.     The H. Family did not suffer termination of parental rights after being subject to an illegal scheme to fast track the deprivation of parental rights and "early permanency" because MDHHS agreed to dismissal after it became aware of the H. Family were innocent, had clean hands and possessed unique skills and knowledge of laws and policy as documented in the Initial Case Plan and court filings.

916.     The H. Family had their physical liberty restricted as they were required to return to Michigan during the pendency of the state case.

917.     The H. Family had their physical liberty restricted as they remained in Michigan during the pendency of the state case.

918.     The H. Family had their physical liberty restricted in J. H. was required to agree to stay in the area with the H. Family RV during the pendency of the state case on October 3rd 2018 at a Family Team Meeting that excluded H. H. as evidenced by MDHHS records and written FTM summary J. H. signed.

919.     The H. Family had their physical liberty restricted in H. Family was required to agree to stay in the area with the H. Family RV during the pendency of the state case as a part of the Initial Case Plan as evidenced by MDHHS records and court filings.

920.     On or before October 28th 2018 MDHHS was required under MCL 722.627, to notify the H. Family of their inclusion on the Central Child Abuse Registry and have still have not made such notification.

921.     MCL 722.627 states: "(1) The department shall maintain a statewide, electronic

central registry to carry out the intent of this act. (2) Unless made public as specified information released under section 7d, a written report, document, or photograph filed with the department as provided in this act is a confidential record available only to 1 or more of the following: …. (f) A person named in the report or record as a perpetrator or alleged perpetrator of the child abuse or child neglect or a victim who is an adult at the time of the request, if the identity of the reporting person is protected as provided in section 5. … MCL 722.627 (4) If the department classifies a report of suspected child abuse or child neglect as a central registry case, the department shall maintain a record in the central registry and, within 30 days after the classification, shall notify in writing each person who is named in the record as a perpetrator of the child abuse or child neglect. The notice shall be sent by registered or certified mail, return receipt requested, and delivery restricted to the addressee. The notice shall set forth the person's right to request expunction of the record and the right to a hearing if the department refuses the request. The notice shall state that the record may be released under section 7d. The notice shall not identify the person reporting the suspected child abuse or child neglect. (5) A person who is the subject of a report or record made under this act may request the department to amend an inaccurate report or record from the central registry and local office file. A person who is the subject of a report or record made under this act may request the department to expunge from the central registry a report or record by requesting a hearing under subsection (6). A report or record filed in a local office file is not subject to expunction except as the department authorizes, if considered in the best interest of the child. (6) A person who is the subject of a report or record made under this act may, within 180 days from the date of service of notice of the right to a hearing, request the department hold a hearing to review the request for amendment or expunction. If the

hearing request is made within 180 days of the notice, the department shall hold a hearing

to determine by a preponderance of the evidence whether the report or record in whole or

in part should be amended or expunged from the central registry. The hearing shall be

held before a hearing officer appointed by the department and shall be conducted as

prescribed by the administrative procedures act of 1969, 1969 PA 306, MCL 24.201 to

24.328. The department may, for good cause, hold a hearing under this subsection if the

department determines that the person who is the subject of the report or record submitted

the request for a hearing within 60 days after the 180-day notice period expired. (7) If the

investigation of a report conducted under this act does not show child abuse or child

neglect by a preponderance of evidence, or if a court dismisses a petition based on the

merits of the petition filed under section 2(b) of chapter XIIA of the probate code of

1939, 1939 PA 288, MCL 712A.2, because the petitioner has failed to establish that the

child comes within the jurisdiction of the court, the information identifying the subject of

the report shall be expunged from the central registry. If a preponderance of evidence of

child abuse or child neglect exists, or if a court takes jurisdiction of the child under

section 2(b) of chapter XIIA of the probate code of 1939, 1939 PA 288, MCL 712A.2, the

department shall maintain the information in the central registry as follows: (a) Except as

provided in subdivision (b), for a person listed as a perpetrator in category I or II under

section 8d, either as a result of an investigation or as a result of the reclassification of a

case, the department shall maintain the information in the central registry for 10 years.

(10) Documents, reports, or records authored by or obtained from another agency or

organization shall not be released or open for inspection under subsection (2) unless

required by other state or federal law, in response to an order issued by a judge,

magistrate, or other authorized judicial officer, or unless the documents, reports, or

records are requested for a child abuse or child neglect case or for a criminal investigation of a child abuse or child neglect case conducted by law enforcement."

922.     MCL 722.625 states: "Except for records available under section 7(2)(a), (b), and (n), the identity of a reporting person is confidential subject to disclosure only with the consent of that person or by judicial process. A person acting in good faith who makes a report, cooperates in an investigation, or assists in any other requirement of this act is immune from civil or criminal liability that might otherwise be incurred by that action. A person making a report or assisting in any other requirement of this act is presumed to have acted in good faith. This immunity from civil or criminal liability extends only to acts done according to this act and does not extend to a negligent act that causes personal injury or death or to the malpractice of a physician that results in personal injury or death."

923.     On or about October 30th 2018, Tonya Martinez and the H. Family had a meeting at the MDHHS Office.

924.     This October 30th 2018 meeting was recorded with consent of all parties present.

925.     During this October 30th 2018 meeting Tonya Martinez was given a demand to return children because MDHHS did not have a valid court order for protective custody of the H. Family children.

926.     During this October 30th 2018 meeting Tonya Martinez was informed MDHHS did not have a valid court order for protective custody because the ex parte order was never filed with the court.

927.     During this October 30th 2018 meeting Tonya Martinez was informed MDHHS did not have a valid court order for protective custody because the ex parte order was not based on probable cause.

928.     During this October 30th 2018 meeting Tonya Martinez was informed MDHHS did not have a valid court order for protective custody because the ex parte order was based on perjurious claims.

929.     During this October 30th 2018 meeting Tonya Martinez was informed MDHHS did not have a valid court order for protective custody because the ex parte order was based on an invalid presumption of a prior protective custody order.

930.     During this October 30th 2018 meeting Tonya Martinez was informed MDHHS did not have a valid court order to remove the children from Illinois.

931.     During this October 30th 2018 meeting Tonya Martinez was informed MDHHS and Thomaca Bush had unlawfully kidnapped H. Family children from Illinois in violation of state and federal laws.

932.     During this October 30th 2018 meeting Tonya Martinez was informed MDHHS and Thomaca Bush had unlawfully kidnapped H. Family children without a valid court order.

933.     During this October 30th 2018 meeting Tonya Martinez was informed MDHHS and Thomaca Bush had unlawfully kidnapped H. Family children without a post deprivation hearing the next business day.

934.     During this October 30th 2018 meeting Tonya Martinez was informed MDHHS and Thomaca Bush had unlawfully kidnapped H. Family children without probable cause.

935.     During this October 30th 2018 meeting Tonya Martinez was informed MDHHS was unlawfully withholding the H. Family children without a valid court.

936.      In this October 30th 2018 meeting Tonya Martinez asked about the court appointed attorneys and referred the legal issues to them to address.

937.      In this October 30th 2018 meeting Tonya Martinez acknowledged that the factors

listed on the court orders that originated from St Clair County and used to remove children, had been in fact unfounded for weeks by St Clair County.

938.    In this October 30th 2018 meeting Tonya Martinez revealed Thomaca Bush had confessed to refusing services to H. H. on or about October 5th 2018 because of H. H.'s disability.

939.    In this October 30th 2018 meeting Tonya Martinez acknowledged the use of unadjudicated cases against parents as presumption of parental unfitness based on unsubstantiated removals only.

940.    During this October 30th 2018 meeting Tonya Martinez and the H. Family discussed the issue of "traveled though" versus legal residences.

941.    During this October 30th 2018 meeting Tonya Martinez acknowledged it was only "residence" that MDHHS was concerned with per policy.

942.    During this October 30th 2018 meeting Tonya Martinez also acknowledged the H. Family was subjected to unequal treatment because they traveled.

943.    During this October 30th 2018 meeting Tonya Martinez further acknowledged Thomaca Bush was seeking "travel" information beyond required by policy.

944.    During this October 30th 2018 meeting Tonya Martinez stated the concern the department was investigating was the condition of the home, acknowledging the department does not investigate substance abuse unless the parents actions on the substance contributed to abuses and lists examples.

945.    After this October 30th 2018 meeting Tonya Martinez failed to properly supervise Thomaca Bush and MDHHS continued to enforce the void ex parte protective custody order for another 30 days.

946.    Tonya Martinez, as Thomaca Bush's direct supervisor, participated and or

encouraged and implicitly authorized, approved, or knowingly acquiesced in the
unconstitutional conduct of Thomaca Bush.

947.	On or About October 31st 2018, Mellisa Wright, the foster care caseworker
staffed the H. Family case with the County Attorney and provided her with the H.
Family's exonerating evidence.

948.	On or About October 31st 2018 the Ingham County Attorney agreed to nolle
prosecute the case based on the inability to substantiate the allegations.

949.	On or About October 31st 2018 the H. Family was erroneously told by J. H. 's
court appointed counsel the children were being returned after the county attorney
declined to prosecute H. Family.

950.	On or About October 31st 2018 MDHHS refused to file a dismissal motion and
indicated they would be hiring independent counsel and still were seeking continued
placement in foster care.

951.	On or About October 31st 2018 H. H. once again was hospitalized in an inpatient
psychiatric hospital as a result of extreme emotional distress.

952.	H. H. and J. H. experienced extreme emotional distress ie. Sadness, self-
destructive thoughts, anxiety, stress, grief and anger and H. H. was again hospitalized
inpatient for treatment. Both also suffered feelings of humiliation/shame, insomnia, fear,
paranoia, mania and depression in addition to the above emotions throughout their ordeal
and these symptoms are ongoing.

953.	On or about November 21st 2018, H. H. attempted to file a writ of habeas corpus
in Ingham County and was informed by an unidentified Juvenile court clerk she could not
file any motions pro se and her lawyer had to file it for her since the Court had assigned
counsel and only a court order could remove a court appointed Attorney.

954. On or about November 14th 2018, H. H. attempted to file a "Motion For Writ Of Habeas Corpus, declare Proceedings Void Ab Initio And Dismiss Case" and the clerk refused to accept the pleading s because H. H. had court appointed counsel and was not "allowed" to file pro se.

955. On or about November 14th 2018, H. H inquired of the unidentified Juvenile court clerk how she was to get the court to withdraw the Court appointed attorney if she could not file any motions and was advised to address it in court.

956. On or about November 21st 2018 the "Initial Case Service Plan" was filed by Mellissa Wright, Foster care caseworker, Child & Family Charities.

957. The "Initial Case Service Plan" was signed by Mellisa Wright and her supervisor October 4th 2018 which was more than 30 days after the children were removed.

958. The "Initial Case Service Plan" was not offered to the H. Family in the statutory required 30 days.

959. The "Initial Case Service Plan" did not contain any provision of direct services by MDHHS.

960. The "Initial Case Service Plan" did not contain any referrals to any direct or community based services.

961. The "Initial Case Service Plan" Reasonable efforts section describes reason children came into care as "due to neglect, homelessness, mental health concerns and lack educational attendance".

962. "Initial Case Service Plan" then states "Ingham County Sheriff and St Clair County Children's Protective Services reports indicated that neglect was not a concern.""The Sheriff report found the home unkempt, but appropriate to reside in."

963. The "Initial Case Service Plan", states: "H. H. receives mental health treatment

voluntarily without intervention and provides evidence to support this."

964.     The "Initial Case Service Plan", states: "the parents provided several proofs of permanent residence in Illinois. They chose to travel in their travel trailer and homeschool the children."

965.     The "Initial Case Service Plan", states: "The children were placed in formal school at the time of their removal and both children placed at grade level indicating the parents home schooling is effective at meeting their educational and intellectual needs."

966.     The "Initial Case Service Plan" contains statements from the foster parents in support of the H. Family includes information on the children's health, healthy eating habits, intelligence, adequacy of education and that the H. Family children were role models to the other children.

967.     These foster parents were willing and capable of homeschooling the H. family children and were denied by the agency to do so because of policy. The H. Family children were placed in public school against the wishes of the H. Family.

968.     The "Initial Case Service Plan", states: "a motion to dismiss the case has been filed and a hearing will be held on 11/29/18 due to none of the allegations have been substantiated"

969.     The "Initial Case Service Plan", states: "Based on information and belief this statement is inaccurate it indicates a decision was made by the court which did not occur on the record or in open court instead this decision was made off the record, in the pretrial conference outside the H. Family's presence and without informing the H. Family.

970.     The "Initial Case Service Plan", states: "services to prevent removal were not provided"

971.     The "Initial Case Service Plan" erroneously states it was the H. Family travel

trailer being replaced, but it was the H. Family truck due to engine failure as correctly indicated in the Ingham County Sheriff's report.

972.     Mellisa Wright, Thomaca Bush, the St Clair on call investigator, Ingham County Sheriff Department and Dennis Baker, all viewed the same 2008 Jayco travel trailer with no changes or alterations.

973.     It was the engine failure at the Ingham county resort that attracted attention with large billowy clouds of white smoke that occurred when the engine oil mixed with water and antifreeze from the blown head gasket that was very noticeable.

974.     The "Initial Case Service Plan", states the childrens removal date was September 28th 2018.

975.     The "Initial Case Service Plan", states the Petition date was September 28th 2018.

976.     The "Initial Case Service Plan", states the court order date was October 18th 2018.

977.     The "Initial Case Service Plan" leaves hearing type and outcome blank.

978.     The "Initial Case Service Plan", states the order type is "JC11B- Order After Pretrial Hearing Child Protective Proceedings.

979.     The "Initial Case Service Plan" appears to acknowledge the lack of a protective custody order and lack of post removal hearing by leaving off the information from the September 28th 2018 hearing, the resulting October 1st 2018 order and failing to acknowledge the missing ex parte protective custody order.

980.     On or about November 27th 2018, Plaintiff H. H. attorney Ronald Berry filed a motion to dismiss petition challenging the merits citing no jurisdiction under the UCCJEA and MCL 722.1204 as well "any concerns have been alleviated as evidenced by the Initial Case Plan.

981.     On or about November 27th 2018, Plaintiff H. H. attorney Ronald Berry filed a

motion to dismiss petition that did not include objections for lack of subject matter

jurisdiction ie No neglect as defined under statute., lack of reasonable effort, harm to

children in care, and discriminatory intent violations of ADA., no notice of preliminary

hearing and perjury.

982.     On or about November 27th 2018, Plaintiff H. H. attorney Ronald Berry filed a

motion without H. H. knowledge, consent and in direct violation of her written demands.

983.     This motion was never referenced in court and Ronald Berry offered no oral

arguments in support of this motion.

984.     H. H. was unaware of this motion to dismiss filed on her behalf and against her

express wishes until August 2019 when she received a copy of the entire court file.

985.     On November 29th 2018, Ingham County Court dismissed the petition by

agreement of all parties, stating "jurisdiction not needed" and noting that the H. Family

did cooperate.

986.     The dismissal order is a determination on the merits of the case.

987.     The state case was resolved in Plaintiff H. Family's favor based on the merits of

the case.

988.     On or after November 29th 2018 MDHHS failed to remove the H. Family from

the central child abuse registry after the court dismissed the petition based on the merits

and has not notified them of their rights under MCL 722.627.

989.     H. H. was informed by the Office of Children's Ombudsman that the H. Family

was not considered to have won their case based on the merits and said they were "lucky"

they got their children back based on a technicality.

990.     Based on information and belief the H. Family is still listed on the central child

abuse registry.

991.    The H. Family rights to within 180 days from the date of service of notice of the right to a hearing, request the department hold a hearing to review the request for amendment or expunction has not yet accrued due to lack of service of such notice and is reserved until after such notice.

992.    This lack of notice is believed to have been caused by Thomaca Bush and MDHHS continued to use an erroneous non residential address for the H. Family despite their records and court records showing they were provided with the correct address in Illinois.

993.    The H. Family has not requested the department hold a hearing to review or request an amendment or expunction because the right is not ripened as there has been no triggering notification.

994.    The H. Family has not requested the department hold a hearing to review or request an amendment or expunction because amending the record would require the destruction of evidence in both the litigation of their civil rights claims and any potential criminal prosecution for acts of obstruction of public justice.

995.    The H. Family is aware of other cases where the case file has been altered and is aware MDHHS altered the H. Family's records between September 28th 2018 and October 2nd 2018 when the second petition was generated.

996.    Based on information and belief MiSACWIS captures a log of all actions and the user who generated the action.

997.    Based on information and belief upon the discovery process it will be ascertained exactly when the petition was altered and by whom.

998.    Based on information and belief it will be ascertained the petition was altered on

October 2nd 2018 by Thomaca Bush.

999.    Based on information and belief it will be ascertained the petition was altered after the Children's Ombudsman's office notified MDHHS of the due process issues discovered when J. H. contacted their offices on October 1st 2018 to make a complaint.

1000.    Due to the prior acts to alter the case record any current version of the H. Family case file is meaningless without the knowledge of historical alterations and the H. Family. has delayed seeking such records until discovery can be made.

1001.    No court order for protective custody placement of the children is in the court record instead the records reflect an order dated October 1st 2018, for "care and supervision" only and finding current placement is satisfactory to meet the children's needs.

1002.    Absent a valid court order for protective custody and proper procedural due process, removal of children by Michigan Child protective Services is illegal and violates clearly established constitutional rights.

1003.    MCL 722.628 section 17) which requires "All department employees involved in investigating child abuse or child neglect cases shall be trained in the legal duties to protect the state and federal constitutional and statutory rights of children and families from the initial contact of an investigation through the time services are provided."

1004.    In Michigan "State and federal constitutional and statutory rights" means a parents or legal guardians rights include but are not limited to:

1005.    Families have Federal Constitutional rights including but are not limited to: Right to exercise the rights guaranteed by the First Amendment to the United States Constitution which prevents the government from making laws which respect an establishment of religion, prohibiting the free exercise of religion, or abridge the freedom

of speech, the freedom of the press, the right to peaceably assemble, or the right to petition the government for a redress of grievances.

1006.   A parents rights to the care and custody of their children is grounded upon First Amendment principles of right to familial association.

1007.   The right to travel is grounded in Article IV, § 2 of the United States Constitution.

1008.   The right to travel is grounded in the 1st amendment.

1009.   The right to travel is grounded in the 14th amendment.

1010.   Right the protection of the rights of the Fourth Amendment of the U.S. Constitution provides the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. Established case law in the 6th United States District has deemed this to apply to child protection workers and includes a person's Constitutional right to resist government intrusion on their privacy and invasion of their seclusion without probable cause based on objective evidence developed by a more reliable source, Constitutional right to be free from warrantless searches for which no probable cause exists and the right to be free of fabricated evidence.

1011.   Right the protection of the rights guaranteed by the Fifth Amendment protects individuals from being forced to incriminate themselves in a crime. Incriminating oneself is defined as exposing oneself to "an accusation or charge of a crime," or as involving oneself "in a criminal prosecution or the danger thereof. The privilege against compelled self-incrimination is defined as "the constitutional right of a person to refuse to answer questions or otherwise give testimony against himself. This applies in Child Protection

cases where there are concurrent law enforcement investigations or potential criminal proceedings as Child Protection workers are required to work with law enforcement in circumstances defined by statutes. The Fifth Amendment also includes a due process clause stating that no person shall "be deprived of life, liberty, or property, without due process of law." which requires government officials to follow fair procedures before depriving a person of life, liberty, or property, and substantive due process, which protects certain fundamental rights from government interference. The Due Process Clause prohibits state and local governments from depriving persons of life, liberty, or property without a fair procedure. The Supreme Court has ruled this clause makes most of the Bill of Rights as applicable to the states as it is to the federal government, as well as to recognize substantive and procedural requirements that state laws must satisfy. The right to due process is established by state statute(s) and implemented by court rules including; notice of hearings as required by statute, notice of the nature of the proceedings and an opportunity to be heard.

1012.    Right the protection of the rights guaranteed by the Eighth Amendment of the United States Constitution that prohibits the imposition of excessive bail, excessive fines, or cruel and unusual punishments.

1013.    Right the protection of civil and constitutional rights are not limited by the constitution under The Ninth Amendment to the United States Constitution addresses rights retained by the people, that are not specifically enumerated in the Constitution. It is part of the Bill of Rights. The amendment reads: The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.

1014.    Right the protection of the rights guaranteed by the Fourteenth Amendment Includes several clauses: the Citizenship Clause, Privileges or Immunities Clause, Due

Process Clause, and the Equal Protection Clause: The Supreme Court has established this include the fundamental liberty interest of natural parents in the care, custody, and management of their child", the constitutional rights of citizens to substantive and procedural due processo, right be free from discrimination based on a protected class and to travel from one state to another and maintain rights and prorections of their home state. The right to due process of law as established by state statute(s) and implemented by court rules including; notice of hearings as required by statute, notice of the nature of the proceedings and an opportunity to be heard.

1015. Families have federal statutory rights as established by various acts of congress including but not limited to:

1016. Rights to nondiscrimination are established in the United States Civil Rights Act of 1968, and Americans with Disability Act of 1990.

1017. The right to be reasonably accommodated for disability is established in Americans with Disability Act and established case law provides "reasonable accommodations" are part of statutorial required "reasonable efforts".

1018. The right to the protections of the UCCJEA and UNIFORM CHILD-CUSTODY JURISDICTION AND ENFORCEMENT ACT 195 of 2001 Article 1 in circumstances Michigan is not the child's home state for the last 6 consecutive months

1019. Families have Michigan State level Constitutional rights as enumerated in Article I of the Michigan Constitution is entitled Declaration of Rights and consists of 27 sections. including but are not limited to:

1020. Section 2 guarantees "No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national

origin."

1021.    Section 3 guarantees "The people have the right peaceably to assemble, to consult

for the common good, to instruct their representatives and to petition the government for

redress of grievances."

1022.    Section 4 guarantees "Every person shall be at liberty to worship God according

to the dictates of his own conscience. No person shall be compelled to attend, or, against

his consent, to contribute to the erection or support of any place of religious worship, or

to pay tithes, taxes or other rates for the support of any minister of the gospel or teacher

of religion. No money shall be appropriated or drawn from the treasury for the benefit of

any religious sect or society, theological or religious seminary; nor shall property

belonging to the state be appropriated for any such purpose. The civil and political rights,

privileges and capacities of no person shall be diminished or enlarged on account of his

religious belief."

1023.    Section 5 guarantees "Every person may freely speak, write, express and publish

his views on all subjects, being responsible for the abuse of such right; and no law shall

be enacted to restrain or abridge the liberty of speech or of the press."

1024.    Section 11 guarantees "The person, houses, papers and possessions of every

person shall be secure from unreasonable searches and seizures. No warrant to search any

place or to seize any person or things shall issue without describing them, nor without

probable cause, supported by oath or affirmation."

1025.    Section 13 guarantees "A suitor in any court of this state has the right to prosecute

or defend his suit, either in his own proper person or by an attorney."

1026.    Section 14 guarantees "The right of trial by jury shall remain, but shall be waived

in all civil cases unless demanded by one of the parties in the manner prescribed by law."

1027.     Section 15 guarantees "No person shall be subject for the same offense to be twice put in jeopardy."

1028.     Section 16 guarantees "Excessive bail shall not be required; excessive fines shall not be imposed; cruel or unusual punishment shall not be inflicted; nor shall witnesses be unreasonably detained."

1029.     Section 17 guarantees "No person shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law. The right of all individuals, firms, corporations and voluntary associations to fair and just treatment in the course of legislative and executive investigations and hearings shall not be infringed."

1030.     Section 18 guarantees "No person shall be rendered incompetent to be a witness on account of his opinions on matters of religious belief."

1031.     Section 23 provides "The enumeration in this constitution of certain rights shall not be construed to deny or disparage others retained by the people."

1032.     Families have Michigan state statutory rights as established by various acts of congress including but not limited to:

1033.     MCL 380.10 states "It is the natural, fundamental right of parents and legal guardians to determine and direct the care, teaching, and education of their children."

1034.     The right to due process including; notice of hearings as required by statute, notice of the nature of the proceedings and a Service of summons as established in MCL 712A.13 unless the child is in protective custody or falls under the provisions of MCL 722.637 with probable cause of serious injury, sexual abuse or methaphmine production exposure to the child in which notice of a preliminary hearing must be given by the person taking child into custody as soon as a preliminary hearing is scheduled and a

preliminary hearing held no later than the next business day. MDHHS employees are only permitted to give notice of a preliminary hearing if child is in protective custody or falls under the provisions of MCL 722.637; all other service is required to be by a person not a party nor an officer of a corporate party the Juvenile case pursuant to MCR 2.103.

1035.    The right to a preliminary inquiry under MCL 712A.11 versus a preliminary hearing when a petition is not accompanied by a request for placement of the child and the child is not in temporary custody or falls under the provisions of MCL 722.637 with probable cause of serious injury, sexual abuse or methaphmine production exposure to the child.

1036.    The right to a preliminary hearing that must commence no later than 24 hours after the juvenile has been taken into court custody, excluding Sundays and holidays, as defined by MCR 8.110(D)(2), or the juvenile must be released when a child is removed via emergency procedures and or an ex parte protective custody order under MCL 712A.14, MCL 712A.14a or MCL 712A.14b.

1037.    The right to retain custody of children pending dispositional hearing unless a court finds the children meet all the criteria of MCL 712A.14b including a finding of "imminent risk of harm" and the child's "immediate removal "from those surroundings is necessary to protect the child's health and safety and places children into protective custody.

1038.    MCL 712A.13a provides: "If a juvenile is removed from the parent's custody at any time, the court shall permit the juvenile's parent to have regular and frequent parenting time with the juvenile. Parenting time between the juvenile and his or her parent shall not be less than 1 time every 7 days unless the court determines either that exigent circumstances require less frequent parenting time or that parenting time, even if

supervised, may be harmful to the juvenile's life, physical health, or mental well-being. If the court determines that parenting time, even if supervised, may be harmful to the juvenile's life, physical health, or mental well-being, the court may suspend parenting time until the risk of harm no longer exists."

1039. The right to the return of a child at a preliminary hearing under MCL 712A.14, MCL 712A.14a or MCL 712A.14b or dispositional hearing under MCL Section 712A.18 or a permanency hearing under MCL 712A.19 or after a rehearing under MCL 712A.21 unless a court determines that the return would cause a substantial risk of harm to the life, the physical health, or the mental well-being of the child.

1040. The right to a review of Referees report and recommendations as authorized in MCL 712A.10 and implemented by MCR 3.913.

1041. Right to rehearing under MCL 712A.21 upon motion of any party or interested party at any stage of the proceedings up until 20 days after the entry of an order to terminate parental rights.

1042. The right to request a judge conduct hearings instead of a referee is established in MCL 712A.10.

1043. The right to a jury trial at the adjudication stage of proceedings is established in MCL 712A.17.

1044. Right to contest continuing exercise of that jurisdiction by filing a motion for rehearing, MCL 712A.21 or MCR 3.992, or by filing an application for leave to appeal with the Michigan Court of Appeals.

1045. The right to an attorney at all stages of the proceedings is established in MCL 712A.17.

1046. The right to be free from discrimination based on a protected class is established

in the ELLIOTT-LARSEN CIVIL RIGHTS ACT Act 453 of 1976 and the Michigan's

PERSONS WITH DISABILITIES CIVIL RIGHTS ACT of 1976

1047.   The right to be reasonably accommodated for disability is established in

Michigan's PERSONS WITH DISABILITIES CIVIL RIGHTS ACT of 1976

1048.   Under MCR 3.993 (A) the following orders are appealable to the Court of

Appeals by right: (1) any order removing a child from a parent's care and custody, (2) an

initial order of disposition following adjudication in a child protective proceeding, (3) an

order of disposition placing a minor under the supervision of the court in a delinquency

proceeding, (4) an order terminating parental rights, (5) any order required by law to be

appealed to the Court of Appeals, (6) any order involving an Indian child that is subject to

potential invalidation under § 39 of the Michigan Indian Family Preservation Act, MCL

712B.1 et seq. or § 1914 of the Indian Child Welfare Act, 25 USC 1901 et seq. any final

order. (7) In any appeal as of right, an indigent respondent is entitled to appointment of an

attorney to represent the respondent on appeal and to preparation of relevant transcripts.

1049.   All orders not listed in MCR 3.993 (A) are appealable to the Court of Appeals by

leave under MCR 3.993 (B)

1050.   Each person who is named in the record as a perpetrator of the child abuse or

child neglect on Michigan's central registry has a right to due process including notice

within 30 days after the classification, a right to request expunction of the record and the

right to a hearing if the department refuses the request under MCL 722.627 (4).

1051.   Ingham County MDHHS had no probable cause and failed to allege exigent

circumstances warranting deprivation from established statutory procedural due process.

1052.   Ingham County did not place the children into custody through a law enforcement

removal, but rather used law enforcement in Champaign County Illinois to execute a

Michigan court order.

1053.    On or about September 24th 2018 Ingham County Sheriff investigated the H. Family and found nothing warranting further action.

1054.    Ingham County Sheriff and Ingham County MDHHS both are required to respond, in their respective roles under the defined in section 2 of chapter 12a of Act No. 288 of the Public Acts of 1939 with the same definitions and parameters and do not have a different standard under the law.

1055.    Law enforcement has a statutory duty to investigate allegations of parents contributing to neglect or delinquency of their children under MCL 750.145.

1056.    MCL 750.145 states: "Contributing to neglect or delinquency of children—Any person who shall by any act, or by any word, encourage, contribute toward, cause or tend to cause any minor child under the age of 17 years to become neglected or delinquent so as to come or tend to come under the jurisdiction of the juvenile division of the probate court, as defined in section 2 of chapter 12a of Act No. 288 of the Public Acts of 1939, as added by Act No. 54 of the Public Acts of the First Extra Session of 1944, and any amendments thereto, whether or not such child shall in fact be adjudicated a ward of the probate court, shall be guilty of a misdemeanor."

1057.    Ingham County court employees in their administrative duties, MDHHS and Thomaca Bush failed to follow established statutes, court rules and policy resulting in the unlawful deprivation of the H. Family's constitutional rights.

1058.    Ingham County Court with gross negligence, in their performance of their government function fails to provide adequate supervision and training of court employees.

1059.    Ingham County Court has continued practice after notice of credible allegations of

failure to perform acts required under statute resulting in willful neglect of duty by a public officer or person holding public trust or employment.

1060.     MDHHS has written policies that exceed statutory authority and are unconstitutional on their face.

1061.     MDHHS maintains written policies regarding child protective services and this policy is maintained in a document called Protective Services Manuel commonly known as the"PSM".

1062.     The version of the PSM quoted in this document is the version in use on September 26th 2018 and has since been updated, however updates fail to rectify the issues raised by the plaintiffs.

1063.     PSM 711-1 section titled "CPS PROGRAM DESCRIPTION", states: "The purpose of Children's Protective Services (CPS) is to ensure that children are protected from further physical or emotional harm caused by a parent or other adult responsible for the child's health and welfare and that families are helped, when possible, to function responsibly and independently in providing care for the children for whom they are responsible. The CPS program is based on the conviction that protection of children is primarily the responsibility of parents. When parents and other responsible adults fail, and children are harmed or are at sufficient risk to warrant intervention, CPS intervenes to safeguard the rights and welfare of children whose families are unable or unwilling to do so. By law, the department has the responsibility to receive and respond to any complaint of child abuse, child neglect, sexual abuse, sexual exploitation, or maltreatment by a person responsible for the child's health or welfare. In each case being investigated (with a few exceptions), CPS must complete a safety assessment to assess the present or imminent danger to a child during the investigation and at other important

points during the life of the case. CPS must also complete a risk assessment on the family which determines the risk of future harm to the child. (See PSM 713-01-CPS Investigation-General Instructions and Checklist, Safety Assessment overview section for when a safety assessment does not need to be completed and PSM 713-11-Risk Assessment for when a risk assessment does not need to be completed.) When investigation of the complaint determines that there is a preponderance of evidence of abuse or neglect by a person responsible for the child's health or welfare, the department must assess the needs and strengths of the family. In these cases, services must be provided to the family, until the conditions affecting the child no longer place the child at risk or until other services are in place to alleviate the risk. Because children have a right to be with their own parents, the ultimate objective of CPS is to protect children by stabilizing and strengthening families whenever possible through services, either direct or purchased, to the parents or other responsible adults to help them effectively carry out their parental responsibilities. Whenever possible, extended family members should be engaged to assist parents to take adequate care of their children. When appropriately assessed, planned for and supported, extended family support and care is a child welfare service that reflects the principles of child-centered, family-focused casework practice. In this system, the child's need for safety, nurturance, and family continuity drives service delivery and funding. Children's needs should be considered in the context of having a family with a focus on maintaining and building family ties. This approach acknowledges the integrity of extended family networks as described by families, respects family strengths and diversity, builds upon family resources, and works to strengthen families by preventing the unnecessary separation of children from their families. Family members should be viewed as collaborative partners in service delivery with interventions offered

to strengthen and, when necessary, increase the ability of the extended family to care for children by achieving family connectedness. Child protection is a child-centered, family-focused service. In most cases, efforts must be made to keep families together. Placement of children out of their homes should occur only if their well-being cannot be safeguarded with their families. Appropriate relative caregivers should be the first choice of placement whenever the child can be safely placed with them. CPS is distinctive in several ways: The request for children's protective services usually comes from someone other than the custodial parents (although it may come from one parent) in the form of a complaint of alleged child abuse and/or neglect. The parents may be unaware of what is happening to the child, or may be unable or unwilling to ask for and use help, even though they may know they need it. Parents may lack the motivation to seek and use available resources, or the community may have failed to identify potential child abuse/neglect situations and provide the services which could have prevented the need for CPS involvement. Once a complaint is received, CPS intervention must be evaluated by the department in the interests of the child who is reported neglected/abused. Any services must be offered on behalf of the child, even though, without a court order, the parent has the choice of accepting or rejecting the services that are offered. There are five possible disposition categories for CPS cases: Category V-Cases in which CPS is unable to locate the family, no evidence of child abuse and/or neglect (CA/N) is found or the court declines to issue an order requiring family cooperation during the investigation. Category IV-Cases in which a preponderance of evidence of CA/N is not found. The department must assist the child's family in voluntarily participating in community-based services commensurate with risk level determined by the risk assessment (structured decision making tool). Category III-Cases in which the department determines that there is a preponderance of

evidence of CA/N and the risk assessment indicates a low or moderate risk. A referral to community-based services must be made byCPS. Category II-Cases in which the department determines that there is a preponderance of evidence of CA/N and the risk assessment indicates a high or intensive risk. Services must be provided by CPS, in conjunction with community-based services. Category I-Cases in which the department determines that there is a preponderance of evidence of CA/N (risk must be at least high at initial assessment, at reassessment or by override) and a court petition is needed and/or required. Services must be provided by CPS (or fostercare), in conjunction with community-based services. The receipt of a complaint by DHS requires CPS to respondpromptly to complaints of alleged child abuse and/or neglect in order to determine the validity of the complaint and determine whether the complaint is to be investigated by CPS staff,transferred to another unit that has jurisdiction (e.g., another state, American Indian Tribal Unit, law enforcement, etc.) to investigate, or be rejected. When assigned for CPS investigation, CPS must take the following actions: 1. Complete a safety and risk assessment on all households (See PSM 713-01-CPS. Investigation-General Instructions and Checklist, Safety Assessment overview section for when a safety assessment does not need to be completed and PSM 713-11-Risk Assessment for when a risk assessment does not need to be completed). 2. When there are safety factors present, determine which interventions, if any, will keep the child safe. 3. Determine whether there is a preponderance of evidence of CA/N. If there is a preponderance of evidence of CA/N: Determine if the child can safely remain in the home. Determine and identify the family problems which contributed to, or resulted in, CA/N and the family strengths which can be built on for the purpose of referring the family to community-based services. Consider family strengths and evaluate the potential for treatment of the

underlying factors to ameliorate risk factors and to assist the family in taking adequate

care of the child. Attempt to engage the family in services. The plan for services should

be developed in consultation with the parents/responsible adults and the family support

network, if appropriate. The goal is to stabilize and rehabilitate the family through

services provided by the department, purchased services and/or the use of other

appropriate community resources to meet the needs of the child and parents. Intensive in-

home services including the use of the family's support system must be considered in an

effort to prevent out-of-home placement, when safe to do so. File a petition with the

Family Division of Circuit Court in situations where the child is unsafe, where there is

active resistance to CPS intervention, or when there is resistance to, or failure to benefit

from, CPS intervention and that resistance/failure is causing an imminent risk of harm to

the child."

1064.    PSM 711-2 section titled "PRIMARY FUNCTIONS", states: "Children's

Protective Services (CPS) program responsibilities include the three primary functions of

intake, field investigation, and service provision and intervention."

1065.    PSM 711-2 section titled "Intake", states: "Intake begins when a complaint

alleging child abuse/neglect is received by the department, and is completed when a

determination is made to: 1. Transfer the complaint to another jurisdiction for

investigation of the complaint (for example, law enforcement, American Indian Tribal

Unit, another state, etc.). 2. Assign for field investigation. (A preliminary investigation

may be part of intake and precede assignment for field investigation if the complaint

requires clarification.) 3. Reject the complaint. A decision is made not to investigate the

complaint, and the complaint is not appropriate for transfer to another agency."

1066.    PSM 711-2 section titled "Field Investigation", states: "The field investigation is

the process of gathering and evaluating information in order to assess the current safety

and future risk of harm to a child and to reach a disposition regarding the complaint

allegations. The department must commence the field investigation within 24 hours of

receipt of the complaint (based on the priority level, commencement may be required to

occur before that). During the CPS investigation process, CPS must obtain information

regarding the child's extended family system and resources. The field investigation

should be completed and a disposition made within 30 calendar days of the receipt of a

complaint."

1067.      PSM 711-2 section titled "Service Provision and Intervention", states: "Service

provision and intervention includes the use of structured decision-making tools to help

determine the level of intervention needed and which, if any, services will be provided to

the family. The use of these assessments provides a valid and reliable way of uniformly

working with families when a preponderance of evidence of child abuse and/or neglect is

found to exist and to regularly measure case progress.

1068.      PSM 711-2 section titled "TWENTY-FOUR (24) HOUR SERVICE', states: "The

Department of Health and Human Services uses a statewide Centralized Intake (CI)

system to receive complaints of abuse and neglect. CI is staffed 24 hours a day, seven

days a week. Intake staff receive complaints, and evaluate and act upon them as required.

The Department of Health & Human Services must ensure that a known and well-

publicized system is in place for receiving after-hour telephone complaints. The CPS

Hotline number, 1-855-444-3911, must be made widely available and, at a minimum,

must be given to police agencies, juvenile courts, public health staff, physicians, clergy,

neighborhood centers, hospitals, schools, and other social agencies. It is critical that

telephone numbers for CPS are readily accessible and listed in the easiest places for the

public to locate. Local offices must be listed in all appropriate directories serving residents within the county boundaries."

1069.     PSM 711-2 section titled "ELIGIBLE CLIENTS", states: "Michigan's Child Protection Law states that an individual up to eighteen years of age is eligible for Children's Protective Services (CPS). Complaints can neither be rejected (not investigated), nor dispositioned based solely on factors such as age or behavioral problems (e.g., incorrigibility or legal status such as delinquency). The criteria for both assignment and disposition of complaints are: Harm or threatened harm. To a child's health or welfare. By a parent, legal guardian, or any other person responsible for the child's health or welfare.That occurs through non accidental physical or mental injury, sexual abuse or exploitation, maltreatment, negligent treatment, or failure to protect. Department of Human Services (DHS), or community-based service providers, are to provide services to all children under eighteen years of age whenever any of the following conditions exist: All cases determined to be Category III, II or I by CPS. A child is petitioned into the Family Division of Circuit Court and the court requests supervision by the department in the child's home."

1070.     PSM 711-4 section titled "LEGAL BASE", states: "The following federal and state laws are the legal base for Children's Protective Services in Michigan: Federal Law Social Security Act, Title IV, Part A, Sec. 402(a) Federal Indian Child Welfare Act, Public Law 95-608 25 USC Sub-section 1901-1952 State Social Welfare Laws 1939 PA 280 (MCL 400.115b, 400.55(h) and 400.56(c)) State Child Protection Law (CPL) 1975 PA 238 (MCL 722.621 et seq.) State Child Care Organization Licensing Law 1973 PA 116 (MCL 722.111 - 722.128) Juvenile Code 1939 PA 288 (MCL 712A.1 et seq.) Public Health Code 1978 PA 368 (MCL 333.17001 et seq.)"

1071.    PSM 711-4 section titled "LEGAL DEFINITIONS subsection titled "Amendment", states: "A change in case record or central registry information such as case name, address, code, case number, etc., including any change to correct inaccurate information."

1072.    PSM 711-4 section titled "LEGAL DEFINITIONS subsection titled "American Indian, American Indian Child, American Indian Tribe (formerly Native American)", states: "See NAA 100 through NAA 615 for the definitions of American Indian, American Indian child, and American Indian tribe.

1073.    PSM 711-4 section titled "LEGAL DEFINITIONS subsection titled "Basis-in-Fact", states: "Direct, personal knowledge on the part of the reporting person that is specific and concrete and reasonably indicates harm or threatened harm to a child's health or welfare."

1074.    PSM 711-4 section titled "LEGAL DEFINITIONS subsection titled "Central Registry Case/ Substantiated Case", states: "A central registry/substantiated case is any case that the department determines that a preponderance of evidence of child abuse and/neglect occurred and any one of the following: The case is classified as Category I or II (Section 8 and 8d of the CPL). (See Five Category Disposition.) The perpetrator is a nonparent adult who resides outside the child's home (Section 8d(3)(4) of the CPL). The perpetrator is a licensed foster parent (Section 8d(3)(4) of the CPL). The perpetrator is an owner, operator, volunteer or employee of a licensed or registered child care organization (Section 8d(3)(4) of the CPL). A CPS case that was investigated before July 1, 1999 and the disposition of the complaint was "substantiated."

1075.    PSM 711-4 section titled "LEGAL DEFINITIONS subsection titled "Child", states: "A person under 18 years of age."

1076.    PSM 711-4 section titled "LEGAL DEFINITIONS subsection titled "Child

Abuse", states: "Harm or threatened harm to a child's health or welfare that occurs

through nonaccidental physical or mental injury, sexual abuse, sexual exploitation, or

maltreatment by a parent, a legal guardian, or any other person responsible for the child's

health or welfare or by a teacher, a teacher's aide, or a member of clergy."

1077.    PSM 711-4 section titled "LEGAL DEFINITIONS subsection titled "Child

Abuse/Neglect Central Registry (CA/NCR or central registry) The system maintained by

the department that is used to keep record of all reports filed with the department under

the CPL in which a preponderance of relevant and accurate evidence of child abuse or

neglect is found to exist (substantiated case) (Section 2(c) of the CPL) and contains:

Historical Registry - list of complaints entered on central registry prior to 8-1-92, which

identifies perpetrators who have not been provided written notification of their names

having been placed on central registry. Perpetrator Registry - list of perpetrators who

have been provided written notification of their names having been placed on central

registry.

1078.    PSM 711-4 section titled "LEGAL DEFINITIONS subsection titled "Child Care

Organization", states: "Defined in 1973 PA 116 (MCL 722.111 to 722.128) and includes

child care centers, nursery schools, parent cooperative preschools, foster family homes,

foster family group homes, children's therapeutic group homes, child care homes, child

caring institutions, child placing agencies, children's camps and children's campsites."

1079.    PSM 711-4 section titled "LEGAL DEFINITIONS subsection titled "Child

Neglect", sates: "Harm or threatened harm to a child's health or welfare by a parent, legal

guardian, or any other person responsible for the child's health or welfare that occurs

through either of the following: Negligent treatment, including the failure to provide

adequate food, clothing, shelter, or medical care. Placing a child at an unreasonable risk to the child's health or welfare by failure of the parent, legal guardian, or any other person responsible for the child's health or welfare to intervene to eliminate that risk when that person is able to do so and has, or should have, knowledge of the risk."

1080. PSM 711-4 section titled "LEGAL DEFINITIONS subsection titled "Children's Protective Services", states: "Program services designed to rectify conditions which threaten the health and safety of children due to the actions or inactions of those responsible for their care. These services include investigation of a child abuse/neglect complaint; determination of the facts of danger to the child and immediate steps to remove the danger; providing or arranging for needed services for the family and child; and when appropriate, initiation of legal action to protect the child."

1081. PSM 711-4 section titled "LEGAL DEFINITIONS subsection titled "Complaint" states: "Written or verbal communication to the department of an allegation of child abuse or neglect. The term "complaint" in the Children's Protective Services manual (PSM) is interchangeable with the term "report" in the Child Protection Law."

1082. PSM 711-4 section titled "LEGAL DEFINITIONS subsection titled "Domestic Violence", states: "A pattern of assaultive and coercive behaviors, including physical, sexual and psychological attacks, as well as economic coercion, that adults or adolescents use against their intimate partners."

1083. PSM 711-4 section titled "LEGAL DEFINITIONS subsection titled "Exploitation", states: "Improper use of a child for one's own profit or advantage."

1084. PSM 711-4 section titled "LEGAL DEFINITIONS subsection titled "Expunge", states: "To eliminate electronically stored information or to remove and destroy reports, records, documents and materials."

1085.     PSM 711-4 section titled "LEGAL DEFINITIONS subsection "False Complaint",

states: "A false allegation of child abuse or neglect made knowingly by an individual to

the department. A person who knowingly makes a false report of child abuse or neglect is

guilty of a misdemeanor if the false report was for an alleged misdemeanor offense. If the

false report was for an alleged felony offense of child abuse and neglect, then the person

is guilty of a felony."

1086.     PSM 711-4 section titled "LEGAL DEFINITIONS subsection titled "Five

Category Disposition", states: "The five dispositions for CPS investigations are: Category

V - services not needed. This category is used in cases in which CPS is unable to locate

the family, no evidence of child abuse and/or neglect (CA/N) is found, or the Family

Division of Circuit Court is petitioned to order family cooperation during the

investigation but declines, and the family will not cooperate with CPS. Further response

by the department is not required. Category IV - community services recommended.

Following a field investigation, the department determines that there is not a

preponderance of evidence of CA/N. The department must assist the child's family in

voluntarily participating in community-based services commensurate with the risk to the

child. Category III - community services needed. The department determines that there is

a preponderance of evidence of child abuse or neglect, and the structured decision-

making tool (risk assessment) indicates a low or moderate risk of future harm to the child.

The department must assist the child's family in receiving community-based services

commensurate with the risk to the child. The person who harmed the child is not listed on

central registry. If the family does not voluntarily participate in the services, or fails to

make progress in reducing the risk of further harm to the child, the department may

reclassify the case as category II if the child's safety indicates a need for CPS

intervention. Exception: If there is a finding of preponderance of evidence of CA/N and the perpetrator is any of the following, the perpetrator must be identified on central registry, even when the SDM risk for the household is determined to be low or moderate: Licensed foster parent. Nonparent adult who resides outside the child's home. Owner, operator, volunteer or employee of a licensed or registered child care organization. Owner, operator, volunteer or employee of a licensed or unlicensed adult foster care family home or adult foster care small group home. Category II - children's protective services required. The department determines that there is a preponderance of evidence of CA/N, and the structured decision-making tool (risk assessment) indicates a high or intensive risk of future harm to the child. CPS MUST: Open a protective services case. Provide services. List the perpetrator of the CA/N on the central registry, either by name or as "unknown," if the perpetrator has not been identified. Category I - court petition required - CPS determines that there is a preponderance of evidence of CA/N and 1 or more of the following is true: A court petition is required by the Child Protection Law. The child is not safe and a petition for removal is needed. CPS previously classified the case as category II, and the child's family does not voluntarily participate in services and court intervention is needed to ensure the family participates in services to ameliorate issues which place the child at risk of imminent harm. There is a violation, involving the child, of a crime listed or described in section 8a(1)(b), (c), (d) or (f) or of child abuse in the first or second degree as prescribed in section 136b of the Michigan Penal Code, 1931 PA 328, MCL 750.136b. (See CPF 718-5, CPS Appendix F-The Michigan Penal Code for a listing of these violations of the penal code.)"

1087.     PSM 711-4 section titled "LEGAL DEFINITIONS subsection "Extended Family Network", states: "Includes the nuclear family with the non-custodial parent, extended or

blended family, and other adults viewed as family who have an active role in the functioning of the child's family. These adults may or may not reside in the immediate area."

1088.   PSM 711-4 section titled "LEGAL DEFINITIONS subsection "Human Trafficking Sex trafficking victim", states "A sex trafficking victim is defined as an individual subject to the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act or who is a victim of a severe form of trafficking in persons in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induces to perform the act is under 18 years old."

1089.   PSM 711-4 section titled "LEGAL DEFINITIONS subsection "Labor trafficking victim", states: "Labor trafficking is the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery."

1090.   PSM 711-4 section titled "LEGAL DEFINITIONS subsection "Local Office CPS File", states: "The compilation of documents maintained at the local office that pertain to a CPS complaint. It is the intent of the Child Protection Law that the CPS file include all reports, documents and materials pertaining to the CPS investigation of a complaint and to the services provided to the child and the family."

1091.   PSM 711-4 section titled "LEGAL DEFINITIONS subsection "Medical Practitioner", states: "A medical practitioner is one of the following: A physician or physician's assistant licensed or authorized to practice under part 170 or 175 of the public health code, MCL 333.17001 to 333.17088 and MCL 333.17501 to 333.17556. A nurse practitioner licensed or authorized to practice under section 172 of the public health code,

MCL 333.17210."

1092.    PSM 711-4 section titled "LEGAL DEFINITIONS subsection "Mental Health

Practitioner", states: "A psychiatrist, psychologist, or psychiatric social worker including

a licensed master's social worker, licensed bachelor's social worker, or registered social

work technician (under 1978 PA 368, as amended) who has successfully completed a

psychiatric social service practicum."

1093.    PSM 711-4 section titled "LEGAL DEFINITIONS subsection "Non-offending

Caretaker" In domestic violence cases, the "non-offending caretaker" is defined as the

"adult victim" living in the home who has NOT been found to be abusive to the children.

In all other CA/N cases, the "non-offending caretaker" is any other adult residing in the

home who has not been found to be abusive or neglectful."

1094.    PSM 711-4 section titled "LEGAL DEFINITIONS subsection "Perpetrator

Notification", states: "Notification to an individual that his/her name has been entered on

the perpetrator registry of central registry, advising him/her who has access to the registry

and record, and informing him/her of his/her rights to review the record and challenge it.

1095.    PSM 711-4 section titled "LEGAL DEFINITIONS subsection "Person

Responsible For The Child's Health Or Welfare", states: "A person responsible for a

child's health or welfare is any of the following: A parent, legal guardian, or person 18

years of age or older who resides for any length of time in the same house in which the

child resides."

1096.    PSM 711-4 section titled "LEGAL DEFINITIONS subsection "A nonparent

adult", states: "A nonparent adult is a person 18 years of age or older and who, regardless

of the person's domicile, meets all of the following criteria in relation to the child: Has

substantial and regular contact with the child. Has a close personal relationship with the

child's parent or with another person responsible for the child's health or welfare. Is not the child's parent or a person otherwise related to the child by blood or affinity to the third degree (parent,grandparent, great-grandparent, brother, sister, aunt, uncle, great aunt, great uncle, niece, nephew). A nonparent adult who resides in any home where a child is receiving respite care. Note: This includes nonparent adults residing with a child when the complaint involves sexual exploitation (human trafficking). An owner, operator, volunteer, or employee of 1 or more of the following: A licensed or registered child care organization as defined in Section 1 of 1973 PA 116 (MCL 722.111). A licensed or unlicensed adult foster care family home or adult foster care small group home as defined in Section 3 of the Adult Foster Care Facility Licensing Act, 1979 PA 218 (MCL 400.703). Child Care Organization or Institutional Setting."

1097.    PSM 711-4 section titled "LEGAL DEFINITIONS subsection "Power Of Attorney", states: "A written, signed document authorizing another person to act as one's agent for specific purposes for a limited period of time. (As an example, a parent may leave a child in the care of a neighbor while the parent is on vacation and may leave a written statement that, during that vacation period, the neighbor may consent to any needed surgery or medical treatment for the child.) Court action is not necessary for a power of attorney and a power of attorney is not equivalent to an order of guardianship."

1098.    PSM 711-4 section titled "LEGAL DEFINITIONS subsection "Preponderance Of Evidence", states: "Evidence which is of greater weight or more convincing than evidence which is offered in opposition to it."

1099.    PSM 711-4 section titled "LEGAL DEFINITIONS subsection "Relative", states"As defined in MCL 712A.13a(j), relative means an individual who is at least 18 years of age and related to the child by blood, marriage, or adoption, as grandparent,

great-grandparent, great-great-grandparent, aunt or uncle, great-aunt or great-uncle, great-great-aunt or great-great-uncle, sibling, stepsibling, nephew or niece, first cousin or first cousin once removed, and the spouse of any of the above, even after the marriage has ended by death or divorce. A stepparent, ex-stepparent, or the parent who shares custody of a half-sibling shall be considered a relative for the purpose of placement. Notification to the stepparent, ex-stepparent, or the parent who shares custody of a half-sibling is required as described in section 4a of the foster care and adoption services act, 1994 PA 203, MCL 722.954a. A child may be placed with the parent of a man whom the court has found probable cause to believe is the putative father if there is no man with legally established rights to the child. A placement with the parent of a putative father under this subdivision is not to be construed as a finding of paternity or to confer legal standing on the putative father."

1100.    PSM 711-4 section titled "LEGAL DEFINITIONS subsection "Relative/Unrelated Caregiver Care (Formerly KinshipCare)", states: "The full-time nurturing and protection of children when they must be separated from the nuclear family and be cared for by a non-custodial parent, relatives, grandparents, stepparents or other unrelated adults who have a bond with a child. Relative/unrelated caregiver care arrangements may be made between and among family members or, alternatively, may involve child welfare agencies. Relative/unrelated caregiver care is unique because of the nature of this type of care, the capacity to provide family continuity, the role of relative/unrelated caregiver care as part of a child welfare service, and relationships between relative/unrelated caregiver care, family preservation, out-of-home placements, and permanency. Non-court Ward Relative/Unrelated Caregiver Placement occurs when the family decides the children can safely live with a non-custodial parent, relative, or unrelated caregiver. In

this arrangement, a social worker may be involved in helping family members plan for the child, but a child welfare agency does not assume legal custody of, or responsibility for, the child. Court Ward Relative/Unrelated Caregiver Placement involves placing children in relative/unrelated caregiver care as a result of a determination by the court and CPS that a child must be separated from his or her parent(s) because of abuse, neglect, drug dependency, abandonment, imprisonment, or special medical circumstances. The court places the child in the legal custody of the child welfare agency or authorizes legal guardianship with relatives or unrelated caregivers, and the relative/unrelated caregiver placement provides the full-time care, protection, and nurturing that the child needs."

1101.    PSM 711-4 section titled "LEGAL DEFINITIONS subsection "Referral", states: "Information which is transmitted from a department CPS staff person to another person, agency or unit.

1102.    PSM 711-4 section titled "LEGAL DEFINITIONS subsection "Relevant Evidence", states: "Evidence having a tendency to make the existence of a fact that is at issue more probable than it would be without the evidence."

1103.    PSM 711-4 section titled "LEGAL DEFINITIONS subsection "Severe Physical Injury", states: "An injury to the child that requires medical treatment or hospitalization and that seriously impairs the child's health or physical well-being."

1104.    PSM 711-4 section titled "LEGAL DEFINITIONS subsection "Sexual Abuse", states: "Engaging in sexual contact or sexual penetration with a child, as defined in section 520a of the Michigan penal code, 1931 PA 328, MCL 750.520a.

1105.    PSM 711-4 section titled "LEGAL DEFINITIONS subsection "Sexual Exploitation", states: "Allowing, permitting, or encouraging a child to engage in prostitution, or allowing, permitting, encouraging, or engaging in the photographing,

filming, or depicting of a child engaged in a listed sexual act as defined in section 145c of the Michigan penal code, 1931 PA 328, MCL 750.145c."

1106.     PSM 711-4 section titled "LEGAL DEFINITIONS subsection "Specified Information", states: "Information in a CPS case record that relates specifically to the department's actions in responding to a complaint of CA/N regulated by Section 7 of the CPL. Certain information is not considered specified information. See Section 2(y) of the CPL."

1107.     PSM 711-4 section titled "LEGAL DEFINITIONS subsection "Unrelated Caregiver (Formerly Fictive Kin), states: "Adults who are not related to a child by blood, marriage, or adoption who have a psychological/emotional bond with the child and are identified as "family" as a result of their active role in the functioning of the nuclear family."

1108.     PSM 711-4 section titled "LEGAL DEFINITIONS subsection "Unsubstantiated Case", states: "CPS case the department classifies under Sections 8 and 8d as Category III, IV or V. (Exception: Category III cases in which the perpetrator is a nonparent adult who resides outside the child's home, a licensed foster parent or an owner, operator, volunteer, or employee of a licensed or registered child care organization are substantiated cases [Section 8d(3)(4) of the CPL])."

1109.     PSM 711-6 section titled "RESPONSIBILITY TO RECEIVE AND INVESTIGATE COMPLAINTS", states: "The Michigan Child Protection Law stipulates that the department is the appropriate point for receipt of all complaints of child abuse or neglect, as defined in the Child Protection Law. The department must take and transfer certain complaints to other counties or agencies that have the jurisdiction and ability to investigate them. Examples are:1. Those allegedly perpetrated by a teacher, teacher's

aide, or member of the clergy are to be transferred to the appropriate local law enforcement agency. 2. Those in which the alleged victim is located in another county or state are to be transferred to that jurisdiction. 3. Those that allegedly occurred in certain child-caring homes, centers or children's camps are to be transferred to the Bureau of Community and Health Systems (BCHS); see PSM 716-9. Individuals making complaints to CPS of behavior or activities which include no allegation or suggestion of child abuse or neglect are to be advised (and assisted, if necessary) to file their complaint directly with other appropriate agencies (for example, law enforcement, mental health, schools, Friend of the Court, etc.) who have the authority and ability to respond. Examples are: 1. Complaints of failure to pay child support. 2. Squabbling/fighting among unrelated schoolmates. 3. A case in which the alleged victim is over 18 years of age and there are no younger siblings. Although the department is the designated reporting point, the law also permits citizens to make complaints directly to law enforcement. If such complaints are determined appropriate only for investigation by law enforcement, there is no requirement for law enforcement to notify CPS. Every complaint received alleging child abuse and/or neglect is to be assessed to determine appropriateness for acceptance for investigation by CPS or for referral to the prosecuting attorney or law enforcement. Centralized intake (CI) staff are responsible for making the determination for assignment after the initial screening (including a preliminary investigation) and then forwarding the complaint to the county of assignment. The county is responsible for forwarding the referral to the prosecuting attorney or law enforcement if the complaint is assigned. If the complaint is rejected or transferred, CI is responsible for the transfer to law enforcement or the prosecuting attorney. If the department's investigation reveals that the alleged perpetrator is not a person responsible for the health

or welfare of the child, a referral is to be made to the appropriate law enforcement agency along with a copy of the written report and the results of any investigation. Child abuse or neglect incidents reported directly to law enforcement and determined by them to have been committed by a person responsible for the health or welfare of the child must be referred to the department with a copy of the written report and the results of any investigation. Both the department and law enforcement are required upon receipt of a complaint of child abuse or neglect to either commence an investigation or refer to the appropriate authority within 24 hours."

1110.    PSM 711-6 section titled "ASSIGNMENT DISPUTES", states: "The local MDHHS office may disagree with an assignment and the local supervisor may contact a CI supervisor in the following limited circumstances: Technical error. Complaint is on an ongoing case and the worker has entered more information into MiSACWIS that would eliminate the need for complaint investigation. The county has additional information that should be added to the complaint or is believed to be new information. Note: The county director or designee may contact the second-line CI manager or director to discuss assignment disputes. CI is responsible for the final decision on the assignment of complaints. Local MDHHS offices are responsible for transferring assignments from county to county. Disputes between counties should be resolved by the involved county directors with the Business Service Center directors involvement, if necessary."

1111.    PSM 711-6 section titled "REJECTION DISPUTES", states: "The local MDHHS office may contact Centralized Intake if they disagree with a rejection due to additional information known to the county staff. Note: The local county office director or designee may contact the second-line CI manager or director to discuss rejection disputes. CI will make the final decision on assignment of complaints."

1112.    PSM 712-1 section titled "INTAKE - INITIAL COMPLAINT", "Intake begins

when a complaint alleging child abuse and/or neglect is received by the department. The

complaint is usually made through a telephone contact by the reporting person, but may

also occur as an in-person or written contact. The intake process is focused on initial fact

gathering and evaluation of information to determine the validity of the complaint,

whether it meets statutory criteria for investigation, and to assess the level of risk to the

child. Evaluation of the complaint information determines the nature and priority of the

initial response."

1113.    PSM 712-1 section titled "SOURCES OF COMPLAINTS", states: "Complaints

of suspected child abuse or neglect originate from various sources, including

professionals mandated by law to report, DHS employees, and the general public."

1114.    PSM 712-1 section titled "Mandated Reporters", states: "Professionals mandated

by law to report Includes physicians, dentists, physician's assistants, registered dental

hygienists, medical examiners, nurses, persons licensed to provide emergency medical

care, audiologists, psychologists, marriage and family therapists, licensed professional

counselors, social workers, licensed master's social workers, licensed bachelor's social

workers, registered social service technicians, social service technicians, persons

employed in a professional capacity in any office of the friend of the court, school

administrators, school counselors or teachers, law enforcement officers, members of the

clergy, regulated child care providers or employees of an organization or entity that, as a

result of federal funding statutes, regulations or contracts, would be prohibited from

reporting in the absence of a state mandate or court order (for example, domestic violence

providers). Note: Each local friend of the court office determines who is employed in a

professional capacity at their local office. DHS employees mandated by law to report

include eligibility specialists, family independence managers, family independence specialists, social services specialists, social work specialists, social work specialist managers, and welfare services specialists. Also includes any employee of DHS who is listed as a professional mandated by law to report above. See Employee Handbook Policies 200, Mandated Reporter- Child, for how mandated DHS employees are to report suspected child abuse and neglect. Note: Children's Protective Services investigators are not required to file a separate report of suspected abuse and/or neglect on their own active investigations. If the CPS investigator learns of a new allegation, suspects new maltreatments, or identifies additional household victims, they must thoroughly investigate those allegations as part of the active investigation and document the findings in the disposition. General Public Includes neighbors, friends, relatives, legislators, the news media, etc."

1115.   PSM 712-1 section titled "COMPLAINT PROCESS", states: "Department of Human Services uses a statewide Centralized Intake (CI) for the reporting of abuse and neglect."

1116.   PSM 712-1 section titled "CPS Centralized Intake", states: "CI is staffed 24 hours a day, 7 days a week and can be reached at 1-855-444-3911. The reporting person will be asked to be as specific as possible about the alleged abuse or neglect, indicating what was observed or heard which caused suspicion of abuse or neglect. If a person comes into the local office to make a complaint in person, the local office should offer a DHS phone and the CI number to make the complaint from the office. If the person does not want to talk on the phone, the local office must take the complaint on a DHS-3550, Intake Form, and forward to CI. All complaints received by the local office through fax or email must be sent to CI with a phone call alerting CI to the complaint. CI contact information: Toll-

Free - 1-855-444-3911. Fax - 616-977-1154 and 616-977-1158. E-mail - DHS-CPS-CIGroup@michigan.gov."

1117.    PSM 712-1 section titled "Mandated Reporters-Non-DHS Employees", states: "The Child Protection Law requires mandated reporters to make an immediate verbal report to DHS upon suspecting child abuse and neglect. Mandated reporters must also make a written report within 72 hours. Mandated reporters should be asked to use the DHS-3200, Report of Actual or Suspected Child Abuse or Neglect form, to fulfill the written report requirement. Professional reports (for example, police reports, hospital reports, etc.) can take the place of the DHS-3200, unless critical information is missing in the professional report. At intake, the mandated reporter will be reminded of the legal requirement to submit a written report on the DHS-3200 form within 72 hours to DHS. The form is available online from the DHS public website. If the reporting person does not have the DHS-3200 form or access to the Internet, a form is to be sent to the mandated reporter immediately in order to expedite compliance with the law. Note: Due to federal laws and regulations, domestic violence providers and substance abuse agencies can only provide the information required for reporting by the Child Protection Law (MCL 722.623) unless the client signs a consent for release of information to DHS for a CPS investigation. See SRM 131, Confidentiality, Domestic Violence Provider Records section and, PSM 717-6, Release of Information Documenting Substance Abuse, for more information."

1118.    PSM 712-1 section titled "Mandated Reporters-DHS Employees Mandated Reporter-Child.", states: "DHS employees, including those who are professionals mandated by law to report, must report suspected child abuse and neglect; see EHP 200. DHS employees must call CI to make a complaint. The ability to enter a complaint into

MiSACWIS CPS is a function which only CI can perform."

1119.    PSM 712-1 section titled "INTRA-DEPARTMENTAL COLLABORATION",

states, "A close working relationship should be established between CPS and other DHS

units to ensure complaints are made appropriately to CPS and, that appropriate referral

and coordination of services take place.When multiple workers are serving the same

family concurrently, they should collaborate and coordinate their activities to minimize

duplication, inconsistencies or gaps in services."

1120.    PSM 712-3 section titled "Child Abuse and Neglect Investigation and Interview

Protocol", states: "MCL 722.628(6) requires that the prosecuting attorney and the

department in each county adopt and implement a standard child abuse and neglect

investigation and interview protocol. The protocol, A Model Child Abuse Protocol (DHS

Pub-794, revised 9/07), developed by the Governor's Task Force on Children's Justice,

should be used as a model. It is extremely important that CPS staff and law enforcement

personnel recognize and respect each other's respective roles and responsibilities in a

joint investigation. Every effort must be made to maintain communication, coordination

and cooperation between the two professions, and each must be sensitive to the

professional needs and responsibilities of the other. Specifically CPS staff Should:

Encourage and pursue frank and open communication with law enforcement to avoid the

actions or efforts of one interfering with the professional responsibilities of the other.

Pursue a mutually satisfactory solution to apparent incompatibilities or conflicts between

procedures of the two organizations. If necessary, seek the assistance of

supervisory/administrative staff or the prosecuting attorney to reach a mutually

satisfactory resolution to such differences.If law enforcement has requested that CPS

delay starting an investigation, and it is determined that CPS cannot wait, law

enforcement should be notified and the concerns discussed. They should be advised that

DHS understands their desire to wait, but that DHS determined that there is imminent

risk of harm to a child, and DHS must proceed, preferably with them. If a prosecutor has

ordered the delay, a decision about whether CPS should proceed or not must be made by

the county director in the local office involved. Evidence obtained through law

enforcement in the course of an investigation must be included, as appropriate, in the

DHS-154, Investigation Report. All law enforcement documents, reports, materials and

records pertaining to an ongoing law enforcement investigation of suspected child abuse

or neglect must be considered confidential and must not be released by the department;

see SRM 131, Confidentiality - Law Enforcement Records. These ongoing records

cannot be used in court or administrative hearings unless provided by the accused. The

Child Protection Law (MCL 722.628b) requires the department to refer (by sending a

copy of the DHS-154) cases to the prosecuting attorney in the county where the child is

located if there is a preponderance of evidence of child abuse/neglect and the case

involves the death, sexual abuse, sexual exploitation, or serious physical injury of a child,

or a child has been exposed to, or had contact with, methamphetamine production; see

SRM 131, Confidentiality - Children's Services for information regarding redaction of the

DHS-154 prior to sending. The prosecuting attorney must review the DHS-154 to

determine if the investigation complied with the protocol adopted by the county as

required (MCL 722.628(6))".

1121.     PSM 712-3 section titled "Law Enforcement Interviews Of Alleged Perpetrators",

states: "When CPS is conducting a coordinated CA/N investigation with law enforcement

on child death cases, sexual abuse cases, severe physical injury cases and cases where a

child has been exposed to or had contact with methamphetamine production, and the law

enforcement agent or designee has interviewed the alleged perpetrator without CPS being present, the following guidelines must be used: If the law enforcement interview made proper inquiry into all of the allegations, and obtained all pertinent information needed by CPS, the CPS worker does not need to re-interview the alleged perpetrator for the purposes of investigation. The information gathered by law enforcement must be summarized in a social work contact. Note: When entering the contact in the Social Work Contacts module, use the date and time law enforcement conducted the interview with the perpetrator, designate the contact type as face-to-face, and document that law enforcement conducted the interview. (If law enforcement made a complaint to CPS subsequent to conducting this interview, use the date and time of the complaint as the contact date and time.) If the law enforcement interview did not make proper inquiry into all of the allegations or did not obtain any other information needed by CPS, the worker must attempt to coordinate with law enforcement to conduct a follow-up interview to gather the needed information and/or make the appropriate inquiries. Exception: If the alleged perpetrator is not subject to an ongoing criminal investigation, the CPS worker does not need to coordinate the follow-up interview with law enforcement. The use of law enforcement interviews of alleged perpetrators does not relieve CPS from conducting needed interviews with these or other persons for the purpose of completing investigations, ongoing assessment and/or service planning."

1122.    PSM 712-3 section titled "COORDINATION WITH PROSECUTING ATTORNEY AND LAW ENFORCEMENT", states: "The interview contained proper inquiry into all of the allegations and other information needed by CPS. Note: When entering the contact in the Social Work Contacts module, use the date and time law enforcement conducted the interview with the alleged victim, designate the contact type

as face-to-face, and document that law enforcement conducted the interview. (If law enforcement made a complaint to CPS subsequent to conducting this interview, use the date and time of the complaint as the contact date and time.) If any of the above criteria for interviewing children are not met,CPS must attempt to coordinate with law enforcement in conducting a follow-up interview using forensic interviewing techniques to make proper inquiry into all of the allegations and other needed information. In cases other than a child death, sexual abuse, severe physical injury, and a child exposed to or having contact with methamphetamine production, CPS may conduct its own interview, regardless of law enforcement's involvement, if CPS believes additional information is needed. The use of law enforcement interviews of alleged victims does not relieve CPS from conducting needed interviews with these or other persons for the purpose of completing investigations, ongoing assessment and/or service planning.

1123.    PSM 712-4 section titled "INTAKE - MINIMAL PRIORITY RESPONSE CRITERIA OVERVIEW", states: "Initial minimum investigation steps are determined at assignment through use of the Children's Protective Services (CPS) Minimal Priority Response Criteria. The use of this tool determines the criteria for two types of responses: • Response time for commencement of the investigation. • Response time for face-to-face contact with each alleged child victim. See Exhibit I - Priority Response Decision-Making Trees in this item.

1124.    PSM 712-4 section titled "COMMENCEMENT OF THE INVESTIGATION MCL 722.628 requires the department to commence an assigned investigation of the child suspected of being abused or neglected within 24 hours following report to Centralized Intake (CI)."

1125.    PSM 712-4 section titled "Definition of Commencement", states:

"Commencement is defined as an action taken, within 24 hours following receipt of a complaint, to begin an investigation of the child(ren) suspected of being abused or neglected. The requirement for commencement is satisfied at the point a caseworker completes an activity which provides information related or relevant to any child involved in the complaint of child abuse or neglect. In investigations involving multiple alleged child victims, a single commencement activity may be sufficient to meet commencement requirements when the activity satisfies one of the bullets below. Acceptable activities taken to begin an investigation may vary and may include communication or contact with any of the following: • The child or children suspected of being abused or neglect. • The child's (or children's) caregiver, or another person involved with the child(ren). • A person who knows the child(ren), recently saw the child(ren) or has relevant knowledge about the family situation, for example, a teacher, a neighbor, friend, relative, sibling, agency staff, other professional, etc. • Law enforcement, medical staff, or an emergency first responder who has knowledge about the child(ren). Note: Contact with the reporting person is not an acceptable commencement."

1126.     PSM 712-4 section titled "PRIORITY RESPONSES", states: "When CI receives a complaint of suspected child abuse or neglect, the CI worker determines whether the case is assigned as a Priority One or Priority Two response based on the priority response tool. CI may override the priority response if necessary, depending on the urgency of the situation and child safety concerns (i.e. law enforcement requesting assistance). A CPS caseworker must commence an investigation and make face-to-face contact with alleged child victims within the corresponding timeframes.

1127.     PSM 712-4 section titled "Priority One Response (12/24)", states: "Priority one response investigative activity should commence as soon as possible after receipt of

report from CI when immediate danger of harm to the child(ren) is determined. Commencement must occur within 12 hours. Face-to-face contact must take place with each alleged child victim within 24 hours.

1128.    PSM 712-4 section titled "Priority two response (24/72", states: "Priority two response investigative activity must commence within 24 hours after receipt of the report from CI, when it is determined the child(ren) is not in immediate danger of harm. Face-to-face contact must take place with each alleged child victim within 72 hours.

1129.    PSM 712-4 section titled " Exhibit VI-neglect complaint priority response criteria", states: "Neglect Complaint Response Criteria Start here for neglect priority response Is the alleged victim in imminent danger of harm? Yes No Priority One Response (12/24)* Is the alleged child victim under 6 years old or limited by a disability? Priority Two Response (24/72) No Yes Does the person responsible for the health or welfare of the child demonstrate a willingness to meet child's basic needs? Yes No Is the person responsible capable of meeting the child's basic needs? Yes No."

1130.    PSM 712-5 section titled "CPS INTAKE - OVERVIEW ELICITING COMPLAINT INFORMATION", states: "The reporting person should be asked to be as specific as possible about the alleged abuse or neglect, indicating what was observed or heard that caused suspicion of abuse or neglect. To assist in determining the appropriateness of a complaint for investigation by CPS and to assess the seriousness of the situation, the following guidelines are suggested when discussing the situation with the reporting person. How, specifically, does the reporting person believe the child is at risk of harm (threatened harm) or has been harmed by abuse or neglect? What specifically occurred? Did the reporting person see or hear something? Does someone else have first-hand knowledge? What are the ages of the children? Are any children

under 6 years old? These children are particularly vulnerable and care should be exercised in assessing such complaints. Is any child singled out for maltreatment? Is this a chronic or isolated instance? If chronic, how often does it occur: daily, weekly, yearly? When did incident occur last? Is a child in immediate physical danger? What is the reporting person's relationship to the family and household? What is the possible motivation for the complaint? Have the relationships between the reporting person and the household been friendly, difficult, strained, etc.? Has the reporting person spoken to the responsible person(s) about this matter and the concern expressed? Are, or have there recently been, other agencies involved with the household that might have information about the situation? These should be identified."

1131.    PSM 712-5 section titled "Allegation", states: "When allegations are entered in SWSS CPS, proofread to ensure that the identity of the reporting person is not revealed. Once a determination is made to assign, transfer, or reject the complaint, the allegations cannot be changed. When selecting allegations under the Allegations tab in SWSS CPS, select at least one yellow-highlighted abuse/neglect type in the Abuse/Neglect Code tab. Also select any of the unhighlighted factors if the reporting person indicates the presence of those factors in the home (for example, domestic violence, drugs

1132.    PSM 712-5 section titled "PRELIMINARY INVESTIGATION", states: "When information received from the reporting person during intake is not sufficient to reach a decision regarding whether or not to assign the complaint for field investigation and to assign a priority response, CPS must conduct a preliminary investigation. A preliminary investigation must begin immediately upon conclusion of the intake contact. Within 24 hours of receipt of the complaint, a decision must be made to accept and assign for CPS field investigation, to transfer to another unit that has jurisdiction to investigate (for

example, the prosecuting attorney and/or law enforcement, American Indian Tribal Unit, another state, Bureau of Child and Adult Licensing, etc.) or to reject the complaint. Activities which may be part of a preliminary investigation include the following: A. Complete a statewide SWSS CPS Soundex search on all persons listed on the complaint. Determine the history and credibility of former complaints. Note: SWSS CPS Soundex searches can be completed on a specific county. To be considered a statewide search, the Soundex search must be completed statewide by selecting "0 Non-spec. County" in SWSS CPS. B. Complete a central registry inquiry to identify past perpetrators. The central registry clearance must be completed on all persons listed on the complaint who are age 18 or older. C. Complete a LEIN check on all persons potentially responsible for the child's health and welfare for all sexual abuse, physical abuse, substance abuse (including methamphetamine exposure) and/or domestic violence allegations. D. Conduct or make contact with any collateral contacts who have direct knowledge relevant to the issues in the complaint in order to assess the child's safety. This can include: a neighbor, pastor, day care provider, school, medical facility, etc. E. Consult with DHS professional staff (for example, CPS, FIS, foster care, etc.) to clarify relevant issues in the complaint. Document all of the steps of the preliminary investigation that were completed in the Update/View Preliminary Investigation box in the Ready for Action tab of the Intake module in SWSS CPS.

1133.   PSM 712-5 section titled "Contacts at Intake", states: "Contacts made during intake must be entered into SWSS CPS in the Social Work Contacts module."

1134.   PSM 712-5 4 of 4 CPS INTAKE - OVERVIEW", states: "Note: If any field contacts are made, the complaint must be assigned for field investigation."

1135.   PSM 712-5 section titled "MULTIPLE COMPLAINT", states: "When the current

complaint is at least the third CPS complaint on a family and the complaint includes a child age 3 or under, CPS must conduct a preliminary investigation covering, at a minimum, steps (A-C) above. Additional steps, including but not limited to steps D and E, should be completed when necessary to assist the department in making appropriate decisions regarding assignment. Note: When the information received during the current complaint is enough to determine the complaint should be assigned for investigation, a preliminary investigation does not need to be completed. See PSM 713-09, Completion of Investigation, Multiple Complaints section for requirements when these complaints are assigned for field investigation. If there is already an assigned investigation or an open case, a copy of the rejected complaint must be forwarded to the assigned worker for his/her information and any necessary follow-up regarding the allegations; see PSM 712-8, CPS Intake Completion. residence, drug-exposed infant, etc.)."

1136.     PSM 712-5 section titled "HEAD LICE", states: "An allegation of neglect based solely on a child having head lice is not appropriate for CPS investigation. This condition could arise in any number of ways and is not, in and of itself, an indicator of neglect.

1137.     PSM 712-5 section titled "INTER-COUNTY COMPLAINTS", states: "CI may receive a complaint that involves a child whose residence is in another county (such as when a child is brought to a hospital located in a county other than the child's residence, or the child is visiting the non-custodial parent). The responsibility for initiating the investigation for these types of complaints depends on the nature of the allegations and the priority response. The county responsible for handling the complaint is as follows: • The county where the child is found is responsible for the complaint if the priority response for the complaint is Immediate Response (12/24)."

1138.     PSM 712-6 section titled "CPS INTAKE - SPECIAL CASE", states: "• The

county of residence is responsible for handling the complaint if the priority response for the complaint is 24 Hour Response and 72 Hour Face-to-Face (24/72), or not appropriate for investigation. See PSM 712-4, Intake-Minimal Priority Response Criteria, to determine the priority response. Exception: If the child attends school in an adjacent county, the county of residence should handle the complaint. The process of handling and assigning complaints depends on the nature of the allegations, the location of all involved individuals, the priority response and the information available to all parties. CI may assign a complaint to a county where the victim does not reside, based upon unique circumstances. If the local office has concerns regarding the assignment, the local office director or his/her designee should contact CI; see PSM 711-6, Responsibility to Receive and Investigate Complaints."

1139.     PSM 712-6 section titled "INTER-COUNTY DISPUTES AND COORDINATION", states: "Disputes between CI and the assigned county must be immediately referred for resolution to the Business Service Center. PSM 712-6 section titled "Priority Response is 12/24 If the priority response for the complaint is 12/24, the assigned investigator must immediately speak to a supervisor or designee (a voicemail message is not sufficient) in the county of residence to notify them of the complaint, coordinate the investigation and agree upon each county's responsibilities. Responsibilities of the county where the child is found (unless otherwise agreed): • Commence the investigation to ensure the immediate safety of the child. • Interview all individuals (for example, all victims, caretakers witnesses, alleged perpetrators, etc.) who may have direct knowledge of the current allegations and are currently in the county where the child is found. • Document all investigative activities and findings completed by the county where the child is found in MiSACWIS within 5 business days. • Maintain

contact with the county of residence to coordinate investigative activities. • Transfer the complaint in MiSACWIS to the county of residence

1140.     When: A petition is filed in the Family Division of Circuit Court in the county where the child is found, the court authorizes the petition, the court transfers case responsibility to the county of the child's residence and the court in the county of residence accepts transfer of the case. Note: If a petition is filed and the court in the county where the child is found authorizes the petition, the complaint must be registered in the county where the child is found, pending transfer. No petition is needed. A petition is filed in the Family Division of Circuit Court in the county where the child is found and the court does not authorize the petition. Responsibilities of the county of residence (unless otherwise agreed): • Make efforts to ensure the safety of any other children located in the county of residence. • Pending case transfer or resolution of court jurisdiction, cooperate with the county (where the child is found) to provide any assistance necessary to ensure the safety of the child (including further interviews, petitioning, etc.). • Interview all individuals (for example, all victims, caretakers, witnesses, alleged perpetrators) who may have direct knowledge of the current allegations and are currently in the county of residence. Accept transfer of case responsibility when the Family Division of Circuit Court in the county of residence accepts the transfer of a petition, if a petition was filed by the county where the child is found. • In cases in which the Family Division of Circuit Court is not involved, the county of residence must accept case responsibility when the transfer is initiated by the county where the child is found. • Accept transfer of the case in MiSACWIS. County of Residence Agrees to Handle the Complaint. The county of residence can agree to handle the complaint. If the county of residence will be handling the complaint, transfer the

complaint in MiSACWIS to the county of residence. The county of residence may request that the county where the child is found take certain actions on the case in order to ensure child safety. These requests must be honored. Note: When determining whether to request that the county where the child is found to take certain actions on the case, consider the impact the request will have on the continuity of services for the family; see Cases Involving Multiple Counties section in this item."

1141.    PSM 712-6 section titled "Priority Response is 24/72", states: "If the priority response for the complaint is 24/72, immediately speak to a supervisor or designee (a voicemail message is not sufficient) in the county of residence to notify them of the complaint. Transfer the complaint in MiSACWIS to the County of Residence. The county of residence may request that the county where the child is found take certain actions on the case in order to ensure child safety. These requests must be honored. Note: When determining whether to request that the county where the child is found take certain actions on the case, consider the impact the request will have on the continuity of services for the family; see Cases Involving Multiple Counties section in this item. All contacts between the workers/supervisors of different counties must be documented in social work contacts by the worker/supervisor initiating the contact.

1142.    PSM 712-6 section titled "INTERSTATE COMPLAINTS", states: "In the event CI receives a complaint from an out-of-state department involving a Michigan child, the county where the complaint is assigned must proceed with standard procedures for evaluating and investigating complaints of child abuse and neglect (CA/N). Michigan CPS staff may communicate initially by telephone with the referring out-of-state department to obtain necessary information. Michigan CPS staff will then write to the department in the other state confirming the specific responsibilities of each. CPS

complaints to or from another state are not governed by the Interstate Compact on the

Placement of Children. Contact may be made directly with the other state department.

For contact information for other states, go to

http://www.aphsa.org/content/APHSA/en/resources/LINKS/STATE_CONTACTS.html".

1143.    PSM 712-6 section titled "SCHOOL ATTENDANCE AND HOME

SCHOOLING", states: "A complaint in which the only allegation involves a child failing

to attend school and/or alternate educational programming is not sufficient basis for

suspecting child neglect, and is inappropriate for investigation by CPS staff. If the

complaint is initiated by non-school personnel, the person should be referred to the

school district's attendance officer. If the complaint is initiated by school personnel, they

are to be informed that this issue falls under the provisions of the Compulsory School

Attendance section of the School Code of 1976 (MCL 380.1561-380.1599), not the Child

Protection Law. A complaint of alleged child abuse or neglect that also includes an

allegation of a child's non-attendance in education programming is appropriate for

investigation by CPS. The complaint should also be referred to the school district's

attendance officer. The investigation and any subsequent service plan must be

coordinated with the school district's attendance officer or other appropriate school staff,

as in any other matter in which more than one department/agency has responsibility."

1144.    PSM 712-6 section titled "SUBSTANCE USE BY CARETAKER", states: "See

PSM 716-7, Substance Use Disorder Cases for information on substance and alcohol

exposed infants.

1145.    PSM 712-7 section titled "DECISION TO REJECT", states: "If, after intake

and/or preliminary investigation, neither CPS intervention nor a transfer to an agency is

determined appropriate, the reasons for rejecting the complaint must be documented in

MiSACWIS CPS by using one of the rejection reasons below and approved by supervision. Comments to clarify the selection may be entered into MiSACWIS CPS; see PSM 712-8, CPS Intake Completion."

1146.     PSM 712-7 section titled "Reasons To Reject a Complaint", states: "Already Investigated - The allegation is essentially the same instance of child abuse and/or neglect (CA/N) already reported and investigated. If the complaint is being investigated or was rejected, add the second reporting person on the initial complaint; see PSM 712-8, CPS Intake Completion, Multiple Reporting Persons section."

1147.     PSM 712-7 section titled " Discounted After Preliminary Investigation ", states: "Allegations are proven unfounded after contact with a reliable source with current, accurate, and first-hand information. Complaint Does Not Meet Child Protection Law (CPL) Definition of Child Abuse/Neglect - The allegations reported do not amount to child abuse/neglect as defined by the CPL (for example, allegations are attributable solely to poverty,etc.). If the complaint is appropriate for handling by another agency, refer the reporting person to the appropriate agency (for example, the friend of the court (FOC) for child support complaints or other custody issues not related to CA/N, community mental health for mental health services, the school district for truancy issues, etc.). Note: If the complaint does not meet the CPL definition of child abuse/neglect but will be transferred to another agency for investigation (for example, law enforcement for complaints when the alleged perpetrator is not a person responsible for the child's health and welfare, DHS or private agency certification staff for an alleged licensing violation, etc.), the complaint must be documented as "Transferred for Investigation" not as a rejection. See the Complaint Documentation section of PSM 712-8, CPS Intake Completion for more information."

1148.    PSM 712-7 section titled "No Reasonable Cause", states: "Allegations are from

second- or third-hand sources, information is vague or insufficient, and/or CPS is unable

to establish any basis in fact for the suspicion. Examples are: a. Reporting person cannot

give information that leads to the identity or whereabouts of the family. b. Complaint

amounts to speculation (versus suspicion) of CA/N (a bruise, injury, mental or physical

condition that is more likely the result of something other than CA/N). c. Reporting

person reports observing child exhibiting normal, exploratory sexual behavior and

speculates the child must have been sexually abused."

1149.    PSM 712-7 section titled "Reporting Person Unreliable or Not Credible", states:

"Although this reason is occasionally appropriate, it should only be used in extreme and

well-documented situations. Examples are: a. Similar complaints have been investigated

and repeatedly denied, or the reporting person is known to repeatedly make false or

questionable reports. b. Complaint lacks substance and/or definition and is seemingly

colored by suspected self-interest of the reporting person, for example, revenge,

neighborhood/family squabble, custody battles, etc. A person who knowingly makes a

false complaint of CA/N is guilty of a misdemeanor if the false complaint was about an

alleged misdemeanor offense. If the false complaint was about an alleged felony offense

of CA/N, the person is guilty of a felony."

1150.    PSM 712-7 section titled "Reversals", states: "When Centralized Intake (CI)

reviews a rejected complaint and makes the decision to assign the case, CI will use the

date and time of the review to create another complaint, which will reference the original

reporting source and log number."

1151.    PSM 712-7 section titled "COMPLAINT DOCUMENTATION", states: "The

department is required to maintain documentation of the receipt and the disposition of all

CPS complaints received and evaluated.The CPS Centralized Intake (CI) for abuse and

neglect and local offices record and maintain complaint information using the Michigan

Statewide Automated Child Welfare Information System (MiSACWIS)."

1152.    PSM 712-7 section titled "Assigned for CPS Field Investigation", states: "The

decision to assign the complaint for CPS investigation is made at CI. The complaint

allegations must minimally meet the Child Protection Law definitions of child abuse

and/or neglect to be appropriate for assignment. Four elements must be present in order

to assign a complaint for investigation: (1) Allegations of harm or threatened harm (2) to

a child's health or welfare (3) through non-accidental or neglectful behavior (4) by a

person responsible for the child's health and welfare.

1153.    PSM 712-7 section titled "New Complaints on Assigned CPS Investigations or

Open CPS Cases", states: "Careful attention must be given to documenting the intake

dispositions of new complaints received on cases during a pending investigation or an

open case. When a new complaint is received on a pending investigation or open case, the

new allegations must be evaluated by the same standards as other complaints in order to

determine the disposition of the complaint. When the new complaint contains allegations

which are essentially the same instance of child abuse and/or neglect and are: Already

investigated, the complaint must be rejected under rejection reason already investigated;

see PSM 712-7, Rejected Complaints. Currently being investigated, add the second

reporting person on the initial complaint; see PSM 712-7, Multiple Reporting Persons. If

the complaint contains allegations other than those already assigned or investigated, and

the new complaint does not meet the criteria for assignment, the complaint must be

rejected using rejection reasons listed in PSM 712-7. Though rejected, a copy of the new

complaint must be forwarded to the CPS worker assigned the pending investigation or

open case for their information and any necessary follow-up regarding the allegations. When the new complaint contains allegations which are not essentially the same instance of child abuse and/or neglect already investigated or assigned for investigation, and which meet the criteria for assignment, the new complaint must be assigned for investigation. The same investigation procedures and requirements exist for the new investigation, including, but not limited to, commencement of investigation, complete interviews with all required individuals within the required time frames, completion of a safety and a risk assessment, and complete investigation of each new allegation. See PSM 713-09, Completion of Field Investigation, for completing investigations on two separate complaints concurrently.

1154.    PSM 712-8 section titled "Transferred for Investigation", states: "1. The complaint contains allegations of child abuse/neglect as defined in the Michigan Child Protection Law, but the complaint is appropriately forwarded to another unit which has jurisdiction to investigate the complaint allegations. This other unit which has jurisdiction might be, but is not limited to, another county, another state, an American Indian Tribal Unit, the Bureau of Children and Adult Licensing, or law enforcement. OR 2. The complaint does not contain allegations of child abuse/neglect as defined by the Michigan Child Protection Law, but the complaint is appropriate for handling by another agency (for example, law enforcement for complaints when the alleged perpetrator is not a person responsible for the child's health and welfare, DHS or private agency certification staff for an alleged licensing violation, etc.). The name and phone number of the reporting person should be included in the written complaint transferred to the other unit/agency, if the other unit/agency is authorized to investigate allegations of abuse and neglect. The reporting person should be advised that the unit/agency responsible for the investigation

might contact them."

1155.    PSM 712-8 section titled "Rejected", states: "The decision has been made not to investigate and not to transfer elsewhere and the supervisor has approved the decision to reject the complaint. One, and only one, of the rejection reasons in the list in PSM 712-7, Rejected Complaints, can be identified for each rejected complaint. If more than one reason applies to a given complaint, the one most compelling reason must be chosen.

1156.    PSM 712-8 section titled "Withdraw Complaint", states: "Reporting person withdraws complaint before the investigation has begun based on new information and there is insufficient reason to proceed."

1157.    PSM 712-8 section titled "Multiple Reporting Person", states: "If a subsequent complaint is received that is essentially the same instance of child abuse and/or neglect already reported, the reporting person of the subsequent complaint should be added to MiSACWIS as an additional reporting person. Document the date and time of the subsequent complaint and any additional information provided."

1158.    PSM 712-8 section titled "Investigation on Initial Complaint is Complete", states: "If the investigation on the initial complaint is complete, the subsequent complaint should be rejected using the rejection reason".

1159.    PSM 712-8 section titled "Already Investigated; see PSM 712-7, Rejected Complaints. Initial Complaint is Pending Investigation", states: "If an intake disposition has already been made on the complaint to assign the complaint for investigation and the investigation is pending, add the additional reporting person to the investigation.

1160.    PSM 712-8 section titled "Initial Complaint was Rejected", states: "If an intake disposition has already been made on the complaint to reject the complaint, a supervisor should add the additional reporting person in MiSACWIS. If the complaint has already

been rejected and a source notification letter is required/requested, print the source notification letter; see PSM 712-9, Notifying Reporters."

1161.     PSM 712-8 section titled "REGISTRATION AND CASE RECORD ESTABLISHMENT", states: "CPS complaints assigned for investigation must be entered into MiSACWIS. CI must complete a statewide MiSACWIS search and central registry clearances on all complaints. Document the results as part of the Preliminary Investigation. The statewide MiSACWIS search must be done on all persons listed on the complaint. Note: MiSACWIS searches can be done for a specific county. To be considered a statewide search, the search must be done by not selecting a specific county. The central registry clearance must be done on all persons listed on the complaint who are age 18 or older. Birthdates for all case members must be estimated at intake, if not known. Local offices should not establish more than one CPS case record for a family. If more than one CPS case record exists in a local office, the records must be combined when a new CPS complaint is received. CPS family history information (copies) from all other local offices must be obtained from the other local offices and incorporated into the case record. Note: If more than one family is residing in a home and there are allegations of abuse and/or neglect regarding both families, a separate complaint should be generated for each family. Regardless of who is alleged to have perpetrated abuse or neglect, registration of all CPS cases must be made in the parent's or legal guardian's name if the child resides with the parent or legal guardian".

1162.     PSM 712-8 section titled "CASE RECORD ORGANIZATION", states: "Complaints received after the implementation of MiSACWIS do not require a paper case record. All the case record information will be stored electronically in MiSACWIS. Any documents received from external sources (such as medical reports, police reports,

etc.) should be scanned into MiSACWIS as an electronic file. Local offices must keep original copies of documents received from external sources in a paper case record organized chronologically if they are not scanned into MiSACWIS. Exception: Local offices must keep all original court orders. For cases existing prior to MiSACWIS implementation, the CPS case file must be organized as follows: Investigative Documents Packet Referral [Complaint] Report.DHS-3200, Report of Actual or Suspected Child Abuse or Neglect. Investigative Report face sheet. DHS-154, Investigation Report. Initial Safety Assessment . DHS-140, CPS Exception Documentation. Evidentiary documents. Pictures. Tapes/discs. DHS 860, CPS Support Person Letter. Investigation checklist. Complaints rejected for investigation by CPS. Written permission to view buttocks; see PSM 713-03, Face-to-Face Contact, Visual Assessment section. Services Packet Needs and Strengths Assessment comments. Service Agreement. DHS-152, Updated Services Plan/Closing Report. Risk Assessment/Re-Assessment. Safety Reassessment. Needs and Strengths Assessment/Re-Assessment. DHS-123, Community Resource Referral Letter. Forms Packet DHS-93, Examination/Authorization/Invoice for Services. Legal Packet Petitions. Court orders. Summons/subpoenas. Family Division of Circuit Court forms. Other legal documents, including consents to release information. Information from friend of the court. Administrative hearing documents. Law Enforcement Packet Police reports. DHS-269, Criminal History Information Request. Other law enforcement documents. Medical/School Reports Packet Medical reports. Psychological and psychiatric evaluations. School reports. Individual Educational Planning (IEP) report. Purchase of Service Referrals/Reports Package Service referrals. Homemaker reports. Parent Aide reports. Families First reports. Other provider reports. Counseling reports. Substance abuse assessment and treatment reports. Drug screening reports. General

Correspondence Packet Letters. Reporting person notification letter. Perpetrator notification letter. Other correspondence, including fax and email. Miscellaneous. Records originating from separate complaints must be consolidated with each other in chronological order, arranged as indicated above, as much as possible in a single case file. The files must be maintained in the local office where the family lives and are only to be transferred when the family moves; see PSM 716-2, When Families in CPS Cases Move or Visit out of County."

1163.     PSM 712-8 section titled "CPS Case Record Retention", states: "The Child Protection Law (MCL 722.628(11)) requires that all CPS complaints and case file information on cases which have not been entered on central registry, including intake, investigation, and services case records, must be retained for 10 years from the date of receipt of the complaint or until the child about whom the complaint is made reaches 18 years of age, whichever is later. CPS case file information on cases which have been entered on central registry must be retained until DHS receives reliable information that the perpetrator of the abuse or neglect is dead.'

1164.     PSM 713-1 section titled "GENERAL INSTRUCTIONS", states: "Children's Protective Services (CPS) must:• Commence the investigation within 24 hours of the receipt of a complaint; see PSM 712-4, Intake-Minimal Priority Response Criteria, Commencement of the Investigation on the priority level, commencement may be required to occur within 12 Hours. • Provide his/her name, show State of Michigan identification, indicate that he/she represents CPS and advise the individual of the specific complaints or allegations made against the individual when CPS contacts an alleged perpetrator or an individual responsible for the health or welfare of a child (MCL 722.628(2)). • Assess child safety and service needs of the family. Referrals for services

must be made for appropriate cases; see Five Category Disposition Decision Tree. •
Include contacts with the reporting person, the family, and other informational sources, as
determined necessary by CPS, for verification of the accuracy of the complaint and
clarification of the situation. In an abuse case, contact must be made with a physician
who examined or treated the child, or medical personal that would have knowledge of the
exam, for additional information and/or for clarification/verification of information
provided, if needed. During an investigation when CPS interviews a minor for a collateral
contact, workers must notify parent(s) or caregiver(s) responsible for the minor who was
interviewed. • When a complaint is received from a mandated reporter, the assigned
worker must make contact with the reporter for additional information or for
clarification/verification of information received, as soon as possible. The first reporting
source listed on the DHS-3200, Report of Actual or Suspected Child Abuse or Neglect, is
considered the primary mandated reporter. Contact with this mandated reporter is
required. However, the assigned worker may need to contact the other reporters listed to
obtain additional information and evidence. Observe the scene (at the home or a location
other than the home) where the alleged abuse/neglect occurred, as well as any objects
alleged to have been involved. If this is not done, document the reason why in the DHS-
154, CPS Investigation Report. • Observe and document each caregiver's and alleged
perpetrator's photo-identification (such as a driver's license or state-identification card). •
Verify and document the dates of birth given by all adults (including, but not limited to
non-custodial and putative parents) living within the home, as well as any adults
associated with the case. If unable to verify this information,document the reason why in
the DHS-154, CPS Investigation Report. • During the CPS investigation, contact with the
non-custodial parent should be made at the earliest point possible. Diligent efforts should

be made to identify and locate absent parents during the CPS investigation. Use the Absent Parent Protocol as a guide. See PSM 715-3, Family Court: Petitions, Hearings and Court Orders, Absent Parent Protocol section, for more information on locating absent parents. • Conduct and document a thorough inquiry of family background. This inquiry includes, but is not limited to: A statewide MiSACWIS search on all persons listed on the Complaint. Note: MiSACWIS CPS searches can be done on a specific county. A central registry clearance. The central registry clearance must be done on parents or persons responsible and all persons listed on the complaint who are age 18 or older. An evaluation of previous complaints/victimization of the child and parents/persons responsible. A review of previous MDHHS case records (such as CPS, foster care, etc.) on the family and household members. A criminal history check, as needed/required. Criminal history results are documented in MiSACWIS; see PSM 713-10, CPS Investigation Report. Any individual(s) for whom a criminal history check is requested via LEIN, must have documentation in MiSACWIS that he or she is connected to the case prior to the request. The LEIN criminal history check must be requested in accordance with MDHHS LEIN policy; see SRM 700, Law Enforcement Information Network (LEIN). • During any CPS investigation or an ongoing CPS case involving a child 12-months of age or younger living in a home, CPS must conduct a home visit to observe the infant's sleep environment and record the observation in the narrative of the DHS-154, CPS Investigation Report. The documentation should address whether: The infant is sleeping alone. If the infant has a bed, bassinet or portable crib. If there is anything in the infant's bed. If the mattress is firm with tight fitting sheets. • Inform the parents of safe sleep practices by providing established safe sleep educational materials. • If the infant does not have a crib or other appropriate infant bed and tight fitted sheets, the worker will

make attempts to assist the family in obtaining these items. MDHHS may utilize the following to help secure a crib or other appropriate infant bed and tight fitted sheets: The family's friends/family members. Community resources. Local office funds. • When a sudden and unexplained infant death occurs, evidence of the following should be considered and may affect the case disposition: Substance use- the parent/caregiver was under the influence of alcohol or substances, including prescribed medications, and there was evidence that his/her behavior or judgment was impaired and/or adversely affected his/her ability to safely care for the infant. Supervision- the parent/caretaker did not check on the infant at a reasonable frequency consistent with the infant's age and medical or developmental needs, or the parent left the infant with a person he/she knew or should have known was incapable of safely caring for the infant. Hazardous environment- the environmental conditions in the home were hazardous or unsanitary and adversely affected the safety of the infant. • For newborns identified as being affected by substance use or withdrawal symptoms, or a Fetal Alcohol Spectrum Disorder, workers must develop a safe care plan to ensure the safety and well-being of these infants; see PSM 716-7, Safe Care Plan. • Inquire about potential American Indian heritage; see NAA 200, Identification of an Indian Child. • Inquire into previous addresses of the family/child when interviewing the parent(s) or any other person responsible for the health and welfare of the child. If it is reported that the family/child has lived in another county or state or on an American Indian reservation, these entities must be contacted to determine if the family has CPS and/or criminal history in those locations. • Inquire whether the client or any adult in the home is a licensed foster parent, or an owner, operator, volunteer or employee of a licensed or registered child care organization, or a licensed or unlicensed adult foster care family or group home. • Assess the danger and need for

protection of all children, even when a complaint involves a specific child victim but other children reside in the home with the family. • Interview all children in the home or document the reason(s) why not on the DHS-154, CPS Investigation Report; see PSM 713-08, Special Investigative Situations, Cases in Which A Family, An Alleged Perpetrator or Child Cannot be Located or Refuse to Cooperate section. All children should be interviewed separately. The alleged child victim must not be interviewed in the presence of the alleged perpetrator (MCL 722.628c). Court orders to expedite child interviews should be sought, as necessary. • Follow the DHS-Pub-779, Forensic Interviewing Protocol, when interviewing children and document the content of the interview."

1165.     PSM 713-1 section titled "CPS INVESTIGATION - GENERAL", states: "When an interview of a child is conducted at Children's Assessment Center or another center specifically equipped for this purpose, the copies of video/audio recorded interviews must be maintained by that center or the law enforcement agency involved. These recordings must not be maintained by the worker in the casefile. Workers may observe these interviews and participate as needed. These interviews should be summarized within the investigative report. If one part of a child's disclosure is weak, false, or unsupportable, that does not make the rest of the disclosure untrue. Every effort must be made to accomplish the forensic interview in one session. However, an additional interview may be necessary to clarify statements made during the child's previous interview; see PSM 713-08, Special Investigative Situations, Guidelines for Investigation When a Child Denies Abuse/Neglect section. • Interview the alleged perpetrator or document the reason(s) why not on the DHS-154, CPS Investigation Report; see PSM 713-08, Special Investigative Situations, Cases in Which A Family, An Alleged Perpetrator or Child

Cannot be Located or Refuse to Cooperate section. • Pay particular attention to situations involving nonparent adults who may or may not be residing in the home. A nonparent adult known to spend significant time with the family and who has substantial and regular contact with the child must be sought out and interviewed. These individuals must be included as adults whose names are run on central registry, using correct dates of birth. If the nonparent adult is not interviewed, document the reason(s) why not on the DHS-154, CPS Investigation Report. • Ensure needed crisis intervention, including intensive home-based services, is immediately available, whenever possible, to alleviate risk and to stabilize and maintain the family. • Be alert throughout the investigation to the needs of the child and take necessary action to protect the health or safety of the child by working with the persons responsible and legal authorities to obtain necessary temporary care, shelter and medical care for the child. • CPS must provide the child's parent/caregiver a copy of DHS Pub-137, A Parent's Guide to Working with Children's Protective Services. • Review the foster care case record or contact the foster care worker when, during the course of an investigation, CPS learns that an alleged child victim or sibling is currently in foster care or has been in foster care; see PSM 716-9, New Complaint When The Child Is In Foster Care. • The CPS investigator must meet with his/her supervisor at least once for case consultation on every assigned complaint prior to case disposition. In addition, a case conference must occur for every 30-day extension. To record in MiSACWIS that the conference occurred, select Supervisor in the contact type and in the narrative only document that the conference occurred. • The case worker must meet with his/her supervisor at least monthly for case consultation on every active case. • Supervisors must review and approve each case service agreement. Case service agreements must not be approved until the supervisor meets with the caseworker, which may occur during the

monthly case consultation. • Supervisor approval indicates agreement with the:
Thoroughness, completeness and accuracy of the report. Assessment/reassessment of risk
and safety of the child. Assessment of child/family safety and safety planning. Identified
needs and strengths of the child and family. Rate of progress identified.
Recommendations made to the court (if applicable). Appropriateness of continued
provision of services or case closure."

1166.    PSM 713-1 section titled "ASSESSING SAFETY OVERVIEW", states: "The
purpose of assessing safety is to: • Assess the present or imminent danger to children in
the family and all households listed on the complaint. • Ensure that major aspects of
danger are considered in every investigation to ensure child safety. • Determine whether
or not to initiate or maintain a protective intervention(s) when danger or a threat of
danger is identified. • Address reasonable efforts issues with families and the court."

1167.    PSM 713-1 section titled "When to Complete the DHHS-1016, Safety
Assessment", states: "The safety assessment must be completed as early as possible in
MiSACWIS following the initial face-to-face contact, but no later than the initial
disposition or when submitting a request for an extension of the 30-day Standard of
Promptness. Complete a new safety assessment for any of the key decision points below
and update the safety assessment narrative to reflect what child safety planning occurred.
Workers are expected to continually assess safety, even if a situation doesn't rise to the
level of one of the key decision points that would require a formal DHS-1222, Safety
Assessment, to be completed. Workers must, throughout every intervention with a child
and/or family, always be observant, ask questions, and be aware of any possible safety
concerns. Exception: A safety assessment is not required in Category V dispositions,
except those in which the Family Division of Circuit Court is asked to order family

cooperation in the investigation but declines, and the family still will not cooperate with CPS."

1168.    PSM 713-1 section titled "Key Decision Points", states: "The key decision points at which safety assessments/reassessments, and safety planning are completed during the investigative stage of the case include, but are not limited to, the following: • Prior to determining whether or not to request court ordered removal of the child from the family. • Prior to making the decision to provide intensive in-home services as an alternative to child removal. • Prior to determining whether to maintain placements or to return the child to his/her own home when removals are made by law enforcement. • If any safety factors change, such as when there is a change in family circumstances or information known about the family or a change in the ability of protecting interventions to minimize safety factors."

1169.    PSM 713-1 section titled "Completion of the Safety Assessment", states: "Complete the safety assessment in the Safety Assessment tab in MiSACWIS. Check each safety factor present and provide an Explanation."

1170.    PSM 713-1 section titled "Safety Responses-Protecting Interventions", states: "For each safety factor identified, consider the resources available in the family and community that might help keep the child safe. Select each protecting intervention taken to protect the child and provide an explanation. Describe all protecting interventions taken or immediately planned and explain how each intervention protects (or protected) each child."

1171.    PSM 713-1 section titled "Safety Decisions", states: "There are three safety decisions that indicate the level of safety when the assessment is completed: • Safe - Children are safe; no safety factors exist. • Safe with services - At least one safety factor

is indicated, and at least one protecting intervention has been put into place. • Unsafe - At least one safety factor is indicated, and the only possible protecting intervention is the removal of the child from the family."

1172.    PSM 713-1 section titled "Assessment Update ", states: "During the course of the investigation, if safety factors remain the same, but the protecting intervention(s) and/or the safety decision changes, the assessment must be appropriately updated. However, if safety factors change, a new assessment must be completed; see key decision points in this item."

1173.    PSM 713-1 section titled "Safety Assessment", states: "Safety Factor Identification Directions: The following behaviors or conditions may be associated with a child in imminent danger of harm. Identify the presence or absence of each factor by checking either yes or no. If the factor applies to any child in the household, check any condition(s) that apply to the family. Consider the vulnerability of each child individually throughout the assessment. Children ages 0-6, developmentally disabled children, or children repeatedly victimized may be considered especially vulnerable. However, any child subject to harm or risk of harm from an adult cannot be expected to protect him or herself. Examples are provided in italics below. When assessing the safety factors below, the word serious denotes an elevated level of concern regarding child safety. Number 1 Caretaker(s) caused serious physical harm to the child and/or made a plausible threat to cause serious physical harm in the current investigation, indicated by: • Severe injury or abuse to child other than accidental. • Caretaker(s) caused severe injury (defined as an injury to the child that requires medical treatment or hospitalization and that seriously impairs the child's health or physical well-being). • Threat to cause harm or retaliate against child. • A threat of action which would result in serious harm (such as kill, starve,

lock out of home, etc.), or plans to retaliate against child for CPS investigation. • Excessive discipline or physical force. • Caretaker(s) has used torture, physical force or acted in a way which bears no resemblance to reasonable discipline, or punished child beyond the duration of the child's endurance. • Potential harm to child as a result of domestic violence. • The child was previously injured in domestic violence incident. • The child exhibits severe anxiety (such as nightmares, insomnia) related to situations associated with domestic violence. • The child cries, cowers, cringes, trembles or otherwise exhibits fear as a result of domestic violence in the home. • The child is at potential risk of physical injury and/or the child's behavior increases risk of injury (such as attempting to intervene during violent dispute, participating in the violent dispute). • Caretaker(s) use guns, knives or other instruments in a violent, threatening and/or intimidating manner. • There is evidence of property damage resulting from domestic Violence. • One or more caretaker(s) fear they will maltreat child. • Alcohol-or substance-exposed infant. • Alcohol or substances found in the child's system. Number 2 Caretaker(s) has previously maltreated a child in their care, and the maltreatment or the caretaker(s) response to the previous incident and current circumstances suggest that child safety may be an immediate concern. There must be both current immediate threats to child safety and related previous maltreatment that was severe and/or represents an unresolved pattern of maltreatment. Check all that apply: • Prior death of a child. • As a result of maltreatment. • Previous maltreatment that caused severe harm to any child. • Previous maltreatment by the caretaker(s) that was serious enough to cause severe injury (defined as an injury to the child that requires medical treatment or hospitalization and that seriously impairs the child's health or physical well-being). • Prior termination of parental rights. • One or more caretaker(s) had parental rights terminated as a result of a

prior CPS investigation; see PSM 715-3, Family Court: Petitions, Hearings and Court Orders, the Mandatory Petition-Request for Termination of Parental Rights section. • Prior removal of any child. • One or more caretaker(s) had a prior removal of any child, either formal placement by CPS staff or informal placement with friends or relatives. • Prior confirmed CPS case. • Prior threat of serious harm to child. • Previous maltreatment that could have caused severe physical injury, retaliation or threatened retaliation against a child for previous incidents, prior domestic violence which resulted in serious harm or threatened harm to a child, or escalating pattern of maltreatment. Number 3 Caretaker(s) fails to protect child from serious physical harm or threatened harm. • Live-in partner found to be a perpetrator. • Caretaker(s) fails to protect child from serious physical harm or threatened harm as a result of physical abuse, neglect or sexual abuse by other family members, other household members or others having regular access to the child. Number 4 Caretaker(s) explanation for the injury is unconvincing and the nature of the injury suggests that the child's safety may be of immediate concern. • Medical exam shows injury is result of abuse or neglect; care-taker(s) offers no explanation, denies or attributes to accident. • Caretaker(s) explanation for the observed injury is inconsistent with the type of injury. • Caretaker(s) description of the causes of the injury minimizes the extent of harm to the child. • Caretaker(s) and/or collateral contacts' explanation for injury has significant discrepancies or contradictions. Number 5 The family refuses access to the child, or there is reason to believe that the family is about to flee, or the child's whereabouts cannot be Ascertained. • Family currently refuses access to the child and cannot or will not provide child's location. • Family has removed child from a hospital against medical advice. • Family has previously fled in response to a CPS investigation. • Family has history of keeping child at home, away from peers, school,

other outsiders for extended periods. • Family refuses to cooperate or is evasive. Number 6 • Child is fearful of caretaker(s), other family members, or other • Child cries, cowers, cringes, trembles, or exhibits or verbalizes fear in front of certain individuals. • Child exhibits anxiety, nightmares, insomnia related to a situation associated with a person in the home. • Child fears unreasonable retribution/retaliation from caretaker(s), others in home or others having access to the child. Number 7 Caretaker(s) does not provide supervision necessary to protect child from potentially serious harm. • Caretaker(s) present but child wanders outdoors alone, plays with dangerous objects or on window ledges, etc. • Caretaker(s) leave(s) child alone (period of time varies with age and developmental stage). • Caretaker(s) makes inadequate/inappropriate child care arrangements or plans very poorly for child's care. • Parent(s) whereabouts are unknown. Number 8 • Caretaker(s) does not meet the child's immediate need for food, clothing, shelter, and/or medical or mental health care. • No housing/emergency shelter; child must sleep in the street, car, etc.; housing is unsafe, without heat, etc. • No food provided or available to child, or child starved/deprived of food/drink for long periods. • Child without minimally warm clothing in cold months. • Caretaker(s) does not seek treatment for child's immediate medical condition(s) or follow prescribed treatments. • Child appears malnourished. • Child has exceptional needs which parent(s) cannot/will not meet. • Child is suicidal and parent(s) will not take protective action. • Child exhibits effects of maltreatment, such as emotional symptoms, lack of behavior control or physical symptoms. Number 9 Child's physical living conditions are hazardous and immediately threatening based on the child's age and developmental stage.• Leaking gas from stove or heating unit. • Dangerous substances or objects stored in unlocked lower shelves or cabinets, under sink or in open. • Lack of water, heat, plumbing, electricity or

provisions are inappropriate, such as stove/space heaters. • Open windows;

broken/missing windows. • Exposed electrical wires. • Excessive garbage or rotted or

spoiled food, which threatens health. • Serious illness/significant injury due to current

living conditions and these conditions still exist, such as lead poisoning, rat bites, etc. •

Evidence of human or animal waste throughout living quarters. • Guns and other

weapons are not stored in a locked or inaccessible area. Number 10 Caretaker(s)' current

substance use seriously affects his/her ability to supervise, protect, or care for the child. •

Caregiver(s) has abused legal or illegal substances or alcoholic beverages to the extent

that control of his/her actions is significantly impaired. As a result, the caregiver is

unable, or will likely be unable, to care for the child; has harmed the child; or is likely to

harm the child. Number 11 Caretaker(s)' behavior toward child is violent or out-of-

control. • Behavior that seems to indicate a serious lack of self-control, such as reckless,

unstable, raving, explosive, etc.• Behavior, such as scalding, burning with cigarettes,

forced feeding, killing or torturing pets, as punishment. • Extreme action/reaction, such as

physical attacks, violently shaking or choking, a verbal hostile outburst, etc. • Use of

guns, knives, or other instruments in a violent and/or out -of-control manner. Number 12

Caretaker(s) describes or acts toward child in predominantly negative terms or has

extremely unrealistic expectations. • Caretaker(s) describes child in a demeaning or

degrading manner, such as evil, possessed, stupid, ugly, etc. • Caretaker(s) curses and/or

repeatedly puts child down. • Actions by the caretaker(s) may occur periodically, but

overall form a negative image of the child. • Caretaker(s) scapegoats a particular child in

the family. • Caretaker(s) blames child for a particular incident, or distorts child's

behavior as a reason to abuse. • The caregiver expects the child to perform or act in a way

that is impossible or improbable for the child's age or developmental stage (for example,

babies and young children expected not to cry, expected to be still for extended periods, be toilet-trained, eat neatly, expected to care for younger siblings or expected to stay alone, etc.). • Caretaker(s) overwhelmed by a child's dysfunctional emotional, physical, or mental characteristics. • Caretaker(s) view child as responsible for the caretaker(s) or family's problems. Number 13 Child sexual abuse is suspected and circumstances suggest that child safety may be an immediate concern. • Suspicion of sexual abuse may be based on indicators such as: The child discloses sexual abuse either verbally or behaviorally (for example, age-inappropriate or sexualized behavior toward self or others, etc.). Medical findings consistent with sexual abuse. Caregiver(s) or others in the household have been convicted, investigated, or accused of rape or sodomy, or have had other sexual contact with the child. Caregiver(s) or others in the household have forced or encouraged the child to engage in sexual performances or activities (including forcing child to observe sexual performances or activities). Access to a child by possible or confirmed/known sexual abuse perpetrator exists. Number 14 Caretaker(s)' emotional stability seriously affects current ability to supervise, protect, or care for child. • Caregiver(s)' inability to control emotions impedes ability to parent the child. • Caregiver(s)' refusal to follow prescribed medications impedes ability to parent the child. • Caregiver(s)' inability to control emotions impedes ability to parent the child. • Caregiver(s) acts out or exhibits a distorted perception that impedes his/her ability to parent the child. • Caregiver(s)' depression impedes his/her ability to parent the Child. • Due to cognitive delay, the caregiver(s) lacks the basic knowledge related to parenting skills such as: Not knowing that infants need regular feedings. Proper diet. Adequate supervision. Failure to access and obtain basic/emergency medical care. Number 15 Other (specify). • Specify other factors that are present that impact the child's safety."

1174.    PSM 713-1 section titled " Safety Response -Protecting Interventions", states: "A protecting intervention is a safety response taken by staff or others to address the safety factor(s) identified in the assessment. These interventions help protect the child from present or imminent danger. A protecting intervention must be in place if any safety factor is indicated. If one or more safety factors are present, it does not necessarily indicate that a child must be placed outside the home. In many cases, it will be possible to initiate a temporary plan that will mitigate the safety factor(s) sufficiently so that the child may remain in the home while the investigation continues. Consider the relative severity of the safety factor(s), the caregiver(s)' protective capacities and response to the investigation/situation, and the vulnerability of the child when identifying protecting interventions. For each safety factor identified in Section 1, consider the resources available in the family and the community that might help to keep the child safe. Check each protecting intervention taken to protect the child and explain below. Describe all protecting safety interventions taken or immediately planned by you or anyone else, and explain how each intervention protects (or protected) each child. Number 1 Monitoring or direct services by MDHHS worker. Number 2 Use of family resources, neighbors or other individuals in the community as safety resources. Number 3 Use of community agencies or services as safety resources (check one). • Intensive home-based. • Other community services. Number 4 Recommend that the alleged perpetrator leave the home, either voluntarily or in response to legal action. Number 5 Recommend that the non-maltreating caretaker move to a safe environment with the child. Number 6 Recommend that the caretaker(s) voluntarily allow the child to stay outside the home; see Temporary Voluntary Arrangements in this item. Number 7 Other. Number 8 Legal action must be taken which may include a recommendation to place child outside the home."

1175.    PSM 713-1 section titled "Instructions", states: "Explain safety response-protecting interventions. If CPS is initiating legal action and placing the child: 1. Explain why responses 1-7 could not be used to keep the child safe. 2. Describe your discussion with the caretaker(s) regarding placement. If services were recommended but caretakers refused to participate, briefly describe the services that were offered."

1176.    PSM 713-1 section titled " Safety Decision", states: "Identify your safety decision by checking the appropriate box below. Check one box only. This decision should be based on the assessment of all safety factors, protecting interventions and any other information known about this case. A (Safe) should be checked only if no safety factors were identified in Section 1, Part A, Safety Factor Identification. A. Safe - Children are safe; no safety factors exist. B. Safe with Services - At least one safety factor is indicated, and at least one protecting intervention has been put into place that has resolved the unsafe situation for the present time. C. Unsafe - At least one safety factor is indicated, and the only possible protecting intervention is the removal of the child from the family. If the investigation is not confirmed and any safety factor is present, briefly explain the protecting intervention or plan".

1177.    PSM 713-1 section titled "Injury to the Child", states: "Was any child injured in this case? If yes, indicate the age of youngest child with most serious injury. If yes, indicate what was the most serious injury to a child: 1. Death. 2. Hospitalization. 3. Medical treatment, but no hospitalization. 4. Exam only of alleged injuries. No medical treatment required. 5. Bruises, cuts, abrasions or other minor injuries; no medical exam or treatment.

1178.    PSM 713-1 section titled "Temporary Voluntary Arrangements", states: "A parent with physical custody or a legal guardian may decide to allow their child to temporarily

stay with the non-custodial (legal) parent, a relative or friend. This may occur when a temporary arrangement is needed to ensure child safety. For example: • While the CPS investigation is conducted. • Until services can begin. • Until the family can complete a particular task (for example, removing fire hazards in the home). The parent with physical custody or a legal guardian must be in agreement with the temporary arrangement. When CPS identifies safety concerns which do not rise to the level of court involvement, the MDHHS-5433, Voluntary Safety Arrangement, can be utilized. The MDHHS-5433 documents a voluntary arrangement between the caregiver(s) and an individual who agrees to care for the child(ren) until identified safety issues can be resolved. If CPS has determined the child is unsafe in the parent's or guardian's home and the voluntary arrangement will not ensure child safety, a petition must be filed."

1179.     PSM 713-1 section titled "CASE MEMBER INFORMATION", states: "During the investigation, CPS must attempt to verify the information listed for case members in MiSACWIS. Special attention must be given to obtaining proper/legal names and accurate birthdates. If information entered at intake is incorrect, update the information prior to disposing of the case."

1180.     PSM 713-1 section titled "Primary and Secondary Caretaker", states: "If more than one adult lives in the home, CPS must identify a primary and secondary caretaker. The primary and secondary caretaker designations will remain the same throughout the case and will be used when completing the risk assessment (initial and reassessment) and the family assessment of needs and strengths (FANS-CPS). The primary caretaker is the adult, usually the parent living in the household, who assumes the most responsibility for child care. When two adult caretakers are present and it is unknown which one assumes the most child care responsibility, the adult legally responsible for the children involved

in the incident should be selected. If this does not resolve the question, the legally responsible adult who was a perpetrator should be selected. The secondary caretaker is defined as an adult living in the household who has routine responsibility for child care but less responsibility than the primary caregiver. A living-together-partner (LTP) may be a secondary caretaker even though he/she has minimal responsibility for care of the child. The non-custodial parent is not a secondary caretaker, unless that person also lives in the household and is considered a member of the household. When two separate households are being investigated on the same complaint (for example, complaint is regarding abuse of a child when visiting the non-custodial parent), a risk assessment and/or FANS-CPS may need to be completed on the secondary household. Identify the households by completing the family information in MiSACWIS prior to completing the risk assessment and the FANS-CPS."

1181.    PSM 713-1 section titled "ABBREVIATED INVESTIGATIONS", states: "If it is determined that there is no basis in fact to support the allegations within the complaint, CPS may conduct an abbreviated investigation and enter the case disposition as Category V-No Evidence. Note: Abbreviated investigations cannot be completed on two sequential investigations involving the same family/children. A field contact is required for an abbreviated investigation. This may include interviews with the alleged victim and/or caretaker. An investigation of alleged abuse requires a face-to-face contact with the alleged child victim(s). The following must be evaluated by the CPS worker when determining the appropriateness of an abbreviated investigation: • Prior family history. • The need for a follow-up contact with the reporting person to clarify or gain more information regarding the allegations. Request supervisory approval for an abbreviated investigation by: • Entering all social work contacts into MiSACWIS. • Entering all

information obtained during the investigation into the appropriate section of MiSACWIS (such as historical summary, child well-being checks, etc.). • Submitting the request for supervisory approval of an abbreviated investigation by completing the Exception Request in MiSACWIS. The request must document why an abbreviated investigation is appropriate. When the request is submitted, the supervisor will be alerted via email of the request. If the supervisor does not approve the request for an abbreviated investigation, the same standards of promptness and investigative requirements apply to the case. Although investigation checklists are not required in abbreviated investigations, these cases cannot be closed until the local office director has reviewed the investigation. Supervisors must route all abbreviated investigations to the local office director in MiSACWIS for review of every abbreviated investigation. A local office director is defined as the county director, district manager or a regional director. In an abbreviated investigation, the supervisor may waive all further investigative requirements, such as:• Interviews with alleged victims or siblings. Note: All investigations with abuse allegations require a face-to-face contact with the alleged child victim(s). • Interviews with alleged perpetrator and other adults. • Determination of American Indian heritage. • Completion of the safety assessment. • Completion of the risk assessment. • Completion of the investigation checklist in MiSACWIS. Contacts mandated by the Child Protection Law cannot be waived. These contacts include the following: • Referral to law enforcement within 24 hours under required circumstances (MCL 722.623 and 722.628); see PSM 712-3, Coordination with Prosecuting Attorney and Law Enforcement for more information. Notification of the results of an investigation to the reporting person (MCL 722.628(13), (14), and (15)). See PSM 712-9, Notifying Reporters, for more information. • Contact with school personnel if a child is interviewed at school (MCL 722.628(9)). See

PSM 713-03, Face-to-Face Contact, Interviewing Children at School or Other Institution section for more information. • Notification of the person responsible for a child's health or welfare about the CPS contact with the child at school or other institution (MCL 722.628(8)); see PSM 713-03, Face-to-Face Contact, Interviewing Children at School or Other Institution section for more information."

1182.     PSM 713-01 section titled "CASES INVOLVING MULTIPLE COUNTIES", states: "In all cases involving multiple counties, requests for courtesy interviews, case records, assistance, etc., must be honored. The worker requesting the courtesy interview or other activity should document what he/she wants done by the other county as a social work contact. The supervisor is to request the assignment of a courtesy worker by contacting the appropriate county and processing the request in MiSACWIS. All activities completed by the courtesy worker must be documented in MiSACWIS by entering any contacts in the Social Work Contacts module, updating the verification of a child's well-being in the investigation, completing any risk assessments on the household, etc., as necessary. Any contacts between the workers/supervisors of different counties should also be documented as social work contacts by the worker/supervisor initiating contact. See PSM 716-2, When Families In CPS Cases Move Or Visit Out Of County, when a family with a pending CPS investigation is absent from the county for a period of 30 days or more, moves, or is temporarily visiting out of the county. Disputes between counties must be immediately referred for resolution by the Business Service Center Directors."

1183.     PSM 713-01 section titled "MONTHLY CASE CONSULTATION DURING CPS INVESTIGATIONS", states: "The CPS Investigator must meet with the supervisor at least once for case consultation on every assigned complaint prior to case disposition. In

addition, a case conference must occur for every 30-day extension. To record in

MiSACWIS that the conference occurred, select Supervisor in the contact type and in the

narrative only document that the conference occurred."

1184.    PSM 713-01 section titled "CPS INVESTIGATION CHECKLIST", states: "See

PSM 713-10, CPS Investigation Report, for information on the CPS Investigation

Checklist."

1185.    PSM 713-03 section titled " FACE-TO-FACE CONTACT OVERVIEW", states:

"A face-to-face contact with the parents (including non-custodial parents) and/or other

persons responsible for the health and welfare of the child, the alleged perpetrator, and

each alleged victim(s) is required for all complaints that are assigned for field

investigation. If a face-to-face contact is not made with the non-custodial parent,

document why in the DHS-154, Investigation Report. Determining the urgency of the

face-to-face contact with the child victim is an initial component of the investigation and

is dictated by the risk to the child victim. The Children's Protective Services (CPS)

Minimal Priority Response Criteria guides decision-making from the receipt of the

complaint to ensure the appropriate response is determined at assignment. In some

circumstances, the criteria allow 72 hours to make face-to-face contact with the child

victim, but making the contact within 24 hours of receipt of the complaint is best

practice; see PSM 712-4, Minimal Priority Response Criteria for more information.The

focus of a CPS investigation must always be on the immediate safety of the child."

1186.    PSM 713-03 section titled "Face-to-Face Contact", states: "The face-to-face

contact must be: I. Priority One Response (12/24). A face-to-face contact must take place

as soon as possible with each child victim within 24 hours. II. Priority Two Response

(24/72). A face-to-face contact must take place with each child victim within 72 hours.

The Michigan Statewide Automated Child Welfare Information System (MiSACWIS) automatically determines whether the standard of promptness for face-to-face contact with the alleged child victim(s) was met. The determination is based on when the face-to-face contact with the last alleged child victim occurred. Face-to-face contact with the parents and other persons responsible for the health and welfare of the child and the alleged perpetrator should occur as soon as possible in the course of the investigation."

1187.    PSM 713-03 section titled "Timely Entry of Face-to-Face Social Work Contacts into MiSACWIS CPS", states: "CPS must enter all social work contacts into the MiSACWIS within 5 business days of contact. Social work contacts include face-to-face, collateral contacts, caseworker contacts with children, parents and foster parents/relative/unrelated caregivers. Families First contractors must submit all face-to-face contacts with children, parents and foster parents/relative/unrelated caregivers to the CPS workers by the third business day of every month. Reports received from Families First workers must be entered into MiSACWIS within 5 business days of receipt."

1188.    PSM 713-03 section titled " Notification of Missed Face-to-Face Contact", states: "If the face-to-face contact standard of promptness (SOP) was or will be missed, notify the supervisor by completing the Exception Request. The notification must document the reasons the SOP was or will be missed. The notification does not extend the timeframe for completion of the SOP or provide approval for the missed SOP; it only provides notice to the supervisor. When the notification is submitted, the supervisor will automatically be alerted via email."

1189.    PSM 713-03 section titled "Complaints Assigned for CPS Field Investigation", states: "All complaints must have a face-to-face contact with all children or, at least, verification of the safety and whereabouts of all children, including children who reside

in another location. The parents (including non-custodial parents) and other persons responsible for the health and welfare of the child and the alleged perpetrator, all other appropriate children, and significant adults must be interviewed as soon as possible after the complaint assignment or the reason(s) for not doing so must be documented in the DHS-154, Investigation Report. The Forensic Interviewing Protocol (DHS Pub-779-revised 4/11), must be followed when interviewing children during the CPS investigation. If the worker experiences difficulty gaining access to the alleged perpetrator or victim, specific actions must be taken as outlined in PSM 713-08-Special Investigative Situations, Cases In Which A Family, An Alleged Perpetrator Or Child Cannot Be Located section. Special Note: According to the Child Protection Law (CPL), MCL 722.628c, the child reported to have been abused or neglected must not be interviewed in the presence of an individual suspected to have perpetrated the abuse. If the CPS worker experiences difficulty gaining access to the victim, a court order must be sought to interview the alleged victim(s) without the alleged perpetrator being present."

1190.     PSM 713-03 section titled "Use of Law Enforcement for Initial Face-to-Face Contact Requirements", states: "Face-to-face contact by law enforcement with the child victim may be considered as satisfying the CPS initial face-to-face contact requirement (required 24 or 72 hour face-to-face). This should be documented by entering the social work contact into MiSACWIS and indicate that law enforcement's contact with the child victim is being used to meet the initial face-to-face contact requirement. This may be done in the following circumstances: When law enforcement has had a face-to-face contact with the child victim after the CPS complaint has been received and the face-to-face contact occurs within the appropriate priority response time frame required for CPS. When law enforcement makes a complaint to CPS subsequent to having a face-to-

face contact with the child victim and this contact has occurred within the past 24 hours. Note: When entering the contact in the social work contacts hyperlink, use the date and time of complaint to indicate the face-to-face contact date and time. These guidelines refer to authorized utilization of law enforcement for the initial face-to-face contact requirement only (including after hours complaints). CPS must still commence an investigation within the required priority response time. Further, a face-to-face contact by law enforcement with the child victim may not be substituted for a required CPS investigative interview of the child victim, except as noted in PSM 12-3-Coordination With Prosecuting Attorney and Law Enforcement, Law Enforcement Interviews of Alleged Perpetrators and Alleged Victims sections. Note: Even after the initial face-to-face contact requirement has been met by CPS or law enforcement, CPS must proceed with additional face-to-face contacts, investigation, or intervention as promptly as needed to ensure the safety of the child(ren) involved."

1191.     PSM 713-03 section titled "FIELD INVESTIGATION HOME VISITS", states: "There are certain circumstances during an investigation when a scheduled or an unscheduled home visit is appropriate. The CPS priority is to ensure the safety of children when they remain in the home. In any situation in which a home call is not or cannot be completed, document the reason why on the DHS-154. A home visit must occur as part of each investigation."

1192.     PSM 713-03 section titled "Scheduled Home Visit", states: "Workers may use scheduled home visits in the following circumstances: When unscheduled face-to-face contacts with the family or other non-parent adults are unsuccessful or difficult, such as when both parents are working and not available during normal working hours. When the worker needs to interview the parents or other nonparent adults as soon as possible, such

as when a child has been hospitalized with injuries. When worker safety dictates a scheduled visit. When a child cannot be located for a school interview and there is a need to see the person responsible and child."

1193.       PSM 713-03 section titled "Unscheduled Home Visits", states: "Workers must use unscheduled home visits in the following circumstances: To determine actual home conditions and monitor child safety. To interview children before parents or other nonparent adults have an opportunity to intervene and coach them in their responses to the interview, if contact is not possible at school or other settings. To measure risks to children when caretakers are allegedly allowing children to be exposed to unsafe adults or situations; for example, sex offenders, substance abusers, past perpetrators of child abuse and neglect or domestic violence. To ensure safety; for example, if there is a joint investigation with law enforcement and an unscheduled joint visit is determined to be the best plan of action. When intake information suggests urgency; for example, that small children are left alone or not properly supervised and the worker must act quickly to assess safety of the child. To interview an alleged perpetrator before they have the opportunity to compromise evidence. To act on intake information; for example, the reporting person indicates that the alleged perpetrator has been informed that a complaint will be made. The alleged perpetrator may expect the allegations to be investigated and attempt to evade the worker."

1194.       PSM 713-03 section titled "Presence of Support Persons During Interview(s) of Adults", states: "Occasionally, a parent, non-parent adult and/or the alleged perpetrator may want a friend, relative, or other support person to be present during an interview. The Child Protection Law does not prohibit the use of a support person during an interview nor does it require CPS to inform the parents or adults that a support person can be

present. When it is requested that a support person be present during the interview, the CPS worker must: Ensure that the request or use of a support person does not delay or impede the investigation. This may include a verbal notification prior to the interview and termination of the interview at any point if necessary. Inform the support person at the beginning of the interview that information obtained during the interview is confidential and subject to the Child Protection Law and that release of this information has civil and criminal penalties. The DHS-860, CPS Support Person Letter, must be signed by the support person prior to initiating the interview and placed in the file."

1195.     PSM 713-03 section titled "Physical Abuse/Neglect Cases", states: "If the investigation is in response to a complaint of physical abuse or neglect, and the child has not already been medically examined, the worker must make an effort to view (subject to restrictions listed below) the part of the child's body which is alleged to have sustained injury. The child's parent or legal guardian must be asked to remove the child's clothing so the alleged injuries are visible. It may be appropriate to look at an infant's diaper rash or welts or bruises on the limbs or back of an older child. However, for children older than an infant, workers must not attempt to view the genitalia or breasts of female children or genitalia of male children. This must be done by a qualified medical professional. Viewing the buttocks of children age six and under is appropriate with verbal permission from a parent/legal guardian. Viewing the buttocks of children age seven and over requires written permission from a parent or legal guardian. The DHS-708, Visual Assessment Permission Letter, may be used to obtain the required written permission from a parent or legal guardian. In all situations not requiring written consent, clothing must not be removed without verbal parental or guardian consent to view alleged injuries. When verbal consent is obtained, the worker must document the consent in the

narrative section of the DHS-154. No child shall be subjected to a search at a school which requires the child to remove his or her clothing to expose a male's buttocks or genitalia or a female's breasts, buttocks or genitalia unless the department has obtained an order from a court of competent jurisdiction permitting such a search (MCL 722.628(10)). Regardless of the parents' or legal guardian's cooperation, the worker is to proceed to secure a medical examination, if appropriate. The absence of visible marks or bruises is not to be used as a basis for not securing a medical examination; see PSM 713-04, Medical Examination and Assessment."

1196.    PSM 713-03 section titled "Sexual Abuse", states: "Given the very technical nature of sexual abuse examinations; see PSM 713-04, Medical Examination and Assessment, and the need to have highly trained physicians do the examinations, CPS workers or teams of CPS workers are not to conduct physical examinations or visual assessments when conducting a sexual abuse investigation, regardless of the age of the child."

1197.    PSM 713-03 section titled "Photographs", states: "Taking photographs of injuries is an accepted practice in documenting evidence. CPS must not take photographs of the genitalia, buttocks of male children or genitalia, buttocks or breasts of female children, including infants. These photographs must be taken by medical personnel during a medical examination. If the child has bruises, marks or injuries that have not been photographed by CPS because of the visual assessment restrictions, CPS is to request that photographs be taken by medical personnel during a medical examination, if a medical examination is being done; see PSM 713-04, Medical Examination and Assessment.

1198.    PSM 713-04 section titled "OVERVIEW", states: "In cases of suspected child abuse or neglect, a medical examination assists with identifying, documenting, and

interpreting injuries or potential medical conditions and helps determine the child's treatment needs. It can be difficult to determine the cause of an injury through use of observation and interviews. For example, a child may be unable to report how an injury occurred or a parent may give an explanation that seems unlikely. Sometimes injuries are not obvious or old injuries exist from previous incidents."

1199.  PSM 713-04 section titled "DEFINITIONS", states: "Medical Practitioner- A physician or physician's assistant licensed or authorized to practice under part 170 or 175 of the public health code, MCL 333.17001 to 333.17088 and MCL 333.17501 to 333.17556, OR a nurse practitioner licensed or authorized to practice under section 172 of the public health code, MCL 333.17210."

1200.  PSM 713-04 section titled "OBJECTIVES OF A MEDICAL EXAMINATION", states: "The objectives of a medical examination are:• To obtain professional medical documentation of an injury or medical condition. • To obtain an accurate medical diagnosis and treatment plan for an injury or medical condition. • To obtain a medical opinion as to whether an injury was caused by intentional actions or was accidental. • To obtain a medical opinion as to the cause or potential cause of an injury or medical condition and whether an injury or medical condition is consistent with any provided explanation. • To collect and preserve potential evidence."

1201.  PSM 713-04 section titled "WHEN TO SEEK A MEDICAL EXAMINATION", states: "A medical examination for the alleged victim is required in the following situations: • Suspected child sexual abuse; see Medical Examinations for Sexual Abuse in this item. • Allegations or indication that the child has been seriously or repeatedly physically injured as a result of abuse and/or neglect. Note: Injuries such as internal injuries and brain injuries are not easily observable and require medical evaluation. •

There is indication that the child suffers from malnourishment or is otherwise in need of medical treatment. • The child has been exposed to or had contact with methamphetamine production; see Methamphetamine Production Examination in this item. • An infant who is not mobile and has marks or bruises. • If a child is under the age of six, or is physically or developmentally disabled, or has any type of chronic medical or mental health needs and any of the following conditions apply: Parent, child, or caretaker has provided an explanation of the injuries that is not credible or is suspicious. Child has unusual bruises, marks, or signs of extensive or chronic physical injury. Child has physical or medical needs that appear to be unmet. Child appears to be fearful of parents/caregivers or exhibits characteristics that indicate the child feels threat of harm; for example, appears withdrawn or anxious. The person responsible for the child's care is/has been a perpetrator of severe physical injury. Death of a sibling or other child in the household due to abuse or neglect."

1202.    PSM 713-04 section titled "Medical Examinations for Sexual Abuse", states: "A medical examination should be sought in suspected sexual abuse cases, except in the limited circumstances described in this section. A decision to obtain a medical examination must be made quickly. If a medical exam for sexual abuse is not completed within 72 hours of the alleged incident, medical evidence may not be possible to obtain. If a medical practitioner who specializes in sexual abuse medical examinations is not immediately available, the child may be examined in the nearest emergency department; refer to Who Should Do a Medical Examination in this item for more information. Evaluate the following when determining whether a medical examination in sexual abuse cases is appropriate: • Does the information gathered or statements made indicate that the child has been sexually abused and/or is at risk for a sexually transmitted disease through

body fluid contact? • Has the alleged incident occurred within 72 hours? • Is the child experiencing physical problems, symptoms, or complaints? • What type of incident is alleged/reported to have occurred, and will the medical evaluation provide value in regard to the type of contact alleged to have occurred? For example, sexual penetration versus grabbing of breasts over clothing. Where the answer is yes to these questions, a medical examination should be sought. If the caseworker is uncertain whether to obtain an examination, a decision should be made in consultation with a medical practitioner who has experience with child sexual abuse examinations, if possible, and the caseworker's supervisor. It is a commonly accepted medical fact that in the majority of sexual abuse cases there is no physical evidence. Sexual abuse evidence will usually depend upon skilled interviewing of the child and collateral contacts, including statements made by children to a caseworker, trusted adult, or medical practitioners."

1203.      PSM 713-04 section titled "PARENTAL CONSENT FOR MEDICAL EXAMINATION", states: A parent has the right to withhold consent to a medical examination of his/her child. If a parent does not consent, the caseworker must engage with the parent by taking the following steps: • Clearly explain the need for a medical examination to the parent. • As much as possible and within reason, allow the parent to participate in decisions regarding the medical examination. For example: Allow the parent to determine whether a support person is present during the examination and who this person should be. Allow the parent to determine who performs the medical examination; see Who Should do a Medical Examination below. • Assist in making transportation arrangements. • Accompany the parent to the examination. If consent is still not granted, the caseworker must contact his/her supervisor. If the caseworker and supervisor determine that a medical exam or second opinion is required to determine

child safety, the caseworker must seek a court order. Child Protection Law (CPL), MCL 722.626(3). To seek a court order during regular court hours, the caseworker must file a petition setting forth the basis for the suspected abuse or neglect and the need for a medical examination. During after-hours (nights, weekends, and/or holidays), the caseworker must contact the judge or other designated court official to request the order. If the court refuses to authorize an after-hours medical examination, the caseworker must continue the investigation without the medical examination and follow-up by filing a petition seeking a court order on the next business day."

1204.    PSM 713-04 section titled "MEDICAL EXAMINATION WITHOUT COURT ORDER", states: "Under the CPL, MCL 722.626(3)(a) and (b), a caseworker must obtain a medical examination without a court order in the following situations: • The child's health is seriously endangered and a court order cannot be obtained. • The child is displaying symptoms suspected to be the result of exposure to or contact with methamphetamine production. If a medical examination without a court order is required and the child needs to be transported to receive the examination, and there is no parent or legal guardian who is not suspected of abuse/neglect to accompany the child, the caseworker must have law enforcement or an ambulance transport the child."

1205.    PSM 713-04 section titled "REQUESTING MEDICAL AND MENTAL HEALTH RECORD INFORMATION", states: "Information from medical and mental health records is frequently necessary to complete a CPS investigation, to provide information to the court, or to develop a more comprehensive services plan in a CPS case. The Child Protection Law, the Public Health Code (1978 PA 368, MCL 333.2640 & 333.16281) and the Mental Health Code (1974 PA 258, MCL 330.1748a) provide the legal authority and obligation for these providers to share their records with CPS, even without the client's

consent. If records requested verbally are not forthcoming from providers, CPS is to make the request in writing, using the Children's Protective Services Request for Medical Information (DHS-1163-M) form or Children's Protective Services Request for Mental Health Information (DHS-1163-P) form. Both are available as Word templates and included in the Reference Forms & Publications Manual (RFF). If the written request is still denied by the provider, the local office is to send a copy of the denied request to the CPS program office in Lansing. The CPS program office will then contact the Department of Community Health for assistance in obtaining the needed records. In an emergency, the local office CPS unit must seek the assistance of the local prosecuting attorney and Family Division of Circuit Court to obtain records which are needed to protect the child or complete an investigation."

1206.   PSM 713-07 section titled "LABORATORYSCREENS RE: SUBSTANCE ABUSE (DRUG OR ALCOHOL)", states: "Positive drug and alcohol screens should not detract from the basic issue, which is assessment of risk to the child versus the habits of their parents or caregivers. Clients who have substance abuse problems should be referred to treatment agencies that may incorporate screening in a full treatment package. Refer clients to their local access management system or an appropriate treatment center. There may be situations in which CPS workers have determined that drug/alcohol screens for parents or other persons responsible are necessary to ensure that case goals are accomplished. Situations in which screening is appropriate are: • To help a parent or other person responsible overcome denial and agree to seek treatment. • There has been a confirmed case of abuse/neglect with a substance abuse issue known to be a contributing factor (e.g., use of income for drugs rather than food and clothing for the child). • To monitor compliance with the services plan when the client is not enrolled in a treatment

program which does its own screening. • To identify or to eliminate contributing factors in the assessment of risk and evidence during the investigative phase of the complaint process. If a client refuses to comply with a request for screening, the worker must evaluate the risk of leaving the child in the home without the benefit of this monitoring tool. If the child is at imminent risk of harm, file a petition with the Family Division of Circuit Court. To ensure the safety of the child, request that drug screens be court ordered and/or that the child be removed from the home. Situations in which drug screening is not appropriate are:• The client is in a substance abuse treatment program which does screens as a part of the treatment program. The department must not pay for duplicate services. Use the Authorization to Release Confidential Information (DHS-1555-CS) to request the results from the treatment program. • Use of screenings as a punitive measure. Note: "Over the counter" drug/alcohol screening products are not reliable and must not be used."

1207. PSM 713-07 section titled "CONSENT", states: "Federal regulations require that the civil rights of a client be protected. Therefore, informed consent is a mandatory component of screening procedures. Screening for illegal drugs or alcohol for forensic versus medical reasons without consent may be a violation of civil rights and constitute an unlawful search and seizure. Screening authorized by CPS is forensic, not medical. If a client is screened, they must be provided with information on the potential ramifications of screening. Aside from legal considerations, informed consent fosters a trusting relationship. Before screening newborns, informed consent must be obtained from the parent or legal guardian. Before requesting that an infant be screened, determine that appropriate consent has been obtained. If a parent or person responsible is having drug screening done as part of a substance abuse treatment protocol, or per physician's order,

the consent is the responsibility of the physician or treatment agency. However, if a CPS worker is requesting that a client comply with screening as part of a service plan and is referring the client to a lab for screening, the worker must ensure that a consent form has been signed. CONFIDENTIALITY Note: Confidentiality issues related to substance abuse information

must be addressed as outlined in SRM 131, Confidentiality - Substance Abuse Records.

1208.     PSM 713-07 section titled "THREATENED HARM-Overview", states: "The legal definition of child abuse and neglect (CA/N) includes the phrase, "harm or threatened harm" to a child. Harm is clearly determined based on the occurrence of a non-accidental injury, sexual abuse or exploitation or maltreatment by a parent or person responsible for the child's health or welfare."

1209.     PSM 713-08 section titled "Definition of Threatened Harm", states: "A child found in a situation where harm is likely to occur based on: A current circumstance (such as home alone, DV, drug house). A historical circumstance (such as a history of abuse/neglect, a prior termination of parental rights, or a conviction for crimes against children) unless there is evidence found during the investigation that past issues have been successfully resolved. Legal Basis In Michigan vs. Gazella (2005), the court ruled that a parent's rights can be terminated based solely on anticipatory (harm)" abuse/neglect due to the previous care and treatment of a child. The courts also ruled that physical compliance with case services is not sufficient to prevent termination of parental rights; a parent must demonstrate that there has been benefit from services. In other words, attending parenting classes is not sufficient if parenting skills did not improve."

1210.     PSM 713-08 section titled "Two Forms of Threatened Harm", states: "There are two forms of threatened harm to consider: 1. A threat to the safety of a child that is based

on a current action or inaction by a person responsible for the child's health and welfare. Examples include, but are not limited to, when a child: Is home alone or left alone in a vehicle; see When a Child is Home Alone section in this item for more information. Is found in a drug house or is exposed to drug use and/or the manufacturing of drugs. Is provided prescription drugs not prescribed to him/her and/or given doses higher/lower than prescribed. Resides in a home wherein domestic violence (DV) has occurred. Resides in a home that is unsafe/unsanitary. Resides in a home where there are unsecured loaded weapons. Is found with a parent or person responsible who is unable to properly supervise/care for the child due to the parent/person responsible's intoxication, drug use, or diminished mental and/or physical capacity. Is exposed to extreme physical actions or excessive discipline, which could result in physical injury. 2. A threat to the safety of a child that is based on the history of child abuse and/or neglect of the person responsible for the child's health and welfare or a nonparent adult, or a conviction(s) of crimes against children. Examples include but are not limited to: New birth with prior termination of parental rights; see PSM 712-6 and Prior Termination in this item. Known perpetrator of a crime against a child; see PSM 712-6 and Known Perpetrator in this item. A thorough review of current and historical information must be completed to ensure child safety. Assessing the threat of harm to a child is an essential part of that review. Assess not only current evidence of abuse/neglect, but also whether or not a preponderance of evidence exists based solely on historical facts and evidence. In situations involving allegations of abuse/neglect based solely on historical factors, a thorough assessment must include whether or not evidence exists that a person responsible/nonparent adult has taken appropriate steps (participated and benefited from services) to rectify conditions that led to the previous abusive and/or neglectful behavior

toward children. The intent of the following is to provide a framework that is to be consistently applied to threatened harm cases."

1211.     PSM 713-08 section titled "Investigation", states: "When investigating complaints of threatened harm, the CPS worker must complete all appropriate investigative steps, including a thorough assessment of known facts and circumstances; see PSM 713-01. Workers must also evaluate and document findings related to the following factors to determine the safety of a child in a threatened harm situation."

1212.     PSM 713-08 section titled "Severity of Past Behavior", states: "1. Criminality and/or a prior substantiation on a CPS case involving issues identified in Section 8(3)(a)(b)(c)(f) of the Child Protection Law, outlined below: (a) Abuse or neglect was the suspected cause of a child's death. (b) The child was the victim of suspected sexual abuse or sexual exploitation. (c) Abuse or neglect resulted in severe physical injury to the child that required medical treatment or hospitalization and seriously impaired the health or physical well-being of the child. (d) The child had been exposed to or had contact with methamphetamine production. Verified evidence of a prior conviction of a crime against children must also be considered when determining if a pattern of abuse or neglect exists. Obtain documentation of past criminal and/or central registry incidents and document how the past behavior relates to current allegations of threatened harm, such as past conviction involved criminal sexual conduct with a child and the current allegations involve a child living in the home with the perpetrator. Length of Time Since Past Incident 2. The length of time that has passed since the documented historical incident occurred and how it relates to the current allegations. Workers must attempt to obtain documentation of the offender's participation in and benefit from services and determine if the past behaviors have been resolved. Workers must review the offender's progress

(participation and benefit from services) since the prior incident(s) and document this assessment in the CPS DHS-154, Investigation Report. Comparison Between Past History and Current Complaint 4. Workers must evaluate historical incidents in relation to current circumstances to determine if there is a threat to a child's safety based on reasonable, justifiable, and specific information (such as a prior termination which was based on parental incapacity due to substance abuse and the parent is currently abusing substances or a prior conviction was for sexual abuse of a child, the perpetrator did not participate in services and the perpetrator is currently living in the home with a child). Vulnerability of Child 5. Workers must consider the vulnerability of the child. A child may be more vulnerable due to age, mental capacity, a disability, etc.."

1213. PSM 713-08 section titled "Disposition", states: "When making a determination of whether or not a preponderance of evidence exists, all of the above factors must be evaluated to assess the risk of threatened harm to the child. A preponderance of evidence is to be found if either is true: Current circumstances provide evidence of abuse or neglect (for example, a vulnerable child is found home alone). Historical circumstances provide evidence that abuse or neglect is likely to occur (such as a prior termination of parental rights or criminal conviction and evidence indicates that historical issues have not been successfully resolved)."

1214. PSM 713-08 section titled "AN ALLEGED PERPETRATOR OR CHILD CANNOT BE LOCATED OR REFUSE TO COOPERATE", states: "When a worker has been unable to contact a family, alleged perpetrator or child victim, the worker must make the following minimum efforts and document the results in the DHS-154, Investigation Report."

1215. PSM 713-08 section titled "Unable to Locate the Family", states: "1. When unable

to locate the family: Seek case information on Bridges, MiSACWIS CPS, Infoview, local office files, etc. Contact the FIS/ES worker if the family has an open assistance case. A family's assistance case may need to be closed if they cannot be located; see BAM 220, Case Actions. Contact any known relatives or individuals (including friends, neighbors, the reporting person) regarding the family's whereabouts. Contact the child's school, if the child is school-aged. Use all routine means of contacting individuals, such as phone calls, letters, worker's business card left at the residence. Check telephone books, the Internet, and other available directories. The local or state library (phone 517-373-3700) may have electronic telephone lists, which may include addresses. Generic cross-indexes (such as Bresser) would include names, addresses and phone numbers. There are numerous resource directories available on the Internet (for example, offers free people search services)."

1216.      PSM 713-08 section titled "Unable to Locate Child(ren) or Parent(s)/Legal PSM 713-08" subsection titled "Guardian(s) Refuse(s) Access to the Child(ren)", states: "2. When unable to locate the victim or make face-to-face contact with all children, or verify the safety and whereabouts of all children in a case assigned for investigation, including siblings who reside in another location: Contact any other known individuals including neighbors, friends or extended family regarding the child(ren)'s whereabouts. When the parent or person responsible states that a victim or sibling of a victim is visiting or residing in another county, state, etc., verify by collateral contact that the child is with that person. Assistance from CPS in the other county, state, or jurisdiction may need to be sought to check the family's records and central registry in that jurisdiction and/or to interview the child. Contact the child's school if the child is school-aged. Note: If the worker is having difficulty having face-to-face contact with children who are not alleged

to be victims, the worker may accept a collateral contact verification of the child's well-being from an individual who meets the criteria of a mandated reporter in the Child Protection Law (for example, a teacher or law enforcement)."

1217.    PSM 713-08 section titled "Evidence and/or Allegations Indicate Imminent Risk of Harm to the Child", states: "If there is evidence and/or allegations that indicate imminent risk of harm to the child, and the whereabouts of a child cannot be verified and/or the parent or legal guardian refuses to cooperate, the worker must: Contact local law enforcement in the jurisdiction where the child is alleged to reside. Explain why the child may be at risk and request that law enforcement check on the child's safety. Petition the Family Division of Circuit Court to take temporary jurisdiction of the child and order the parent or legal guardian to make the child available for an interview by CPS."

1218.    PSM 713-08 section titled "Unable to Locate the Alleged Perpetrator/Alleged Perpetrator Refuses To Cooperate", states: "The alleged perpetrator must be interviewed, if located, in all serious complaints as defined by MCL 722.628(3), also including complaints alleging chronic physical abuse or neglect or involving children under age 6. When unable to locate/interview the alleged perpetrator: The worker must attempt to make contact by phone, inquiries at place of work or by arranging after-hours visits to the home. A letter may be sent advising the individual of the need to interview him/her, but cannot be the only action taken. In serious cases, the non-offending parent or caretaker must be advised that the alleged perpetrator must not be in contact with the child until the worker has an opportunity to interview the alleged perpetrator. In serious cases, if the alleged perpetrator cannot be located and/or interviewed after taking the above actions, assistance from law enforcement and/or a court petition must be filed requesting court assistance in interviewing the alleged perpetrator. See PSM 715-3, Family Court:

Petitions, Hearings and Court Orders, Absent Parent Protocol section, for more information on locating absent parents."

1219. PSM 713-08 section titled "Accommodation in Emergency Situations", states: "For emergency situations, such as a CPS investigation and an accommodation is not readily available, the safety of the child must come first. Follow-up should be conducted as soon as possible with effective communication in the appropriate mode. In situations requiring that notetaking be used as a last resort, verify the information obtained through the provision of interpreters or assistive technology as soon as possible to prevent misunderstandings or erroneous conclusions."

1220. PSM 713-08 section titled "TIME FRAME FOR COMPLETION OF FIELD INVESTIGATION", states: "The standard of promptness (SOP) for completing an investigation is 30 days from the department's receipt of the complaint. This includes completion of the safety assessment; risk assessment; family and child assessments of needs and strengths; DHS-154, CPS Investigation Report; services agreement, as needed; and case disposition in MiSACWIS."

1221. PSM 713-08 section titled "Extenuating Circumstances", states: "In some situations, completing an investigation may require an extension of the 30-day standard of promptness (SOP). To allow for extenuating circumstances, supervisors may approve an extension. The extension request must be submitted for supervisory approval prior to the end of the initial 30-day SOP. The request must document the reasons for the extension. Extensions are not to be approved solely for the purpose of meeting the SOP. Supervisory approval can only occur for the following circumstances: • Arranging travel and coordinating interviews with alleged victims who do not reside in the county or are not immediately available for interviews. • Obtaining medical records (including autopsy

reports), or a second medical opinion to verify an injury or medical condition. •
Obtaining mental health evaluations, reports, and records necessary to reach an accurate
case disposition, but the reports are not yet available. • Coordinating interviews with law
enforcement necessary to reach an accurate case disposition • Coordinating interviews
with other states or counties necessary to complete a thorough investigation. Requests for
extensions which do not fall under these circumstances may be allowed, if reviewed and
approved by the deputy director of field operations or their designee. Documentation of
approval of an extension by the deputy director of field operations or their designee must
be documented in the supervisor approval section in MiSACWIS. Note: Extensions
reviewed and approved by the deputy director of field operations must also have the same
safety assessment and documentation requirements applicable to supervisors as well as
the following: • A face-to face contact with each alleged victim and a completed safety
assessment, prior to extension approval. • A written request, including the basis for the
request, which following the deputy director's approval must be documented in the case
file."

1222.     PSM 713-08 section titled "Face-to-Face", states: "When a complaint has received
an approval for an extension, or has gone overdue, face-to-face contact must be made
with the child victim(s) every 30 days from the date of the complaint. Workers should
additionally be aware of safety concerns that may impact children not identified as
victims, and make contact when needed. All face-to-face contacts must be documented.
Face-to-face requirements do not apply once a complaint has been disposed by the
investigator and transferred to a CPS supervisor for review and approval. When the
complaints are received for review and approval, supervisors may identify additional
casework activities, including face-to-face contacts. Unless identified by the supervisor

during this review period, additional face-to-face contacts would not be required."

1223.     PSM 713-08 section titled "COMPLETION OF INVESTIGATION

OVERVIEW", states: "The investigation must include the systematic and objective

examination of facts and evidence which support the determination that a preponderance

of evidence of child abuse/neglect exists or does not exist; see Other Factors in this item,

to consider when making a determination of whether a preponderance of evidence of

abuse/neglect exists and how to best provide any needed services to the family."

1224.     PSM 713-08 section titled "No Preponderance of Evidence of Abuse/Neglect",

states: "If abuse/neglect is not confirmed, the case must be classified as a Category V or

IV. Document the facts and evidence which support the determination of specific

individuals as the perpetrator(s) and victim(s). No evidence decisions (Category V) are

appropriate for investigations in which all allegations were based on false or erroneous

information, when unable to locate the family, or when the court is asked to order

cooperation but declines."

1225.     PSM 713-09 section titled "Preponderance of Evidence of Abuse/Neglect", states:

"If abuse/neglect is confirmed, the case must be classified as a Category III, II, or I.

Document the facts and evidence which support the determination of specific individuals

as the perpetrator(s) and victim(s). See PSM 713-08, Special Investigative Situations,

Coordination with Friend of the Court, for requirements on determining if there is an

open Friend of the Court case when abuse and/or neglect is confirmed. Note: If the

perpetrator is unknown and the case is kept open for services, attempts to identify the

perpetrator must continue."

1226.     PSM 713-09 section titled "Subsequent Investigations on Open CPS Cases",

states: "When a new complaint is assigned for investigation and there is already an open

case, the assigned worker must complete a new DHS-154. The next DHS-152, Updated

Services Plan, (USP) on the open case should summarize the new investigation. The

social work contacts section of the USP should also include the social work contacts of

the new investigation. If child abuse and/or neglect is confirmed on the new complaint,

the worker must open or maintain the case with the higher risk level."

1227.    PSM 713-09 section titled "Other Factors", states: "Consider the following factors

when making a determination of whether sufficient evidence exists to confirm

abuse/neglect".

1228.    PSM 713-09 section titled "Historical Information", states: "Within 30 days of

receipt of the complaint, the worker must review historical information on all complaints,

investigations and services for the family, including any informal history of CA/N,

voluntary out-of-home placements, etc. See PSM 713-10, CPS Investigation Report, CPS

History Tab section, for detailed instructions on what information should be compiled and

reviewed and how it should be documented. In cases with a history of domestic violence,

consider the non-offending caretaker's ability to protect the child from violence over a

sustained period of time. See PSM 713-08, Special Investigative Situations, Domestic

Violence section, for more information on investigating complaints that include

allegations and/or evidence of domestic violence."

1229.    PSM 713-09 section titled "Denial/Alternative Explanation of Event", states: "A

person's denial of abuse/neglect must be weighed along with all evidence and/or

information gathered, including: • Child's credibility. • Child's motive. • Evidence the

child was coached.• Child provides differing and conflicting explanations of how the

incident occurred. • Evidence gathered demonstrates that the abuse/neglect did not occur.•

Child's description of the abuse/neglect is not consistent with reliable witness accounts.

See PSM 713-08, Special Investigative Situations, Guidelines for Investigation When a Child Denies Abuse/Neglect section."

1230.   PSM 713-09 section titled "Service Provision When a child can remain safely in his/her own home with services, caretakers should be included in the planning of services that build on parental strengths. Services must be identified and implemented that will adequately safeguard the child from imminent risk of harm. Protective services may be continued without initiating legal action if a child can remain in his/her own home safely, and the caretakers are willing and able to voluntarily participate in services to improve conditions for the child. The decision to continue protective services must include an assessment of the parents": • Strengths. • Abilities and limitations related to protecting the child from Harm. • Ability to provide the child with appropriate care. • Desire and capacity to use help in bringing about positive change in their behavior or attitudes. • Their interest and desire to maintain their own family. Relative care and/or other family resources may provide support to the parents as they improve their skills and work with protective services. See PSM 714-1, Post-Investigative Services, for more information on providing services and when service provision is required."

1231.   PSM 713-10 section titled "OVERVIEW", states: "The DHS-154, Children's Protective Services Investigation Report (see format at the end of this section), must be used for all CPS investigation narratives. The Child Protection Law (MCL 722.628b) requires the department to refer (by sending a copy of the DHS-154) cases to the prosecuting attorney in the county where the child is located if there is a preponderance of evidence of child abuse/neglect and the case involves the death, sexual abuse, sexual exploitation, or serious physical injury of a child, or a child has been exposed to, or had contact with, methamphetamine production. See PSM 717-4, Release of CPS

Information, for information on release of the DHS-154 and other CPS case record information. See PSM 713-09, Completion of Field Investigation, for more information on what needs to be completed prior to the disposition of the investigation."

1232. PSM 713-10 section titled "CHILDREN'S PROTECTIVE SERVICES INVESTIGATION REPORT", states: "There are sections of MiSACWIS which must be completed in order to generate the DHS-154, Children's Protective Services Investigation Report."

1233. PSM 713-10 section titled "CPS History and Trends", states: "In the CPS History and Trends section, review previous CPS or foster care (FC) history including tribal CPS/FC, CPS/FC history in other states, etc. via the hyperlinks or physical case file to their Person Profile, including but not limited to: Previous complaint dates, allegations, and dispositions. Physical case files, if necessary. Previous court involvement with the family, including foster care. Previous services with which the family has been involved, outcomes of the services, and the relevance of these previous services to the current situation of the family. Circumstances surrounding any informal/voluntary out-of-home placements (for example, situations where a parent is not providing care for one or more of his/her minor children). Note: The above information does not print on the DHS-154. In the "Document Trends or Patterns in the Family's Child Welfare History only" section workers should summarize the previous history of the family. Include patterns of child abuse and/or neglect (for example, there is an indication that the father has a substance abuse problem in all three previous investigations, the child has had similar unexplained injuries in the two previous investigations, all previous history is regarding physical abuse of the children, etc.) and the impact of the family's history, including any voluntary or involuntary out-of-home placements, on the current allegations/investigation. This

information will print on the DHS-154. If there is no previous history, indicate that in this section."

1234. PSM 713-10 section titled "Safety Assessment", states: "Any safety assessment question answered yes and the accompanying explanation, the safety response-protecting interventions entered, and the safety decision will pre-fill onto the DHS-154. See PSM 713-01, CPS Investigation-General Instructions and Checklist, Safety Assessment Overview section for more information on completing the safety assessment."

1235. PSM 713-10 section titled "Risk Assessment FANS/CANS" states: "Any narratives provided for the risk assessment, family assessment of needs and strengths (FANS-CPS) and the child assessment of needs and strengths (CANS-CPS), will be pre-filled onto the DHS-154."

1236. PSM 713-10 section titled "Social Work Contacts" states: "All contacts, either attempted or successful, must be entered into MiSACWIS. This includes the required case consultation between the CPS worker and supervisor as outlined in PSM 713-01. When entering social work contacts on a case, the date and time of the contact must be included. When a social work contact with the client/family includes engaging the client/family in services, document in the social work contact narrative how the family/client was engaged in services. The social work narrative must include statements, evidence and actions taken by the worker that address the safety of the child. MiSACWIS is the official case record. Any notes taken by a caseworker of statements made by the child, parents(s), or other witnesses must be accurately and comprehensively entered into MiSACWIS. Once these notes are entered into MiSACWIS, the hard copies need not be maintained. All social work contacts with accompanying narratives will pre-fill onto the DHS-154."

1237.    PSM 713-10 section titled "Investigative Tasks" states: "The Investigative tasks

section in MiSACWIS that must be completed when applicable, include: Linked Intakes,

Investigation Persons, Petition for Removal, Allegations/Findings, Safety Assessment,

Risk Assessment, Create Household, FANS, CANS, Social Work Contacts , Checklists,

Exception/Extension Request, Forms/Reports, Documents, Family Team Meeting,

Amendment/Expungement and Link Investigation to Case"

1238.    PSM 713-10 section titled "Allegations and Findings" states: "Answer question,

does a preponderance of evidence exist that child abuse/neglect occurred, with a yes or

no. No Preponderance of Evidence- If a preponderance of evidence of abuse/neglect does

not exist, select No Preponderance in MiSACWIS. Preponderance of Evidence- If a

preponderance of evidence of abuse exists, select the victim(s) and perpetrator(s) of each

type of abuse/neglect found to exist. If a preponderance of evidence of threatened harm

of some type of abuse/neglect occurred, that type of abuse/neglect must also be selected.

Also, select whether or not the type of abuse or neglect is an egregious act as outlined in

PSM 715-2. Disposition Summary- In the Disposition Summary box, summarize the

relevant facts/evidence pertaining to the allegations obtained during the investigation that

resulted in the determination of whether a preponderance of evidence existed. Evidence

must include the relevant facts and documents, pertaining to the investigation, obtained

through: Visual assessments (including a description of any injuries/marks found).

Verification of the safety and whereabouts of all children, including children who reside

in another location. Interviews with: Parents. Nonparent adults. Alleged perpetrators.

Victims. Other household members. Relatives. Witnesses. Service providers. Neighbors.

Medical practitioners. Other significant persons. Observation of the scene (including any

relevant descriptions of the scene). Assessment of the family's history and how it impacts

the current allegations/investigation. Any other documentation (for example, police reports, medical reports, school reports).It should be clear from the social work contacts entered and the information entered in the Disposition who did what, when, where and how. Include documentation, as appropriate, of prevalent and underlying family issues (for example, substance abuse, lack of parenting skills, child behavioral issues, violence in the home) and any other issues found during the investigation. Conclusion- The Disposition must be a conclusion that includes the following: Investigation disposition (preponderance/no preponderance). Name of the perpetrator(s) (if applicable), the type of abuse/neglect for which the perpetrator is responsible, and whether the perpetrator will be listed on central registry. Name of the victim(s) and the type of abuse and/or neglect of which the child is a victim, if applicable (for example, Child A is a victim of physical abuse and Child B is a victim of physical neglect). Note: If a preponderance of evidence of threatened harm of abuse/neglect occurred, the report must indicate so (for example, Child C was a victim of threatened harm of physical abuse). Category disposition (I, II, III, IV, or V) and level of risk, except for those cases specifically excluded from risk assessments. Any applicable discretionary or mandatory overrides; see PSM 713-11, Risk Assessment, Overrides section. Any services which the family has been or will be referred/provided. If a referral to services is required but not made, the reason(s) why not must be documented on the DHS-154. See PSM 714-1, Post-Investigative Services, for more information on providing services and when service provision is required".

1239. PSM 713-10 section titled "SUBMISSION OF DHS-154 FOR SUPERVISORY APPROVAL" states: "The completed report must be submitted to the supervisor via MiSACWIS. The supervisor must review and approve (after all needed corrections are made) the report in MiSACWIS. The system will document the date report: Was

completed by the worker. Was returned to the worker for corrections to be made (if applicable). Was returned to supervisor with corrections made (if applicable).Was approved by the supervisor. Supervisory Approval- The CPS supervisor must review and approve, within 14 calendar days of receipt, by signature, all DHS-154, Investigation Reports, CPS Updated Services Plan, and Case Closure. Approval indicates agreement with the: Thoroughness, completeness, and accuracy of the investigation. Disposition of the investigation.- Assessment of risk and safety of the children. Assessment of family/child needs/strengths. Services provided to the family. The CPS supervisor must also review the Supervision checklist to determine whether child safety needs and investigation requirements have been met. If any items are not met, the supervisor should request that the worker complete them. Local Office Director Approval of the CPS Investigation Checklist and Other Case Actions If the supervisor wants to approve the investigation, the supervisor must request that the local office director or designee approve the investigation, when any of the following are true:1. The supervisor did not approve all the items on the Supervision Checklist. 2. Face-to-face contact was not made with all alleged child victims. 3. A petition was not filed as required under MCL 722.628d(1)(e), 722.637 and 722.638. (See PSM 715-3, Family Court: Petitions, Hearings and Court Orders, Mandatory Petitions-Court Jurisdiction, for more information on when a petition is required under MCL 722.628d(1)(e), 722.637 and 722.638d(1)(e)). 4. A petition was not filed when court intervention was needed to ensure child safety. Note: All Abbreviated investigations cannot be closed until after the local office director has reviewed the investigation. See PSM 713-01, CPS Investigation - General Instructions and Checklist, Abbreviated Investigation section. Note: Items 2 through 4 above should only occur in rare circumstances, such as when the family flees the state or

the child ran away and cannot be located.The supervisor must document why the investigation is approved even though the above items were not approved/completed in MiSACWIS. The local office director or designee must review the investigation within 48 hours of receipt of the request for review from the CPS supervisor and document their decision in MiSACWIS."

1240.     PSM 713-11 section titled "RISK ASSESSMENT" states: "A risk assessment is required on all assigned investigations with the following exceptions. The case is determined to be a Category V-unable to locate, no evidence of child abuse and/or neglect (CA/N) is found, or the court declines to issue an order requiring family cooperation during the investigation. Supervisory approval is obtained to complete an abbreviated investigation on the complaint. There is a preponderance of evidence of CA/N and the perpetrator is one of the following: A nonparent adult who resides outside the child's home. (If there is also a perpetrator who resides in the child's home, a risk assessment must be done (for example, mom is the primary caretaker and found to be a perpetrator of failure to protect and mom's boyfriend, who is a nonparent adult who resides outside the child's home, is a perpetrator of sexual abuse). A licensed foster parent. (If a licensed foster parent is also a perpetrator of CA/N on their biological/adoptive children, a risk assessment must be completed and services provided, as required/necessary.) If services will be provided in any of the situations above, a risk assessment must be completed. Note: When two separate households are being investigated on the same complaint (for example, complaint is regarding abuse of a child when visiting the non-custodial parent), complete a risk assessment on the household where the alleged or confirmed perpetrator resides or for which services will be provided. If there is an alleged or confirmed perpetrator in both households or services will be provided to both households, a separate

risk assessment must be completed on each household. Two households must not be combined on one risk assessment. Note: If CPS is requesting removal of the child from the home and placement with the non-custodial parent is being evaluated (either through a voluntary placement made by the custodial parent or a court order), CPS must complete a risk assessment on the non-custodial parent's household within 24 hours or the next business day. (See PSM 715-2, Removal and Placement of Children, Placement With Non-Custodial Parents and Relatives section for more information on placement with non-custodial parents and PSM 713-01.) In each case in which a preponderance of evidence of child abuse and/or neglect (CA/N) has been found and a risk assessment is completed, the risk level determines in which category (Category II or III) the case must be classified. If a petition is filed (mandatory or discretionary), the case must be classified as a Category I. The risk assessment determines the level of risk of future harm to the children in the family. Interviews with the family should be structured to allow the worker to discuss all risk and safety issues with the caretakers and complete the risk assessment following the conclusion of contacts with the family. Risk levels are intensive, high, moderate, or low, based on the scoring of the scale. (See PSM 713-01, CPS Investigation-General Instructions and Checklist, Safety Assessment Overview section for more information on safety assessments). When the investigation is done (all fact-gathering activities, interviews, etc., have been done), complete the Risk Assessment in MiSACWIS for all investigations except those noted above. The risk assessment calculates risk based on the answers to the abuse and the neglect scales, regardless of whether the initial complaint was for abuse or neglect. The risk level is based on the higher score of either the abuse or neglect scale. After scoring the scales, determine whether conditions exist for a mandatory or discretionary override. See Overrides section

below for information on mandatory overrides and when discretionary overrides may be used. The final risk level is determined after any override reasons have been identified. Cases with: A preponderance of evidence of CA/N and intensive or high-risk levels (Category I or II), or with a mandatory or discretionary override, and/or petition to the court, must be opened for ongoing services (CPS or foster care) and perpetrators must be placed on central registry. A preponderance of evidence of CA/N and low or moderate risk levels (Category III) must be referred to community-based services commensurate with the risk level and are not to be placed on central registry. Exception: If there is a preponderance of evidence of child abuse and/or neglect and the perpetrator is a nonparent adult who lives outside the child's home or a licensed foster parent, the perpetrator must be placed on central registry. Category II cases may be opened for monitoring and to receive feedback from community-based service providers. See PSM-714-1, Post-Investigative Services for information on Category III cases. Initial classification of Category III may be elevated to Category II either through a risk override at the initial assessment or a risk reassessment. If the case is reclassified a Category II, the perpetrator's name must be placed on central registry. Initial classification of Category III or Category II must be elevated to Category I if a petition is filed. If the case was initially classified as a Category III, the perpetrator's name must be placed on central registry. In Category IV cases, the CPS worker must assist the family in voluntarily participating in community-based services commensurate with the risk level."

1241.    PSM 713-11 section titled "OVERRIDES" states: "Overrides to risk levels have been established to ensure that the level of risk for a case accurately reflects the risk level for the children. The two types of overrides to the risk level are mandatory and discretionary overrides."

1242.   PSM 713-11 section titled "Mandatory Overrides" states: "Each time a risk

assessment is completed, the mandatory override reasons must be reviewed to determine

if any apply to the case. The mandatory overrides listed below require that the risk level

for the family be scored as intensive, regardless of the initial risk level. These cases must

be served according to the contact standards required for intensive risk cases. Even if the

initial risk level scores at intensive, the mandatory override reason must be identified on

MiSACWIS. The following are mandatory overrides Sexual abuse cases in which the

perpetrator is likely to have access to the child victim. Cases with non-accidental physical

injury to an infant. Exception: A drug-or alcohol-exposed infant, without indication from

the medical practitioner that there was an injury to the child due to the drug or alcohol

exposure, does not require a mandatory override. Severe, non-accidental, physical injury

requiring medical treatment or hospitalization and that seriously impairs the child's health

or physical well-being. Death (previous or current) of a child/sibling as a result of abuse

or neglect."

1243.   PSM 713-11 section titled "Discretionary Overrides" states: "Each time a risk

assessment is completed, evaluate the need for discretionary override. A discretionary

override is applied by the worker to increase the risk level in any case in which the

worker determines that the risk level set by the risk assessment is too low. This may occur

when the worker is aware of conditions affecting risk that are not captured within the

items on the risk assessment and/or there are unique circumstances in the family that

increases risk. At initial assessment of risk, discretionary overrides must have supervisory

approval and may only be used to increase the risk level by one risk level.

1244.   PSM 713-11 section titled "Overrides at Risk Reassessment" states: "See PSM

714-4, CPS Updated Services Plan and Case Closure, for information on overrides at risk

reassessment."

1245. PSM 713-11 section titled "RISK ASSESSMENT DEFINITIONS" states: "Select one score for each question and provide an explanation for the selection if the question is scored as a risk factor."

1246. PSM 713-11 section titled "Neglect Scale" lists a neglect scale with questions from N1 to N11.

1247. "Neglect Scale" question N1. states: "Current complaint and/or finding includes neglect a. No. b. Yes, the current complaint includes allegations of neglect, abuse and neglect, or a preponderance of evidence of neglect is found to exist, even if not alleged in the current complaint."

1248. "Neglect Scale" question N2 states: "Number of prior assigned neglect complaints and/or findings. Count all assigned complaints for neglect, confirmed or denied; and complaints in which a preponderance of evidence of neglect was found to exist that was not alleged in the complaint. a. One or less. b. Two or more."

1249. "Neglect Scale" question N3. states: "Number of children in the household. The number of individuals under 18 years of age residing in the household at the time of the current complaint. If a child was removed as a result of the investigation or is on runaway status, count the child as residing in the household. If the child was removed from the household as the result of a previous investigation and the goal is reunification, count the child as residing in the household. If the child was removed as the result of a previous investigation and parental rights to that child were terminated or the goal is termination of parental rights, do not count the child as residing in the household. a. Three or less. b. Four or more."

1250. "Neglect Scale" question N4. states: "Primary caretaker's social support Relatives,

friends, or neighbors are able to help when a caretaker(s) or other adult is not functioning well and/or is in need of assistance to provide for the child's safety and well-being. Relatives, friends, or neighbors have come forward to help when the family and child needed support and/or the child needed placement. Relatives, friends, or neighbors have followed through on commitments in the past and provide ongoing support and assistance to the caretaker a. The primary caretaker accesses or can access relatives, friends, or neighbors for positive social support. Limited or negative social support (check all that apply:__ No or limited supportive relationships with relatives, friends, or neighbors. Caretaker does not, cannot, or will not access others for assistance in care for child when needed__ Relatives, friends, or neighbors have a negative impact on caretaker. People that the caretaker uses for social support have a negative influence on the caretaker's ability to provide for, protect, or supervise the child. Examples include, but are not limited to: Encourages caretaker to physically discipline children when abuse has occurred or abuse is a concern. Encourages caretaker not to seek services. Discourages the department's attempts to assist the parent in a positive manner. Encourages inappropriate parenting practices."

1251. "Neglect Scale" question N5. states: " Primary caretaker is unable/unwilling to control impulses. a. No, the primary caretaker is able and willing to control impulses.b. Yes, the primary caretaker is unable and/or unwilling to control impulses. Examples include, but are not limited to: Regularly acting without weighing alternatives or considering consequences. Spur-of-the-moment actions, and/or heedless, self-centered actions that regularly result in threatened or actual harm to the child. A regular inability to delay gratification of personal needs to assume child care responsibility. Lashing out verbally (yells/screams, berates, uses hostile language, etc.) and/or physically (hits,

shoves,threatens violence, etc.) in response to (undesired or negative) actions of the child and/or others."

1252.     "Neglect Scale" question N6. states: Primary caretaker provides inadequate physical care and/or inadequate supervision of child. a. No, the primary caretaker provides adequate physical care and supervision of child b. One or both of the following is true (check all that apply):__ Provides inadequate physical care: The provision of physical care (the appropriate feeding, clothing, shelter, hygiene, and medical care) is inconsistent with and/or not appropriate for the child's needs. There has been harm or threatened harm to the child's health and/or well-being due to the inadequate physical care. Examples include, but are not limited to: Failure to obtain medical care for severe or chronic illness. Repeated failure to provide child with clothing appropriate for the weather. Poisonous substances or dangerous objects lying within reach of child. Child's clothing or hygiene causes negative social consequences for the child.__ Provides inadequate supervision: Supervision is inconsistent with and/or not appropriate for the child's safety, resulting in threatened or actual harm to the child."

1253.     "Neglect Scale" question N7. states: " Primary caretaker currently has a mental health problem. a. No. b. Yes, in the past year, the primary caretaker has been assessed as needing, been referred for, or participated in mental health treatment. This includes, but is not limited to: DSM-IV-TR diagnosis by a mental health practitioner. Repeated referrals for mental health/psychological evaluations. Recommended or actual hospitalization for mental health problems. Current or recommended use of psychotropic medication prescribed by mental health clinician (for example, physician, psychiatrist, etc.)".

1254.     "Neglect Scale" question N8. states: " Primary caretaker involved in harmful relationships.The primary caretaker is, or has been, involved in relationships that are

harmful to domestic functioning or child care within the past year. Include only domestic violence between caretakers or between a caretaker and another adult. Do not include parent-child or child-child violence. a. No. b. Harmful relationship(s) or one domestic violence incident – Relationships with adults inside or outside the home that are harmful to domestic functioning. Examples include, but are not limited to: Criminal activities. Domestic discord. One incident of physical violence and/or intimidation/threats/harassment. c. Multiple domestic violence incidents – Primary caretaker is currently involved in a relationship (either as a victim or as a perpetrator) in which two or more incidents of physical violence or fighting and/or intimidation/threats/harassment have occurred."

1255.     "Neglect Scale" question N9. states: "Primary caretaker currently has a substance abuse problem. a. No .b. Yes, within the past year, the primary caretaker has, or had, a problem with alcohol and/or other drugs that interferes, or interfered, with the caretaker's or the household's functioning. Examples include, but are not limited to: Substance use has negatively affected caretaker's employment, and/or marital or family relationships.Substance use has negatively affected caretaker's ability to provide protection, supervision, care, and nurturing of the child. Substance use has led to criminal involvement."

1256.     "Neglect Scale" question N10. states: "Family is homeless or children are unsafe due to housing conditions. a. No. b. Yes, one or more of the following is true (check all that apply):__ The family is homeless or about to be evicted (current eviction notice).__ Current housing is physically unsafe; not meeting the health and/or safety needs of the child. Examples include, but are not limited to: Structural defects or is unsound. Exposed wiring, inoperable heat or plumbing. Human/animal waste on floors that is due to failure

to consistently clean or maintain the environment. Rotten or rotting food due to failure to consistently clean or maintain the environment. Disconnection of major utilities (gas, electric or water).

1257.    "Neglect Scale" question N11. states: "Primary caretaker able to put child's needs ahead of own. a. Yes, the primary caretaker demonstrates ability to put child's needs ahead of his/her own. b. No, the primary caretaker makes choices or behaves out of self-interest rather than the best interest of the child and this has a negative effect on child safety and well-being. Examples include, but are not limited to: Regularly does not make or keep appointments for the child that will interfere with caretaker's social activities. Ignores child when other adults are present. Leaves the child with others for extended periods of time to pursue social activities."

1258.    PSM 713-11 section titled "Abuse Scale" lists a neglect scale with questions from A1 to A11..

1259.    "Abuse Scale" question A1. states: "Current complaint and/or finding includes mental injury. a. No. b. Yes, the current complaint includes allegations of mental injury or a preponderance of evidence of mental injury is found to exist, even if not alleged in the current complaint."

1260.    "Abuse Scale" question A2. states: "Number of prior assigned abuse complaints and/or findings. Count all assigned complaints for abuse of any type (sexual, physical, child maltreatment, or mental injury), confirmed or denied; and complaints in which a preponderance of evidence of abuse of any type was found to exist that was not alleged in the complaint. a. None. b. One or two. c. Three or more."

1261.    "Abuse Scale" question A3. states: "Age of youngest child. Indicate whether one or more children residing in the household at the time of the current complaint is age six

years or younger. If a child was removed as a result of the investigation or is on runaway status, count the child as residing in the household. If the child was removed from the household as the result of a previous investigation and the goal is reunification, count the child as residing in the household. If the child was removed as the result of a previous investigation and parental rights to that child were terminated or the goal is termination of parental rights, do not count the child as residing in the household."

1262.      "Abuse Scale" question A4. states: "Number of children in the household. The number of individuals under 18 years of age residing in the household at the time of the current complaint. If a child is removed as a result of the investigation or is on runaway status, count the child as residing in the household. If the child was removed from the home as the result of a previous investigation and the goal is reunification, count the child as residing in the household. If the child was removed as the result of a previous investigation and parental rights to that child were terminated or the goal is termination of parental rights, do not count the child as residing in the household."

1263.      "Abuse Scale" question A5. states: "Either caretaker was abused and/or neglected as a child. a. No, neither caretaker was abused or neglected as a child. b. Yes, past records (CPS, foster care, etc.), self-reporting by the caretaker, credible statements by others, or other credible information indicates that either caretaker was abused and/or neglected as a child."

1264.      "Abuse Scale" question A6. states: "Secondary caretaker has low self-esteem .Note: The risk assessment in MiSACWIS only presents this question when there is a secondary caretaker listed in the household. a. No, secondary caretaker does not demonstrate low self-esteem or no secondary caretaker present in the household. b. Yes, secondary caretaker's behavior and/or expressions indicate feelings of

inferiority/inadequacy and/or low self-esteem. Examples may include, but are not limited to: Self-conscious behavior, self-doubting, or self-abasing. Behavior/expressions demonstrating that caretaker feels that he/she is inadequate, inferior, unlovable, or unworthy. Describes self as not being good enough for others, a loser, misfit, or failure."

1265. "Abuse Scale" question A7. states: "Either caretaker is domineering and/or employs excessive and/or inappropriate discipline. Consider the circumstances of the current complaint and past practices by either caretaker. a. No. b. Yes (check all that apply):__ Domineering: Either caretaker is domineering, indicated by controlling, abusive, overly restrictive, or unfair behavior or over-reactive rules. __ Inappropriate discipline: Disciplinary practices caused harm or threatened harm to child because they were excessively harsh physically, emotionally, and/or were inappropriate for child's age or development. Examples include, but are not limited to: Persistent berating. Belittling and/or demeaning the child. Consistent deprivation of affection or emotional support to the child".

1266. "Abuse Scale" question A8. states: "Either caretaker has current or a history of domestic violence. Include only domestic violence between caretakers or between caretaker and another adult. Do not include parent-child or child-child violence. a. No, neither caretaker has current or past domestic violence. b. Yes, either caretaker is currently involved or has ever had involvement in relationships characterized by domestic violence (either as a victim or as a perpetrator), evidenced by two or more incidents of physical violence or fighting and/or intimidation/threats/harassment."

1267. "Abuse Scale" question A9. states: "A child in the household has one or more of the following characteristics. a. No child in the household has any of the below listed characteristics.b. Yes (check all that apply to any child in the household). __ Diagnosed

developmental disability: Intellectual Developmental Disorder. Attention deficit disorder or ADHD. Learning disability or any other significant developmental problem. The child may be in a special education class(es).__ History of Delinquency: Any child in the household has been referred to juvenile court for delinquent or status offenses or is an adjudicated delinquent. Include status offenses not brought to court attention, such as run-away children, habitual truants from school, and drug or alcohol problems.__ Mental health issue: Any child with any diagnosed mental health problem not related to a physical or developmental disability.__ Behavioral issue: Behavioral problems not related to a physical or developmental disability. Examples include, but are not limited to: Problems at school as reported by school or caretakers. Attendance in a special classroom for behavioral needs."

1268.    "Abuse Scale" question A10. states: "All caretakers are motivated to improve parenting skills. a. All caretaker(s) are motivated or parenting skills are appropriate and no improvement needed. b. Yes, caretakers are willing to participate in parenting skills program or other services to improve parenting or initiate appropriate services for parenting without referral by the department. c. No, one or both caretakers need to improve parenting skills but either: Refuse services. Agree to participate but indicate that parenting style will not change. Agree to participate but history shows a pattern of uncompleted services when working with CPS or foster care."

1269.    "Abuse Scale" question A11. states: "Primary caretaker views incident less seriously than the department. a. No, the primary caretaker views the allegations/findings of abuse or neglect as serious or more serious than the department and/or accepts responsibility for investigated behaviors. b. Yes, there is evidence that the primary caretaker views the current allegations/findings less seriously than the department.

Examples include, but are not limited to: Justifying abuse and/or neglect of child. Minimizing harm or threatened harm to child. Blaming the child. Displacing responsibility for the incident. Downplaying the severity of the incident."

1270.     PSM 713-12 section titled "OVERVIEW" states: "In most cases where a preponderance of evidence of child abuse/neglect (CA/N) is found to exist, a family assessment of needs and strengths (FANS-CPS) and a child assessment of needs and strengths (CANS-CPS) need to be completed. These assessments are completed with family input and are used to identify areas which the family needs to focus on to reduce risk of future CA/N. These assessments are used to: Develop a service agreement with the family that prioritizes the needs that contributed most to the maltreatment as identified by the FANS-CPS and CANS-CPS. Identify services needed for cases that are opened for service provision or closed and referred to other agencies for service provision. Identify gaps in resources for client services. Identify strengths that may aid in building a safe environment for families. See PSM 714-1,Post-Investigative Services, for information on service provision and service agreements.When the investigation is complete (all fact-gathering activities, interviews, risk assessment, etc. have been done) and there is a preponderance of evidence of CA/N, complete the FANS-CPS and CANS-CPS."

1271.     PSM 713-12 section titled "FAMILY ASSESSMENT OF NEEDS AND STRENGTHS (FANS-CPS)", states: "If a preponderance of evidence of CA/N is found to exist, the family assessment of needs and strengths (FANS-CPS) must be completed, with the following exceptions: The perpetrator is a nonparent adult who resides outside the child's home and there is no other perpetrator. The perpetrator is a licensed foster parent. (If the licensed foster parent is also a perpetrator of CA/N of their biological/adoptive children, a FANS-CPS must be completed.) See PSM 716-9 New Complaint When Child

Is In Foster Care.If services will be provided in either of the situations listed above, a FANS-CPS must be completed. When two separate households are investigated on the same complaint, a FANS-CPS must be completed for all households in which a perpetrator resides or for which services will be provided; for example, when the noncustodial parent is found to be a perpetrator of abuse and the custodial parent is not found to be a perpetrator, a FANS-CPS is needed only on the non-custodial parent's household, unless services will also be provided to the custodial parent. A separate FANS-CPS must be completed if needed for more than one household. Two households must not be combined on one FANS-CPS; see PSM 713-01 CPS Investigation-General Instructions and Checklist, Case Member Information section, for more information on establishing households in SWSS CPS. Note: If CPS is requesting removal of the child from the home and placement with the non-custodial parent is being evaluated (either through a voluntary placement made by the custodial parent or a court order), CPS must complete a FANS-CPS on the non-custodial parent's household within 24 hours or the next business day. See PSM 715-2 Removal and Placement of Children, Placement With Non-Custodial Parents and Relatives section, for more information on placement with non-custodial parents and PSM 713-01 CPS Investigation-General Instructions and Checklist, Case Member Information section, for more information on establishing households in SWSS CPS. To view the Family Assessment of Needs and Strengths (DHS 259) form, a summary of the FANS-CPS, go to RFF 259."

1272.    PSM 713-12 section titled "FANS-CPS Definition" states: "Select one score for each caretaker for each question. Provide an explanation for the selection for each caretaker if the question is scored as a strength or a need (score other than 0). Primary and secondary caretakers may score differently on each item. The explanation should

include specific, concise examples to support the scoring of the item. The answers to the FANS-CPS questions and explanations should include an assessment of family dynamics and description of issues which place a child at risk, including behaviors of significant other persons who live with, or are associated with the family. In addition, the assessment should outline the family strengths that will help to eliminate future risk to the family."

1273.    PSM 713-11 section related to a "Strength and Needs Scale" listing questions from S1 to S13."

1274.    Strength and Needs Scale" question S1 states: "EMOTIONAL STABILITY", states: "A. Exceptional Coping Skills – Caretaker displays the ability to deal with adversity, crises and long term problems in a positive manner. Has a positive, hopeful attitude. B. Appropriate responses – Caretaker displays appropriate emotional responses. No apparent dysfunction. C. Some problem – Caretaker displays depression, low self-esteem, apathy and/or is currently receiving outpatient therapy. Caretaker has difficulty dealing with situational stress, reacting inappropriately to crisis and problems. D. Chronic or significant problems – Caretaker displays chronic depression, apathy and/or significant loss of self-esteem. Caretaker is hospitalized for emotional problems and/or is dependent upon medication for behavior control."

1275.    Strength and Needs Scale" question S2 states: "PARENTING SKILLS", states: "A. Strong skills – Caretaker displays knowledge and understanding of parenting skills and is utilizing these skills with the child on a daily basis. Parent shows an ability to identify positive traits in their child (recognize abilities, intelligence, social skills, etc.), encourages cooperation and a positive identification within the family. B. Adequate skills – Caretaker displays adequate parenting patterns which are age appropriate for the child in the areas of expectations, discipline, communication, protection, and nurturing.

Caretaker has the basic knowledge and skills to parent. C. Improvement needed –
Improvement of basic parenting skills needed by caretaker. Caretaker has some
unrealistic expectations, gaps in parenting skills, demonstrates poor knowledge of age
appropriate disciplinary methods, and/or lacks knowledge of child development which
interferes with effective parenting. D. Destructive/abusive parenting – Caretaker displays
destructive/abusive parenting patterns."

1276.    Strength and Needs Scale" question S3 states: "SUBSTANCE ABUSE", states:
"A. No evidence of problems – No evidence of a substance abuse problem with caretaker.
B. Caretaker with some problem – Caretaker displays some substance abuse problem
resulting in disruptive behavior, or causing some discord in family, or is currently
receiving treatment or attending support program. C. Caretaker with significant problem
– Caretaker has significant substance abuse problems resulting in such things as loss of
job, problems with the law, family dysfunction. D. Problems resulting in chronic
dysfunction – Caretaker has chronic substance abuse problems resulting in a chaotic and
dysfunctional household/lifestyle."

1277.    Strength and Needs Scale" question S4 states: "DOMESTIC RELATIONS",
states: "A. Supportive relationship - Supportive relationship exists between caretakers
and/or adult household members. Caretakers share decision-making and responsibilities.
B. Single caretaker not involved in domestic relationship - Single caretaker. C. Domestic
discord/lack of cooperation - Lack of cooperation between partners (or other adult
household members), open disagreement on how to handle child problems/discipline.
Frequent and/or multiple live-in partners. D. Significant domestic discord/domestic
violence - Repeated history of leaving and returning to abusive spouse/partner.
Involvement of law enforcement and/or domestic violence problems. Personal protection

orders, criminal complaints."

1278.    Strength and Needs Scale" question S5 states: "SOCIAL SUPPORT SYSTEM",

states: "A.Strong support system - Caretaker has a strong, constructive support system.

Active extended family (may be blood relatives or close friends) who provide material

resources, childcare, supervision, role modeling for the parent and child, and/or parenting

and emotional support.B. Adequate support system - Caretaker uses extended family,

friends, community resources to provide a support system for guidance, access to child

care, and available transportation, etc. C. Limited support system - Caretaker has limited

support system, is isolated, or is reluctant to use available support. D. No support or

destructive relationships - Caretaker has no support system and/or caretaker has

destructive relationships with extended family and community resources. Note: An

explanation must be provided for this question. Identify relatives or unrelated caregivers

who have an established bond/support system with the family. The explanation should

reflect the type of support provided, frequency and circumstances under which this

support was needed and used and if relative/unrelated caregivers are willing to continue

to give support to this family. Identify if there are other relative/unrelated caregivers

available for assistance. If no extended family support exists for this family, document

why not.See PSM 715-2 Removal and Placement of Children, if CPS is seeking to place

the child outside the care of the primary caretaker and place with the non-custodial parent

or relative (either through a voluntary placement made by the custodial parent or a court

order)."

1279.    Strength and Needs Scale" question S6 states:

"COMMUNICATION/INTERPERSONAL SKILLS", states: "A. Appropriate skills –

Caretaker appears to be able to clearly communicate needs of self and child and to

maintain both social and familial relationships. B. Limited or ineffective skills – Caretaker appears to have limited or ineffective interpersonal skills which limit their ability to make friends, keep a job, communicate needs of self or child to schools or agencies. C. Hostile/destructive – Caretaker isolates self/child from outside influences or contact, and/or have interpersonal skills that are hostile/destructive."

1280.    Strength and Needs Scale" question S7 states: "LITERACY", states: "Adequate literacy skills – Caretaker has functional literacy skills, is able to read and write adequately to obtain employment, and assist child with school work. B. Marginally literate – Caretaker is marginally literate with functional skills that limit employment possibilities and ability to assist child. C. Illiterate – Caretaker is functionally illiterate and/or totally dependent upon verbal communication."

1281.    Strength and Needs Scale" question S8 states: "INTELLECTUAL CAPACITY", states: "A. Average or above functional intelligence – Caretaker appears to have average or above average functional intelligence. B. Some impairment/difficulty in decision making skills –Caretaker has limited intellectual and/or cognitive functioning which impairs ability to make sound decisions or to integrate new skills being taught, or to think abstractly. C. Significant limitations – Caretaker is limited intellectually and/or cognitively to the point of being marginally able or unable to make decisions and care for self and/or child, or to think abstractly."

1282.    Strength and Needs Scale" question S9 states: "EMPLOYMENT", states: "A. Employed – Caretaker is gainfully employed and plans to continue employment. B. No Need – Caretaker is out of labor force, such as, full time student, disabled person or homemaker. C. Unemployed, but looking – Caretaker needs employment or is underemployed and engaged in realistic job seeking or job preparation activities. D.

Unemployed, but not interested – Caretaker needs employment, has no recent connection with the labor market, is not engaged in any job preparation activities or seeking employment."

1283.    Strength and Needs Scale" question S10 states: "PHYSICAL HEALTH ISSUE", states: "A. No problem – Caretaker does not have health problems that negatively affect family functioning. B. Health problem/physical limitation that negatively affects family – Caretaker has a health problem or physical limitation (including pregnancy) that negatively affects family functioning. C. Significant health problem/physical limitation – Caretaker has a significant/chronic health problem or physical limitation that affects their ability to provide for and/or protect their child."

1284.    Strength and Needs Scale" question S11 states: "RESOURCE AVAILABLITY/MANAGEMENT", states: " A. Strong Money Management Skills – Family has limited means and resources but family's minimum needs are consistently met. B. Sufficient income – Family has sufficient income to meet their basic needs and manages it adequately. C. Income Mismanagement – Family has sufficient income, but does not manage it to provide food, shelter, utilities, clothing, or other basic or medical needs, etc. D. Financial crisis – Family is in serious financial crisis and/or has little or no income to meet basic family needs."

1285.    Strength and Needs Scale" question S12 states: "HOUSING", states: "A. Adequate housing – Family has adequate housing of sufficient size to meet their basic needs. B. Some, but correctable problems – Family has housing, but it does not meet the health/safety needs of the child due to such things as inadequate plumbing, heating, wiring, housekeeping, or size. C. No housing/eviction notice – Family has eviction notice, house has been condemned or is uninhabitable or family has no housing."

1286.    Strength and Needs Scale" question S13 states: "SEXUAL ABUSE", states: "A.
No evidence of problem – Caretaker is not known to be perpetrator of child sexual abuse.
B. Failed to protect – Caretaker has failed to protect a child from sexual abuse indicated
by a preponderance of evidence of failure to protect. Evidence of sexual abuse –
Caretaker is known to be a perpetrator of child sexual abuse by a preponderance of
evidence by CPS or a criminal conviction."

1287.    PSM 713-12 section titled "CHILD ASSESSMENT OF NEEDS AND
STRENGTHS (CANS-CPS)" sates: "If a preponderance of evidence of CA/N is found to
exist, the CANS-CPS must be completed for every child victim and for every child
residing in a household in which a perpetrator of CA/N resides. A CANS-CPS must also
be completed for every child in a household if services will be provided to that
household. (For example, the custodial parent has three children and one of those three
children has a non-custodial parent. The non-custodial parent is found to be a perpetrator
and the custodial parent is not a perpetrator. A CANS-CPS must be completed on the
child that is the victim. A CANS-CPS does not need to be completed for the two other
children in the custodial parent's household, unless services will be provided to that
household.) Note: If a child does not reside in the household (such as, child resides with a
relative and this child's well-being was only verified for the investigation), a CANS-CPS
does not need to be completed on that child. If the perpetrator is a licensed foster parent,
a CANS-CPS does not need to be completed on the foster children (even if they are the
child victims) because this is done by the foster care worker quarterly. If the licensed
foster parent is also a perpetrator of CA/N of their biological/adoptive children, a CANS-
CPS must be completed on each of the biological/adoptive children; see also PSM 716-9-
New Complaint When Child Is In Foster Care. A separate CANS-CPS must be completed

for each child. Children must not be combined on one CANS-CPS."

1288.     PSM 713-12 section titled "CANS-CPS Definitions", states: "When completing

the CANS-CPS, consider the physical, social and emotional characteristics of the child.

Describe the effect the neglect or abuse has on the child. Consider both needs and

strengths to describe: How the child relates behaviorally to peers and other adults. C1.

Medical/Physical A. Adequate health – Child has no known health care needs. B.

Physical health need – Child has a medical condition(s) that requires ongoing treatment

and/or interventions regardless of whether a treatment/intervention is in place. Examples

of medical conditions include, but are not limited to: Fragile asthmatic. Eczema.

Allergies. Diabetes. Cerebral palsy. Physical disability. Effects of lead exposure. Prenatal

drug/alcohol exposure. Poor dental care. Significant vision problem such as blindness,

partial blindness. C2. Mental Health and Well-being A. Adequate emotional

behavior/coping skills – Child displays interactions and/or behaviors that do not, or

minimally, interfere with school, family, peer and community functioning. B. Emotional

behavior/coping needs – Child has difficulties dealing with daily stresses or crises or has

problems that interfere with family, school, peer and/or community functioning.

Examples of problems include, but are not limited to: Withdrawal from social interaction.

Changes in sleeping or eating patterns. Increased aggression. Very easily frustrated.

Frequent threats to run away or running away. Fire setting. Suicidal behavior/idealization.

Violence toward people and/or animals. Self-mutilation. Enuresis, encopresis. Diagnosed

with psychiatric disturbance/mental health condition. C3. Education A. Adequate

academic achievement – Child is working at or above grade level or is too young or not

required to attend school. B. Educational needs – Child is working below grade level.

Child has a special education plan or is in need of a special education plan. Child exhibits

behavioral problems at school, including frequent truancy."

1289.　　PSM 713-13 section titled "OVERVIEW", states: "Every individual identified as a

perpetrator in a Category I or Category II CPS case or those cases in which a

preponderance of evdence of child abuse and/or neglect (CA/N) exists and the perpetrator

is a nonparent adult who resides outside the child's home, is a licensed foster parent, or is

an owner, operator, volunteer, or employee of a licensed or registered child care

organization, when the victim is not their own child, must be listed on the Child Abuse

and Neglect Central Registry (CA/NCR or central registry). Central registry includes two

separate listings: the perpetrator registry and the historical registry. The perpetrator

registry includes only the names of those individuals who have been given notification

(identified by a date in the due process (DP) box) that their names were placed on central

registry. The historical registry includes the names of those whom the department cannot

verify received due process (DP)."

1290.　　PSM 713-13 section titled "PERPETRATOR NOTIFICATION (DUE

PROCESS)", states: "Perpetrator notification of placement on Central Registry requires

formal, documented notification to the individual, which includes all of the following:

The individual has been identified as a perpetrator. • The potential consequences of being

listed on central registry, including who has access to central registry information. • The

right to review the file. See SRM 131, Release of CPS Information, Procedures for

Releasing Information, for more information on what information can be released from

the CPS file. • The right to request amendment or expunction of the record; see PSM 717-

2, Amendment or Expunction, Perpetrator (Petitioner) Requests for Amendment or

Expunction section for more information on these requests. These requirements are met

when notice is provided to the perpetrator using the Perpetrator Notification Letter in

MiSACWIS."

1291.      PSM 713-13 section titled "PERPETRATOR NOTIFICATION

REQUIREMENTS AND TIMEFRAMES", states: "Notification to the perpetrator must

be done and documented by using the Perpetrator Notification Letter in MiSACWIS.

This notice shall be sent by registered or certified mail, return receipt requested, and

delivery restricted to the addressee. • If the Perpetrator Notification Letter is delivered in

person, it must be delivered within 5 working days of completing the case in

MiSACWIS. The date of delivery is the "Date of Notice" to be entered on the letter. The

recipient must be asked to sign a copy of the letter. If he/she refuses, the worker

delivering the letter must sign on the appropriate line. A copy of the signed letter (by

perpetrator and/or worker) must be placed in the case file. • If the Perpetrator Notification

Letter is sent by mail, it must be sent by registered or certified mail, return receipt

requested, and delivery restricted to the addressee within 5 working days of completing

the case in MiSACWIS. Restricted certified mail (to be delivered to addressee only) may

be used at local office discretion. The date of mailing is the "Date of Notice" to be

entered on the letter. If the notification is returned "refused" or PERPETRATOR

NOTIFICATION REQUIREMENTS AND TIMEFRAMES" Notification to the

perpetrator must be done and documented by using the Perpetrator Notification Letter in

MiSACWIS. This notice shall be sent by registered or certified mail, return receipt

requested, and delivery restricted to the addressee. • If the Perpetrator Notification Letter

is delivered in person, it must be delivered within 5 working days of completing the case

in MiSACWIS. The date of delivery is the "Date of Notice" to be entered on the letter.

The recipient must be asked to sign a copy of the letter. If he/she refuses, the worker

delivering the letter must sign on the appropriate line. A copy of the signed letter (by

perpetrator and/or worker) must be placed in the case file. • If the Perpetrator Notification Letter is sent by mail, it must be sent by registered or certified mail, return receipt requested, and delivery restricted to the addressee within 5 working days of completing the case in MiSACWIS. Restricted certified mail (to be delivered to addressee only) may be used at local office discretion. The date of mailing is the "Date of Notice" to be entered on the letter. If the notification is returned "refused" or otherwise undeliverable, the envelope and receipt must be placed in the case file."

1292.    PSM 714-2 section titled, "OVERVIEW", states: "Child abuse and neglect purchased services are those services purchased for a children's services client-family through contracts negotiated between the department and a service provider. Purchased services are to be viewed as part of the total services plan developed by department staff with the family. Purchased services are to be available to assist relatives in providing support to the client's family, allow placement in relative care, or prevent removal from the relative's home to promote permanency for a child in a relative care setting.Purchased services contracts are negotiated by the local office. Within federal and/or state guidelines, local offices determine what services will be purchased with local contract funds, select service providers, negotiate and monitor contracts, assess provider performance, evaluate the effectiveness of contract services and determine the continuance or termination of contracts."

1293.    PSM 714-2 section titled, "Reasonable Efforts" states: "Reasonable efforts to prevent placement must be attempted in all situations in which the child is not at imminent risk of harm without removal from home.Note: The Indian Child Welfare Act requires active efforts be provided to American Indian children and their families. Reasonable efforts are not sufficient; see NAA 100 - NAA 615.Note: Family Team

Meetings (FTMs) are meetings conducted to make or recommend critical case decisions. Various circumstances such as an emergency removal or considered removal of a child(ren) require a FTM and mandate that they occur within required time frames. Note: Those relative caregivers providing care for a child who would otherwise have been placed in non-relative foster care must be assessed on an individual basis for eligibility for these services based upon the needs of the child and the family network providing care for the child. The services offered and/or provided as part of CPS ongoing services provision and reasonable efforts to prevent removal may include, but are not limited to, 24-hour emergency caretaker, homemaker, day care, crisis or family counseling, emergency shelter, emergency financial assistance, respite care, parent aid services, home-based family services, self-help groups, mental health services, drug and alcohol abuse counseling, and vocational training."

1294.    PSM 714-2 section titled, "PURCHASED SERVICES - CHILD ABUSE AND NEGLECT", states: "Various funding sources are available to finance service provision. Individuals and families may be eligible for financial payments under day care, Medicaid or other assistance payment programs. In addition, local offices have program funds or allocations that are specifically intended for services to families that are purchased through contracts with community-based providers. There are also specialized resources available to local offices to fund services for emergency situations and to assist with essential needs."

1295.    PSM 714-2 section titled, "State Emergency Relief (SER)", states: "State Emergency Relief (SER) is a statewide resource to prevent serious harm to individuals and families. SER assists applicants with safe, decent, affordable housing and other essential needs when an emergency arises which threatens health or safety. SER, when

applicable, is a first resource to individuals and families and is often sufficient to resolve an emergency. Eligibility for SER is determined by Family Independence Specialists/Eligibility Specialists. SER program information, covered services and department policy is detailed in the Emergency Relief Manual (ERM)."

1296.    PSM 714-2 section titled, "Family Reunification Account (FRA)", states: "The Family Reunification Account (FRA) is a flexible funds sub-account under the local office Child Safety & Permanency Plan (CSPP) allocation. The amount of CSPP funds designated for FRA is determined by the local office. Use of FRA funds is for the individualized needs of families and must avert/prevent unnecessary removal of children from their home, facilitate early return home, or permanency through relative placement. The local office CPS or foster care worker certifies that the concrete/direct service purchase is needed in reference to the above."

1297.    PSM 714-2 section titled, "Family Reunification Account Eligibility", states: "The Family Reunification Account is a local office children's services resource. The following families are eligible: CPS families at imminent risk of experiencing a removal. Families with one or more children in a MDHHS supervised out-of-home placement (inclusive of MDHHS supervised foster care, juvenile justice and relative placement). FRA funds may be used to allow placement in relative care and/or prevent removal from an existing relative care placement to promote permanency for the child. Utilization of FRA and payment for services is pursued in the order resources are listed below. SER is the first resource to be used when SER is applicable. 1. Regular SER services, if applicable. 2. If regular SER is not sufficient to remove a threat to health or safety or to relieve an extreme hardship, an exception to SER policy is to be requested following procedures outlined in ERM 104, SER Policy Exceptions.3. Payment from FRA funds may be

accessed for food, clothing, shelter, security deposits, appliances, furniture and household items when not covered by SER. Client-specific transportation assistance is allowable for CPS families. FRA funds cannot be used for transportation assistance covered or reimbursed by other responsible resources including classified service functions or Foster Care policy (FOM 903-9). Note: Residential or institutional facilities and Child Placement Agency staff are responsible for parent/child visitations (parenting time), including transportation, for children placed in their care".

1298.     PSM 714-2 section titled, "Worker Process for Family Reunification Account", states: "A. The local CPS or foster care worker prepares a memo that states: 1. SER eligibility has been exhausted, denied, or is not applicable. 2. The concrete item(s) is needed to avoid a removal, or to accomplish a return of a child home by a specified date within the next six (6) months, or to allow/preserve a relative placement. 3. The specific type of concrete item(s) and amount of money needed per specified item. 4. CPS or foster care case name and case number. 5. The phone number of the worker and supervisor. B. Prepare the DHS-1291, Local Payment Authorization. C. 1. Submit the memo and DHS-1291 with a hardcopy invoice or bill per the local business office process. An invoice or bill must be obtained from the vendor/provider before authorizing payment. The invoice or bill obtained by the local office from a vendor/provider may be original, faxed, copied, scanned, or emailed. If an invoice is not available, a purchase order should be requested. 2. Accounting procedures require submittal of the DHS-1419, State Emergency Relief Decision Notice with the FRA payment request for any services that could be covered by SER. The DHS-1419 is documentation that SER was attempted but denied for some reason. A DHS-1419 is NOT required to access FRA for non-SER covered services. Instead, the local office FRA memo should note that SER is not applicable. D. If the

amount from FRA is more than $500 or the needed service is different than those specified under number 3 of the eligibility section above, an exception may be requested of the local office director; see Family Reunification Account Local Office Exception Process in this item. Local Business Office Process. Payments are to be processed by the local business office using standardized accounting procedures".

1299.     PSM 714-2 section titled, "Family Reunification Account Local Office Exception Process", states: "Occasionally there may be a need for some other support service not specifically identified as a covered service or for amounts exceeding $500. Exceptions to covered service or amounts exceeding $500 require an exception approval from the local office director. The local office director is responsible for ensuring that the payment request is an allowable expense. Once the local office director signs an exception request, the payment procedures as outlined above are to be followed. FRA program standards are available for reference on the MDHHS intranet under Financial Operations, Office of Contracts and Purchasing, Resources, Program Standards. Questions about allowable/disallowable expenditures may be addressed to the Family Preservation program office."

1300.     PSM 714-2 section titled, "Substance Abuse Treatment Services", states: "2012 PA 500 to MCL 330.1275(1) requires substance abuse treatment agencies who have a waiting list for services to give priority to a parent whose child has been removed or is in danger of being removed due to substance abuse. Problems with particular treatment agencies should be forwarded to the identified women's treatment coordinator in your region."

1301.     PSM 714-4 section titled, "Social Work Contacts", states: "All contacts, either attempted or successful, must be entered into MiSACWIS. This includes the required

case consultation between the CPS worker and supervisor as outlined in PSM 714-1.
When entering social work contacts on a case, the date and time of the contact must be
included. Include the specific reason for the contact and a brief summary of the
information obtained during the contact. All social work contacts with accompanying
narratives will pre-fill into the USP. When a social work contact with the client/family
includes engaging the client/family in services, indicate that in MiSACWIS. Document in
the social work contact narrative how the family/client was engaged in services. The
social work narrative must include statements, evidence and actions taken by the worker
that address the safety of the child."

1302.    PSM 714-4 section titled, "Safety Reassessment Complete", states: "a safety
reassessment in MiSACWIS at key decision points. For any safety reassessment
questions answered yes, the accompanying explanation, the safety response-protecting
interventions entered, and the safety decision will pre-fill into the USP. The CPS worker
must update the safety assessment narrative to reflect what child safety planning
occurred. See PSM 713-01, CPS Investigation-General Instructions and Checklist, Safety
Assessment Overview section, for information on completing safety reassessments."

1303.    PSM 714-4 section titled, "Risk Reassessment", states: " When a case is
transferred to on-going CPS, a new risk reassessment cannot be completed by the CPS
ongoing worker until contact has been made with the family. When completing a risk
reassessment in MiSACWIS select one score for each question and provide an
explanation for the selection if the question is scored as a risk factor. Any narratives
provided for the risk reassessment will pre-fill into the USP Risk Reassessment
Overrides. After completing the risk reassessment, determine if any reasons exist for a
mandatory or discretionary override".

1304.    PSM 714-4 section titled, "Discretionary Override", states: "A worker may override the reassessment score based on professional opinion or relevant factors that support a higher or lower risk level than indicated by the scale. The reason for the discretionary override must be documented in the Override Risk Level box and approved by the supervisor. At the time of the first USP and after, a discretionary override to lower risk may be considered".

1305.    PSM 714-4 section titled, "Mandatory Override", states: "If a mandatory override reason, which indicates a higher risk, has occurred since the last assessment, it must be identified when the risk reassessment is completed and the risk level increased to intensive. The reason for the mandatory override must be documented in MiSACWIS. If a mandatory override reason was identified at the time of the initial assessment, or at the most recent reassessment, and case progress indicates a lower risk level, the original override reason does not have to be identified at reassessment or used to increase the risk level to intensive. See PSM 713-11, Risk Assessment, Overrides section, for more information on discretionary and mandatory overrides."

1306.    PSM 714-4 section titled, "Family/Child Assessment Tab", states: "Complete a reassessment of the FANS-CPS and CANS-CPS. Provide an explanation for each selection if the question is scored as a strength or a need (score other than 0). The explanations entered for each question on the FANS-CPS and the CAN-CPS will pre-fill into the USP. See PSM 713-12, Family and Child Assessment of Needs and Strengths, for more information on completing reassessments of the FANS-CPS and CANS-CPS.Updating/Adding Services for Family. After the reassessment of the FANS-CPS is completed, update the Services Provided screen for each need and select the Progress box to provide a narrative regarding each service, which includes the following: The family's

progress toward achieving service goals and activities in that need area. Information from service providers. Any revisions to the services provided in that need area."

1307.     PSM 714-4 section titled, "Updating/Adding Services for Child(ren)", states: "After the reassessment of the CANS-CPS is completed, update the Services Provided screen for each need and select the Progress box to provide a narrative regarding each service".

1308.     PSM 714-4 section titled, "Escalate Category Tab", states: "The Escalate Category tab is used when the category of the case must be escalated from Category III to Category II or I or Category II to I. See PSM 714-1, Post-Investigative Services, for more information on when the category of the case must be escalated. If the case is escalated to a Category I, the Legal section in MiSACWIS must be completed. Note: If the category is escalated from III to II or I, the perpetrator's name must be entered on central registry. See PSM 713-13, Child Abuse/Neglect Central Registry (CA/NCR), for information on providing notice to the perpetrator that his/her name has been listed on central registry."

1309.     PSM 714-4 section titled, "Progress Report Tab", states: "If the case will remain open, document in the MiSACWIS, report the following: A summary of the reasons why the case was opened. The family's overall progress toward achieving service goals and activities. Specific examples of changes in behaviors or other conditions that explain a reduction in risk to the child. Any revisions in the service agreement, including changes in services. A summary of any new complaints investigated during the report period. Explain any new safety issues and how the service agreement has been amended to address them. Any other information relevant to the risk to and safety of the child".

1310.     PSM 714-4 section titled, "SUPERVISORY APPROVAL" states: "The CPS supervisor must review and approve via signature, within 14 calendar days of receipt, all

DHS-152 Updated Services Plans; see PSM 713-10, CPS Investigation Report, for review and approval of DHS-154 Investigation Reports. Approval indicates agreement with the: Thoroughness, completeness, and accuracy of the USP. Reassessment of risk and safety of the child. Reassessments of the FANS-CPS and CANS-CPS and the services provided to the family. Progress made by the family. Appropriateness of continued provision of services or case closure."

1311.    PSM 715-2 section titled, "OVERVIEW", states: "Whenever conditions in the child's home endanger his/her health and safety and available supports and services cannot be provided to ensure the child's safety, CPS must take prompt action to protect the child, which may include requesting court jurisdiction and removal; see PSM 715-1, Removal of the Alleged Perpetrator from the Home, and PSM 713-01, CPS Investigation - General Instructions and Checklist, Safety Assessment Overview section, for more information on options to prevent removal of a child from the home. When CPS identifies safety concerns which do not rise to the level of court involvement, the MDHHS-5433, Voluntary Safety Arrangement, can be utilized. The MDHHS-5433 documents a voluntary arrangement between the caregiver(s) and an individual who agrees to care for the child(ren) until identified safety issues can be resolved. When removal is necessary to protect a child, a petition or affidavit of facts must be submitted (electronically or otherwise) to the Family Division of Circuit Court. Local MDHHS staff must receive (electronically or otherwise) a written court order authorizing removal and placement, or authorizing the department to arrange for placement. On the removal petition, the worker must document why it is contrary to the welfare of the child to remain in the home and what reasonable efforts were made to prevent removal. Law enforcement may remove a child with or without a court order based upon their own

statutory requirements. CPS cannot receive custody of a child from law enforcement or remove a child from his/her home or arrange emergency placement without a written court order (in writing, communicated electronically or otherwise) authorizing the specific action even if requested by law enforcement. When MDHHS is contacted by law enforcement seeking the assistance of CPS in the removal of a child, CPS must immediately contact the designated judge or referee."

1312.     PSM 715-2 section titled, "Emergency Orders" states: "Emergency removal and placement (sometimes referred to as ex parte orders) must only occur after hours and must be based on conditions which immediately threaten the child's health or welfare. In all other situations, a preliminary hearing must be the venue for the court to make a determination regarding preliminary jurisdiction and/or placement.The need for emergency removal must be evaluated prior to contacting the court. A judge or referee may issue a written ex parte order upon receipt (electronically or otherwise) of a petition or affidavit of facts and the court finds all of the following: There is reasonable cause to believe that the child is at substantial risk of harm or is in surroundings that present an imminent risk of harm and immediate removal is necessary to protect the child's health and safety.The circumstances warrant an ex parte order pending the preliminary hearing. Consistent with the circumstances, reasonable efforts were made to prevent or eliminate the need for removal of the child. No remedy other than protective custody is reasonably available to protect the child. Continuing to reside in the home is contrary to the child's welfare. The ex parte order shall be supported by written findings of fact.See NAA 235, Emergency Placement, and NAA 240, Non-Emergency Placement, for removal of American Indian children. CPS must review with the parents and children any potential placements even during an emergency removal. When reviewing potential placements,

CPS must consider: The provider's ability to maintain full-time care and custody of the child(ren) if the goal of reunification with the biological parents does not succeed. The provider's ability to provide high level of full-time care until the child(ren) reaches adulthood. Limiting the number of placements for the child."

1313.     PSM 715-2 section titled, "Reasonable Efforts", states: "Provisions were enacted into federal law in the Adoption Assistance and Child Welfare Act of 1980 (42 USC 670 et seq.) and the Adoption and Safe Families Act (ASFA) of 1997 (42 USC 1305 et seq.), as well as Michigan's Probate Code (MCL 701.1 et seq.), that require judicial oversight when a child is removed from his/her home. These provisions require a judicial determination that reasonable efforts have been made by the supervising department/agency. The types of reasonable efforts which must be made by the department differ, depending on the status of the child. The four types of reasonable efforts determinations are to:1. Prevent removal. 2. Make it possible for the child to return home. 3. Find reasonable efforts are not reasonable. 4. Finalize the permanency plan. All dispositional and review hearing court orders must include a finding by the court that there have been reasonable efforts to prevent or eliminate the need for removal of the child from his/her home, to make it possible for the child to return to his/her home or to arrange an alternative permanent placement for the child (for example, adoption). The court may also determine that making such efforts is not reasonable. The types of orders listed above that are applicable to CPS are #1 and #3."

1314.     PSM 715-2 section titled, "To Prevent Removal", states: "These requirements were enacted into federal law and state law to ensure that no child would be placed in foster care who could be protected in his/her own home. Consequently, there must be a judicial determination that reasonable efforts were made prior to removal to maintain the

child in his/her own home. This means that services must be provided to families by CPS to prevent the removal and foster care placement of the child who could be protected in his/her home. When the child is removed in an emergency because of imminent risk of harm to the child's health or welfare and there is no reasonable opportunity to provide services, the court may determine that "reasonable efforts" were not possible to prevent removal and a lack of efforts was reasonable.The CPS worker must document:1. The reasonable efforts provided to the family to prevent removal of the child from his/her home.OR Why it was not possible to provide reasonable efforts to the family prior to removal. 2. The likely harm to the child if separated from the parent(s), guardian or custodian. 3. The likely harm to the child if returned to the parent(s), guardian or custodian. Note: Active efforts must be made to prevent removal for American Indian children; see NAA 235, Emergency Placement, and NAA 240, Non-Emergency Placements, for removal of American Indian children".

1315.     PSM 715-2 section titled, "When Reasonable Efforts are not Reasonable", states: "CPS must evaluate each case to determine if efforts to reunify the family are reasonable and present their recommendation to the court. The court makes the final determination regarding reasonable efforts. A mandated petition for termination of parental rights is not a reason for not providing services to reunify the family. A worker, in consultation with his/her supervisor, should discuss those cases in which it is not reasonable to provide services for reunification. The DHS-154, Investigation Report, and the DHS-152, Updated Services Plan, must contain clear documentation of the reasons why the department believes that providing services towards reunification is not reasonable.Exception: The local office may, but is not required, to make reasonable efforts to reunify the child with a parent who is required by court order to register under

the sex offenders registration act. The court may order reasonable efforts to be made by the Department of Human Services."

1316.    PSM 715-2 section titled, "FAMILY TEAM MEETINGS (FTM)", states: "Family Team Meetings (FTM) will occur at multiple stages through-out the life of a CPS case. A FTM must occur no later than seven days after a preliminary hearing.

1317.    PSM 715-2 section titled, "COURT ORDERED REMOVAL OF CHILD FROM HOME", states: "When it is necessary to remove a child from his/her home, the Family Division of Circuit Court must be contacted immediately for written authorization of removal and to arrange placement, or authorize the department to arrange for placement. The Legal module of MiSACWIS CPS must be completed. Under Removal Reasons, the worker must document why it is contrary to the welfare of the child to remain in the home and what reasonable efforts were made to prevent removal.Note: Consider requesting the court to order the alleged perpetrator out of the home; see PSM 715-1, Removal of the Alleged Perpetrator from the Home. See PSM 713-08, Special Investigative Situations, Coordination with Friend of the Court, for requirements on determining if the family has an open Friend of the Court (FOC) case when a petition is filed and notifying FOC when there is a change in a child's placement.The Family Division of Circuit Court in each county should designate an official of the court to be available after hours (nights, weekends, and/or holidays) to provide written authorization for removal and placement of a child in out-of-home care in emergency situations. If the designated official is not available, contact local law enforcement and request assistance in taking the child into custody. Law enforcement may remove a child temporarily without court authorization; see Michigan Court Rule 3.963(A) and the Probate Code of 1939, MCL 712A.14(1).Note: Do not take any child into custody or arrange emergency

placement without a written court order authorizing the specific action even when law enforcement takes the child into custody without court authorization. The local office must have formal written agreements with the Family Division of Circuit Court, local law enforcement, and with shelter care resources, so that written emergency authorization of removal and placement can be completed without delay."

1318.     PSM 715-2 section titled, "Assistance from Law Enforcement", states: "Law enforcement can and should play a role in removal when the situation requires their assistance. Assistance from law enforcement must be requested when: A written court order has been obtained and the parents refuse to allow the child to be removed. A child's life or safety is in immediate danger because of the parent's condition or because a young child is alone and no parent or other responsible person can be located. The child is behind closed doors and it is necessary to secure forcible entry to determine the child's safety. A crime is being committed (for example, methamphetamine lab, or domestic violence.) A child or worker may need protection against bodily harm."

1319.     PSM 715-2 section titled, "MEDICAL NEEDS OF CHILDREN IN FOSTER CARE", "A child's health status must be assessed and medical needs must be identified and documented prior to the child's placement into foster care. CPS must make every effort to obtain this medical information, including names of medical provider(s), the child's last medical visit, current medications, and current mental health status before the removal of a child. This information must be provided to the foster care worker and the foster placement. CPS should contact their designated Health Liaison Officer (HLO) before the removal occurs. CPS must contact the HLO within 24 hours of the child's removal and provide the name and contact information for the foster care home or relative caregiver and any know medical information for the child. CPS must also provide

the placement with a completed DHS-3762, Medical Authorization Card and the DHS-Pub-268, Guidelines for Foster Parents and Relatives Caregivers for Health Care and Behavioral/Mental Health Services."

1320.  PSM 715-2 section titled, "CASE RECORD DOCUMENTATION WHEN CHILD REMOVED", "Appropriate documentation must be completed whenever removal of a child is requested. In an emergency removal with no services provided, the DHS-154 or USP must indicate why no services were provided to the family prior to removal of the child which would make it possible for the child to remain home.Specifically identify the facts which indicate imminent risk of harm to the child. If services were provided prior to the removal, the DHS-154 or USP must identify the services provided by the department to the family in an effort to prevent the need for removal of the child from the home. Documentation must indicate why services did not eliminate the need for removal.

1321.  PSM 715-3 section titled, "OVERVIEW" states: In most cases, safety concerns for children may be resolved through active engagement with families and provision of services, without court involvement. When efforts to achieve and maintain a child's safety in his or her own home or with family have failed or where the Child Protection Law (CPL), MCL 722.621 et seq., requires, a petition must be filed. A petition can be filed to maintain placement of the child with his/her family and to request court ordered participation in services, to request removal of a perpetrator from the home, or for placement of a child outside of the home. When filing a court petition the least intrusive relief needed to keep a child safe should be requested. Petitions seeking to remove a child from his/her parents should only be filed in extreme cases when all efforts to assure child safety have failed or the child cannot be protected short of removal. The assigned

caseworker files the petition on behalf of Michigan Department of Health and Human Services (MDHHS), but the Family Division of Circuit Court in each county decides whether to authorize or grant the petition."

1322.     PSM 715-3 section titled, "DEFINITIONS", states: "Power of Attorney: A written agreement in which a parent or guardian of a child delegates any or all their powers regarding the care, custody, or property of the child to another adult"

1323.     PSM 715-3 section titled, "WORKING WITH LEGAL COUNSEL", states: "The local MDHHS office must work with the prosecuting attorney's office (or alternate counsel) to develop and maintain a protocol outlining procedures for submitting petitions. When a caseworker presents a mandatory petition to the prosecuting attorney's office for filing with the court and the prosecutor refuses to file the petition, the caseworker must then file the petition directly with the court. If the Family Division of Circuit Court refuses to accept or authorize the mandatory petition, a copy of the unauthorized petition must be scanned and uploaded into the Document tab of the Investigation Task page in MiSACWIS and placed in the Legal Documents section of the physical case file If the prosecuting attorney's office (or alternate legal counsel) refuses to file a non-mandatory petition with the court, the caseworker may file the petition directly with the court. Document the prosecuting attorney's refusal and any action taken in social work contacts."

1324.     PSM 715-3 section titled, "Representation of MDHHS by the Attorney General or Private Attorney", states: "If the local prosecuting attorney refuses to represent the department in a mandatory child welfare action, the local office must request representation by the attorney general or a private attorney; see FOM 903-9, Case Service Payments, for information on receiving reimbursement for costs."

1325.    PSM 715-3 section titled, "PETITIONS", states: "Various circumstances outlined below require that a caseworker file a petition for court jurisdiction over a child. The following considerations should be made if filing a petition: • All petitions do not warrant a request for removal of the child.• The least intrusive relief necessary for protection of the child should be requested. • Circumstances may exist in which a caseworker must also include a request for termination of parental rights."

1326.    PSM 715-3 section titled, "Supervisor Approval", states: "Prior to presenting a petition to the court caseworkers must review the case concerns with their supervisor, or designee. If the relief requested is for removal of the child from his/her home, the supervisor/designee must review and approve the decision to petition the court. Approval by the supervisor or designee must be based on review of the following:• Compliance with CPL (MCL 722.637 and 722.638).• Review of current safety concerns and protective interventions. • Review of case history and services provided to the family. Discussion and identification of alternatives to removal of the child, when appropriate."

1327.    PSM 715-3 section titled, "Mandatory Petition- Court Jurisdiction Child Protection Law, Section 8d(1)(e) (MCL 722.628d(1)(e) A caseworker must submit a petition if there is evidence of child abuse or neglect and 1 or more of the following are true: • The child is not safe, and a petition is needed to ensure the child's safety.• A petition is required under another provision of the CPL.• The abuse or neglect is caused by one of the following crimes:MCL 722.628a(1)(b) - Assault with intent to commit criminal sexual conduct (in violation of section 520g of the penal code, MCL 750.520g). MCL 722.628a(1)(c) - A felonious attempt or a felonious conspiracy to commit criminal sexual conduct.MCL 722.628a(1)(d) - An assault on a child that is punishable as a felony. MCL 722.628a(1)(f) - Involvement in child sexually abusive material or child sexually

abusive activity (in Violation of section 145c of the penal code, MCL 750.145c). MCL 750.136b(1)-(4) - First- or second-degree child abuse including: Intentionally causing serious mental or physical harm. Intentionally committing an act that would likely cause serious mental or physical harm, regardless of whether harm occurs. A person's omission causes serious physical or mental harm."See PSM 718-5, CPS Appendix F - The Michigan Penal Code, for a listing of the penal code violations. Caseworkers must remember when requesting a petition that a request for removal is not necessary in all required petition situations. Relief requested should be least intrusive necessary to protection of the child or resolution of the emergency. Child Protection Law, Section 17 (MCL 722.637)A caseworker must submit a petition within 24 hours after determining that the parent or legal guardian either perpetrated or failed to protect the child from: • Sexual abuse.• Severe physical injury, due to abuse or neglect. • Exposure to or had contact with, methamphetamine production.A caseworker is not required to submit a petition if it is determined that the parent or legal guardian is not a suspected perpetrator of the abuse/neglect and the following apply:• The parent or legal guardian did not neglect or fail to protect the child. • The parent or legal guardian does not have a historical record that shows a documented pattern of neglect or failing to protect the child. • The child is safe in the parent's or legal guardian's care. Child Protection Law, Section 18, MCL 722.638A caseworker must submit a petition when it is determined that there is a preponderance of evidence that a parent, guardian, custodian, or a person who is 18 years of age or older and who resides for any length of time in the child's home, has abused a child or a sibling of the child and the abuse includes one or more of the following: • Abandonment of a young child.• Criminal sexual conduct involving penetration, attempted penetration, or assault with intent to penetrate. • Battering, torture,

or other severe physical abuse.• Loss or serious impairment of an organ or limb.• Life-threatening injury.• Murder or attempted murder. Note: MiSACWIS refers to the above acts as egregious acts.See Mandatory Petition Non-Offending Parent in this item for situations when the perpetrator is not a parent, and the parent did not fail to protect from these acts, therefore not requiring a petition.A caseworker must also submit a petition when it is determined that there is a risk of harm, child abuse, or child neglect to a child, the parent has failed to rectify the conditions that led to prior termination of parental rights and either of the following are true: • The parent's rights to another child were non-voluntarily terminated under section 2(b) of MCL 712A.2, or similar law of another state. For more information see Mandatory Petition-Request for Termination of Parental Rights in this item. • The parent's rights to another child were voluntarily terminated following the initiation of proceedings under section 2(b) of MCL 712A.2, or similar law of another state, and the proceeding involved abuse or neglect that included one or more of the following: Abandonment of a young child. Criminal sexual conduct involving penetration, attempted penetration, or assault with intent to penetrate. Battering, torture, or other severe physical abuse. Loss or serious impairment of an organ or limb. Life-threatening injury. Murder or attempted murder. Voluntary manslaughter. Aiding and abetting, attempting to commit, conspiring to commit, or soliciting murder or voluntary manslaughter. For investigations involving prior voluntary termination, and these serious acts, the petition must also include a request for termination of parental rights. For more information on mandatory petitions with a request for termination, see Mandatory Petition-Request for Termination of Parental Rights in this item."

1328.   PSM 715-3 section titled, "Non-Mandatory Termination Petitions - Case Conference", states: "If the department is not required to petition for termination of

parental rights at the initial disposition hearing but is considering doing so, the caseworker must hold a conference with the appropriate agency personnel (CPS, foster care, etc.) to agree upon the course of action. The caseworker shall notify the attorney representing the child of the time and place of the conference and the attorney may attend. If an agreement is not reached at this conference, the local office director or designee must resolve the disagreement after consulting with the attorneys representing both the department and the child."

1329.    PSM 715-3 section titled, "Non-Mandatory Court Jurisdiction Petition - Temporary Custody", states: "Where none of the conditions requiring a mandatory petition exist, the caseworker may consider filing a petition when: 1. Court authority is needed to order the parent to do something to allow the child to remain safely in his/her own home. 2. Court authority is needed to secure safety of the child. If requesting removal, caseworkers must document through use of social work contacts, and on the petition that reasonable efforts were provided or attempted and that services did not eliminate the need for removal. When one or more of the following conditions exist, the juvenile code (MCL 712A.2) provides for jurisdiction of a child: • Whose parent or other person legally responsible for the care and maintenance of the child, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship.• Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, or other custodian, is an unfit place to live.Caseworkers must remember when requesting a petition that a request for removal is

not necessary for all petitions. Relief requested should be least intrusive necessary to protection of the child or resolution of the emergency."

1330.     PSM 715-3 section titled, "Supplemental/ Amended Petitions", states: "If a caseworker becomes aware of additional confirmations of abuse/neglect for a child whose case has been adjudicated by the court, CPS must file a supplemental petition and testify at the adjudication hearing, if necessary. If adjudication is pending, CPS must file an amended petition and testify at the adjudication hearing, if necessary.The caseworker must immediately notify the court if new facts or evidence becomes known which contradict the alleged abuse/neglect contained within a previously filed petition already authorized by the court."

1331.     PSM 715-3 section titled, "Court Hearing", states: "The department bears the burden of proof as a petitioner. The caseworker signing the petition is responsible for being able to prove the facts contained within the petition. When filing a petition with the Family Division of Circuit Court, the caseworker should be prepared to present the followingThe severity of the safety concerns for the child. • Evidence and proof supporting the determination of abuse or neglect. Evidence may be contained in documents obtained from collateral sources; for example, police records, school, and attendance reports, visiting nurse and medical reports. • All efforts made by the department to improve the situation to prevent the need for court involvement. Emphasis should be made to indicate how the direct services were: Adequate. Applicable to the problem. Sufficient in frequency and duration.Appropriate to parental capacity.• Reasonable efforts to prevent removal, in cases where removal of the child is requested.• Potential placement options for the child, including the non-custodial parent, or relatives. In presenting the department's position, the caseworker should provide information that

was gathered and recorded as a part of the investigation."

1332.     PSM 715-3 section titled, "Court Decision", states: "Once a petition has been filed, the court has several options in disposing of the petition: • Dismiss the petition, with or without warning; see Problem Court and Administrative Hearing Orders below for required further action• Postpone a decision pending the provision of further services designed to improve the situation.• Authorize the filing of the petition and setting an adjudicative hearing. • Issue an order removing the perpetrator from the home.• Make the child a temporary court ward and leave him/her in his/her own home.Make the child a temporary court ward and remove him/her from his/her home and place the child with the department for care, supervision, and out-of-home placement.• Make the child a permanent court ward, remove the child from his/her home, and terminate parental rights.Note: If the court dismisses a petition after it is filed, and the department has not found a preponderance of the evidence, this case would not be classified as a Category I disposition."

1333.     PSM 715-3 section titled, "Problem Court and Administrative Hearing Order", states: "If the court or referee refuses to authorize a petition, dismisses the petition, or if the court order conflicts with CPL, the case worker must notify his/her supervisor. The supervisor must notify the Children's Services Legal Division (CSLD) to determine if further legal action is necessary. The supervisor must include the following in the email to the CSLD Mailbox: • Petition. • Pertinent Court Order. • A brief description of the conflict. • Synopsis of the local prosecutor's position or alternative counsel's position. • Explanation of any action they plan to take."

1334.     PSM 715-3 section titled, "Children Absent Without Legal Permission (AWOLP)", states: "For more information on steps to take when a child is AWOLP; see

FOM 722-03A, Absent Without Legal Permission (AWOLP).

1335.     PSM 715-3 section titled, "Child Located in Another State", states: "When a court order has been issued ordering removal of a child not physically present in Michigan, the department must contact the other state's CPS equivalent. If the other state is willing to take custody of the child, then the court of the other state and the Michigan court must communicate in accordance with the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) (see MCL 722.1101 et seq.). For the department to take physical custody of a child in another state, the department must have both of the following: • A written court order: Naming the department; and Ordering MDHHS staff to pick up the child; And • Written consent to return the child to Michigan from the LGAL."

1336.     PSM 715-4 section titled, "COORDINATION WITH FOSTER CARE", states: "The provision of services to abused or neglected children and their household is a CPS function when the children are living in their own homes. Reasonable efforts must be made to prevent or eliminate the need for removal prior to the removal of a child from his/her own home, except in emergency removal situations. When children have been removed from their homes and placed in the care and supervision of the department, the provision of services to abused or neglected children and their families is a function of foster care staff. Transition of responsibility should be facilitated by a case conference to outline protective services activity, objectives, and recommended treatment. Relatives should be identified for placement or as potential placement options and these options should be discussed with the foster care worker. See PSM 713-08, Special Investigative Situations, Coordination with Friend of the Court, for requirements on notification to Friend of the Court when there is a change in a child's placement."

1337.    PSM 715-4 section titled, "Removal of Child-Case Management Responsibility", states: "CPS retains responsibility of the case if the child remains in his/her own home (including when a child is placed with the non-custodial parent) and the court requests continued department supervision or if the child is in out-of-home placement which is expected to last 7 days or less. When removal of the child is necessary and the child is made a temporary ward, responsibility of the case is transferred to foster care staff. CPS must initiate transfer of case management responsibility as soon as a decision is made to place the child in out-of-home placement that is expected to last more than 7 days. Note: Initial placement with a non-custodial parent, voluntary or court-ordered, is not considered an out-of-home placement per 1973 PA 116 (Child Care Organization Licensing Act) and it is therefore the responsibility of CPS to monitor and provide services".

1338.    PSM 715-4 section titled, "Responsibilities and Functions", states: "The following describes the responsibilities and functions of CPS and foster care when the court orders out-of-home placement: 1.The local office must ensure there are adequate procedures for appropriate placement in emergency situations, with priority given to relative caregivers. It is also to ensure that a child and the relative or licensed foster home placement are suitably matched. The child must be placed in the most family-like setting available and in as close proximity to the child's parents' home as is consistent with the best interests and special needs of the child. CPS must provide supportive services during this transition period to ensure that at no time will the children or parents be without a responsible worker. Efforts to resolve the issues leading to the out-of-home placement must continue. Where possible, reunification of the child with family should be pursued. Within five working days of the initial out-of-home placement, the CPS worker must

transfer the case to Foster Care. 2. When out-of-home placement has been ordered and is expected to last more than 7 days, foster care is to assume responsibility for the case upon transfer in MiSACWIS. See FOM 722-6I, Maintaining Connections Through Visitation and Contact for information on how often parenting time should occur. CPS will implement visitation until service responsibility is transferred to foster care. When a child is placed in out-of-home care and the duration of care is expected to be less than 7 calendar days, CPS will continue to carry responsibility. If care is expected to extend beyond 7 days, foster care must assume responsibility for the case once the CPS worker completes the transfer in MiSACWIS. The CPS worker must transfer case responsibilities by completing the transfer in MiSACWIS, within five working days of placement. Prompt completion of the transfer is essential to allow foster care time to develop case plans which must be submitted to the court within 30 calendar days of a child's removal. When the transfer is complete, CPS is no longer responsible for provision of services to the child and family. The CPS case must be closed in MiSACWIS once the case is successfully transferred to the Foster Care worker. CPS would still be required to testify at necessary hearings and submit amended petitions when required."

1339.     PSM 716-2 section titled, "WHEN FAMILIES IN CPS CASES MOVE OR VISIT OUT OF COUNTY" "INVESTIGATION OR ONGOING PROTECTIVE SERVICE CASE", states "When a family with an active CPS investigation or ongoing protective service case is absent from the county for a period of 30 days or more, or moves, or is temporarily visiting out of the county, the county of residence must:Make telephone contact with the CPS staff in the county where the family is located and discuss the nature of the active CPS investigation or ongoing protective service case. If a family is in another county temporarily, the county of residence should outline the need for courtesy

interviews, contacts, services, etc. The need must include safety precautions or alerts for the child(ren); see PSM 713-01-CPS Investigations (for active investigations) and PSM 714-1-Post-Investigative Services Cases Involving Multiple Counties sections (for ongoing cases), for how to document and process requests for courtesy interviews, supervision, etc. Immediately (within two working days) of the telephone contact send copies of required case information to the county where the family is temporarily staying. If a family has moved to a new county, the supervisor must transfer the active investigation or ongoing case on SWSS CPS through the Case Listing module to the new county of residence for the family. Any paper CPS case file will be maintained in the county of origin with copies of the case record being sent to the new county of residence within five working days. Whenever CPS becomes aware that a family with an active CPS investigation or ongoing protective service case in another county has moved into or is temporarily visiting their county, CPS staff must: 1. Immediately make telephone contact with the CPS staff in the county with the active investigation/ongoing case to determine the nature of the active investigation/ongoing case and the level of risk to the children. 2. If it is unknown whether the family has moved to the county or is visiting temporarily, the county where the family is located should make face-to-face contact with the family (parents, legal guardian and children) to determine if the family's county of residence has changed. 3. If the family has moved and the investigation is not complete or ongoing protective services are necessary, the new county of residence should request transfer of the case. The supervisor must transfer the case on SWSS CPS through the Case Listing module to the new county of residence for the family. Any paper CPS case file must be maintained in the county of origin with copies of the case record being sent to the new county of residence within five working days. If the family is in the other

county temporarily, the county of residence should outline the need for courtesy interviews/services. The need must include safety precautions or alerts for the child(ren). See PSM 713-01-CPS Investigations (for active investigations) and PSM 714-1-Post-Investigative Services Cases Involving Multiple Counties sections (for ongoing cases), for how to document and process requests for courtesy interviews, supervision, etc. Immediately (within two working days) of the telephone contact, send copies of required case information to the county where the family is temporarily staying.Disputes between counties must be immediately referred for resolution to:Regional service delivery center. Outstate operations for urban counties.Wayne County Children and Family Services Administration for Wayne County."

1340.      PSM 716-2 section titled, "NEW COMPLAINT ON CLOSED CASES", states: :If a county receives a CPS complaint, and the family has previous CPS history in other counties, the worker must contact the county(ies) where the prior CPS history took place and request a copy of any paper (file not in SWSS CPS) CPS files and incorporate the historical CPS case information in the investigation narrative for assessment of patterns of abuse/neglect, service history, etc. The historical case file material must be placed in the current CPS case file. The county with the closed CPS case record must provide any needed information immediately by telephone and/or fax, when requested. If requests for CPS case records are not honored, refer immediately to the following for resolution: Regional service delivery center. Outstate operations for urban counties.Wayne County Children and Family Services Administration for Wayne County."

1341.      PSM 716-7 section titled, "OVERVIEW" states "A complaint involving only substance use is insufficient for investigation or confirmation of child abuse or neglect.

Parents may use legally or illegally obtained substances and prescribed medications to varying degrees and remain able to safely care for their children. Substance use and/or abuse by a parent/caregiver may be a risk factor for child maltreatment. When substance use by a parent/caregiver or another adult in the home is alleged, caseworkers must evaluate its impact on child safety.

1342.    PSM 716-7 section titled, "DEFINITIONS", states: "Controlled Substance- A drug or chemical which is regulated by the government. Controlled substances include illicitly used drugs or prescription medications."

1343.    PSM 716-7 section titled, "DEFINITIONS", states: "Meconium- The earliest stool of an infant. The meconium is composed of materials ingested during the time the infant spends in the uterus." PSM 716-7 section titled, "DEFINITIONS", states: "Medication assisted treatment (MAT)- The use of medications in combination with counseling and behavioral therapies to provide a holistic approach to substance use disorders. Examples includeSuboxone and Methadone."

1344.    PSM 716-7 section titled, "DEFINITIONS", states: "Passive exposure- Exposure to a substance which occurs through being in the presence of someone smoking, inhaling the substance, or coming in physical contact with the substance, but not actively using the substance themselves. Prenatal exposure is an example of passive exposure."

1345.    PSM 716-7 section titled, "INTAKE", states: "To assign for investigation, complaints containing allegations of substance use must meet Child Protection Law (CPL) definitions of suspected child abuse and/or neglect, see PSM 712-8, CPS Intake Completion. Assignment of Substance or Alcohol Exposed Infants MCL 722.623a, requires mandated reporters who have reasonable cause to suspect that a newborn has any amount of alcohol, a controlled substance, or a metabolite of a controlled substance in his

or her body to make a complaint of suspected child abuse to Child Protective Services (CPS). A CPS complaint is not required if the mandated reporter knows that the controlled substance, metabolite, or the child's symptoms are the result of MAT or medication prescribed to the mother or the newborn.Note: Medical marijuana and MAT are medical treatment. CPS will investigate complaints alleging that an infant was born exposed to substances not attributed to medical treatment when exposure is indicated by any of the following:• Positive urine screen of the newborn. • Positive result from meconium testing. • Positive result from umbilical cord tissue testing. • Confirmation by a medical professional of withdrawal symptoms in a newborn that are not the result of medical treatment. Pending Meconium Results If meconium results are pending, mandated reporters must be advised of their obligation to contact centralized intake (CI) again if the newborn's tests are found to be positive for a controlled substance or if the newborn exhibits symptoms of exposure to a controlled substance."

1346.    PSM 716-7 section titled, "DANGEROUS SUBSTANCE RESPONSE", states: "The following conditions may exist in homes where illegal substances are manufactured, sold, used, or distributed: • Criminality. • Loss of household control (individual who controls the drug trade usually controls the environment). • Unsecured weapons. • Potential for violence including threats of physical assault; assaultive or coercive behavior. • General neglect, such as squalor, lack of food, etc. • Unmet needs of the child. • Presence of individuals who endanger the child's welfare and may have history of child abuse or neglect, and/or may be unwilling or unable to safely care for children.When caseworker safety issues are identified, coordination with law-enforcement must occur. Caseworkers must have law enforcement accompany them when going to homes where there is known manufacture or distribution of illegal substances."

1347.    PSM 716-7 section titled, "INVESTIGATION REQUIREMENTS subsection,

"Verification of Medication" states: "Verification of mood altering prescription

medication is required when substance use may be a risk factor. These medications

include: • Anti-depressant prescriptions. • Anti-psychotic prescriptions. • Opioid

analgesics (narcotic pain medications). • Any prescription identified as MAT (Suboxone,

Methadone, etc.). The caseworker verifies medication by completing and documenting in

a social work contact, any of the following activities: • Observing the written

prescription. • Observing the current prescription bottle. • Contacting the prescribing

medical professional."

1348.    PSM 716-7 section titled, ""INVESTIGATION REQUIREMENTS subsection,

"Verification of Medication", states: "Verification of mood altering prescription

medication is required when substance use may be a risk factor. These medications

include: • Anti-depressant prescriptions. • Anti-psychotic prescriptions. • Opioid

analgesics (narcotic pain medications). • Any prescription identified as MAT (Suboxone,

Methadone, etc.). The caseworker verifies medication by completing and documenting in

a social work contact, any of the following activities: • Observing the written

prescription. • Observing the current prescription bottle.• Contacting the prescribing

medical professional. Contact with the prescribing medical professional or his/her staff

should be made when all of the following are present:• Substance use is identified as a

risk factor. • A mood altering medication is prescribed. • Caseworker has concern for

parental compliance with prescribed medication. Caseworkers should contact the medical

professional to inquire on compliance with prescribed medications and any potential

impact of the medication on parenting. For information on requesting medical or mental

health information,see PSM 713-06, Requesting Medical and Mental Health Record

Information."

1349.    PSM 716-7 section titled, "INVESTIGATION REQUIREMENTS subsection,

"Medical Marijuana" states: "If a parent/caregiver indicates that she/he is medically

authorized to use marijuana, caseworkers should verify that the parent has a Michigan

Medical Marijuana Program (MMMP) card. Either of the following options can be used

for verification: • Observation of the card and documentation within a social work contact

that the card was observed.• Completion and submission of the form, MMMP Release for

Disclosure of Information (MMP3000). This form may be sent electronically to Michigan

Department of Licensing and Regulatory Affairs (LARA). Once the MMMP card has

been verified, this verification may be used in subsequent investigations.In cases in which

there is medical use of marijuana reported, the following steps should be taken, when

applicable or warranted: • Observation and verification that marijuana plants and any

growing equipment are not accessible to the children in the home. • Assessment of child

safety and of the parent's ability to safely care for and protect the child. • If necessary,

develop a safety plan with the family to ensure that the child does not have access to the

substance and is not exposed to the substance through passive means. For example, the

parents identify their plan for keeping the substance out of the reach of the

child.Caseworkers should seek a medical examination of the child if there is evidence of

exposure to the child or accidental ingestion."

1350.    PSM 716-7 section titled, "DECISION MAKING FOR INVESTIGATIONS

INVOLVING SUBSTANCES", states: "With investigations involving allegations of

substance use or exposure, caseworkers must make investigation decisions based on the

presence or absence of evidence of child abuse or neglect as defined; see PSM 711-4,

CPS Legal Requirements and Definitions. This includes investigations involving: •

Parental substance use. • Substance exposed infants. •Manufacturing, selling or distribution of substances where a child resides. Parental substance use, or positive toxicology in a newborn does not in and of itself prove child abuse or neglect. A caseworker will need to determine if harm has occurred or is likely to occur, not simply if the child has been affected by or exposed to a substance. Parental substance use is a risk factor, not a determinant for case confirmation. Many children of parents who are dependent on substances will not experience abuse or neglect or suffer negative developmental outcomes. They may however be at an increased risk for maltreatment and entering the child welfare system. For guidance in assessing parent capacity and decision making, caseworkers should consider the following: • Does the use extend to the point of intoxication, unconsciousness, or inability to make appropriate decisions for the safety of their child(ren)? • Does the use of substances cause reduced capacity to respond to the child's cues and needs? • Is there evidence to demonstrate difficulty regulating emotions or controlling anger? • Are the following emotions regularly demonstrated? Aggressiveness Impulsivity • Is there an appearance of being sedated or inattentive? Is there demonstrated ability to consistently nurture and supervise the child(ren) according to their developmental needs? • Do co-occurring issues exist which would impact parenting or exacerbate risk such as:Social isolation. Poverty. Unstable housing. Domestic violence. • Are there supports such as family and friends who can care for the child(ren) when the parents are not able to? Are the parents willing to use their supports when necessary? • Has the use of substances caused substantial impairment of judgement or irrationality to the extent that the child was abused or neglected? • Any other factor which demonstrates inability to protect the child(ren) and maintain child safety. Consideration of these factors must be documented within social work contacts. MCL

722.637 requires a petition for court jurisdiction in cases where the infant requires medical treatment or hospitalization resulting from substance/alcohol exposure and medical personnel indicate that the exposure seriously impairs the infant's health or physical well-being; see PSM 715-3 Family Court: Petitions, Hearings and Court Orders. The caseworker should assess the need to file a petition only after contacting medical staff and obtaining the following:• Information on treatment needed. • Information on extent of anticipated hospitalization.• Information on how exposure has resulted in diagnosis of a chronic medical condition, necessary ongoing medical treatment, or hospitalization of the infant • Specific details on how the exposure has seriously impaired the infant's health or physical well-being."

1351. MDHHS maintains a "Michigan Child Welfare Law Manual" (MCWL) for CPS Employees and it is available by chapter on MDHHS website.

1352. MDHHS maintains a "Michigan Child Welfare Law Manual" for CPS Employees that was last updated in 2007 and contains many sections of erroneous language that does not reflect the current statutes, court rules or current case law including, In re Sanders 852 NW 2d 524, 495 Mich. 394 (2014).

1353. The Plaintiffs proffer the existing court rules and statutes are relevant to application and submit the erroneous language in the "MCWL" as a fact in the case and not as a matter of accurate law.

1354. Thomaca Bush and MDHHS was aware of many of the key laws and case laws surrounding reporting of suspected child abuse to MDHHS.

1355. MDHHS maintains a "Michigan Child Welfare Law Manual" for CPS Employees and Chapter One (1) is available online at

1356.     https://www.michigan.gov/documents/dhs/MCWLChap1_33835_7_382142_7.pdf

1357.     Michigan Child Welfare Law Manual Chapter One (1) is on "Reporting".

1358.     MCWL 1.3. states: "QUANTUM OF SUSPICION - REASONABLE CAUSE TO

SUSPECT. The Child Protection Law does not require that the reporter investigates the

matter or knows with certainty that abuse or neglect has occurred. In fact, the statute does

not even require that the reporter actually suspect child abuse or neglect. The threshold of

concern is very, very low. A mandated reporter must file a report based upon a reasonable

cause to suspect child abuse or neglect. The reporter is not expected to investigate the

matter, know the definitions of child maltreatment used in judicial proceedings, or even

to know the name of the perpetrator. The Michigan law, like the laws in other States, is

weighted toward encouraging persons to over-report rather than under-report. The law is

intended to make reporting rather uncomplicated and places responsibility for

investigation and subsequent action on protective services."

1359.     MCWL 1.7.3. states: "Immunity from Federal Law Claims Although the State

statute can extend good faith immunity from lawsuits under State law, it cannot extend

immunity from liability under federal law. CPS workers are granted absolute immunity

from prosecution under federal law, however. See the discussion in Chapter 19,

LIABILITY."

1360.     MCWL 1.10.1 states:Perpetrator Notification. A person identified as a perpetrator

after August 1, 1992 must receive, within 5 days after the substantiation, formal,

documented notification from the Department68: • that he/she has been identified as a

perpetrator, • of the potential consequences of being listed on the perpetrator registry • of

the right to review the file, • of the right to request amendment or expunction of the

record. Persons on the historical registry, i.e. based on cases received before August 1,

1992, will also receive notice of being listed on the central registry if: (1) an individual or organization outside of CPS that is permitted access to the central registry requests information about that individual (e.g. a foster care provider seeking information about a potential employee) or (2) a subsequent complaint of child maltreatment is substantiated.69"

1361.    MCWL 1.11. states: "The DHS is also required to provide educational and training services to the general public and to professionals throughout the State. (2) The department shall assure a continuing education program for department, probate court, and private agency personnel. The program shall include responsibilities, obligations and powers under this act and the diagnosis and treatment of child abuse and neglect when committed by persons responsible for the child's health or welfare. (3) The department shall provide for the dissemination of information to the general public with respect to the problem of child abuse and neglect in this state and the facilities, prevention, and treatment methods available to combat child abuse and neglect when committed by persons responsible for the child's health or welfare.76 Multidisciplinary services are to be available through the DHS to combat child abuse and neglect. The department, in discharging its responsibilities under this act, shall provide, directly or through the purchase of services from other agencies and professions, multidisciplinary services such as those of a pediatrician, psychologist, psychiatrist, public health nurse, social worker, or attorney through the establishment of regionally based or strategically located teams. The department shall prepare a biennial report to the legislature containing information on the activities of the teams created pursuant to this subsection and including recommendations by the teams and the department regarding child abuse and neglect when committed by persons responsible for the child's health or welfare.77"

1362.     Footnote 77. denotes "MCL 722.629(1)"

1363.     MCWL 1.2.3. states: "(j) "Child neglect" means harm or threatened harm to a
child's health or welfare by a parent, legal guardian, or any other person responsible for
the child's health or welfare that occurs through either of the following14: (i) Negligent
treatment, including the failure to provide adequate food, clothing, shelter, or medical
care. (ii) Placing a child at an unreasonable risk to the child's health or welfare by failure
of the parent, legal guardian, or other person responsible for the child's health or welfare
to intervene to eliminate that risk when that person is able to do so and has, or should
have, knowledge of the risk. The exact nature of the harm, which constitutes child
neglect, is not specified more precisely in statute. Although the statute sets forth the
means by which the harm can occur (through negligent treatment or placing the child at
unreasonable risk), the degree of harm or the type of harm is not set forth and may be
incapable of precise definition. Child neglect is a matter of community values that vary
somewhat from community to community and change over time. Child neglect is also a
matter of subjective judgment in case by case situations by judges, caseworkers, and
others involved in child protection. Despite the imprecision of the definition and the fact
that criminal penalties are involved for failure to report suspected child abuse and
neglect, however, constitutional challenges for vagueness have been rebuffed.15
Pregnancy and venereal disease in a child under 12 is clearly to be reported to protective
services."

1364.     Footnote 14. denotes "MCL 722.622(j)"

1365.     Footnote 15. denotes "People v. Cavaiani, 172 Mich.App. 706 (1988)"

1366.     Thomaca Bush and MDHHS was aware of many of the key laws and case laws
surrounding investigation of suspected child abuse by MDHHS.

1367.    MDHHS maintains a "Michigan Child Welfare Law Manual" for CPS Employees and Chapter Two (2) is available online at https://www.michigan.gov/documents/MCWLChap2_34808_7.pdf

1368.    Michigan Child Welfare Law Manual Chapter Two (2) is on "Investigation".

1369.    MCWL 2.1.1. states: "The law gives the Department of Human Services (DHS) the duty to investigate cases of suspected child abuse or neglect1: (2) The department shall study and act upon a request for service as to, or a report received of, neglect, exploitation, abuse, cruelty, or abandonment of a child by a parent, guardian, custodian, or person serving in loco parentis, or a report concerning a child in need of protection. On the basis of the findings of the study, the department shall assure, where necessary, the provision of appropriate social services to the child, parent, guardian, custodian, or person serving in loco parentis, to reinforce and supplement the parental capabilities, so that the behavior or situation causing the problem is corrected or the child is otherwise protected. In assuring the provision of services and providing the services, the department shall encourage participation by other existing governmental units or licensed agencies and may contract with those agencies for the purchase of any service within the scope of this subsection. The department shall initiate action in an appropriate court if the conduct of a parent, guardian, or custodian requires. The department shall promulgate rules necessary for implementing the services authorized in this subsection. The rules shall include provision for local citizen participation in the program to assure local understanding, coordination, and cooperative action with other community resources. In the provision of services, there shall be maximum utilization of other public, private and voluntary resources available within a Community.

1370.    Footnote 1 denotes ". MCL 400.115b(2)"

1371.    Footnote 2 denotes ". MCL 722.628(7)"

1372.    MCWL 2.1.3. states: "The Child Protection Law identifies the DHS as the single

State agency responsible for receiving and acting upon reports of suspected child abuse

or neglect and sets out its investigative duties. (1) Within 24 hours after receiving a report

made under this act, the department shall...commence an investigation of the child

suspected of being abused or neglected ... .Commencing an investigation requires contact

with someone other than the referring person within 24 hours of receipt of a complaint to

assess risk and determine the DHS response. (2) In the course of its investigation, the

department shall determine if the child is abused or neglected. The department shall

cooperate with law enforcement officials, courts of competent jurisdiction, and

appropriate state agencies providing human services in relation to preventing, identifying,

and treating child abuse and neglect; shall provide, enlist, and coordinate the necessary

services, directly or through purchase of services from other agencies and professions;

and shall take necessary action to prevent further abuses, to safeguard and enhance the

welfare of the child, and to preserve family life where possible.4

1373.    Footnote 3 denotes "MCL 722.628(1)"

1374.    Footnote 4 denotes "MCL 722.628(2)"

1375.    MCWL 2.2.1. states "In each county, the prosecuting attorney and the DHS are

required to establish procedures for involving law enforcement officials in suspected

child abuse and neglect cases.5 The county prosecuting attorney and the DHS are obliged

to adopt and implement a standard child abuse and neglect protocol using as a model the

protocol developed by the Governor's Task Force on Children's Justice as published in

FIA Publication 794 (revised 8-98) and FIA Publication 779 (8-98), or an updated version

of those publications.6 Some investigations will be the primary responsibility of the DHS, others we be the primary responsibility of law enforcement and still others will.

1376.     Footnote 5 denotes "MCL 722.628(6)"

1377.     MCWL 2.2.4. states "A child protection investigation may reveal violations of the criminal law. The prosecuting attorney has discretion as to which cases are prosecuted criminally, but the most serious cases most likely will be. Injuries, assaults, and other harms to children, whether inflicted by parents or others, are crimes subject to the same criminal statutes and criminal prosecution as similar acts done to adults. In addition to these criminal statutes, the Legislature has created child abuse laws in the penal code". ... "A person contributing to the neglect or delinquency of a child by any act or word, tending to cause the child to come under the jurisdiction of the Juvenile Division of the Probate Court is guilty of a misdemeanor.26 Accosting, enticing, or soliciting a child under the age of 16 for immoral purposes is also a misdemeanor, and a second offense is a felony. 27"

1378.     Footnote 27. denotes "MCL 750.145a"; and "MCL 750.145b"

1379.     MCWL 2.3.1. states "The MDHS Services Manual, Item 712 and following sets forth the intake process for receiving and evaluating reports of suspected child abuse and neglect. The administrative process need not be recited here. The Investigation 35 Services Manual provides guidance to the caseworker for the initial fact-finding and discretionary preliminary investigation. The DHS does not assign every case for field investigation but evaluates them according to established intake criteria."

1380.     MCWL 2.3.2. states "Once a complaint is accepted, it is assigned for field investigation within 24 hours, although the alleged seriousness of the risk to the children may dictate a more immediate response.30 A full description of the protective services

investigation and assessment process is not necessary here. See the MDHS Services

Manual. The major elements include: 1) a face-to-face contact with the parents, guardian

or caretaker and the child to determine the presence or degree of danger; 2) an effort to

visually assess the part of the child's body which is alleged to have sustained injury; and

3) a determination of the sources of danger and risk to the child based on an assessment

of risk, including an assessment of the parents and significant other persons associated

with the family, the children, and the general situation. The investigation and evaluation

of all complaints assigned for field investigation must be completed within 30 calendar

days from the date the Department received the complaint.31 Protective services are to be

provided as long as the child needs protection. Cases that have an intensive or high score

on the abuse/neglect scale must be kept open until the risk level is moderate or low.32"

1381.    MCWL 2.7.3.a. states "A worker should first ask the parent or caretaker to take

the child to a hospital or clinic for examination. In all but emergency situations, the

protective services worker and others should obtain a parent's written permission or the

written permission of the immediate caretaker to transport a child to a physician before

trying other means of getting a child to a doctor. In a true emergency, however, the

following options are available."

1382.    MCWL 2.7.3.b. states "If the worker cannot obtain parental permission to take the

child to a physician or the parent denies permission, the worker may apply to the Family

Court for an order. The court may order the child taken into custody if the "conditions or

surroundings under which the child is found are such as would endanger the health,

safety, or welfare of the child."49 See discussion at 2.11 below for the procedure.

1383.    MCWL 2.7.3.d. states "The Child Protection Law requires the DHS to obtain a

medical evaluation "without a court order if the child's health is seriously endangered and

a court order cannot be obtained or if the child is displaying symptoms suspected to be the result of exposure to or contact with methamphetamine production."52 Thus, if the worker reasonably believes the child's health is seriously endangered, if parental permission is not granted, and if a court order cannot be obtained, the worker is required to transport the child to a physician on his or her own authority.53 The worker should first request law enforcement assistance to remove the child for a medical exam and should not expose him or herself to risk of physical injury.54 If the worker believes a medical exam is necessary, but the child's life or health is not seriously endangered, the worker should wait and apply to the court for authority."

1384.      MCWL 2.9. states "Privacy of a home is protected by the Fourth Amendment to the U.S. Constitution incorporated verbatim as Article 1, §11 of the Michigan Constitution. It guarantees "the right of the people to be secure in their persons, houses, papers, and effects." Therefore, except in cases of emergency, workers should obtain direct or implied consent from an adult person left in charge before entering the home or should have a search warrant or court order. In practice, law enforcement assistance is essential in executing a search warrant or a court order to keep peace, prevent physical injury to all involved and prevent the destruction of evidence. A federal court in O'Donnell v. Brown reaffirmed that the Fourth Amendment restricts unlawful entry by social workers into a private home.57 The O'Donnell case arose from the entry of police officers and CPS caseworkers into and the temporary removal of children from a private family home while their parents were out of town, following a 911 call alleging child neglect. In O'Donnell, the authorities visited the house more than once during a span of eight hours before deciding to remove the children. When the police officers and CPS finally entered the home, they did not have a valid, written order giving them authority to

enter the home. In holding that the CPS caseworkers violated the Fourth Amendment, the O'Donnell Court held that the Fourth Amendment protects against unreasonable searches and seizures. Government entry into a private home is considered a search implicating the Fourth Amendment. Warrantless searches and seizures are per se unreasonable under the Fourth Amendment, except pursuant to a few specifically established exceptions, such as consent or exigent (emergency) circumstances. The police and CPS, in O'Donnell did not have consent to enter the home and remove the children. Given this, the O'Donnell Court concluded that only emergency circumstances would justify the warrantless entry into the home. "Exigent circumstances" occur where a real immediate and serious consequences would occur were a police officer to postpone action to get a warrant. There must be a need to protect or preserve life or avoid serious injury. The O'Donnell Court made clear: mere possibility of danger is not enough. The bottom line of this case is constitutional rights should not be lightly disregarded. If CPS are unsure whether a situation presents emergency circumstances then it likely does not. To avoid the Fourth Amendment legal issues in O'Donnell, the Michigan Court Rules specifically addresses under what circumstances CPS and law enforcement can enter a private home and take a child into custody (1) without a court order [See, MCR 3.963 (A)] and (2) with a court order [See, MCR 3.963 (B)]. MCR 3.963(A) Taking Custody Without Court Order. An officer may without court order remove a child from the child's surroundings and take the child into protective custody if, after investigation, the officer has reasonable grounds to conclude that the health, safety, or welfare of the child is endangered. The language in MCR 3.963(A) is consistent with the language found in MCL 712A.14. The O'Donnell Court briefly addressed MCR 3.963 and MCL 712A.14, indicating that they may authorize the seizure of a child, but they do not give law enforcement the authority to enter a home to

effect the seizure. The entry itself must satisfy the Fourth Amendment, which generally requires a warrant (aka, an order authorizing entry into a specified premises) unless there are emergency circumstances, which would be the case in situations falling under MCR 3.963(A). Cases falling under MCR 3.963(A) are those cases where law enforcement reasonably concluded that they need to immediately enter and remove a child out of the home because that child was in real, immediate and serious danger. Law enforcement's entry into a private home is supported by MCR 3.963(A) only in situations where there is no time to spare to get a signed, written order by the court authorizing law enforcement to enter the home to remove the child. Otherwise, the Fourth Amendment applies to law enforcement, social workers, as it does to all other officers and agents of the State whose requests to enter, however benign or well-intentioned, are met by a closed door. There is no social worker exception to the strictures of the Fourth Amendment. In circumstances, such as O'Donnell, where it is not an emergency to remove the child from the home, law enforcement and CPS must obtain a signed, written order to both enter the home and to take the children into custody. See MCR 3.963 (B) below. MCR 3.963(B) Court-Ordered Custody. (1) The court may issue a written order authorizing a child protective services worker, an officer or other person deemed suitable by the court to immediately take a child into protective custody when, upon presentment of proofs as required by the court, the judge or referee has reasonable grounds to believe that conditions or surroundings under which the child is found are such as would endanger the health, safety, or welfare of the child and that remaining in the home would be contrary to the welfare of the child. At the time it issues the order or as provided in MCR 3.965(D), the court shall make a judicial determination that reasonable efforts to prevent removal of the child have been made or are not required. The court may include in such an order authorization to enter

specified premises to remove the child. See JCO5b. Had the police officers and CPS

obtained a signed, written order authorizing them to enter the O'Donnell home and

remove and place the children into protective custody, they may very well have avoided

the Fourth Amendment violations. See JC05b. State statutes and regulations cannot be

construed to displace the protections of the United State Constitution even when the State

acts to protect the welfare of children."

1385.    Footnote 57. denotes "O'Donnell v. Brown, 335 F. Supp. 2d 787, 2004 U.S. Dist.

LEXIS 18976 (W.D. Mich. 2004)"

1386.    MCWL 2.10.2. states "Photographs are an important investigative tool in child

abuse and neglect cases. Evidence of bruises and injuries that may fade over time is

preserved; home conditions are documented. In these cases a picture is indeed worth

more than a thousand words. Once taken, the photographs are admissible in court if the

proper foundation is laid, i.e. that the photo is a fair and accurate representation of the

child or home situation at the time the photo was taken. Contrary to popular belief,

Michigan law does not require that photos be automatically developed as in Polaroid

camera or be developed in private darkrooms in order to maintain a chain of custody.

35mm cameras take far superior photos than do Polaroids and the film may be

commercially developed. The person who took the photos or who was present during the

taking of the photos must testify that the pictures fairly and accurately represent the items

photographed at the time. If parents or the person in apparent charge gives permission to

photograph the children or the home, such photos are permitted. Implicit or tacit

permission may also justify taking photos. For instance, the worker may say, "I'm going

to take a few pictures now, okay?" and no objection is raised. Photographs are also

permitted where there is no expectation of privacy such as when the children are in a

public place or in someone else's home or at school. Photos of face and hands and arms

are permissible as are photos of the outside of the home or through open windows. Photos

of private body parts or the interior of the home cannot be taken without permission, a

search warrant or court authority. Photographs may be taken of a child as part of a

medical exam without permission of the parent or custodian under authority of the Child

Protection Law.59 A

1387.    child in court custody may have his or her photo taken.60

1388.     Footnote 60. denotes "MCR 3.923(C)"

1389.    MCWL 2.11.1. states "When a worker cannot obtain parental or caretaker

permission to talk with a child, inspect the home, take photos, obtain a medical exam,

etc., the worker may wish to apply to the Family Court for an order or ask the prosecuting

attorney to obtain a search warrant."

1390.    MCWL 2.11.2. states "Prosecutors are accustomed to applying for search warrants

where violations of criminal law may have occurred and those procedures often work

well for gathering evidence that may be subsequently used in child protection cases. In

O'Donnell v. Brown, the federal court addressed the necessity of obtaining a search

warrant when entering a private home, even in the name of ensuring a child's welfare.61

The O'Donnell Court held where CPS caseworkers, accompanying local police, entered

into a family home and removed children based on a verbal order from a referee, that the

referee's verbal order did not comprise valid authority to either enter the home or remove

the children. In O'Donnell, the authorities visited the home more than once before

deciding to remove the children. There was time to obtain a written order. The O'Donnell

Court specified that the Fourth Amendment required a written order for these actions

where no exigent circumstances existed. Again, the Fourth Amendment protects against

unreasonable searches and seizures. Government entry into a private home is considered a search implicating the Fourth Amendment. Warrantless searches and seizures are per se unreasonable under the Fourth Amendment, except under established exceptions, such as the exigent circumstances exception. The entry into a private home must satisfy the Fourth Amendment, which generally requires a warrant."

1391.    Footnote 61.denotes "O'Donnell v. Brown, 335 F. Supp. 2d 787, 2004 U.S. Dist. LEXIS 18976 (W.D. Mich. 2004)".

1392.    MCWL 2.11.3. states "Ordinarily, court action is initiated by filing a written petition with the court. A worker may, however, apply for an emergency order in a telephone conversation between the worker and the judge or referee in circumstances where filing a written request with the court would put the child in continued danger or risk losing valuable evidence. Authority for requesting court action orally and without a written petition is based upon MCR 3.961(A) that requires a request for court action to be in writing "absent exigent circumstances."62 The oral request should be followed up with a written petition as soon as possible."

1393.    Footnote 62. denotes "MCR 3.961(A)".

1394.    MCWL 2.11.4. states "Under authority of MCL 712A.15 and MCR 3.963(B), the court may order a child protective services worker, an officer, or other person deemed suitable by the court to immediately take a child into custody. The Juvenile Court has the authority to temporarily place children in foster care upon the filing of a petition and without first conducting an evidentiary hearing.63 To obtain such a written order the worker must present proofs as required by the judge or referee. Ordinarily, a petition is written, but, as discussed above, oral proof may be used in emergency situations. Then the petitioner must show a judge or referee "reasonable grounds to believe that conditions

or surroundings under which the child is found are such as would endanger the health, safety, or welfare of the child."64 If the court makes that finding it may order that certain identified premises be entered and that the child be placed in protective custody pending a preliminary hearing.65."

1395.    Footnote 63. denotes "In re Albring, 160 Mich.App. 750 (1987)".

1396.    Footnote 64. denotes "MCR 3.963(B)".

1397.    MCWL 2.11.5. states "Once a petition is filed, as to the child, the court may order other investigation including taking of photos, gathering certain physical evidence, and obtaining expert evaluations.66 Before entering such investigation orders, the court must have a petition, before it (which could be an oral petition under exigent circumstances) find probable cause to believe that the facts of the petition are true and constitute legal neglect, and, based on that finding, authorize filing of the petition. After the petition is filed, the court can order further investigation based upon a showing of need, including ordering the child to be examined by a physician, dentist, psychologist or psychiatrist.67 Section 12 of the Juvenile Code reads in relevant part68: After a petition shall have been filed and after such further investigation as the court may direct, in the course of which the court may order the child to be examined by a physician, dentist, psychologist, or psychiatrist, the court may dismiss said petition or may issue a summons reciting briefly the substance of the petition, and requiring the person or persons who have the custody or control of the child, or with whom the child may be, to appear personally and bring the child before the court at a time and place stated... . The court may also order evaluations of parents before adjudication based on language in MCL 712A.12 which provides that the court can direct any "such further investigation" as needed. MCR 3.923(A)(3)(b) provides: if at any time the court believes the evidence has not been fully developed it

may adjourn the matter and order production of other evidence. Based upon the statutory language, read in conjunction with the court rule, the court has the authority to enter orders as to examination or evaluation of a parent or a child at any time during the proceedings, including the adjudicative phase and prior to jurisdiction. The court rule [MCR 3.923(B)] further clarifies that the court may order that a minor or a parent be evaluated by a physician, dentist, psychologist or psychiatrist.69 Case law, In re Johnson, additionally supports the court's authority to order evaluations of the parents before adjudication.70 With respect to a pre-adjudication issue involving a psychological evaluation of a parent, the Johnson Court held, "The dominant consideration of the court shall be the welfare of the child, which must prevail over conflicting rights of the parent, allowing the [family] court the discretion to compel [an] examination [to] help protect the child's welfare by permitting the acquisition of information essential to the ... proceedings ... ."71".

1398.    Footnote 66. denotes "MCL 712A.12"; and " MCR 3.923".

1399.    Footnote 67. denotes " MCL 712A.12".

1400.    Footnote 68. denotes "MCL 712A.12".

1401.    Footnote 69. denotes "MCR 3.923(B)".

1402.    Footnote 70. denotes "In re Johnson, 142 Mich.App. 764, 766 (1985)".

1403.    MCWL 2.12. states "Upon completion of its investigation, the law requires that the Department place the case in one of five categories for response. Sec. 8d. (1) For the department's determination required by section 8, the categories, and the departmental response required for each category, are the following: (a) Category V - services not needed. Following a field investigation, the department determines that there is no evidence of child abuse or neglect. (b) Category IV - community services recommended.

Following a field investigation, the department determines that there is not a preponderance of evidence of child abuse or neglect, but the structured decision-making tool indicates that there is future risk of harm to the child. The department shall assist the child's family in voluntarily participating in community-based services commensurate with the risk to the child. (c) Category III - community services needed. The department determines that there is a preponderance of evidence of child abuse or neglect, and the structured decision-marking tool indicates a low or moderate risk of future harm to the child. The department shall assist the child's family in receiving community-based services commensurate with the risk to the child. If the family does not voluntarily participate in services, or the family voluntarily participates in services, but does not progress toward alleviating the child's risk level, the department shall consider reclassifying the case as category II. (d) Category II - child protective services required. The department determines that there is evidence of child abuse or neglect, and the structured decision-making tool indicates a high or intensive risk of future harm to the child. The department shall open a protective services case and provide the services necessary under this act. The department shall also list the perpetrator of the child abuse or neglect, based on the report that was the subject of the field investigation, on the central registry, either by name or as "unknown" if the perpetrator has not been identified. (e) Category I - court petition required. The department determines that there is evidence of child abuse or neglect and 1 or more of the following are true: (i) A court petition is required under another provision of this act. (ii) The child is not safe and a petition for removal is needed. (iii) The department previously classified the case as category II and the child's family does not voluntarily participate in services. (iv) There is a violation, involving the child, of a crime listed or described in section 8a(1)(b), (c), (d), or (f) or of

child abuse in the first or second degree as prescribed by section 136b of the Michigan penal code, 1931 PA 328, MCL 750.136b. (2) In response to a category I classification, the department shall do all of the following: (a) If a court petition is not required under another provision of this act, submit a petition for authorization by the court under section 2(b) of chapter XIIA of 1939 PA 288, MCL 712A.2. (b) Open a protective services case and provide the services necessary under this act. (c) List the perpetrator of the child abuse or neglect, based on the report that was the subject of the field investigation, on the central registry, either by name or as "unknown" if the perpetrator has not been identified.72".

1404.     Footnote 72. denotes "MCL 722.628d(1)&(2)".

1405.     Thomaca Bush and MDHHS was aware of many of the key laws and case laws surrounding Jurisdiction.

1406.     MDHHS maintains a "Michigan Child Welfare Law Manual" for CPS Employees and Chapter three (3) is available online at

https://www.michigan.gov/documents/dhs/MCWLChap3_33856_7_382143_7.pdf .

1407.     Michigan Child Welfare Law Manual Chapter Three (3) is on "Jurisdiction".

1408.     MCWL 3.2.2.1. states: 'The Term "Jurisdiction" is Ambiguous. Unfortunately, the term "jurisdiction" has several distinct meanings commonly used in Michigan family courts -- to the confusion of many. In addition to the subject matter jurisdiction as established by statute, the word "jurisdiction" also refers to the age limits and the geographic territory within which the court may exercise its authority. 18 "Jurisdiction" also refers to the power to exercise authority in loco parentis, which flows from a finding of fact that the child in question belongs to the class of children over which the family court has power to act; i.e., the facts of a given case bring a child within the provisions of

section MCL 712A.2(b). For example, MCR 3.973(A) reads: "A dispositional hearing is conducted to determine measures to be taken by the court with respect to the child properly within its jurisdiction [and ... against any adult, once the court has determined following trial, plea of admission, or plea of no contest that one or more of the statutory grounds alleged in the petition are true.]" (emphasis added.) To add further confusion to the use of this single term, the court's power to exercise authority varies with the procedural stage of the family court process. There is no consensus as to the exact terms to describe the varying scope or extent of the court's jurisdiction. The following may be a useful way to organize your thinking about the process. 1) Emergency jurisdiction is taken when the court issues and ex parte order pursuant to MCL 712A.15 and the child is placed out of his or her home without hearing. 2) Preliminary jurisdiction is assumed when a child is continued in custody after a preliminary hearing provided for in MCL 712A.13a and MCR 3.965 and before formal adjudication. 3) Temporary jurisdiction results after formal adjudication, i.e., after a trial or a plea by respondent(s) and the court finds that the facts alleged are true and bring the child within the provisions of the statute, MCL 712A.2(b).19 4) Permanent jurisdiction over a child results when the court places the child in the permanent custody of the court pursuant to 712A.19b and terminates all parental rights to the child. Because the term "jurisdiction" is not used with precision in the Juvenile Code, exercise care to avoid confusion. 3.2.2.2. Geographic Jurisdiction; Found Within the County The phrase "found within the county" means physically present in the county and is consistent with the dictionary definition of found which is, "a person is said to be found within a state when actually present therein" and is not the same as residence or domicile.20 3.2.2.3. Age Jurisdiction Section 2(b) of the Juvenile Code provides neglect jurisdiction over children who have not yet reached their eighteenth

birthday.21 Once established, court authority may continue over a child for two years beyond the maximum age of jurisdiction, i.e. age 20.22 The court may assume jurisdiction of a child if the petition is filed 19. MCR 3.973(A) 20. BLACK'S LAW DICTIONARY 808 (4th Ed.Rev); In re Mathers, 371 Mich. 516, 526 (1963) 21. MCL 712A.2(b) 22. MCL 712A.2a(1); MCL 712A.5 reads, in part: "The court does not have jurisdiction over a juvenile after he or she attains the age of 18 years, except as provided in section 2a." Jurisdiction 59 prior to his or her eighteenth birthday but acted upon subsequent to the 18th birthday.23 Thus, if a neglect petition is filed before a youngster's eighteenth birthday, the Family Court seems to have the power to exercise its full authority."

1409.      MCWL 3.3.2. states "Value Judgment is Required The question of whether or not legal neglect exists is especially difficult because a three-step analysis is required. First, as in any court, the facts of the case must be determined. Second, the standards of the applicable law must be consulted. Third, a normative judgment, that is a value judgment, is made by the court as to whether or not the facts as proven violate the community minimum standard of child care below which a parent shall not fall lest the State intervene on behalf of the child. The statutory definition of legal neglect is broad and flexible enough so that the juvenile judge not only determines that the facts fit the statutory definition, but also that the community minimum standard of childcare is breached in a particular case. Only then does legal neglect exist. For example, facts are alleged: "Brown left her nine-year old child alone for ten hours." The facts are proven true or not true. The statute allows the family court to assume jurisdiction of a child "who is abandoned." Does leaving a nine-year old child alone for ten hours under these circumstances constitute child neglect? Does such an act breach the norms of this

community, i.e., the community minimum standard of childcare? Because interpretation of the facts and the law in child neglect depends so much on value judgments that are somewhat personal and idiosyncratic, the community minimum standard of childcare varies from county to county and even from judge to judge, or referee to referee, within the same county. One only has to consider the standards of childcare in our parents' and grandparents' generations to realize their evolving and flexible nature. 36. State v. McMaster, 259 Or. 291, 486 P.2d 567 (1971) – (Superseded by statute as stated in, Explained by, Harmonized by State ex rel. State Office for Servs. to Children & Families v. Stillman (In re AhlgrenStillman), 333 Ore. 135, 36 P.3d 490, 2001 Ore. LEXIS 1000 (2001) 37. In re J.T. 115 Cal Rptr 553 (1974) - Superseded by statute as stated in In re Rocco M., 1 Cal. App. 4th 814, 2 Cal. Rptr. 2d 429, 1991 Cal. App. LEXIS 1411, 91 D.A.R. 15205 (Cal. App. 1st Dist. 1991) 38. In the Matter of K.B., T.B. and S.B., 302 N.W. 2d 410 (1981) 39. In re Huber, 291 S.E.2d 916 (1982) 40. In re Aschauer's Welfare, 611 P.2d 1245 (1980) Revised: 9/1/2007 62 MICHIGAN CHILD WELFARE LAW Although the statutory standards of child neglect are ambiguous, appellate decisions have clarified them over the years. The discussion, which follows, is a partial and not exhaustive enumeration of the legal grounds for temporary wardship in Michigan. This is an attempt to identify the principal Michigan cases which speak to the question of minimum statutory standards for child neglect jurisdiction."

1410.     MCWL 3.4.1. states: "Proof of Neglect is Necessary; Parents not Held to Ideal Standard Parents will not be held to any ideal standard in the care of their children, said the Michigan Supreme Court in Fritts v. Krugh, but rather to minimum statutory standards. Their fitness as parents and the questions of neglect of their children must be measured by statutory standards without reference to any particular alternative home

which may be offered the children.41 Evidence which would support a finding of temporary wardship need only establish temporary neglect while "the entry of an order for permanent custody due to neglect must be based upon testimony of such a nature as to establish or seriously threaten neglect of the child for the long-run future."42 There must be some testimony of neglect before the court has the power to take jurisdiction of a child.43 Consent of the parties is insufficient to confer jurisdiction on the court. The court must still independently determine whether a sufficient factual basis exists to permit the court to assume jurisdiction.44 The best interests of the child, although relevant in child protection proceedings is not by itself a basis for the court to take jurisdiction.45 There must be a statutory basis under MCL 712A.2(b). Culpable neglect need not be shown to support exercise of jurisdiction by the family court over a child. The respondents need not be blameworthy in order for the court to find the children neglected under MCL 712A.2(b)(2) and assume jurisdiction.46".

1411.     MCWL 3.4.8. States "Ordering Medical Treatment The Family Court is empowered to order medical care for a child falling within the provisions of the Juvenile Code. Section 2(b)(1) gives the court jurisdiction over a child "whose parent or other person legally responsible for the care and maintenance of such child, when able to do so, neglects or refuses to provide proper or necessary *** medical, surgical or other care necessary for his health."79 74. Raleigh Fitkin-Paul Morgan Memorial Hospital v. Anderson, 201 A.2d 537 (1964) 75. Jefferson v. Griffin Spaulding County Hospital Authority, 274 S.E.2d 457 (1981) 76. Docket No. 81-108 AV, decided March 9, 1981 77. Id. 78. Id. 79. MCL 712A.2(b)(1) Jurisdiction 69 Unless the court had assumed formal jurisdiction over a child, there appeared to be no authority for the court to enter orders regarding medical treatment until the case of In re AMB.80 In AMB, an infant was born

with a life-threatening heart condition and within hours of her birth she was placed on a ventilator. The child was a product of rape. The father of the infant was also the father of the baby's mother, KB. The child's mother was mentally impaired or developmentally delayed. The DHS filed a petition seeking temporary jurisdiction over the infant and permanent custody of the minor mother. Within a couple days of the petition being authorized, the hospital contacted the DHS because they wanted to remove the child from life support. The Family Court held a hearing and authorized the removal of life support. The Michigan Court of Appeals held that "MCL 722.124a(1) enabled the family court to act in this case even before holding an adjudication," because of the unique circumstances, but they stressed that "the parties and the family courts in protective proceedings must make every possible effort to hold an adjudication before authorizing withdrawal of life support."81 A clear grant of authority to order medical care follows, however, if the court assumes formal jurisdiction under section 2(b) and enters a dispositional order under MCL 712A.18(f) 82: (f) Health care. Provide the child with medical, dental, surgical or other health care, in a local hospital if available, or elsewhere, maintaining as much as possible a local physician-patient relationship ***. Emergency trials are often conducted in medical needs cases, even in the hospital where, upon the proper showing, the court may make the child a temporary ward and enter the necessary orders permitting medical care Note, however, that elective, non-emergency medical care surgery must be consented to by parents unless the child is a permanent ward of the court.83"

1412.    Footnote 80 denotes case "In re AMB, 248 Mich.App. 144 (2001)".

1413.    Footnote 83 denotes case "MCL 722.124a".

1414.     MCWL 3.4.3. states: "Unfit Home Environment. Evidence of acts of physical and sexual abuse upon a three-year-old by the mother's boyfriend was sufficient to support a finding that the mother's home was an unfit place for the child to live and make the child a temporary ward of the court.56 Allegations of a dirty home, diaper rash, and that one child had swallowed valium were insufficient to grant the court jurisdiction over the children where there were no allegations that the home was uninhabitable.57

1415.     Footnote 57 denotes case 'In re Youmans, 156 Mich.App. 679 (1986)"

1416.     MCWL 3.5.6. states: "Children from Another State The Uniform Child-Custody Jurisdiction and Enforcement Act gives a Michigan court jurisdiction of custody proceedings, including child protection cases, when the child is physically present in the State and has been abandoned or action is required in an emergency to protect the child.108 Before hearing the petition in a custody case, however, the Michigan court must determine if a court of another State is exercising jurisdiction in a custody proceeding, including a child protection proceeding.109 If another State is exercising jurisdiction or is the home State of the child involved, the Michigan court cannot proceed, except for emergency actions, unless the court of the other State stays its proceeding because Michigan is the more appropriate forum for other reasons."

1417.     Footnote 108 denotes case "MCL 722.1101 et. seq."

1418.     Footnote 109 denotes case "MCL 722.1206(2)"

1419.     Footnote 110 denotes case "MCL 722.1206(1)"

1420.     Thomaca Bush and MDHHS was aware of many of the key laws and case laws surrounding "Placement".

1421.    MDHHS maintains a "Michigan Child Welfare Law Manual" for CPS Employees and Chapter Four (4) is available online at https://www.michigan.gov/documents/MCWLChap4_34809_7.pdf.

1422.    Michigan Child Welfare Law Manual Chapter Four (4) is on "Placement".

1423.    MCWL 4.1. States "Occasionally workers encounter a child under circumstances that require immediate removal of the child from a dangerous environment. If a worker cannot obtain cooperation of the parents, it may be necessary to obtain authority for an emergency placement to protect the child. There are three ways under Michigan law to take custody of a child on an emergency basis pending a preliminary hearing."

1424.    MCWL 4.1.1. States "When faced with a situation in which a child's surroundings place the child in immediate danger, the worker should contact a law enforcement officer. The Juvenile Code gives law enforcement the power to remove a child from immediate danger1: Any local police officer, sheriff or deputy sheriff, state police officer, county agent or probation officer of any court of record may, without the order of the court, immediately take into custody any child *** whose surroundings are such as to endanger his or her health, morals or welfare. Michigan court rules clarify the procedure the officer must follow. The officer may take a child into protective custody "if, after investigation, the officer has reasonable grounds to conclude that the health, safety, or welfare of the child is endangered."2 Once an officer takes a child into custody, the officer is required to immediately attempt to notify the parent, guardian, or custodian.3 Unless the child requires detention as provided under the Juvenile Code, the officer is required to accept the written promise of the parent, guardian, or custodian to bring the child to the court at a time determined in the written statement and then release the child to the parent, guardian, or custodian.4 If the child is not released by the officer, the child and his or her

parent(s), guardian or custodian if they can be located, are to be immediately brought before the court for a preliminary hearing.5 Court approval is necessary for continued detention of the child and the statute requires that an order signed by the judge or a referee authorizing the filing of a complaint (petition) be entered and if it is not, that the child be released to the parent(s), guardian or custodian.6 The statute or rules do not define "immediately" beyond the common meaning of the word. The court rules require the officer taking a child into custody to7: (1) immediately attempt to notify the child's parents, guardian, or legal custodian of the protective custody; (2) inform the parent, guardian, or legal custodian of the date, time, and place of the preliminary hearing scheduled by the court; (3) immediately bring the child to the court for preliminary hearing, or immediately contact the court for instruction as to placement pending preliminary hearing; (4) if the court is not open, contact the person designated under MCR 3.934(B)(2) for permission to place or release the child pending preliminary hearing; (5) ensure that the petition is prepared and submitted to the court; (6) prepare a custody statement similar to the statement required for detention of a juvenile as provided in MCR 3.934(A)(4) and submit it to the court. The custody statement referred to in subsection 6 should include the grounds for and the time and location of detention and the names of persons notified and the times of notification or the reason for failure to notify.8 The need for immediate action does not always occur during business hours, of course. The court is required to designate a judge, referee, or other person who may be contacted by an officer taking a child into custody during hours the court is not open and in each county there must be a facility open at all times where an office may obtain the name of the person to be contacted for permission to detain the juvenile pending a preliminary hearing.9 The juvenile judge or his or her designated person has the authority

to enter emergency protective custody orders pending preliminary hearing as discussed below."

1425.     Footnote 1. denotes "MCL 712A.14(1)".

1426.     Footnote 2. denotes "MCR 3.963(A)".

1427.     Footnote 3. denotes "MCL 712A.14(1)".

1428.     Footnote 5. denotes "MCL 712A.14(2) ".

1429.     Footnote 7. denotes "MCR 3.963(C) ".

1430.     Footnote 8. denotes "MCR 3.934(A)(4)(a)&(b)".

1431.     Footnote 9. denotes "MCR 3.934(B)(2)".

1432.     MCLW 4.1.2. States "Once a complaint or petition is filed the court may order a child detained pending hearing if his or her home conditions make immediate removal necessary.10 The court may issue a written order authorizing a child protective services worker, an officer, or other person deemed suitable by the court to immediately take a child into custody when, upon presentment of proofs as required by the court, the judge or referee has reasonable grounds to believe that conditions or surroundings under which the child is found are such as would endanger the health, safety, or welfare of the child and that remaining in the home would be contrary to the welfare of the child.11 The court may include in such an order authorization to enter specified premises to remove the child. 12 The written order must indicate that the judge or referee has determined that continuation in the home is contrary to the welfare of the child and must state the basis for that determination.13 Emergency court orders are generally issued ex parte, that is, without a formal hearing or the presence of all interested parties. Typically the protective services worker confers with the judge or referee in his or her office and presents the facts and circumstances and the written petition. The officer taking a child into custody,

with or without a court order, is required to take the same steps outlined in MCR 3.963(C) recited above. If the court orders a person other than an officer to take a child into custody, it is not clear who should assume the responsibility to notify the parents and bring the child to court under MCR 3.963(C). Presumably the court would direct the petitioner (who is most likely to be a protective services worker) or its own staff to do so."

1433.    Footnote 10. denotes "MCL 712A.15(1)".

1434.    Footnote 11. denotes "MCR 3.963(B)(1)".

1435.    Footnote 13 denotes "MCR 3.963(B)(2)".

1436.    MCWL 4.2.1. states ""Placement" is defined as "court-approved transfer of physical custody of a child to foster care, a shelter home, a hospital, or a private treatment agency.15 At the Preliminary Hearing, if the child is not released to the parent, the court rules require the court to receive evidence that the criteria for placement are met. The respondent is to be afforded the opportunity to cross-examine witnesses, to subpoena witnesses, and to offer proof to counter the allegations against him or her. The respondent may waive the probable cause determination.16 When custody of a child is at stake, the court may adjourn the hearing, but only up to 14 days to secure attendance of a witness or for good cause shown.17".

1437.    Footnote 15. denotes "MCR 3.903(C)(8)".

1438.    Footnote 16. denotes "MCR 3.965(C)(1); MCR 3.965(B)(11)".

1439.    Footnote 17. denotes "MCR 3.965(B)(10)".

1440.    MCWL 4.2.2. States "Michigan law creates a preference for maintaining the child in his or her own home and provides for various means to remove the danger from the child's home, rather than removing the child. See discussion in Chapter 6,

PRELIMINARY HEARING. The court may place the child with someone other than a parent pending trial or further court order if it makes "contrary" to the "welfare determination" under MCL 3.965(C). The "contrary to the welfare of the child" test for removal of a child from parental care is the same test required at the permanency planning hearing for return of the child to the parent's custody. That is the child is to be returned at permanency planning unless return is "contrary to the welfare of the child."18 The law recognizes that placement of a child and separation from the family carries its own risk and that government is unable to eliminate all risk to children to zero. The law presumes children are ordinarily best served by placement in their natural families and thus some level of risk in the natural family is tolerated. Only if the threatened harm amounts to a "substantial risk" is placement of the child away from the parents permitted. Without making compromises on child safety, protection of the child in the family by measures less drastic than out of home placement is encouraged. Federal law requires that the court find that reasonable efforts have been made to prevent or eliminate the risk to the child necessitating placement. The reasonable efforts finding is required to receiving federal funds for foster placement.19 If placement is ordered, the court must make a statement of findings, in writing or on the record, explicitly including the finding that it is contrary to the welfare of the child to remain at home and the reasons supporting that finding. If the "contrary to the welfare of the child" finding is placed on the record and not in a written statement of findings, it must be capable of being transcribed.20 The findings may be made on the basis of hearsay evidence that possesses adequate indicia of trustworthiness.21 If the child is not released, the child must be placed in the most family-like setting consistent with the needs of the child.22 In protective proceedings

there is no right to bail for release of a child in custody of the court.23 The requirement to determine probable cause to place a child in foster care is not jurisdictional.24".

1441.  Footnote 18. states "MCR 3.903(C)(3) defines "contrary to the welfare of the child" to include, but is not limited to, situations in which the child's life, physical health, or mental well-being is unreasonably placed at risk".

1442.  Footnote 19. denotes "42 USC 670 et seq; See also Adoptions Safe Family Act, 105 Pub L 89, 111 Stat 1115".

1443.  Footnote 20. denotes "MCR 3.965(C)(3)".

1444.  Footnote 21. denotes "MCR 3.965(C)(3)".

1445.  Footnote 22. denotes "MCR 3.965(C)(2)".

1446.  Footnote 23. denotes "MCR 3.965(C)(5)".

1447.  Footnote 24. denotes "In re Albring, 160 Mich.App. 750 (1987)".

1448.  MCWL 4.4.1. States "The practice in Michigan courts and within the child welfare agencies is to seek relatives to care for a child when out of home placement is necessary. At the dispositional hearing the court is authorized to place the child under supervision in the child's own home or in the home of an adult who is a relative to the child.33 "Relative" means an individual who is at least 18 years of age and related to the child by blood, marriage, or adoption, as grandparent, great-grandparent, great-great-grandparent, aunt or uncle, great-aunt or great-uncle, great-great-aunt or great-great-uncle, sibling, stepsibling, nephew or niece, first cousin or first cousin once removed, and the spouse of any of the above, even after the marriage has ended by death or divorce. A child may be placed with the parent of a man whom the court has found probable cause to believe is the putative father if there is no man with legally established rights to the child. A placement with the parent of a putative father is not to be construed as a finding of

paternity or to confer legal standing on the putative father. The court may order terms and conditions of placement including reasonable rules for the conduct of the custodian as the court determines".

1449.    Footnote 32. denotes "MCL 722.954(3)".

1450.    Thomaca Bush and MDHHS was aware of many of the key laws and case laws surrounding "Petition"..

1451.    MDHHS maintains a "Michigan Child Welfare Law Manual" for CPS Employees and Chapter Five (5) is available online at

https://www.michigan.gov/documents/MCWLChap5_34810_7.pdf

1452.    Michigan Child Welfare Law Manual Chapter Five (5) is on "Petition".

1453.    MCWL 5.1.1. states "Under certain circumstances the Department of Human Services (DHS) is required to file petitions with the Family Division of Circuit Court. Within 24 hours after the department determines that a child was severely physically injured as defined in section 8 [MCL 722.628(3)(c)], sexually abused, or allowed to be exposed to or to have contact with methamphetamine production, the department shall submit a petition for authorization by the court under *** MCL 712A.2(b) of chapter XIIA of 1939 PA 288, MCL 712A.2.1 1. MCL 722.637(1). Subsection (2), however, clarifies that the "department is not required to file a petition for authorization by the court as described in subsection (1) if the department determines that the parent or legal guardian is not a suspected perpetrator of the abuse and the department determines that all of the following apply: (a) The parent or legal guardian did not neglect or fail to protect the child; (b) The parent or legal guardian did not have a historical record that shows a documented pattern of neglect or failing to protect the child; (c) The child is safe in the parent's or legal guardian's care".

1454.    MCWL 5.2. states "Due process requires that a person subject to deprivation of

liberty be apprised of charges against him or her with sufficient clarity and specificity so

that he or she may prepare a defense. Absent exigent circumstances, a request for court

action to protect a child must be in writing in the form of a petition.8 "Petition," in Child

Protection Proceedings, means a verified complaint or other written accusation that a

parent has harmed or failed to properly care for a child.9 The Juvenile Code requires that

"[t]he petition ... shall be verified and may be upon information and belief." The petition

means a complaint or other written allegation verified in the manner provided in MCR

2.114(B) that a parent, guardian, non parent adult or legal custodian has harmed or failed

to properly care for a child, or that a juvenile has committed an offense.10 The court rules

establish the requirements of a petition in child protection proceedings: A petition must

contain the following information, if known11: (1) the child's name, address, and date of

birth; (2) the names and addresses of: (a) the child's mother and father12, (b) the parent,

guardian, legal custodian or person who has custody of the child, if other than a mother or

father, (c) the nearest known relative of the child, if no parent, guardian, or legal

custodian can be found, and (d) any court with prior continuing jurisdiction 12. The

Supreme Court held in In re KH, KL, KL and KJ, 469 Mich. 621, that if a legal father

already exists, then no other man identified as a putative father [pursuant to MCR

3.903(A)(23)] should be identified as a respondent or given notice on a child protective

petition. (3) the essential facts, which constitute an offense against the child under the

Juvenile Code; (4) a citation to the section of the Juvenile Code relied upon for

jurisdiction; (5) the child's membership or eligibility for membership in an American

Indian tribe or band, if any, and the identity of the tribe13; (6) the type of relief requested,

including whether temporary or permanent custody is sought. (7) information required by

MCR 3.206(A)(4), identifying whether a family division matter involving members of the same family is or was pending. If the petitioner does not know the requested information, the petition should state that.14 The petition serves two primary and interrelated functions. First, it is a court document, which should set forth the alleged basis of the court's jurisdiction over a particular child. The petition names the child and the respondents and frames the issues to be addressed by the court. The court may not inquire into matters not alleged in the petition.15 The Juvenile Code liberally allows for amending petitions. "A petition or other court record may be amended at any stage of the proceedings, as the ends of justice may require."16 Nonetheless, failure to include a necessary allegation in the petition may preclude introducing certain evidence at trial. The second principal function of the petition is to communicate to the respondents a notice of the charges against them so that they might evaluate their situation and prepare a response. The description of the parents' acts of commission or omission should be put in terms specific enough to allow a defense to be prepared.17 13. If there is any indication that a child is an Indian child, the petitioner must provide notice to the tribe. In re IEM, 233 Mich.App. 438(1999); In re NEGP, 245 Mich.App. 126 (2001). If there is any uncertainty as to the tribal affiliation, the petitioner must also notify the Secretary of the Interior. See Indian Child Welfare Act, 25 USC 1901 et seq.".

1455.      Footnote 14. States "MCL 712A.11(4); A petition to terminate parental rights did not violate the mother's right to due process even though it did not include her name and did not cite the specific statutory basis for permanent custody since it was amended to include her name and it specified the grounds for neglect. In re Slis, 144 Mich.App. 678 (1985)"

1456.    Footnote 15. States Evidence to be admitted at trial must be confined to issues formed by the pleadings. 19 Mich L & P Encyc. Pleadings s23

1457.    Footnote 16. denotes "MCL 712A.11(6)".

1458.    Footnote 17. states "See In re Hatcher, 443 Mich. 426 (1993). A petition is a verified complaint or other written accusation filed with the court setting forth charges against a parent, custodian, or child with ample clarity and specificity to reasonably apprise the court of matters under consideration. A petition has two essential functions: to set forth the alleged basis of the court's jurisdiction over a particular child and to communicate to respondents notice of charges against them so that they might evaluate their situation and prepare a response."

1459.    MCWL 5.5. States "A petition or other court record may be amended at any stage of the proceedings, as the ends of justice may require.25 Occasionally, new facts relevant to the alleged abuse or neglect come to the attention of the caseworker after the petition has already been filed. These facts may be newly discovered or they may be facts whose relevance to the legal proceedings became appreciated only after some period of reconsideration of the court strategy. Prior to adjudication, an amended petition that incorporates the original allegations and adds new factual allegations is the proper procedural vehicle for getting those new factual issues before the court. Allegations made in the original petition may be deleted on choice of protective services, by motion of counsel or as part of negotiation. The petition so modified is also called an amended petition. Although the language of the statute seems quite liberal in its allowance of amendments to the petition, courts are properly reluctant to approve amendments adding allegations in the later stages of the proceedings if doing so may compromise the rights of one of the parties. As discussed above, the petition provides notice to the parents of the

charges against them. If those charges are subject to change at any time, the parents' opportunity to prepare a defense could be jeopardized. Out of concern for the parents' rights, a judge may grant an amendment only after he or she is convinced that the amendment is important and that it was not omitted in the first petition because of petitioning party's negligence. An amendment near the date of trial may require an adjournment of the trial date to provide the respondents sufficient time to prepare. A delay in trial date may cause difficulty complying with time limits.26 Generally, the earlier in the court process, the easier it will be to amend the petition. The decision to allow or disallow an amendment is at the discretion of the judge. Know your local court practice and the judge's attitude regarding amended petitions.

1460.      Footnote 25. Denotes "MCL 712A.11(6)".

1461.      Footnote 26. states "MCR 3.972(A) requires a trial within 63 days after the child is removed from the home unless the trial is postponed on stipulation of the parties; because the process cannot be completed; or because the court finds that the testimony of a presently unavailable witness is needed. If the child is not in placement, the trial must be held within 6 months after the filing of the petition unless adjourned for good cause under MCR 3.923(G). A hearing on a supplemental petition for termination of parental rights must be held within 42 days of filing the petition. The court may, for good cause shown, extend the period for an additional 21 days. MCR 3.977(G)(1)(b)".

1462.      Thomaca Bush and MDHHS was aware of many of the key laws and case laws surrounding preliminary hearings.

1463.      MDHHS maintains a "Michigan Child Welfare Law Manual" for CPS Employees and Chapter Six (6) is available online at https://www.michigan.gov/documents/MCWLChap6_34811_7.pdf

1464.     Michigan Child Welfare Law Manual Chapter Six (6) is on "Preliminary
          Proceedings".

1465.     MCWL 6.1. States "If there is no out of home placement of the child requested,
          the court process may begin with a preliminary inquiry.1 The purpose of both the
          preliminary inquiry and the preliminary hearing is for the judge or referee to determine
          whether a case should be placed on the formal calendar.2 The preliminary inquiry is an
          informal review by the court to determine appropriate action on a petition and may be
          conducted by a referee,3 There is no requirement by statute or court rule that the parties
          receive notice or that they be present, and there is no time limit for conducting a
          preliminary inquiry. At the preliminary inquiry the court may dismiss the complaint or
          deny authorization of the petition, refer the matter to alternative services, or authorize the
          filing of a petition.4 A petition may be authorized upon a showing of probable cause that
          one or more of the allegations in the petition are true and fall within MCL 712A.2(b).5
          Consistent with the definition of "preliminary inquiry" as an informal review by the
          court, the quality of evidence to support a showing of probable cause is discretionary
          with the court. The rule says that probable cause "may be established with such
          information and in such manner as the court deems sufficient" so that a hearing with the
          presence of parties is not strictly required.6 If parents are present at the preliminary
          inquiry, they are to be advised of their right to retain counsel and, if they are indigent, that
          the court will appoint counsel for them on request.7 However, the court rule requires
          affirmative action by respondent to trigger appointment and continuation of appointed
          counsel in all hearings that may affect parental rights, and the right to counsel may be
          waived or relinquished under MCR 3.915(B)(1)(c).8 The Child Protection Law, the
          Juvenile Code and the court rules all require that the court appoint a legal representative

for the child.9 The rules say, "The court must appoint an attorney to represent the child at every hearing." Thus, if the court conducts a preliminary inquiry in the nature of a hearing -- even an informal provides that in protection proceedings "a preliminary inquiry may be made to determine whether the interests of the public or of the child require that further action be taken. If it appears that formal jurisdiction should be acquired, the court shall authorize a petition to be filed." hearing -- the rules require appointment of counsel for the child. Even though the rules do not require taking of testimony, reviewing evidence, or appearance of parties at preliminary inquiry, when these occur, the inquiry takes on the characteristics of a hearing and appointment of counsel for the child seems required. If, however, the preliminary inquiry is conducted as an informal review of the petition only, with no hearing, appointment of counsel for the child seems unnecessary. The statute says that the court may authorize a petition to be filed at the conclusion of a preliminary hearing or inquiry.10 Authorization of a petition seems necessary to set the matter on the formal calendar but the court has the option of holding a preliminary inquiry or hearing when placement of the child is not requested. The Michigan Supreme Court in Hatcher held that the valid exercise of the Juvenile Court statutory jurisdiction is established by the contents of the petition after the judge or referee has found probable cause to believe that the allegations of the petition are true.11 Hatcher also seems to say that the subject matter jurisdiction of the court is established when the petition is authorized and the matter placed on the formal calendar -- a function of the preliminary inquiry when the petitioner does not seek placement of the child.".

1466.    Footnote 1. denotes "MCR 3.962(A)".

1467.    Footnote 2. denotes "MCL 712A.11(1)".

1468.     Footnote 3. States "MCR 3.903(A)(22); MCR 3.913(A)(1). Parties have a right to a judge only at hearings on the formal calendar. MCR 3.912(B)".

1469.     Footnote 4. denotes "MCR 3.962(B)".

1470.     Footnote 5. denotes "MCL 712A.13a(2); MCR 3.962(B)(3)".

1471.     Footnote 6.denotes " MCR 3.962(B)(3)".

1472.     Footnote 7. denotes "MCR 3.915(B)(1)(a) ".

1473.     Footnote 8denotes ". In re Hall, 188 Mich.App. 217 (1991)

1474.     Footnote 9. denotes "MCL 722.630, MCL 712A.17c(7), MCR 3.915(B)(2)".

1475.     Footnote 10. denotes "MCL 712A.13a(2)".

1476.     Footnote 11. denotes "In re Hatcher, 443 Mich. 426 (1993); MCR 3.965(B)(11)".

1477.     MCWL 6.2.1. states "Although a preliminary hearing may be held to consider authorizing a petition when the child is not in placement or placement is not requested, preliminary hearing is required if the child is in temporary placement or the petition is accompanied by a request that the child be placed.12 "Placement" is defined as "court-approved removal of a child from the parental home and placement in foster care, in a shelter home, in a hospital, or with a private treatment agency."13".

1478.     Footnote 12. denotes "MCR 3.965".

1479.     Footnote 13. denotes "MCR 3.903(C)(8".)

1480.     MCWL 6.2.2. states "If the child has been taken into custody, the preliminary hearing must commence within 24 hours after the child is taken into court custody, excluding Sundays and holidays, and unless adjourned for good cause shown. If not, the child must be released.14 If the child is in placement, the preliminary hearing may be adjourned for up to 14 days to secure appearance of witnesses or for other good cause

shown.15 There is no time requirement for conducting a preliminary hearing when a child is not in court custody.

1481.    Footnote 14. denotes "MCR 3.965(A)".

1482.    Footnote 15. denotes "MCR 3.965(B)(10)".

1483.    MCWL 6.2.3.1. states "When a child is placed, notice of the preliminary hearing or an emergency removal hearing under MCR 3.974(B)(3) must be given to the parent of the child as soon as the hearing is scheduled. The notice may be in person, in writing, on the record or by telephone.16 Note that "parent" under the rules means "the mother, the father as defined in MCR 3.903(A)(7), or both, of the minor."17 When a child is taken into custody and the person summoned is other than the parent or guardian, the parent or guardian must also be personally notified of the preliminary hearing.18".

1484.    Footnote 16. denotes "MCR 3.920(C)(2)(b)".

1485.    Footnote 17. denotes "MCR 3.903(A)(17)".

1486.    Footnote 18. denotes "MCL 712A.12 ".

1487.    MCWL 6.2.3.2. states "When a child is not in court custody, the parents must be served by summons.19 The summons must be personally served 3 days before the hearing, or it must be served by registered mail at least 14 days before the hearing when the party to whom the summons is addressed resides outside of Michigan.20 If personal service of the summons is impracticable or cannot be achieved, the court may direct that it be served by registered or certified mail addressed to the last known address of the party, return receipt requested and restricted to the addressee.21 If the court finds that service cannot be made because the whereabouts of the person to be summoned has not been determined after reasonable effort, the court may direct any manner of substituted service, including publication.22 If the court finds personal service of a summons is not

required, the court may direct that it be served in a manner reasonably calculated to provide notice.23".

1488.     Footnote 19. denotes "MCR 3.920(B)(1)&(2)".

1489.     Footnote 20. denotes "MCR 3.920(B)(5)(a)(iii)&(b)".

1490.     Footnote 21. States 'MCR 3.920(B)(4)(b); MCL 712A.13. The Michigan Supreme Court recently adopted local rule in Wayne County allowing for simultaneous attempts at service in juvenile proceedings [MCR 3.920(B)(4)(b)(i), (ii), and (iii)]. 22. MCR 3.920(B)(4)(b)".

1491.     Footnote 23. denotes "MCR 3.920(B)(4)(c)".

1492.     MCWL 6.2.5. states "Unless the preliminary hearing is adjourned (only for up to 14 days), the court shall decide whether to authorize the filing of the petition.35 The petition may be authorized upon a showing of probable cause that 1 or more of the allegations in the petition are true and fall within the provisions of MCL 712A. 2(b).36 The court may permit the respondent to waive the probable cause determination.37 The court shall indicate whether permanent or temporary custody is sought and must direct that the respondent and attorney for the child receive a copy of the petition authorized to be filed.38".

1493.     Footnote 35. denotes "MCR 3.965(B)(10)&(11)".

1494.     Footnote 36. denotes "MCL 712A.13a(2), MCR 3.965(B)(11)".

1495.     Footnote 37. denotes "MCR 3.965(C)(1)".

1496.     Footnote 38. denotes "MCR 3.965(B)(2)&(3)".

1497.     MCWL 6.2.6.1. states "If a preliminary hearing is held when the child is not in custody or placement is not sought, presumably the quality of evidence relied upon by the court to authorize the petition is the same as that required in preliminary inquiry. In

preliminary inquiry the showing of probable cause may be established with such information and in such manner as the court deems sufficient thus giving the court broad discretion as to the quality of evidence relied upon.39".

1498.   Footnote 39. denotes "MCR 3.962(B)(3)".

1499.   MCWL 6.2.6.2. states "If placement is sought at preliminary hearing the court still has considerable latitude on evidentiary questions. The court's findings must be in writing or on the record, explicitly including the finding that it is contrary to the welfare of the child to remain at home. These findings may be based on "hearsay evidence that possesses an adequate degree of trustworthiness."40".

1500.   Footnote 40. denotes "MCR 3.965(C)(3)".

1501.   MCWL 6.2.7.1. states "The preference of the law is to keep children with their families as much as possible. Both the U.S. and Michigan Constitutions recognize and protect a private realm of family life. The preamble to the Michigan Juvenile Code creates a presumption that the child remains in his own home when it says41: This chapter shall be liberally construed so that each juvenile coming within the court's jurisdiction receives the care, guidance and control, preferably in his or her own home conducive to the juvenile's welfare, and the best interests of the state. If the juvenile is removed from the control of his or her parents, the juvenile shall be placed in care as nearly as possible equivalent to the care that should have been given to the juvenile by his or her parents. Federal law requires that reasonable efforts (conditions) be made to prevent removal of the child before the state is eligible for federal reimbursement for the cost of foster care.42 These conditions address such issues as the financial circumstances of family members before placement and the required content of judicial orders approving the child's placement. 42 USC § 672(a). Under Michigan law, if continuing the

child's residence in the home is contrary to the welfare of the child, the court shall not return the child to the home, but shall order the child placed in the most family-like setting available consistent with the child's needs.43 The law's preference is for acting to protect the child in the child's own home without placement, if at all possible. Protective orders from the court can be very valuable in removing the danger and not the child. The law allows other protective orders at preliminary hearing, including the ability to remove the alleged perpetrator from the home. Child safety is paramount. The legislature has made it abundantly clear that while child safety may be achieved by measures other than removal of the child from his or her home, there is to be no compromise on the overall safety of the child. The statute provides that the court is not to leave the child in the home, return the child to the home or place the child with a person not licensed to provide foster care, unless it finds that the conditions of custody at the placement and with the individual are adequate to safeguard the child from risk of harm to the child's life, physical health, or mental well-being.44".

1502.     Footnote 41.denotes " MCL 712A.1(3)".

1503.     Footnote 42. denotes "42 USC 670 et seq.".

1504.     Footnote 43. denotes "MCR 3.903(C)(3); MCR 3.965(C)(2)".

1505.     Footnote 44. denotes "MCL 712A.13a(5)".

1506.     MCWL 6.2.7.2. states "If the court releases the child to the parents following authorization of the petition, the court has authority to enter protective orders as "reasonable terms and conditions necessary for either the physical health or mental well-being of the child."45 For example, the court may order that the parent attend counseling, submit to random drug screens, allow homemakers or prevention workers into the home

on a regular basis, or exclude certain individuals from the household that may present a danger to the child".

1507.    Footnote 45. denotes "MCL 712A.13a(3), MCR 3.965(B)(10)".

1508.    MCWL 6.4. states "From a social work perspective, families seem most receptive to rehabilitation closer to the point of crisis rather than weeks later. In an effort to balance the interest in providing meaningful and prompt services to families with the interest in preserving due process rights, the law requires that the Department prepare an Initial Services Plan within 30 days of the child's placement but that participation in the plan is voluntary without a court order. The court must inform the parties orally or in writing of the Department's obligation to prepare a plan and that cooperation, without a court order, is voluntary.52 In many cases, with advice of counsel, parents will choose to cooperate fully with the Department's intervention efforts. In other cases, the factual and legal questions about whether the court should have jurisdiction or what the proper disposition ought to be are so substantial that the parents will choose not to cooperate unless an order is entered by the court. The Initial Services Plan is to include53: (i) the background of the child and the family; (ii) an evaluation of the experiences and problems of the child; (iii) a projection of the expected length of stay in foster care; and (iv) an identification of specific goals and projected time frames for meeting the goals. Upon motion of any party, the court shall review custody and placement orders and initial services plans pending trial and may modify those orders and plans in the best interests of the child.54 Under what circumstances may the court order services for a parent as part of a court ordered treatment plan prior to adjudication? Apart from orders necessary to protect a child when released to a parent under "reasonable terms and conditions" pursuant to MCL

712A.13a(3), there is no authority for the court to order a parent to participate in a treatment plan prior to adjudication and disposition without the parent's consent.55".

1509.    Footnote 52. denotes "MCL 712A.13a(8); MCR 3.965(E)".

1510.     Footnote 53. denotes "MCR 3.965(E)(a), (b), (c), and (d) 54. MCL 712A.13a(12), MCR 3.965(E)(4)".

1511.     Footnote 55. denotes "MCL 712A.13a(8)(c); MCL 712A.6"

1512.    Thomaca Bush and MDHHS was aware of many of the key laws and case laws surrounding pretrial proceedings..

1513.    MDHHS maintains a "Michigan Child Welfare Law Manual" for CPS Employees and Chapter Seven (7) is available online at https://www.michigan.gov/documents/MCWLChap7_34812_7.pdf

1514.    Michigan Child Welfare Law Manual Chapter Seven (7) is on "Pretrial".

1515.    MCWL 7.1.1. States "Notice to all parties whose legal rights may be affected by the court proceedings is an essential element of due process. The initial formal notice to a party is called a summons. A summons must be issued and served on the respondent, the parent or person with whom the child resides, other than a court-ordered custodian, directing such person to appear with the child for trial.1 A summons must always be served before a trial or termination of parental rights hearing.2 After a party's first appearance before the court, subsequent notice of proceedings and pleadings are to be served on the party or the party's attorney, with the exception that notice of a trial or termination proceeding must be by summons.3 The summons requirements established by statute are jurisdictional. Without proper notice, the court is not empowered to act unless it is shown under oath that a summons will be ineffectual or that action is required for the immediate welfare of the child.4 If the summons requirements are not met,

jurisdiction is not established and orders issued from the proceedings are void. The fact that a parent had actual notice does not cure this jurisdictional error.5 Any interested party who voluntarily appears in the proceedings, however, may waive service of process or notice of the hearing in writing.6 The appearance and participation of a party at a hearing is a waiver by that party of defects in service with respect to that hearing unless objections regarding the specific defect are placed on record.7 If a party appears or participates without an attorney, the court shall advise the party that the appearance and participation waives notice defects. It is well settled that the right to notice is personal and cannot be challenged by anyone other than the person entitled to notice.8

1516.    Footnote 1. denotes "MCR 3.920(B)(2)(b); In re Atkins, 237 Mich.App. 249 (1999)".

1517.    Footnote 2. denotes "MCR 3.920(B)(2)(b) and MCR 3.920(F)".

1518.    Footnote 3. denotes "MCR 3.920(F)".

1519.    Footnote 4. denotes "Oversmith v. Lake, 295 Mich. 627 (1940)".

1520.    Footnote 5. denotes "In re Brown, 149 Mich.App. 529 (1986); In re Mayfield, 198 Mich.App. 226 (1993) ".

1521.    Footnote 6. denotes "MCL 712A.12, MCR 3.920(E)".

1522.    Footnote 7. denotes "MCR 3.920(G)".

1523.    Footnote 8. denotes "In re Terry, 240 Mich.App. 14, 21 (2000)".

1524.    MCWL 7.1.2. states "The summons shall direct the person to appear with the child unless the child's appearance has been excused. The summons is to specify the time and place of the appearance, identify the nature of the hearing, explain the right to an attorney and the right to trial by judge or jury, have a copy of the petition attached to the

summons and, in child protection cases, include a prominent notice that the hearings could result in termination of parental rights.9".

1525.    Footnote 9. denotes "MCR 3.920(B)(3)".

1526.    MCWL 7.1.3. states "The summons is ordinarily to be served by delivering it to the party personally.10 If, however service of the summons is impracticable or cannot be achieved, the court may direct that it be served by registered or certified mail addressed to the last known address of the party, return receipt requested, and restricted to the addressee. If the court finds service cannot be made because the whereabouts of the person to be summoned has not been determined after reasonable effort, the court may direct any manner of substituted service, including publication.11 The court rules leave some discretion to the court in serving summons when it provides that "if personal service of a summons is unnecessary, the court may direct that it be served in a manner reasonably calculated to provide notice."12 A summons shall be personally served at least 7 days before trial.13 If summons is served by registered mail, add 7 days if person resides in Michigan and 14 days if the party lives outside Michigan.14 Publication notice does not require publication of the petition itself and shall appear in a newspaper in the county where the party resides, if known, and, if not, in the county where the action is pending. The notice must be published at least one 21 days before a termination hearing or a permanency planning hearing, 14 days before trial or a child protective dispositional review hearing, or 7 days before any other hearing.15".

1527.    Footnote 10. denotes "MCR 3.920(B)(4)(a); MCL 712A. 12; In re SZ, 262 Mich.App. 560, 564-565 (2004)

1528.    Footnote11. states "MCR 3.920(B)(4)(b). The Michigan Supreme Court recently adopted local rule in Wayne County allowing for simultaneous attempts at service in

juvenile proceedings [MCR 3.920(B)(4)(b)(i), (ii), and (iii)]. MCL 712A. 13; In re SZ, 262 Mich.App. 560, 564-565 (2004)

1529. Footnote 12.denotes " MCR 3.920(B)(4)(c)".

1530. Footnote 13. denotes "MCR 3.920 (B)(5)(a)(ii)".

1531. Footnote 14. denotes "MCR 3.920(B)(5)(b)".

1532. Footnote 15. denotes "MCR 3.920(B)(5)(c)".

1533. MCWL 7.1.4. states ' Notice of hearing must be given in writing or on the record at least 7 days prior to the trial.16 The respondent, the respondent's attorney, the child's lawyer-GAL, a parent, guardian, or legal custodian (if other than the respondent), the petitioner, the guardian ad litem of a party, the foster parents, preadoptive parents, and relative caregivers of a child in foster care under State responsibility, and any other person the court may direct, shall be notified of the trial.17

1534. Footnote 16. denotes "MCR 3.920(C)(1)".

1535. Footnote 17. denotes "MCR 3.921(B)(1)(a), (b), (c), (d), (e), (f), (g) and (h)".

1536. Thomaca Bush and MDHHS was aware of many of the key laws and case laws surrounding trials.

1537. MDHHS maintains a "Michigan Child Welfare Law Manual" for CPS Employees and Chapter Eight (8) is available online at https://www.michigan.gov/documents/MCWLChap8_34813_7.pdf

1538. Michigan Child Welfare Law Manual Chapter Eight (8) is on "Trial".

1539. MCWL 8.4.1. States "If the child is in placement, the trial must commence as soon as possible, but not later than 63 days after the child is removed from the home. If the child is not in placement, the trial must be held within 6 months after the filing of the petition.18".

1540.    Footnote 18. Denotes "MCR 3.972(A); MCL 712A.17(1)".

1541.    MCWL 8.4.2. States "In keeping with an appreciation of a child's sense of time and the general need to move expeditiously in these matters when placement of the child is affected, the Juvenile Code provides limited grounds for postponing the trial beyond 63 days when the child is in placement. The court may postpone the trial19: (1) on stipulation of the parties for good cause; (2) because process cannot be completed; or (3) because the court finds that the testimony of a presently unavailable witness is needed. When trial is postponed pursuant to subrule (2) or (3) above, the court shall release the child to the parent, guardian, or legal custodian unless the court finds that releasing the child to the custody of the parent, guardian, or legal custodian will likely result in physical harm or serious emotional damage to the child.20 Since there is no general "good cause" reason for a postponement, parties interested in prompt resolution of the matter should insist on their rights to prompt trial and the discipline imposed by this rule."

1542.    Footnote 19. Denotes "MCR 3.972(A)".

1543.    Footnote 20. States "Id.".

1544.    Thomaca Bush and MDHHS was aware of many of the key laws and case laws surrounding MDHHS employee liability.

1545.    MDHHS maintains a "Michigan Child Welfare Law Manual" for CPS Employees and Chapter Nineteen (19) is available online at https://www.michigan.gov/documents/MCWLChap19_34829_7.pdf.

1546.    Michigan Child Welfare Law Manual Chapter Nineteen (19) is on "Liability".

1547.    MCWL 19.1. States "In our litigious society lawsuits are common. It is the price we pay for open access to the courts. It is one thing to file a suit, however. It is another

thing altogether to win a financial recovery. As this chapter will discuss, there are important legal rights at stake for both children and family members in child protection. Yet, the legislature and the courts recognize the fundamental importance of child protection and foster care and have extended immunity to child welfare professionals against all but grossly negligent or reckless behavior".

1548.    MCWL 19.2. states "Child protection investigations are, by their very nature, an invasion of personal privacy and civil liberties of parents and children. In child protection, government agents inquire and intervene into the most private relations between parent and child -- often without court supervision or authority. Despite this threat to personal liberty, our State and federal laws give considerable discretion and protection to caseworkers and others who follow established procedures for child protection investigations. Our laws reflect a societal concern that children be protected from harm and a public policy choice that family privacy must yield to child protection concerns. Nonetheless, workers and others need to be constantly and carefully aware that child protection actions have the potential to violate family privacy and other constitutionally protected liberty interests of parents and children. Workers should respect the family privacy and integrity of their clients as a matter of good professional practice. Parents have a fundamental liberty interest in the care, custody, and management of their children.1 This liberty interest has also been called a "right of privacy," particularly in the areas of freedom of choice in intimate matters such as marriage and childbearing.2 The family itself is not beyond regulation in the public interest, however.3 Parents' privacy interest in familial relations is limited by the compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves.4 Children themselves have rights

in this process. Children have a constitutional right to be protected from harm when in foster care.5Workers should proceed cautiously, out of respect for the families involved, but also because serious violations of civil rights could result in legal liability".

1549.    Footnote 1. denotes "Santosky v. Kramer, 455 U.S. 745 (1982)

1550.    Footnote 2. denotes "Harris v. McRae, 448 U.S. 297, reh den 448 U.S. 917 (1980)

1551.    Footnote 3. denotes "Moore v. City of East Cleveland, 431 U.S. 494 (1977)

1552.    Footnote 4. denotes "Prince v. Massachusetts, 321 U.S. 158, 166 (1944); Myers v. Morris, 810 F.2d 1437 (8th Cir. 1987)

1553.    Footnote 5. denotes "Meador v. Cabinet for Human Resources, 902 F.2d 474 (6th Cir. 1990)

1554.    MCWL 19.3. states "Theoretically a child welfare caseworker could be sued for a range of possible shortcomings, including deprivation of civil rights, violation of a statutory duty, and professional malpractice. In Williams v. Coleman the Michigan Court of Appeals upheld a $900,000 judgement against DSS foster care workers who failed to report a case of suspected child abuse and neglect to child protective services.6 Foster care workers have a duty under the child protection law to file such reports, the court said. Recently in Thomas v. St. Vincent & Sarah Fischer Center, the federal court in the Eastern District of Michigan was asked to address whether the social workers at a private agency could be considered state actors for purposes of liability under 42 USC § 1983.7 In Thomas, a "special needs" child named Joshua was placed under the supervision of the FIA, [now DHS], with his maternal grandmother. A year later, he was ordered into foster care because his grandmother could no longer care for him. Monitoring of his foster care case was transferred from the FIA to St. Vincent & Sarah Fisher Center, Inc. (St. Vincent), a private agency that contracts with FIA to provide foster care. Not long after

social workers allegedly received reports of him being abused, Joshua died as a result of physical injuries inflicted by his foster parent. In reaching the decision that the social workers from St. Vincent were state actors for purposes of liability, the Thomas Court held that because the social workers performed a function statutorily reserved to the State and Joshua had no choice concerning the placement and supervision he received, St. Vincent social workers were state actors and potentially liable for Joshua's injuries. Individuals may be sued for unauthorized disclosure of client confidences. An abrogation of privilege and confidentiality in child protection cases based on the Child Protection Law does not necessarily extend to other legal proceedings. The legal theories that have been found to support such action are: (1) a breach of implied contract of secrecy;8 (2) a breach of statutory duty to preserve confidences of a client;9 (3) a tort of defamation;10 and (4) a tort of Invasion of Privacy.11 Nevertheless, the chances of lawsuit being successfully brought for unauthorized disclosures of confidential information remain slight. First, a plaintiff would have to show that a duty of confidentiality existed. We have reviewed at length the considerable exceptions and possible waivers to any duty of confidentiality. Second, the plaintiff would have to show that an existing duty was breached or violated. Third, the plaintiff would have to show that the breach of duty, i.e., unauthorized release of confidential information actually was the cause of measurable damages.12 Risks of a lawsuit are also increased by communication of inaccurate information that raises the possibility of suit for defamation. Thus, information communicated orally and in written form must be accurate. Note also that a criminal misdemeanor penalty may attach to anyone who permits or encourages unauthorized dissemination of information in protective services reports and records.13 Any person, including a protective services worker, who improperly discloses the name of the person

filing a report of suspected child abuse or neglect may also be held criminally liable.14

Therefore, the risk of legal liability for breach of confidentiality, although present, is not

substantial. Ethics, a sense of fair play, and respect of clients' integrity and privacy is

more likely to motivate human services professionals to carefully control the

dissemination of private information about their clients than is the formal sanction of

law."

1555.    Footnote 6. states "Williams v. Coleman, 194 Mich.App. 606 (1992); See also,

Becker-Witt v. Board of Examiners, 2003 Mich.App. Lexis 247 (The ALJ revoked a

social worker's license for failure to report suspected child

abuse. The ALJ found that petitioner's failure to comply with the Child Protection Law

constituted both gross negligence and in competence as defined by the occupational code,

MCL 339.604(e) and (g).)

1556.    Footnote 7. denotes "Thomas v. St. Vincent & Sarah Fischer Center, 2006 U.S.

Dist. LEXIS 58556 (E.D. Mich. Aug. 21, 2006)

1557.    Footnote 8. denotes "Doe v. Roe, 400 N.Y.S.2d 668 (1977); Clark v. Garaci, 208

N.Y.S.2d 564 (1960); Hammonds v. Aetna

1558.    Casualty & Surety Co., 243 F.Supp. 793 (N.D. Ohio 1965)

1559.    9. denotes "See, e.g., Doe v. Roe, Id. 10. 73 ALR2d 325

1560.    11. denotes "20 ALR3d 1109

1561.    12. denotes "Id. 13. MCL 722.633

1562.    14.denotes "Id., Op. Atty. Gen. 1980, No. 5915, p. 1075

1563.    MCWL 19.4. states "Balanced against the theoretical possibilities of lawsuits is

the fact that child protection workers and, to a somewhat lesser extent, foster care

workers, are extended considerable immunity from lawsuits. The rationale for this

protection is that social workers should not feel intimidated in their important work of

protecting children from harm. If social workers were constantly fearful of being second-

guessed through lawsuit, their capacity to protect children from harm could be adversely

affected. As to potential federal law liability, even if the legislature chose to do so, State

law cannot protect against violations of federal constitutional rights and such federal suits

in child welfare are not uncommon. When child protection caseworkers have been sued

for alleged violations of federal civil rights, federal courts have extended an absolute

immunity from suit for acts that are judicial or prosecutorial in nature – such as filing and

prosecuting petitions in juvenile court and seeking immediate apprehension of a newborn

from her natural mother. 15 Federal courts have not extended absolute immunity for

federal civil rights claims for investigatory and administrative acts.16 In Achterhof v.

Selvaggio the court held that opening a child abuse case, investigating it, and placing a

parent's name in the central registry concerning child abuse are not quasi-prosecutorial

activities for which absolute immunity applies. Rather these activities are administrative

or investigative. In Rippy v. Hattaway, the court defined social workers' functions that are

entitled to absolute immunity as those "intimately associated with the judicial phase of

proceedings."17 Examples of where social workers were entitled to absolute immunity

included: for claims arising out of the appointment of guardians ad litem; failures to

ensure representation of the child; failures to inform the parents of their right to counsel;

the content of their investigations and recommendations done to aid the court in making

removal determinations; and, for determining the requirements of the plan under which

the child will be returned. However, a social worker is not entitled to absolute immunity

where she promulgates and enforces her own policies. Additionally, the federal court in

the Eastern District of Michigan in Thomas v. St. Vincent & Sarah Fischer Center,

reiterated that social workers are entitled to absolute immunity only where there actions

relate to judicial and prosecutorial functions, or are otherwise "intimately associated with

the judicial phase of proceedings."18 The court extended qualified immunity to the

defendants in Achterhof. Qualified immunity means that the defendant would only be

held liable upon proof of violating a "clearly established statutory or constitutional right

of which a reasonable person would have known," or, if the law is not clearly established,

and the alleged violation was undertaken in good faith, upon proof of gross negligence or

deliberate indifference to a known risk and a violation of clear standards of law.19 A

social worker for a private agency was extended qualified immunity in a South Dakota

case in which a child sued for violation of civil rights when she was separated from her

father as a result of investigation and subsequent neglect legal proceedings.20 The federal

appeals court for the Sixth Circuit, which includes Michigan, has also extended qualified

immunity to private agency staff.21 The worker's vulnerability to suit is greater in foster

care cases where children enjoy a clearly established right to be protected from harm.22

"The cases analogize the state's role in placing children in foster homes to the mental

institution and prison settings in which state liability has been clearly established for

'deliberate indifference' to the plight of individuals in detention."23 The U.S. Supreme

Court rejected the proposition that the State owes an affirmative constitutional duty to

protect a child not in state custody.24 In DeShaney, the Wisconsin child protective

services left Joshua DeShaney in the custody of his father who inflicted irreparable brain

injury on the child. Because Joshua was not in State custody and even though there was

an active CPS investigation, the U.S. Supreme Court held that the State had no

affirmative constitutional duty to protect one citizen from another unless the citizen is in

government custody. Although DeShaney precludes suits against CPS for failure to

protect a child based on constitutional rights violations, it does not preclude suits where

failure to remove a child was grossly negligent nor does it preclude a constitutional rights

case against an agency responsible for supervising a foster home. Child protection

caseworkers are government agents, and can be held personally liable if they act in an

unconstitutional way.25".

1564.        Footnote 15. states "Salyer v. Patrick, 874 F.2d 374 (6th Cir. 1989), (social

workers filing a juvenile abuse petition which resulted in a temporary emergency custody

order were entitled to absolute immunity); Kurzawa v. Mueller, 732 F.2d 1456 (6th Cir

1989), (social workers involved in prosecuting neglect and delinquency petitions in the

Michigan courts leading to the removal of a child from his parents' home were entitled to

absolute immunity as was the guardian ad litem; Accord, Vosburg v. Department of

Social Services, 884 F.2d 133 (4th Cir. 1989); Hoffman v. Harris, 7 F.3d 233 (6th Cir.

1994), cert.den. 114 S.Ct. 1631, (Justices Thomas and Scalia dissenting). Achterhof v.

Selvaggio, 886 F.2d 826 (6th Cir 1989); Coverdell v. Department of Social and Health

Services, 834 F.2d 758, 764 (4th Cir. 1989)".

1565.        Footnote 16. denotes "Achterhof v. Selvaggio, 886 F.2d 826 (6th Cir 1989)".

1566.        Footnote 17. denotes "Rippy v. Hattaway, 270 F.3d 416, 422 (6th Cir. 2001)".

1567.        Footnote 18. denotes "Thomas v. St. Vincent & Sarah Fischer Center, 2006 U.S.

Dist. LEXIS 58556 (E.D. Mich. Aug. 21, 2006)".

1568.        Footnote 19. states "Harlow v. Fitzgerald, 457 U.S. 800 (1982); Doe v. NYC Dept

of Social Services, 649 F.2d 134, 146. See also K.H. v. Morgan, 914 F.2d 846 (7th Cir.

1990) (Illinois child welfare workers not entitled to qualified immunity from liability for

placing child in custody of foster parent state knew or suspected to be a child abuser.)

Rippy v. Hattaway, 270 F.3d 416 (6th Cir. 2001) (Tennessee child welfare workers

entitled to absolute immunity from liability for refusing to return child to parent after it was determined that it was safe to do so.)".

1569.    Footnote 20. denotes "Lux v. Hansen, 886 F.2d 1064 (8th Cir. 1989)".

1570.    Footnote 21. denotes "Bartell v. Lohiser, 215 F.3d 550 (6th Cir. 2000)".

1571.    Footnote 22. denotes "Meador v. Cabinet for Human Resources, 902 F.2d 474 (6th Cir. 1990); Norfleet v. Arkansas Dept of Human Services, 989 F.2d 289 (8th Cir. 1993); Taylor v. Ledbetter, 818 F.2d 791 (11th Cir. 1989)".

1572.    Footnote 23. denotes "Lintz v. Skipski, 25 F.3d 304; (1994)".

1573.    Footnote 24. denotes "DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189 (1980)".

1574.    Footnote 25. denotes "O'Donnell v. Brown, 335 F. Supp. 2d 787, 2004 U.S. Dist. LEXIS 18976 (W.D. Mich. 2004)".

1575.    MCWL 19.5. states "First, the Child Protection Law provides for immunity from civil or criminal liability for persons acting in good faith under the Act26: A person acting in good faith, who makes a report, cooperates in an investigation, or assists in any other requirement of this act shall be immune from civil or criminal liability, which might otherwise be incurred thereby. A person making a report or assisting in any other requirement of this act shall be presumed to have acted in good faith. This immunity from civil or criminal liability extends only to acts done pursuant to this act and does not extend to a negligent act which causes personal injury or death or to the malpractice of a physician which results in personal injury or death. Caseworkers' recommendations to the court, as well as their investigation leading up to those recommendations relating to the initiation of the judicial proceedings, are protected by absolute immunity.27 But, carrying out the removal of a child is not considered judicial functions, and is neither protected by

absolute immunity nor qualified immunity.28 Michigan law provides immunity from tort liability for government employees in the course of employment29: (2) Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency, each volunteer acting on behalf of a governmental agency, and each member of a board, council, commission, or statutorily created task force of a governmental agency is immune from tort liability for an injury to a person or damage to property caused by the officer, employee, or member while in the course of employment or service or caused by the volunteer while acting on behalf of a governmental agency if all of the following are met: (a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority. (b) The governmental agency is engaged in the exercise or discharge of a governmental function. (c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage. Notice that the legislature has not protected government employees from "gross negligence," however. The difference between "gross negligence" and "ordinary negligence" comes across in this classic example. Assume that Driver D (D is for distracted) is proceeding down a busy street at the posted speed limit, say 35 mph, and momentarily loses concentration. Maybe Driver D is listening to the radio or thinking about whether the Tigers might ever have a winning season again. Driver D runs a red light and causes an accident. Pretty dumb. The behavior is negligent -- but not necessarily reckless or grossly negligent. This level of negligence is called "ordinary negligence." Now compare Driver B (B is for beer) who after two six packs decide to proceed down the same busy street at 75 mph – 40 mph over the posted limit. At the same intersection Driver B whizzes through the red light and also causes an

accident. Driver B's behavior is beyond ordinary negligence. It is grossly negligent or reckless. It is reckless behavior of this sort, demonstrating a substantial lack of concern for whether an injury results, that is not protected against and could expose a worker to liability. In Martin v. Children's Aid Society, the Michigan Court of Appeals extended absolute immunity to a private agency under contract to the Michigan DSS. 30 The plaintiffs' infant daughter was removed from their custody by the DSS after hospital tests revealed numerous broken bones in various stages of healing. The DSS placed the child with Children's Aid Society (CAS). CAS contracted with the DSS to provide services to neglected and abused children. CAS placed the child in a foster home. Following several years and many hearings, the parents regained custody after submitting medical evidence that the child suffered from a disease that caused her injuries. The parents filed an action alleging negligence, breach of statutory and contractual duties, bad faith and violation of constitutional rights against CAS and various social workers for CAS and the DSS. The court recognized in Martin that many federal courts had extended absolute immunity to child protection caseworkers for suits alleging deprivation of constitutional rights under 42 USC 1983. However, the court noted that it did not intend to create "blanket absolute immunity."31 The court stated that the immunity granted was "limited to the facts of this case, in which the close oversight of the social worker's placement recommendations by the probate court is especially noteworthy."32 Further, although the court noted the basis of the plaintiffs' case in Martin was not a federal claim, rather state law claims, it adopted the reasoning of the federal cases cited above in extending the protections to private agencies. The rationale is worthy of an extended quotation here33: Federal appellate courts have extended absolute immunity to social workers initiating and monitoring child placement proceedings and placements in cases similar to the instant case. Babcock v.

Tyler, 884 F.2d (CA 9, 1989); Vosburg v. Dep't of Social Services, 884 F.2d 133 (CA4, 1989); Coverdell v. Dep't of Social & Health Services, 834 F.2d 758 (CA9, 1987); Meyers v. Contra Costa Co Dep't of Social Services, 812 F.2d 1154 (CA 9, 1987); Kurzawa v. Mueller, 732 F.2d 1456 (CA 6, 1984). These precedents recognize the important role that social workers play in court proceedings to determine when to remove a child from the home and how long to maintain the child in foster care. They also recognize that, to do that difficult job effectively, social workers must be allowed to act without fear of intimidating or harassing lawsuits by dissatisfied or angry parents. Kurzawa, supra at 1458. Caseworkers need to exercise independent judgment in fulfilling their post-adjudication duties. The fear of financially devastating litigation would compromise caseworkers' judgment during this phase of the proceedings and would deprive the court of information it needs to make an informed decision ... . There is little sense in granting immunity up through adjudication ... and then exposing caseworkers to liability for services performed in monitoring child placement and custody decisions pursuant to court orders. Babcock, supra at 503. Accord Coverdell, supra at 765, "To permit the [social] worker to become 'a lightning rod for harassing litigation . . .' would seriously imperil the effectiveness of state child protection schemes." *** When a court is involved, granting immunity from civil suit does not mean that the parents of a child taken from their home are without recourse to contest wrongful conduct by a social worker. "The parent of the apprehended child is not left remediless--he or she may always attack the court's order directly or on appeal." Id. Accord Vosburg, supra at 136 "Safeguards against . . . misconduct were built into the . . . adjudication process itself." Although we have found no Michigan precedent regarding this question, we find convincing the decisions granting absolute immunity to social workers. As the CAS

defendants persuasively point out in their brief, absolute immunity is necessary to assure that our important child protection system can continue to function effectively: No more heinous act can be alleged than the physical abuse of a helpless infant by an adult. The volatile mix of accused parents, deprived of the custody of the baby, observing it in the care of foster parents, finding themselves in the unfamiliar confines of the court system, required to retain counsel at great cost, subject to the social services bureaucracy and its necessary interrogation and probing of the most intimate aspects of the family psyche, is almost guaranteed, rightly or wrongly, to produce resentment and a desire for retribution by the parent. Many parents in this situation are seriously psychologically disturbed. Professional assistance to the Probate Court is critical to its ability to make informed, life deciding judgments relating to its continuing jurisdiction over abused children. Its advisors and agents cannot be subject to potential suits by persons, aggrieved by the Court's decision vindictively seeking revenge against the Court's assistant as surrogates for the jurist. Faced with such liability, the social worker would naturally tend to act cautiously and refrain from making difficult decisions, delay in intervening to protect the child, avoid confronting the aggressive parent with the necessity of changing his attitudes and seeking psychiatric help to do so. Such an atmosphere defeats the function of the continuing jurisdiction of the Probate Court in the abstract, and in reality poses the potential for death for an abused child who is not protected because the social worker exercised excessive caution in arriving at a judgment as to whether there is sufficient evidence of abuse to merit action on his or her part. Mere qualified immunity is not enough protection to prevent the chilling effect of a potential suit on the exercise of a social worker's professional judgment and discretion in operating as an arm of the Probate Court to protect abused children. This litigation is vivid proof of that. Judge

Stephens has ruled that Cross-Appellants have qualified immunity, but that has not prevented years of litigation. The threat of a suit like this one could make any social worker back off from making discretionary decisions that he or she would otherwise believe to be in the child's best interest. Two years after Martin, in Spikes v. Banks, the plaintiff became a ward of the state when she was 13. She was placed with defendant Teen Ranch, Inc., which in turn placed her in a foster home with defendant Annie Banks (Banks).34 While residing with Banks, the plaintiff was sexually assaulted by Banks' 23-year-old nephew. The nephew impregnated her. The plaintiff's complaint alleged Teen Ranch and Banks were negligent in their care of her. The trial court granted summary disposition to Teen Ranch, relying on absolute immunity created in Martin, supra. More recently, in Beauford v. Lewis, the court again granted absolute immunity to a social worker.35 In Beauford, the plaintiff's daughter was removed from her custody pending termination proceedings alleging possible sexual abuse of the child by the plaintiff's husband. Following lengthy custody proceedings - in which the defendant social worker investigated and recommended termination of the plaintiff's rights - the plaintiff regained custody of her daughter. The plaintiff sued the social worker, and the claim was summarily dismissed pursuant to Martin. The plaintiff argued the trial court erred in granting immunity under Martin, because Martin was limited to its particular facts (close oversight by the probate court). The Beauford court held that the "close oversight" referred to in Martin was satisfied in a situation in which the probate court reviewed the defendant social worker's findings and recommendations, and took action as a result, at proceedings in which parents are able to contest the recommendations.36 The court held that the defendant "acted as an agent to aid the court in its decision regarding termination of plaintiff's parental rights, and her investigation and recommendations were subject to

review by the family division as part of its proceedings. . .the court's failure to address the course and conduct of [her] investigation is irrelevant."37".

1576. Footnote 26. states "MCL 722.625; See also Awkerman by Awkerman v. Tri-County Orthopedic Group, P.C. (1985) 143 Mich.App. 722; O'Donnell v. Brown, 335 F. Supp. 2d 787, 2004 U.S. Dist. LEXIS 18976 (W.D. Mich. 2004)".

1577. Footnote 27. states "Id.".

1578. Footnote 28. denotes "O'Donnell v. Brown, 335 F. Supp. 2d 787, 2004 U.S. Dist. LEXIS 18976 (W.D. Mich. 2004)".

1579. Footnote 29. denotes "MCL 691.1407".

1580. Footnote 30. denotes "Martin v. Children's Aid Society, 215 Mich.App. 88, 544 N.W.2d 651 (1996)

1581. Footnote 31.denotes " Martin, 215 Mich.App. at n.5.

1582. Footnote 32. states "Id.

1583. Footnote 33. states "Id. at 95-97 497".

1584. Footnote 34. denotes "Spikes v. Banks, 231 Mich.App. 341 (Mich. App. 1998)".

1585. Footnote 35. denotes "Beauford v. Lewis, 269 Mich. App. 295, 711 N.W.2d 783 (2005)".

1586. Footnote 36. denotes "Beauford, 711 N.W.2d at 786.".

1587. Footnote 37. denotes "Beauford, 711 N.W.2d at 786-787.".

1588. MCWL 19.6. states "DHS CASEWORKERS MAY BE HELD PERSONALLY LIABLE FOR MONETARY DAMAGES. In O'Donnell v. Brown, the federal court in the Western District of Michigan held that child protection caseworkers cannot claim they have absolute immunity and/or qualified immunity from being individually sued for monetary damages under state tort claims [such as for: false imprisonment, gross

negligence] if they violate a person's constitutional rights.38 The O'Donnell Court additionally held if caseworkers violate persons constitutional rights, the individual worker can be held personally liable for monetary damages under 42 USC § 1983, and the court concluded that caseworkers cannot claim immunity from personal monetary damages based on the Eleventh Amendment, which bars suits against states absent consent or congressional approval.39".

1589.    Footnote 38. denotes "O'Donnell v. Brown, 335 F. Supp. 2d 787, 2004 U.S. Dist. LEXIS 18976 (W.D. Mich. 2004)".

1590.    Footnote 39. states "Id.".

1591.    MCWL 19.7. states "Although the risk of successful lawsuit against child welfare workers is not great, there is still some risk and workers and their agencies must know and carefully abide by the legal limits of their power to investigate and intervene in families.40 If you are sued for an activity that is within the scope of your employment with the State, the Attorney General will represent you and does so very vigorously. If your conduct was within the scope of your employment, the State will pay damages if they are ordered. If you are faced with the possibility of a suit, consult the Administrative Handbook for instructions.".

1592.    Footnote 40. states "See "Governmental Immunity for the Child Care Social Worker: Has Michigan Gone Too Far for Too Little?" 5 Cooley L. Rev. 763 (1988)".

1593.    The Defendants failed to follow their own policies, statutes and court rules thus failed willful neglect to perform their statutory duty.

1594.    MCL 750.478 states : "When any duty is or shall be enjoined by law upon any public officer, or upon any person holding any public trust or employment, every willful neglect to perform such duty, where no special provision shall have been made for the

punishment of such delinquency, constitutes a misdemeanor punishable by imprisonment for not more than 1 year or a fine of not more than $1,000.00."

1595.    Michigan CPS has systemic issues not isolated to the H. Family.

1596.    Michigan's structural decision making tool, MiSACWIS is deeply flawed and is resulting in wrongful removals primarily due to inaccurate data propagated by CPS investigators like Thomaca Bush.

1597.    MiSACWIS is scheduled to be replaced by 2024, because MiSACWIS is so unreliable, federal court monitors wouldn't accept data generated through the system.

1598.    "During a May 10, 2018 status conference in the matter of Dwayne B. vs. Snyder, the Honorable Nancy G. Edmunds of the United States District Court for the Eastern District of Michigan ordered an independent assessment of MiSACWIS and the state's child welfare data reporting infrastructure."

1599.    " The order arose from persistent and significant data quality and reporting challenges that have prevented, delayed, or stymied efforts by court monitors to verify the state's progress in implementing multiple commitments related to Dwayne B. vs. Snyder, including those prescribed in an Initial Agreement."

1600.    "The goal of this assessment was to identify factors that impact MDHHS' ability to collect, store, process, and produce accurate data related to the commitments of the ISEP for the case of Dwayne B. vs. Snyder. Independent Assessment of Michigan's Statewide Automated Child Welfare Information System (MiSACWIS) and Child Welfare Data Reporting Infrastructure."

1601.    "This evaluation was conducted from July 2018 to February 2019."

1602.    "Finding # 1: Persistent and significant defects stemming from a flawed MiSACWIS design and initial roll-out continue to generate an unmanageable backlog of

defects, incidents, and data fixes that are likely to persist indefinitely, inhibit effective casework, contribute to data entry errors, negatively affect outcomes for children and families, and impact MDHHS's ability to collect and report accurate and timely ISEP data for both the monitors and field staff."

1603.     "Multiple sources indicated that MiSACWIS system defects, system design problems, and data entry errors lead to persistent data quality challenges that impair the quality and availability of data needed for reporting and responding to ISEP commitments. These issues present an obstacle to effective, efficient, and quality casework and impair caseworkers' ability to achieve positive outcomes for children and families consistent with the expectations of the ISEP."

1604.     MiSACWIS Assessments, Reviews, Audits, and Surveys reviewed for this report included the State Audit Report – OAG MiSACWIS Performance Audit Report; June 2017 OAG Results of the OAG's audit of MiSACWIS conducted April 2014 to February 2017; State Audit Report Response –MDHHS Initial Response to OAG; MiSACWIS Performance Audit Report January 2018; MDHHS initial response to the OAG's audit of MiSACWIS State Audit Report Response –MDHHS summary of responses as of August 6, 2018 to the OAG MiSACWIS Performance Audit Report; MDHHS summary of responses as of August 6, 2018 to the OAG's audit of MiSACWIS State Audit Report – OAG Children's Protective Services (CPS) Performance Audit Report September 2018; and OAG Results of the OAG's audit of MDHHS CPS Investigations conducted May 2014 to July 2016.

1605.     OAG's audit of MiSACWIS State Audit Report – OAG Children's Protective Services (CPS) Performance Audit Report September 2018 highlights systemic issues that also occurred in the H. Family case.

1606.    "AUDIT SCOPE To examine activities and records related to MDHHS's CPS

investigations. We conducted this performance audit in accordance with generally

accepted government auditing standards. Those standards require that we plan and

perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis

for our findings and conclusions based on our audit objectives. We believe that the

evidence obtained provides a reasonable basis for our findings and conclusions based on

our audit objectives."

1607.    "The audit objectives and corresponding audit procedures were directed toward

concluding on MDHHS operations related to CPS field investigations. Our audit

objectives and procedures were not directed toward concluding on MDHHS's CPS

complaint intake operations or service provision and intervention operations."

1608.    "MDHHS did not appropriately commence 17% of reviewed investigations within

the CPL-required 24-hour time frame. MDHHS cited differences in interpretation of the

law with the OAG regarding the requirement and application of MDHHS policy for over

one-third of the exceptions noted (Finding #1).

1609.    MDHHS could not support that investigators had conducted a complete CPS

history review for family and household members in approximately 40% of the

investigations reviewed (Finding #4)."

1610.    "Investigators' face-to-face contact with alleged child victims was not within

required time frames in 11% of reviewed investigations, averaging 6.4 days late (Finding

#6).

1611.    Investigators did not document required interviews of children, or the reason(s)

why an interview was not conducted, in 7% of reviewed investigations. Investigators also

did not document verification of the safety and whereabouts of all children in 13% of reviewed investigations (Finding #7)."

1612. "MDHHS could not support that initial safety planning had occurred or that it was not needed in 33% of reviewed investigations. Also, investigators' safety assessments were not complete or accurate for 7% of reviewed investigations and, on average, were not completed until 25 days after the initial contact with families (Finding #8)."

1613. "MDHHS did not accurately assess the risk of future harm to children in over 35% of reviewed investigations. These inaccuracies led to improper category classification and Central Registry omissions for 8 investigations in our sample (Finding #13)."

1614. "The CPL requires MDHHS to use a structured decision-making (SDM) tool* (commonly referred to as the risk assessment tool) to measure the risk of future harm to a child and to classify each completed investigation as a Category I, II, III, IV, or V based on its investigation conclusions. MDHHS's SDM tool contains 22 questions. Investigators must respond to 15 questions based on gathered evidence, and MiSACWIS provides automatic responses for 7 questions based on the family's data entered into MiSACWIS." "Investigator-provided responses address topics such as the caretaker's mental health, current abuse of substances, domestic violence history, and CA/N experienced as a child. MiSACWIS automatically populates responses for questions related to prior household and family member CPS involvement, the number of children in the household, and the age of the youngest child in the home. Based on the accumulated responses to the 22 questions, a numeric score is calculated and the risk level (intensive, high, moderate, or low) of future harm to the children is assessed. This

assessed level and the investigator's conclusion of whether a preponderance of evidence of CA/N exists dictate the investigation category classification."

1615.    "The CPL requires MDHHS to add confirmed perpetrators of CA/N to the Central Registry in all investigations classified as Category I and II and certain Category III investigations.

1616.    We reviewed the completed risk assessment tool for 156 investigations, in conjunction with other investigation documentation. We noted that the risk assessment tool was inaccurately completed because, in some instances, MiSACWIS incorrectly populated certain responses and the investigator did not make the necessary corrections and, in other instances, the investigator incorrectly responded to questions contrary to collected evidence. This resulted in improper risk-level assessments for 57 (37%) of the investigations as follows: For 11 investigations, the inaccuracies in the risk assessment tool resulted in assessed risk levels that were too high. When the risk of future harm to a child is assessed too high, families may be subject to higher-than-needed levels of monitoring, such as additional face-to-face contacts with MDHHS, and receive services that are not warranted for the circumstances. Also, when a preponderance of evidence of CA/N is found in the investigation and the risk is assessed too high, there is a risk that MDHHS may assign a higher category classification to the investigation and inappropriately add the perpetrator to the Central Registry."

1617.    "We determined that underlying system coding caused MiSACWIS to often provide an inaccurate response for 6 of the 7 automatically generated responses and investigators did not always make the appropriate corrections. In addition, MDHHS supervisory oversight intended to ensure compliance with investigation requirements was

not sufficient to identify and correct the inaccurately assessed risk levels (see Finding #17)."

1618. "We consider this finding to be a material condition because of the significant exception rate and the potential for negative implications on child safety resulting from inaccurate CPS investigation conclusions related to post-investigative monitoring and services, investigation category classification, and proper placement of known perpetrators on the Central Registry."

1619. "RECOMMENDATION We recommend that MDHHS accurately assess the risk of future harm to children for CPS investigations."

1620. "AGENCY PRELIMINARY RESPONSE MDHHS provided auditors with the following response: MDHHS agrees with the need for CPS to accurately assess risk of future harm to children during CPS investigations. To that end, MDHHS determined that errors in completion of the Risk Assessment Tool were chiefly the result of user error in scoring the tool."

1621. "In the July 2017 release, MiSACWIS stopped prefilling questions in the risk assessment which helps ensure that the worker accurately completes the assessment rather than relying on the system to score the items. To improve supervisory overview of tool completion and increase the likelihood that user misapplication of the tool will be identified and corrected, the department has requested a MiSACWIS enhancement that will result in all questions and responses for each risk factor to appear on the CPS Investigation Report. Supervisors reviewing the Report will have more information upon which to verify tool accuracy."

1622. "MDHHS did not conduct impact assessments for Michigan Statewide Automated Child Welfare Information System (MiSACWIS) risk assessment functionality changes.

We identified over 6,000 previously completed investigations with incorrect risk levels and nearly 24,000 other investigations with potentially incorrect risk levels (Finding #14)."

1623.       "CPS investigators need to improve their completion of child and family needs and strengths assessments because they incorporate the family's input to identify focus areas to reduce the risk of future CA/N. Specifically, the assessments help identify the services needed, gaps in resources, and strengths that may help the family provide a safer environment for the children."

1624.       "Of 73 CPS investigations that required completion of the child and family needs and strengths assessments, they were not completed for 14 (19%) investigations and 29 children, which included 5 alleged victims and 24 other children."

1625.       "MDHHS policy requires a completed child assessment of needs and strengths for each child victim and any other children residing in a household with a perpetrator of child abuse or neglect when a preponderance of evidence of CA/N is found to exist. In addition, policy indicates that a family assessment of needs and strengths must also be completed in most instances when an investigation finds that a preponderance of evidence of CA/N exists."

1626.       "MDHHS supervisory oversight intended to ensure compliance with investigation requirements was not sufficient to identify and correct the deficiencies noted in the completion of child and family needs and strengths assessments (see Finding #17).

1627.       Investigators did not complete required child and family needs and strengths assessments for nearly 20% of reviewed investigations (Finding #15)."

1628.       "Ineffective supervisory review of investigations significantly contributed to deficiencies reported in 15 findings, 11 of which are considered to be material conditions.

Also, CPS supervisors did not review 18% of reviewed investigations within 14 calendar days and could not support that required case consultations occurred with investigators for 15% of reviewed investigations (Finding #17)."

1629. "MDHHS did not monitor families' participation in post-investigative services for nearly 22,000 investigations and therefore could not determine whether these families received and participated in the services intended to alleviate the child's risk level for CA/N (Finding #18)."

1630. "Clarification of MDHHS policy and guidance provided to CPS investigators is needed for properly classifying investigations when MDHHS has filed a court petition and subsequent evidence does not support that CA/N occurred. Misclassification can impact Central Registry decisions, post-investigative service provision, and the accuracy of CPS history records (Finding #19)."

1631. "MDHHS policy is sometimes ambiguous related to Category I classifications for CPS investigations. The CPL states that the department shall determine in which single category (of 5 choices) to classify an allegation of CA/N based on the results of a completed field investigation and defines the 5 single categories."

1632. "Section 8d(1)(e) of the CPL defines a Category I CPS investigation as an investigation in which a court petition is required, and the department determines that there is evidence of CA/N, and 1 or more of 4 specifically outlined situations are true."

1633. "The CPL also requires that MDHHS list all perpetrators associated with a Category I investigation on the Central Registry.

1634. While the majority of MDHHS's policy is directly reflective of these CPL requirements for a Category I classification, policy language related to CPS risk assessment and escalation of a CPS category both contain statements indicating that CPS

investigators must assign a Category I classification to an investigation any time a court

petition is filed without any additional commentary related to the other CPL

requirements. Even though MDHHS intends for these statements to be applied only in

situations where there is a preponderance of evidence that CA/N has occurred, our

interviews with MDHHS investigation staff and management confirmed that confusion

commonly exists when determining the appropriate classification for investigations when

a court petition is filed and the evidence obtained during the investigation does not

support that CA/N occurred. This confusion was also evidenced in our selected

investigations."

1635.     "MDHHS provided Auditors with the following response: MDHHS disagrees.

Law, policy, and training are clear that a complaint investigation may only be classified

as a Category I after child abuse or neglect is confirmed. The error that the OAG detected

was the result of a MiSACWIS error that has since been rectified to reflect existing

policy. Prior to April 2016, MiSACWIS defaulted to a Category I disposition when a

court petition was filed which may have led to confusion amongst some field staff."

1636.     "MDHHS agrees that any misidentification of a person's name on the Central

Registry would be concerning and warrant prompt correction. MDHHS is in the process

of determining if any other names may have been improperly listed on the Central

Registry prior to the modification made to MiSACWIS."

1637.     "MDHHS could not support that it provided notification to perpetrators that their

names had been added to the Central Registry for over 40% of reviewed investigations

(Finding #21)."

1638.     "Our review of 37 investigations that required MDHHS to add the perpetrator(s)

to the Central Registry noted that MDHHS did not have documentation to support that it

had appropriately provided written notification to 24 perpetrators associated with 16 (43%) of the investigations."

1639.      "CPS investigators provided Auditors with differing responses to explain why documentation of written notification was absent. Responses included that a notice was not provided or documented, and some investigators provided no explanation. In addition, MDHHS supervisory oversight intended to ensure compliance with investigation requirements was not sufficient to identify and correct instances when documentation of notifications was deficient (see Finding #17)."

1640.      "We consider this finding to be a material condition because of the significant exception rate and the impact on individuals being potentially unaware of their inclusion on the Central Registry and their legal right to request hearings for amendment or expunction.

1641.      MDHHS's lack of documentation is significant because, without proof that notifications occurred, MDHHS may be unable to support its actions and decisions if subsequently questioned or challenged and, for auditing purposes, we must presume that the notifications did not occur."

1642.      "MDHHS provided Auditors with the following response: MDHHS agrees that documentation in MiSACWIS was not sufficient in some cases to subsequently demonstrate that notification occurred and that improvements with documentation consistency are needed. Lack of documented notice does not necessarily mean that notification was not provided to individuals listed on the Central Registry. Oftentimes, the CPS worker provides the written notification to the person during the initial Family Team Meeting. When that is not feasible, the worker is responsible for sending the

notification letter registered or certified mail and documenting this in the electronic case file."

1643.      "In February 2018, MDHHS sent a statewide Communication Issuance to child welfare staff outlining implementation strategies to increase uniformity in documentation. Staff were directed to print, sign and provide the DHS-847 (notification letter) via certified mail. The communication directs staff to document in MiSACWIS that the notice was sent via certified mail; and then, upon receipt of the certified mail receipt, document, scan, and upload a copy in MiSACWIS that proof of receipt was received."

1644.      "MDHHS did not capture complete, accurate, and/or valid investigation commencement data for 26% of reviewed investigations (Finding #24)."

1645.      "OBSERVATION #3 Commonly used MDHHS policy terms should be standardized to provide clarity and help ensure consistency in carrying out investigations. Inconsistent policy terminology may have contributed to some deficiencies noted during our review of 160 selected CPS investigations."

1646.      "Standardizing commonly used policy terminology would increase MDHHS's assurance that CPS investigation requirements are carried out in a consistent, systematic, and objective manner."

1647.      "The CWLA Standards of Excellence for Services for Abused or Neglected Children and Their Families states that the child protection agency should develop and maintain written policies and procedures that provide its staff and community members with important information about the agency's philosophy, mission, purpose, practice expectations, and organizational structure. The agency's policies and procedures should provide staff with a clear statement of their roles and responsibilities and should be written in a consistent format. As an example, we noted that MDHHS used 11 different

terms throughout CPS policies to describe adults associated with an investigation. These inconsistencies may have contributed to some of the deficiencies noted during our review of Central Registry clearances (Finding #2), criminal history checks (Finding #3), and CPS history checks (Finding #4):"

1648.     The defendants unlawful actions were taken under color of law and resulted in a 60 day deprivation plaintiffs constitutionally protected rights; 1st amendment right to familial association and free from invasion of privacy, 4th amendment right to be secure in person and property, and free from invasion of privacy, 5th amendment right to due process, and of the 14th amendment right of equal protection at stake here is "the interest of a parent in the companionship, care, custody, and management of his or her children." Stanley v. Illinois, 405 U. S. 645, 651 (1972)

1649.     Defendants failure to hold a post deprivation hearing the next business day rendered any post-deprivation remedies insufficient to absolve any earlier due process defects.

1650.     Defendants do not have a defense of an extraordinary situation where some valid governmental interest was at stake that justified deviation from statutory requirements.

1651.     Had defendants acted in an emergency situation, they still denied the H. Family post-deprivation notice and a hearing was not provided as required by statute in failing to give them a post deprivation hearing.

1652.     The Ingham County Court case involved no emergency, and it would not have been impossible to get a valid, written court order for the removal of the children if probable cause truly had existed.

1653.     While post-deprivation process can make up for lack of pre-deprivation process when government officials commit "random or unauthorized" acts, but in the Ingham

County case, the Defendants, who are government officials acted according to established practices that themselves violate due process rights.

1654.  The deprivation of the H. Family's constitutional rights resulted in part from MDHHS policies, custom, a failure to supervise and a failure to train.

1655.  The deprivation of the H. Family's constitutional rights resulted in part from the Ingham County Juvenile Courts policies, custom, a failure to supervise and a failure to train.

1656.  The H. Family have a greater likelihood of future CPS involvement then the average family due to the use of mere "concerns" without reasonable suspicions, probable cause or preponderance of the evidence.

1657.  The H. Family have a greater likelihood of future CPS involvement then the average family due to their lifestyle choices and risk factors.

1658.  The H. Family has changed their travel patterns out of fear of a 3rd report in Michigan and likelihood of future deprivation of rights.

1659.  The H. Family still travels to Michigan monthly for personal business and pleasure.

1660.  The H. Family still travels to Michigan for two (2) week stays at their membership resorts several times a year for about a total of eight (8) to ten (10) weeks out of the year.

1661.  The H. Family still has membership at a resort in Ingham County Michigan in which they are entitled to 2 week vacations at a time.

1662.  The H. Family has incurred additional expense utilizing hotels instead of their RV for several of their trips to Ingham County Michigan, in fear of future CPS calls based on erroneous assumptions and concerns of potential neglect indicators like presumption of

homelessness.

1663.       The H. Family has incurred additional expenses beyond their membership

commitments, at $425.00 a month, 10 months out of the year, by staying primarily

stationary at a campground in Illinois, out of fear, their frequent travel will cause future

CPS calls based on erroneous assumptions and concerns of potential neglect indicators.

1664.       The H. Family have a likelihood of future CPS involvement in Michigan because

of their timeshare resorts have 11 resorts in Michigan and the H. Family travels to

Michigan often under the same circumstances that lead to two (2) prior cps

investigations.

1665.       The H. Family has a likelihood of future CPS involvement in Michigan because

Ingham County officials have retaliated against the H. Family for 1st amendment

activities such as contacting government officials to address the H. Family's concerns and

grievances.

1666.       In May 2019, Thomaca Bush attempted to press criminal charges against H. H.

for protected free speech to chill future free speech, made accusations about H. H. mental

health status being some sort of threat to her, but a subsequent criminal investigation

found no evidence of a crime and only protected free speech, with the Lansing Detective

concluding H. H. was airing her grievances in the correct manner and Thomaca Bush was

seeking H. H. be prohibited from contacting public officials about evidence H. H. was

uncovering and from making social media posts about the government malfeasance H. H.

discovered and the H. Family's issues with the Ingham County case exposing Thomaca

Bush's actions and inactions.

1667.       On March 5th 2020 Ingham County Juvenile Court Administrator Scott Leroy

sent Illinois law enforcement to do a welfare check on H.H. and the 2 children, in an act

of intimidation to chill future free speech.

1668.     Ingham County Juvenile Court Administrator Scott Leroy has attempted to

gaslight H. H. that the children's removal was H. H. fault for failing to appear in court

September 28th 2018, that the court did nothing improper at case initiation, suggesting H.

H. needed to seek mental help instead of seeking redress of grievances.

## ARGUMENTS

WHEREFORE, Plaintiffs respectfully request that this Honorable Court consider the following arguments:

1. On or about September 29th 2018, in Champaign County Illinois, the H. Family minor children were unlawfully removed from their care, in violation of statute denying substantive and procedural due process to Michigan, prior to an enforceable court order, the original petition willfully taken away, withdrawn, or avoided from the record, removal without following statutory requirements for reasonable efforts, acting in discrimination of a protected class (disability discrimination) in violation of Illinois, Michigan and federal law, at the behest of the named Defendants until November 29th 2018.

2. The 4th Amendment of the United States Constitution required no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

3. The Sixth Circuit has established parents and children have a well-elaborated constitutional right to live together without governmental interference, that a parent has a liberty interest in familial association and privacy that, absent extraordinary circumstances, cannot be violated without adequate pre-deprivation procedures, this interest includes parents' rights to make decisions about the care, custody, and management of their children. O'Donnell v. Brown, 335 F. Supp. 2d 787, 813 (W.D. Mich. 2004)

4. The Sixth Circuit has established the substantive component of the Due Process Clause provides "heightened protection against government interference with certain fundamental rights and liberty interests", that in the absence of exigent circumstances

or a court order authorizing the children to be seized and placed in protective custody, children can not be removed without notice to the parents, that governmental officials will not remove a child from his home without an investigation and pre-deprivation hearing resulting in a court order of removal, absent exigent circumstances requires pre deprivation notice and a hearing except for extraordinary situations where some valid governmental interest is at stake that justified postponing the hearing until after the event only where a child's life is in imminent danger or where there is immediate danger of severe or irremediable injury to the child's health (and prior judicial authorization is not immediately obtainable) may an official summarily assume custody of a child from his parents, post-deprivation remedies will be adequate only when pre-deprivation remedies were "impossible" and courts permit post-deprivation process to make up for lack of pre-deprivation process when government officials commit "random or unauthorized" acts, but when government officials act according to an "established state procedure that itself violates due process rights," post-deprivation remedies are inadequate. O'Donnell v. Brown, 335 F. Supp. 2d 787, 813 (W.D. Mich. 2004)

5. The Sixth Circuit has established due process requires a valid, written court order for the removal of the children before children can be seized absent exigent circumstances or probable cause. O'Donnell v. Brown, 335 F. Supp. 2d 787, 813 (W.D. Mich. 2004)

6. The Sixth Circuit has established an ex parte hearing based on misrepresentation and omission does not constitute notice and an opportunity to be heard. O'Donnell v. Brown, 335 F. Supp. 2d 787, 813 (W.D. Mich. 2004)

7. The Sixth Circuit has established the Fourth Amendment applies to CPS workers, as

it does to all other officers and agents of the state whose requests to enter, however benign or well-intentioned, are met by a closed door. There is ... no social worker exception to the strictures of the Fourth Amendment. Walsh v. Erie County Dept. of Job and Family Serv., 240 F. Supp. 2d 731 - Dist. Court, ND Ohio 2003 and O'Donnell v. Brown, 335 F. Supp. 2d 787, 813 (W.D. Mich. 2004)

8. The Sixth Circuit has established there can be no doubt that the state can and should protect the welfare of children who are at risk from acts of abuse and neglect. There likewise can be no doubt that occasions arise calling for immediate response, even without prior judicial approval. But those instances are the exception. Otherwise child welfare workers would have a free pass into any home in which they have an anonymous report of poor housekeeping, overcrowding, and insufficient medical care and, thus, a perception that children may be at some risk. Walsh v. Erie County Dept. of Job and Family Serv., 240 F. Supp. 2d 731 - Dist. Court, ND Ohio 2003

9. The Sixth Circuit has established this is not to say that CPS workers could have done nothing in response to reports of abuse or neglect but once the plaintiffs declined to be responsive, CPS workers are obligated by the Constitution to depart, and to leave the family alone and in peace until such time as more information was learned from other, and more trustworthy sources. If, at that point, the family refuses to cooperate, CPS workers have several options, including filing of an abuse or neglect complaint and seeking an emergency removal order pursuant to state laws, CPS workers electing to forego those options, then a reasonable jury could find, violates the Fourth Amendment. Walsh v. Erie County Dept. of Job and Family Serv., 240 F. Supp. 2d 731 - Dist. Court, ND Ohio 2003

10. The Sixth Circuit has established an investigation must occur before filing of an

abuse or neglect complaint and seeking an emergency removal order, based on probable cause, pursuant to state laws and that anonymous reports of poor housekeeping, overcrowding, and insufficient medical care and, thus, a perception that children may be a some risk is not probable cause. Walsh v. Erie County Dept. of Job and Family Serv., 240 F. Supp. 2d 731 - Dist. Court, ND Ohio 2003

11. The Sixth Circuit has clearly established prosecutorial immunity is not a defense for the execution of a removal order that would not have been issued but for known falsities that the social worker provided to the court to secure the order and has directly held that a social worker, like a police officer, cannot execute a removal order that would not have been issued but for known falsities that the social worker provided to the court to secure the order. Brent v. Wayne Co. Dept. of Human Services, 901 F.3d 656, 685 (6th Cir. 2018)

12. "The rights of parents to the care, custody and nurture of their children is of such character that it cannot be denied without violating those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions, and such right is a fundamental right protected by this amendment (First) and Amendments 5, 9, and 14". Doe v. Irwin, 441 F Supp 1247; U.S. D.C. of Michigan, (1985).

13. It is clearly established in this district and the 6th circuit "Procedural due process generally requires that the state provide a person with notice and an opportunity to be heard before depriving that person of a property or liberty interest." "The constitutional guarantee of procedural due process requires that the government provide "due process" before making a decision to "infringe upon a person's life, liberty, or property interest." Howard v. Grinage, 82 F.3d 1343, 1349 (6th

Cir.1996)."Procedural due process "prohibits arbitrary and unfair deprivations of

protected life, liberty, or property interests without procedural safeguards." Id. at

1350. The touchstone of procedural due process is the fundamental requirement that

an individual be given the opportunity to be heard "in a meaningful manner." Id. at

1349. "[T]he right to a hearing prior to the deprivation is of constitutional stature."

O'Donnell v. Brown, 335 F. Supp. 2d 787 (W.D. Mich. 2004)

14. It is clearly established in this district and the 6th circuit "Supreme Court held that

post- deprivation remedies that fully compensate a plaintiff for his loss of property are

sufficient to satisfy the requirements of due process. The Sixth Circuit has extended

the Parratt rule to deprivation of liberty rights. See, e.g., Wilson v. Beebe, 770 F.2d

578, 584 (6th Cir.1985); Braley v. City of Pontiac, 906 F.2d 220, 223 (6th Cir.1990).

However, post-deprivation remedies will be adequate only when pre-deprivation

remedies were "impossible," Mertik v. Blalock, 983 F.2d 1353, 1364-65 (6th

Cir.1993), for example, because of an emergency situation. See Donald v. Polk

County, 836 F.2d 376, 380 (7th Cir.1988) ("In an emergency situation, the government

may take away property or liberty, so long as postdeprivation notice and a hearing are

provided."); Jordan by Jordan, 15 F.3d at 343 ("[I]t is well-settled that the

requirements of process may be delayed where emergency action is necessary to avert

imminent harm to a child ... provided that adequate post-deprivation process to ratify

the emergency action is promptly accorded."" O'Donnell v. Brown, 335 F. Supp. 2d

787 (W.D. Mich. 2004)

15. It is clearly established in this district and the 6th circuit "the substantive component

of the Due Process Clause provides "heightened protection against government

interference with certain fundamental rights and liberty interests." Washington v.

Glucksberg, 521 U.S. 702, 720, 117 S.Ct. 2258, 2267, 138 L.Ed.2d 772 (1997). The

Supreme Court has consistently recognized that rights involving family life are

worthy of special constitutional protection. See, e.g., Moore v. City of East

Cleveland, 431 U.S. 494, 499, 97 S.Ct. 1932, 1935-36, 52 L.Ed.2d 531 (1977)

(listing cases). Courts have recognized in various situations an abstract fundamental

liberty interest in familial integrity. See Martinez v. Mafchir, 35 F.3d 1486, 1490

(10th Cir.1994). This interest includes parents' rights to make decisions about the

care, custody, and management of their children. See, e.g., Santosky v. Kramer, 455

U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599

(1982) (there is "a fundamental liberty interest of natural parents in the care, custody,

and management of their child"); Glucksberg, 521 U.S. at 720, 117 S.Ct. at 2268

(stating that parents have a fundamental right to direct the upbringing of their own

children) (citing Meyer v. Nebraska, 262 U.S. 389, 43 S.Ct. 625 (1923)); Doe v.

Staples, 706 F.2d 985, 988 (6th Cir.1983) ("[I]t is axiomatic that a parent has a liberty

interest in the freedom of personal choice in matters of family life in which the state

cannot interfere.") (citing Smith v. Organization of Foster Families, 431 U.S. 816, 97

S.Ct. 2094, 53 L.Ed.2d 14 (1977) and Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208,

31 L.Ed.2d 551 (1972))." O'Donnell v. Brown, 335 F. Supp. 2d 787 (W.D. Mich.

2004)

16. In this matter the CPS defendants were following practices surrounding enforcing

orders after preliminary hearings that have not been signed by a judge, these

practices do not appear to be endorsed by law instead they directly violated state law.

17. In this matter the practices had been criticized in Michigan Courts and found to be in

a clear absence of judicial authority in a case directly taught to CPS workers, In Re

AMB.

18. CPS Defendants failed to adequately investigate the circumstances leading to the removal, failed to verify critical information before seizing the children, and gave the court false information as complaining witnesses.

19. Ingham County CPS and MDHHS/FIA (as their predecessor) have been aware since July 30th 2004, that parents have the right to due process when it was upheld against FIA and Ingham County CPS Investigators in "O'Donnell v. Brown, 335 F. Supp. 2d 787 (WD Mich 2004)".

20. Thomaca Bush and the other Defendants employed by MDHHS, did receive training on the standards clearly established in "O'Donnell v. Brown, 335 F. Supp. 2d 787 (WD Mich 2004)" as it is referenced in the MCWL taught to all CPS workers in Michigan

21. "The Supreme Court has recognized a right to privacy in the first, third, fourth, fifth and ninth amendments of the United States Constitution" Griswold Et Al. v. Connecticut 381 U.S. 479 (1965).

22. "At various times the Court has found a concern for privacy underlying some of the provisions of the Bill of Rights. See, e. g., Stanley v. Georgia, 394 U.S. 557, 565, 89 S.Ct. 1243, 1248, 22 L.Ed.2d 542 (1969) (the first amendment protects the right to read and observe what one pleases in the privacy of one's home); Terry v. Ohio, 392 U.S. 1, 8-9, 88 S.Ct. 1868, 1872-1874, 20 L.Ed.2d 889 (1968) (the fourth amendment protects areas in which one has a reasonable expectation of privacy from unreasonable searches and seizures); Katz v. United States, 389 U.S. 347, 350 n.5, 88 S.Ct. 507, 510 n.5, 19 L.Ed.2d 576 (1967) (the third amendment's prohibition against the peacetime quartering of soldiers protects an aspect of privacy from governmental intrusion); Griswold v. Connecticut, 381 U.S. 479, 484, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510

(1965) (several of the provisions of the Bill of Rights create "zones of privacy," including the fifth amendment, which creates a zone of privacy that an individual cannot be forced to surrender to his detriment). The Supreme Court has also held in a line of cases that the Constitution protects an individual's interest in independence in making certain kinds of important decisions. Whalen v. Roe, 429 U.S. 589, 599-600, 97 S.Ct. 869, 876-877, 51 L.Ed.2d 64 (1977). Thus, Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and progeny have established a woman's right to choose for herself whether to carry a pregnancy to term, at least until the fetus is viable. As the Court recognized in Roe, id. at 152-153, 93 S.Ct. at 726-727, this right to independence has also been found for certain decisions relating to marriage, Loving v. Virginia, 388 U.S. 1, 12, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967); procreation, Skinner v. Oklahoma, 316 U.S. 535,

541-542, 62 S.Ct. 1110, 1113-1114, 86 L.Ed. 1655 (1942); contraception, Eisenstadt v. Baird, 405 U.S. 438, 453-454, 92 S.Ct. 1029, 1038-1039, 31 L.Ed.2d 349 (1972); family relationships, Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944); and child rearing and education, Pierce v. Society of Sisters, 268 U.S. 510, 535, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925)." JP v. DeSanti, 653 F. 2d 1080 (1981)

23. "The Constitution also protects "the individual interest in avoiding disclosure of personal matters." Federal Courts (and State Courts), under Griswold can protect, under the "life, liberty and pursuit of happiness" phrase of the Declaration of Independence, the right of a man to enjoy the mutual care, company, love and affection of his children, and this cannot be taken away from him without due process of law. There is a family right to privacy which the state cannot invade or it becomes actionable for civil rights damages". Griswold v. Connecticut, 381 US 479, (1965).

24. "Once the plaintiffs declined to be responsive, the defendants were obligated by the Constitution to depart, and to leave the plaintiffs alone and in peace until such time as more information was learned from other, and more trustworthy sources." Walsh v. Erie County Dept. Of Job And Family Services 240 F.Supp.2d 731 (2003)

25. "Despite the defendants' exaggerated view of their powers, the Fourth Amendment applies to them, as it does to all other officers and agents of the state whose requests to enter, however benign or well-intentioned, are met by a closed door. There is, the defendants' understanding and assertions to the contrary notwithstanding, no social worker exception to the strictures of the Fourth Amendment." Walsh v. Erie County Dept. Of Job And Family Services 240 F.Supp.2d 731 (2003)

26. The Plaintiffs had a clearly established constitutional right to procedural due process when placed on central registry,

27. "Similarly, Selvaggio's placement of James Achterhof's name on the central registry was not entitled to absolute immunity. This action was administrative in nature, not prosecutorial. Mich.Comp.Laws § 722.627(1) requires the Department of Social Services to "maintain a central registry to carry out the intent of this act." This registry is supposed to contain only those reports "in which relevant and accurate evidence of child abuse or neglect is found to exist.          " Mich.Comp.Laws *831 § 722.622(a). It appears, however,

that once a report is filed with the department pursuant to the statute, it is immediately entered into the central registry system. To remedy those cases where a report has been improperly added to the registry section 722.627(3) provides that "[i]f the investigation of a report fails to disclose evidence of abuse or neglect, the information

identifying the subject of the report shall be expunged from the central registry." The statute further provides that "[a] person who is the subject of a report or record may request the department to expunge from the central registry a report or record in which no relevant and accurate evidence of abuse or neglect is found to exist." It appears that the placement of Achterhof on the central registry was, like the initial investigation of the case, mandated by the statute. This action was an administrative function not intimately related with the judicial process. If, as the Achterhofs allege, Selvaggio chose to maintain James Achterhof's name on the registry after an initial investigation revealed no accurate and relevant evidence of child abuse, then this decision was not entitled to absolute immunity since it too was administrative in nature, not prosecutorial." Achterhof v. Selvaggio 886 F.2d 826 (1989)

28. "Section 722.628(2) provides that "[i]n the course of its investigation, the department shall determine if the child is abused or neglected." If, as the Achterhofs allege, Selvaggio chose to continue his investigation after an initial investigation revealed no evidence of child abuse, then this action was also investigatory not prosecutorial." Achterhof v. Selvaggio 886 F.2d 826 (1989)

29. The family had a constitutional right to travel and maintain their privileges and immunities under the UCCJEA as citizens of their home state of Illinois as they do have a family residence to go home to when they weary of their travels, that they do in fact regularly return to, had not been absent from for six (6) months, was in route to return to their legal residence in Tazewell County Illinois.

30. "Separated as our issue is from that of the future interests of the children, we have before us the elemental question whether a court of a state, where a mother is neither domiciled, resident nor present, may cut off her immediate right to the care, custody,

management and companionship of her minor children without having jurisdiction

over her in personam. Rights far more precious to appellant than property rights will

be cut off if she is to be bound by the Wisconsin award of custody." May v.

Anderson, 345 US 528, 533; 73 S Ct 840, 843, (1952)

31. "(I)t is now too well settled to be open to further dispute that the 'full faith and

credit' clause and the act of Congress passed pursuant to it5 do not entitle a

judgment in personam to extraterritorial effect if it be made to appear that it was

rendered without jurisdiction over the person sought to be bound.' Baker v. Baker,

Eccles & Co., 242 U.S. 394, 401, and see 403, 37 S.Ct. 152, 155, 61 L.Ed. 386;

Thompson v. Whitman, 18 Wall.457, 21 L.Ed. 897; D'Arcy v. Ketchum, 11 How.

165, 13 L.Ed. 648." May v. Anderson, 345 US 528, 533; 73 S Ct 840, 843, (1952)

32.  "The right of a citizen of one State to pass through, or to reside in any other State, for

purposes of trade, agriculture, professional pursuits, or otherwise; to claim the benefit

of the writ of habeas corpus; to institute and maintain actions of any kind in the courts

of the State; to take, hold and dispose of property, either real or personal; and an

exemption from higher taxes or impositions than are paid by the other citizens of the

State; may be mentioned as some of the particular privileges and immunities of

citizens, which are clearly embraced by the general description of privileges deemed

to be fundamental; to which may be added, the elective franchise, as regulated and

established by the law. Corfield v. Coryell:" (C.C.E.D. Pa.) 6 Fed. Case 546, 551-552

(No. 3230) 1825

33. "The constitutional right to travel from one State to another . . . has been firmly

established and repeatedly recognized." United States v. Guest, 383 U. S. 745, 757.

"This constitutional right, which, of course, includes the right of "entering and abiding

in any State in the Union," Truax v. Raich, 239 U. S. 33, 39, is not a mere conditional liberty subject to regulation and control under conventional *643 due process or equal protection standards.[1] "[T]he right to travel freely from State to State finds constitutional protection that is quite independent of the Fourteenth Amendment." United States v. Guest, supra, at 760, n. 17.[2] As we made clear in Guest, it is a right broadly assertable against private interference as well as governmental action.[3] Like the right of association, NAACP v. Alabama, 357 U. S. 449, it is a virtually unconditional personal right,[4] guaranteed by the Constitution to us all." Shapiro v. Thompson, 394 US 618 (1969)

34. "Plaintiff clearly had a protected liberty interest in freedom from bodily restraint and freedom of bodily movement." Vinson v. Campbell County Fiscal Court, 820 F. 2d 194 (1987)

35. Basic and applicable Fourth Amendment principles were clearly articulated and firmly embedded in our constitutional jurisprudence well before the events giving rise to this suit: government officers cannot enter a home without either prior court approval, consent, or exigent circumstances; the scope of a search is limited by its justification; all persons are entitled to freedom of movement absent reasonable suspicion of criminal or other unlawful activity." Walsh v. Erie County Dept. Of Job And Family Services 240 F.Supp.2d 731 (2003)

36. The Defendants committed egregious acts in violation of the United States Constitution, policy, state and federal laws.

37. The Defendants had written policy and laws to guide them and failed to follow even the most basic of standard procedures or their own policies.

38. The Defendants maintain written policies enumerated in Children's Protective

Services Policy Manuals (PSM) that are in excess of their statutory authority and violate parents constitutional rights.

39. Defendant MDHHS/Herman Mccall, MDHHS Executive Director of Children's Services Agency, is responsible in his official capacities as the Head of MDHHS CPS, for the written policies enumerated in the Michigan Child Welfare Law manual (MCWL), Michigan Children's Protective Services Policy Manuals (PSM) and their implementation.

40. Defendant Elizabeth Montemayor is responsible in her official capacities for the written policies enumerated in Children's Protective Services Policy Manuals (PSM) and their implementation in Ingham County.

41. MDHHS was required to offer services in any case not designated "Dispositional Category V" under MCL 722.628d, and failed to offer any services to defendants even after removal, and per policy failure to have completed services can and would be used against the H. Family in future cases to elevate "safety" and/ or "risk" assessment resulting in further deprivation of constitutional rights.

42. The litany of services available but not considered or offered include: 24 hour emergency caretaker homemaker services; daycare; crisis counseling, individual and family counseling; emergency shelters; arrangements for the provision of temporary child care to provide respite to the family for a brief period, as part of a plan for preventing the children's removal from the home; home-based family services, self-help groups, provisions, or arrangements for mental health, drug and alcohol abuse counseling, Drug treatment, housing assistance, parenting education, anger management classes, mental health care referrals, child-development classes, home visits by nurses, referrals to medical care, financial management services, stress

management services, wrap-around services, and facilitate meetings with family/support persons.

43. The Ingham County petition was filed 96 hours after the initial report and the petition shows no Intensive home-based services were made available to the H. Family within 24 hours or any time thereafter to alleviate any perceived risk and stabilize the family.

44. Use of unadjudicated cases based on prior removal with no inquiry as to if evidence exists of how the parent treated the child in the past, to present at trial under rules of evidence denies the H. Family right to Due process and full weight and credit of prior court orders from Illinois.

45. Thomaca Bush's, malicious actions taken in retaliation for assertion of protected rights violated clearly established constitutional right under the 1st amendment, "To survive dismissal, a plaintiff pleading a First Amendment retaliation claim must allege that (1) the plaintiff engaged in constitutionally protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct." THOMPSON, v OHIO STATE UNIVERSITY 990 F.Supp.2d 801 (2014)

46. It was a due process violation to have held a preliminary hearing within 24 hours if they had not first issued an ex parte order and then MDHHS obtained physical possession of children prior to hearing: as the petition contained no allegations that fell under provisions of MCL 712a .13a (2).

47. The H. Family children did not fall under the provisions of MCL 712a.2 as no allegations of abuse or neglect as defined by statute exist.

48. MDHHS investigated the H. Family without statutory authority and in

absence of allegations of abuse or neglect as defined by Michigan Statutes.

49. The H. Family will always meet the risk criteria currently in use in the child protective services policies nationwide and have a greater likelihood of future CPS involvement then the average family due to the encouragement of CPS, to the public, for the reporting mere "concerns" without reasonable suspicions and the government educates the public and mandated reporters on risk factors and potential indicators of child abuse and/or neglect but not the legal definitions of abuse or neglect when encouraging reporting of families to child protective services.

50. The H. Family children did not fall under the provisions of MCL 722.637 as no allegations of serious injury, sexual abuse or methaphmine production exposure exist.

51. The court authority is limited to hear same day petitions by lack of personal jurisdiction under provisions of MCL 712a.13 unless it first meets either MCL 712a.13a or MCL 712A.14b.

52. The court did not follow the provisions of MCL 712A.14b.

53. There was no application made for ex parte removal order required in MCR 3.963 "if the Department of Human Services is requesting the court grant it protective custody and placement authority, the Department of Human Services shall present to the court a petition or affidavit of facts and request a written ex parte placement order."

54. The was instead a request to "leave in home" in the "Preliminary Hearing Information Sheet Protective Services Referral".

55. Thomaca Bush was seeking an "order to cooperate with the investigation" and answer all the questions posed during her investigation, not an order to engage family in services.

56. The Record contains multiple references to reason for court involvement was not initially removal and placement in foster care or even to court order services and instead this was an unauthorized attempt to gain "Cooperation with an investigation" to overcome constitutional rights objections.

57. MDHHS employees propagate their own policies and practices in the seeking of, implementations of and execution of "orders after preliminary hearing" as "orders to cooperate" and there is not established policy describing such procedure in the "PSM" before the dispositional stage as services are voluntary till this stage per policy.

58. The court petition shows Thomaca Bush was aware H. H. was only refusing to answer particular questions and not refusing all cooperation evidenced by the inclusion of such fact in the court petition "stating the information was irrelevant" …. "H. H." "reported this worker was infringing on her constitutional rights, the worker needed to move on from the questions, and she would only answer what she needed or wanted to".

59. Thomaca Bush committed perjury in her petition in claiming "lack of cooperation by the parents regarding ensuring the children's safety and wellbeing", the H. Family was cooperating in exonerating themselves until Thomca Bush, with unclean hands, moved the interview outside and escalated the matter into a confrontational interview.

60. Thomaca Bush committed perjury in her petition in claiming "CPS worker, Thomaca Bush, attempted to ask H. H. questions regarding the investigation. H. H. became very irate and confrontational, stating the information was irrelevant, calling the worker a "bitch", and getting into the worker's face".

61. H. H. did not become irate or confrontational when asked questions, she was very pleasant in bringing forth exonerating evidence initially, she became frustrated and upset after Thomaca Bush with unclean hands, took the interview outside, became confrontational first, began asking questions beyond standard protocol and continued infringing on H. H.'s constitutional rights despite assertion of rights and pleas for accommodations.

62. Thomaca Bush omitted exonerating evidence of H. H. cooperation with Thomaca Bush's investigation, treated mental illness, legal defenses as medical marijuana patients and the H. Family out of state address, the H. Family asserting rights as out of state residents.

63. Thomaca Bush did include a statement in the petition that "Mr. Salamango reported most of the information he found out about the family came from CPS history he received from Illinois.", indicating the information required to finish her investigation was available from more reliable sources when H. H. declined to be responsive.

64. The refusal was to answer the question of what states the H. Family's children had ever "traveled through" and refusal to answer was not preventing Thomaca Bush from making certain that children were safe.

65. Thomaca Bush had the ability to conduct records search in all 50 states and thus could have gathered any information she wanted from a more reliable source without infringing on the H. Family's constitutional rights.

66. Thomaca Bush's false statements and omissions demonstrate "deliberateness or a reckless disregard for the truth.

67. The Ingham County Court File contains a document labeled "Preliminary Hearing

Information Sheet Protective Services Referral" that contains the question "Do you want foster care?" The answer is "No, remain in home with cooperation".

68. Any practice using an "order to cooperate" during the investigative stage is not authorized under any statute and would exceed the authority granted under MCL 722.628, MCL 722.628d, violates MCL 712A.11, MCL 712a.13a and established case law.

69. "Due process requires a specific adjudication of a parent's unfitness before the state can infringe the constitutionally protected parent-child relationship." In re Sanders 852 NW 2d 524, 495 Mich. 394 (2014)

70. The petition is void of any allegations that triggered a required petition, void of allegations the H. Family's children were unsafe needing removal and void of any allegations that the H. Family refused to "voluntarily participate in "services".

71. Children's Protective Services Policy Manuals (PSM) reference to "an order requiring family cooperation during the investigation" is evidence of a practice not authorized under any statute and such a custom or practice exceeds the authority granted under MCL 722.628 (12) and MCL 722.628d.

72. MCL 722.628 (12) required Thomaca Bush to have first completed her field investigation and then classified into a single category under MCL 722.628d, subsequently following the requirements of MCL 722.628d before seeking court intervention.

73. Michigan law has no provisions for "orders to cooperate during investigation" and requires a "probable cause" of "abuse or neglect" prior to submission of petition or use of procedures under MCL 722.626 (3) to gain medical examinations of children.

74. MCL 722.628 does not require parents or custodians to cooperate with investigation but directs others such as MDHHS, law enforcement and schools to conduct/cooperate with the investigation.

75. MCL 712A.13a (3) does not apply to children not in custody, because children not in custody do not need a court order to be released.

76. The children were not in custody to be released and therefore MCL 712A.13a (3) does not apply.

77. The Court "order after a preliminary hearing" did not directly release the children to their parents and therefore MCL 712A.13a (3) does not apply.

78. In light of "In Re Sanders", "orders to cooperate with an investigation" would not be "reasonable terms and conditions" because it violates parents constitutional rights prior to adjudication and before MDHHS has statutory authority to file a petition.

79. MDHHS lacks authority to use MCL 712a.13a (3) provisions in cases the children have not been previously removed, when they only seek in home jurisdiction and do not avail themselves of the ex parte protective custody order process.

80. Probable cause requires more than "concerns (anonymous or otherwise) regarding the family's living conditions" and requires a minimum of a proffer of "evidence" of "current harm or threatened harm to a child's health or welfare" or conditions rendering the H. Family RV "uninhabitable".

81. While Walsh V Erie County speaks to the sufficiency of an anonymous call, it clearly indicates a need to make a determination on the veracity of the call, needing more trustworthy sources and a need to determine if the information was based on personal observations or neighborhood rumors, malicious gossip and personal animosity.

82. Dennis Baker's reliance on third party gossip and made an acknowledgment that law

enforcement found no evidence to support the allegations or a reason to believe that the children were at such risk of harm or injury that immediate action was necessary.

83. Thus the petition does give indication of the caller's basis for the allegation was neighborhood rumors, malicious gossip. and personal animosity.

84. Odor of a service dog/household pets, Laundry and dirty dishes on an 18 inch counter space does not render a home uninhabitable, and is rather evidence the children were being provided clothing and food.

85. MDHHS investigated the H. Family for home schooling their children and traveling and then placed the children in public school against the H. Family's wishes despite the foster parent being willing to provide home education, with no evidence of educational neglect instead the children were found to be ahead in many areas, adequate educated, healthy with healthy eating habits, well behaved and role models to the other foster children in the home.

86. Michigan did not find services beyond voluntary prior established community based services necessary under the Initial Case Plan and completion of an accurate "safety" and/ or "risk" assessment and correct "Dispositional Category" should have been a "IV" under MCL 722.628d.

87. The H. Family have constitutional rights to decline to cooperate with answering a nonstandard question not necessary to further a legitimate government function, during an investigation.

88. "Once the plaintiffs declined to be responsive, the defendants were obligated by the Constitution to depart, and to leave the plaintiffs alone and in peace until such time as more information was learned from other, and more trustworthy sources." Walsh v. Erie County Dept. Of Job And Family Services 240 F.Supp.2d 731 (2003)

89. The order entered October 1st 2018, gave The H. Family 7 days to comply with demand to turn over specified information and sign medical releases.

90. Plaintiff J. H. signed the required authorizations about 24 hours after order was signed and prior to its service.

91. The Initial Case Plan and order for dismissal indicates the H. Family was fully cooperative.

92. Instead of doing the required tasks clearly established by laws and policies Thomaca Bush sought to impose her will upon H. H. for in retaliation for H. H. explicit warnings Thomaca Bush was violating constitutional rights and assertion of rights.

93. Thomaca Bush ignored policy and completed the legal section of MiSACWIS before an accurate "safety" and/ or "risk" assessment had been conducted.

94. The petition for jurisdiction only was subject to preliminary inquiry procedures and not a formal preliminary hearing under Michigan Court Rules and Statutes.

95. "The court rules and statutes prescribing procedures for protective proceedings are not just technical obstacles that may be discarded in the name of expediency or even in the understandable rush to protect a child. Rather, taken together, the statutes and court rules reflect standards that are essential to the administration of justice. The statutes and court rules make the proper procedures in a protective proceeding clear. It should be equally clear that they must be followed." In re AMB, 640 NW 2d 262

96. "The family court must comply with the notice requirements in MCR 5.920 and MCR 5.921 to establish personal jurisdiction over respondents. As critical as personal jurisdiction is, the right to notice is personal and cannot be challenged on appeal by anyone other than the person deprived of notice. Aside from the statutory right to

notice, ordinary procedural due process principles determine whether the family court can hold a hearing without offering notice and an opportunity to be heard to individuals whose interests are affected." In re AMB, 640 NW 2d 262

97. Thomaca Bush did receive training on the standards clearly established in "In re AMB, 640 NW 2d 262" as it is referenced in the MCWL taught to all CPS workers in Michigan.

98. Failure to give the H. Family adequate advance notice of the preliminary hearing required by law violated the H. Family right to due process.

99. "Due process of law requires notice of the sort we have described— that is, notice which would be deemed constitutionally adequate in a civil or criminal proceeding. It does not allow a hearing to be held in which a youth's freedom and his parents' right to his custody are at stake without giving them timely notice, in advance of the hearing, of the specific issues that they must meet." In re GAULT, 387 US 1 - Supreme Court 1967.

100.    This September 28th 2018 hearing is heard at 1:15 a mere 24 minutes after submission of the first petition to Referee Peter Brown via email.

101.    Even if the H. Family waived their constitutional rights and attempted to appear in court, they could not logistically have made the trip to Lansing in that short of time as they were en route to Illinois with their travel trailer.

102.    The court exceeds its authority in authorizing petition with no allegations that met statutory authority under MCL 712a.13a (2).

103.    After the unauthorized preliminary hearing, Ingham County Court Referee Peter Brown failed in his duties as no report of testimony was made to a judge and the judge merely signed off the court order completed by the referee three days

later.

104.     A written signed report to the judge was required under MCL 712A.10 (1) (c).

105.     Ingham County Court Referee Peter Brown heard testimony on lack of service attempt to J. H. and an attempt to H. H. that Thomaca Bush testified was met with an objection to improper service yet made determination service was properly made with no notice to reviewing judge of material facts at issue with service and the known objection of H. H. .

106.     There is no written report to the content of testimony, only an order authored by the court in the case file that contains judicial findings after hearing no indication of what the testimony was.

107.     Referee Peter Brown violated his duties under MCL 712A.10 and acted in "clear absence of judicial authority" in issuing orders and serving them on parties without judicial review after such practice was clearly established as invalid.

108.     "Neither the court rules nor any statute permits a hearing referee to enter an order for any purpose. In fact, that a hearing referee must make and sign a report summarizing testimony and recommending action for a judge reveals that the Legislature specifically denied referees the authority to enter orders, no matter their substance. To paraphrase the Michigan Supreme Court in Campbell v. Evans, we do not doubt that hearing referees play an extremely valuable role in the operation of the family courts, especially when attempting to handle emergency cases. However, a hearing referee's recommendations and proposed order cannot be accepted without judicial examination. "They are a helpful time-saving crutch and no more. The responsibility for the ultimate decision and the exercise of judicial discretion in

reaching it still rests squarely upon the trial judge" and may not be delegated. Consequently, when it is apparent that someone other than a judge made the substantive legal decision in a case, the only appropriate appellate response is to reverse." In re AMB 640 NW 2d 262, 248 Mich. App. 144 (2001)

109.     The Plaintiffs note Michigan law was amended after In Re AMB, to allow referees to issue only ex parte protective custody orders and interim orders pending preliminary hearing.

110.     "It is important to bear in mind, however, that the friend of the court is not the judge (which we suspect he would be the first to concede), and that his recommendations are never to be followed blindly. They are a helpful time-saving crutch and no more. The responsibility for the ultimate decision and the exercise of judicial discretion in reaching it still rests squarely upon the trial judge. These grave prerogatives he may never delegate to others." Campbell v. Evans, 99 NW 2d 341 (1959).

111.     Ingham County Court referee Peter Brown acted with clear absence of all jurisdiction and in a judicial capacity when he authored the court order and made substantive legal findings following preliminary hearing.

112.     Ingham County Court Referee Peter Brown acted with clear absence of all jurisdiction and in a judicial capacity; when he completed service of the proposed "court order following preliminary hearing" and issued court ordered summons in lieu of a "written report with a summary of testimony"; to some of the parties prior to a judge's review and petition being authorized by court as evidenced by proof of service in page 6 of order after preliminary hearing.

113.     Court referees are not authorized to author or issue orders of any kind at a

hearing under MCL 712A.10 (1) and are limited in their power to issue orders to ex

parte placement orders and interim orders pending preliminary hearing only under

MCR 3.963(B) pursuant to MCR 3.913.

114.     Ingham County Court is allowing Referees to author court orders and issue

court ordered summons that includes an order after preliminary hearing and referees

are not preparing a written report with summary of testimony prior to court order

being authorized by a judge .

115.     Ingham County Court Referee Brown was required to make required

advice to parties pursuant to MCR 3.913 (C) and is failing to do so.

116.     In not filing a written report of testimony and recommendation Ingham

County Court Referee Brown denied the H. Family's rights to seek review of the

recommendations for plain legal error under MCR 3.991 (B).

117.     The H Family had meritorious claims of plain legal error of lack of subject

matter and personal jurisdiction that had been raised would have likely resulted in a

different judicial decision under MCR 3.991 (E) (2) because the referee committed a

clear error of law, which likely would have affected the outcome and cannot

otherwise be considered harmless.

118.     The H. Family had meritorious claims of plain legal error of lack of subject

matter and personal jurisdiction that had been raised would have likely resulted in a

different judicial decision under MCR 3.991 (E) (2) .

119.     Ingham County Court Referee Brown made plain legal errors in determining;

the children were removed September 28th 2018 , that court had subject matter

jurisdiction, that notice of hearing had been given as required by statute, making

findings of probable cause for allegations using verbiage "may have", and

"suspected" with no proffer of evidence or identified 1st hand witness and that reasonable efforts had been made.

120.     After this hearing Thomaca Bush without lawful authority tried to "serve" and enforce an 'recommended order after preliminary hearing" prior to judicial review, in an effort to force H. H. to abandon her efforts to pick and choose which questions H. H. chose to answer.

121.     When Thomaca Bush could not locate the H. Family she enlisted the help of Marisa Anderson to get the H. Family to voluntarily turn over the H. Family's children.

122.     Thomaca Bush and Marisa Anderson both knew they did not have a valid court order for removal of children after preliminary hearing, evidenced by Thomaca Bush seeking an "apprehension order" to gain a court order to remove children.

123.     The H. Family attempted to assert rights under the 14th Amendment in having Illinois laws followed to place their children under the guardianship of A.W. the paternal grandmother and Marisa Anderson violated their rights in refusing to consider that option versus removal to Michigan.

124.     Thomaca Bush sought an "apprehension order" to unlawfully enforce the "recommended order after preliminary hearing".

125.     Thomaca Bush committed perjury in her affidavit in claiming a petition had been authorized for removal and H. Family had absconded in violation of a court order, concealing original petition was for jurisdiction and she had requested in writing to leave children in the home and there was no protective custody order issued placing children under the limits of MCL 712A.2c.

126.     Since the H. Family was to have children placed with them and children were located with J. H. and were never out of H. Family immediate control, custody and care, the children were not absent from their placement to have absconded on September 28th 2018.

127.     The H. Family was entitled to a hearing to determine if they had violated a court order and absconded with their children before MDHHS could seek to amend the Petition to seek removal and follow due process procedures established by the constitution and statute.

128.     Defendants Thomaca Bush, Marisa Anderson, Rita Ermatinger and Jane Doe Defendants No. One, Two and Three, did not have a valid court order to remove the H. Family's Children from Illinois on September 29th 2018 or at any time thereafter.

129.     As no valid court order existed after the ex parte hearing September 28th 2018, what was verbally discussed by the referee at the preliminary hearing was not a valid order.

130.     "As the following discussion explains, the fundamental problem with Defendants' conduct is that the referee's verbal order did not comprise valid authority to either enter the home or remove the children. The Fourth Amendment required a written order for these actions, and no exigent circumstances existed to obviate this requirement." O'Donnell v. Brown, 335 F. Supp. 2d 787

131.     The referee's failure to issue a written "ex parte protective custody order" or "interim placement order" rendered any oral discussion moot.

132.     "The referee did not promptly issue a written confirmatory search warrant and

file it. State of New Jersey v. Valencia, 93 N.J. 126, 459 A.2d 1149, 1155 (N.J.1983). In short, Defendants have demonstrated no indicia of compliance with minimal procedural safeguards to support the validity of the oral order." O'Donnell v. Brown, 335 F. Supp. 2d 787

133. "Applying Pittman to a Michigan family's claims against social workers because "Michigan courts also have the ultimate decision-making power on custody and guardian appointment for developmentally disabled persons. . ."). Specifically, the court has the final authority to issue an ex parte order for immediate protective custody, Michigan Compiled Laws § 712A.14b, order placement of a juvenile outside of her home, Michigan Compiled Laws § 712A.13a(8), and "order the juvenile placed in the most family-like setting available consistent with the juvenile's needs,"Michigan Compiled Laws § 712A.13a(12). Moreover, review of custody orders rests with the state court. Michigan Compiled Laws § 712A.13a(14)." GODBOLDO v. County of Wayne Case No. 14-11065. E.D. Michigan, Southern Division. October 2, 2015.

134. The Court adoption of the recommended order October 1st 2018, 2 days after the H. Family's children were removed, did not remedy any of the due process violations.

135. "Courts permit post-deprivation process to make up for lack of pre-deprivation process when government officials commit "random or unauthorized" acts, but when government officials act according to an "established state procedure that itself violates due process rights," such as the faulty "verbal" court order in this case, post-deprivation remedies are inadequate." O'Donnell v. Brown, 335 F. Supp.

2d 787.

136.     Ingham County Court, and MDHHS and Ingham County MDHHS maintain unconstitutional practices, when they facilitate unlawful removal of children not in custody via preliminary hearing that denies statutory due process notice of hearing under MCL 712a.13 in cases that do not meet statutory standards for the notice exceptions of MCL 712a.13a (2).

137.     Any practice using an "order to cooperate with an investigation" is not authorized under any statute and would exceed the authority granted under MCL 722.628, MCL 722.628d, violates MCL 712A.11, and established case law.

138.     "Due process requires a specific adjudication of a parent's unfitness before the state can infringe the constitutionally protected parent-child relationship." In re Sanders 852 NW 2d 524, 495 Mich. 394 (2014)

139.     "The Court struck down the one-parent doctrine, noting that parents have a fundamental right "to make decisions concerning the care, custody, and control of their children." Id. at 409, 852 N.W.2d 524. The Court emphasized that this right "cannot be overstated." Id. at 415, 852 N.W.2d 524. Because this right is fundamental and protected by the Due Process Clause of the Fourteenth Amendment of the United States Constitution, it "cannot be infringed without some type of fitness hearing." Id. Therefore, the Court concluded that "due process requires that every parent receive an adjudication hearing before the state can interfere with his or her parental rights." Id. The adjudication required by due process is "a specific adjudication of a parent's unfitness before the state can infringe the constitutionally protected parent-child relationship." Id. at 422, 852 N.W.2d 524. The Court rejected the one-parent doctrine as a violation of due process because it "allow[ed] the court to deprive a parent of

this fundamental right without any finding that he or she [was] unfit.     " Id." In re

Collier, 887 NW 2d 431, (2016) 314 Mich. App. 558.

140.     MCL 722.628 (12) required Thomaca Bush to have first completed her

field investigation and then classified into a single category under MCL

722.628d, subsequently following the requirements of MCL 722.628d before

seeking court intervention.

141.     The H. Family's children did not fall under the provisions of MCL 722.637

as no allegations of serious injury, sexual abuse or methaphmine exposure exists.

142.     The H. Family's children were not in "protective custody" when Ingham

County Court held a preliminary hearing on September 28th 2018 at approximately

1:15 pm.

143.     A finding that children were removed on September 28th 2018, at the

preliminary hearing indicates Thomaca Bush conducted a ""constructive removal"

and/or erroneous assumption of "emergency jurisdiction" without a court order for

protective custody.

144.     The overt acts of fraud on the court, fabricating of false, inaccurate, or

misleading evidence, altering petition, filing second altered petition, concealing

original petition from court record after submission to the court for the unlawful

purpose to avoid a judgment for jurisdiction only from taking effect, not issuing a

written summons, attempting to enforce referee recommended order as enforceable

prior to court adapting order, seizing children based on false representation of prior

court order, failing to file the Affidavit for apprehension orders and failing to return

the executed order and schedule a preliminary hearing the next business day is a

felonious Offense against Public Justice/Obstruction of Justice.

145.  "EMBEZZLING or vacating records, or falsifying certain other proceedings in a court of judicature, is a felonious offense against public justice."... "crime of deep malignity"... "extortion is an abuse of public justice, which consists in any officer's unlawfully taking, by color of his office, from any man, any money or thing of value, that is not due to him, or more than is due, or before it is due." Blackstone's Commentaries with Notes of Reference (1803) ST. GEORGE TUCKER VOLUME 5, CHAPTER 10 Offenses Against Public Justice.

146.  Thomaca Bush, Marisa Anderson Rita Ermatinger, Jane Doe Defendants No. One, Two and Three, in concert and though a conspiracy, unlawfully seized and removed the

H. Family children from Illinois to Michigan with no due process as required under the UCCJEA and accompanying state laws violating the H. Family's constitutional rights.

147.  Peter Brown had no lawful authority to give Thomaca Bush a court order after preliminary to be executed without judicial review or a judge's signature.

148.  Defendants Thomaca Bush, Marisa Anderson, Rita Ermatinger and Jane Doe Defendants No. One, Two and Three, each individually purported that a court had issued a valid court order to take the H. Family's children into protective custody, extradited to Michigan and placed in foster care and that failure to turn over children was in violation of a valid court order.

149.  Thomaca Bush made perjurious statements in an attempt to gain an "apprehension order".

150.  Marisa Anderson, filled out forms that required documentation of the H. Family's children's legal status and did not seek to establish legal status prior to

placement attempts and lied about this status to the H. Family and A.W..

151.    Rita Ermatinger helped Thomaca Bush coordinate the H. Family's children were extradited from Illinois and she had in her possession an order with state line limits, both were trained in laws and policies requiring due process prior to extradition and denied the H. Family their constitutional rights.

152.    Defendants Thomaca Bush, Marisa Anderson, Rita Ermatinger and Jane Doe Defendants No. One, Two and Three removed the children in excess of the state line limits.

153.    Defendants Thomaca Bush, Marisa Anderson, Rita Ermatinger and Jane Doe Defendants No. One, Two and Three, all failed to schedule a preliminary hearing the next business day and did not take the children to court the next business day on October 1st 2018.

154.    Defendant Thomaca Bush had the children in her physical possession on October 1st 2018, failed to schedule a preliminary hearing the next business day and did not take the children to court the next business day on October 1st 2018, instead sought an unauthorized forensic medical exam without a court order or parental consent instead of taking the children to court or releasing them.

155.    Stacey Strouse initiated proceedings without following statutory due process requirements, scheduled a same day preliminary hearing for September 28th 2018, without a verified petition and before the expiration of time required for due process notice appointed court appointed attorneys to the H. Family without statutory authority or a verified petition and delegated the court's duty to serve notice of hearing on the H. Family to Thomaca Bush.

156.    Stacey Strouse, Thomaca Bush, Peter Brown and Sidra Alvi-waller conspired

to avoid the process on the original petition, take away original petition for "jurisdiction" and submit a petition for removal without notice to the H. Family depriving due process notice of the nature of proceedings.

157.     Sidra Alvi-waller entered an altered petition for removal without noting the original submission date and took away the original petition for in home jurisdiction.

158.     Had the H. Family been afforded any of the due process protections under the constitution, state and federal laws; ie. correct application of state statutes, reasonable efforts, no fabricated evidence, adequate notice of hearing, written summary of testimony, judicial review of testimony at a preliminary hearing, post deprivation hearing, notice of second petition, a protective custody order, a placement hearing, notice of inclusion on the Central Registry, ect., they would have been able to present a meritorious defense and not suffered violations of their constitutional rights.

159.     Defendant Richard Garcia authorized a practice or custom that allowed the splitting of the Juvenile Court Register's duties that lead to no one doing these statutory duties and the deprivation of the H. Family's constitutional rights.

160.     The Defendants actions of ignoring every step of due process afforded the H. Family under the constitution, state and federal laws lead to a kangaroo court, outright denial of procedural due process, is an "egregious abuse of governmental power" and "Shocks the conscience".

161.     Any reasonable and prudent person would have known such actions were substantive due process violations that violated the Plaintiffs' "Clearly established constitutional rights" to familial association and deprived them of the care and custody of their children.

162.     Referee Peter Brown does not have judicial immunity for acts "in clear access of all jurisdiction".

163.     "A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the "clear absence of all jurisdiction." Stump v. Sparkman, 435 US 349 - Supreme Court 1978

164.     "A distinction must be observed here between excess jurisdiction and the clear absence of all jurisdiction over the subject-matter. Where there is clearly no jurisdiction over the subject-matter , any authority exercised is a usurped authority, and for the exercise of such authority, when the want of jurisdiction is known to the judge, no excuse is permissible." BRADLEY v. FISHER. 80 U.S. 335 Supreme Court of the United States.

165.     Referee Peter Brown does not have absolute judicial immunity for acts in his administrative duties.

166.      "Absolute judicial immunity can only be overcome in two circumstances. First, "a judge is not immune from liability for nonjudicial actions, i.e., actions not taken in the judge's judicial capacity." Mireles, 502 U.S. at 11, 112 S.Ct. 286 (citing Forrester v. White, 484 U.S. 219, 227–29, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988); Stump v. Sparkman, 435 U.S. 349, 360, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978)). Second, "a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." Id. at 12, 112 S.Ct. 286 (citations omitted). Here, Hartsfield is not entitled to absolute judicial immunity because the acts complained of in the first amended complaint are not judicial acts. The Supreme Court has "made clear that whether an act by a judge is a "judicial" one relate[s] to the

nature of the act itself, i.e., whether it is a function normally performed by a judge, and to the expectations of the parties, i.e., whether they dealt with the judge in his judicial capacity." Mireles, 502 U.S. at 12, 112 S.Ct. 286 (quoting Stump, 435 U.S. at 362, 98 S.Ct. 1099) (internal quotation marks and citation omitted). In other words, courts "look to the particular act's relation to a general function normally performed by a judge." Ratt v. Corrigan 989 F. Supp. 2d 550 (E.D. Mich. 2013)

167.    The Sixth Circuit has held that "a judicial officer acts in the clear absence of jurisdiction only if he knows that he lacks jurisdiction, or acts despite a clearly valid statute or case law expressly depriving him of jurisdiction." Mills v. Killebrew, 765 F.2d 69, 71 (6th Cir.1985)

168.    Referee Peter Brown does not have immunity for issuing "orders after a preliminary hearing" without judicial review.

169.    "Per this process and procedure put in place by Defendant Judge Hartsfield, the Order, which appeared facially valid, was issued as if valid even though, in fact, it was issued without judicial review and in violation of Michigan law and the due process clauses of the Fifth and Fourteenth Amendments of the United States Constitution." Ratté v. Corrigan, 989 F. Supp. 2d 550.

170.    Defendant's assignment of court appointed attorneys before the submission of a verified petition creates a conflict of interest and is fundamentally unfair when it denies parents the right to notice and opportunity to be heard.

171.    "Since the State has an urgent interest in the welfare of the child, it shares the parent's interest in an accurate and just decision. For this reason, the State may share the indigent parent's interest in the availability of appointed counsel. *28 If, as our adversary system presupposes, accurate and just results are most likely to be

obtained through the equal contest of opposed interests, the State's interest in the child's welfare may perhaps best be served by a hearing in which both the parent and the State acting for the child are represented by counsel, without whom the contest of interests may become unwholesomely unequal." Lassiter v. Dept. Of Social Services of Durham Co. NC 452 U.S. 18 (1981) Supreme Court ofUnited States

172.     "The State's interests, however, clearly diverge from the parent's insofar as the State wishes the termination decision to be made as economically as possible and thus wants to avoid both the expense of appointed counsel and the cost of the lengthened proceedings his presence may cause. But though the State's pecuniary interest is legitimate, it is hardly significant enough to overcome private interests as important as those here," Lassiter v. Dept. Of Social Services of Durham Co. NC 452 U.S. 18 (1981) Supreme Court of United States

173.     "In its Fourteenth Amendment, our Constitution imposes on the States the standards necessary to ensure that judicial proceedings are fundamentally fair. A wise public policy, however, may require that higher standards be adopted than those minimally tolerable under the Constitution. Informed opinion has clearly come to hold that an indigent parent is entitled to the assistance of appointed counsel not only in parental termination proceedings, but in dependency and neglect proceedings as well." Lassiter v. Dept. Of Social Services of Durham Co. NC 452 U.S. 18 (1981) Supreme Court of United States

174.     Ingham County Court has an appointment and funding scheme for court appointed attorneys that violates statute(s), compromises the independence of these attorneys, deprives parents of the opportunity to be heard and denies parents effective counsel thus 6th amendment rights are implicated by these policies when

the County has a stated goal of "early permanency".

175.     Defendant Richard Garcia is responsible for his administrative capacity for the hiring of Ingham County Court appointed attorneys and the unlawful funding scheme that has compromised the independence of court appointed attorneys in Ingham County.

176.     Funding court appointed attorneys outside the statutory scheme for the stated purpose of "early permanency" violates parents rights to fundamentally fair proceedings and promotes procedural due process violations.

177.     Defendant Richard Garcia is responsible for his administrative capacity for the failure to file the affidavit for apprehension orders and the missing ex parte protective custody orders the next business day.

178.     "Judges must maintain a high standard of judicial performance with particular emphasis upon conducting litigation with scrupulous fairness and impartiality". 28 USCA § 2411; Pfizer v. Lord, 456 F.2d 532 (1972).

179.     "State Judges, as well as federal, have the responsibility to respect and protect persons from violations of federal constitutional rights." Gross v. State of Illinois, 312 F 2d 257; (1963).

180.     The H. Family has attempted to have Ingham County MDHHS deal with their allegations of compromised court appointed attorneys, fabricated evidence, perjury, the taken away petition, lack of valid order for protective custody, the UCCJEA issues, lack of reasonable efforts, discrimination and refusal to reasonably accommodate the H. Family.

181.     The Defendants position is they got a court to sign off, so the rest is moot

and their employees followed policies.

182.     The H. Family is not persuaded by this argument, the court proceedings
were brought based on fabricated evidence, without statutory authority and a
court had not authorized the Defendants actions.

183.     The "orders" the Defendants rely on are deficient on their face, not
based on probable cause and null and void.

184.     The only court order in the court file is for "care and supervision" and was
not issued until after the children were seized, illegally taken from Illinois and
subjected to forensic medical exams.

185.     The court never authorized the Defendants to enforce "a recommended
order" as an enforceable order.

186.     Judge Janelle Lawless did not authorize Referee Peter Brown to issue
orders in her stead and instead personally signed the order 3 days later.

187.     Referee Peter Brown did not authorize protective custody in an ex parte
order on September 28th 2018, even though statute allows him too.

188.     Due process claims are not barred by prosecutorial immunity. "On the other
hand, when social workers act to "remove[] ... children from the home," they act "in a
police capacity rather than as legal advocates[,]" and absolute immunity does not
apply." ... "Analyzing due process claims against social worker under qualified
immunity rather than absolute immunity, as due process claims involved "alleged
deprivation of . . .`fundamental liberty interest in family integrity" which implicated
social worker's "conduct unrelated to her role as an advocate before the juvenile
court." Van Buren v. Crawford County Case No. 13-14565. United States District
Court, E.D. Michigan, Northern Division. May 29, 2014.

189.     "Due process requires: 1) The parents be given notice prior to the removal of
the child (at the time of the removal when exigent circumstances exist or promptly
thereafter) stating the reasons for the removal; 2) The parents be given a full
opportunity at the hearing to present witnesses and evidence on their behalf; 3) The
parents may have a retained attorney at the hearing; 4) The hearing must be conducted
by a neutral and detached hearing officer; and 5) The hearing officer conducting the
removal hearing must state in writing the decision reached and the reasons upon
which the decision is made." Doe v. Staples, 706 F. 2d 985 (1983)

190.     Thomaca Bush couldn't have given the required 72 hour notice of hearing or
"notice to prior to removal" when 24 minutes prior to the preliminary hearing she's
filing paperwork with the Clerk and Referee Peter Brown; that shows the intent was
not placement of the H. Family's children in foster care or removal from home but to
"remain in home".

191.     The H. Family was afforded no opportunity to present witnesses and
evidence on their behalf.

192.     The evidence does not show preliminary hearing was conducted by a neutral
and detached hearing officer, instead he essentially rubber stamped Thomaca Bush's
requests without judicial review or making findings that support "probable cause";
even using verbiage of "may" and "suspected".

193.     Peter Brown did not state in writing what his decision on "placement"
was as protective custody was not granted on lines 13 or 25.

194.     The placement decision was deliberately withheld to give Thomaca Bush
and MDHHS leverage to ensure H. H. abandoned her constitutional rights
objections.

195.  The placement decision was the children would remain with cooperation or they could take no further notice of intent to remove.

196.  Thomaca Bush was using a practice to leave placement open ended so that a second removal hearing would not be necessary and instead MDHHS bypasses a pre or post deprivation hearing by asking for an "apprehension order" versus "an ex parte protective order".

197.  Thomaca Bush and the MDHHS defendants made the decision to remove the H. Family Children and not the court.

198.  Certainly the Defendants were on notice that they have to afford parents notice that the intent is to remove children and place them in foster care not just "order to cooperate with the investigation" and/or "jurisdiction only".

199.  Defendants were on notice of proper procedures and still acted in disregard to H. Family's constitutional rights on multiple counts.

200.  Defendants afforded the H. Family no pre deprivation due process and no post deprivation due process as explicitly prescribed by Michigan statutes.

201.  MCWL 1.10.1 put CPS workers on notice a person identified as a perpetrator must receive, within 5 days after the substantiation, formal, documented notification from the Department that he/she has been identified as a perpetrator, of the potential consequences of being listed on the perpetrator registry, of the right to review the file and of the right to request amendment or expunction of the record.

202.  MCWL 2.7.3 put CPS workers on notice they were required to have a court order to get an medical exam without parental consent or exigent circumstances.

203.  MCWL 2.9. put CPS workers on notice "Privacy of a home is protected by the Fourth Amendment to the U.S. Constitution.

204.     MCWL 2.11.3. put CPS workers on notice court action is initiated by filing a written petition with the court absent exigent circumstances they may not initiate based on a phone call request.

205.     MCWL 2.12. put CPS workers on notice that completion of its investigation is required before the Department placed the case in one of five categories for response and the correct level of response.

206.     MCWL 3.4.1. put CPS workers on notice proof of neglect is necessary and parents are not to be held to any ideal standard in the care of their children.

207.      MCWL 3.4.3. put CPS workers on notice allegations of a dirty home insufficient to grant the court jurisdiction over the children where there were no allegations that the home was uninhabitable.

208.     MCWL 3.5.6. put CPS workers on notice the Uniform Child-Custody Jurisdiction and Enforcement Act applies to out of state children in child protection cases and requires the child be physically present in the State and has either been abandoned or action is required in an emergency to protect the child. That before hearing the petition Michigan courts must determine if a court of another State is exercising jurisdiction in a custody proceeding, including a child protection proceeding. If another State is the home State of the child involved, the Michigan court cannot proceed, except for emergency actions.

209.     MCWL 5.2. put CPS workers on notice due process requires that a person subject to deprivation of liberty be apprised of charges against him or her with sufficient clarity and specificity so that he or she may prepare a defense and the statutory requirements for filing a petition.

210.     MCWL 5.5. put CPS workers on notice the petition provides notice to the parents of the charges against them. If those charges are subject to change at any time, the parents' opportunity to prepare a defense could be jeopardized. Out of concern for the parents' rights, a judge may grant an amendment only after he or she is convinced that the amendment is important and that it was not omitted in the first petition because of the petitioning party's negligence.

211.     MCWL 6.1. put CPS workers on notice if there is no out of home placement of the child requested, the court process begins with a preliminary inquiry and the presence of parties is not required.

212.     MCWL 6.2.2. put CPS workers on notice when a child has been taken into custody, the preliminary hearing must commence within 24 hours after the child is taken into court custody, excluding Sundays and holidays, and unless adjourned for good cause shown. If not, the child must be released.

213.     MCWL 6.2.3.1. put CPS workers on notice when a child is placed, notice of the preliminary hearing or an emergency removal hearing must be given to the parent of the child as soon as the hearing is scheduled.

214.     MCWL 6.2.3.2. put CPS workers on notice when a child is not in court custody, the parents must be served by summons which must be personally served 3 days before the hearing, or it must be served by registered mail at least 14 days before the hearing when the party to whom the summons is addressed resides outside of Michigan.

215.     MCWL 7.1.1. put CPS workers on notice, that notice to all parties whose legal rights may be affected by the court proceedings is an essential element of due process.

216.     MCWL 7.1.3. put CPS workers on notice a summons shall be personally

served at least 7 days before trial. If a summons is served by registered mail, add 7

days if the person resides in Michigan and 14 days if the party lives outside

Michigan.

217.     MCWL 19.2. put CPS workers on notice, child protection investigations are,

by their very nature, an invasion of personal privacy and civil liberties of parents

and children and workers should proceed cautiously, out of respect for the families

involved, but also because serious violations of civil rights could result in legal

liability.

218.     MCWL 19.3. put CPS workers on notice child welfare caseworkers can be

sued for a range of possible shortcomings, including deprivation of civil rights,

violation of a statutory duty, and professional malpractice.

219.     The Defendants knew the first petition was deficient in taking the children

and that's why a second one even exists.

220.     There are procedures in place to afford parents due process in Michigan

Juvenile proceedings and they were flagrantly flaunted every step of the process.

221.     The Defendants should have at least afforded the H. Family notice of the

Second Petition for "REMOVAL" and a preliminary hearing on this second petition

filed October 2nd 2018.

222.     H. H. 's court appointed public defender Ronald Berry refused to raise the

issue of not being notified of the nature of the proceedings stating H. H. would never

prove she wasn't told the petition was for "removal" and she was instead told

Thomaca Bush was seeking "in-home jurisdiction" only.

223.     H. Family was unaware of the existence of the "Information Sheet" stating

a request to "remain in home" and the altered petition that would have supported
H. H. claims.

224.     The H. Family had a "fundamental liberty interest" in the care, custody and
management of their children and established case law does require hearing prior to
extradition of children across state lines even if the court had transferred legal
custody to MDHHS.

225.     Setting same day court hearing in violation of due process is administrative
and not prosecutorial and the H. Family seeks all Defendants to be held liable for
their individual administrative duties, actions and inactions in the denial of
procedural due process at preliminary hearing stage(s).

226.      Tonya Martinez was informed MDHHS did not have a valid court order for
protective custody because of the multitude of due process issues and failed to rectify
the issues, as Thomaca Bush's direct supervisor.

227.     Tonya Martinez acknowledged MDHHS did not have a court order based on
probable cause, that MDHHS was aware of exculpatory evidence and failed to rectify
the issues, as Thomaca Bush's direct supervisor.

228.     Tonya Martinez was given a demand to return children because MDHHS did
not have a valid court order for protective custody of the H. Family children and failed
to act despite a statutory obligation to protect the H. Family's constitutional rights.

229.     Tonya Martinez failed to properly supervise Thomaca Bush and MDHHS
continued to enforce the void ex parte protective custody order for another 30 days
after Tonya Martinez was made aware of the defects.

230.     Tonya Martinez, as Thomaca Bush's direct supervisor, participated and
or encouraged and implicitly authorized, approved, or knowingly acquiesced

in the unconstitutional conduct of Thomaca Bush.

231.     There are systematic issues with failure to train and supervise MDHHS employees, resulting in federal court monitors to find the data generated by these employees to be so unreliable, federal court monitors wouldn't accept data generated through the MiSACWIS system.

232.     Per the State's own audit MDHHS did not accurately assess the risk of future harm to children in over 35% of reviewed investigations, in some instances, the investigator incorrectly responded to questions contrary to collected evidence.

233.     The audit identified over 6,000 previously completed investigations with incorrect risk levels and nearly 24,000 other investigations with potentially incorrect risk levels.

234.     The audit blamed ineffective supervisory review of investigations significantly contributed to deficiencies reported in 15 findings.

235.     The audit found systematic issues with properly classifying investigations when MDHHS has filed a court petition and subsequent evidence does not support that CA/N occurred.

236.     The audit found MDHHS's policy language related to CPS risk assessment and escalation of a CPS category contain statements indicating that CPS investigators must assign a Category I classification to an investigation any time a court petition is filed without any additional commentary related to the other CPL requirements.

237.     Auditors interviews with MDHHS investigation staff and management confirmed that confusion commonly exists when determining the appropriate classification for investigations when a court petition is filed and the evidence obtained during the investigation does not support that CA/N occurred.

238.     The audit revealed MDHHS could not support that it provided notification to
perpetrators that their names had been added to the Central Registry for over 40% of
reviewed investigations

239.     Thomaca Bush acted with malice in fabricating evidence of "untreated mental
illness", "suspected substance abuse" and made complaining witness statements with
false representation of the H. Family's statements; in refusing the H. Family services
to prevent removal; in denying due process notice; in enforcing recommended order
after preliminary hearing without judicial review and prior to a valid order being
entered; in seeking apprehension order without notifying the court of material fact
children were not in the courts jurisdiction; in executing an ex parte removal order
across state lines without following the UCCJEA, state laws or policy; in removal of
children with no due process afforded for sole reason H. H. objected to invasion of
her rights asserting statutory and constitutional rights; because H. H. called her a
curse word and she was angry and not going to allow H. H. to "refuse to cooperate
with the investigation".

240.     Thomaca Bush, Peter Brown , Marisa Anderson, Jane Doe Defendants No.
One, Two and Three, Rita Ermatinger and Sidra Alvi-waller acted in an "intentional
deviation from a clear duty" and from a "definite rule "of conduct, with a "deliberate
purpose" not to discharge their statutory duties necessary to afford the H. Family
constitutional protections, and purposely doing some wrongful acts with knowledge
or appreciation of the likelihood of resulting injury to the H. Family

241.     All named Defendants engaged in `Wanton conduct' involving failure to
exercise any care whatsoever toward those to whom she owed a statutory duty of
care, and her failure occurs under circumstances in which there was a great

probability that harm would result."

242.    All named Defendants acted in "reckless disregard" of the constitutional rights

of the H. Family by intentional acts and intentional failure to do an act which it is his

duty to the other to do, knowing or having had reason to know of facts which would

lead a reasonable person to realize, not only that her conduct creates an unreasonable

risk of unlawful deprivation of the civil and constitutional rights of the H. Family, but

also that such risk is substantially greater than that which is necessary to make her

conduct negligent.

243.    The Defendants do not enjoy immunity for their conduct that violates

"clearly established statutory or constitutional rights of which a reasonable person

would have known."

244.    "When government officials perform discretionary functions, they are

immune from suit through qualified immunity "insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable

person would have known." Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808,

172 L.Ed.2d 565 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct.

2727, 73 L.Ed.2d 396 (1982))." Ratt v. Corrigan United States District Court, E.D.

Michigan, Southern Division.Nov 26, 2013989 F. Supp. 2d 550 (E.D. Mich. 2013)

245.    While Thomaca Bush may enjoy absolute immunity for the filing of a petition

and or affidavit for apprehension orders and her testimony, this immunity does not

extend to the execution of orders that probable cause was based on her false

statements and omissions to acquire.

246.    "The well-established Fourth Amendment principle that an officer "cannot

rely on a judicial determination of probable cause" to justify executing a warrant "if

that officer knowingly makes false statements and omissions to the judge such that

but for these falsities the judge would not have issued the warrant." Vakilian v. Shaw,

335 F.3d 509, 517 (6th Cir. 2003) (quoting Yancey, 876 F.2d at 1243). Though we

entirely agree — and now directly hold — that a social worker, like a police officer,

cannot execute a removal order that would not have been issued but for known

falsities that the social worker provided to the court to secure the order". Brent v.

Wayne Co. Dept. of Human Services, 901 F.3d 656, 685 (6th Cir. 2018)

247.       The Defendants and the State does not enjoy 11th amendment protections

under Section 1988, for acts "in their official capacity", that violated the Plaintiffs

14th amendment rights.

248.       "The state does not enjoy 11th amendment protections for declaratory relief or

attorney fees "in Hutto, we rejected the argument of the Attorney General of Arkansas

that the general language of § 1988 was insufficient to overcome a State's claim of

immunity under the Eleventh Amendment, noting that "[t]he Court has never viewed

the Eleventh Amendment as barring such awards, even in suits between States and

individual litigants." "Moreover, even if the Eleventh Amendment would otherwise

present a barrier to an award of fees against a State, Congress was clearly acting

within its power under § 5 of the Fourteenth Amendment in removing that barrier.

Under § 5 Congress may pass any legislation that is appropriate to enforce the

guarantees of the Fourteenth Amendment. ... " As the Court of Appeals pointed out,

such a fee award "furthers the Congressional goal of encouraging suits to vindicate

constitutional rights without undermining the longstanding judicial policy of avoiding

unnecessary decision of important constitutional issues." "It is thus an appropriate

means of enforcing substantive rights under the Fourteenth Amendment". Maher v.

Gagne, 448 US 122 - Supreme Court 1980

249.      The fact that Plaintiff's claims against the individual Defendants are

"inextricably intertwined" with issues decided in the state court custody proceedings

no longer is a determinative factor for purposes of the Rooker-Feldman analysis.

250.      "While pre-Exxon, Rooker-Feldman analysis employed the "inextricably

intertwined" analysis, see Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 25 (1987)

(Marshall, J., concurring); Executive Arts Studio, Inc. v. City of Grand Rapids, 391

F.3d 783, 793 (6th Cir. 2004), the Sixth Circuit has since abandoned this

"inextricably intertwined" analysis. Poplar v. Waite, Case No. 1:11-cv-470. United

States District Court, W.D. Michigan, Southern Division. August 12, 2011

251.      "The Sixth Circuit has instructed that the relevant inquiry is the "source of the

injury" as alleged by the plaintiff: If the source of the injury is the state court decision,

then the Rooker-Feldman doctrine would prevent the district court from asserting

jurisdiction. If there is some other source of injury, such as a third party's actions, then

the plaintiff asserts an independent claim. McCormick v. Braverman, 451 F.3d 382,

393 (6th Cir. 2006).

252.      "Here, the source of injury alleged is not the state-court orders themselves, but

rather, the Court Defendants' practice of "rubber stamping" protective orders without

review by a judge and Wenk's actions in allegedly taking advantage of this practice to

remove AG-H without proper review of her petition. See Ratte v. Corrigan, 989 F.

Supp. 2d 550, 558-59 (E.D. Mich. 2013) ("Plaintiffs are not challenging the form

order or asking the Court to review it in any way. The "source of injury" alleged in

plaintiffs' first amended complaint is Hartsfield's practice of allowing removal of children from their homes without judicial review by providing what is in effect a pre-signed form order to non judicial officers."). Indeed, the challenge is to the procedures for taking away AG-H rather than Judge Pierce's judgment affirming the removal. And the Michigan Court of Appeals explicitly declined to consider "procedural defects in the order to remove the child," finding they were "moot for purposes of this appeal, given that the circuit court has terminated its jurisdiction over the child." In re Godboldo-Hakim, 2012 WL 2914260, at *2. Accordingly, Plaintiffs are not "asking this court to evaluate the merits of the state court's decisions" as the plaintiff in Raddatz v. Beaubien, 880 F.Supp. 500, 503 (E.D. Mich. 1995), was. (See Court Def.'s Mot. at 18-19 (citing Raddatz).) Accordingly, Rooker-Feldman does not bar this Court from considering Plaintiffs' claims." GODBOLDO v. County of Wayne Case No. 14-11065. E.D. Michigan, Southern Division. (2015).

253.     To the extent the court must review the September 28th 2018 "ex parte protective custody"/"apprehension order"and the October 1st 2018 "Order after preliminary hearing" the Plaintiffs are not barred by Rooker-Feldman because they were not given adequate notice of the September 28th 2018 hearing, and were not afforded an opportunity to present their meritorious defense, there was no probable cause basis alleged in petition; nor were these appealable orders at the time under Michigan Court Rules.

254.     The Sixth Circuit has clearly established Ex Parte Young doctrine provides a limited exception to the sovereign immunity bar, in that litigants may seek certain forms of relief by naming the relevant state officer, in his official capacity, as a defendant and does not preclude actions against state officials sued in their official

capacity for prospective injunctive or declaratory relief. Brent v. Wayne Co. Dept. of Human Services, 901 F.3d 656, 685 (6th Cir. 2018)

255.     Younger Abstinence Doctrine does not apply as the underlying state case was dismissed in the H. Family's favor; the Plaintiffs allege the prosecution was in bad faith; and the state prosecution was part of a pattern of harassment against H. H. and J. H. ; and denial of due process notice of hearing; and denials for an opportunity to be heard and notice of the nature of the proceedings at all relevant stages of the state case.

256.     The H. Family has a greater likelihood of future CPS involvement than the average family due MDHHS's use of mere "concerns" that do not meet statutory definitions for abuse or neglect because as MDHHS policies state, they are designed to encourage over reporting and MDHHS's failure to educate the public and mandated reporters on definitions of abuse or neglect only providing education on risk factors and potential indicators.

257.     The H. Family have a greater likelihood of future CPS involvement then the average family due to their lifestyle choices and risk factors including their prior CPS history and disabilities and because of their timeshare resorts have 11 resorts in Michigan and the H. Family travels to Michigan often under the same circumstances that lead to two (2) prior cps investigations.

258.     The Plaintiffs only seek declaratory and injunctive relief for acts taken in an official capacity and limit their claims to monetary damages for acts in individual capacities not covered under established privileges of immunity.

## CAUSE OF ACTION

### COUNT I

**( Equal Protection)**

(Asserted by all named Plaintiffs)

1.  Each and every allegation of the Complaint incorporated herein as fully set forth.

2.  A state and its agents assume an affirmative duty under the Fourteenth Amendment to the United States Constitution to afford equal protection for all citizens.

3.  A state and its agents assume an affirmative duty under the Fourteenth Amendment to the United States Constitution to afford equal protection without discriminatory animus on the basis of disability without nexus to abuse or neglect as defined by statute.

4.  A state and its agents assume an affirmative duty under the Fourteenth Amendment to the United States Constitution to afford equal protection to the H. Family as out of state residents traveling to/through Michigan.

5.  The foregoing actions and inactions of a failure to meet the affirmative duty to protect from harm all named Plaintiffs, which is a substantial factor leading to, and proximate cause of, the violation of the constitutionally-protected liberty and privacy interests of all named Plaintiffs.

6.  The foregoing actions and inactions of Defendants constitute a policy, pattern, practice and/or custom that is inconsistent with the exercise of reasonable professional judgment and amounts to deliberate indifference to the constitutionally protected rights and liberty and privacy interests of all named Plaintiffs.

7.  As a result, all named Plaintiffs have been and maybe again, in future, deprived of the equal protection rights conferred upon them by the Fourteenth Amendment to the United States Constitution.

## COUNT II

### ( Procedural Due Process)

(Asserted by all named Plaintiffs)

1. Each and every allegation of the Complaint is incorporated as if fully set forth herein.

2. The foregoing actions and inactions of Defendants, amount to a pattern, practice, or custom of failure to exercise reasonable professional judgment and of deliberate indifference to Plaintiffs' constitutional rights, and are the cause of the violation of such rights.

3. As a result of Defendants' conduct, Plaintiffs have been harmed and deprived of their fundamental right to parent and familial association without procedural due process of law in violation of the United States Constitution and relevant statutes.

## COUNT III

### ( Substantive Due Process)

### (Freedom of Association/Familial Integrity)

(Asserted by all named Plaintiffs)

1. Each and every allegation of the Complaint is incorporated as if fully set forth herein, and

2. The foregoing actions and inactions of Defendants, amount to a pattern, practice, or custom of failure to exercise reasonable professional judgment and of deliberate indifference to Plaintiffs' constitutional rights, and are the cause of the violation of such rights, and

3. As a result of Defendants' conduct, Plaintiffs have been harmed and deprived of their fundamental rights to parent and familial association without substantive due process for 61 days, in violation of the United States Constitution and relevant statutes.

## COUNT IV

## (1st Amendment Relatation)

### (Asserted by all named Plaintiffs)

1. Each and every allegation of the Complaint is incorporated as if fully set forth herein, and

2. Thomaca Bush, with malice, knowing and willing refused to complete the investigative tasks required of her by statute and policy in retaliation for assertion of constitutional rights; and

3. Thomaca Bush, with malice, knowing and willing refused to offer reasonable efforts to prevent required of her by statute and policy in retaliation for assertion of constitutional rights; and

4. Thomaca Bush, with malice, knowing and willing fabricated evidence in retaliation for assertion of Constitutional rights; and

5. Defendants with malice, knowing and willing took away original petition for jurisdiction only and submission of altered petition for removal without notice.

6. The foregoing actions and inactions of the Defendants, amount to malicious intent, a failure to exercise reasonable professional judgment and of deliberate indifference to Plaintiffs' constitutional rights, and are the cause of the violation of such rights, and

7. As a result of Defendants' conduct, Plaintiffs have been harmed and deprived of both federal and state-created liberty rights for exercising the 1st amendment of the US Constitution.

## COUNT V

## (Invasion Of Privacy)

1. Each and every allegation of the Complaint is incorporated as if fully set forth herein.

2. The foregoing actions and inactions of Defendants invaded the H Family's privacy without justification or statutory authority.

3. Defendants intrusion upon the plaintiff's seclusion or solitude without a legitimate government interest; and

4. Defendants intrusion upon the plaintiffs into his private affairs without a legitimate government interest; and

5. Defendants Intrusion of H. Family's private travel; and

6. Public disclosure of embarrassing private facts about the plaintiffs; and

7. Public disclosure of protected medical information and sealed juvenile records in Illinois that were never subject to public disclosure and did not meet exceptions to privacy laws in either Michigan or Illinois.

8. Creating official government records which places the Plaintiffs in a false light in the public eye.

9. As a result of Defendants' conduct, the H. Family have been harmed and deprived of their constitutional right to privacy by the acts of the defendants.

## COUNT VI

### (Intentional Infliction of Emotional Distress)

### (State Claim)

1. Each and every allegation of the Complaint is incorporated as if fully set forth herein.

2. The foregoing actions of Defendants inflicted extreme emotional distress on the H. Family.

3. Defendants outrageous and conscious shocking acts of denying the H. Family their children and due process protections have caused all members extreme emotional Distress; and

4. H. H. had two (2) psychiatric inpatient hospitalizations as a result of the extreme emotional Distress; and

5. The entire H. Family have suffered long term trauma as a result of the Defendants actions; and

6. The entire H. Family will require healing to overcome the emotional and mental health harm caused by the Defendants actions.

7. Defendants intended to cause emotional distress or knew or should have known that its conduct would result in serious emotional distress to the plaintiffs; and

8. Defendants' conduct was outrageous and extreme and beyond all possible bounds of decency and was such that it can be considered as utterly intolerable can be considered as utterly intolerable in a civilized in a civilized community; and

9. Defendants' conduct was the proximate cause of plaintiff's psychic injury; and

10. The Plaintiffs do not seek to recover damages for actual mental health injuries suffered during the pendency of the state case, and instead rely on the standards of the extreme emotional distress a non disabled person would be reasonably expected to suffer under the same circumstances.

11. The Plaintiffs seek to recover damages for future treatment for the entire H. Family in the private sector.

12. Plaintiffs' emotional distress was serious and of such a nature that no reasonable person could be expected to endure it.

13. As a result of Defendants' conduct, the H. Family suffered extreme emotional distress:

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

1. Assert jurisdiction over this action; and

2. Find in favor of the Plaintiffs pursuant to Rule 57 of the Federal Rules of Civil Procedure 42 U.S.C. § 1983, 42 U.S.C. § 1985, 42 U.S.C. §1986 and 42 U.S.C. § 1988.

3. Find the Defendants harmed the H. Family investigating the H. Family without any allegations that met criteria of abuse or neglect as defined by Michigan Statute to justify the intrusion on the H. Family privacy.

4. Find the Defendants denied the H. Family's rights under the First, Fourth, Fifth, Sixth and Ninth Amendments to the United States Constitution.

5. Find the Defendants denied the H. Family Equal Protection rights under the Fourteenth Amendment to the United States Constitution.

6. Find the Defendants denied the H. Family's Procedural Due Process rights under the Fourteenth Amendment to the United States Constitution.

7. Find the Defendants denied the H. Family's Substantive Due Process rights under the Fourteenth Amendment to the United States Constitution.

8. Find the Defendants harmed the H. Family with practices and policies to initiate investigations and inclusion of parents on the central registry based on "concerns" of "potential neglect indicators" instead of allegations of abuse or neglect as defined by statute; and without the statutory standards of "reasonable suspicion", "propendance of the evidence" and "probable cause" denied the H. Family's equal protection and due process rights.

9. Find the Defendants inclusion of the H. Family on the Central Registry as child abusers for "concerns" MDHHS had no Statutory Authority to determine was "physical neglect"

denied the H. Family's equal protection and due process rights.

10. Find Thomaca Bush's inclusion of Plaintiffs in Central Registry without due process notice required by statute denied the H. Family's equal protection and due process rights.

11. Find the Defendants use of practices to seek "orders to cooperate with the investigation" against unadjudicated parents with no probable cause established, prior to an order for disposition and prior to completing a field investigation as required by MCL 722.628 (12) denied the H. Family's equal protection and due process rights.

12. Find Defendants Thomaca Bush, Marisa Anderson, Jane Doe Defendants No. One, Two and Three and Rita Ermatinger enforcement of Court Referees "recommended orders" prior to judicial review denied the H. Family's equal protection and due process rights.

13. Find Defendants' denial of due process by use of same day preliminary hearings to remove children not in custody or meeting exceptions of MCL 722.637 denied the H. Family's equal protection and due process rights.

14. Find Defendants' denial of due process by use of same day preliminary hearings to gain in-home jurisdiction of children not in custody, not seriously injured or otherwise meeting exceptions of MCL 722.637 denied the H. Family's equal protection and due process rights.

15. Find Defendants' failure to apply the requirements of MCL 712A.14b to remove children prior to entry of a judicial order with judges signature affixed denied the H. Family's equal protection and due process rights.

16. Find Defendants' holding hearings without statutory required due process notice of hearing under MCL 712A.13 and denying the H. Family an opportunity to present their meritorious defense thus denied the H. Family's equal protection and due process rights.

17. Find Defendants Thomaca Bush, Marisa Anderson, Jane Doe Defendants No. One, Two

and Three and Rita Ermatinger failure to offer direct services required under MCL 722.628 and MCL 722.628d denied the H. Family's equal protection and due process rights.

18. Find Thomaca Bush and MDHHS made the decision to remove the H. Family Children and not the court when the court issued a void ex parte order without the required findings, was enforcing a non existent court order, had state line limits, lacked a signature and this order was not a valid court order when it was never filed the next business day.

19. Find Defendants' actions were an "egregious abuse of governmental power".

20. Find Defendants outrageous and conscious shocking acts of denying the H. Family their children and due process protections have caused the H. Family extreme emotional Distress; and would presumably cause extreme emotional Distress to any mentally sound person.

21. Find Defendants invaded the H Family's privacy without justification or statutory authority.

22. Find Thomaca Bush, with malice, knowing and willing violated the H. Family's constitutional rights, in retaliation for assertion of Constitutional rights and free speech.

23. Find Ingham County's scheme involving the appointment and funding of court appointed attorneys with a stated purpose of "early permanency" compromises the independence of court appointed attorneys and undermines the fundamental fairness of the proceedings and is inconsistent with due process.

24. Find the H. Family have a likelihood of future harm from CPS involvement in Michigan due to their lifestyle choices, various risk factors, their timeshare resorts have 11 resorts in Michigan, including a resort in Ingham County, the H. Family travels to Michigan often and under the same circumstances that lead to two (2) prior cps investigations and

Defendants maintain practices to encourage reporting of "potential indicators" of abuse and neglect without the reporter having personal suspicions of abuse or neglect as defined by law.

25. Permanently enjoin Defendants from subjecting Plaintiff to future practices that violate the H. Family's rights pursuant to 28 U.S.C. § 1651(a); and

26. Order appropriate remedial relief to ensure Defendants' future compliance with their legal obligations to Plaintiffs; and

27. Award to Plaintiffs the reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees, pursuant to 42 U.S.C. §§ 1920, 42 U.S.C. § 1983, 42 U.S.C. § 1985, 42 U.S.C. §1986 ,42 U.S.C. §1988 and Federal Rules of Civil Procedure 23(e) and (h); and

28. Award to Plaintiffs compensatory and punitive damages in the amount of Five Million Dollars ($5,000,000.00) against defendants Thomaca Bush, Peter Brown , Marisa Anderson, Jane Doe Defendants No. One, Two and Three, Rita Ermatinger and Sidra Alvi-waller; in their individual capacities, for acts not covered under established privileges of immunity, pursuant to 42 U.S.C. §§ 1920, 42 U.S.C. § 1983, 42 U.S.C. § 1985, 42 U.S.C. §1986 and Federal Rules of Civil Procedure 23(e) and (h); and

29. Grant such other and further equitable relief as the Court deems just and necessary.

"I declare state under the penalty of perjury under the laws of the United States of America that

the foregoing is true and correct to the best of my knowledge."

_(signature)_____ (REDACTED*)   200 Catherine St Pekin IL 61554

Date _7-18-2020_

H. H.

_(signature)_____ (REDACTED*)   200 Catherine St Pekin IL 61554

Date _7-18-2020_

J. H.

| | |
|---|---|
| State _____ of _Illinois_ , County of _Sangamon_ . | |
| Signed and sworn (or affirmed) before me | |
| on _July 18, 2020_ by __H. H. (REDACTED*)__ | |
| and on _July 18, 2020_ , by __J. H. (REDACTED*)__ | |
| _(signature)_____ | DEANNA R. JONES<br>OFFICIAL SEAL<br>Notary Public, State of Illinois<br>My Commission Expires<br>January 28, 2023 |

*(original filed under protective motion)

"I declare state under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge."

*Heidi Hall*

Date 7-18-2020

H. H.

Date 7-18-2020

J. H.

State _____ of *Illinois*, County of *Sangamon*

Signed and sworn (or affirmed) before me

on *July 18, 2020*, by *Heidi Hall*,

and on *July 18, 2020*, by *Joseph Hall*

*Deanna R Jones*

DEANNA R. JONES
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
January 28, 2023