UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HEIDI HALL and JOSEPH HALL,

               Plaintiffs,                                   Hon. Hala Y. Jarbou

v.                                                Case No. 1:20-cv-731

THOMACA BUSH, et al.,

               Defendants.

_____/

## REPORT AND RECOMMENDATION AND ORDER

Plaintiffs Heidi Hall and Joseph Hall filed a complaint pursuant to 42 U.S.C. § 1983 and other federal statutes against numerous Defendants in connection with a Michigan Child Protective Services investigation in the fall of 2018 that resulted in the removal and detention of their children, M.H. and J.H., from Illinois to Michigan for 61 days. In their first amended complaint—the current operative pleading—the Halls sue a number of Defendants who generally fall into two groups: (1) the State Defendants, who include Thomaca Bush, Marisa Anderson, Tonya Martinez, Elizabeth Montemayor, Herman McCall, and Rita Ermatinger;[1] and (2) the County Defendants, including Ingham County, Stacy Strouse, Sidra Alvi-Waller, Peter Brown, Richard Garcia, and Carol Siemon.[2] The Halls assert the following federal claims: (1) violation of substantive due process; (2) violation of procedural due process; (3) unlawful search and seizure; (4) First

---

[1] The Halls also sued State Defendants Jooyeun Chang and Robert Gordon, but have voluntarily agreed to dismiss those Defendants. (ECF No. 55 at PageID.1990.) Accordingly, per the Halls' request, those Defendants should be dismissed from the case and their separate Motion to Dismiss (ECF No. 50) should be granted.

[2] The Halls also sue Unknown Parties Nos. 1–4, one of whom is alleged to be a Champaign County, Illinois Department of Children and Family Services employee. (ECF No. 26 at PageID.1775.)

Amendment retaliation; (5) violation of their Fourteenth Amendment right to equal protection; (6) failure to train; (7) failure to supervise; and (8) conspiracy under 42 U.S.C. § 1985. Invoking this Court's diversity jurisdiction, the Halls also assert a state-law claim for intentional infliction of emotional distress (IIED).[3]

Presently before me are the State Defendants' Motion to Dismiss and the County Defendants' Motion to Dismiss. (ECF Nos. 37 and 50.) Also before me is the Halls' Motion for Leave to Amend. (ECF No. 65.) The motions are fully briefed and ready for decision. Pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that Defendants' motions be **GRANTED.** The Halls' motion for leave to amend is **DENIED**.

## I.      Background

### A.      The Parties

The Halls are husband and wife and reside in Illinois. They have two children together, M.H. and J.H.

Thomaca Bush is a Child Protective Services (CPS) Investigator with Ingham County. Marisa Anderson is a CPS supervisor who supervised Defendant Bush. Rita Ermatinger and Tonya Martinez are CPS supervisors in Ingham County. Elizabeth Montemayor is the Ingham County CPS program manager. Herman McCall is the Executive Director of the Michigan Children's Service Agency. Jane Doe Nos. 2 and 3 are CPS employees for Ingham County and Jane Doe No. 4 is a CPS supervisor. (ECF No. 46 at PageID.1775–77.)

Carol Siemon is the Ingham County Prosecutor. Stacy Strouse is the Deputy Juvenile Register/Scheduling Clerk for the Ingham County Circuit Court. Sidra Alvi-Waller is a Deputy Juvenile Register for the Ingham County Circuit Court. Peter Brown is an Ingham County Circuit

---

[3] The Halls also asserted a claim for malicious prosecution (Count VII), which they have agreed to dismiss. (ECF No. 55 at PageID.2021.)

Court Referee. Richard Garcia is the Chief Probate Judge for the Ingham County Circuit Court. (*Id.*)

### B.    The CPS Investigation and Removal of the Children[4]

In August and September 2018, the Halls and their children visited Michigan on a camping trip with a 25-foot trailer. As of late September, the Halls were staying at a campground in Ingham County. (ECF No. 46 at PageID.1782.) On September 24, CPS received a complaint of potential child abuse and neglect by the Halls, prompting a visit from CPS. (*Id.* at PageID.1784.) Defendant Bush visited the Halls at their campsite at Heartland Woods RV Resort on September 26. During that visit, Bush spoke with Joseph Hall, who indicated that he had an Illinois medical marijuana card and that the Halls had been subjected to prior CPS removals in Illinois. Joseph also indicated that the family had been living in a camping trailer for over a year as a lifestyle choice and that the children were being home schooled. (*Id.* at PageID.1786; ECF No. 38-2 at PageID.1617.)

On September 27, 2018, Bush spoke with St. Claire County CPS worker Jason Salamango, who informed her that the St. Claire County office of the Michigan Department of Health and Human Services (MDHHS) had previously begun an investigation into the family. (*Id.* at PageID.1619.) In addition, Bush spoke with an Ingham County deputy sheriff who had been dispatched to the family's campsite to perform a well-being check earlier that week. (*Id.*) That same day, Defendant Bush interviewed Heidi Hall at the Ingham County Fair Grounds. During the

---

[4]  "When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. National Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). Public records that a court may consider in deciding a motion to dismiss include documents from other court proceedings. *Watermark Senior Living Ret. Communities, Inc. v. Morrison Mgmt. Specialists, Inc.*, 905 F.3d 421, 425-26 (6th Cir. 2018) (citing *Buck v. Thomas M. Cooley Law Sch.*, 597 F.3d 812, 816 (6th Cir. 2010)). Accordingly, it is appropriate to consider records from the state-court child welfare proceeding.

interview, Heidi Hall was irate and confrontational and told Bush that she was infringing on her constitutional rights. (*Id.* at PageID.1618; ECF No. 46 at PageID.1786–87.)

As a result of her investigation, on September 28, Defendant Bush filed a Petition in the Family Court Division of the Ingham County Circuit Court requesting that the Court take jurisdiction over M.H. and J.H., issue an order of removal, and place them in MDHHS's care and custody. The Petition further requested that the Halls be provided parenting time with the children. (ECF No. 38-2.) Defendant Strouse scheduled a hearing for less than a half-hour later. (ECF No. 46 at PageID.1791.) Bush attempted to inform the Halls of the hearing, but Heidi Hall "hung up" on her. (*Id.* at PageID.1791–92.) Defendant Brown held the hearing and entered an Order After Preliminary Hearing finding probable cause and authorizing the Petition. (ECF No. 38-3.) The order found:

> It is contrary to the welfare of the children . . . to remain in the home with their parents, Heidi Hall and Joseph Hall Sr. due to physical neglect and lack of cooperation by the parents regarding ensuring the children's safety and wellbeing. The parents have previous CPS history in Illinois regarding physical neglect. The mother, Heidi Hall, has reported mental health issues. Family is living in a 25 foot trailer with garbage all over inside and outside of the trailer. The family is vomiting "all over the place." The children are dirty and smell like urine. The children have not bathed in over 25 days and . . . may have had lice.

(*Id.* at PageID.1622.) The order set a pretrial hearing for October 18, 2021, and a trial for November 26, 2018. (*Id.* at PageID.1625.) It also appointed separate counsel for both Heidi and Joseph and appointed a guardian ad litem for the minors. (*Id.* at PageID.1625.)

When Defendant Bush attempted to locate the children, she discovered that the Halls had left the state and returned to Illinois. Defendant Anderson called Heidi Hall, who informed her that the family was at a K.O.A. campground in Illinois en route to their destination. (ECF No. 46 at PageID.1794–95.) At approximately 8:30 p.m. on September 28, Bush sought and obtained from Defendant Garcia Orders to Take Children into Protective Custody, directing CPS/law

4

enforcement to apprehend the children and return them to the Michigan DHHS for care and supervision. (ECF No. 38-4; ECF No. 46 at PageID.1797–98.) The apprehension orders noted that the Halls had absconded with the children. (ECF No. 38-4 at PageID.1627, 1632.) On September 29, at approximately 6:00 a.m., a deputy sheriff from Champaign County, Illinois, seized the children from a motel room where the family was staying. The children were then returned to Michigan and placed in foster care. (ECF No. 46 at PageID.1799.)

On October 1, 2018, Ingham County Judge Janelle Lawless issued an Order After Preliminary Hearing. (*Id.* at PageID.1801.) On October 2, 2018, Defendant Alvi-Waller updated the "registry of action" and entered a Record of Preliminary Hearing to reflect an order for the "care and custody" of the minors after their removal. (*Id.*) On October 18, 2018, Judge Lawless held a pretrial hearing. Following the hearing, she entered an Order After Pretrial Hearing that continued the placement with MDHHS until the scheduled trial on December 3, 2018. (ECF No. 53-4.)

The children were returned to the Halls on November 29, 2018—61 days after they were removed—after the court granted a motion to dismiss that Heidi Hall's appointed counsel filed. (ECF No. 46 at PageID.1809–10.) The order of dismissal stated that "[b]ased upon the agreement of all parties . . . jurisdiction is not necessary in this matter." (ECF No. 63-2 at PageID.2150.)

C.     **Procedural History**

On August 5, 2020, the Halls filed a 512-page, 2,133-paragraph, six-count complaint. The State Defendants filed a motion to dismiss on November 23, 2020. The County Defendants elected to file an answer on October 13, 2020. On November 2, 2020, the Halls filed a motion to strike certain paragraphs of the County Defendants' answer or to deem them admitted. On December 30, 2020, I entered an order concluding that the Halls raised valid arguments as to some of the County Defendants' responses, but I found that their voluminous complaint violated Rule 8(a)(2)'s "short

and plain statement" requirement. Accordingly, I directed the Clerk to strike the complaint and granted the Halls an opportunity to file an amended complaint in accordance with Rule 8(a), containing no more than 50 pages. I also held the State Defendants' motion to dismiss in abeyance pending the Halls' filing of a first amended complaint. I directed the State Defendants to indicate— once the Halls filed their amended pleading—whether the grounds for their motion to dismiss remained valid and whether they would seek to supplement their motion. (ECF No. 45.)

The Halls filed their amended complaint on January 22, 2021, which condensed their pleading into the allowed 50-page limit but also added new claims and Defendants. The State Defendants advised that the amendment did not alter their original motion to dismiss, but they requested an opportunity to supplement the motion. The State Defendants filed their supplement on February 8, 2021. (ECF No. 47.) This time around, the County Defendants elected to file a motion to dismiss in lieu of an answer, which they filed on February 12, 2021. (ECF No. 52.) On April 1, 2021, after the motions were fully briefed, the Halls moved to file a second amended complaint. (ECF No. 65.)

## II.    Motions to Dismiss

### A.    Motion Standard[5]

A Rule 12(b)(6) motion to dismiss for failure to state a claim on which relief may be granted tests the legal sufficiency of a complaint by evaluating its assertions in a light most

---

[5] Although the State Defendants and the County Defendants cite Rule 12(b)(6) as the applicable standard for their respective motions, many of the defenses they raise are properly characterized as jurisdictional defenses appropriately raised under Rule 12(b)(1). *See, e.g., Edwards v. Commonwealth of Ky. Revenue Cabinet*, 22 F. App'x 392, 393 (6th Cir. 2001) ("Eleventh Amendment immunity constitutes a jurisdictional bar, and neither supplemental jurisdiction nor any other basis for jurisdiction overrides Eleventh Amendment immunity.") (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984)); *Leech v. DeWeese*, 689 F.3d 538, 540 (6th Cir. 2012) (characterizing absolute judicial immunity as a jurisdictional defense). In any event, all of the jurisdictional arguments present facial challenges that may be analyzed in the same manner as a Rule 12(b)(6) motion.

favorable to Plaintiff to determine whether it states a valid claim for relief. *See In re NM Holdings Co., LLC*, 622 F.3d 613, 618 (6th Cir. 2010).

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a claim must be dismissed for failure to state a claim on which relief may be granted unless the "[f]actual allegations [are] enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007). As the Supreme Court more recently held, to survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009). This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the complaint simply pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* As the Court further observed, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678-79.

### B.    State Defendants' Motion

#### 1.    Eleventh Amendment Immunity

The Halls sue many of the State Defendants in their official capacities. The State Defendants contend that the official capacity claims are barred by the Eleventh Amendment. An official capacity suit is no different than a suit against the state itself. *See Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) ("A suit against an individual in his official capacity is the equivalent of a suit against the governmental entity."). Because the Eleventh Amendment prohibits suits for damages against states in federal court, *see Quern v. Jordan*, 440 U.S. 332, 342 (1979), damage claims against state officials in their official capacities are also barred by the Eleventh Amendment. *See Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005) (noting that Eleventh

7

Amendment immunity "applies to actions against state officials sued in their official capacity for money damages") (citing *Lapides v. Bd. of Regents*, 535 U.S. 613, 616, 623 (2002)). The immunity is not limited to damage claims. "This immunity is far reaching. It bars all suits, whether for injunctive, declaratory or monetary relief, against the state and its departments." *Thiokol Corp. v. Dep't of Treasury*, 987 F.2d 376, 381 (6th Cir. 1993) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100–01 (1984)). An exception to this general rule exists, however, for claims seeking prospective injunctive or declaratory relief compelling a state official (in his or her official capacity) to comply with federal law. *See Ex Parte Young*, 209 U.S. 123 (1908); *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507–08 (6th Cir. 2008) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989)).

The Halls do not dispute that they may not assert official capacity claims for damages against the State Defendants. They contend, however, that their request for declaratory relief pursuant to their official capacity claims is not barred because they have alleged a continuing violation of federal law. The Halls have regained custody of their children and no longer have a pending CPS case in Michigan. They thus cannot seek declaratory relief based on the facts alleged in their complaint. "Past harm allows a plaintiff to seek damages, but it does not entitle a plaintiff to seek injunctive or declaratory relief. This is because the fact that a harm occurred in the past 'does nothing to establish a real and immediate threat that' it will occur in the future, as is required for injunctive relief." *Kanuszewski v. Michigan Dep't of Health & Human Servs.*, 927 F.3d 396, 406 (6th Cir. 2019) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 106 (1983)).

A plaintiff who seeks declaratory relief must establish Article III standing in the same manner as a claim for other types of relief. Article III standing requires an injury-in-fact, a causal relationship between the injury and the defendant's challenged acts, and the likelihood that a

favorable decision will redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Moreover, the injury must be "actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan*, 504 U.S. at 560–61). A plaintiff who seeks declaratory relief can meet the standing requirements by showing "actual present harm or a significant possibility of future harm . . . ." *Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 527 (6th Cir. 1998).

The Halls attempt this showing by arguing that they face a threat of future violations "if and when the[y] . . . use their timeshare rv resorts, including an Ingham County resort." (ECF No. 55 at PageID.1992.) The Halls' "some day" assertion falls well short of establishing the type of injury required for declaratory relief. A plaintiff's mere assertion of an "intent" to engage in future behavior is insufficient to show that he or she will be injured absent declaratory relief. *Lujan*, 504 U.S. at 564 (quoting *Lyons*, 461 U.S. at 102). Absent evidence of concrete plans, mere "'some day' intentions . . . do not support a finding of the 'actual or imminent' injury that our cases require." *Id.*; *see also Barber v. Miller*, 809 F.3d 840, 849 (6th Cir. 2015) (holding that the plaintiff's allegation that social workers would have access to his child because state law required him to send his child to school failed to demonstrate an "immediate threat of harm" for purposes of the plaintiff's request for a declaratory judgment invalidating a statute requiring schools to cooperate with child-abuse investigations). Thus, the Halls lack standing to assert a claim for declaratory relief under *Ex Parte Young*, and the official capacity claims should be dismissed.

### 2. *Rooker-Feldman* Doctrine

The State Defendants invoke the *Rooker-Feldman* doctrine as a jurisdictional bar to certain of the Halls' claims. In particular, the State Defendants contend that the Halls' claims based on the removal of their children are barred by *Rooker-Feldman* because their alleged injuries arise primarily from the state-court's orders.

9

The *Rooker-Feldman* doctrine has its roots in the Supreme Court's decisions in *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983), and *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and provides that lower federal courts are without authority to review final judgments of state courts in judicial proceedings. This is because "only the Supreme Court of the United States has the jurisdiction to review state court decisions." *Coleman v. Governor of Mich.*, 413 F. App'x 866, 870 (6th Cir. 2011) (citing *Rooker*, 263 U.S. at 416); *see also Givens v. Homecomings Fin.*, 278 F. App'x 607, 608–09 (6th Cir. 2008). The Supreme Court has clarified the scope of the doctrine, confining it to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). In light of *Exxon Mobil*, the Sixth Circuit "distinguishe[s] between plaintiffs who bring an impermissible attack on a state court judgment— situations in which *Rooker-Feldman* applies—and plaintiffs who assert independent claims before the district court—situations in which *Rooker-Feldman* does not apply." *Kovacic v. Cuyahoga Cnty. Dep't of Children & Family Servs*, 606 F.3d 301, 309 (6th Cir. 2010).

In *McCormick v. Braverman*, 451 F.3d 382 (6th Cir. 2006), the Sixth Circuit explained that the proper focus in determining whether *Rooker-Feldman* bars jurisdiction over a claim is the source of the alleged injury. *Id.* at 393. "If the source of the injury is the state court decision, then the *Rooker-Feldman* doctrine would prevent the district court from asserting jurisdiction. If there is some other source of injury, such as a third party's actions, then the plaintiff asserts an independent claim." *Id.* In addition, the doctrine is not limited to final judgments that terminate the state-court proceeding, but instead applies to orders entered and decisions made throughout the pendency of the litigation in that forum. *See Reguli v. Guffee*, 371 F. App'x 590, 595–96 (6th Cir.

2010) (noting that the majority of the plaintiff's claims stemmed from various orders issued by the juvenile court referee and were thus barred by the *Rooker-Feldman* doctrine). In *Hancock v. Miller*, No. 2:19-cv-00060, 2020 WL 1493609 (M.D. Tenn. Mar. 27, 2020), the plaintiff alleged numerous claims that arose directly from a juvenile court judge's ex parte order for the child welfare agency to take custody of the plaintiff's children. The court concluded that the ex parte order was the "main source of injury" for the plaintiff's claims relating to the pursuit, seizure, and retention of her children, as well as the alleged interference with the plaintiff's parental rights arising from those actions, notwithstanding the plaintiff's contention that the court entered the order without proper jurisdiction. *Id.* at *11; *see also Cunningham v. Dep't of Children's Servs.*, 842 F. App'x 959, 964 (6th Cir. 2021) (*Rooker-Feldman* precluded the district court from reviewing or addressing any aspect of the ex parte order, including the plaintiff's claim that the juvenile court judge violated the Constitution by acting outside her jurisdiction).

Turning to the Halls' claims, *Rooker-Feldman* bars many of them in their entirety, and at least portions of others, as they assert injury arising from the removal order. Count I, a substantive due process claim based on the removal of the minors, asserts an injury arising out of the ex parte removal orders. Although Count II asserts a claim for procedural due process based on events leading up to the issuance of the ex parte orders, the claim is barred to the extent it alleges deficiencies in the orders and execution "in excess of their limits." (ECF No. 46 at PageID.1817.) Count III, which alleges unlawful seizure of the minors based on warrants for their seizure that were issued without probable cause and not supported by oath or affirmation, alleges an injury arising out of the state-court's order authorizing removal. *Rooker-Feldman* thus precludes review of this claim. Count IV, a claim for First Amendment retaliation, is barred in part to the extent it alleges seizure/removal of the minors—an adverse action that arose directly from the ex parte

orders. Count V, which alleges an equal protection claim based on the Halls being deprived of the care and custody of the minors from September 29, 2018, through November 30, 2018, also alleges injury resulting from the state-court removal and seizure orders. Finally, Count VI, the IIED claim, alleges emotional distress based on the removal of the minors for 61 days. Although the Halls cite acts or omissions by Jane Does 1 through 4, Ermatinger, and Bush, the injury—removal of the children—arose directly from the ex parte orders. This claim, like the others, is barred by *Rooker-Feldman*. Therefore, the Court lacks jurisdiction over these claims.

The Halls contend that their claims are not barred because they are based upon Defendants' actions apart from the orders. (ECF No. 55 at PageID.1991.) But many of the claims allege injury based on the removal of the minors, and as discussed above, the orders for the seizure and removal of the minors are the source of the injury. Thus, while the *Rooker-Feldman* doctrine does not bar the entire action, it bars most of the Halls' claims.

### 3.     Absolute Immunity

The State Defendants contend that the Halls' claims against Defendants Bush, Ermatinger, and Anderson are barred by absolute immunity to the extent they are based on Defendants' actions while functioning as legal advocates.

Social workers are absolutely immune from liability when they act as "legal advocates" in initiating and pursuing child welfare proceedings. *Holloway v. Brush*, 220 F.3d 767, 775 (6th Cir. 2000) (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 273–74 (1993)). "The scope of this immunity is akin to the scope of absolute prosecutorial immunity, which applies to conduct 'intimately associated with the judicial phase of the criminal process.'" *Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 640 F.3d 716, 724 (6th Cir. 2011) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). A social worker's absolute immunity also extends to "interactions with a court, such as 'testimony or recommendations given in court concerning the child's best interests

12

as she saw the matter.'" *Kovacic v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 724 F.3d 687, 694 (6th Cir. 2013) (quoting *Pittman*, 640 F.3d at 725). As is the case with prosecutorial immunity, a social worker's immunity for legal advocacy applies even to intentional misrepresentations made to the court. *Pittman*, 640 F.3d at 725; *see also Dean v. Byerley*, 354 F.3d 540, 554 (6th Cir. 2004) ("The defense of absolute immunity provides a shield from liability for acts performed erroneously, even if alleged to have been done maliciously or corruptly.").

It is clear from the Halls' allegations that Defendant Bush was acting as a legal advocate when investigating the child abuse and neglect complaint, interviewing the Halls, and preparing and submitting the petition and supporting documents to the court. *See Schattilly v. Daugharty*, 656 F. App'x 123, 130 (6th Cir. 2016) (stating that "this immunity includes social workers' statements in complaints or affidavits that they submit to courts—even if the statements are false or misleading"). Although the allegations regarding Defendants Ermatinger's and Anderson's conduct during this time are sparse—in fact, there is no indication that they played any role in preparing and filing the petition or securing the issuance or the ex parte orders—they, like Bush, are immune from liability for their actions leading up to the issuance of the court orders. *See O'Donnell v. Brown*, 335 F. Supp. 2d 787, 826-827 (W.D. Mich. 2004) ("The CPS workers' recommendations to the family court, as well as their investigation leading up to those recommendations, relate to the initiation of judicial proceedings and thus fall within the scope of absolute immunity."). However, as Bush, Ermatinger, and Anderson concede (ECF No. 62 at PageID.2112), absolute immunity does not apply to their actions relating to the removal of the children.[6] Those claims, as discussed above, are barred by the *Rooker-Feldman* doctrine.

---

[6] Citing *O'Donnell*, the Halls contend that Defendants Ermatinger and Bush are not immune from their claims for misrepresentations and omissions during the ex parte hearing process. (ECF No. 55 at PageID.1994). The quote the Halls rely on for this proposition is a quote from a Tenth Circuit

### 4.   Qualified Immunity[7]

The State Defendants also contend that they are entitled to qualified immunity. "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane Cnty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant raises the qualified immunity defense, the burden shifts to the plaintiff to demonstrate that the defendant officer violated a right so clearly established "that every 'reasonable official would have understood that what he [was] doing violate[d] that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The analysis entails a two-step inquiry. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). First, the court must "determine if the facts alleged make out a violation of a constitutional right." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Second, the court asks if the right at issue was "'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Id.* (citing *Pearson*, 555 U.S. at 232). A court may address these steps in any order. *Id.* (citing *Pearson*, 555 U.S. at 236). A government official is entitled to qualified immunity if either step of the analysis is not satisfied. *See Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016).

---

case, *Malik v. Arapahoe County Department of Social Services*, 191 F.3d 1306, 1315 (10th Cir. 1999), apparently cited by the plaintiffs in *O'Donnell*. *See* 335 F. Supp. 2d at 812. In any event, the portion of the opinion the Halls cite did not deal with immunity. In the section of the opinion discussing the CPS defendants' entitlement to absolute immunity, the court noted that they were immune for their actions during the investigation leading up to their recommendations to the court and their initiation of the child welfare proceedings. *Id.* at 826–27.

[7] Although I have concluded that many of the claims are barred by the *Rooker-Feldman* doctrine, I will consider the State Defendants' qualified immunity defense with regard to each federal claim as an alternative basis for dismissal.

Although the Sixth Circuit has observed that "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity," *Wesley v. Campbell*, 779 F.3d 421, 433–44 (6th Cir. 2015), it has also said that when the "pleadings in th[e] case are not ambiguous," and "it is clear that no violation of a clearly established constitutional right could be found under any set of facts that could be proven consistent with the allegations or pleadings," the Court acts well within its discretion in granting a pre-answer motion to dismiss on the basis of qualified immunity. *Jackson v. Schultz*, 429 F.3d 586, 589–90 (6th Cir. 2005).

### a.    Substantive Due Process

In Count I, the Halls allege that Defendants Ingham County, Bush, Ermatinger, Jane Does 1 through 4, Montemayor, and Martinez violated their right to substantive due process by depriving them of their right to familial integrity when they seized the minors.[8]  The Halls concede in Count 1 that the state may interfere with family relationships in order to protect children from risks to their health and safety, but they contend that the seizure nonetheless violated their rights because Defendants failed to provide them constitutionally-adequate process before removing the children. (ECF No. 55 at PageID.1816.)

"[T]he Supreme Court has repeatedly reaffirmed the existence of a constitutional right to the maintenance of a parent-child relationship." *Kottmyer v. Maas*, 436 F.3d 684, 689 (6th Cir. 2006); *see Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected."). "[A] child and his parents share a vital interest in preventing erroneous termination of their natural

---

[8] The Halls do not allege a substantive due process claim based upon actions that "shock the conscience." Such a claim would fail as they allege no fact or facts amounting to conscience-shocking behavior. *See Range v. Douglas*, 763 F.3d 573, 589–90 (6th Cir. 2014) ("Such conduct includes actions 'so "brutal" and "offensive" that [they do] not comport with traditional ideas of fair play and decency.'" (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) (quoting *Breithaupt v. Abram*, 352 U.S. 432, 435 (1957)))).

relationship." *Santosky v. Kramer*, 455 U.S. 745, 760 (1982). Nonetheless, the right to familial integrity and association "is neither absolute nor unqualified." *Kottmyer*, 436 F.3d at 690. In particular, "the government has a compelling interest in protecting minor children from abuse or neglect." *O'Donnell*, 335 F. Supp. 2d at 821 (citing *Martinez v. Mafchir*, 35 F.3d 1486, 1490 (10th Cir. 1994)); *see Kottmyer*, 436 F.3d at 690 (noting that the right to the maintenance of a parent-child relationship "is limited by an equal[ly] compelling governmental interest in the protection of children, particularly where the children need to be protected from their own parents").

The Sixth Circuit has held that where state law authorizes juvenile courts to make child custody decisions, it is the court alone that deprives the plaintiff of his fundamental right to family integrity. *See Pittman*, 640 F.3d at 729. In *Pittman*, the plaintiff-father alleged that a social worker deprived him of his fundamental liberty interest in maintaining his parent-child relationship with his son based upon her misrepresentations about the plaintiff and mishandling of the plaintiff's caregiver approval process in the custody proceeding. *Id.* at 726–27. The court concluded that the social worker could not be liable for depriving the plaintiff of his fundamental right because the juvenile court had the ultimate decision-making authority regarding placement and custody. *Id.* at 729. Although *Pittman* involved Ohio courts, Michigan courts similarly have the ultimate decision-making authority on custody matters. *See Kolley v. Adult Protective Servs.*, 725 F.3d 581, 586 (6th Cir. 2013) (applying *Pittman* to claims against Michigan social workers based on the appointment of a guardian and custody decision for a developmentally disabled adult); *Van Buren v. Crawford Cnty.*, No. 13-14565, 2014 WL 2217016, at *8 (E.D. Mich. May 29, 2014) ("As in Ohio, only a Michigan juvenile court can violate a plaintiff's substantive due process rights by interfering with the fundamental right to family integrity.").

Here, the minors were seized pursuant to an order issued by Defendant Referee Brown that Judge Lawless later approved. The Halls argue that the removal order was invalid because Referee Brown could not issue an ex parte removal order pursuant to Mich. Comp. Laws. § 712A.10. (ECF No. 55 at PageID.1999.) However, pursuant to Mich. Comp. Laws § 712A.14b, a referee is authorized to issue an ex parte removal order upon receipt of a petition or affidavit of facts. Mich. Comp. Laws § 712A.14b; *see also* M.C.R. 3.913(A)(2)(b) (authorizing a referee to issue an ex parte placement order under M.C.R. 3.963(B)). Moreover, Defendant Judge Garcia issued orders to take the minors into custody before their actual removal. Accordingly, to the extent a deprivation occurred, it resulted from a court order and not from Defendants' conduct.

Thus, I recommend that Count 1 be dismissed as to the State Defendants.

### b.    Procedural Due Process

In Count II, the Halls allege that State Defendants Bush, Anderson, Ermatinger, Jane Does 1 through 4, Montemayor, and McCall denied the Halls their right to due process. Analysis of a procedural due process claim involves two steps: "the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989); *see also Pittman*, 640 F.3d at 729 ("To establish a violation of his procedural due process rights, Pittman must show (1) that [he] was deprived of a protected liberty or property interest, and (2) that such deprivation occurred without the requisite due process of law." (internal quotation marks omitted)). The Halls do not specify the interest of which they were deprived. To the extent they complain about the CPS investigation, the claim lacks merit as they have no liberty or property interest in the manner in which Defendant Bush performed her investigation. The performance of an investigation is discretionary, and no particular outcome is mandated. *Langdon v. Skelding*, 524 F. App'x 172, 177–78 (6th Cir. 2013).

17

For purposes of the instant motion, I will assume that the Halls assert the deprivation of their fundamental right in the maintenance of a parent-child relationship. "[S]tate intervention in the relationship between a parent and child must be accomplished by procedures meeting the requisites of the Due Process Clause." *Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 635 (6th Cir. 2007). "Even a temporary deprivation of physical custody requires a hearing within a reasonable time." *Id.* "Notice and an opportunity to be heard remain the most basic requirements of due process." *Flaim v. Medical College of Ohio*, 418 F.3d 629, 635 (6th Cir. 2005).

This claim fails for two reasons. First, as the Halls acknowledge in their complaint, they had adequate notice of the September 28, 2018 hearing. At approximately 12:40 p.m. that day, Bush contacted Heidi Hall to let her know that she would be filing a petition, when Heidi Hall interrupted, objected to telephone notice, and advised Bush to serve her in Illinois as the family would not be in Michigan for personal service. Heidi Hall then hung up on Bush. (ECF No. 46 at PageID.1791–92.) In addition, the Halls were provided copies of the orders issued on September 28. Judge Lawless held a hearing on October 1, 2018, within two days after the minors were removed, at which the Halls were represented by appointed counsel. Additional hearings were then held, at which the Halls were also represented by counsel. (ECF No. 46 at PageID.1803.) Thus, the Halls have not demonstrated a procedural due process violation. Second, as set forth in *Pittman*, the court, and not Bush or any other CPS worker, was responsible for depriving the Halls of their protected interest in family integrity. Because the family court's orders authorizing removal accomplished the deprivation, the State Defendants did not violate the Halls' right to procedural due process. 640 F.3d at 730.

Accordingly, the Halls' procedural due process claim fails.

### c.    Unlawful Search and Seizure

In Count III, the Halls allege that Defendants Bush, Ermatinger, and Jane Does 1 through 4 violated their right under the Fourth Amendment to be free from unreasonable searches and seizures by seizing the minors with an invalid electronic warrant in Illinois. This claim is likely precluded by the *Rooker-Feldman* doctrine, as discussed above.

The Fourth Amendment protects against unreasonable searches and seizures by a representative of the government. *Hudson v. Palmer*, 468 U.S. 517, 522-26, 528 n.8 (1984). Unless one of the limited exceptions applies, police officers may not enter an individual's home without a warrant supported by probable cause. *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) (per curiam). Warrantless searches of a home are presumed unreasonable. *Andrews v. Hickman Cnty.*, 700 F.3d 845, 854 (6th Cir. 2012) (citing *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)). The Fourth Amendment's protections apply against entries and searches by social workers. *Id.* at 859–60. "[T]he standards are the same, whether the state actor is a law enforcement officer or a social worker." *Id.* at 863.

As noted, the claim the Halls allege in Count III is that Defendants seized the minors without a warrant supported by probable cause. This claim lacks merit because the seizure was pursuant to court orders Defendant Garcia issued. "The removal of a child from his custodial parents' home is a seizure for Fourth Amendment purposes, which is constitutionally reasonable if it is pursuant to a court order, is supported by probable cause, or is justified by exigent circumstances." *Krantz v. City of Toledo Police Dep't*, 197 F. App'x 446, 453 n.5 (6th Cir. 2006) (citing *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1010 (7th Cir. 2000), *and O'Donnell*, 335 F. Supp. 2d at 806–07). Here, it is undisputed that the removals were made pursuant to court orders.

In their response, the Halls add an allegation against Bush that they did not specifically include in Count III. That is, citing *Brent v. Wayne County Department of Human Services*, 901

F.3d 656 (6th Cir. 2018), they state that "36 days before the events subject to the Plaintiffs [sic]

Amended Complaint occurred the 6th Circuit Court of Appeals 'directly [held] that a social

worker, like a police officer, cannot execute a removal order that would not have been issued but

for known falsities that the social worker provided to the court to secure the order." (ECF No. 55

at PageID.1992.) The facts of *Brent* differ from those in the instant case. According to the Sixth

Circuit, the social worker in *Brent* "enlisted the assistance of Detroit Police Officers to execute the

order by falsely claiming that previous attempts to remove the children had been unsuccessful."

*Id.* at 668. Here, there is no allegation that Bush or any other CPS worker executed the removal

order, or enlisted law enforcement to do so, by false pretenses. In *Cunningham v. Department of*

*Children's Services*, 842 F. App'x 959 (6th Cir. 2021), the Sixth Circuit distinguished *Brent*,

concluding that it did not preclude qualified immunity:

> Cunningham is correct in stating that in *Brent* we did deny qualified immunity to a
> social worker who orchestrated the removal of minor children from a home.
> However, the social worker in that case actually enlisted police officers to remove
> the children and recruited them to do so under false pretenses. *Id.* at 668. The police
> officers then actually removed the children from the home, despite the fact that the
> order was facially defective. *Id.*

> Here, the ex parte order permitted DCS to interview A.C. outside the presence of a
> third party, enter any place where A.C. was located in order to conduct the
> examination, forensically interview A.C. at the CAC, and take temporary custody
> of A.C. if necessary to complete the investigation. However, Gray did none of these
> things, nor did she engage in any activity that would have been tantamount to
> "removal" of A.C. Accordingly, Cunningham has not alleged that Gray has violated
> clearly established law in her service of the ex parte order.

*Id.* at 969. Similarly, in this case, the Halls do not allege that Bush or any other CPS worker enlisted

police officers to remove the minors in Illinois under false pretenses, or that Bush or any other

CPS worker participated in the "removal." Accordingly, the Halls fail to show that Bush, Ermatinger, or the Jane Doe CPS workers violated the Halls clearly established rights.[9]

The Halls also mention a Fourth Amendment claim against Defendant Bush based on her warrantless search of the Halls' camping trailer on September 27, 2018. That is not alleged in Count III. However, the Halls describe the circumstances for this claim in their factual allegations, and the State Defendants moved to dismiss this claim from the original complaint. (ECF No. 38 at PageID.1605.) The State Defendants contend that the claim fails because the Halls admit they consented to the search. The Halls respond that any consent was obtained under duress because Defendant Bush threatened to seek a court order compelling them to cooperate if they did not allow the search, even though there was no basis for such an order. (ECF No. 55 at PageID.2012). The Halls allege as follows:

> [T]he Plaintiffs under duress of practices for orders to cooperate, consented to a search and interviews within standard investigation per MDHHS policy to avoid an unlawful "order to cooperate with investigation" as threatened because her research and written Michigan Child Protection policy showed that seeking such order would trigger automatic inclusion in Michigan Child Abuse Registry and assumption of Michigan court jurisdiction in a manner inconsistent with established statutory requirements, before the conclusion of a field investigation and without preponderance of the evidence or probable cause resulting in greater due process violations chilling further efforts to resist.

(ECF No. 46 at PageID.1786.)

Consent is one of the most common exceptions to the Fourth Amendment's warrant and probable cause requirements. *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999). Consent must be voluntary and not the product of duress or coercion, and the issue is one "of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218,

---

[9] Apart from the merits, the Halls may not prosecute this claim themselves for a more fundamental reason. That is, the unlawful seizure claim belongs to their children. *Krantz*, 197 F. App'x at 453 n.5. The Halls have not brought this claim on behalf of the minors.

227 (1973). Factors that inform the issue include: "the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police." *United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir. 1996). However, it is well established in the context of a search by the police that an officer's threat to obtain a warrant if the individual does not consent to a search does not taint the individual's consent to search. *United States v. Salvo*, 133 F.3d 943, 954 (6th Cir. 1998); *see also United States v. White*, 979 F.2d 539, 542 (7th Cir. 1992) ("When the expressed intention to obtain a [search] warrant is genuine . . . and not merely a pretext to induce submission, it does not vitiate consent."). Similarly, under the circumstances alleged, Defendant Bush's threat to obtain a court order directing the Halls to cooperate with Bush's investigation and allow access to their camping trailer would not vitiate Heidi Hall's admitted consent. Thus, the Halls fail to state a claim for unlawful search of their camping trailer.

Therefore, I recommend that the Fourth Amendment claim (including the unlawful search claim) be dismissed.

### d. First Amendment Retaliation

The Halls allege in Count IV that Defendants Bush and Ermatinger retaliated against them in violation of their First Amendment rights because they continued their travels (back to Illinois), and Heidi Hall asserted her constitutional rights. In order to establish a prima facie case of retaliation, a plaintiff must show that: "(1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; [and] (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct."

*Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 295 (6th Cir. 2012) (quoting *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006)).

As for the first element, continuing to travel does not constitute protected conduct as travel, alone, does not constitute speech. However, it is reasonable to assume that Heidi Hall's assertion of her constitutional rights constituted protected speech. As for the second element, adverse action, the Halls allege that Defendants failed to complete their field investigation, and Defendant Bush threatened Heidi Hall with a "fictional" order to cooperate with an investigation. (ECF No. 46 at PageID.1818.) It is doubtful that failing to complete an investigation amounts to adverse action, as such failure likely would not deter a person of ordinary firmness from continuing to engage in protected conduct, but Defendant Bush's alleged threat to obtain an order could be sufficiently adverse to support a retaliation claim. The Halls' claim fails at the third element, however, because they allege no factual basis for the requisite causal connection. In other words, they allege nothing more than the ultimate conclusion of retaliation without supporting facts from which it could be reasonably inferred that protected conduct motivated Defendant Bush's actions. "[A]lleging merely the ultimate fact of retaliation is insufficient." *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987). "[C]onclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'" *Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005) (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987)). For example, according to the Halls, Defendant Bush was already into the second day of her investigation when Heidi Hall asserted her constitutional rights. Defendant Bush may well have made the alleged threat because Heidi Hall was impeding her ongoing investigation and not because Heidi Hall asserted her constitutional rights. The Halls' naked assertion that Defendant Bush acted with a retaliatory motive in these circumstances is nothing more than an unsupported conclusion.

### e.      Equal Protection

In Count V, the Halls allege that State Defendants Bush, Anderson, Ermatinger, Jane Does 1 through 4, Montemayor, and McCall violated their Fourteenth Amendment right to equal protection by discriminating against them based on their status as out-of-state residents, medical marijuana users, and Heidi Hall's disability.

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend XIV. This prohibition is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). It does not forbid all classifications, but simply prevents governmental decision makers from treating differently persons who are similarly situated in all relevant respects. *Id.* at 439; *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920); *Richland Bookmart, Inc. v. Nichols*, 278 F.3d 570, 574 (6th Cir. 2002) (the Clause "protects against arbitrary classifications, and requires that similarly situated persons be treated equally"). To establish an equal protection claim, "a plaintiff must adequately plead that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Center for Bio–Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (internal quotation marks omitted).

The Halls' allegations as to this claim are entirely conclusory. They merely state that they were denied equal protection of the laws based on their alleged classifications, but they allege no fact suggesting that they were treated differently from other similarly situated parents who were Michigan residents, non-disabled, or non-medical marijuana users. Their allegation of unequal treatment is entirely conclusory. Conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim under Section 1983. *See Lillard v. Shelby Cnty. Bd.*

*of Educ.*, 76 F.3d 716, 726 (6th Cir. 1996). Moreover, an equal protection claim requires proof of "intentional and arbitrary discrimination." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Rather than alleging specific facts demonstrating discriminatory animus, the Halls simply lump numerous Defendants into a claim and allege in conclusory fashion that they denied the Halls equal protection, without alleging what each Defendant did that forms the basis of their claim of unequal treatment. Thus, I recommend that this claim be dismissed.

### f. Failure to Train and to Supervise

In Count VIII, the Halls allege that State Defendants Montemayor and McCall failed to correct unconstitutional policies, practices, or conditions and failed to train Michigan DHHS employees on matters that allegedly resulted in constitutional violations. In Count IX, the Halls allege that State Defendants Anderson, Ermatinger, Jane Does 1 through 4, Montemayor, and Martinez failed to supervise or give direction to other Defendants or their subordinates who were involved in the CPS investigation or the Ingham County case.

To the extent the Halls seek to allege a failure to train or supervise as a means to indirectly impose *respondeat superior* liability on the State Defendants, such claims must be rejected. The court in *Phillips v. Ballard*, No. 5:17-CV-301, 2019 WL 2359571 (E.D. Ky. June 4, 2019), aptly explained why such theories are unavailable against state employees absent active participation in the constitutional violation:

> As a threshold matter, an assertion that supervisory government officials failed to adequately train or supervise their subordinates typically arises not as a freestanding claim but as one of several ways for a plaintiff to show that a policy or custom of a city or county caused the plaintiff's injury, so that municipal liability may attach. *See Shadrick v. Hopkins Co., Ky.*, 805 F.3d 724, 737 (6th Cir. 2015); *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013); *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011). In this case, the defendant officials are employed by KDOC, a state agency, not by a city or county municipality, and hence the policy-or-custom requirement of *Monell v. Dep't of Soc. Servs.*, 98 S. Ct. 2018, 2037–38 (1978) does not apply. A "failure to train" claim against a state agency or its employees is therefore simply inapposite in that sense. *See id.* at 2035 n.54 ("Our holding today

25

is, of course, limited to local government units which are not considered part of the State for Eleventh Amendment purposes."). In addition, a "failure to train" claim cannot be used to circumvent the *respondeat superior* liability bar for supervising officials. *Accord Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 117 S. Ct. 1382, 1391 (1997) ("To prevent municipal liability for a hiring decision from collapsing into respondeat superior liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged.").

*Id.* at \*19.

Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575-76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough; nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899. Supervisory liability attaches only if the plaintiff shows that the defendant "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending [defendant]." *Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016) (internal quotation marks omitted). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

There are no allegations in the first amended complaint that Defendants Montemayor, McCall, Martinez, or Jane Does 1 through 4 were "actively engaged in unconstitutional behavior," *Jones v. Clark Cnty.*, 959 F.3d 748, 761(6th Cir. 2020) (citing *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006)), and to the extent such allegations exist, they fail to state a claim as set forth above. In addition, to the extent that the Halls have alleged that Defendants Anderson or

Ermatinger engaged in any conduct relating to the investigation or initiation of the Ingham County case or acts performed pursuant to the removal orders, absolute immunity bars their claims.

Accordingly, I recommend that these claims be dismissed.

### g.  Conspiracy under Section 1985

In Count X, the Halls allege a conspiracy claim under 42 U.S.C. § 1985 against all Defendants except Defendant Martinez, the purpose of which was to remove the minors from the Halls' custody "before the completion of a field investigation, without probable cause, without 72 hour notice via summons and without notice and opportunity to be heard during the pre and post removal deprivation hearings and without proper procedures for gaining a valid 'ex parte protective custody order' or following the UCCJEA." (ECF No. 46 at PageID.1821.)

To maintain a cause of action for conspiracy under Section 1985(3), a plaintiff must establish the following elements: (1) a conspiracy involving two or more persons; (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) which causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States.[10] *Smith v. Thornburg*, 136 F.3d 1070, 1078 (6th Cir. 1998) (*citing Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839 (6th Cir. 1994)). In addition, the plaintiff must demonstrate that the conspiracy was motivated by a class-based animus, such as race. *Johnson*, 40 F.3d at 839.

The Halls fail to state a Section 1985(3) conspiracy claim. First, their claim lacks any allegation of fact demonstrating that any Defendant was motived by class-based animus. *See Estate of Smithers ex rel. Norris v. City of Flint*, 602 F.3d 758, 765 (6th Cir. 2010) ("To sustain a claim under section 1985(3), a claimant must prove both membership in a protected class and

---

[10] The Halls do not specifically cite 42 U.S.C. § 1985(3), but that is the only provision of the statute appropriate to their claim.

discrimination on account of it."). They simply omit this element. More importantly, the claim is based solely on conclusions. That is, there is no factual support that Defendants made an agreement or a plan to engage in illegal, discriminatory conduct. *See Saunders v. Ghee*, No. 94-4073, 1995 WL 101289, at *1 (6th Cir. Mar. 9, 1995) ("Even under the most liberal construction, Saunders's complaint under § 1985(3) merely alleges broad, conclusory language without the factual allegations necessary to support a conspiracy theory."); *O'Hara v. Mattix*, 255 F. Supp. 540, 542 (W.D. Mich. 1966) ("The courts will not accept mere allegations of conspiracy; there must be some showing of facts to support the conspiracy."). In short, the Halls merely allege a series of independent acts by different individuals and conclude that it must have been a conspiracy. Accordingly, I recommend that this claim be dismissed as to all Defendants.

### 5.  State-Law Claim

#### a.  Jurisdiction

As noted above, *see* n.3, *supra*, the Halls agree to dismiss their malicious prosecution claim, leaving the IIED claim as the only state-law claim. The State Defendants argue that the Court should decline to exercise supplemental jurisdiction over this claim. Normally, this would be the recommended outcome pursuant to 28 U.S.C. § 1367(c)(3), but here the issue requires more discussion. *See Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims."). In this case, the Halls are citizens of Illinois, all Defendants who have appeared are citizens of Michigan, and the Halls have invoked diversity jurisdiction pursuant to 28 U.S.C. § 1332. (ECF No. 46 at PageID.1772.) An addition wrinkle remains, though: the Halls sued Jane Doe No. 1, who is alleged to be a citizen of Illinois. (*Id.* at PageID.175.) The presence of Jane Doe No. 1, who has not been served, precludes diversity

jurisdiction. *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978). Thus, the Court does not have diversity jurisdiction.

In deciding whether to exercise supplemental jurisdiction, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Applying these considerations, I recommend that the Court exercise supplemental jurisdiction over the IIED claim based on two considerations. First, there are clear grounds to dismiss the claim. Second, disposing of the claim at this juncture will promote judicial economy and convenience to the parties.

### b.      IIED Claim

In Count VI, the Halls allege that Jane Does 1 through 4, Ermatinger, and Bush intentionally caused the removal of the minors "without the completion of a field investigation, without probable cause and intentionally bypassed the summons process and such deprivation occurred without accordance of the various provisions of Michigan Child Protection Law." (ECF No. 46 at PageID.1819.) The elements of an IIED claim are: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. *See Hayley v. Allstate Ins. Co.*, 262 Mich. App. 571, 577 (2004). IIED is an intentional tort. *Graham v. Ford*, 237 Mich. App. 670, 674 (1999).

### *Immunity*

The State Defendants argue that they entitled to absolute immunity on the IIED claim, including social worker immunity under *Martin v. Children's Aid Society*, 215 Mich. App. 88 (1996), immunity pursuant to Mich. Comp. Laws 722.625, and common law individual governmental immunity. For the reasons that follow, I recommend that the State Defendants are

entitled to *Martin* immunity for social workers and common law governmental immunity on the IIED claim.

In *Martin*, the Department of Social Services (DSS) obtained an order removing the plaintiffs' infant child based on alleged child abuse. The DSS subsequently placed the child with the Children's Aid Society (CAS), a private organization with which DSS had contracted to provide services for neglected and abused children. 215 Mich. App. at 90–91. During the child welfare proceeding, CAS placed the child in foster care. When the plaintiffs later regained custody of the child, they sued DSS and CAS, alleging claims of negligence, breach of statutory and contractual duties, bad faith, and violation of their constitutional rights. *Id.* at 93. The court concluded that CAS was entitled to absolute immunity, noting that social workers play an important role in court proceedings to determine whether a child should be removed from the home and how long the child should remain in foster care. *Id.* at 96. The court further observed that social workers functioned as advisors and agents to the court and should not be subjected to vindictive lawsuits as surrogates for the judge. *Id.* at 97. The court justified a broad grant of immunity because the plaintiffs had a remedy: the probate court "regularly reviewed the placement recommendation of the CAS defendants at statutorily required hearings," which sufficiently protected the plaintiffs against wrongful conduct by the CAS defendants." *Id.* at 98. Finally, the court noted that its decision was "limited to the facts of th[e] case, in which the close oversight of the social worker's placement recommendations by the probate court [wa]s especially noteworthy." *Id.* at n.5.

*Martin* immunity is properly described as a blanket absolute immunity that is broader than the immunity social workers are granted under federal law. *Brent*, 901 F.3d at 679 (quoting *Braverman v. Hall*, No. 253619, 2005 WL 1123889, at *1 (Mich. Ct. App. May 12, 2005)). Such

immunity is unaffected by allegations of bad faith. *See Richmond v. Catholic Soc. Servs.*, No. 246833, 2004 WL 1416266, at *2 (Mich. Ct. App. June 24, 2004) (per curiam) ("Because the *Martin* panel held that it was appropriate for the entire action to be dismissed, it necessarily ruled that a claim of bad faith could not survive the defense of absolute immunity."). Finally, as clarified in *Beauford v. Lewis*, 269 Mich. App. (2005), that reference to "close oversight" in *Martin* does not mean that the court must have overseen every aspect of the social worker's conduct, but that the court reviewed the social worker's findings and determinations and took action as a result. *Id.* at 301.

Here, the Halls' IIED claim is based on acts related to the filing of the abuse and neglect petition for removal in the circuit court and the issuance of the removal orders. Because such activity was subject to court review, I recommend that Defendants are entitled to absolute immunity on the IIED claim.

Apart from *Martin* immunity, the Michigan Supreme Court has recognized governmental employee qualified immunity for intentional torts. *Odom v. Wayne Cnty.*, 482 Mich. 459 (2008). To establish entitlement to this immunity, the employee defendant must show that:

> (a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,
>
> (b) the acts were undertaken in good faith, or were not undertaken with malice, and
>
> (c) the acts were discretionary, as opposed to ministerial.

*Id.* at 480. Only the second element is at issue here, as there is no dispute that the Defendants acted within the scope of their authority when they conducted the CPS investigation, filed the petition with the court, and carried out the removal orders, and that such acts were discretionary. As for the second element, the test is subjective, meaning that "'[i]t protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who

acts with malicious intent.'" *Oliver v. Smith*, 290 Mich. App. 678, 688 (2010) (per curiam) (quoting *Odom*, 482 Mich. at 481–82). Stated differently a defendant must show that she performed the alleged act without "malicious intent, capricious action or corrupt conduct." *Odom*, 482 Mich. at 474 (quotation marks omitted).

Having reviewed the allegations of the first amended complaint, I find no factual assertion indicating that Defendants acted with malicious intent. The allegations show that Defendants simply performed their statutory duties without malicious intent or corrupt conduct. The Halls do not argue otherwise, as they fail to address the issue in their response. (ECF No. 55 at PageID.1995.)

### *Merits*

Apart from immunity, I further recommend that the IIIED claim be dismissed on the merits because the claim, as alleged, fails to satisfy the first element: extreme and outrageous conduct. "Liability for the intentional infliction of emotional distress has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Graham*, 237 Mich. App. at 674. The test is whether "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 603 (1985) (quoting Restatement (Second) of Torts § 46 cmt. d (1948)). The Halls' allegations do not meet this high threshold. Although the Halls assert that Defendants failed to properly comply with the law and satisfy procedural requirements in seeking the removal of the minors, nothing indicates that their conduct was extreme. For example, the Halls concede that Defendant Bush notified Heidi Hall of her intent to file a petition and that Heidi Hall "hung up" on Defendant Bush. Moreover, Defendant

Bush complied with the law by filing a petition and obtaining a court order before seeking removal of the minors. Even if Defendants made mistakes or failed to properly comply with the law, these allegations do not to establish an IIED claim.

Accordingly, I recommend that the IIED claim be dismissed.

### C.    County Defendants' Motion

#### 1.    Eleventh Amendment Immunity

The County Defendants argue that the Eleventh Amendment bars the Halls' official capacity claims against them. They are correct. *See LaFountain v. Meyer*, No. 1:16-cv-658, 2016 WL 3679279, at *2 (W.D. Mich. July 12, 2016) ("The Sixth Circuit Court of Appeals has already considered the application of Eleventh Amendment immunity to Michigan state courts. The Sixth Circuit determined that Michigan's courts are arms of the state and thus entitled to Eleventh Amendment immunity.") (citing *Pucci v. 19th District Court*, 628 F.3d 752, 760–74 (6th Cir. 2010)); *Varner v. Schrock*, No. 1:14-cv-999, 2014 WL 5441807, at *3 (W.D. Mich. Oct. 24, 2014) (noting that the plaintiff's suit against the clerk in her official capacity was equivalent to a suit brought against the circuit court and that "[t]he circuit courts of the State of Michigan are arms of the state and, thus, immune from suit"). It is also well established that the Eleventh Amendment bars official capacity claims against Michigan judges and court employees. *See Smith v. Skryzynski*, No. 2:16-CV-12129, 2016 WL 3230701, at *3 (E.D. Mich. June 13, 2016) ("Eleventh Amendment immunity applies to state employees, such as prosecutors, judges, and court clerks who are sued in their official capacities."); *Geller v. Washtenaw Cnty.*, No. 04-72947, 2006 WL 2726965, at * 3 (E.D. Mich. Sept. 22, 2006) ("'Employes [sic] of the district court are employees of the judicial district, an administration unit of the state's one district court, which in turn is a subdivision of Michigan's one court of justice.'") (quoting *Judges of the 74th Judicial Dist. v. Bay Cnty.*, 385 Mich. 710, 723 (1971)). Similarly, official capacity claims against prosecutors acting

33

as advocates for the state are barred by Eleventh Amendment immunity. *See Owens v. Osbourne*, No. 07-CV-13585, 2008 WL 4425496, at *5 (E.D. Mich. Sept. 25, 2008).

Accordingly, as set forth above, the Hall's official capacity claims for damages should be dismissed. In addition, for the reasons set forth above, I recommend that the Halls' claim for declaratory relief be dismissed.

### 2. *Rooker-Feldman* Doctrine

Like the State Defendants, the County Defendants argue that the *Rooker*-Feldman doctrine bars all or most of the Halls' claims against them. Because much of the Halls' alleged injury arises primarily from the removal of the minors, the *Rooker-Feldman* doctrine bars all claims asserting such injury because the removal orders caused the injury. *See Reguli v. Guffee*, 371 F. App'x 590, 595–96 (6th Cir. 2010) (holding that various acts the plaintiffs alleged a juvenile court referee committed stemmed directly from her orders and that *Rooker-Feldman* thus barred review of claims based on those acts); *Jamison v. Child Protective Servs.*, No. 1:17-CV-559, 2017 WL 4510629, at *3 (W.D. Mich. Oct. 10, 2017) (the plaintiff's claims that the ex parte removal order was unlawful and that the state-court judge lacked jurisdiction to enter the order were barred by *Rooker-Feldman*).

### 3. Absolute Judicial Immunity

The County Defendants contend that Defendants Judge Garcia and Referee Brown are entitled to absolute judicial immunity from the Halls' claims.

It is well established that a judge is absolutely immune from suit seeking monetary relief, so long as the judge was performing judicial functions. *See Mireles v. Waco*, 502 U.S. 9, 9–10 (1991). "[J]udicial immunity is an immunity from suit, not just from ultimate assessment of damages." *Id.* at 11. The "immunity applies to actions brought under 42 U.S.C. § 1983 to recover for alleged deprivation of civil rights." *Stern v. Mascio*, 262 F.3d 600, 606 (6th Cir. 2001). A judge

34

is not immune (1) where the judge's alleged actions were not taken in the judge's judicial capacity, or (2) where the actions, although judicial in nature, were taken in the complete absence of jurisdiction. *Mireles*, 502 U.S. at 11–12. "[T]he scope of the judge's jurisdiction must be construed broadly where the issue is the immunity of the judge. A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the 'clear absence of all jurisdiction.'" *Stump v. Sparkman*, 435 U.S. 349, 356–57 (1978) (quoting *Bradley v. Fisher*, 80 U.S. 335, 351 (1871)). "Whether an act is judicial depends on the nature and function of the act, not the act itself." *Barnes v. Winchell*, 105 F.3d 1111, 1116 (6th Cir. 1997) (internal quotation marks omitted) (quoting Mireles, 502 U.S. at 13). The analysis involves two considerations: "(1) looking to the nature of the act itself, whether the act is a 'function normally performed by judge' and (2) regarding the expectations of the parties, whether the parties 'dealt with the judge in his judicial capacity.'" *Id.* (quoting *Mireles*, 502 U.S. at 12). The Sixth Circuit has observed that the line between judicial acts covered by immunity and those that are not "is not self-revealing." *Norfleet v. Renner*, 924 F.3d 317, 319 (6th Cir. 2019). The court added:

> Two illustrations come to mind. If a judge with general criminal jurisdiction ruled that an act amounted to a crime when it did not, he would merely act in excess of jurisdiction and thus be immune from a § 1983 lawsuit challenging his decision. But if a probate judge assumed authority over a criminal case, the judge would act in the clear absence of jurisdiction because he is invested only with authority over wills and the settlement of estates of deceased persons.

*Id.* (internal quotation marks and citations omitted).

### a.    Judge Garcia

Judge Garcia's actual involvement in the child protective proceeding was fairly limited—entry of the orders to take the minors into custody. In issuing the ex parte orders to take the minors into custody, Judge Garcia engaged in a judicial act. *See Cunningham*, 842 F. App'x at 964–65.

35

Moreover, the Halls do not question that Judge Garcia acted well within his jurisdiction in issuing the orders. Judge Garcia was a Chief Probate Judge of the Ingham County Circuit Court and sometimes served in that court's Family Division in accordance with the Concurrent Jurisdiction Plan approved by the Michigan Supreme Court. The Michigan circuit courts are courts of general jurisdiction, Mich. Comp. Laws § 600.151, and have jurisdiction over all matters not prohibited by law. Mich. Const. 1963, art. 6 § 13. In addition, Judge Garcia was authorized by Mich. Comp. Laws § 712A.14(b) to issue the ex parte orders authorizing Michigan DHHS to immediately take the minors into custody.

The Halls contend that they are not asserting a damage claim against Judge Garcia for entering the ex parte orders, but rather for his administrative role in supervising court employees and overseeing the efficient operation of the court that resulted in the deprivation of their clearly established right to reasonable notice and an opportunity to be heard.[11]   The Halls cite *Forrester v. White*, 484 U.S. 219 (1988), in which the Supreme Court held that a state-court judge was not entitled to immunity from suit on a claim by a probation officer that the judge demoted and discharged her from her position based on her sex. The Court held that the judge's act of demoting and discharging the plaintiff was not an adjudicative act, but instead was an act the judge took in his administrative capacity, involving "supervising court employees and overseeing the efficient operation of a court." *Id.* at 229. The Halls also cite *Morrison v. Lipscomb*, 877 F.2d 463, (6th Cir. 1989), in which the Sixth Circuit held that the chief judge of a Michigan district court was not entitled to judicial immunity for an order declaring a moratorium on writs of restitution in

---

[11] The Halls also suggest that Judge Garcia is somehow individually liable for MDHHS written policies. (ECF No. 59 at PageID.2057.) They fail to cite any authority for this proposition. *See In re Mich. Employment Relations Commission's Order*, 406 Mich. 647, 662 (1979) ("It is elementary that in Michigan government the Legislative, Executive and Judicial branches are separate and co-equal.").

observance of the holiday season. The court reasoned that such act was not an adjudication connected to any particular litigation, but instead was an administrative act. *Id.* at 466. Neither *Forrester* nor *Morrison* supports the Halls' attempt to avoid judicial immunity, as the Halls fail to identify an administrative act that Judge Garcia took that violated the Halls' constitutional rights. He did not make an alleged unlawful employment decision, as alleged in *Forrester*, and he did not declare a moratorium on judicial process that affected the Halls' or anyone else's rights. In short, the Halls fail to allege that Judge Garcia engaged in any non-judicial act in supervising court employees that was connected in any way to an alleged violation of their constitutional rights. *See Johnson v. Turner*, 125 F.3d 324, 334 (6th Cir. 1997) (holding that a juvenile court judge did not engage in non-judicial functions where he did not personally initiate or preside over proceedings to enforce paternity and child support statutes).

The Halls also contend that Judge Garcia may not claim absolute judicial immunity because he acted in an administrative capacity when he approved a roster of attorneys eligible for appointment in child protection cases that was improperly funded by a grant from MDHHS. This argument pertains to the Halls' allegations of dissatisfaction with their appointed counsel's failure or refusal to raise arguments and file motions at the Halls' urging for dismissal of the case, (ECF No. 46 at PageID.1803–10), as well as their contention that the Ingham County Circuit Court's automatic appointment of counsel to parents who appear indigent violated their rights to self-representation and to select their own private counsel.[12] (*Id.* at PageID.1804–05.) To the extent the Halls complain about the appointment of counsel in their case, such act is judicial in nature

---

[12] The Halls' claim that they were denied the right of self-representation or to retain their own counsel in the case lacks merit. Although they allege that the court rejected Heidi Hall's attempted filing of a writ of habeas corpus because she was represented by counsel (ECF No. 46 at PageID.1809), they do not allege that she or they ever sought to retain counsel or filed a motion to represent themselves, even though they had ample opportunity to do so.

and subject to absolute judicial immunity. *See Thomas v. Moore*, No. 1:19-cv-1002, 2019 WL 289821, at *3 (W.D. Tenn. Jan. 22, 2019) ("Decisions regarding the admission of evidence and appointment of counsel are unquestionably within the scope of the judicial function."); *Jones v. Goldtrap*, No. 3:12-cv-1338, 2013 WL 3272718, at *2 (M.D. Tenn. June 27, 2013), *report and recommendation adopted*, 2014 WL 690732 (M.D. Tenn. Feb. 21, 2014) ("Every act alleged, from Judge Blackburn's failing to appoint counsel for Plaintiff to refusing to recuse herself from the case, is an act of judicial nature."); *Sims v. Becker*, No. 1:07-cv-266, 2007 WL 2159411, at *2 (W.D. Mich. June 13, 2007) ("To the extent Judge Leiber denied Plaintiff's request for dismissal or appointment of new counsel, there is no doubt that he was acting within his jurisdiction.").

Neither the Halls nor the County Defendants cite a case from the Sixth Circuit or any other court directly addressing whether a judge's act of creating, or overseeing the creation of, a list or panel of attorneys who are eligible for court appointments constitutes a judicial or administrative act. The County Defendants cite *Coleman v. Governor of Michigan*, 413 F. App'x 866 (6th Cir. 2011), for the proposition that a judge's performance of administrative responsibilities incident to a judicial office are within the scope of absolute judicial immunity. The act at issue in *Coleman* was a judge's administrative order interpreting a statute and advising court personnel on the execution of the statutory interpretation. *Id.* at 873. The Sixth Circuit determined that enforcement of the administrative order constituted a judicial action, even though the order was ex parte and not issued in the context of specific litigation. *Id. Coleman* suggests, but does not directly state, that judicial decisions regarding how a court functions can be adjudicative in nature.

Other courts have considered the precise issue at hand. For example, in *Roth v. King*, 449 F.3d 1272 (D.C. Cir. 2006), the D.C. Circuit considered whether the creation of panels of attorneys to represent indigent parties in juvenile delinquency cases was a judicial act subject to

absolute judicial immunity. In that case, the chief judge of the Superior Court of the District of Columbia issued an administrative order creating a committee to recommend panels of attorneys to represent indigent parties. Prior to the creation of the committee, superior court judges appointed counsel from a list of volunteers who had not been subjected to a screening process. *Id.* at 1277. After considering attorney applications and recommendations from judges, the committee issued a report that recommended a list of attorneys for inclusion on the panels. The chief judge then issued an administrative order establishing the attorney panels according to the committee's recommendations. *Id.* at 1277–78. The court held that the judges' development and implementation of the orders creating the attorney panels were acts of a different character than the employment decisions at issue in *Forrester* and, thus, were judicial in nature. *Id.* at 1286–87.

Considering the application of quasi-judicial immunity, the Second Circuit reached a different result in *Mitchell v. Fishbein*, 377 F.3d 157 (2d Cir. 2004). The plaintiff in *Mitchell* alleged that a screening committee that was responsible for reviewing attorney applications for appointment to a criminal defense panel terminated his appointment on the basis of his race and in retaliation for his complaints of racial discrimination. The court concluded that the committee was not entitled to quasi-judicial immunity because its proceedings were not similar to those of a judicial tribunal, and its decisions were not "integrally related" to "a concrete judicial case or controversy," even though they related to the judicial process in general. *Id.* at 173–74. The court found that the committee's function of generating a list of attorneys who were deemed qualified to represent indigent criminal defendants, including making additions to and deletions from the list, similar to the function at issue in *Ex Parte Virginia*, 100 U.S. 339 (1879). *Id.* at 174. In *Ex Parte Virginia*, the Court found a judge's act of preparing a general list of jurors for future trials

from a list of inhabitants of a county be "ministerial" in nature, rather than a judicial act. 100 U.S. at 348.

The Fifth Circuit reached a different conclusion in *Davis v. Tarrant County*, 565 F.3d 214 (5th Cir. 2009), in which the plaintiff-attorney sued state court judges who denied his application for inclusion on the felony appointment list. After setting forth the Texas procedures for appointing defense counsel in criminal cases and considering the applicable law, the court concluded that the creation of an appointment list is functionally inseparable from the act of appointing counsel in an individual case. Rejecting the Second Circuit's analysis in *Mitchell*, the court explained:

> [W]e believe that the act of selecting applicants for inclusion on a rotating list of attorneys eligible for court appointments is inextricably linked to and cannot be separated from the act of appointing counsel in a particular case, which is clearly a judicial act, and therefore that the judges' acts at issue in this suit must be considered to be protected by judicial immunity. We disagree with the *Mitchell* court that the act of selecting qualified attorneys for inclusion on an appointment list can be rigidly separated from the act of appointing an attorney in a particular case. The appointment process must be viewed holistically. In this case, the selection of applicants for inclusion on the list and the actual appointment of attorneys in specific cases occur as part of an appointment process that cannot be divided in a principled way into judicial and administrative acts. In light of the fact that the defendant judges have very limited discretion in deciding which attorney to appoint in a specific case—they may only deviate from the rotation system for good cause—decisions about which attorneys should be placed on the wheel functionally determine which attorney actually will be appointed in a particular case. Also, the nature of the decision of whether to select an applicant for inclusion on the appointment wheel and the decision of whether to appoint an attorney in a particular case are essentially identical; in both situations, the judge must assess an attorney's competence and ability to effectively represent clients before the court. Although the selection decision is not made in the context of a specific suit, the decision will presumably be made based upon an attorney's conduct in other cases before the court.

*Id.* at 226. The court also cited the Sixth Circuit's decision in *Sparks v. Character & Fitness Committee of Kentucky*, 859 F.2d 428 (6th Cir. 1988), for the proposition that other courts have found that "acts taken completely outside the context of a specific adjudication are properly classified as judicial and protected by absolute judicial immunity." *Id.* In *Sparks*, the Sixth Circuit

held that a bar applicant's action against the Kentucky Supreme Court and other defendants associated with admission to practice law in that state was barred by absolute judicial immunity. Key to the court's determination was the authority the Kentucky constitution vested in the Kentucky Supreme Court to promulgate rules governing admission to the bar and discipline of its members. *Id.* at 430. The court concluded:

> The court's exercise of its inherent power to choose its officers is substantially determinative of the character and quality of our entire judicial system, state and federal. Our system of justice depends, in substantial measure, upon the service of competent and qualified attorneys. The decision whether to admit or deny an applicant admission to the bar, and thus to determine the composition and quality of the bar, affects both the quality of justice in our courts and the public's perception of that quality. The decision is therefore integral to the very essence of the judicial process.

*Id.* (quoting initial opinion, 818 F.2d 541, 542–43 (6th Cir. 1987)).

In light of the foregoing cases, I find the Fifth Circuit's analysis in *Davis* persuasive. That is, the creation of a list or panel of attorneys who are eligible to be appointed in cases before the court is part and parcel of the appointment process in individual cases, and is thus functionally inseparable from the judicial act of appointing counsel. Moreover, as *Sparks* makes clear, an act traditionally performed by judges does not cease to be judicial in nature simply because it is not performed within the context of a judicial proceeding.

Even if Judge Garcia is not entitled to absolute immunity for the act of creating or approving a list or roster of attorneys who are eligible to represent respondents in child protective proceedings, I recommend that he is entitled to dismissal of this aspect of the Halls' claim on the ground that it fails to state a claim. Although the County Defendants did not move for dismissal on the basis of qualified immunity, they do argue in their motion that the Halls fail to state a claim upon which relief can be granted. (ECF No. 53 at PageID.1880.) The crux of the Halls' claim, as I understand it, is that Judge Garcia violated their right to due process by approving a roster of

attorneys for appointment funded by a grant from MDHHS to Ingham County and that fast-tracking appointment of counsel deprived them of their right to notice and an opportunity to be heard, the right to hire their own counsel, and the right to represent themselves. But it is not clear how any of this could have violated the Halls' right to due process. There is no indication that MDHHS controls the attorneys on the panel or that the grant to Ingham County somehow negatively affected their appointed counsel's representation. Moreover, there is no constitutional right to self-representation in civil cases, *see Chase v. City of Philadelphia*, 611 F. App'x 67, 68 n.5 (3d Cir. 2015); *Eitel v. Holland*, 787 F.2d 995, 998 (5th Cir. 1986); *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 137 (1st Cir. 1985), and the Halls do not allege that they ever tried to retain replacement counsel but were denied permission to do so.

### b.  Referee Brown

 Defendant Referee Brown's only act in this case was the issuance of an ex parte order to take the minors into custody. (EFC No. 38-3.) Juvenile and family court referees are entitled to "the full reach of judicial or . . . quasi-judicial immunity" when performing judicial acts. *Lucarell v. McNair*, 453 F.2d 836, 838 (6th Cir. 1972); *see also Whitaker v. Eveland*, Nos. 1:12-cv-1088, 1090, 2013 WL 5740830, at *8 (W.D. Mich. Oct. 23, 2013) ("The Sixth Circuit and the district courts in this state have held that state-court referees are entitled to absolute judicial immunity when acting in such a quasi-judicial capacity.") (collecting cases). Referee Brown's entry of the ex parte order is unquestionably a judicial action.

Although the Halls contend that they are only asserting claims against Referee Brown based on his administrative acts, they identify no act that he took that could be considered administrative. His sole act that provides any basis for a claim is entry of the ex parte order. Citing Mich. Comp. Laws § 712A.10, the Halls further contend that Referee Brown acted in the complete absence of jurisdiction because he was not permitted to issue orders under that statute. As noted

above, however, Mich. Comp. Laws § 712A.14b(1) authorizes a referee to issue an ex parte order authorizing the MDHHS to immediately take a child into custody if the referee finds that specified conditions are met. To the extent the Halls complain about deficiencies in Referee Brown's order or his failure to follow specified procedures, the appropriate remedy would have been an appeal. Moreover, consistent with the illustrations from *Norfleet* set forth above, even if Referee Brown acted in excess of the jurisdiction he had, he would still be immune from the Halls' claims challenging his ex parte order. 924 F.3d at 319; *see also Stern v. Mascio*, 262 F.3d 600, 607 (6th Cir. 2001) ("Even grave procedural errors or acts taken when no statute purports to confer on the court the authority purportedly exercised will not deprive a judge of judicial immunity.").

### c.      Defendants Strouse and Alvi-Waller

The Halls allege that Defendant Strouse scheduled the September 28, 2018 hearing on the petition less than a half hour later rather than 72 hours from the filing as required by statute. (ECF No. 46 at PageID.1791.) They further allege that on October 2, 2018, Defendant Alvi-Waller updated the "registry of action" and entered a "Record of Preliminary Hearing" to reflect an order for the "care and custody" and/or removal of the minors. (*Id.* at PageID.1801.) Defendants Strouse and Alvi-Waller contend that they are entitled to quasi-judicial immunity. I agree.

Courts have extended absolute judicial immunity to non-judicial officers who perform "quasi-judicial" functions. *Bush v. Rauch*, 38 F.3d 842, 847 (6th Cir. 1994). "Quasi-judicial immunity extends to those persons performing tasks so integral or intertwined with the judicial process that these persons are considered an arm of the judicial officer who is immune." *Id.* (citing *Scruggs v. Moellering*, 870 F.2d 376 (7th Cir. 1989)). In determining whether an individual is entitled to quasi-judicial immunity, courts employ a "functional" approach, looking "to the nature of the function performed, not the identity of the actor who performed it." *Id.* (citations and internal quotation marks omitted). A court employee who acts as a judge's designee or carries out a

43

function for which the judge is immune is also immune from suit. *Johnson*, 125 F.3d at 333. Scheduling a hearing and updating a docket and entering documents into the record are the sort of conduct for which court employees are immune. *See Harris v. Suter*, 3 F. App'x 365, 366 (6th Cir. 2001) ("When a clerk files or refuses to file a document with the court, he is entitled to immunity, provided the acts complained of are within the clerk's jurisdiction."); *Pearson v. Oakland Cnty. Circuit Court*, No. 1:15-cv22, 2015 WL 728475, at *4 (W.D. Mich. Feb. 19, 2015) (court clerk and staff entitled to immunity for docketing the plaintiff's filings and rejecting pleadings that did not comply with court rules); *Borden v. Raley*, No. 1:08CV-P27, 2008 WL 2038903, at *4 (W.D. Ky. May 12, 2008) (concluding that clerk of court who allegedly have failed to promptly schedule hearings was immune from suit for such actions or delays); *Jonaitis v. Morrison*, No. 1:07-cv-1002, 2008 WL 151252, at *3 (W.D. Mich. Jan. 14, 2008) (holding that "processing documents submitted by a litigant, deciding whether, when, and how to file them, deciding whether a litigant has made a motion, and scheduling or not scheduling hearings on a purported motion, are quintessential quasi-judicial functions" for purposes of absolute immunity (footnotes omitted)).

Therefore, I recommend that the claims against Defendants Strouse and Alvi-Waller be dismissed because they are entitled to absolute quasi-judicial immunity.

### 4. Defendant Siemon

The County Defendants argue that Defendant Siemon, the Ingham County prosecutor, is entitled to absolute prosecutorial immunity for her acts relating to the prosecution of the child protective proceeding. (ECF No. 53 at PageID.1898–99.) The Halls do not dispute that Siemon is entitled to absolute immunity for her conduct relating to the child protective proceeding. *See Imbler v. Pachtman*, 424 U.S. 409, 430 (1976); *Cunningham*, 842 F. App'x at 966–67. They contend, however, that they are suing her for breach of her duties to instruct MDHHS on how to process petitions made to the court. (ECF No. 59 at PageID.2067.) As the County Defendants note,

however, by statute, the MDHHS, a state agency, obtains its legal advice from the Michigan Attorney General. Mich. Comp. Laws § 14.32; *see also People v. Penn*, 102 Mich. App. 731, 733 (1981) ("It has long been recognized, however, that Attorney General opinions are binding on state agencies.") (citing *Travis City Sch. Dist. v. Attorney Gen.*, 384 Mich. 390, 410 n.2 (1971)). Thus, even if such a claim were cognizable, Siemon is not the proper defendant for the claim. The Halls claims against Siemon should be dismissed.[13]

### 5. Failure to Train and Supervise Allegations

Consistent with the recommendation regarding Defendant Siemon, the Halls' failure to train and supervise allegations against Judge Garcia should be dismissed because he had no obligation to train the MDHHS employees or its personnel. Moreover, because the Ingham County Circuit Court and its personnel are considered an arm of the State of Michigan for purposes of the Eleventh Amendment, such liability cannot be imposed against Judge Garcia on a theory of municipal liability.

### 6. Section 1985 Conspiracy

The County Defendants contend that absolute and quasi-judicial immunity bars the Halls' Section 1985(3) conspiracy claim against them. They are correct. *See Harvey v. Loftus*, 505 F. App'x 87, 90 (3d Cir. 2012) ("Judicial immunity attaches even if the act was done in furtherance of a conspiracy.") (citing *Dennis v. Sparks*, 449 U.S. 24, 26–27 (1980)); *Holloway v. Walker*, 765 F.2d 517, 524 (5th Cir. 1985) ("[I]t is irrelevant that Walker is alleged to have performed those acts pursuant to a bribe or a conspiracy; they remain 'judicial acts.'"); *Ashelman v. Pope*, 793 F.2d 1072, 1077–78 (9th Cir. 1986) ("[A] conspiracy between judge and prosecutor to predetermine the

---

[13] This recommendation pertains to all claims against Siemon, including the Fourth Amendment claim in which the Halls assert that Siemon failed to advise the State Defendants as to various matters.

outcome of a judicial proceeding, while clearly improper, nevertheless does not pierce the immunity extended to judges . . . ."); *John v. Barron*, 897 F.2d 1387, 1392 (7th Cir. 1990) ("[J]udges, on mere allegations of conspiracy, could be hauled into court and made to defend their judicial acts, the precise result that judicial immunity was designed to avoid.") (citing *Ashelman*, 793 F.2d at 1077). Moreover, as previously noted, the conspiracy claim is subject to dismissal for the independent reason that it is conclusory in nature and fails to satisfy the pleading requirements for a Section 1985(3) claim.

### 6.    IIED Claim

Finally, the County Defendants contend that they are entitled to absolute and quasi-judicial immunity with regard to the IIED claim pursuant to Mich. Comp. Laws § 691.1407(5) and the common law. *See Denhof v. Challa*, 311 Mich. App. 499, 511–14 (2015). The Halls failed to respond to the argument, thus waiving any argument on the issue. *See Gomery v. Continental Cas. Co.*, No. 1:13-cv-947, 2014 WL 4209648, at *4 (W.D. Mich. Aug. 25, 2014) (collecting cases). In addition, as noted above in the analysis of the State Defendants' motion, the Halls fail to properly plead an IIED claim.

### III.    Motion for Leave to Amend

The Halls seek leave to file a second amended complaint to add additional details, clarify their prior allegations, reword some of their prior allegations, and remove some of their prior allegations. In addition, they seek to add two new exhibits. (ECF No. 66 at PageID.2171.) The State Defendants responded to the motion (ECF No. 69), but the County Defendants did not.

Pursuant to Fed. R. Civ. P. 15(a)(2), "a court should freely give leave [to amend] when justice so requires." A court may deny leave "in cases of undue delay, undue prejudice to the opposing party, bad faith, dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or futility." *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999)

(citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "Ordinarily, delay alone, does not justify denial

of leave to amend." *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002). A motion to amend

is considered futile if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6). *Rose v.*

*Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000). In some cases, a court may

also deny a motion to amend as futile where the defendant would be entitled to qualified immunity.

*See Haverstick Enters., Inc. v. Financial Fed. Credit, Inc.*, 32 F.3d 989, 995–96 (6th Cir. 1994).

The Halls' proposed amendment pertains to the following four areas:

- The obligation of a county prosecutor under the Michigan Child Protection Law to adopt and implement child abuse and neglect investigation and interview protocols using the model protocols developed by the Governor's task force on children's justice (Proposed 2d Am. Compl., ECF No. 66-3 at PageID.2198–99);
- Allegations pertaining to the removal of the minors in Illinois (*id.* at PageID.2208–09);
- The characterization of Referee Brown's September 28, 2018 order (*id.* at PageID.2202–03); and
- Defendant Bush's search of the trailer on September 27, 2018 (*id.* at PageID.2194.).

For the reasons set forth below, the motion is denied because it is futile and brought in bad faith.

Each area will be addressed in turn.

A.     **Adoption of Protocols**

The Halls' purpose in adding allegations about a county prosecutor's statutory obligation

under the Michigan Child Protection Law to develop and implement child abuse and neglect

investigation and interview protocols for law enforcement is not clear. *See* Mich. Comp. Laws. §

722.628(4) and (6). Such allegations do not save the Halls' claims from dismissal. To the extent

the Halls contend that Defendant Bush and other State Defendants failed to follow such protocols

during their investigation, the claim would be barred by absolute immunity. In addition, courts

faced with claims based on noncompliance with such forensic protocols have granted qualified

immunity on the grounds that noncompliance does not amount to a constitutional violation. *See*

*Trakhtenberg v. Oakland Cnty.*, No. 14-13854, 2015 WL 6449327, at \*19 (E.D. Mich. Oct. 26, 2015) (citing *Palmer v. Adams*, No. 10-cv-14500, 2012 WL 2071810, at \*11 (E.D. Mich. June 8, 2012) ("Importantly, Plaintiff provides no legal support for her theory that failure to conduct an investigation in strict compliance with the CFP and Forensic Interview Protocol amounts to a violation of a clearly established constitutional right.")). On the other hand, to the extent the Halls contend that the allegation somehow supports a claim that Defendant Siemon failed to train or supervise Defendant Bush and the other CPS workers, the claim fails because, as explained above, Siemon was not responsible for training or supervising MDHHS employees.

### B.    Removal of the Children in Illinois

The Halls seek to bolster their allegations relating to the removal of the minors from Illinois to Michigan based on the ex parte removal orders, apparently in order to bring this case in line with the facts at issue in *Brent*, *supra*. But even with the additional allegations, this case is still distinguishable from *Brent*, meaning that Defendants Bush and Ermatinger would be entitled to qualified immunity. *See Cunningham*, 842 F. App'x at 968–69.[14] First, the social worker in *Brent* was alleged to have included "known falsities" in the petition she submitted to obtain the removal order. *Brent*, 901 F.3d at 685. Here, however, while the Halls allege that the petition misrepresented the truth about Heidi Hall's cooperation and objections on constitutional grounds and omitted exonerating evidence regarding Heidi Hall's mental health treatment and the Halls' medical marijuana patient status, they allege only that Bush had *knowledge* of omitted exonerating evidence, not inclusion of false information. (ECF No. 66-3 at PageID.2202.) Second, as previously noted, there is no allegation, as was the case in *Brent*, that Bush or Ermatinger recruited Illinois officials under false pretenses. *Id.* at 688. Moreover—again in contrast to *Brent*—the

---

[14] It is notable that the panel in *Cunningham* applied qualified immunity on a motion to dismiss. 842 F. App'x at 963.

proposed amendment alleges that the State Defendants never sent the allegedly "facially invalid court order" to the Illinois officials prior to the removal. (*Id.* at PageID.2209.) In light of these differences, the facts of *Brent* are not sufficiently particularized to have placed the lawfulness of Defendants' actions "beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

### C.      Referee Brown's Order

The Halls include additional allegations in the proposed amendment attacking the validity of Referee Brown's ex parte order, asserting that it was neither an ex parte protective custody order nor an interim order pending preliminary hearing. (*Id.* at 2202.) As discussed above, Referee Brown had statutory authorization to issue an ex parte removal order under Mich. Comp. Laws § 712A.14b(1). Although the order was not titled or identified as an ex parte interim placement order, the substance of the order, which placed the minors with the MDHHS, was consistent with statute's authorization. (ECF No. 38-3 at PageID.1624.) Moreover, as previously noted, Judge Garcia's orders issued later that evening specifically authorized the removal.

### D.      September 27, 2018 Trailer Search

Paragraph 63 of the proposed amendment omits the Halls' admission in both their original and amended complaints that they "consented to a search" of their trailer by Defendant Bush on September 27, 2018. (ECF No. 1 at PageID.77; ECF No. 46 at PageID.1786.) Instead, the Halls now claim, in apparent avoidance of the motion to dismiss, that they "did not physically resist a search of the[ir] . . . travel trailer." (ECF No. 66-3 at PageID.2194.)

"Under federal law, stipulations and admissions in the pleadings are generally binding on the parties and the Court." *Ferguson v. Neighborhood Hous. Servs. of Cleveland, Inc.*, 780 F.2d 549, 551 (6th Cir. 1986) (brackets and internal quotation marks omitted). A statement will be binding only if it is "deliberate, clear and unambiguous," *MacDonald v. General Motors Corp.*, 110 F.3d 337, 340 (6th Cir. 1997), and "expressly concede[s] . . . an alleged fact." *Id.* (quoting

49

*United States v. Belculfine*, 527 F.2d 941, 944 (1st Cir. 1975)). A party may be relieved of an admission through amendment. *Kay v. Minacs Grp. (USA), Inc.*, 580 F. App'x 327, 331 (6th Cir. 2014) (citing *American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988).

Here, the Halls' admission in their first two pleadings that they consented to the search was deliberate, clear, and unambiguous. Moreover, they do not assert that the statement was a mistake. In fact, after being ordered to substantially condense their initial complaint, they were required to parse over 500 pages of allegations to include only those that were most material and pertinent to their claims. Having done so, they still included their admission of consent in their first amended complaint. The issue, then, is whether the Court should allow an amendment to relieve the Halls of this admission. The State Defendants cite *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137 (5th Cir. 1993), as support for the contention that the Halls' proposed amendment suggests bad faith. *Wimm* does support a finding of bad faith, although it involved different circumstances, as the plaintiffs in *Wimm* sought to *add* new allegations known to them for many months after the defendant filed a motion for summary judgment. *Id.* at 140–41. Nonetheless, courts have held that in circumstances such as this—where the plaintiff deletes an allegation to avoid a motion to dismiss—the court is free to accept the original allegation. *See Gause v. Chase Home Fin. LLC*, No. 09-CV-4886, 2010 WL 843945, at *2 (E.D.N.Y. Mar. 9, 2010) (amended complaint's omission of original complaint's allegation that two defendants were New York citizens in order to create diversity jurisdiction was frivolous); *Colliton v. Cravath, Swaine & Moore LLP*, No. 08 Civ 0400, 2008 WL 4386764, at *6 (S.D.N.Y. Sept. 24, 2008) ("Where a 'plaintiff blatantly changes his statement of the facts in order to respond to the defendant['s] motion to dismiss . . . [and] directly contradicts the facts set forth in his original complaint,' a court is authorized 'to

accept the facts described in the original complaint as true.'" (quoting *Wallace v. New York City Dep't of Corr.*, No. 95 Cv. 4404, 1996 WL 586797, at *2 (E.D.N.Y. Oct. 9, 1996))).

Here, of course, the only allegation before the Court is the Halls' admission of consent set forth in the amended complaint. Because consent is a factual issue peculiarly within the Halls' knowledge and is not something they would learn through discovery, I find it appropriate in these circumstances to deny leave to amend on the ground of bad faith. *See Austin v. Ford Models, Inc.*, 149 F.3d 148, 155 (2d Cir. 1998), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (affirming denial of leave to amend on the basis that the plaintiff could not erase admissions in her first complaint through amendment).

### IV. Conclusion

For the foregoing reasons, I recommend that the Court **grant** the State Defendants' Motions to Dismiss (ECF Nos. 37 and 50) and the County Defendants' Motion to Dismiss (ECF No. 52).

In addition, **IT IS ORDERED** that Plaintiffs' Motion for Leave to Amend (ECF No. 65) is **DENIED**.

Dated: July 21, 2021                                        /s/ Sally J. Berens
                                                            SALLY J. BERENS
                                                            U.S. Magistrate Judge

### NOTICE

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).